**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CHICAGO HEADLINE CLUB, BLOCK CLUB CHICAGO, CHICAGO NEWSPAPER GUILD LOCAL 34071, NABET-CWA LOCAL 54041, ILLINOIS PRESS ASSOCIATION, RAVEN GEARY, CHARLES THRUSH, STEPHEN HELD, DAVID BLACK, WILLIAM PAULSON, AUTUMN REIDY-HAMER, and LEIGH KUNKEL, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | **No. 25-cv-12173** |
| v. | ) ) ) | **PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations, ICE; RUSSELL HOTT, Chicago Field Office Director, ICE; RODNEY S. SCOTT, Commissioner, U.S. Customs and Border Protection (CBP); GREGORY BOVINO, Chief Border Patrol Agent, CBP; DANIEL DRISCOLL, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); WILLIAM K. MARSHALL III, Director of the Federal Bureau of Prisons (BOP); PAMELA BONDI, Attorney General of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF JUSTICE; UNIDENTIFIED FEDERAL OFFICER DEFENDANTS; UNIDENTIFIED FEDERAL AGENCY DEFENDANTS; and DONALD J. TRUMP, President of the United States, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## COMPLAINT

PLAINTIFFS, CHICAGO HEADLINE CLUB, BLOCK CLUB CHICAGO, CHICAGO NEWSPAPER GUILD LOCAL 34071, NABET-CWA LOCAL 54041, ILLINOIS PRESS ASSOCIATION, RAVEN GEARY, CHARLES THRUSH, STEPHEN HELD, DAVID BLACK, WILLIAM PAULSON, AUTUMN REIDY-HAMER, and LEIGH KUNKEL, on behalf of themselves and others similarly situated, by their undersigned attorneys, hereby complain against Defendants KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations, ICE; RUSSELL HOTT, Chicago Field Office Director, ICE; RODNEY S. SCOTT, Commissioner, U.S. Customs and Border Protection (CBP); GREGORY BOVINO, Chief Border Patrol Agent, CBP; DANIEL DRISCOLL, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); WILLIAM K. MARSHALL III, Director of the Federal Bureau of Prisons (BOP); PAMELA BONDI, Attorney General of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF JUSTICE; UNIDENTIFIED FEDERAL OFFICER DEFENDANTS; UNIDENTIFIED FEDERAL AGENCY DEFENDANTS; and DONALD J. TRUMP, President of the United States, in their official capacities, and state as follows:

## INTRODUCTION

1.      The federal government has sent federal forces to cities across the United States in order to prevent the press, elected officials, religious leaders, and civilians engaged in peaceful protest from exercising their First Amendment rights.

2.      All over the country, federal agents have shot, gassed, and detained individuals engaged in cherished and protected activities.

3.      Never in modern times has the federal government undermined bedrock constitutional protections on this scale or usurped states' police power by directing federal agents to carry out an illegal mission against the people for the government's own benefit.

4.      This lawsuit concerns the right of the demonstrator Plaintiffs to exercise their First Amendment rights to peacefully protest and to exercise their religion in the area around the ICE facility in Broadview, Illinois, and in other places where demonstrators are opposing the Administration's federal incursion into the Chicagoland area. And it concerns the rights of the journalist Plaintiffs to observe, record, and report on the federal agents' activities and the public's demonstrations against them.

5.      Plaintiffs endeavor to protect their basic constitutional rights to express their views opposing the lawlessness unleashed on the Chicagoland area, and to safely report on that public outcry, without fear of again being shot, gassed, and beaten by federal agents.

6.      Following the announcement of "Operation Midway Blitz" in early September 2025, the Trump Administration has ramped up immigration enforcement operations and deployed federal officers to Broadview and other Chicagoland area locations.

7.      Civilians, elected officials, and religious leaders in the community have continually gathered outside of the Broadview ICE facility to make their voices heard in

opposition to the federal government's policies and actions. The demonstrations have been staged daily for 30 days as of the filing of this complaint and are ongoing. The vast majority of protesters are animated but peaceful. The people of faith gather in prayer. Collectively, they express their views with chants, prayer, and uplifted voices.

8.     Local and national press have continuously covered the federal law enforcement deployment to Chicago and the Broadview ICE facility in particular, sending reporters to the scene. They have written countless news articles, keeping the public informed and facilitating public debate in furtherance of the bedrock American democratic principle that the government is accountable to its people.

9.     Federal agents have responded with a pattern of extreme brutality in a concerted and ongoing effort to silence the press and civilians. Dressed in full combat gear, often masked, carrying weapons, bearing flash grenades and tear gas canisters, and marching in formation, federal agents have repeatedly advanced upon those present at the scene who posed no imminent threat to law enforcement. Snipers with guns loaded with pepper balls, paintballs, and rubber bullets are stationed on the roof of the Broadview ICE facility with their weapons trained on the press and civilians. Federal agents have tackled and slammed people to the ground; they have lobbed flash grenades and tear gas canisters indiscriminately into the crowd; they have fired rubber bullets and pepper balls at selected individuals; and they have cursed and shouted at demonstrators to provoke them.

10.     In addition, federal agents have repeatedly fired less lethal crowd-control munitions directly at clearly identifiable members of the press who were engaged in reporting. They have subjected members of the press to tear gas. And members of the press have been threatened and arrested by federal officers while reporting near the Broadview facility for no

4

reason other than in retaliation for documenting the federal response to the demonstrations.

11.     Many civilians and press are being injured and sickened, to the point of serious injuries. Some are being randomly singled out for arrest. They are tackled to the ground, handcuffed, and marched into the Broadview ICE facility, where they are detained *incommunicado* for hours.

12.     No legitimate purpose exists for this brutality or for these arrests. The officers are not physically threatened. No government property is threatened. Defendants are acting to intimidate and silence the press and civilians engaged in protected First Amendment activities.

13.     Plaintiffs seek this Court's protection of their constitutional rights, and they ask the Court to enjoin and prevent Defendants from further use of their unconstitutional tactics.

## PARTIES

### Journalist Plaintiffs

14.     Plaintiff CHICAGO HEADLINE CLUB is a non-profit membership organization of professional journalists working in the Chicagoland area with hundreds of professional journalist members. The Chicago Headline Club is the largest chapter of the Society of Professional Journalists, a national non-profit organization. The Chicago Headline Club's mission is to support member (and non-member) journalists in the Chicagoland area and to promote the values of a free press. The organization pursues this mission by offering trainings, networking opportunities, legislative advocacy, scholarships for young journalists, and by maintaining a legal defense fund to support journalists' First Amendment rights. Several journalist members of the Chicago Headline Club have been shot at with pepper balls by federal officers and subjected to other force while reporting at the Broadview facility.

15.     Plaintiff BLOCK CLUB CHICAGO is a nonprofit news organization registered in

5

the State of Illinois. The organization delivers daily, nonpartisan, and essential coverage of Chicago's diverse neighborhoods through its newsletter, news website, and social media pages. Block Club's website is read by more than a million unique readers each month. Block Club has been covering the protests at the Broadview facility since mid-September. During that time, at least four Block Club reporters or photographers were hit with pepper balls by federal officers at the Broadview ICE facility and were at risk of enduring other forms of force, despite standing on public ways and apart from the crowd, wearing visible press credentials, and displaying other visible indications they were there as members of the press. The danger to Block Club's journalists has made it far harder to carry out its reporting at Broadview.

16. Plaintiff THE CHICAGO NEWSPAPER GUILD LOCAL 34071 (CNG) is a member-led union that is a member chapter of The NewsGuild-CWA. The Guild's membership includes journalists at the Chicago Tribune, Chicago Reader, Chicago Sun Times, and City Bureau, as well as other members including Cook County Court Interpreters and the staff of labor unions and non-profits based in the Chicago area. As a labor union, CNG bargains collective agreements, and represents and organizes workers. CNG has several members who have been targeted by federal officers while reporting at the Broadview ICE facility despite being visibly identifiable as members of the press and not violating any laws or disobeying any lawful orders.

17. Plaintiff NABET-CWA LOCAL 54041 is the Chicago chapter of the National Association of Broadcast Employees & Technicians nationwide membership union for news media. Local 54041 represents photographers and other journalists at Chicagoland broadcast news channels such as WLS (ABC affiliate), WFLD (Fox affiliate), WMAQ (NBC Universal affiliate), WSNS (Telemundo affiliate), and WGBO (Univision affiliate), and others. NABET's

mission includes advocating for its members' working conditions and aiding them in the practice of journalism. As the federal violence toward journalists at the Broadview ICE facility has intensified, Plaintiff NABET-CWA has been forced to divert significant resources to tracking and responding to attacks on journalists by federal agents. At least two NABET-CWA members have been assaulted by federal agents while practicing their profession at Broadview in the past two weeks: one member was subjected to a cloud of tear gas when federal agents ordered him to get out of his clearly marked press vehicle, and the other was shot at close range in the chest with pepper balls by a federal agent.

18.     Plaintiff ILLINOIS PRESS ASSOCIATION is a nonprofit membership organization registered in the State of Illinois. The Illinois Press Association is a statewide trade association dedicated to preserving and protecting the editorial and business interests of Illinois Newspapers. The Illinois Press Association includes approximately 350 newspapers, including the Chicago Sun Times, the Chicago Tribune and the Daily Herald of Arlington Heights. The Illinois Press Association member organizations have been and will continue to cover the protests against ICE and the federal response to these protests, however the ability of these member-organizations to do so has been impaired by the violence that their reporters have encountered from federal agents.

19.     The organizations listed in paragraphs 14 to 18 above bring this action on their own behalf and, as applicable, on behalf of their members.

20.     Plaintiff RAVEN GEARY is a resident of Chicago, Illinois. Plaintiff Geary is an investigative journalist and co-founder of Unraveled Press, a local media organization. Plaintiff Geary has been reporting on the protests and federal response at the Broadview ICE facility since the beginning of September 2025. In that time, Plaintiff Geary, who always wears her press

credentials as well as a helmet with "PRESS" on it, has been fired at by federal agents with pepper balls on several occasions, including on the morning of Friday, September 25, when she was hit directly in the face by an officer who shot her from approximately 30 feet away while she was standing in a public parking area, taking a picture of him. Despite the violence she has experienced, she intends to return to Broadview to continue reporting on the protests and the federal crackdown on them.

21.     Plaintiff CHARLES THRUSH is a journalism student and a contract reporter for Plaintiff Block Club Chicago. Plaintiff Thrush has been sent by Block Club to the Broadview ICE facility to report on the protests and the federal agents' actions targeting them. Plaintiff Thrush was shot in the hand while clearly identifiable as a member of the press, standing apart from protesters and videotaping as federal agents fired pepper balls at two peaceful protesters attempting to shelter behind a collapsible umbrella. Plaintiff Thrush was also subjected to tear gas and had to run to safety when officers indiscriminately fired chemical agents and kinetic crowd control devices into the crowd. Plaintiff Thrush intends to return to the Broadview ICE facility to continue reporting on the protests, but he has refrained from doing so on at least one occasion due to his (and his Block Club editors') fears for his safety.

22.     Plaintiff STEPHEN HELD is a journalist and resident of Chicago. Plaintiff Held has been attending the protests at the Broadview ICE facility since they began in September and is well known to the federal officers at the facility as a member of the press. Plaintiff Held documents the protesters and the federal officer response to them with a video camera and on social media for Unraveled Press, which he co-founded. Plaintiff Held has been shot in the groin by federal officers. And on Saturday September 27, 2025, he was arrested while on a public parkway videoing officers arresting a protester and attempting to obey conflicting instructions

from angry federal officers. Plaintiff Held, who was wearing no fewer than four visible indications that he was a member of the press, was tackled, thrown to the ground, handcuffed, and brought inside the Broadview facility. Hours later, he was released with no charges because he had done nothing wrong. Plaintiff Held wants to continue his work reporting at the Broadview ICE facility but is afraid that he will again be targeted if he returns.

**Protester Plaintiffs**

23.     Plaintiff DAVID BLACK is an ordained minister in the Presbyterian Church (PCUSA) who serves as Senior Pastor and Head of Staff at the First Presbyterian Church of Chicago in the Woodlawn neighborhood. As Rev. Black stood in the street offering prayers and urging ICE officers stationed on the roof of the Broadview ICE facility to repent from their unnecessarily brutal enforcement of the immigration laws, the ICE officers suddenly and without warning fired upon him, striking him repeatedly in the head with pepper balls. Moments later he was sprayed in the face with tear gas by officers on the street. Rev. Black is called by his faith to return to Broadview to pray for ICE officers there, but his experience requires him to overcome fear in order to do so.

24.     Plaintiff WILLIAM PAULSON is a 67-year-old retired union painter and student at the City Colleges of Chicago who came to the Broadview ICE facility to express his opinions in opposition to ICE's tactics in enforcing the immigration laws and to bear witness there. While Plaintiff Paulson was on the public way and in the company of other protesters, a group of ICE officers emerged from behind the fence surrounding the ICE facility and, without warning or ordering dispersal, began lobbing canisters of tear gas into the crowd and throwing flash bang grenades. He was overwhelmed and began to vomit. He wishes to return to Broadview to protest, but he is reluctant to do so.

25.     Plaintiff AUTUMN REIDY-HAMER is an Oak Park resident and mother who came to the Broadview ICE facility to protest because she disagrees with rounding up immigrants, separating them from their families, and denying them access to lawyers. She wanted to gather with neighbors and elected officials to speak out against this peacefully and to say that the federal officers' actions do not represent her as a citizen and constituent. A federal officer threw a flash-bang grenade next to her resulting in temporary hearing loss and ringing in her ear. Federal officers also tear gassed her. She is unable to safely exercise her First Amendment rights in the face of federal officers' actions.

26.     Plaintiff LEIGH KUNKEL is a 38-year-old resident of Chicago. She went to the Broadview ICE facility on the morning of Friday September 26th to show solidarity for the members of her community who were being held inside and support those bravely taking a peaceful stand by protesting outside. She was struck in the back of the head and then in the nose by pepper balls shot by a federal officer from close range. When she was shot, she was taking cover behind a van after federal officers had begun shooting pepper balls into the crowd without any warning or apparent justification. She left the protest with welts, a bloody nose, and a newfound fear of exercising her First Amendment rights. She will return to the Broadview ICE facility to continue protesting and bearing witness, but she is afraid that when she does so, she will again be met with physical violence.

**Federal Defendants**

27.     Defendant KRISTI NOEM is Secretary of U.S. Department of Homeland Security (DHS). DHS is a Cabinet-level Department of the U.S. government. Its stated missions include anti-terrorism, border security, immigration, and customs. It was created in 2002, combining 22

10

different federal departments and agencies into a single Cabinet agency.

28.     Defendant TODD LYONS is Acting Director and the senior official currently performing the duties of the Director of the U.S. Immigration and Customs Enforcement (ICE), an agency housed within DHS. Its stated mission is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety."

29.     Defendant MARCOS CHARLES is Acting Executive Associate Director of Enforcement and Removal Operations within ICE.

30.     Defendant RUSSELL HOTT is the Chicago Field Office Director for ICE. ICE employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters.

31.     Defendant RODNEY S. SCOTT is the Commissioner of the U.S. Customs and Border Protection (CBP). CBP is an agency within DHS. Its stated mission is to "[p]rotect the American people, safeguard our borders, and enhance the nation's economic prosperity." CBP employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters.

32.     Defendant GREGORY BOVINO is titularly the Chief Patrol Agent of the U.S. Border Patrol's El Centro Sector. After leading similarly violent and unlawful immigration enforcement efforts in Los Angeles in the summer of 2025, Bovino was reassigned to Chicago in September 2025. On September 27, 2025, he directed federal officers to use excessive force against protesters and journalists at Broadview, and he used such force himself.

33.     Defendant DANIEL DRISCOLL is the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). The ATF's stated mission is "[t]o conduct investigations utilizing our unique expertise, partnerships, and intelligence to enhance public

safety by enforcing the laws and regulations and uphold the Constitution of the United States of America." ATF employees have been stationed at the Broadview ICE facility and are among the federal officers who have used excessive force against protesters and journalists.

34.     Defendant WILLIAM K. MARSHALL III is the Director of the Federal Bureau of Prisons (BOP), an agency within the U.S. Department of Justice. BOP employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters and journalists.

35.     Defendant PAMELA BONDI is Attorney General of the United States, and in that position, oversees the U.S. Department of Justice.

36.     Defendant U.S. Department of Homeland Security is a department of the executive branch of the United States government, responsible for coordinating immigration enforcement actions. ICE, CBP, and the DHS Management Directorate are component agencies within the Department of Homeland Security. Homeland Security Investigations (HSI) is a subordinate agency housed within ICE, while the Federal Protective Service (FPS) is a subordinate agency housed within the DHS Management Directorate. Likewise, CBP contains multiple law enforcement offices, including the U.S. Border Patrol and Office of Field Operations.

37.     Defendant U.S. Department of Justice (DOJ) is a department of the executive branch of the United States government, responsible for enforcing federal law. The ATF and the Bureau of Prisons are component agencies within the DOJ.

38.     UNIDENTIFIED FEDERAL AGENCIES are unidentified agencies or departments of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which

12

they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

39.     UNIDENTIFIED FEDERAL OFFICER DEFENDANTS are unidentified agents and officers of federal agencies, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, who are participating in the unlawful conduct described in this Complaint.

40.     Defendant DONALD J. TRUMP is the President of the United States and chief executive with responsibility for the federal agencies and agents acting under his authority.

41.     Each of the defendants is sued in their official capacity.

## ALLEGATIONS OF FACT

### The Trump Administration Deploys or Threatens to Deploy
### Federal Law Enforcement Officers And Military to Cities Across the United States

42.     During the summer and fall of 2025, the Trump Administration deployed federal forces, including federal law enforcement officers and military forces, to cities across the United States. The Administration's federal force deployments have aimed to suppress speech and dissent, with which the Administration disagrees. The Trump Administration has referred to American civilians engaged in protected First Amendment activities as "anarchists," "agitators," "violent mobs," "crazy people," and "the enemy from within."

43.     In every city to which they have been deployed, federal forces have used unjustified violence against the press, elected officials, religious leaders, and private individuals engaged in peaceful and protected activities, using extreme force indiscriminately and arresting people without any legal basis.

44.     These federal forces are not trained to conduct local policing, and their presence is superfluous to trained local police agencies, who are well-equipped to address issues of local law

enforcement. Local officials have roundly disclaimed the need for federal assistance in policing.

**Injunctive Relief in Los Angeles Prohibits Federal Forces**
**From Violently Suppressing Lawful Protests**

45.     In early June 2025, the Trump Administration, without notice to local officials, began a series of indiscriminate immigration raids across Los Angeles, in which masked federal officers in paramilitary gear brandished rifles and abducted community members from churches, local businesses, and courthouses.

46.     Rallying to oppose the actions taken against their friends and neighbors, community members protested at locations in which ICE officers were believed to be holding community members, including the Federal Building at the Roybal Complex.

47.     The overwhelming majority of the protesters exercised their First Amendment rights in a peaceful, nonviolent, and legally compliant manner. While there were isolated instances of individuals acting unlawfully, state and local law enforcement officials responded to such actions in a prompt, professional manner.

48.     Nevertheless, the Trump Administration deployed thousands of National Guard troops and federal law enforcement officers to Los Angeles, purportedly to quell the violence.

49.     Instead, the federal forces escalated the violence against civilians in Los Angeles, launching attacks on the press and peaceful protesters. Among other tactics, the federal forces fired volleys of tear gas, pepper balls, chemical spray, and rubber bullets indiscriminately into crowds of civilians.

50.     The Trump Administration's deployment of federal forces and the tactics used in Los Angeles are at issue in *Los Angeles Press Club v. Noem*, No. 2:25-cv-05563 (C.D. Cal. 2025) (Vera, J.). In that litigation, the district judge, among other things, has preliminarily enjoined the federal defendants from "[u]sing crowd control weapons (including kinetic impact

projectiles ("KIP"s), chemical irritants, batons, and flash-bang grenades) on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person." *L.A. Press Club*, No. 2:25-cv-05563, Doc. No. 55 at 43 (Sept. 10, 2025), appeal filed, *L.A. Press Club v. Noem*, No. 25-5975 (9th Cir. Sep. 19, 2025).

51.     As the federal deployment of forces in Los Angeles continued, President Trump warned that the deployment in California was "the first, perhaps, of many" federal efforts to suppress protected First Amendment activities, and that civilians demonstrating in future would be met with "equal or greater force."

### Federal Forces Are Deployed in Washington, D.C.

52.     Shortly thereafter, in August 2025, the Trump Administration deployed federal forces in Washington, D.C.

53.     Despite an historic decrease in the rate of violent crime in that city, President Trump declared that local crime was an emergency and assumed control of the city's Metropolitan Police Department.

54.     At the same time, the Trump Administration deployed thousands of National Guardsmen in Washington, D.C., authorizing them to carry firearms. A majority of these guardsmen were from out-of-state.

55.     In response, thousands of residents have gathered to peacefully protest the deployment of federal forces and National Guard on city streets.

56.     These forces have patrolled the capital's main tourist areas and neighborhoods across the city, fully armed, traveling in armored vehicles, and wearing military fatigues.

57.     The District of Columbia filed a lawsuit on September 4, 2025, seeking

declaratory and injunctive relief to enjoin the overreach by the executive branch. The issues are currently being litigated.

### The Trump Administration Deploys Federal Forces to Portland, Memphis, and New Orleans

58.     In Portland, Oregon, civilians began peaceful protests at an ICE facility in early June. Federal agents responded to these protests by using tear gas, pepper balls, and smoke grenades indiscriminately, and by arresting protesters.

59.     On September 27, 2025, President Trump, stating that he was acting at the request of Defendant Noem, ordered Secretary of Defense Pete Hegseth, "to protect War ravaged Portland and any of our ICE facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force if necessary," even though there was no evidence of any siege or attack in Portland. The Trump Administration has federalized and will imminently deploy National Guardsmen to Portland, and it has reportedly considered sending troops from the 82nd Airborne Division, an elite combat division of the U.S. Army, to Portland.

60.     In response to the threat and deployment of the National Guard in Portland, peaceful protests have continued at the ICE facility. Federal agents have tackled protesters and indiscriminately used chemical agents.

61.     In addition, Oregon and the City of Portland have filed for a temporary restraining order to enjoin the deployment of National Guardsmen in Portland. Officials have repeatedly made clear that they can manage their own public safety needs, without the interference of federal agents or military forces. On October 4, 2025, a district court enjoined the Trump Administration from implementing its memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland. *See* Opinion and Order Granting Motion

16

for Temporary Restraining Order, *Oregon v. Trump*, 3:25-cv-01756, Doc. No. 56 (D. Or. Oct. 4, 2025) (Immergut, J.). Despite this court order, the Trump Administration has signaled its intent to deploy California National Guard service members to Oregon.

62.     In New Orleans, Louisiana, the Trump Administration has made similar threats to deploy military forces. On September 3, President Trump said, "We're making a determination now—do we go to Chicago, or do we go to a place like New Orleans where we have a great governor, Jeff Landry, who wants us to come in and straighten out a very nice section of this country that's become quite tough, quite bad. So we're going to maybe Louisiana and you have New Orleans, which has a crime problem. We'll straighten that out in about two weeks, it will take us two weeks. Easier than D.C."

63.     Leaked plans from the Pentagon in mid-September showed the federal government's intention to deploy 1,000 National Guardsmen to cities in Louisiana, including New Orleans, contingent on Governor Jeff Landry requesting the National Guard. Governor Landry made that request on September 29, asking Secretary Hegseth to deploy 1,000 guardsmen to address "ongoing public safety concerns regarding high crime rates," although New Orleans is currently experiencing some of its lowest crime rates in decades.

64.     In Memphis, Tennessee, the Trump Administration has taken similar action. On September 15, President Trump signed an order establishing a "Memphis Safe Task Force," in response to the "dire" situation in Memphis where "tremendous levels of violent crime [] have overwhelmed its local government's ability to respond effectively," although some crime rates have declined in the last twenty months. This task force includes the deployment of federal agents as well as military forces. A member of President Trump's administration told the task force that they are "unleashed," and that the goal was to "bulldoze the criminal elements in the

17

city, and therefore liberate the law-abiding citizens." Hundreds of federal and state law enforcement vehicles were seen at a staging area east of central Memphis on October 1, and uniformed military personnel have appeared at a makeshift command center.

### The Trump Administration Has Recently Deployed Federal Forces to Chicago

65.     In his first term in office, President Trump vowed to send a "surge" of federal law enforcement officers to Chicago "whether they like us there or not," to deal with protesters and crime in a city that President Trump called "stupidly run" "by liberal Democrats."

66.     Beginning in August and September 2025, President Trump again focused on Chicago, saying that he would send federal forces, purportedly to address a crime spike. President Trump called Chicago a "killing field" and the "murder capital of the world." He said "Chicago is the worst and most dangerous city in the World, by far …. I will solve the crime problem fast, just like I did in DC. Chicago will be safe again, and soon." He added that, in his view, the people of Chicago were "screaming" for help, in particular "African American ladies, beautiful ladies are saying, please, President Trump, come to Chicago, please."

67.     The President's statements about crime in Chicago are lies. Chicago has seen record reductions in the frequency of violent crime in recent years, and its violent crime rate per capita is lower than many other cities in the United States, including Kansas City, Cincinnati, Indianapolis, and Little Rock. The past summer was the least violent in Chicago since 1965.

68.     Illinois Governor J.B. Pritzker has said, "There is no emergency that warrants the deployment of troops" to Chicago. Mayor Brandon Johnson has added, "We do not want or need military occupation in our city."

69.     Nonetheless, on August 22, 2025, President Trump signed an executive order directing the newly retitled Secretary of War to establish quick reaction forces within the

18

National Guard to assist local, state, and federal law enforcement.

70.     On September 6, 2025, President Trump escalated his rhetoric, describing his planned operations in Chicago as a "war," this time emphasizing immigration enforcement, instead of crime. President Trump shared the image below on social media, depicting the Chicago skyline ablaze, swarming with military helicopters, with the title "Chipocalypse Now," and the statement "I love the smell of deportations in the morning. Chicago about to find out why it's called the Department of WAR":





71.     On September 8, 2025, DHS announced that ICE and CBP officers would join the deployment to Chicago as part of a campaign named "Operation Midway Blitz." The press release announcing Operation Midway Blitz stated that the operation would "target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets."

19

72.     Since then, DHS leadership and hundreds of federal agents have swarmed City streets. The Pentagon approved plans for DHS to base federal operations at the Great Lakes Naval Station, the largest military base in Illinois. Defendant Bovino, who led operations in Los Angeles, has taken over operations in Chicago. Defendant Noem has been present in Chicago as well, directing federal forces personally.

73.     Roving patrols of masked, militarized, and often unidentifiable agents have been seen on streets from Chicago's city center to its suburbs. Federal agents have killed civilians, and they have used extreme and unlawful force against individuals. They have illegally stopped, detained incommunicado, and arrested hundreds of people, including many citizens. Federal agents have arrested elected officials without any basis. They have conducted military-style raids on civilian apartment complexes, terrorizing residents, including children, and demolishing personal property. They have blown off the doors of people's houses with explosive devices. They have shot at people. They have thrown tear gas canisters on city streets. They have conducted operations at hospitals, schools, and places of worship.

74.     The Trump Administration has stated explicitly its intention to illegally suppress speech and assembly, use illegal force, and conduct illegal detentions of individuals who oppose them.

        a.      Defendants have focused their federal incursions on cities in "blue" states, where Democrats make up the majority of voting constituents, like Chicago and Los Angeles, or blue cities in red states, like Memphis and New Orleans. President Trump has said that such cities pose "a war from within," and that he instructed the Secretary of Defense that "we should use some of these dangerous cities as training ground for our military."

b.      Defendants have focused in particular on political opponents. For example, President Trump has specifically said he is deploying federal forces to Chicago "against Pritzker."

c.      Defendants have focused on journalists and media organizations they do not agree with, repeatedly referring to journalists as "disgusting," "crooked," "dangerous," and, most significantly, as "the enemy of the American people." President Trump has suggested that critical media coverage of his administration is "illegal" and "no longer free speech."

d.      Defendants have made clear that they are against protests in general, and that protesters should be met with violence as a consequence of speaking out. For instance, President Trump stated that protesters in the Chicago area were "going to be met with equal or greater force" to that used in Los Angeles. Defendant Noem added, "The more that they protest … the harder ICE is going to come after them." Trump has said that "In the good old days" protesters were treated "very, very rough. And when they protested once, you know, they would not do it again so easily."

e.      Defendants have focused on viewpoints that they do not like. For example, on September 25, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions were "anti-American." This theme has been conveyed to federal officers stationed at the Broadview ICE facility. Secretary Noem has promised the agents stationed at Broadview that they will be given full authority to "hammer" and arrest the

21

protesters for "the way that they're talking, the way that they're speaking, who they're affiliated with."

f.　　Meanwhile, Defendants have ignored and, in some cases, even sought to defend viewpoints that support Defendants' policies and actions. For example, on October 3, Defendant Bondi dispatched the DOJ Civil Rights Division to investigate the arrest of conservative-leaning journalist Nick Sorter who has supported the Trump Administration's policies and actions, despite calling for the arrest of other journalists who have criticized those same policies and actions.

g.　　Defendants have stated clearly that they intend to illegally arrest civilians. The DHS has stated that it is now federal government policy to conduct arrests based on "reasonable suspicion," rather than the probable cause standard required by the Fourth Amendment. Similarly, Defendant Bovino has indicated an intent to use arrests as a means of suppressing free speech by referring to the newly-erected "free speech zone" outside the Broadview ICE facility as a "free arrest zone."

75.　　Governor Pritzker said last week that the Trump Administration's rhetoric and operations in Chicago are authoritarianism.

76.　　Many people in the Chicagoland area are opposed to the Trump Administration's actions. Following a longstanding tradition of protest, individuals in Chicago have led peaceful marches, demonstrations, and other protests throughout the region. The Broadview ICE facility became a focal point for those protests.

**There is a Long History of Peaceful Protest at the Broadview ICE Facility**

77.　　Broadview, Illinois, a western suburb of Chicago, has long been home to a federal immigration processing center at 1930 Beach St, which serves as a primary hub for ICE

operations within the greater Chicago area (the "Broadview facility" or the "Broadview ICE facility'). When ICE officers arrest an individual in the Chicago area, the arrestee is taken to the Broadview facility to be processed at the short-term intake site before being transported to a detention center.

78.     Prayer vigils and protests have taken place at the Broadview ICE facility since at least 2007, when a pair of Catholic nuns joined with an immigration attorney to hold weekly prayer vigils at the facility.

79.     Since that time, a group of religious leaders and other people of faith have consistently gathered on Friday mornings at the Broadview ICE facility as an expression of their religious beliefs to pray for the people detained there, their families, and workers at the facility.

80.     More recently, protesters gathered in June 2025 to demand the release of a mother and longtime Chicago resident and community activist, who was detained after appearing at a routine immigration appointment.

81.     Over Father's Day weekend in 2025, hundreds of people in Chicago received text messages ordering them to report to the Broadview facility. At least two individuals were detained. Protests followed. Following these events, four Illinois State Representatives attempted to visit the facility on back-to-back days but were turned away.

82.     Over the summer of 2025, as a result of reports of inhumane conditions for detainees inside the facility, protesters gathered from time to time to demand the closure of the facility. These protests were peaceful and non-threatening.

**To Suppress Media Coverage of the Broadview Protests, Defendants Attack the Press**

83.     As President Trump and other high-level Administration officials intensified their anti-immigrant and anti-Chicago rhetoric, Operation Midway Blitz was rolled out, and federal

officials continued to fill the Broadview ICE facility with immigration detainees and other arrestees, the location became a more active center for protest and dissent. As described fully below, federal officers in short order attempted to silence that dissent and quash the protests through violence and intimidation.

84. The protests at the Broadview ICE facility and the federal government's violent attempts to silence the protesters became a story of great interest to the local Chicago media and was also covered in the national press. Much of the coverage described the federal officers' abusive tactics. Defendants sought and are seeking to quash this coverage by attacking and intimidating members of the Press on the ground there.

85. Federal immigration officers at the Broadview ICE facility have repeatedly and intentionally singled out persons whom they know to be members of the Press for violence, assault, and intimidation. These assaults are not incidental or unintentional. They are undertaken by design to intimidate journalists on scene and to frustrate and suppress coverage of the federal officers' actions toward protesters and immigration detainees.

86. The attacks on individual journalists are too numerous to list in full. The following incidents are merely illustrative.

    a. Leigh Giancreco is a freelance reporter who was sent by Block Club Chicago to report on the Broadview protests. Even though she was wearing a black helmet labeled PRESS, a neon yellow vest, and press credentials, federal officers shot pepper balls at her, striking her repeatedly.

    b. Plaintiff Raven Geary is a journalist with Unraveled Press who has been covering the actions of ICE at the Broadview facility and throughout Chicago for months and is known as a member of the press to many of the federal agents stationed at

24

Broadview. Nevertheless, and while wearing visible press credentials and press patches, she was shot with a pepper ball in the face without warning while standing in a public parking lot taking a photo of an ICE officer.

      c.     Plaintiff Charles Thrush is a freelance reporter in his final year of journalism school at DePaul University. He is a contract reporter for Block Club Chicago covering the protests. At the Broadview facility, wearing his press credential around his neck, Mr. Thrush was singled out, fired upon, and struck with a pepper ball. The federal officer shot Mr. Thrush despite the fact he was standing at a distance from the protesters and even though (or because) he was clearly displaying his press credential.

      d.     Colin Boyle is a photojournalist who was reporting on the protests in collaboration with Mr. Thrush. Mr. Boyle wore a black backpack clearly marked PRESS and a hat with a Velcro PRESS patch as well as his Chicago Police Department-issued press credentials. He was carrying two cameras. As he photographed peaceful protesters being fired upon by federal officers, Mr. Boyle was also struck with pepper balls.

      e.     Shawn Mulcahy is the News Editor of the Chicago Reader and a member of the Chicago News Guild. At the Broadview facility, he wore press credentials, wore a helmet marked PRESS, and carried a notebook. On September 26, 2025, while Mr. Mulcahy was clearly engaged in journalistic activity, a federal officer shot him with a rubber bullet or foam round. Later that same day, ICE agents threw tear gas canisters at Mr. Mulcahy and a group of other journalists

      f.     On the morning of September 29, 2025, in a well-publicized incident, a journalist with CBS Chicago was targeted while in her car driving near the Broadview ICE facility checking on the status of the protests. A federal agent standing behind the

25

fence shot pepper balls at the journalist's car, and chemicals went through her window. There were no protests or activities at Broadview at the time. The journalist had to stop her car and get out as the chemicals engulfed the interior of her vehicle. The Illinois State Police and Broadview Police are investigating the attack.

87.     The purpose of these and other attacks was to frighten these and other journalists from the Broadview ICE facility so that the federal officers' violence and suppression of dissent would go unreported.

**Protests Increase in September and October 2025 as Operation Midway Blitz Ramps Up; Federal Officers Respond with Brutality in an Effort to Quash Dissent**

88.     Those who have come to protest at the Broadview ICE facility are from around the Chicagoland area. They gather to register their dissent against various federal policies and the massive influx of federal agents. Some bring signs. Some are young, some middle aged, and some are elderly. Included in the group are members of the clergy and other persons of faith, who come to express their religious beliefs through prayer and vigil. Others are non-religious. Their viewpoints are not uniform, but they are united in their opposition to the Trump Administration's practices of immigration enforcement, including the influx of enforcement officers into Chicago and the brutality with which suspected undocumented individuals are being arrested, detained, and deported.

89.     The protests occurred on a near-daily basis throughout the month of September and into October. The protesters remain committed to their cause and desire to continue their demonstrations of dissent.

90.     The protests and prayer vigils at the Broadview ICE facility are expected to continue.

91.     The protesters have expressed and continue to express their views by chanting and

26

singing, through prayer, and, in some cases, by shouting their condemnation of the actions of ICE and other immigration enforcement authorities. With only a few exceptions, the protests at the Broadview ICE facility have been peaceful and non-threatening to the federal officers and the operations within and around the facility. The protesters staged and are staging their demonstrations of dissent on public property (sidewalks, parkways and the street) in front of and adjacent to the Broadview ICE facility.

92.     The Broadview ICE facility is located at 1930 Beach Street in Broadview, Illinois. The multi-story brick structure is set back from Beach Street and surrounded by a fence, and as of Tuesday September 23, 2025, is protected by a second fence that blocks part of Beach Street. Beach Street is a public way. It is within the jurisdiction of the Broadview Police Department, which is responsible for patrol of Beach Street and other public thoroughfares in Broadview.

93.     In September, as immigration enforcement in Chicagoland ramped up, large numbers of federal immigration enforcement officers congregated at the Broadview ICE facility. On information and belief, these federal officers include a mix of officers from ICE, CBP, ATF, BOP, FBI, and other unknown federal immigration enforcement agencies.

94.     Acting on direction from agency heads and from high level officials, including the Secretary of Homeland Security, the United States Attorney General, President Trump himself, and the other Defendants named in this complaint, the federal officers at Broadview have determined, and remain determined, to deploy physical brutality, tear gas, mace and pepper spray; exploding pepper balls and rubber bullets; flash grenades; and other tactics specifically designed to intimidate, to instill fear, and to silence those who are protesting at the Broadview ICE facility. These tactics are being used primarily to silence and to retaliate against those who are protesting in opposition to the immigration policies of the Trump Administration and

perceived political enemies.

95.     The federal authorities have stationed a small group of enforcement officers on the roof of the Broadview ICE facility. Those officers bear weapons that are capable of discharging exploding chemical pellets and rubber bullets, as well as lethal firearms. From their location on the rooftop, they are able to survey the crowd of protesters below and can target and shoot at individual protesters. Many protesters and those gathering to pray have felt intimidated by the officers' armed presence while they protest and pray. Those gathered have been injured by pepper balls and rubber bullets that these rooftop snipers have aimed in the direction of their faces and torsos.

96.     Other federal enforcement officers are assigned to apparent platoons that muster in the courtyard area in front of the Broadview ICE building. These officers, like the officers on the rooftop, wear cloth masks, dress in army-style fatigues, and carry weapons, tear gas canisters, flashbang grenades, and other implements. In response to the protests, these groups of officers sometimes surge beyond the ICE facility fence without warning and storm the protesters. They attack by slamming individual protesters to the ground, wielding batons and shields, throwing tear gas canisters indiscriminately at groups of protesters, and macing individual protesters in the face at close range, among other things. These are tactics that the federal officers have honed and deployed against dissenters around the country.

97.     There is no legitimate law enforcement purpose for these actions. The protesters do not take actions that threaten the federal officers. The federal officers' brutality is not a response to the violation of any previously given order to disperse or to desist. Rather, the brutality described in the prior paragraphs is deployed solely to silence dissent, to intimidate, and to instill fear.

28

98.     These tactics (including the use of tear gas and mace along with rubber and pepper balls in particular) create a risk of significant physical harm and injury. Exposure to tear gas can cause long-term respiratory damage among other physical and psychological harms, and flashbangs risk blasting a radius of shrapnel every time they are deployed.

99.     The individual acts of brutality by federal officers are too numerous to catalogue. By way of example only, the following acts of violent intimidation have been employed against innocent, non-threatening individual protesters over the course of September and up to the filing of this complaint:

a.     On September 19, ICE officers approached a group of protesters seated on Beach St. and, without warning or giving a dispersal order, grabbed the protesters, picked them up, and threw one protester onto the ground. The incident is recorded on video.

b.     On that same day, ICE officers fired a barrage of rubber bullets and pepper balls from the roof of the Broadview facility into the crowd of protesters below while federal officers on the ground bombarded protesters with flashbang grenades and tear gas. Protester Madeline Sullivan attempted to help the injured, but became overwhelmed, disoriented and ill. Sullivan vomited and continues to suffer back and neck pain.

c.     Daniel Shouse protested on September 22 and 24. On the first day, without warning and with no provocation, an ICE officer repeatedly shot him with a paintball gun. The second day, officers shoved him without provocation and nearly ran him over as he attempted to avoid an intersection. Mr. Shouse sought treatment in a hospital.

d.     Autumn Reidy-Hamer, a resident of Oak Park, came to protest on September 26 and 27. She was part of a group that federal officers sprayed with tear gas and pepper spray without warning or provocation. She saw officers push and shove

29

protesters without warning or provocation.

e.       William Paulson, aged 67, was part of a group of protesters who were protesting peacefully only to be approached by federal officers who tackled a protester and threw him hard to the ground. For no apparent reason and without warning, federal officers from behind the Broadview facility fence lobbed tear gas canisters into the group.

f.       Throughout the evening and night of September 27, federal officers released roaming clouds of tear gas at non-threatening protesters, fired exploding pepper pellets and rubber bullets at protesters from close range, pushed and shoved peaceful protesters and confiscated their signs. All of these violent and unprovoked responses are recorded on video. Some were witnessed by Mr. Paulson.

g.       Michelle Narvaez, who came to the Broadview ICE facility on September 22 and again on September 24 to protest the federal officers' violence and suppression of free speech, witnessed federal agents use flashbang grenades, tear gas and pepper balls against non-threatening protesters. She saw federal officers, with no warning, shoot a 16-year-old child who was approaching the Broadview facility to drop off possessions for his detained father after he was instructed to approach the facility by an officer inside.

h.       Rev. David Black, an ordained Presbyterian minister, came to Broadview on September 19, visibly attired in clerical garb, to protest, to pray, and to minister to ICE officers by encouraging them to change their ways, was repeatedly struck in the face when ICE snipers fired exploding at him from the roof of the Broadview facility. Moments later he was doused with chemical spray that ICE agents directed at his face. These events are recorded on video.

i.       Rev. Beth Johnson, an ordained minister in the Unitarian Church, was

fired upon without warning or justification as she and other protesters and clergy members stood on the sidewalk singing "We Shall Overcome" and other traditional songs of protest. Rev. Johnson was wearing her clerical collar.

These are examples only, and they could be multiplied many times over. Federal officers, acting on instructions and encouragement from high government officials, have systematically worked to intimidate and terrorize non-threatening protesters. They have done so on a daily basis since the protests at the Broadview facility began. These attacks on free speech are continuing and will continue unless they are enjoined.

### Federal Officers' Actions Harm Broadview Residents

100.    The violence perpetrated by the federal officers–particularly the deployment of massive quantities of toxic chemicals as they attempt to suppress dissent–also affects the community where the Broadview facility is located.

101.    Clouds of tear gas and other chemicals have sickened residents. By way of example only:

a.    Jose Juan Alvarado, a resident of Broadview, reports that he and his wife were sickened and reduced to tears when they went to the grocery store, passing through clouds of tear gas.

b.    Reggie Thompson has been unable to access services, including grocery delivery and electrical support, because of the ICE officers' violent presence. The vast quantities of tear gas have aggravated his asthma.

c.    Local business owner Robert Butler-Bey has experienced emotional distress and has been unable to breathe because of the tear gas.

d.      Dimeko Harden, who lives a block from the Broadview facility, has

been unable to retrieve mail, to bring repairmen into her home and to engage in normal

activities without experiencing pain and difficulty breathing. She has been forced to

keep her teenage son at home, because he suffers from asthma.

102.    The mayor of Broadview, Katrina Thompson, has made federal agents aware of

the harm their actions are causing to her community. Mayor Thompson stated "[t]he relentless

deployment of tear gas, pepper spray and mace at the ICE facility is endangering nearby village

residents, harming police officers, harming firefighters and American citizens exercising their

First Amendment rights," Broadview's Chief of Police echoed these concerns, explaining that

federal agents have "verbally abused" his officers and stating, "[t]he employment of tear gas,

pepper spray, mace, and rubber bullets by ICE … is creating a dangerous situation for the

community and our first responders."

**The Federal Officers' First Amendment Violations Expand Beyond Broadview**

103.    On Friday October 3 and Saturday October 4, 2025, federal agents significantly

escalated their suppression of speech and journalism throughout the city of Chicago including in

the Logan Square, Humboldt Park and Brighton Park neighborhoods. In at least three separate

incidents federal officers deployed the same tactics they have been using at Broadview against

spontaneous crowds that had gathered and were peacefully expressing opposition to Operation

Midway Blitz and the tactics being used by ICE and other federal agencies.

104.    On October 3, residents of Logan Square spontaneously gathered to express their

opposition to the immigration activity occurring in the area. The crowd was peacefully voicing

their opposition to the tactics and mission of ICE officers. The ICE officers responded by yelling

slurs at the assembled crowd, including calling one protester a "faggot" and then, without

warning, an ICE officer threw a canister of tear gas at the assembled protesters.

105.    In Brighton Park, protesters gathered in response to a large and visible presence of ICE and CBP officers on the morning of October 4. A crowd of fifty to seventy-five protesters held signs, filmed, and shouted for ICE to leave Chicago. Chicago Police officers took up a position between the protesters and the federal officers, but at some point the federal officers pushed past the local police officers and began pointing weapons at the protesters and using less-lethal munitions including flashbang grenades, tear gas, and rubber bullets. In one incident in the neighborhood a group of five or six CBP officers shot tear gas canisters, without any warning, into a group of people who were peacefully protesting 30-40 feet away from them. Chicago Police officers and civilians alike were subjected to the tear gas and forced to disperse from the streets and sidewalks.

106.    In Humbold Park, ICE agents encountered protesters yelling "you're not welcome here." Some protesters attempted to block the ICE vehicles and were forcibly moved by the officers. Then, as the officer drove away and without any clear justification, they deployed several canisters of tear gas on the assembled crowd.

**Plaintiffs and the Class of Protesters Fear Continuing Their Lawful Activities**

107.    Based on the violent and brutal actions of the federal officers described above, protesters of reasonable firmness would be deterred from returning to Broadview or going to other protests in this District to express their firmly held beliefs.

108.    There is no indication that federal agents will cease or alter their pattern of using excessive force against protesters. To the contrary, recent developments suggest that the use of force will be amplified.

109.    On September 29, 2025, the Attorney General indicated an intention to deploy

additional forces to the Broadview ICE facility. Citing the protests in Los Angeles, Portland, and Chicago, she issued a memorandum titled "Ending Political Violence Against ICE." It directed the ATF, USMS, DEA, FBI to "immediately direct all necessary officers and agents to defend ICE facilities and personnel whenever and wherever they come under attack, including in Portland and Chicago." The memorandum specifically invoked protests at the Broadview ICE facility as justification.

110. The memorandum further states that "[o]ur officers will suppress all unlawful rioting and arrest every person suspected of threatening or assaulting a federal law enforcement officer or interfering with federal law enforcement operations." The Attorney General directed the U.S. Attorney's Office of the Northern District of Illinois to charge all arrested individuals with the highest provable offense available.

111. The memorandum concluded by stating these priorities are directed not only at "criminals who are caught red-handed committing acts of violence against ICE facilities and personnel," but also "every person who aids, abets, or conspires to commit these crimes, whether through funding, coordination, planning, or other means."

112. Additionally, President Trump has doubled down on his view that quashing protests in cities like Chicago is a "war" that must be won. On September 30, President Trump instructed a gathering of military leaders to use American cities, including Chicago, as a "training ground." He continued, "They're very unsafe places, and we're going to straighten them out one by one…And this is going to be a major part for some of the people in this room. That's a war, too. It's a war from within." President Trump said "[W]e're going into Chicago very soon. That's a big city with an incompetent governor."

113. President Trump's repeated statements that Chicago will be used as a site of

military intervention, the Attorney General's identification of the Broadview protests as a justification for increased law enforcement presence and consequences at protest sites in Chicago and nationwide, continued threatening commentary from federal officials, in combination with the actions of federal officers as described above, have chilled the lawful exercise of Plaintiffs' First Amendment rights.

114.    Journalists are at risk of being targeted for physical violence if federal officers perceive that their activities may expose their misconduct. The protesters face chemical gas, being shot at by non-lethal projectiles, physical brutality, the risk of illness and serious physical injury, and the psychological effects of a campaign of "shock and awe." The Administration's rhetoric and the federal officers' actions have instilled fear and hesitance in even the most resolute of the protesters.

115.    On October 2, 2025, as part of a purported effort to "protect" the protesters, the Illinois State Police attempted to establish for the first time a "First Amendment zone" where protesters would be entitled to exercise their right of free speech free from brutality, harassment and arrest. This did nothing to deter or deflect the ongoing illegal federal conduct as described in the preceding paragraphs, which will recur and continue with even greater ferocity unless enjoined.

116.    The following day, October 3, 2025, Defendants Noem and Bovino were present at the Broadview ICE Facility to exhort ICE and CBP officers to continue their brutality by "going hard" at protesters for the way they were "talking" and "speaking." Speaking to assembled federal officers and gesturing toward the protesters in the State Police "First Amendment Zone," Bovino asserted that "this is an unsafe crowd" and that the area around the Broadview ICE facility was going to be a "Free *Arrest* Zone."

117.    Noem and Bovino watched (and in Bovino's case, participated), in the use of excessive force against protesters and journalists. Noem told federal officers that she commended their "professionalism" and said they were "setting an example," Noem also stated, "Today when we leave here, we're going to go hard … we're going to hammer these guys," referring to the protesters. Noem objected to the protesters because of "the way they're **talking, speaking, who they're affiliated with, who they're funded with**, and what they're talking about as far as consequences for what we're doing" She said, "We're gonna make sure there's consequences for the way they're behaving and we're going to prosecute them…." She continued, "We're gonna give you guys all the authority that you need to go out there and arrest these individuals who are advocating for violence against you." She emphasized that they would "send a message," and that Defendants were "here to stay" and "expanding."

118.    But Defendant Noem has defined the sort of "violence" that would (in her view) justify force and arrest to include protected First Amendment activities, such as filming and recording officers.

### RULE 23(b)(2) CLASS ALLEGATIONS

119.    **Class Definition:** all persons who are or will be peacefully present at demonstrations in the Northern District of Illinois, and who intend to non-violently participate in, observe, or record the demonstrations, or engage in news gathering, reporting, or prayer. (Henceforth referred to as the "Class.")

a.      **The Religious Exercise Sub-Class:** all persons who are or will be present at the demonstrations in the Northern District of Illinois, and who intend to pray or otherwise engage in their religious practice there.

120.    Plaintiffs and the putative Class were subjected to the constitutional violations

described in this complaint. The legal and factual issues are common to the Class and affect all Class members.

## Numerosity

121.    The Class is composed of hundreds of people and constantly growing and is therefore so numerous that the joinder of all members is impracticable.

## Common Issues of Fact or Law

122.     Although the actions complained of in this Complaint occurred at different times, Defendants acted uniformly with respect to the Class. Defendants consistently and indiscriminately tear gassed, shot projectiles or less lethal weapons at, and otherwise used excessive force against members of the Class without warning, orders, or any lawful justification to suppress their exercise of First Amendment rights.

123.    There are questions of law and fact common to the Class and they predominate over individualized questions. These common questions of fact and law include, but are not limited to:

a.    Whether Defendants routinely use crowd control weapons or other force against those present at the Broadview ICE facility demonstrations without warning and without providing directions, means, and opportunity to disperse before taking aggressive and injurious police action.

b.    Whether Defendants routinely use crowd control weapons or other force against those present at the Broadview ICE facility demonstrations without regard to whether that force was justified.

c.    Whether Defendants target protesters for their speech.

d.    Whether Defendants target clergy for their exercise of religion or

protected expression.

e. Whether Defendants use force against those present at the Broadview ICE facility who were exercising their rights in a public area.

a. Whether Defendants infringe upon the First Amendment rights of those present at the Broadview ICE facility.

b. Whether Defendants' actions would chill First Amendment speech in a person of ordinary firmness.

c. Whether Defendants discriminate against protesters and press in violation of the First Amendment.

d. Whether members of the Class engage in protected First Amendment activities.

e. Whether Defendants retaliate against members of the Class because of the content of their speech.

f. Whether Defendants use excessive force against members of the Class in violation of the Fourth Amendment.

g. Whether Defendants falsely arrest members of the Class in violation of the Fourth Amendment.

h. Whether Defendants' actions substantially burden the free exercise of religion by members of the Religious Exercise Sub-Class.

121. The Defendants have acted, threaten to act, and will continue to act on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**Typicality**

38

122.     Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the Class. Plaintiffs were all present at the protests at the Broadview ICE facility; were subjected to one or more of the violations previously enumerated; and seek protection to bar the repeat of those violations in the future.

123.     Plaintiffs have the same interests and have suffered the same type of injuries as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the members of the Class.

124.     Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the Class.

**Adequate Representation**

125.      The named individual Plaintiffs will fairly and adequately represent the common class interest. The named individual Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff Class, and they will fairly and adequately protect the interests of the Class.

126.     The named individual Plaintiffs are represented by the undersigned counsel, who are all experienced in civil rights, class actions, and complex litigation and are familiar with the issues in this case. Plaintiffs' attorneys have successfully litigated numerous class action cases, including for civil rights violations.

127.     Counsel for the Plaintiffs know of no conflicts between members of the Class, the named Plaintiffs, or the attorneys in this action.

**Maintenance and Superiority**

132.     Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

133.     Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the classes to protect their interests.

134.     Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the Class.

135.     Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the classes predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and allege thereon, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.*, from protests in the Northern District of Illinois. It will promote judicial efficiency to resolve the common questions of law and fact in one forum.

136.     No difficulty will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Injunctive relief can be determined on a classwide basis.

137.     Pursuant to Rule 23(c)(4), the particular issues raised in this lawsuit are appropriate for certification—because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

## CLAIMS FOR RELIEF

## COUNT I

## First Amendment of the United States Constitution

138.     Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

139.     In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

140.     Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence.

141.     Individuals who peacefully gather on the streets of Broadview and in public rights of way near the Broadview ICE facility to protest have the right to gather, speak, express themselves, gather and report the news, pray, and petition for redress of grievances.

142.     Defendants' actions are designed to chill, suppress, and control speech, reporting, and religious activities that they do not like.

143.     Defendants' actions do not serve any governmental interest, much less a significant or compelling governmental interest. And, Defendants' actions are not narrowly tailored.

144.     Plaintiffs' and class members' exercise of their rights to speak, assemble, petition, gather news, and freely practice their religious beliefs is being chilled due to the well-founded fear that they will be brutalized by federal agents for no reason other than engaging in protected

activity on the streets and sidewalks of Broadview.

145.     Defendants' actions would likely deter a person of ordinary firmness from engaging in protected First Amendment activity.

146.     Plaintiffs' and class members' protected activity was and is at least a motivating factor in Defendants' adverse actions against Plaintiffs and class members.

147.     Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

148.     Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT II

### Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1

149.     Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

150.     The Religious Freedom Restoration Act ("RFRA"), provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

151.     Defendants' policy, pattern, and practice of targeting Rev. Black and other similarly situated Religious Exercise subclass members with violence substantially burdens their exercise of religion.

152.     No compelling governmental interest exists that would justify Defendants' use of force against clergy peacefully praying in public spaces, nor is the wanton and gratuitous violence employed by Defendants the least restrictive means of furthering any compelling governmental interests that might exist.

42

153.     Defendants' ongoing conduct in violation of Plaintiff's and subclass members' rights and liberties under federal law has caused and is causing them irreparable harm.

154.     In the absence of an injunction, Defendants will continue to use force against Rev. Black and other Religious Exercise subclass members in an effort to stop them from exercising their religious beliefs.

155.     Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

### COUNT III

**Fourth Amendment of the United States Constitution
Excessive Force and Unreasonable Seizures**

156.     Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

157.     In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizures, specifically, arrests without probable cause and excessive force under the Fourth Amendment.

158.     Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence and/or arresting them without probable cause to believe that they committed a federal crime.

159.     Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs and class members. They also restricted Plaintiffs' and class members' freedom of movement through a show of authority.

160.     The force Defendants used was unreasonable.

161.     Defendants have also arrested Plaintiff Held and other similarly situated

individuals without probable cause, and solely to suppress, chill, and retaliate against the exercise of their First Amendment rights.

162.    Defendants are prohibited by the Fourth Amendment from making "preemptive arrests."

163.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' rights has caused and is causing them irreparable harm.

164.    In the absence of an injunction, Defendants will continue to use excessive force against and effect seizures without probable cause on Plaintiffs and class members in violation of the Fourth Amendment, pursuant to official federal policy.

165.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT IV

## Administrative Procedures Act

166.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

167.    Defendants and the federal agents discussed in this complaint are operating pursuant to a final federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence.

168.    Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs and class members. They also restricted Plaintiffs' and class members' freedom of movement through a show of authority.

169.    The force Defendants used was unreasonable.

170.    Federal law provides for the publication of regulations that "prescribe the

categories of officers and employees … who may use force (including deadly force) and the circumstances under which such force may be used." 8 U.S.C. § 1357(a).

171.    Federal regulation provides that "Non-deadly force may be used only when a designated immigration officer … has reasonable grounds to believe that such force is necessary." 8 C.F.R. § 287.8(a)(ii).

172.    Federal regulation further provides that "A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." 8 C.F.R. § 287.8(a)(iii).

173.    Federal regulation further provides that "Deadly force is any use of force that is likely to cause death or serious physical injury" and that "Deadly force may be used only when a designated immigration officer … has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(i)-(ii).

174.    Defendants' policy and practice of using force against peaceful protesters, journalists, and legal observers fails to take into consideration the risk of harm associated with each weapon used, and permits uses of force that, in violation of 8 C.F.R. § 287.8(a): (1) do not further any legitimate mission assigned to Defendants by law; (2) target the general public; (3) are not based on reasonable grounds to believe such force is necessary; and/or (4) deploy gratuitous violence exceeding the minimum necessary to accomplish any legitimate aims.

175.    Defendants' policy and practice of using excessive force against Plaintiffs and other similarly situated peaceful protesters, journalists, and legal observers is "final agency

action" that is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

176.     Defendants' policy and practice of suppressing the speech, religious exercise, reporting and other protected First Amendment activities of Plaintiffs and other similarly situated peaceful protesters, journalists, and legal observers is "final agency action" that is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

177.     Defendants' policy and practice of engaging in policing functions, beyond the scope of "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property," 40 U.S.C. § 1315, amounts to final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

178.     Defendants' policy and practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under § 1357(a). 5 U.S.C. §§ 704, 706(2)(C).

179.     As a proximate result of Defendants' APA violations, Plaintiffs and class members are suffering and will continue to suffer a significant deprivation of their liberty in violation of the statute.

180.     Defendants' unlawful policies and practices against Plaintiffs and class members, described herein, have caused and are causing them irreparable harm.

181.     In the absence of an injunction, Defendants will continue to engage in their unlawful policies and practices against Plaintiffs and class members, described herein.

182.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT V

## 28 U.S.C. § 2201
## Declaration of Rights

183.    Plaintiffs incorporate each of the paragraphs of the complaint as if restated fully herein.

184.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

185.    There is an actual controversy within the jurisdiction of this court, in as much as one or more federal defendants have engaged in actions endangering Plaintiffs and class members protesting federal immigration policy on the streets of Broadview. No federal authority has agreed to stop this practice.

186.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful, and an injunction precluding Defendants from continuing them.

## COUNT VI

## Conspiracy

187.    Plaintiffs incorporate each of the paragraphs of this complaint as if restated fully herein.

188.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiffs and class members of their constitutional rights, all as described in the various paragraphs of this Complaint.

189.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose

47

by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiffs and class members of these rights.

190.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

191.    The misconduct described herein was undertaken intentionally, in total disregard of Plaintiffs' and class members' constitutional rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment and the following relief:

1.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint restrain Plaintiffs' ability to assemble, peacefully protest, pray, and gather news, in violation of the First Amendment;

2.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of using excessive and retaliatory force, in violation of the First and Fourth Amendments;

3.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will have excessive and retaliatory force used on them, in violation of the First and Fourth Amendments;

4.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of committing arrests without probable cause, in violation of the Fourth Amendment;

5.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will be arrested without probable cause, in violation of the Fourth Amendment;

48

6.      An order vacating and setting aside Defendants' unlawful policies and final agency actions of suppressing disfavored speech, retaliation, interference with free exercise of religion, excessive force, and policing and defending federal property beyond the lawful authority of the federal officials, 5 U.S.C. § 706; and

7.      An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the unlawful actions described in this complaint, and specifically prohibiting Defendants, their officers, agents, assigns, and all persons acting in concert with them from:

> a.      Dispersing, arresting, threatening to arrest, threatening or using physical force against any person whom they know or reasonably should know is a Journalist, unless Defendants have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order. Defendants may ask a Journalist to change location to avoid disrupting law enforcement, as long as the instructions are clear and the press have time to comply and sufficient opportunity to report and observe;
>
> b.      Issuing a dispersal order requiring any person to leave a public place that they lawfully have a right to be, unless dispersal is justified by a commanding officer's finding of a serious threat to public safety;
>
> c.      Using riot control weapons—including but not limited to kinetic impact projectiles (KIPs), Pepper ball or paintball guns, pepper or OC spray, tear gas or other chemical irritants, soft nose rounds, 40 or 37mm launchers, less-lethal shotguns, and flashbang, Stinger, or rubber-ball grenades—on members of the press, protesters, or religious practitioners who are not themselves posing a

49

threat of imminent physical harm to a law enforcement officer or another person;

       d.      Using riot control weapons (including those described above) at identified targets, if doing so could foreseeably result in injury to the press, protesters, or religious practitioners who are not posing a threat of imminent physical harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;

       e.      Firing large riot control weapons—including but not limited to tear gas canisters, flashbang, Stinger grenades, or rubber-ball grenades—so as to strike any person, including by deploying these weapons above the head of the crowd, unless the person poses an imminent threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

       f.      Firing projectile riot control weapons—including but not limited to KIPs, pepper balls, paintballs, and soft nose rounds—at the head, neck, groin, torso, or other sensitive areas of any person, or striking any person with a vehicle, unless that person poses an immediate threat of serious bodily injury to a law enforcement officer or another person;

       g.      Using force, such as pulling or shoving a person to the ground, tackling, body slamming, or kettling on individual(s) who pose no immediate threat of physical harm to others, unless necessary and proportional to effectuate an apprehension and arrest;

       h.      Using any riot control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted

50

individual(s), unless the threat of physical harm is so serious and imminent that a warning is infeasible. Such warnings shall explain that Defendants may employ riot control weapons, give the targeted individual(s) sufficient time to avoid the use of force, and leave room and opportunity for safe egress. If it appears that the intended audience was unable to hear the warnings, the warning must be repeated prior to the use of riot control weapons;

      i.     Seizing or arresting any non-violent protester who is not resisting a lawful dispersal order, unless there is specific probable cause to believe that the individual has committed a crime for which a custodial arrest is warranted and for which the federal agent has lawful authority to make an arrest;

8.     An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the unlawful actions described in this complaint, and specifically requiring Defendants, their officers, agents, assigns, and all persons acting in concert with them to have visible identification (name and/or badge number) affixed to their uniforms and prominently displayed, including when wearing riot gear; and

9.     Any other relief this Court deems proper.

DATED: October 6, 2025          RESPECTFULLY SUBMITTED,

          **CHICAGO HEADLINE CLUB, et al.**

      By:    /s/ Steve Art_____
            *One of Plaintiffs' Attorneys*

Jon Loevy
Locke Bowman
Steve Art
Heather Lewis Donnell
Theresa Kleinhaus
Matt Topic
Lindsay Hagy
Jordan Poole
Dominique Gilbert
Justin Hill
Aaron Tucek
Alexandra Wolfson
**LOEVY + LOEVY**
311 N. Aberdeen Street
Chicago, Illinois 60647
(312) 243-5900
steve@loevy.com

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
℅ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL
RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern Pritzker
School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2234
wally.hilke@law.northwestern.edu

Craig B. Futterman
**MANDEL LEGAL AID CLINIC**
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

Hayden Johnson*
Katie Schwartzmann*
Conor Gaffney*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave NW, Ste 601
Washington DC 20006
(202) 579-4582
hayden.johnson@protectdemocracy.org
katie.schwartzmann@protectdemocracy.org
conor.gaffney@protectdemocracy.org
*Application for pro hac vice forthcoming*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
**ROGER BALDWIN FOUNDATION OF
ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org