**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO HEADLINE CLUB *et al.* | ) |
| | ) |
| Plaintiffs, | )    Case No. 25-cv-12173 |
| | ) |
| v. | ) |
| | ) |
| KRISTI NOEM, Secretary of U.S. Department of Homeland Security, in her official capacity, *et al.*, | ) ) ) |
| | ) |
| Defendants. | ) |

## <u>EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER</u>

Jon Loevy
Heather Lewis Donnell
Locke Bowman
Steve Art
Theresa Kleinhaus
Matt Topic
Lindsay Hagy
Jordan Poole
Dominique Gilbert
Justin Hill
Aaron Tucek
Alexandra Wolfson
**LOEVY + LOEVY**
311 N. Aberdeen Street
Chicago, Illinois 60647
(312) 243-5900

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
℅ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Craig B. Futterman
**MANDEL LEGAL AID CLINIC**
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611

Hayden Johnson*
Katie Schwartzmann*
Conor Gaffney*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave NW, Ste 601
Washington DC 20006
(202) 579-4582
*Application for pro hac vice forthcoming*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2224

Kevin M. Fee, Jr.
Rebecca Glenberg
**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 1

I.    The Trump Administration Deploys Federal Law Enforcement Officers and Military to Cities Across the United States ........................................................................... 1

II.   The Trump Administration Recently Deployed Federal Forces to Chicago as Part of Its Plan to Silence Critics ........................................................................................ 6

III.  Defendants' Attacks on Protesters, Journalists, and Religious Figures at the Broadview ICE Facility ......................................................................................................... 7

IV.   Defendants Have Expanded Their First Amendment Violations Beyond the Broadview ICE Facility ....................................................................................................... 11

LEGAL STANDARD ............................................................................................. 12

ARGUMENT ......................................................................................................... 13

I.    Plaintiffs Are Likely to Succeed on the Merits ................................................. 13

      A.    Defendants Are Systematically Violating the First Amendment Rights of Protesters, Journalists, and Clergy ........................................................ 13

      B.    Defendants Are Retaliating against Plaintiffs for Their Protected Expression ..... 24

      C.    Defendants Are Violating RFRA .......................................................... 31

      D.    Defendants' Systematic Violence Is Excessive in Violation of the Fourth Amendment ........................................................................................ 34

II.   Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm ...................... 38

      A.    Irreparable Harm under the First Amendment and RFRA Is Presumed .............. 38

      B.    Fourth Amendment Injuries Further Constitute Irreparable Harm ...................... 39

      C.    Plaintiffs Have No Adequate Legal Remedy .......................................... 40

III.  The Balance of Equities and Public Interest Favor an Injunction ................................... 41

CONCLUSION ...................................................................................................... 42

REQUEST FOR ORAL ARGUMENT ........................................................................ 42

# TABLE OF AUTHORITIES

## Cases

*Abay v. City of Denver*,
445 F. Supp. 3d 1286 (D. Colo. 2020) ...................................................... 30, 45

*ACLU v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ............................................................. 14, 16, 28

*Alsaada v. City of Columbus*,
536 F. Supp. 3d 216 (S.D. Ohio 2021) .................................................... 28, 30

*Anthony v. Seltzer*,
696 Fed. App'x 79 (3d Cir. 2017) ................................................................. 40

*Anti Police-Terror Project v. City of Oakland*,
477 F. Supp. 3d 1066 (N.D. Cal. 2020) ....................................................... 30

*Arkansas Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ............................................................................... 15, 20

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .................................................................................... 14

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ...................................................................... 12

*Black Lives Matter Los Angeles v. City of Los Angeles*,
2021 WL 3162706 (C.D. Cal. Apr. 19, 2021) ............................................... 44

*Black Lives Matter Seattle-King Cnty. v. City of Seattle*,
466 F. Supp. 3d 1206 (W.D. Wash. 2020) .................................................... 30

*Boos v. Barry*,
485 U.S. 312 (1988) .................................................................................... 27

*Breathe v. City of Detroit*,
484 F. Supp. 3d 511 (E.D. Mich. 2020) ...................................................... 45

*Breathe v. City of Detroit*,
2020 WL 8575150 (E.D. Mich. Sept. 16, 2020) ........................................... 39

*Bridges v. Gilbert*,
557 F.3d 541 (7th Cir. 2009) ....................................................................... 26

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) .................................................................................... 37

*Brown v. Kemp,*
    86 F.4th 745 (2023) ........................................................................................ 18

*Cerro Metal Prods. v. Marshall,*
    620 F.2d 964 (3d Cir. 1980) .......................................................................... 44

*Chavez v. United States,*
    226 F. App'x 732 (9th Cir. 2007) ................................................................. 44

*Chicago Women in Trades v. Trump,*
    773 F. Supp. 3d 592 (N.D. Ill. 2025) ..................................................... 12, 13

*Christian Legal Society v. Walker,*
    453 F.3d 853 (7th Cir. 2006) .................................................................. 22, 38

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ....................................................................................... 15

*City of Houston v. Hill,*
    482 U.S. 451 (1987) ....................................................................................... 17

*Clash v. Beatty,*
    77 F.3d 1045 (7th Cir. 1996) ........................................................................ 41

*Covino v. Patrissi,*
    967 F.2d 73 (2d Cir. 1992) ............................................................................ 44

*DM Trans, LLC v. Scott,*
    38 F.4th 608 (7th Cir. 2022) ......................................................................... 46

*Don't Shoot Portland v. City of Portland,*
    465 F. Supp. 3d 1150 (D. Or. 2020) ............................................................. 30

*Fogarty v. Gallegos,*
    523 F.3d 1147 (10th Cir. 2008) ..................................................................... 40

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ....................................................................................... 14

*Graham v. Connor,*
    490 U.S. 386 (1989) ....................................................................................... 38

*Gupta v. Melloh,*
    19 F.4th 990 (7th Cir. 2021) ......................................................................... 40

*Hague v. CIO,*
    307 U.S. 496 (1939) ....................................................................................... 17

*Hartman v. Moore,*
547 U.S. 250 (2006) ...................................................................................... 26

*Holt v. Hobbs,*
574 U.S. 352 (2015) ...................................................................................... 34

*Index Newspapers LLC v. U.S. Marshals Service,*
977 F.3d 817 (9th Cir. 2020) ............................................................ 17, 25, 28

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago,*
56 F.4th 437 (7th Cir. 2022) .......................................................................... 42

*Jacobs v. City of Chicago,*
215 F.3d 758 (7th Cir. 2000) ......................................................................... 40

*Joelner v. Vill. of Washington Park,*
378 F.3d 613 (7th Cir. 2004) ......................................................................... 47

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ...................................................................................... 15

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) ............................................................ 35, 37, 43

*L.A. Press Club v. Noem,*
__ F. Supp. 3d __, 2025 WL 2658327 (C.D. Cal. Sept. 10, 2025) .......................... passim

*League of Women Voters of the U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 47

*Mahmoud v. Taylor,*
606 U.S. ___, 145 S. Ct. 2332 (2025) ............................................................ 43

*Massey v. Johnson,*
457 F.3d 711 (7th Cir. 2006) ......................................................................... 30

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ...................................................................................... 13

*McCullen v. Coakley,*
573 U.S. 464 (2014) ...................................................................................... 24

*Nelson v. City of Davis,*
685 F.3d 867 (9th Cir. 2012) ................................................................... 40, 41

*Nken v. Holder,*
556 U.S. 418 (2009) ...................................................................................... 13

v

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
    460 U.S. 37 (1983) .................................................................................. 16, 17

*Police Dept. of Chicago v. Mosley,*
    408 U.S. 92 (1972) ........................................................................................ 18

*Quraishi v. St. Charles Cnty.,*
    986 F.3d 831 (8th Cir. 2021) ................................................................. 39, 41

*Ramirez v. Webb,*
    787 F.2d 592, 1986 WL 16752 (6th Cir. 1986) ....................................... 44

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ........................................................................ 17, 18, 20

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ................................................................................ 17, 27

*Soc. of Divine Word v. USCIS,*
    129 F.4th 437 (7th Cir. 2025) ...................................................................... 35

*Speech First, Inc. v. Killeen,*
    968 F.3d 628 (7th Cir. 2020) ...................................................................... 13

*Surita v. Hyde,*
    665 F.3d 860 (7th Cir. 2011) ...................................................................... 27

*Taylor v. City of Milford,*
    10 F.4th 800 (7th Cir. 2021) ................................................................. 38, 39

*Torres v. Madrid,*
    592 U.S. 306 (2021) ..................................................................................... 39

*United States v. Grace,*
    461 U.S. 171 (1983) ..................................................................................... 24

*United States v. Husband,*
    226 F.3d 626 (7th Cir. 2000) ...................................................................... 39

*USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.,*
    402 F. Supp. 3d 427 (N.D. Ill. 2019) ........................................................ 12

*Village of Broadview v. DHS, et al.,*
    No. 25-cv-12164 (N.D. Ill.) ......................................................................... 11

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ..................................................................................... 25

*West v. Radtke*,
48 F.4th 836 (7th Cir. 2022) ............................................................... 36, 37

*Williams v. Ind. State Police Dep't*,
797 F.3d 468 (7th Cir. 2015) ............................................................... 39

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2009) ............................................................... 13, 47

*Woodruff v. Mason*,
542 F.3d 545 (7th Cir. 2009) ............................................................... 27

**Statutes**

42 U.S.C. § 2000bb-1 ............................................................... 31

**Ordinances**

Illinois Code of Ordinances § 8-2-9(B)(1) ............................................................... 22

**Constitutional Provisions**

U.S. Const. Amend. IV ............................................................... 34

## INTRODUCTION

Plaintiffs endeavor to protect their basic constitutional rights to express their views opposing the lawlessness unleashed on the Chicagoland area, and to safely report on that public outcry, without fear of again being shot, gassed, and beaten by federal agents. In response to Plaintiffs' peaceful exercise of their First Amendment rights, federal agents have responded with a pattern of extreme brutality in a concerted and ongoing effort to silence the press and civilians. No legitimate purpose exists for this brutality or for these arrests. The officers are not physically threatened. No government property is threatened. Defendants are acting to intimidate and silence the press and civilians engaged in protected First Amendment activities.

When the administration deployed these same tactics in violation of peoples' First Amendment and other rights in Los Angeles, a federal court entered preliminary injunctive relief that is nearly identical to what Plaintiffs seek here. *See L.A. Press Club v. Noem*, __ F. Supp. 3d __, 2025 WL 2658327, at *24-25 (C.D. Cal. Sept. 10, 2025). The Court noted that "under the guise of protecting the public, federal agents have endangered large numbers of peaceful protestors, legal observers, and journalists—as well as the public that relies on them to hold their government accountable. The First Amendment demands better." *Id.* at *2.

Plaintiffs now ask this Court to apply the same well-settled law to protect their bedrock constitutional rights and prevent Defendants from further use of their unconstitutional tactics.

## FACTUAL BACKGROUND

I.     **The Trump Administration Deploys Federal Law Enforcement Officers and Military to Cities Across the United States**

At the direction of Defendant Trump, Defendants have launched a war against certain

cities across the United States, including Chicago.[1] The Trump Administration has referred to American civilians engaged in protected First Amendment activities as, among other things, "violent mobs,"[2] and "the enemy from within,"[3] and has deployed thousands of troops and federal agents to American cities, purportedly to deter crime and enforce immigration policies.[4] In reality, these officers were conscripted in service of Defendant Trump's efforts to suppress public criticism of his policies and actions.

The Trump Administration's campaign against American citizens began in Los Angeles with the deployment of thousands of troops and federal officers.[5] Defendant Trump warned that the deployment in California was "the first, perhaps, of many"[6] federal efforts to suppress protected First Amendment activities, and that civilians demonstrating in future would be "met

---

[1] Bernd Debussman Jr. And James FitzGerald, *U.S. cities should be military training grounds, Trump tells generals*, BBC (Oct. 1, 2025), available online at https://www.bbc.com/news/articles/cvgq044n72po (last visited Oct. 5, 2025).

[2] Karoline Leavitt, Statement From the White House, The White House (Jun. 7, 2025), available online at https://www.whitehouse.gov/briefings-statements/2025/06/statement-from-the-white-house-d320/#:~:text=%E2%80%9CIn%20recent%20days%2C%20violent%20mobs,are%20executed%20fully%20and%20completely.%E2%80%9D (last visited Oct. 5, 2025).

[3] Tina Sfondeles, Trump Floats Using Chicago, other Democrat-led Cities for Military training, Says Troops Coming 'Very Soon', WBEZ Chicago (Sep. 30, 2025), available online at https://www.wbez.org/immigration/2025/09/30/donald-trump-pete-hegseth-chicago-military-training-ground-national-guard-operation-midway-blitz (last visited Oct. 5, 2025).

[4] Faris Tanyos, *2,000 more National Guard troops being deployed to Los Angeles, Pentagon says*, CBS News (June 18, 2025), available online at https://www.cbsnews.com/news/2000-national-guard-troops-deployed-los-angeles-pentagon/ (last visited Oct. 5, 2025); *See District of Columbia National Guard*, D.C. National Guard Activated to Support Law Enforcement in District of Columbia (August 23, 2025), available online at https://dc.ng.mil/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/ (last visited Oct. 5, 2025); *See* Hanna Park, Andy Rose, Chris Boyette, *What to know about Trump's latest federal deployments in Memphis, Portland and other US cities*, CNN (Oct. 2, 2025), available online at https://www.cnn.com/2025/10/02/us/trump-national-guard-portland-memphis-wwk-hnk (last visited Oct. 5, 2025).

[5] Ivan Pereira, *Trump warns that LA military deployment could be first 'of many' in response to ICE protests*, ABC News (Jun. 10, 2025), available online at https://abcnews.go.com/Politics/trump-warns-la-military-deployment-response-ice-protests/story?id=122700315 (last visited Oct. 5, 2025).

[6] *Id.*

with equal or greater force."[7] Following up on this threat, the Trump Administration deployed thousands of National Guardsmen in Washington, D.C., authorizing them to carry firearms. Then, turning his sights to Portland, Oregon, Defendant Trump, stating that he was acting at the request of Defendant Noem, ordered Secretary of Defense Pete Hegseth, to use "Full Force" against protesters at ICE facilities in that city.[8] The Trump Administration has similarly deployed military forces and federal agents in Memphis, Tennessee, and is considering doing so in New Orleans, Louisiana.[9]

Courts have taken action in response. In addition to the injunction in Los Angeles, a district court in Oregon enjoined the Trump Administration from ordering the federalization and deployment of Oregon National Guard service members to Portland. Ex. 40 (Opinion and Order and TRO in *State of Oregon v. Trump*).[10] The Trump Administration Has Expressly Stated Their Intention to Suppress Dissent.

The Trump Administration has stated explicitly its intention to illegally suppress speech and assembly, use illegal force, and illegally detain individuals who oppose it. Defendants have focused their federal incursions on cities in "blue" states, where Democrats make up the majority of voting constituents, like Chicago and Los Angeles, or blue cities in red states, like

---

[7] Aaron Blake, *2 Reasons Trump Calling in Troops in DC is so Extraordinary*, CNN (Aug. 11, 2025), available online at https://www.cnn.com/2025/08/11/politics/washington-dc-troops-trump (last visited Oct. 5, 2025).

[8] Donald J. Trump (@realDonaldTrump), "I am also authorizing Full Force if necessary", TRUTH SOCIAL (Sep. 27, 2025, 9:19 AM) available online at https://truthsocial.com/@realDonaldTrump/posts/115276694936263266 (last visited Oct. 5, 2025).

[9] Alex Gangitano, *Trump Floats New Orleans as Next for Federal Crime Crackdown*, The Hill (Sep. 03, 2025), available online at https://thehill.com/homenews/administration/5483976-trump-eyes-new-orleans-crime/ (last visited Oct. 5, 2025); The White House, *Restoring Law and Order in Memphis*, The White House (Sep. 15, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/09/restoring-law-and-order-in-memphis/ (last visited Oct. 5, 2025).

[10] On October 5, the Trump Administration deployed 300 California National Guardsmen to Oregon. *See* Joe Hernandez, *Trump federalizes the National Guard in Chicago, while troops arrive in Oregon*, NPR (Oct. 5, 2025), available online at https://www.npr.org/2025/10/05/nx-s1-5563170/trump-national-guard-chicago-portland-illinois-oregon-pritzker (last visited Oct. 5, 2025).

Memphis and New Orleans. Defendant Trump has said that these cities constitute "a war from within," and instructed the Secretary of Defense to "use some of these dangerous cities as training grounds for our military."[11] Defendants have focused in particular on political opponents. For example, Defendant Trump has specifically said he is "going to go to Chicago early, against Pritzker. Pritzker is nothing." [12] Defendants have described journalists as "disgusting," "crooked," "dangerous," and, most significantly, as "the enemy of the American people."[13] Trump has suggested that any critical coverage of his administration is "illegal" and "no longer free speech."[14] Defendants have made their disdain for protests and protesters clear, as well as their desire to inflict violence on protesters.[15] For instance, President Trump stated that protesters in the Chicago area were "going to be met with equal or greater force" to that used in Los Angeles. Trump has said that "In the good old days" protesters were treated "very, very rough. And when they protested once, you know, they would not do it again so easily."[16]

---

[11] PBS, *WATCH: Trump Suggests Using U.S. Cities as 'Training Grounds for Our Military'"*, YouTube (Oct. 1, 2025), available online at https://www.youtube.com/watch?v=-m2n-gSFbtU&t=167s at 1:40, 2:44 min. (last visited Oct. 5, 2025).

[12] James Neveau, *Trump Signals He Will Send National Guard to Chicago 'Against Pritzker'"*, NBC Chicago (Sep. 16, 2025), available online at https://www.nbcchicago.com/news/local/chicago-politics/trump-signals-he-will-send-national-guard-to-chicago-against-pritzker-after-memphis/3824883/ (last visited Oct. 5, 2025).

[13] Samuel G. Freedman, *Trump's Demonization of the Media can have Deadly Consequences*, CNN (Oct. 19, 2018) available online at https://www.cnn.com/2018/10/19/opinions/trump-rally-gianforte-attacks-on-press-khashoggi-freedman (last visited Oct. 5, 2025).

[14] Irie Sentenr, *Trump: "It's no longer free speech."*, Politico (Sept. 19, 2025) available online at https://www.politico.com/news/2025/09/19/trump-no-longer-free-speech-00574219 (last visited Oct. 5, 2025).

[15] Benny Johnson (@bennyjohnson), "Left-wing extremists surrounded this ICE facility in Chicago. Federal agents crushed the threat immediately. This is the pep talk from [Secretary Noem] that stopped the threat dead in its tracks. Listen...", X.com (Oct. 3, 2025, 1:05 PM), available online at https://x.com/bennyjohnson/status/1974174065985470970 (last visited Oct. 5, 2025).

[16] Anna North, *Donald Trump's 'Second Amendment' Comment Was Part of a Patter,* N.Y. Times (Aug. 10, 2016), available online at https://archive.nytimes.com/takingnote.blogs.nytimes.com/2016/08/10/donald-trumps-second-amendment-comment-was-part-of-a-pattern/ (last visited Oct. 5, 2025).

Defendants have focused their ire on viewpoints that they do not like. For example, in June, Defendant Trump professed his hatred of protesters and vowed to use "very big force" against protesters.[17] On June 7, 2025, Trump also threatened, "These Radical Left protests, by instigators and often paid troublemakers, will NOT BE TOLERATED."[18] Defendants have characterized protected First Amendment activity—such as recording officers—as "violence"[19] and a "threat" Ex. 38 (DHS memo) at 3.

On September 25, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions were "anti-American."[20] This theme has been conveyed to federal officers stationed at the Broadview ICE facility. Defendant Noem has promised the agents at Broadview they will be given full authority to "hammer" and arrest the protesters for "the way that they're talking, the way that they're speaking, who they're affiliated with."[21] Meanwhile, Defendants have ignored and, in some cases, even sought to defend viewpoints that support Defendants' policies and actions. For example, on October 3, Defendant Bondi dispatched the DOJ Civil Rights Division to investigate the arrest of conservative-leaning journalist Nick Sorter who has supported the Trump

---

[17] TIME, *Trump Warns, Military Parade Protests Will Face 'Very Big Force,'* YouTube, (June 10, 2025), available online at https://www.youtube.com/watch?v=kuKjAIBP8go&t=52s at 1:04 min. (last visited Oct. 5, 2025).

[18] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Jun. 8, 2025, 1:41 AM) available online at https://truthsocial.com/@realDonaldTrump/posts/114646378582957392 (last visited Oct. 5, 2025).

[19] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Follow Camarillo, California Farm Raids*, YouTube (July 14, 2025), available online at https://www.youtube.com/watch?v=uDFX4q6huH8 at 0:26 min, (last visited Oct. 5, 2025).

[20] Countering Domestic Terrorism and Organized Political Violence, 90 Fed. Reg. 47,225, 47,225-26) (Sept. 25, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/ (last visited Oct. 5, 2025).

[21] *Supra* n.15.

Administration's policies and actions, despite calling for the arrest of other journalists who have criticized those same policies and actions.[22]

## II.     The Trump Administration Recently Deployed Federal Forces to Chicago as Part of Its Plan to Silence Critics

In Chicago and its suburbs, the violent and unlawful suppression of First Amendment activities has reached its peak. In August 2025, Defendant Trump announced plans to send federal troops to Chicago, codenamed "Operation Midway Blitz."[23][24][25] Defendant Trump described the planned operation as a war, referencing the film "Apocalypse Now" in his threats to the city.[26] The following weeks saw federal officers from U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Customs and Border Protection (CBP), and the Bureau of Alcohol, Tobacco, and Firearms (ATF), among others, arrive in Chicago. *See, e.g.*, Ex. 16 (Thrush Decl.) ¶ 35; Ex. 19 (Boyle Decl.) ¶¶ 10-12. Reflecting Defendant Trump's rhetoric, these officers roamed the streets of Chicago brazenly,

---

[22] David Zimmerman, *DOJ orders investigation into 'wrongful arrest' of conservative influencer Nick Sortor in Portland*, Washington Examiner (Oct. 3, 2025), available online at https://www.washingtonexaminer.com/news/justice/3835788/doj-investigation-wrongful-arrest-conservative-influencer-nick-sortor-portland/ (last visited Oct. 5, 2025).

[23] Chris Cameron, *Deploy National Guard to Chicago? Trump Says He Has 'The Right to Do Anything I Want to Do'*, N.Y. Times (Aug. 26, 2025), available online at https://www.nytimes.com/2025/08/26/us/politics/trump-national-guard-chicago-dictator.html (last visited Oct. 5, 2025).

[24] As of Oct. 4, 2025, Defendant President Trump has authorized the deployment of 300 National Guard troops to Chicago. *See* Christal Hayes*, Trump authorizes deployment of 300 National Guard troops to Chicago*, BBC (Oct. 4, 2025), available online at https://www.bbc.com/news/articles/c2dnk0ee6pyo (last visited Oct. 5, 2025).

[25] *Department of Homeland Security*, ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois, DHS (Sept. 8, 2025), available online at https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal (last visited Oct. 5, 2025).

[26] Juliana Kim, Alana Wise, Kat Lonsdorf, *Trump threatens 'Apocalypse-Now'-style action against Chicago to boost deportations*, NPR (Sept. 6, 2025), available online at https://www.npr.org/2025/09/06/nx-s1-5532148/national-guard-chicago-baltimore-new-orleans (last visited Oct. 5, 2025).

often using excessive force against individuals they encountered.[27]

## III. Defendants' Attacks on Protesters, Journalists, and Religious Figures at the Broadview ICE Facility

Federal officers have made hundreds of immigration arrests of dubious legality and used the ICE detention facility in Broadview, Illinois as a primary hub for processing and detaining arrestees.[28] The Broadview ICE facility quickly became a focal point for members of the Chicago community opposed to the Trump Administration's policies.[29] Individual citizens assembled on public streets and sidewalks outside the facility to protest the Trump Administration's policies and actions.[30] They held signs that said things like, "immigrants are welcome here," "no one is illegal on stolen land," "free our neighbors," Ex. 7 (Sullivan Decl.) ¶ 4; and sang songs and chanted together, Ex. 5 (Sigcho-Lopez Decl.) at ¶ 6; Ex. 16 (Thrush) Decl. at ¶ 18. People of faith similarly gravitated to the Broadview ICE facility, called by their

---

[27] Charlie De Mar and Todd Feurer, *Federal agent throws tear gas canister from SUV on busy Chicago street*, CBS News (Oct. 3, 2025), available online at https://www.cbsnews.com/chicago/news/federal-immigration-agent-throws-tear-gas-canister-logan-square-street/ (last visited Oct. 5, 2025); *See* Tom Schuba, Cindy Hernandez, Selena Kuznikov, Michael Puente, *Border Patrol shoots woman on Southwest Side; agents, protesters, battle for hours*, WBEZ Chicago (Oct. 4, 2025), available online at https://www.wbez.org/immigration/2025/10/04/federal-agents-shoot-woman-they-say-boxed-in-authorities-in-brighton-park (last visited Oct. 5, 2025); *See ICE Agents Dragged Naked Children Out of Homes in Chicago Raid: Neighbors*, Newsweek (Oct. 3, 2025), available online at https://www.newsweek.com/ice-agents-dragged-naked-children-out-homes-chicago-raid-10823150 (last visited Oct. 5, 2025); *See* Renee Hickman and Brad Brooks, *Footage of deadly ICE shooting in Chicago suburb challenges official narrative*, Reuters (Sept. 24, 2025), available online at https://www.reuters.com/world/us/police-records-witness-accounts-complicate-dhs-narrative-fatal-chicago-area-ice-2025-09-24/ (last visited Oct. 5, 2025).

[28] Michael Loria and Eduardo Cuevas, *800 arrests amid Chicago immigration 'blitz' of helicopters and midnight raids*, USA Today (Oct. 3, 2025), available online at https://www.usatoday.com/story/news/nation/2025/10/03/chicago-area-immigration-raids-dhs/86497161007/ (last visited Oct. 5, 2025); *See* Lauren FitzPatrick and Adriana Cardona-Maguigad, *ICE's Broadview facility has become a de facto detention center, minus the rules and oversight*, WBEZ Chicago (Oct. 1, 2025), available online at https://www.wbez.org/immigration/2025/10/01/broadview-immigration-processing-center-detention-ice-dhs (last visited Oct. 5, 2025)

[29] Emmy Victor and Ashlyn Wright, *Protesters rally at ICE facility in Broadview amid growing tensions*, WGN Chicago (Oct. 4, 2025), available online at https://wgntv.com/news/operation-midway-blitz/protesters-rally-at-ice-facility-in-broadview-amid-growing-tensions/amp/ (last visited Oct. 5, 2025)

[30] *Id.*

faith to pray for the federal officers "to repent and turn away from unnecessary and brutal enforcement of the immigration laws." Ex. 1 (Black Decl.) ¶ 2; Ex. 3 (Johnson Decl.) ¶¶ 5-11. With such newsworthy events occurring at the Broadview ICE facility, journalists and other members of the press joined the growing body of people to investigate, document, and report on the protests, as well as to cover the Trump Administration's policies and actions transpiring in backdrop of the protests. Ex. 20 (Lulay Decl.) ¶¶ 12-20, 26, 30; Ex. 24 (Griswold Decl.) ¶ 12; Ex. 26 (Arnold Decl.) ¶ 16.

Consistent with the Trump Administration's proclamation of "war" against anyone who criticizes law enforcement or border policies, federal officers (at Defendants' direction) have consistently used force to disrupt and disband the lawful assembly. *See generally* Ex. 32 (Kerlikowske Decl.). Without justification, and without giving protesters warning or an adequate opportunity to avoid the uses of force, federal officers have fired rubber bullets and pepper balls at protesters, launched flashbang grenades, and indiscriminately sprayed clouds of tear gas. *See* Exs. 1-26 (declarations of protesters, clergy, and members of the press, discussed in more detail below). The massive amount of tear gas has caused community members around Broadview— including those who live near the facility and were not themselves protesting—to experience serious health problems. Ex. 27-30 (declarations of people who live and work near Broadview describing effects of tear gas). Defendants' actions were taken with the goal of suppressing protected speech activities, as demonstrated by Defendant Trump's call for greater force to be used against protesters, and by Defendant Noem's statements, that "[t]he more that they protest … the harder ICE is going to come after them."[31]

---

[31] Brad Brooks, Jane Ross, Phil Stewart, and Idrees Ali, *Trump administration deploys Marines to Los Angeles, vows to intensify migrant raids*, Reuters (June 10, 2025), available online at https://www.reuters.com/world/us/los-angeles-police-order-immigration-protesters-downtown-go-home-2025-06-09/ (last visited Oct. 5, 2025); *See* Stacey Dec, *White House tries to clarify Trump's threat to use*

Additionally, federal officers (at the direction of Defendants) prevented press members at the Broadview ICE facility from performing their journalistic activities. Ex. 16-26 (declarations from journalist and journalist-organizations). Journalists who wore clothing that clearly identified them as members of the press were shot with pepper balls, subjected to clouds of tear gas, and even arrested. *See, e.g.*, Ex. 18 (Held Decl.) at ¶¶ 17-20, 28-32. Some of these journalists were shot despite standing at a distance from protesters. *See, e.g.*, Ex. 16 (Thrush Decl.) ¶¶ 14-16. These actions were taken with the intent of suppressing journalistic coverage of the Trump Administration's policies and actions, consistent with the Trump Administration's persistent attacks on members of the media.[32]

Defendants have indicated they intend to continue using force of this nature. On September 29, 2025, Defendant Bondi issued a memorandum directing multiple federal agencies (including the ATF, U.S. Marshals Service, and the Federal Bureau of Investigations) to "suppress all unlawful rioting."[33] The memorandum specifically referenced the Broadview protests as an example of unlawful rioting.[34] Defendant Trump echoed this edict, declaring that the deployment in Chicago was part of a war against protesters in cities across the United States.

---

*'heavy force' on 'any' military parade protesters*, ABC News (June 11, 2025), available online at https://abcnews.go.com/Politics/white-house-clarify-trumps-threat-heavy-force-military/story?id=122746297 (last visited Oct. 5, 2025); *See* Andy Rose, *Trump says 'it's anarchy' in Portland. Here's why locals say that's far from reality*, CNN (Sept. 30, 2025), available online at https://www.cnn.com/2025/09/30/us/portland-residents-trump-troops (last visited Oct. 5, 2025).

[32] Edward Helmore, *Trump is waging war against the media—and winning*, The Guardian (July 5, 2025), available online at https://www.theguardian.com/us-news/ng-interactive/2025/jul/05/trump-attack-us-media (last visited Oct. 5, 2025).

[33] Office of the Attorney General, *Ending Political Violence Against ICE*, memorandum for the Director of the Federal Bureau of Intelligence, the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Director of the U.S. Marshal's Service, the Administrator of the Drug Enforcement Administration, and the Director of the Executive Office of U.S. Attorneys (Sept. 29, 2025), available online at https://www.justice.gov/opa/pr/attorney-general-bondi-issues-memo-ending-political-violence-against-ice (last visited Oct. 5, 2025).

[34] *Id.*

On October 2, 2025, the Illinois State Police (ISP) attempted to establish a First Amendment zone where protesters would be entitled to exercise their right to free speech.[35] This did nothing to deter the ongoing illegal federal conduct. Indeed, the very next day, Defendants Noem and Bovino were present at the Broadview ICE facility to exhort ICE and CBP officers to continue "going hard" at protesters for the way they were "talking" and "speaking."[36] Speaking to assembled federal officers and gesturing toward the protesters in the State Police "Free Speech Zone," Bovino asserted that "this is an unsafe crowd" and that the area around the Broadview ICE facility was going to be a "Free *Arrest* Zone."[37] Defendant Bovino and a phalanx of federal agents proceeded to attack Plaintiffs and others lawfully assembled in the area designated by the ISP. Ex. 16 (Thrush Decl.) ¶¶ 35-41; Ex. 45 (10/3/25 Video of Bovino) (*infra* n.54).

The violence perpetrated by the federal officers—particularly the deployment of massive quantities of toxic chemicals as they attempt to suppress dissent—also affects the community where the facility is located. Residents and business owners have been sickened and unable to engage in normal activities. Exs. 27-30 (Butler-Bey, Harden, Alvarado, and Thompson Decls.). The mayor of Broadview, Katrina Thompson has made federal agents aware of the harm their actions are causing to her community. Mayor Thompson stated "[t]he relentless deployment of tear gas, pepper spray and mace at the ICE facility is endangering nearby village residents, harming police officers, harming firefighters and American citizens exercising their First Amendment rights,"[38] Broadview's Chief of Police echoed these concerns, explaining that

---

[35] Jermont Terry, *Officials set up designated protest zone outside ICE facility in Broadview, Illinois*, CBS News Chicago (October 2, 2025), available at https://www.cbsnews.com/chicago/news/broadview-ice-facility-designated-protest-zone-concrete-barriers/ (last visited Oct. 5, 2025).
[36] *Supra* n.15.
[37] *Id.*
[38] Sara Tenebaum, *Broadview ICE Facility, Agents at Center of Criminal Investigations, Village Officials Say,* CBS (Oct. 1, 2025), available online at https://www.cbsnews.com/chicago/news/broadview-criminal-investigations-ice-activity-facility-fence/ (last visited Oct. 5, 2025).

federal agents have "verbally abused" his officers and stating, "[t]he employment of tear gas, pepper spray, mace, and rubber bullets by ICE … is creating a dangerous situation for the community and our first responders."[39] The Village of Broadview filed a lawsuit seeking an order requiring the Defendants to remove the fence they illegally erected on public property (Beach Street). *See* Dkts. 1 (Compl.), 10 (Mot. for TRO) in *Village of Broadview v. DHS, et al.*, No. 25-cv-12164 (N.D. Ill.).

### IV. Defendants Have Expanded Their First Amendment Violations Beyond the Broadview ICE Facility

Meanwhile, federal officers have expanded their First Amendment violations beyond the Broadview ICE facility. On Friday, October 3, in Logan Square, ICE agents encountered people expressing concern for their immigrant neighbors and their opposition to the tactics ICE was using in the community.[40] Without warning or any apparent justification, an ICE officer threw a cannister of tear gas out of his vehicle along a busy Chicago street in front of an elementary school.[41] The next day, in Brighton Park, a group of 75-100 people gathered in response to the large and visible presence of ICE and CBP in the neighborhood. Ex. 39 (Goyette Supp. Decl.) ¶¶ 2, 13-15. Chicago Police officers took up a position between the protesters and the federal agents, but the federal agents pushed past the local police officers and began pointing weapons at the protesters standing in the street. Ex. 41 (Espinoza Decl.) ¶ 9. Elsewhere in the vicinity, federal agents used less-lethal munitions including flashbang grenades, tear gas, and rubber

---

[39] CBS Chicago, Broadview Police Chief Says ICE Facility is "Creating a Dangerous Situation for the Community", YouTube (Oct. 1, 2025), available online at https://www.youtube.com/watch?v=h_Jp1hgHm2s at 1:17 min. (last visited Oct. 5, 2025).
[40] Charlie De Mar & Todd Feurer, *Federal agent throws tear gas canister from SUV on busy Chicago street*, CBS News Chicago (Oct. 3, 2025), available online at https://www.cbsnews.com/chicago/news/federal-immigration-agent-throws-tear-gas-canister-logan-square-street/ (last visited Oct. 5, 2025).
[41] *Id.*

bullets against peaceful protesters including minors and elderly residents of the neighborhood. *Id.* ¶ 10. One federal agent dropped a flashbang grenade 18 inches from a journalist's foot. Ex. 39 (Goyette Supp. Decl.) ¶ 18. Other CBP officers did not give any warning before they shot canisters of tear gas at protesters who were at least twenty feet away and following the agents' instructions to back up. Ex. 34 (Orozco Decl.) ¶ 9.

\* \* \*

The Defendants have given no indication they will stop this unconstitutional conduct without a court order. Plaintiffs filed this suit seeking to enjoin the escalating violations of their rights.

## LEGAL STANDARD

The standards governing temporary restraining orders and preliminary injunctions are the same. *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). To obtain injunctive relief preliminarily or a restraining order, the movant must establish: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Chicago Women in Trades v. Trump*, 773 F. Supp. 3d 592, 603-04 (N.D. Ill. 2025) (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009). When, as here, the government is a party to the suit, the final two inquiries (assessing the harm to the opposing party and weighing the public interest) merge. *Chicago Women in Trades*, 773 F.3d Supp. at 604 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The party seeking preliminary relief "carries the burden of persuasion" on each of these points. *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). However, where, as here, plaintiffs are "likely to win on

12

the merits, the balance of harms need not weigh as heavily in [their] favor." *Speech First, Inc. v.*

*Killeen*, 968 F.3d 628, 637 (7th Cir. 2020).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of their claims because Defendants'

dangerous, sweeping, and unnecessary use of impact munitions, chemical weapons, and near-

lethal grenades to suppress and retaliate against newsgathering, protest, assembly, and prayer is

patently unconstitutional. Little analysis is needed to recognize that the federal government

waging war against the civilian population—and doing so in response to the exercise of bedrock

constitutional rights—is unlawful. The conduct is so egregious, and so unlawful, that it is *res*

*ipsa loquitor*; it speaks for itself.

Plaintiffs are additionally likely to prevail on the merits for at least the following reasons:

(1) the government's actions are not narrowly tailored to serve compelling or significant

governmental interests; (2) the government's actions are being done in retaliation for Plaintiffs'

exercise of their First Amendment rights; (3) the government's actions violate the Religious

Freedom Restoration Act and (4) the government is systematically violating Plaintiffs' Fourth

Amendment rights to be free from excessive force. "In First Amendment cases, the likelihood of

success … will often be the determinative factor" in granting an injunction. *ACLU v. Alvarez*,

679 F.3d 583, 589 (7th Cir. 2012) (cleaned up).

### A. Defendants Are Systematically Violating the First Amendment Rights of Protesters, Journalists, and Clergy

In the First Amendment context, the moving party bears the initial burden of making a

colorable claim that its First Amendment rights have been infringed, or are threatened with

infringement, at which point the burden shifts to the government to justify the restriction. *See*

13

*Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (burden of proof at the preliminary injunction stage tracks the burden of proof at trial); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) (same).

Plaintiffs—protesters, clergy, and journalists alike—have engaged in, and intend to continue to engage in, protected speech activity outside of the Broadview ICE facility and throughout the Chicagoland area. For example, Plaintiffs Paulson, Reidy-Hamer, and Kunkel have protested against federal immigration policy, including mass detentions and deportations. *Citizens United v. FEC*, 558 U.S. 310, 371 (2010) ("The First Amendment protects political speech[.]"); Ex. 6 (Paulson Decl.) ¶¶ 4-5, 7, 12, 14-15; Ex. 12 (Reidy-Hamer Decl.) ¶¶ 3-5; Ex. 8 (Kunkel Decl.) ¶ 2.

Likewise, Plaintiff Black and other clergy are engaged in religious exercise. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022) ("the Free Speech Clause provides overlapping protection for expressive religious activities"). Ex. 1 (Black Decl.) ¶ 2 ("I felt called and compelled by my Christian faith to come to the area around the Broadview ICE facility in Broadview, Illinois to minister to the ICE officers there and to urge them to repent and turn away from unnecessary and brutal enforcement of the immigration laws."); ¶ 4 ("I extended my arms, palms outstretched toward the ICE officers … I urged the ICE officers to repent and to believe the Good News that the Kingdom of God is near as I remained in a posture of prayer."); Ex. 2 (Curran Decl.) ¶¶ 2-4 (has attended Friday prayer vigils at the Broadview ICE facility for 19 years, to "pray for the people who are detained in that facility, their families and the people that work there, including agents employed by … ICE."); Ex. 3 (Johnson Decl.) ¶¶ 1-2, 4-5, 8, 11.

And the journalist Plaintiffs made the editorial decision to cover the protests and the federal response to the protests. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674

(1998) ("When a public broadcaster exercises editorial discretion in the selection . . . of its programming, it engages in speech activity"). Ex. 26 (Arnold Decl.) ¶ 16 ("The protests at Broadview, along with the immigration enforcement actions there, are extraordinarily important to the public and therefore important for the press to cover."); Ex. 24 (Griswold Decl.) ¶ 12 (similar); Ex. 20 (Lulay Decl.) ¶¶ 5-17, 26 (similar); Ex. 25 (Grimm Decl.) ¶ 20 (similar); Ex. 18 (Held Decl.) ¶ 3; Ex. 17 (Geary Decl.) ¶ 3; Ex. 19 (Boyle Decl.) ¶¶ 2-4; Ex. 22 (Mulcahy Decl.) ¶¶ 4-5; Ex. 23 (Decker Decl.) ¶¶ 2-4. Pursuant to that editorial judgment, they have engaged in constitutionally protected newsgathering at Broadview. *Alvarez*, 679 F.3d at 598-600.

Second, this protected activity is taking place on public streets, sidewalks, and public ways. *E.g.*, Ex. 35 (Paulson photos showing protesters on Beach Street); Ex. 36 (Acting Fire Chief Martin Aff. (Dkt. 10-3, No. 25-12164) at ¶¶ 3, 4, 15 (illegal ICE fence on Beach Street, a public street owned by the Village of Broadview); Ex. 37 (photos of Beach Street and illegal ICE fence, from Dkt. 10-2, No. 25-12164); Ex. 1 (Black Decl.) ¶¶ 3-4 (sang, marched and prayed on the street in front of facility); Ex. 12 (Reidy-Hamer Decl.) ¶¶ 5, 10, 19 (chanted, sang, and protested on Harvard, Beach, and 25th Streets); Ex. 6 (Paulson Decl.) ¶¶ 5, 15 (stood on sidewalks, streets, and grass); Ex. 26 (Arnold Decl.) ¶ 14 (agents indiscriminately used weapons on protesters, legal observers, and journalists gathered on Harvard Street and sidewalk); Ex. 8 (Kunkel Decl.) ¶¶ 3 6, 9-10, 16; Ex. 19 (Boyle Decl.) ¶¶ 5, 6, 8, 16; Ex. 16 (Thrush Decl.) ¶¶ 14, 31, 35-36; Ex. 22 (Mulcahy Decl.) ¶ 9; Ex. 18 (Held Decl.) ¶ 24; Ex. 3 (Johnson Decl.) ¶ 3.

These First Amendment activities are therefore happening in traditional public fora afforded the highest level of protection under the First Amendment. "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Loc.*

15

*Educators' Ass'n*, 460 U.S. 37, 45 (1983). Places like "streets and parks … 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* (quoting *Hague v. CIO,* 307 U.S. 496, 515 (1939)). "Public demonstrations and protests are clearly protected by the First Amendment, and a protest not open to the press and general public is not a public demonstration." *Index Newspapers LLC v. U.S. Marshals* Service, 977 F.3d 817, 830 (9th Cir. 2020) (citing *Snyder v. Phelps*, 562 U.S. 443 (2011); *City of Houston v. Hill*, 482 U.S. 451, 472 (1987) ("[T]he First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive.")).

### 1. Defendants' content-based regulation of Plaintiffs' speech is presumptively unconstitutional.

Defendants' actions at the Broadview ICE facility are unconstitutional because they are unjustified content-based discrimination. Defendants discriminate against the viewpoint of protesters, and they regulate the content that journalists choose to cover. Because Defendants' actions fail to satisfy strict scrutiny, they are unconstitutional. Such content-based regulation is "presumptively unconstitutional," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), because the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

Over the past few months, Defendants have repeatedly announced their intent to punish protesters for their "motivating ideology" and "opinion or perspective." *Reed*, 576 U.S. at 168 (internal quotation marks omitted); *Brown v. Kemp*, 86 F.4th 745, 780-81 (2023) (recognizing that discriminating based on a speaker's motives is viewpoint-based discrimination). The most blatant example of this viewpoint-based discrimination is a presidential memorandum directing

16

federal officers to "investigate, prosecute, and disrupt" entities and organizations who criticize "support for law enforcement and border patrol."[42] Other statements resound this message. On June 10, Defendant Noem threatened that "[t]he more that they protest … the harder ICE is going to come after them."[43] Defendant Bondi explicitly referred to the protests outside of the Broadview ICE facility as one of the "riots" she sought to suppress.[44] *Id.* On September 30, President Trump described protesters as launching a "war from within" the United States and encouraged federal officers to use physical violence against protesters when they get too close.[45] Most recently, on October 3, Defendants Noem and Bovino encouraged federal officers to target protesters for their speech and affiliations.[46]

Federal officers at the Broadview ICE facility have mobilized the Defendants' directions in a manner that discriminates against protesters' viewpoints. For example, on September 27, federal officers rushed at protesters solely for the purpose of stealing away their signs.[47] There is no reason to steal away a sign except to silence the viewpoint expressed in that sign. Some of the many other examples of content- and viewpoint based discrimination at the protests include: federal agents specifically targeting journalists; shouting journalists' name to intimidate them; assaulting protesters talking at them; shooting at protesters who were not on federal property or

---

[42] Countering Domestic Terrorism and Organized Political Violence, 90 Fed. Reg. 47,225, 47,225-26) (Sept. 25, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/ (last visited Oct. 5, 2025).

[43] Brad Brooks, et al., *Trump Administration Deploys Marines to Los Angeles, Vows to Intensify Migrant Raids*, Reuters (June 10, 2025), *supra* n.31.

[44] Department of Justice, *Attorney General Bondi Issues Memo on Ending Political Violence Against ICE*, Office of Public Affairs (Sep. 29, 2025), available online at https://www.justice.gov/opa/pr/attorney-general-bondi-issues-memo-ending-political-violence-against-ice (last visited Oct. 5, 2025).

[45] The White House, *President Trump Delivers Remarks to the Department of War*, YouTube (Sept. 30, 2025), available online at https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-department-of-war/ at 42:00-47:00 min. (last visited Oct. 5, 2025).

[46] *Supra* n.15

[47] Status Coup News, *BREAKING: ICE ATTACKS Protesters at Chicago Detention Center,* YouTube (Sept. 27, 2025), available online at https://www.youtube.com/watch?v=QoobmuQoKWM at 37:10, 37:20, 38:20, and 38:30 (last visited Oct. 5, 2025).

interfering in any way with operations at the facility; stepping on protesters' signs; using crowd control weapons on protesters who were chanting things the agents did not like (*e.g.*, "we love you" to family members of detained individuals); charging, tackling, and arresting chanting protesters; firing on a protester with a mobility aid on the ground; shooting Reverend Black in the head while he was trying to talk to them, pepper spraying and shoving him; twisting a clergy member's nipples; violently choking a protester; insulting protesters; laughing at protesters pushed to the ground with blood coming out of their ears; arresting a protester trying to give medical aid to another protester. Ex. 18 (Held Decl.) ¶¶ 8, 11-16, 21, 27; Ex. 1 (Black Decl.) ¶¶ 4-6; Ex. 6 (Paulson Decl.) ¶¶ 13, 15-18; Ex. 23 (Decker Decl.) ¶¶ 11-12; Ex. 9 (Breslin Decl.) ¶¶ 8-9; Ex. 16 (Thrush Decl.) ¶¶ 18, 22, 37 (agents violently arresting protester with sign that read, "Immigrants in, Racists out"), 38; Ex. 7 (Sullivan Decl.) ¶ 8; Ex. 31 (Thomson Decl.) ¶¶ 10-13 (in response to protesters deploring ICE violence against immigrants, federal agents shot pepper balls at them while saying, "I'm sick of this," and "enough is enough"); Ex. 42 (Yarusso Decl.) ¶¶ 8-10 (ICE agents pepperballed nonthreatening protesters saying, "shame on you," to them; an agent said "something like 'That's enough!' in response to the protesters as agents were using pepper balls on the crowd.")[48] The protesters held signs critical of ICE. Ex. 31 (Thomson Decl.) ¶ 7 (protesters held signs critical of ICE or equated ICE to Nazis or fascists.).

---

[48] *Id*. at 6:44 min. (an agent taunts protester), 10:17 min. (an agent mockingly says Silverio's name, the man murdered by ICE, when a protester brings him up, telling the protester to say his name right then proceeds to walk away), 38:59 min. (an agent tells a protester "talk shit we go where we want" followed by another agent getting close to the protester who avoiding touching them and is taunted by "exactly exactly") (last visited Oct. 5, 2025). *See also* WGN, ICE Agents Clash with Protesters in Broadview, YouTube (Sep. 26, 2025) available online: https://www.youtube.com/watch?v=kyFTG3ucU9M at 2:02 min. (agents push protester and kick their sign away) (last visited Oct. 5, 2025); Status Coup News X.com (Sep. 26, 2025), available online at: https://x.com/StatusCoup/status/1971720063922429984 at 1:27 min. (agents fired pepper balls where press was taking pictures of a protester being arrested) (last visited Oct. 5, 2025)

In addition to discriminating against the viewpoint of protesters, Defendants' regulation of the public fora also moderates the content of journalists' publishing. Journalists and news organizations attend the Broadview protests to exercise their "editorial discretion in the selection . . . of [their] programming." *Arkansas Educ. Television Comm'n*, 523 U.S. at 674. By using forceful means that prevent and deter journalists from covering the protests—by, among other things, firing projectiles and chemical agents at journalists—Defendants are imposing a restriction on journalists' content.

The viewpoint-based discrimination against protesters, and the content-based restrictions imposed upon journalists, are both subject to strict scrutiny. *Reed*, 576 U.S. at 171. Here, Defendants fail to satisfy strict scrutiny because their actions are not narrowly tailored to any governmental interest. The evidence shows that federal officers could control the protests through lawful, non-forceful means. For example, on the afternoon of September 27, federal officers dispersed the protesters to allow a car to pass through by slowly and calmly walking the protesters back and directing them to the sidewalks.[49] At that time, federal agents were not wearing any face coverings. But federal agents returned later that evening wearing gas masks, evincing a premeditated plan to use chemical agents against the protesters (despite their prior success at peaceful means). And, indeed, federal agents used tear gas as a primary means of crowd control on multiple occasions throughout that evening after having donned gas masks.[50] By resorting to forceful means when peaceful measures were sufficient, Defendants' actions fail to satisfy the narrow tailoring requirement. For example, Plaintiffs' expert, Gil Kerlikowske, who is a former Commissioner of Customs and Border Protection, and has 47 years of law enforcement experience, states:

---

[49] *Supra* n.47 at 0:50 to 8:55 min.
[50] *Supra* n.47 at 2:09:30 min.

> From the materials I reviewed, there is not a legitimate law enforcement reason for significantly and indiscriminately tear gassing Mr. Paulson, Ms. Breslin, Ms. Hamer, and many other demonstrators repeatedly in this manner. There is likewise no legitimate law enforcement purpose for tear gassing members of the media …. Instead, the more likely explanation was that federal agents deployed widespread tear gas into the crowd, stretching for a block, as an effort to forcibly end the protest that evening by dispersing the non-violent demonstrators blocks away. Yet … the federal agents deployed tear gas in a manner that at the same time blocked many demonstrators' ability to retreat, forcing them into greater risk of physical confrontation with federal agents. This is not a proportional or appropriate use of chemical irritants in the protest policing context at issue, and it does not appear to be in service of any legitimate protest control purpose ….

Ex. 32 (Kerlikowske Decl.) ¶ 42. That a former Commissioner of CBP has attested to the excessive and unwarranted nature of the federal officers' actions further demonstrates that Defendants' approach is not narrowly tailored to serve any governmental interest.

The high likelihood of serious injury from Defendants' use of crowd control weapons also means that Defendants' actions fail narrow tailoring. Dr. Rohini Haar, an emergency-room physician whose research focuses on the impacts of violence and human rights violations on health, concludes that crowd control weapons can cause significant and long-lasting health harms. Some types of kinetic impact weapons can also be lethal. Ex. 33 (Haar Decl.) ¶¶ 15-71. *See L.A. Press Club*, 2025 WL 2658327, at *11-12 (finding Kerlikowske and Haar qualified, credible, and persuasive).

Moreover, Defendants used forceful actions indiscriminately against *all* people without regard for the peacefulness of an individual. This is not a situation where federal agents use force against a few agitators. At the Broadview ICE Facility, federal agents on a rooftop shoot pepper balls at clergy praying in the street. Ex. 1 (Black Decl.) ¶¶ 4-5. They throw flashbang grenades at people who are singing and chanting. Ex. 12 (Reidy-Hamer Decl.) ¶¶ 5-8. And they lob tear gas without warning in front *and behind* the protesters, so that protesters are caught in a cloud of gas without any path to escape. Ex. 6 (Paulson Decl.) ¶¶ 15-21. Defendants are using excessive force

against anyone who dares stand in public fora outside the Broadview ICE facility, even when those people are not engaging in any violence or criminal conduct. *See, e.g.*, Ex. 1 (Black Decl.) ¶¶ 4-5; Ex. 12 (Reidy-Hamer Decl.) ¶¶ 5-6, 11; Ex. 6 (Paulson Decl.) ¶¶ 3, 9, 11; Ex. 26 (Arnold Decl.) ¶¶ 14-15; Ex. 24 (Griswold Decl.) ¶ 10; Ex. 16 (Thrush Decl.) ¶¶ 2, 6, 9, 11, 14, 16-17, 35; Ex. 18 (Held Decl.) ¶¶ 4, 9, 11-12, 21; Ex. 17 (Geary Decl.) ¶¶ 5, 9-11; Ex. 25 (Grimm Decl.) ¶ 9; Ex. 11 (Roche Decl.) ¶¶ 4-8; Ex. 8 (Kunkel Decl.) ¶¶ 4, 6-11; Ex. 15 (Sakiyama Decl.) ¶¶ 18-24, 27-28; Ex. 3 (Johnson Decl.) ¶ 11; Ex. 2 (Curran Decl.) ¶¶ 15-16.

Even when protesters comply with federal agents' orders, they are still subjected to excessive force. For example, on September 27, after a protester moved to the sidewalk, a federal agent fired a pepper ball (or paintball) gun at him after being instructed by a supervisor to "light him up."[51]

Defendants' regulations also are not narrowly tailored for members of the press gathering outside of the Broadview ICE facility. Journalists are experiencing the same uses of force as protesters. Journalists are being shot with pepper balls and other projectiles. Ex. 26 ¶ 12 (Arnold Decl.), Ex. 23 ¶ 12 (Decker Decl.), Ex. 19 ¶¶ 3, 14, 17-19 (Boyle Decl.), Ex. 22 ¶¶ 9-10 (Mulcahy Decl.); Ex. 18 ¶¶ 13, 18, 20 (Held Decl.); Ex. 17 (Geary Decl.) ¶ 9; Ex. 25 ¶¶ 8-10, 14 (Grimm Decl.); Ex. 24 ¶ 10 (Griswold Decl.); Ex. 20 ¶¶ 14, 16, 20 (Lulay Decl.); Ex. 16 ¶¶ 2, 14-16, 24 (Thrush Decl.). Journalists are being subjected to massive amounts of chemical agents. Ex. 26 ¶ 15 (Arnold Decl.); Ex. 29 ¶¶ 3, 14, 20 (Boyle Decl.); Ex. 22 ¶ 10 (Mulcahy Decl.); Ex. 18 ¶ 20 (Held Decl.); Ex. 25 ¶¶ 11, 13-14 (Grimm Decl.); Ex. 24 ¶ 10 (Griswold Decl.); Ex. 20 ¶¶ 14-15, 20 (Lulay Decl.); Ex. 21 ¶¶ 8-10 (Goyette Decl.); Ex. 16 ¶¶ 2, 17 (Thrush Decl.). These examples of force are being inflicted upon journalists without provocation. Journalists

---

[51] *Supra* n.47 at 37:50 min.

who are simply attempting to perform their job in the public fora outside the Broadview ICE facility, without antagonizing or inciting federal officers, are subjected to unlawful uses of force. There are countless alternative (more effective) means of crowd control that are more narrowly tailored. Most obviously, federal officers could focus their crowd control measures on any unruly protesters, not peaceful journalists who are clearly identifiable by insignia denoting them as members of the press. Ex. 26 ¶ 14 (Arnold Decl.); Ex. 23 ¶ 5 (Decker Decl.); Ex. 19 ¶¶ 7, 9 (Boyle Decl.); Ex. 22 ¶ 7 (Mulcahy Decl.); Ex. 18 ¶¶ 5-6 (Held Decl.); Ex. 17 ¶ 4 (Geary Decl.); Ex. 25 ¶ 8 (Grimm Decl.); Ex. 20 ¶ 22 (Lulay Decl.); Ex. 16 ¶ 5 (Thrush Decl.).

The narrow tailoring analysis here is not close. There are many lawful methods of crowd control that law enforcement personnel could employ. For example, obstruction of roadways or public sidewalks can be addressed by enforcing existing local ordinances. *See* Broadview, Illinois Code of Ordinances § 8-2-9(B)(1) (prohibiting obstruction of street, sidewalk). But firing projectiles and tear gas indiscriminately is not a lawful means of crowd control. Such actions, when used in pursuit of content moderation or viewpoint discrimination, violate the First Amendment.

### 2. Defendants' Purported Time, Place, and Manner Restrictions on Speech Are Still Content-Based, Overbroad, and Not Narrowly Tailored

"The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter." *Christian Legal Society v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006). Here, Plaintiffs are exercising their right to free speech in streets, sidewalks, and public ways. Traditional public fora like these "have historically been open to the public for speech activities." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (referring to public streets and sidewalks). Thus, the government's ability to regulate speech in these places is "'very limited.'" *Id.* at 477 (quoting *United States v. Grace*, 461 U.S. 171, 177

22

(1983)). Governmental actions that restrict speech in public fora, such as streets and sidewalks, must be (1) content neutral, (2) narrowly tailored to serve a substantial government interest, and (3) leave open ample alternative means of communication. *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

For the reasons explained above, Defendants' use of excessive force in the public fora outside the Broadview ICE facility is not content-neutral, and Defendants' restrictions are not narrowly tailored. *See, supra*, Argument, I.A.1. The newly-established "First Amendment zone" outside the facility is not used in a content-neutral manner. For example, Defendant Bovino has called the area a "Free Arrest zone," and Defendant Noem specifically called for the arrest and prosecution of protesters for their speech and association.[52] And Defendants are continuing to use excessive force on protesters and journalists. Ex. 12 (Reidy-Hamer Decl.) ¶ 25 ("From what I observed [on October 3, 2025], the newly established First Amendment area did not help protect the demonstrators."); *see also* ¶¶ 16-24; Ex. 15 (Sakiyama Decl.) ¶¶ 27-29; Ex. 8 (Kunkel Decl.) ¶ 18. Nor have the Defendants narrowly tailored their use of force or dispersal orders to what is necessary to protect any government interests, such as protecting federal property or allowing ingress or egress to the Broadview ICE facility. First, there is no interest in dispersing the press. Second, Plaintiffs have not obstructed officers. And third, the federal agents repeatedly left federal property to chase down protesters.[53] *See Index Newspapers LLC*, 977 F.3d at 831 (finding a "mountain of evidence that the Federal Defendants routinely left federal property to engage in crowd control," which was not within their authority).

Defendants' regulation of the public fora also does not leave open ample alternative means of communication. For example, the protester and press Plaintiffs and the putative class

---

[52] *Supra* n.15, at 1:02-1:25, 2:38-2:42 min.
[53] *Supra* n.47, at 47:08-48:40 min. (agents chasing down protester several blocks away from facility).

seek to communicate with and give their message to the detained immigrants, detainees' loved ones, as well as the federal agents working at the facility. *E.g.*, Ex. 1 (Black Decl.) ¶¶ 2, 4; Ex. 2 (Curran Decl.) ¶¶ 20-21; Ex. 6 (Paulson Decl.) ¶ 15; Ex. 9 (Breslin Decl.) ¶ 11. To do that, they need to be near enough to the facility to communicate their message. However, they have been forced away from the facility, or, due to the excessive use of force on them, forced to cease their protected activity altogether. And, the press Plaintiffs who have been forced away from the facility have been unable to cover the events at the facility, which are highly newsworthy. *E.g.*, Ex. 6 (Paulson Decl.) ¶¶ 23-24; Ex. 12 (Reidy-Hamer Decl.) ¶¶ 7, 12, 14; Ex. 1 (Black Decl.) ¶¶ 5-7; Ex. 18 (Held Decl.) ¶¶ 19-32; Ex. 16 (Thrush Decl.) ¶¶ 29; Ex. 20 (Lulay Decl.) ¶¶ 27-29; Ex. 3 (Johnson Decl.) ¶¶ 7, 12; Ex. 11 (Roche Decl.) ¶ 9; Ex. 2 (Curran Decl.) ¶¶ 23-26, 39-40; Ex. 7 (Sullivan Decl.) ¶ 12.

### B. Defendants Are Retaliating against Plaintiffs for Their Protected Expression

The First Amendment prohibits government officials from retaliating against people for engaging in protected activities. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prevail on a First Amendment retaliation claim, Plaintiffs must show: (1) they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2009)). "The First Amendment prohibits threats of punishment designed to discourage future protected speech." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). This is an objective test: "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Id.*

24

Plaintiffs are likely to succeed on this claim. First, it cannot be disputed that they (and others present) were engaged in activity protected by the First Amendment. *E.g.*, Ex. 16 (Thrush Decl.) ¶¶ 3-4, 8, 30; Ex. 17 (Geary Decl.) ¶¶ 2-4, 6; Ex. 18 (Held Decl.) ¶¶ 2-4; Ex. 22 (Mulcahy Decl.) ¶¶ 4-7; Ex. 20 (Lulay Decl.) ¶¶ 2-3, 19, 24, 26; Ex. 19 (Boyle Decl.) ¶¶ 2, 4; Ex. 1 (Black Decl.) ¶¶ 2-4; Ex. 6 (Paulson Decl.) ¶¶ 4-5, 7, 12, 14-15; Ex. 12 (Reidy-Hamer Decl.) ¶¶ 4-16; Ex. 8 (Kunkel Decl.) ¶ 2; Ex. 25 (Grimm Decl.) ¶¶ 2-3, 7, *see also* Ex. 2 (Curran Decl.) ¶¶ 1-5, 9, 11, 17-18, 23-24, 28, Ex. 23 (Decker Decl.) ¶¶ 2-4, 6, 14; Ex. 7 (Sullivan Decl.) ¶¶ 2, 4-5; Ex. 5 (Sigcho-Lopez Decl.) ¶¶ 4-5; Ex. 21 (Goyette Decl.) ¶¶ 2-4. "Newsgathering, observing government conduct, and protest are each considered paradigmatic protected activities." *L.A. Press Club*, 2025 WL 2658327, at *16; *e.g., Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (peaceful picketing on "matters of public concern at a public place adjacent to a public street ... 'occupies a special position in terms of First Amendment protection.'") (citation omitted); *Boos v. Barry*, 485 U.S. 312, 318 (1988) ("Organized political protest is a form of classically political speech") (cleaned up); *Alvarez*, 679 F.3d at 600 (First Amendment right to observe and film police activities in public).

Second, being shot with impact or chemical munitions, gassed, pepper sprayed, hit with near-lethal grenades, and/or otherwise threatened with arrest for engaging in peaceful First Amendment activity would (obviously) likely deter a person of ordinary firmness from continuing to engage in that protected activity. *See Index Newspapers* LLC, 977 F.3d at 827 n.4 ("being shot with pepper balls, tear gas, and paint-marking munitions, being pepper sprayed at close range, or being shoved by a law enforcement officer would chill a person of ordinary firmness from continuing to exercise their First Amendment rights."); *L.A. Press Club*, 2025 WL 2658327, at *16 (DHS defendants cannot "meaningfully dispute that being subjected to rubber

25

bullets, tear gas, pepper balls, and other crowd control weapons would deter individuals of ordinary firmness from continuing to engage in the protected activity."); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 269 (S.D. Ohio 2021); *see, e.g.*, Ex. 16 (Thrush Decl.) ¶¶ 20-21, 27-30; Ex. 6 (Paulson Decl.) ¶¶ 23-24; Ex. 17 (Geary Decl.) ¶¶ 9-11, 15; Ex. 12 (Reidy-Hamer Decl.) ¶¶ 5-27; Ex. 1 (Black Decl.) ¶¶ 5-7; Ex. 8 (Kunkel Decl.) ¶¶ 4-6, 9-20; Ex. 22 (Mulcahy Decl.) ¶ 13; *see also* Ex. 2 (Curran Decl.) ¶¶ 33-41; Ex. 10 (Shouse Decl.) ¶¶ 8-10;  Ex. 9 (Breslin Decl.) ¶¶ 13-14, 17-19; Ex. 5 (Sigcho-Lopez Decl.) ¶ 8; Ex. 7 (Sullivan) ¶¶ 7, 10; Ex. 23 (Decker Decl.) ¶ 15; and Ex. 33 (Haar Decl.) ¶¶ 43-45, 47, 58-59 (kinetic and chemical irritant projectiles can cause respiratory distress, blunt force trauma, and even permanent disability and death, especially when deployed at close range or against children or older people), ¶¶ 63-70 (flashbang and stun grenades are indiscriminate and can cause serious injuries, including third-degree burns, impact wounds, explosive injuries, blindness, and even death, ¶ 71 ("Misuse of crowd control weapons can result in increased injury severity and greater frequency of injuries. … These include directly firing canisters at individuals or dense crowds, which can cause severe injury or death."). "The risk of such injuries is certainly likely to deter a person of ordinary firmness." *L.A. Press Club*, 2025 WL 2658327, at *16.

Defendants have already stated their specific intention to turn the "Free Speech Zone" outside the Broadview ICE facility into a "Free Arrest Zone." The risk of being unlawfully arrested—as Plaintiff Held was—is also likely to deter a person of ordinary firmness from engaging in protected First Amendment activity. Ex. 18 (Held Decl.) ¶¶ 19, 21-32; Ex. 16 (Thrush Decl.) ¶ 36 (protesters detained for protesting on the greenspace). Defendants have already shown they will conduct these arrests with a level of violence that would obviously deter

someone from being willing to engage in expressive conduct (indeed, Defendants have made clear that this is the very point of their actions).

Third, Plaintiffs' First Amendment activity was at least a motivating factor in Defendants' use of force and other adverse actions. There is direct proof (discussed in the factual background above) that Defendants seek to deter and prevent First Amendment activity directed at documenting and protesting the Trump Administration's mass deportation campaign.

Beside the direct proof of Defendants' hostility toward the press and protesters, there is significant circumstantial proof of retaliatory motive. "Circumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive." *Massey v. Johnson*, 457 F.3d at 717 (7th Cir. 2006). The fact that Plaintiffs were not committing any unlawful acts but merely engaged in protected activity at the time Defendants used physical force or chemical weapons against them is evidence of retaliatory motive. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020); *Alsaada*, 536 F. Supp. 3d at 269; *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155 (D. Or. 2020); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020); *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020).

In *Los Angeles Press Club*, the district court reached the same conclusion with respect to DHS defendants' behavior, and it did so "based, in part, on the extensive record evidence that federal officers repeatedly targeted journalists and peaceful legal observers far from any protesters or bad actors." 2025 WL 26568327, at *17. Here, journalists were repeatedly targeted. Ex. 17 (Geary Decl.) ¶¶ 5, 9, 11-14; Ex. 16 (Thrush Decl.) ¶¶ 6, 14-17, 23-26; Ex. 19 (Boyle Decl.) ¶¶ 3, 7-9, 14, 16-19; Ex. 22 (Mulcahy Decl.) ¶¶ 3, 8-12; Ex. 20 (Lulay Decl.) ¶¶ 12, 14-

27

16, 20, 23; Ex. 18 (Held Decl.) ¶¶ 4, 7-8; Ex. 24 (Griswold Decl.) ¶¶ 9-10. The Journalist

Plaintiffs were easily identifiable as press. Ex. 18 (Held Decl.) ¶¶ 5-6, 17-18, 20; Ex. 16 (Thrush

Decl.) ¶ 5; Ex. 20 (Lulay Decl.) ¶ 22; Ex. 20 (Geary Decl.) ¶ 4; Ex. 22 (Mulcahy Decl.) ¶ 7; Ex.

19 (Boyle Decl.) ¶¶ 7, 9; Ex. 26 (Arnold Decl.) ¶ 12; *see also* Ex. 23 (Decker Decl.) ¶¶ 5, 10, 13.

Plaintiff Held was tackled and arrested for nothing other than doing his job—recording agents

arresting a man. Ex. 18 (Held Decl.) ¶¶ 28-30. The arresting agent laughed at him and his cries

for help. *Id.* ¶ 30. Held was later released without any charges. No one ever told him what he was

being arrested for. *Id.* ¶¶ 31-32.

The evidence shows that the protests at the Broadview ICE facility were peaceful, non-

threatening, and lawful. Ex. 16 (Thrush Decl.) ¶¶ 7, 9; Ex. 17 (Geary Decl.) ¶ 8; Ex. 19 (Boyle

Decl.) ¶¶ 5, 8; Ex. 6 (Paulson Decl.) ¶ 11; Ex. 12 (Reidy-Hamer Decl.) ¶ 5; Ex. 5 (Sigcho-Lopez

Decl.) ¶ 6. Yet, peaceful protesters, clergy, and journalists were shot directly with chemical

munitions and kinetic impact weapons, including in the face, head, and groin, pepper sprayed,

thrown to the ground, tackled, directly threatened, had live firearms and Tasers pointed at them,

run over by pickup truck driven by an agent, and gassed. Ex. 23 (Decker Decl.) ¶¶ 8-9; Ex. 6

(Paulson Decl.) ¶ 11; Ex. 1 (Black Decl.) ¶¶ 4-6; Ex. 43 (Black video, pepper sprayed,

IMG_7636); Ex. 44 (Black video, pepper balled in head);[54] Ex. 13 (Narvaez Decl.) ¶¶ 5-10; Ex.

9 (Breslin Decl.) ¶ 6; Ex. 10 (Shouse Decl.) ¶¶ 2-4, 6-9; Ex. 21 (Goyette Decl.) ¶¶ 6-8.[55] Given

that Plaintiffs and the putative class were engaged in nothing other than peaceful protected

---

[54] Exhibits 43, 44, and 45 can be downloaded from: https://spaces.hightail.com/space/ZzXNsei63k
[55] *See* WGN, *Protesters Clash with Agents Outside Broadview ICE Processing Facility Amid Ongoing Demonstrations*, YouTube (Sep. 26, 2025), available online at  at 1:45-2:16 min (last visited Oct. 5, 2025); Amanda Moore (@noturtlesoup17), X.com (Sep. 27, 2025), "A man was just arrested outside of the Broadview ICE facility in Chicago. When legal observers from the National Lawyers Guild asked why, an agent threatened to arrest them too" available online at https://x.com/noturtlesoup17/status/1972073776339952042 (last visited Oct. 5, 2025).

activity, it can be inferred that their protected activity was at least a motivating factor in Defendants' actions. *See, e.g.*, Ex. 32 (Kerlikowske Decl.) ¶ 55 (opining that using OC spray against Reverend Black at close range was "a serious departure from standard practice and the use-of-force training any competent officer would receive… There is no legitimate law enforcement purpose or training that could support such aggressive misuse of force against a peaceful demonstrator. Instead, it is more likely than not that the misuse of force in this instance was done for some other non-policing goal, such as in response to the viewpoints Reverand Black was there to express."); *see also id.* ¶ 77 ("Law enforcement should never use force to punish an individual performing civil disobedience or to send a message to demonstrators.").

As discussed above, there is also substantial evidence showing that the Defendants have been specifically using force out of hostility to the protesters' message or to the press simply trying to do their jobs.

In addition, Defendants are using crowd control weapons even when crowds were already dispersing, attempting to comply with orders to disperse, or in the absence of any order (or audible order) to disperse. Ex. 16 (Thrush Decl.) ¶¶ 11-13, 35; Ex. 6 (Paulson Decl.) ¶¶ 7-10, 16-21; Ex. 17 (Geary Decl.) ¶ 9; Ex. 12 (Reidy-Hamer Decl.) ¶ 6; Ex. 9 (Breslin Decl.) ¶¶ 12-13 (agents used force despite inaudible orders); Ex. 5 (Sigcho-Lopez Decl.) ¶ 6; Ex. 21 (Goyette Decl.) ¶ 10; Ex. 7 (Sullivan Decl.) ¶ 9.

Defendants are repeatedly firing pepper balls and tear gas canisters directly *at* people. *E.g.*, Ex. 16 (Thrush Decl.) ¶¶ 12, 14-15, 18, 20, 23-26; Ex. 19 (Boyle Decl.) ¶¶ 14, 17-19; Ex. 17 (Geary Decl.) ¶¶ 9-10; Ex. 6 (Paulson Decl.) ¶¶ 16-17; Ex. 9 (Breslin Decl.) ¶ 13; Ex. 5 (Sigcho-Lopez Decl.) ¶ 6; Ex. 18 (Held Decl.) ¶ 14. These weapons are intended to be shot at the

ground, to disperse the chemical irritant in the vicinity, not to be used as a projectile weapon. Ex. 32 (Kerlikowske Decl.) ¶ 57.

And, agents have shot protesters in their head, neck, groin, or other sensitive areas. *See L.A. Press Club*, 2025 WL 2658327, at *18 ("In a disturbing number of cases, Defendants hit declarants in the head. The parties concur that targeting sensitive areas, like the head, neck, spine, or groin, is inappropriate unless the use of deadly force is justified."); Ex. 32 (Kerlikowske Decl.) ¶ 62 ("Shooting pepper balls from a rooftop indiscriminately into a crowd from a heightened position, where the likelihood of shooting someone above the waist is high, is a significant departure from accepted and standard practices and training for law enforcement in a protest context.") *Id.* ¶ 57 ("The materials I reviewed also clearly demonstrate an ongoing pattern, spanning multiple days and circumstances, of federal agents indiscriminately firing pepper balls without warning and in a manner likely to cause serious bodily injury."). Agents have also shot protesters in the back. Ex. 23 (Decker Decl.) ¶ 9.

Defendants are also using violent physical force without warning or justification, including punching, grabbing, and brutally tackling and throwing people to the ground. Ex. 6 (Paulson Decl.) ¶ 13; Ex. 1 (Black Decl.) ¶ 6; Ex. 43 (Video of Black getting shoved then pepper sprayed); Ex. 16 (Thrush Decl.) ¶¶ 36, 38-39; Ex. 18 (Held Decl.) ¶¶ 10, 17.[56]

---

[56] Darius Johnson, *Video shows protester being hit by pickup truck outside Broadview, Illinois ICE facility,* CBS News (Sept. 25, 2025) available online at https://www.cbsnews.com/chicago/news/video-shows-protester-hit-pickup-truck-broadview-ice-facility/?intcid=CNM-00-10abd1h (last visited Oct. 5, 2025); *see also* Kat Abugezalah (@KatAbughazaleh), X.com,(Sept. 19, 2025 at 7:20 AM), "This is what it looks like when ICE violates our First Amendment Rights." available online at https://x.com/KatAbughazaleh/status/1969013628398411810 (last visited Oct. 5, 2025); Ron Smith (@ronxyz00), X.com (Oct. 3, 2025, 11:32 AM) "Sad scenes outside Broadview ICE facility. These are not ICE agents. These are Nazi Gestapo." available online at https://x.com/ronxyz00/status/1974150663195275464?s=46&t=kwXzoKXCNt-ZYuqA5Nrezw (last visited Oct. 5, 2025); WGN, *supra* n.48 at 1:57 min.

In sum, "[t]he sheer frequency—and brutality—of these events raises the inference of retaliation." *L.A. Press Club*, 2025 WL 2658327, at *18. In *Los Angeles Press Club*, the district court found that "the avalanche of evidence before the Court—along with federal officials' statements—suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protesters." *Id.* at *19 (policy or custom of retaliation may be inferred from widespread practices or evidence of repeated constitutional violations and the absence of evidence that officers were discharged or reprimanded for their retaliatory actions). The court also cited evidence that "Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force," including the same evidence Plaintiffs submit here. *Id.* There is more than sufficient evidence here to find that Plaintiffs are likely to prevail on their First Amendment retaliation claim.

### C.    Defendants Are Violating RFRA

The Religious Freedom Restoration Act ("RFRA") "provide[s] greater protections for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Under RFRA, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). This statutory language creates a burden shifting framework. "Once a RFRA claimant makes a prima facie case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny." *Soc. of Divine Word v. USCIS*, 129 F.4th 437, 449 (7th Cir. 2025).

31

Rev. Black and the putative Religious Exercise subclass are likely to succeed on their RFRA claim. Defendants' use of violent force against people peacefully praying, including clergy members and lay practitioners alike, substantially burdens their exercise of religion. The Seventh Circuit recognizes three ways by which a RFRA claimant can make the required showing of substantiality. A plaintiff must show that the offending government policy "either (1) compelled them to 'perform acts undeniably at odds with fundamental tenets of [their] religious beliefs,' (2) 'put[ ] substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs,' or (3) 'bears direct, primary, and fundamental responsibility for rendering [a] religious exercise ... effectively impracticable.'" *Id.* at 450 (quoting *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013)). In conducting this analysis, courts "focus primarily on the intensity of the coercion applied by the government and not the centrality of the religious practice in question" *Id.* (cleaned up) (quoting *West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022)).

Here, Defendants' conduct puts substantial pressure on Rev. Black and other similarly situated people to modify their behavior and violate their beliefs under highly coercive threats of violence. Like many others, Rev. Black feels called by his deeply held religious beliefs to travel to the Broadview ICE facility and peacefully offer prayers or engage in other religious exercises. Ex. 1 (Black Decl.) ¶ 2; Ex. 2 (Curran Decl.) ¶¶ 2-8; Ex. 3 (Johnson Decl.) ¶ 2; Ex. 14 (Gottlieb Decl.) ¶ 6; Ex. 4 (Worthington Decl.) ¶¶ 5-7. Some have exercised their religion in this manner for decades. Ex. 2 (Curran Decl.) ¶¶ 2-8.

In recent weeks, Defendants have engaged in a policy, pattern, and practice of targeting people visibly engaged in prayer and other religious exercise, including Rev. Black, with pepper balls, tear gas, and other physical violence without provocation. Ex. 1 (Black Decl.) ¶¶ 4-6 (Reverend Black targeted with multiple pepper ball shots, including in the head; pushed; shoved;

subject to canisters of chemicals deployed indiscriminately; had chemicals sprayed directly into face; and "soaked … in liquid chemicals from my head to my toes"); Ex. 3 (Johnson Decl.) ¶¶ 5-11 (tear gas, pepper balls, and rubber bullets deployed against religious group praying and singing hymns); Ex. 14 (Gottlieb Decl.) ¶¶ 4-5, 8 (tear gas, pepper spray, foam bullets, sponge grenades); Ex. 4 (Worthington Decl.) ¶ 3 (tear gas, pepper bullets, pepper spray, sponge grenades); Ex. 17 (Geary Decl.) ¶ 10 ("Federal agents have fired 'less lethal' munitions at … clergy praying"); Ex. 16 (Thrush Decl.) ¶ 38 ("I witnessed an identifiable member of the clergy, Michael Woolf of Evanston Illinois, have his nipples grabbed and twisted and his neck grabbed by a Federal Bureau of Prisons officer.").

This forces Rev. Black and others attempting to exercise their religious beliefs to choose between their health and safety on the one hand and authentically practicing their faith on the other. Ex. 1 (Black Decl.) ¶ 8; Ex. 2 (Curran Decl.) ¶¶ 33-41; Ex. 3 (Johnson Decl.) ¶ 13; Ex. 14 (Gottlieb Decl.) ¶ 11; Ex. 4 (Worthington Decl.) ¶ 11. Indeed, some have in fact concluded that it is too dangerous to continue freely exercising their religion at Broadview because of Defendants' violent actions. *See, e.g.*, Ex. 2 (Curran Decl.) ¶¶ 38-40 (Father Curran has restricted who he invites to join prayer vigils and stopped using the vigils as an opportunity to provide religious education to Catholic students because of the high risk of violence). Such coercion is a textbook example of an impermissible substantial burden on religious exercise. *See West*, 48 F.4th at 845 (substantial burden occurs when the government "attaches some meaningful negative consequence to [a person's] religious exercise, forcing him to choose between violating his religion and incurring that negative consequence.")

Furthermore, Defendants' policy, pattern, and practice of using force against people praying or otherwise practicing their religion, including Reverend Black, cannot survive strict

scrutiny. Strict scrutiny analysis under RFRA sets a high bar. "[U]nder RFRA's version of strict scrutiny, the government must establish a compelling and specific justification for burdening *these* claimants." *Korte*, 735 F.3d 654, 685 (7th Cir. 2013). The government must "identify an 'actual problem' in need of solving, and the curtailment of [the right] must be actually necessary to the solution." *Id.* (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

The government cannot meet this burden here. As previously explained, there is no governmental interest, much less a compelling governmental interest, in using force on individuals engaged in peaceful First Amendment activity, including the exercise of religion. And regardless, the gratuitous violence deployed by Defendants is certainly not the least restrictive means of advancing any legitimate government interest. In short, the ongoing violence directed at Rev. Black and others engaged in religious exercise is flatly illegal, and Plaintiffs are likely to succeed on the merits of their RFRA claim.

### D. Defendants' Systematic Violence Is Excessive in Violation of the Fourth Amendment

Plaintiffs are also likely to succeed in showing that Defendants' acts of violence are unreasonable and thus constitute excessive force that violates the Fourth Amendment of the U.S. Constitution. The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Although police officers may use force to seize another person under appropriate circumstances, the Fourth Amendment protects against the use of excessive force." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). Whether government agents used excessive force is analyzed under an objective reasonableness standard which involves "a careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Accordingly, the analysis "is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Id.* at 806-07 (quoting *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015)).

It is impossible to reconcile Defendants' ongoing violence in Broadview with these constitutional standards. Again and again, Defendants have assaulted, deployed tear gas, pepper balls, rubber bullets, flashbang grenades, and other less lethal munitions against people lawfully present on public property, engaging in lawful free expression. The use of these weapons constitutes a seizure under the Fourth Amendment as these weapons "restrain[] the liberty" of individuals through the use of "physical force." *Torres v. Madrid*, 592 U.S. 306, 311 (2021). The bodily integrity of Plaintiffs whose lungs have been poisoned by gas, or whose eyes have been burned by pepper spray, or whose skin bear bruises and lacerations from being shot with paintballs or rubber bullets has certainly been infringed by Defendants' actions. *United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000).

Plaintiffs were exercising their liberty to assemble in the public fora—to protest or conduct news-gathering activities—and Defendants infringed on that liberty by using these weapons to attack and disperse the crowd. *See, e.g.*, *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 840 (8th Cir. 2021) (deploying tear gas is a seizure); *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (tear gas, projectiles, and physical contact was use of force); *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012) (firing pepper balls is a use of force).

Using such force against peaceful protesters is excessive under the Fourth Amendment. The vast majority of people assembled in Broadview are exercising their First Amendment rights in a peaceful manner. *See, supra*. There is no need to use *any* force, much less violent projectiles and chemical agents, against individuals who pose no threat to federal officers or who are not obstructing their work. *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000) (pointing a gun at an individual who presents no danger violates Fourth Amendment); *Anthony v. Seltzer*, 696 Fed. App'x 79, 82 (3d Cir. 2017) (collecting cases for the proposition that "force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest"). Yet federal officers have demonstrated a pattern of aiming their weapons directly at these peaceful individuals and firing upon them. *E.g.*, Ex. 16 (Thrush Decl.) ¶¶ 14-15, 18; Ex. 23 (Decker Decl.) ¶¶ 8-10; Ex. 18 (Held Decl.) ¶¶ 17, 30. Law enforcement officers "do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever," much less intentionally assault them with tear gas, pepper balls, and flashbang grenades. *Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021) (quoting *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).

More generally, federal officers attack crowds indiscriminately by firing projectiles and dispersing chemical agents in a sweeping manner that is not targeted at specific agitators. *E.g.*, Ex. 6 (Paulson Decl.) ¶¶ 11, 16-21; Ex. 11 (Roche Decl.) ¶ 7; Ex. 3 (Johnson Decl.) ¶ 11. Such undifferentiated action is excessive, given that the overwhelming majority of people at Broadview have been peacefully, if vociferously, expressing themselves. *Quraishi*, 986 F.3d at 840 (deploying tear gas to disperse crowd was excessive); *Nelson*, 685 F.3d at 877 (firing pepper balls to disperse crowd was excessive).

The force behind these measures is of the highest degree. Deploying any of these weapons can cause serious and life-threatening harm. As Dr. Rohini Haar has attested, projectiles like rubber pellets and foam batons can "penetrate the skin" and be "just as lethal" as conventional live ammunition. Ex. 33 ¶ 18 (Haar Decl.). Flash-bang grenades can cause "injuries and even death" due to the pressure of the blast or shrapnel exploding outward from the grenade. *Id.* ¶ 20. And chemical agents like tear gas cause individuals to experience burning sensation on their skin and obstruction in their airways, as well as fear and anxiety. *Id.* ¶ 45. A scalding canister filled with tear gas launched into a crowd can cause its own deadly injuries. *Id.* ¶ 43. Many peaceful protesters, clergy, and journalists have suffered just these sorts of injuries at the Defendants' hands. *E.g.*, Ex. 5 (Sigcho-Lopez Decl.) ¶ 6 (hit in the leg by a tear gas canister); Ex. 6 (Paulson Decl.) ¶¶ 17-20 (describing burning skin and difficulty breathing); Ex. 11 (Roche Decl.) ¶ 11 (contusion from projectile); Ex. 8 (Kunkel Decl.) ¶ 15 (bloody face from projectile).

There is no need for this violence. And the Constitution does not permit it. As discussed above, Defendants choose to use forceful measures that far exceed what is reasonable under the circumstances. As former Commissioner of CBP Gil Kerlikowske explained, "[t]he federal agents policing protests at the Broadview Processing Center … are deploying force that exceeds a legitimate law enforcement purpose or accepted standards for use of force." Ex. 32 (Kerlikowske Decl.) ¶ 2. The actions are excessive because federal officers are not using de-escalation techniques that have proved effective at crowd control, such as giving clear instructions and adequate time to comply with such orders. *Id.* ¶¶ 22-33. Instead, officers use forceful measures against peaceful and non-resisting individuals without giving any warning. *Id.* ¶¶ 22-33, 38-76. And officers are not carefully focusing their forceful efforts on a few unruly

people; they are deploying it indiscriminately at everyone within sight. *Id.* ¶¶ 38-53 (discussing undifferentiated use of tear gas).

Federal officers are engaging in an overwhelming amount of violence against protesters and journalists without justification. Such excessive force violates the Fourth Amendment and inflicts serious injuries upon people in the Northern District. Absent an order from this Court, more people will be seriously harmed by Defendants' actions.

## II.     Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm

### A.     Irreparable Harm under the First Amendment and RFRA Is Presumed

"Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases." *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450-52 (7th Cir. 2022) (Easterbrook, J.) (citing *Christian Legal Soc'y*, 453 F.3d at 859). Total deprivation of the right is not needed; that the plaintiffs "continued to engage in *some* political activity does not foreclose their contention that they were deterred from engaging in other activities," since "[a] loss is a loss[.]" *Id.* (emphasis in original); *see also Mahmoud v. Taylor*, 606 U.S. ___, 145 S. Ct. 2332, 2364 (2025) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotation omitted)). The same standard applies to RFRA. *See Korte*, 735 F.3d at 666 ("Although the claim is statutory, RFRA protects First Amendment free-exercise rights, and in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." (cleaned up).

Some Plaintiffs have already curtailed their protected activities due to Defendants' violence. Ex. 6 (Paulson Decl.) ¶ 23 (stayed only a few minutes on September 28 out of fear); Ex. 16 (Thrush Decl.) ¶ 42 (will only be able to continue reporting if he can keep himself safe; "may also have to stand further back, which will make it harder to do my job of accurately reporting the events"); Ex. 19 (Boyle Decl.) ¶ 22 (Block Club adopted policy that reporters only

attend the protest in teams of two or more to remain safe, which limits ability to report on the protests as frequently as he otherwise would); Ex. 20 (Lulay Decl.) ¶¶ 27-30; Ex. 22 (Mulcahy Decl.) ¶ 13; Ex. 12 (Reidy-Hamer Decl.) ¶ 27 ("I am not going to the next planned First Amendment demonstration because it is too much to handle."); Ex. 24 (Griswold Decl.) ¶¶ 8, 11; *see also* Ex. 2 (Curran Decl.) ¶¶ 33, 39-40.

### B. Fourth Amendment Injuries Further Constitute Irreparable Harm

Similarly, appellate courts have repeatedly determined that Fourth Amendment injuries, no less than First Amendment violations, constitute irreparable harm. *See Chavez v. United States*, 226 F. App'x 732, 737 (9th Cir. 2007) (holding that allegations of repeated Fourth Amendment violations by immigration enforcement agents constituted "likelihood of substantial and immediate irreparable injury"); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that Fourth Amendment rights are a "fundamental right" and their violation causes irreparable harm); *Ramirez v. Webb*, 787 F.2d 592, 1986 WL 16752, at *2 (6th Cir. 1986) (explaining that Fourth Amendment violations are irreparable injuries because "[u]nreasonable searches and seizures, particularly when premised on race and alienage, are demeaning to such a degree as to be practically uncompensable."); *Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 974 (3d Cir. 1980) (explaining that "inspection[s] violating the Fourth Amendment … constitute irreparable injury for which injunctive relief would be appropriate"). Courts have granted preliminary injunctive relief to prevent irreparable Fourth Amendment violations as well as First Amendment violations. *See, e.g.*, *Black Lives Matter Los Angeles v. City of Los Angeles*, 2021 WL 3162706, at *3 (C.D. Cal. Apr. 19, 2021); *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 519 (E.D. Mich. 2020), order clarified, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020); *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1294 (D. Colo. 2020).

Here, there is a likelihood, well beyond a mere possibility, of future irreparable injury. When Defendants Noem and Bovino addressed federal agents at the Broadview ICE facility on October 3, Noem commended the agents' "professionalism" and said they were "setting an example," in their use of force and arrests.[57] She said, "We're gonna make sure that there's consequences for the way that they're behaving…."[58] She continued, "We're gonna give you guys all the authority that you need to go out there and arrest these individuals who are advocating for violence against you."[59] She emphasized that they would "send a message," and that Defendants were "here to stay" and "expanding."[60]

Moreover, Plaintiffs intend to return to exercise their First Amendment rights at the Broadview ICE facility. Ex. 1 (Black Decl.) ¶ 8 ("Nonetheless, my faith strongly calls me to return, even in the face of my fear."); Ex. 8 (Kunkel Decl.) ¶ 20 ("I plan to return to the facility to continue showing solidarity but am fearful for my safety."); Ex. 6 (Paulson Decl.) ¶ 24 (same); Ex. 18 (Held Decl.) ¶ 33 (intends to return); Ex. 17 (Geary Decl.) ¶ 15 ("I will be returning to the protests at Broadview because it is my duty to do so); Ex. 16 (Thrush Decl.) ¶ 42 ("I still plan to regularly return to the Broadview facility to continue reporting but will only do so if I am able to keep myself safe…").

### C. Plaintiffs Have No Adequate Legal Remedy

Finally, beyond the presumption of irreparable harm that accompanies the violation of fundamental constitutional rights, Plaintiffs have no adequate remedy at law for Defendants' illegal conduct. As the Seventh Circuit has explained, "Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the

---

[57] *Supra* n.15, at 0:06-0:17 min.
[58] *Id.* at 1:14-1:23 min.
[59] *Id.* at 1:25-1:30 min. (Noem calls videotaping officers "violence.")
[60] *Id.* at 1:59-2:04 min.

harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). Here, the gravamen of Plaintiffs' claims for relief is that they have reason *now* to engage in expressive activities—whether that be peacefully protesting, offering prayer, or observing and reporting on the activities of federal law enforcement—in response to federal immigration policies and highly publicized enforcement activities happening in the Chicagoland area *now*. In response, Plaintiffs have been met with an organized, ongoing campaign of excessive force and arbitrary violence committed by Defendants. Defendants have given every indication that this campaign of illegal violence will continue. A legal remedy might, after years of litigation, provide some compensation for the physical injury to a particular plaintiff caused by a particular use of force. But such one-off compensation cannot and does not remedy the harm to the individual Plaintiffs, the organizational Plaintiffs, and the putative Class resulting from Defendants' ongoing policy and practice of using violence to close public space and stifle public discourse at the Broadview ICE facility. Only an injunction can provide such relief.

## III.    The Balance of Equities and Public Interest Favor an Injunction

Finally, the balance of equities and public interest weigh in favor of granting emergency relief. The Court must balance the "competing claims of injury and … consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citation omitted). "[U]pholding constitutional rights serves the public interest" and "it is always in the public interest to protect First Amendment liberties." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (citations omitted). In the absence of the relief, Defendants will continue to violently tread on deeply valued foundational liberties, including rights to freedom of speech, expression, association, press, and religion, as well as the right to be free from unreasonable and arbitrary uses of force.

41

By contrast, Defendants will suffer no injury from a temporary restraining order. As demonstrated throughout this motion, Defendants' misconduct advances no compelling state interest, but instead means to silence, intimidate, and physically harm those with whom Defendants disagree. But there is no public interest in allowing Defendants to violate Plaintiffs' rights through unlawful action—and in fact, there is "substantial public interest" in ensuring that that government "abide[s]" by the law. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Nor can Defendants claim the proposed TRO will endanger them or jeopardize their lawful mission. Plaintiffs' expert, the former Commissioner of the CBP and Chief of the Seattle Police, has carefully explained why it is both "safe" and "workable for law enforcement." Ex. 32 (Kerlikowske Decl.) ¶¶ 2, 120-139; *see also L.A. Press Club*, 2025 WL 2658327, at *23-24 (finding nearly-identical relief workable).

In sum, the balance of the equities tilts sharply in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion and enter the attached proposed order.

## REQUEST FOR ORAL ARGUMENT

If oral argument would assist the Court in resolving this motion, Plaintiffs stand ready for argument at the Court's convenience.


DATED: October 6, 2025                    Respectfully submitted,

                                          /s/ Elizabeth Wang
                                          *Counsel for Plaintiffs*

Jon Loevy
Locke Bowman
Steve Art
Heather Lewis Donnell
Theresa Kleinhaus
Matt Topic
Lindsay Hagy
Jordan Poole
Dominique Gilbert
Justin Hill
Aaron Tucek
Alexandra Wolfson
**LOEVY + LOEVY**
311 N. Aberdeen Street
Chicago, Illinois 60647
(312) 243-5900
steve@loevy.com

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
⅓ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2224
wally.hilke@law.northwestern.edu

Craig B. Futterman
**MANDEL LEGAL AID CLINIC**
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

Hayden Johnson*
Katie Schwartzmann*
Conor Gaffney*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave NW, Ste 601
Washington DC 20006
(202) 579-4582
hayden.johnson@protectdemocracy.org
katie.schwartzmann@protectdemocracy.org
conor.gaffney@protectdemocracy.org
*Application for pro hac vice forthcoming*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org