Docusign Envelope ID: 48A6FDF8-8DF8-4621-A0D5-9DE44DC37032

## DECLARATION OF GIL KERLIKOWSKE

I, Gil Kerlikowske, declare:

1.      I have worked in law enforcement and policy for 47 years, including serving as Commissioner of the U.S. Customs and Border Protection (CBP) from 2014 to 2017 and as Chief of Police in Seattle from 2000 through 2009. In my nearly five decades of experience, I have had substantial training, developed expertise, and set policy on the appropriate law enforcement response to crowd control and civil unrest in the context of protests, use of force in that context, and use of force generally. As further described in my experiences recounted in this declaration, I am among the most experienced law enforcement officers in the country when it comes to appropriate crowd control response and techniques during protest and civil disturbances.

2.      I have been asked to evaluate whether the force that federal authorities used against journalists and protesters at the Broadview Processing Center in Chicago was consistent with use of force standards and best practices and guidance; specifically, I have evaluated the documented uses of less-lethal weapons and munitions, chemical irritants, and physical force in the context of protests. I have also been asked whether the relief stated in the temporary restraining order that Plaintiffs propose is safe and workable from a law enforcement perspective. I base this declaration on my nearly fifty years of experience in law enforcement and with crowd control and the standards for use of force, as well as the witness accounts, photographs, and videos of the recent protests at Broadview. My conclusions are in three categories:

- **Opinion No. 1**: The federal agents policing protests at the Broadview Processing Center, most of whom have so far been agents from the Department of Homeland Security (DHS), are deploying force that exceeds a legitimate law enforcement purpose or accepted standards for use of force, including by using force against people who are

1

**EXHIBIT 32**

not engaged in threatening acts, misusing less-lethal munitions and chemical irritants, and indiscriminately and disproportionately using force that needlessly injures people who pose no imminent threat to law enforcement.

- **Opinion No. 2**: The proposed TRO is safe for law enforcement. There is no reason to use force, less-lethal weapons, or chemical irritants other than in the ways that they are designed and supposed to be used consistent with standard practices and procedures. Defending federal property mainly involves establishing a perimeter around the building. There is no reason to target or disperse journalists, observers, or protestors who do not pose a threat from that position. To the extent officers leave federal property, the TRO is also safe as it permits officers to use proportionate force in response to imminent threats of violence and to make arrests where there is probable cause of lawbreaking.

- **Opinion No. 3**: The proposed TRO is workable for law enforcement. Trained and experienced law enforcement can protect public safety without excluding journalists and legal observers or using excessive force against them or demonstrators, even in the heat of volatile protests. They can also avoid using disproportionate force to harm demonstrators, including those standing in streets and yelling at officers, who do not actually pose an imminent risk of violence. Difficulties to federal authorities in implementing these workable, well-grounded practices is more likely to arise from lack of training and experience working in dense urban environments and lack of leadership that is experienced in urban civil disturbances/unrest, not from the lack of workability of limiting the misuses of force that exceed standard practices and procedures.

## I.     Qualifications

Docusign Envelope ID: 48A6FD58-8DF8-4521-A9D5-9DE44DC37032

3.     For almost my entire almost five-decade career, evaluating uses of force and training officers on the appropriate and reasonable use of force in policing situations, including specifically in the context of protest and civil unrest, has been one of my core job responsibilities.

4.     In addition to formerly serving as the Commissioner of CBP, which is the largest law enforcement agency in the United States, and as the Chief of Police in Seattle, I have held several positions, undergone and provided trainings, and had academic experiences relevant to my expertise on these subjects. Some of those experiences are summarized in this declaration, and a true and correct copy of my full curriculum vitae is attached as Exhibit 1.

5.     During my tenures leading police departments, I have strategized and overseen the policing of hundreds of large and potentially volatile protests, many of which were larger than the Chicago protests at issue here. In these positions, I was responsible for how the officers working under me behaved, their training to use crowd control measures and force reasonably and within the law, and for supervising investigations into excessive force.

6.     When I served as Chief of Police in Seattle, I oversaw over 200 protests. We probably had at least 25 significant protests every year I was there from 2000 through 2009. I have been on the front lines of many large demonstrations in Seattle, standing in uniform with my officers, and I know firsthand what policing a chaotic and volatile demonstration is like. In addition to my experience in Seattle, I served as Police Commissioner in Buffalo, New York, where I also had duties and experience with crowd control.

7.     In overseeing those protests, my job was to make sure that all the officers who reported to me, from the line personnel all the way up, were properly trained to handle the protests. I also played a key role in formulating and executing the strategic plans for how we would police

Docusign Envelope ID: 48A6FD58-8D58-4521-A9D5-9DE44DC37032

each protest. These plans included how and when to use force, who, if anyone, would be given less-lethal weapons, and how to treat journalists, legal observers, and protesters.

8.     I myself have also received significant training on crowd control tactics and best practices. My formal training on crowd control began when I was with the Military Police in 1970, where I received training on standard practices for crowd and riot control. I had additional training in the Army on physical security measures. I received further in-service crowd control training when I served in the St. Petersburg Police Department.

9.     Additionally, as a president of the Police Executive Research Forum, President of the Major Cities Chiefs Association, and member of the International Association of Chiefs of Police, I have attended dozens of national and international law enforcement conferences where discussions and presentations on demonstrations and civil unrest have been the topic. For example, Chief Norm Stamper did a detailed presentation and analysis of what occurred in Seattle in November 1999 during the World Trade Organization demonstration and lessons to be learned.

10.     I also received substantial training as a commander, which covered crowd control and use of force, including without limitation, eleven weeks of training at the FBI National Academy in Quantico, three weeks of training at the Senior Management Institute for Police in Boston, two weeks of FBI Law Enforcement Executive Training in Quantico, and three weeks at the FBI National Executive Institute in Quantico. By further way of example, I assigned command personnel to go to the WTO, IMF, G-8 and Northern Ireland to gain knowledge from viewing how other departments handled these incidents. The commanders returned and provided the knowledge they had acquired. After a "Mardi Gras" disturbance went awry in Seattle, Austin, and Philadelphia, those agencies came to Seattle for a meeting I convened to train myself and other attendees on how these large demonstrations should be policed and lessons learned.

4

11.     As a commander, I have also supervised the training of officers on the equipment and use of less-lethal munitions and chemical irritants, the types of orders they will receive in using those techniques, and the formations that will be used for crowd control in general. Through my experiences, I have gained significant knowledge of less-lethal technology and techniques. For example, I introduced less-lethal weapons to CBP and went to the facility to observe with the instructors and see the technology firsthand. I was shown and fired the soft nose, pepperball and FN303 less-lethal weapons at the CBP Harper's Ferry training center in 2016. I have been tasered twice (while I was Police Chief in Seattle) and been subjected to pepper spray (while I was the commanding officer in Buffalo).

12.     Finally, throughout my career I have gained significant experience evaluating the uses of force after the fact and determining reasonableness and appropriateness under the circumstances the officer faced. For example, I was the Internal Affairs Commander during my time in St. Petersburg. I also set up and reviewed the Internal Affairs (Professional Standards) department for CBP, and I hired and oversaw the Assistant Commissioner who reviewed and approved the policies for receiving and investigating complaints, including those involving the use of force. Overall, I have reviewed and assessed hundreds of use-of-force reports and investigations during my career.

13.     At the policymaking level, I have also served as the Director of the Office of National Drug Control Policy and as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services.

14.     For relevant academic experiences, I received BA and MA degrees from the University of South Florida in Tampa. I also graduated from the Executive Institute at the Federal Bureau of Investigation Academy in Quantico, Virginia. I have been an IOP Fellow at the Harvard

Kennedy School of Government and have taught as a distinguished visiting fellow and professor

of the Practice in Criminology and Criminal Justice at Northeastern University.

      15.     I have been a testifying expert in one matter filed in the last four years: *Los Angeles*

*Press Club v. Noem*, case number 2:25-cv-05563.

      16.     I am being compensated at a rate of $600 per hour.

## II.    Materials considered

      17.     The materials I reviewed in connection with preparing this declaration are:

- Declaration of Alderman Byron Sigcho-Lopez
- Declaration of Autumn Hamer
- Declaration of Charles Thrush
- Declaration of Colin Boyle
- Declaration of Daniel Shouse
- Declaration of Dave Decker
- Declaration of David Black
- Declaration of Dimeko Harden
- Declaration of Jose Juan Alvarado
- Declaration of Madeline Sullivan
- Declaration of Monica Breslin
- Declaration of Paul Goyette
- Declaration of Raven Geary
- Declaration of Reggie Thompson
- Declaration of Robert Butler-Bey
- Declaration of Scott Sakiyama
- Declaration of Shawn Mulcahy
- Declaration of Stephanie Lulay
- Declaration of Stephen Griswold
- Declaration of Stephen Held
- Declaration of Terrence Roche
- Declaration of William Paulson
- Videos:
  - Status Coup News, *BREAKING: ICE ATTACKS Protesters at Chicago Detention Center,* Youtube (Sept. 27, 2025), available online at https://www.youtube.com/watch?v=QoobmuQoKWM (last visited Oct. 5, 20205)
  - WGN, *ICE Agents Clash with Protesters in Broadview*, YouTube (Sep. 26, 2025) available online at https://www.youtube.com/watch?v=kyFTG3ucU9M at 2:02 min. (last visited Oct. 5, 2025)
  - @StatusCoup, X.com post (Sept. 26, 2025 6:34 pm), https://x.com/StatusCoup/status/1971720063922429984 (last visited Oct. 5, 2025)

- o Darius Johnson, *Video shows protester being hit by pickup truck outside Broadview*, *Illinois ICE facility*, (Sept. 25, 2025) available at https://www.cbsnews.com/chicago/news/video-shows-protester-hit-pickup-truck-broadview-ice-facility/?intcid=CNM-00-10abd1h (last visited Oct. 5, 2025)
- o @KatAbughazaleh, X.com post (Sept. 19, 2025 at 7:20 am), https://x.com/KatAbughazaleh/status/1969013628398411810
- o @FordFischer, X.com post (Sept. 19, 2025 4:25 pm), https://x.com/fordfischer/status/1969150886422155594?s=46&t=kwXzoKXCNt-ZYuqA5Nrezw;
- o @fox32chicago, TikTok post (Sept 19, 2025), https://www.tiktok.com/t/ZTMhGh1nS/
- o @Ronxyz00, X.com post (Oct. 3, 2025 11:32 am), https://x.com/ronxyz00/status/1974150663195275464?s=46&t=kwXzoKXCNt-ZYuqA5Nrezw
- o Video, Sept. 26, 2025 available at https://spaces.hightail.com/space/ib44OApQsB
- o Video, Oct. 3, 2025 available at https://spaces.hightail.com/space/ib44OApQsB
- o Charles Thrush Video, Oct. 3, 2025 available at https://spaces.hightail.com/space/ib44OApQsB

18.     These materials, witness statements and videos, are the type of information typically relied upon by experts in my area to assess whether tactics and force used by law enforcement during protests were reasonable and consistent with standard practices and accepted training.

### III.     Opinion 1: Federal Agents are using unnecessary force that exceeds the standards and practices for law enforcement in the context of protests

19.     After reviewing the video and photo evidence and the witness statements described above, and having not seen any explanation or refutation to the contrary, there appears to be widespread intentional, or willfully reckless, misuse of force against journalists, legal observers, and peaceful demonstrators who have attended the Broadview Processing Center protests. This includes the indiscriminate and unjustified use of less-lethal munitions and chemical irritants, and the unreasonable use of physical force. The kinds of force used in these instances are consistent with a similar pattern of unreasonable tactics and force that I observed by DHS and other federal officers in protests in Los Angeles. Considering the known information, there appears to be at

minimum no legitimate law enforcement justification for the uses of force in these identified instances. It is my opinion that the force used is inconsistent with accepted law enforcement practice and training.

20.    The misuses of force that I have reviewed and that I recount in this declaration are more likely than not disproportionate to any legitimate law enforcement interest and extremely dangerous to everyone at the protest. They do not appear to be the isolated conduct of a single or even a handful of officers, as discussed below. Instead, there is a widespread pattern that indicates, at minimum, a lack of guidance and leadership on the correct and widely accepted policing tactics to adopt and use in a protest setting.

21.    As further described above, I base these opinions on my almost fifty years of combined experience overseeing, reviewing, and approving strategic plans for how to police a protest; training people on how to police a protest; gaining hands-on expertise with policing civil unrest in cities and devising appropriate responses for law enforcement agencies; studying the use-of-force limitations that are standard and can be implemented to safely and effectively police in such situations; and myself being a line agent and commander with my officers physically present and making on-the-spot decisions in a protest setting.

### a. Lack of warnings and de-escalation tactics

22.    Absent exigent circumstances in which an individual poses an imminent threat to law enforcement or others, law enforcement is trained to issue audible warnings and wait for an opportunity for compliance, and generally to use de-escalation techniques, before using force. This includes before using less-lethal munitions and chemical irritants. That is the standard practice in policing protests and civil unrest, and it is what appropriately trained officers are expected and instructed to do. When force must be used after these steps, or in rare exigent circumstances where these steps are practically impossible, the force must still be proportionate to the threat imposed.

Docusign Envelope ID: 48A6FD58-8D58-4521-A9D5-9DE44DC37082

23.     My review of the materials here shows that federal agents repeatedly failed to follow these standard practices. The materials demonstrate that federal agents at the Broadview Processing Center often used force (itself often disproportionate, irrespective of the warning) without giving sufficient audible warnings. In some circumstances, they provided some warning but without giving adequate opportunity to comply before acting. And in several situations that I reviewed, the federal agents appeared to resort to force without first employing de-escalation tactics. In each scenario, the use of force exceeded standard practices in this field that I have trained my officers to follow and are accepted among policing forces in urban areas.

24.     In a vivid example, video evidence on September 27 shows that as federal agents pushed the crowd of journalists, observers, and demonstrators down the public street, a supervising officer (who appears to be a DHS commanding officer, Greg Bovino) told an agent to "light em up" and, with no warning, the agent began shooting pepper balls at the crowd, despite the crowd standing on the sidewalk steps away from any agent.[1] This incident is part of a pattern of people standing on the sidewalk or street, posing no imminent threat of violence, and still being subjected to disproportionate force.

25.     In another part of the video on September 27, a federal agent who appears to be a commanding officer confronts a journalist documenting the scene and yells that "this is the last time we're warning you," without providing any clear direction about what the journalist was supposed to do or what use of force would be deployed.[2] The officers then deployed force against the crowd.

---

[1] Status Coup News, *BREAKING: ICE ATTACKS Protesters at Chicago Detention Center,* Youtube (Sept. 27, 2025), available online at https://www.youtube.com/watch?v=QoobmuQoKWM (last visited Oct. 5, 20205) at 37:40 (last visited Oct. 5, 2025)
[2] *Id* at 39:5-40:37

26.     Witness reports further support that the lack of audible warning, time to comply, or use of de-escalation techniques show a widespread pattern at the Broadview Processing Center.

27.     For example, Mr. Paulson reports in his declaration that, without audible warning, federal agents on September 26 lobbed tear gas canisters over the top of a tall fence at demonstrators standing between 8 and 25 feet away from any agents and on the other side of a fence. Paulson Decl. ¶¶ 8-11. Such lack of warning before lobbying tear gas canisters at the crowd that included peaceful demonstrators, which posed no threat to law enforcement on the other side of a tall fence, is inconsistent with standard and accepted use of force, de-escalation, and protest control practices.

28.     The next day, Mr. Paulson again observed federal agents deploy tear gas canisters into the crowd without sufficient warning. Paulson Decl. ¶¶ 16-17, 21. He could hear that agents were saying something, but not audibly, and other protestors yelled back to the agents "we can't hear you." Nonetheless, Mr. Paulson soon saw tear gas canisters shooting over his head.

29.     Video evidence corroborates the issues of foregoing adequate warning, wait, and de-escalate techniques. In the evening on September 27, protestors were yelling repeatedly at federal agents assembled at the Broadview Processing Center gate that they could not hear any of what the agents were communicating. Moments later, agents started using physical and projectile force against demonstrators, as well as a large cloud of tear gas. In the video, I observed at least oleoresin capsicum (OC) spray, pepper balls, and flash bangs being deployed. All of this occurred without warning or time for compliance before the escalated misuse of force.[3]

30.     Other witness reports—including from the declarations of Alderman Sigcho-Lopez (at ¶¶ 6-7), Reverend Black (at ¶¶ 5-6), Ms. Breslin (at ¶¶ 12), Ms. Sullivan (at ¶¶ 9), Mr. Goyette

---

[3] *Supra*, n. 1 at 2:07:04-2:08:56 and 2:09-2:12

(at ¶¶ 15), Mr. Held (at ¶¶ 12), Mr. Decker (at ¶¶ 7), Mr. Roche (at ¶¶ 5), Mr. Thrush (at ¶¶ 10-13, 16), Ms. Kunkel (at ¶¶ 4), and Ms. Hamer (at ¶ 6)—that I describe further below also outline how federal agents repeatedly engaged in each type of misuse of force after failing to adequately warn, wait, or de-escalate. Specifically, federal agents repeatedly deployed pepper balls, tear gas canisters, flash bangs, rubber bullets, soft nose rounds, stinger grenades, and physical force without first providing adequate audible warning, time to comply, or otherwise first using de-escalation tactics.

31.    This is in contrast with other reported occasions in which the federal agents gave an audible warning to disperse and the crowd complied. Goyette Decl. ¶ 13; Thrush Decl. ¶¶ 10-11. These reports show that federal agents had the equipment and ability to use audible warnings but declined to do so.

32.    Additionally, Mr. Thrush reports that on October 3, the commanding officer, Greg Bovino, along with about 50-75 officers, confronted the crowd of peaceful demonstrators and journalists in the morning and said "this is your first and only warning" to disperse. Thrush Decl. ¶35. At this point, Thrush reports that the crowd was already at least 500 feet away from the Broadview Processing Center, leaving it unclear where exactly commanding officer Bovino wanted the crowd to disperse to. This is not how trained and responsible officers are supposed to provide warnings before a specific use of force. The warning must be a caution about the use of force to be used close in time to that use, with a direction on how to avoid the force against you, and providing time to comply. Even then, such warnings are to be used where a crowd is acting lawlessly or violently turning into a riot, not toward a peaceful demonstration. It must also be specific, with instructions for how demonstrators can retreat to avoid the use of force. A "first-and-only-warning" approach is inconsistent with standard practices and accepted training for

Docusign Envelope ID: 48A6FDE8-8DF8-4621-A0D5-9DE44DC37032

policing in protest settings. It is likely to provoke, rather than settle, tensions between police and the crowd.

33.     Overall, the materials that I have reviewed show that instead of trying to de-escalate the situation or abide by standard practices to issue warnings and allow time for demonstrators to avoid the need to use force, federal agents at the Broadview Processing Center had other objectives inconsistent with a legitimate protest control or policing purpose.

### b.  *Limited circumstances warranting use of force in a protest context*

34.     Under standard best practices in this field, use of force is unreasonable and unjustified from a law enforcement perspective when the individual is not doing anything to threaten law enforcement or being dangerous to others. The rule that all officers must follow, and under CBP's use of force policy in specific, provides that law enforcement officers must not deploy force unless it is necessary to protect against the threat or occurrence of violence or the threat of property being sieged and overrun.

35.     As part of these standards, less-lethal weapons and chemical irritants should not be used as "compliance tools." Nor should they be used on someone for nonviolently disobeying an order to disperse or to stop blocking a road. They are meant to proportionately respond to specific acts of violent or imminent threats. While trespassing is unlawful and a person for whom there is probable cause to show lawbreaking can be arrested, it is ultimately a minor infraction. It should not be met with less-lethal force, which can sometimes be deadly. Less-lethal force should only be used on aggressive individuals who pose an immediate threat to law enforcement or to prevent an assault. There is not a valid law enforcement purpose for targeting a person with less-lethal force who simply steps from a sidewalk to a driveway, without threat of imminent violence action.

36.     Nor should less-lethal munitions or chemical irritants be deployed indiscriminately. They should never be shot in a manner that would hit an individual above the waist where serious

injury can result. A properly trained officer knows that such techniques are to be used strategically and in a focused manner to prevent the imminent threat of violent action while imposing no more harm than necessary to the specific identified target.

37.     However, the materials I reviewed of the demonstrations at the Broadview Processing Center show that federal agents are not following these standard and accepted practices for the appropriate use of force, including of less-lethal munitions and chemical irritants. Instead, the materials I reviewed show the widespread pattern of federal agents inappropriately using these techniques and technologies indiscriminately, without warning, and in ways that will increase harms and risks of serious injury.

### c.   *Indiscriminate use of tear gas and flash bangs at Broadview Processing Center*

38.     For example, Mr. Paulson's declaration illustrates the indiscriminate and unjustified use of chemical irritants at the Broadview Processing Center. Paulson Decl. ¶¶ 9–11. He observed that on September 26, federal agents lobbed two tear gas canisters over a tall fence into a crowd, without warning, and under circumstances where Mr. Paulson reported observing no sign of violence or threat of violence. That is not how teargas canisters are supposed to be deployed, even in a legitimate riot control setting.

39.     Mr. Paulson also experienced the indiscriminate misuse of tear gas canisters by federal agents on September 27. He reports (at ¶¶ 16-18) that federal agents shot tear gas canisters into the crowd at above-head level and to an area where Mr. Paulson was standing away from the front lines of the protest. The canisters landed both in front of and behind him, including blocking his ability to retreat away from the Broadview Processing Center.

40.     Ms. Breslin's declaration appears to recount the same events on the evening of September 27th. Her statement reports that federal agents abruptly got in formation, called out orders to each other but failed to provide audible warnings or compliance time to the people at the

demonstration across the fence, and then "began gassing people on the street indiscriminately." Breslin Decl. ¶13. She also reports that when she attempted to avoid the irritants by getting into her car parked nearby, without posing any threat to law enforcement, federal agents pursued her and forcibly removed her from her vehicle to be back into the tear gas fog. Breslin Decl. ¶ 14.

41.     Ms. Hamer also corroborates that federal agents threw tear gas canisters and flash bangs into the crowd where she stood peacefully, without warning and without a threat of violence, on both September 26 and September 27. Hamer Decl. ¶¶ 6, 10. Mr. Sakiyama similarly reports the widespread use of tear gas against demonstrators those days. Sakiyama Decl. ¶¶ 18-24. Ms. Kunkel does the same for the events on September 26. Kunkel Decl. ¶ 16.

42.     From the materials I reviewed, there is not a legitimate law enforcement reason for significantly and indiscriminately tear gassing Mr. Paulson, Ms. Breslin, Ms. Hamer, and many other demonstrators repeatedly in this manner. There is likewise no legitimate law enforcement purpose for tear gassing members of the media, who were reportedly also in the crowd. Instead, the more likely explanation was that federal agents deployed widespread tear gas into the crowd, stretching for a block, as an effort to forcibly end the protest that evening by dispersing the non-violent demonstrators blocks away. Yet as Mr. Paulson and Ms. Breslin report, the federal agents deployed tear gas in a manner that at the same time blocked many demonstrators' ability to retreat, forcing them into greater risk of physical confrontation with federal agents. This is not a proportional or appropriate use of chemical irritants in the protest policing context at issue, and it does not appear to be in service of any legitimate protest control purpose or to be consistent with the training expected of officers working in such circumstances.

43.     The indiscriminate tear gassing of the crowd at the Broadview Processing Center on September 26 and 27 are not isolated incidents, from the reports I have reviewed. Alderman

Docusign Envelope ID: 48A6FDE8-8DF8-4621-A0B5-9DE44DC37032

Sigcho-Lopez also attests that on September 19, federal agents in military camouflage threw tear gas canisters, without audible warning or order to disperse, into a protest on the street where demonstrators were chanting and holding signs. Sigcho-Lopez Decl. ¶ 6. Ms. Sullivan's declaration also reports the widespread and warning-less use of tear gas canisters and flash bang grenades on September 19 that occurred "out of nowhere." Sullivan Decl. ¶ 9. Journalists' reporting further corroborate these facts. Lulay Decl. ¶ 12; Geary Decl. ¶ 11.

44. None of these witness reports indicate that the federal agents' widespread use of tear gas and flash bangs followed violence or threats of violence from any individual in the targeted crowd. Yet federal agents threw the tear gas indiscriminately into the crowd and hit Alderman Sigcho-Lopez in the leg. This indiscriminate deployment of tear gas canisters into a crowd, that appears to have posed no imminent risk of violence, does not meet accepted standards and practice of the use of chemical irritants in the protest context.

45. Part of the reason why chemical irritants should be used sparingly and carefully is because they can have significant adverse collateral effects on people who are not the target, such as bystanders and residents in the surrounding areas. Agents are trained to ensure that the use of tear gas canisters is not for non-threatening crowd control but to respond to a developing dangerous riot posing an imminent threat of violence. Trained agents also know that before deploying tear gas canisters, the agents should plan for and take sufficient care to assess the area and environmental factors. This includes spatial proximity to businesses, residents, and bystanders, and considerations like wind direction. In circumstances where law enforcement is aware of the possibility of a need to use tear gas in response to a demonstration that could, in some manner, escalate to violence, a trained officer would have already coordinated with an EMS or have medical staff to be on standby to render medical attention when necessary.

46.     It does not appear from the materials I reviewed that federal agents have taken any of these measured and precautionary approaches to the use of chemical irritants that is the standard, authorized practice for protest policing.

47.     Mr. Paulson, Ms. Breslin, Ms. Hamer, and others report how the tear gas canisters deployed on September 27 evening affected them and a large group of demonstrators, with the gas spreading extensively down the street. Paulson Decl. ¶¶ 17, 19–20; Breslin ¶¶ 14, 19; Hamer Decl. ¶¶ 6, 10. This spread of the tear gas suggests that several canisters were used at once and, as stated above, not in response to any apparent violent threat. Ms. Sullivan's and Alderman Sigcho-Lopez's testimony suggests that a similar story is likely the case for the widespread use of tear gas canisters on September 19. Sullivan Decl. ¶¶ 9-11; Sigcho-Lopez Decl. ¶¶ 6-7.

48.     Video evidence also supports the conclusion that federal agents engaged in widespread use of tear gas without a clear indication of the imminent risk of violence from a dangerous riot. Video of the September 27th events corroborates the testimony about indiscriminate use of chemical irritants against demonstrators that do not appear to pose any imminent threat of violence, as well as journalists and legal observers.[4] Even if there had been some threat present, which is not evident, laying down a barrage of tear gas to the extent reported by witnesses and captured on video on September 27 would almost certainly be grossly disproportionate to the situation.

---

[4] *Supra*, n. 1 at 2:07:04-2:08:56 and 2:09-2:12

49. Similar journalist reports and video evidence on September 26th also corroborate the accounts of the indiscriminate tear gas that federal agents misused that day.[56] Boyle Decl. ¶ 14.

50. Mr. Roche, a Marine Corps Veteran and former officer, also reports that on September 26 he was hit in the head with a forceful projective that "released a large payload of CS power over" his head, with the heavy force of the projective causing him to stumble and fall. Roche Decl. ¶¶ 8-9. He reported that a doctor informed him he suffered a concussion from the impact. Roche Decl. ¶ 11. This appears consistent with a tear gas canister hitting Mr. Roche in the head. No reasonable use of force or law enforcement purpose would justify hitting a demonstrator in the head with an airborne tear gas canister. Tear gas canisters are meant, when used in limited circumstances to break up a riot or prevent imminent violence, to be deployed on the ground nearby the rioters. It is never to be shot in the air in a manner that could hit someone in the head. This is because deploying tear gas in a manner that will hit someone in the head could be deadly. Serious injuries have occurred from people being hit in the head with force from a tear gas canister. Such actions cannot be justified by any law enforcement need and far exceeds standard practices and expected training for using tear gas in even riot settings.

51. Additionally, Mr. Thrush reports that he personally observed a federal agent directly target a clearly identified journalist, who Mr. Thrush describes as having multiple camera lenses and visible press credentials, by throwing a full tear gas canister at him from fifteen feet away, injuring him and making him unable to walk. Thrush Decl. ¶ 25. This also is not how training and responsible officers are supposed to use tear gas to prevent a developing dangerous riot.

---

[5] WGN, *ICE Agents Clash with Protesters in Broadview*, YouTube (Sep. 26, 2025) available online: https://www.youtube.com/watch?v=kyFTG3ucU9M at 2:02 min. (last visited Oct. 5, 2025) at 2:16-2:36
[6] @StatusCoup, X.com post (Sept. 26, 2025 6:34 pm), https://x.com/StatusCoup/status/1971720063922429984 (last visited Oct. 5, 2025)

52.     The declarations of local business owners and residents further show that federal agents did not sufficiently account for environmental factors before resorting to misusing tear gas canisters. The declarations from nearby business owners and residents about experiencing the adverse effects of tear gas are very instructive for the reasons why it is standard practice that tear gas should be used in limited circumstances, and trained officers know to assess environmental factors before using tear gas, and then doing so sparingly. Butler-Bey Decl. ¶¶ 8-12; Alvarado Decl. ¶¶ 3-4; Thompson Decl. ¶¶ 3-7; Harden Decl. ¶¶ 3-9, 15-17. Mr. Goyette also reports that he saw federal agents shoot a tear gas canister through a window of a private building, where smoke began streaming out. Goyette Decl. ¶ 9. These collateral damages and harms further support the reports and evidence that agents used tear gas indiscriminately and beyond standards and guidance for use on the relevant dates.

53.     It is clear from these materials that federal agents were using tear gas indiscriminately, not taking care to limit its use to targeted instances of violence or the development of a violent riot, and not taking care to limit collateral damage to bystanders and businesses. This is a significant departure from the circumscribed and well-developing training and accepted practices that organized police know to use in the protest setting.

### d.  *Targeted misuse of OC spray at Broadview Processing Center*

54.     The materials I reviewed also demonstrate that, in addition to the indiscriminate misuse of tear gas canisters, the federal agents' focused use of chemical irritants against demonstrators has also been inconsistent with standard practices and training for such tactics. The materials show that federal agents have misused OC spray against non-threatening demonstrators at point-blank range.

55.     Reverend Black's declaration, and the accompanying videos, demonstrate that federal agents targeted OC spray against him at close range on September 19 when he was clearly

18

wearing clerical clothing and did not pose any imminent threat of violence. Black Decl. ¶¶ 6-7. This misuse of OC spray against a peaceful demonstrator is a serious departure from standard practice and the use-of-force training any competent officer would receive for policing in a protest setting. The close-range use of OC spray against Reverend Black, a non-violent demonstrator expressing his views, does not serve any apparent legitimate law enforcement purpose. The video of the events shows that Reverend Black was standing peacefully, arms to his sides, when without warning the federal agent shoved him and deployed OC spray within inches of his face, making Reverend Black recoil and fall to the ground where he needed assistance to get up. There is no legitimate law enforcement purpose or training that could support such aggressive misuse of force against a peaceful demonstrator. Instead, it is more likely than not that the misuse of force in this instance was done for some other non-policing goal, such as in response to the viewpoints Reverend Black was there to express.

56.     Other reports and videos show that the use of OC spray against Reverend Black was not an isolated incident, but part of a larger pattern of these sorts of misuses of force. Mr. Goyette attests that, on September 26, federal agents used OC spray against a protester who posed no threat to law enforcement and then they arrested him. Goyette Decl. ¶ 7. Mr. Thrush reports a similar occurrence in which federal agents OC-sprayed two isolated, non-violent demonstrators standing away from and across a tall fence from the agents. Thrush Decl. ¶ 14. One video from September 26 shows a federal agent using OC spray against demonstrators from across the chain link fence.[7] As with Reverend Black, I did not see any indication from the materials I reviewed that the individuals who were OC-sprayed posed an imminent threat of violence to make this use

---

[7] *Supra*, n. 6 at 0:40

Docusign Envelope ID: 48A6FDE8-8DF8-4621-A0B5-9DE44DC37032

of force justified by any law enforcement purpose or consistent with standard and accepted practices for such force.

### e. Indiscriminate use of less-lethal munitions at Broadview Processing Center

57.     The materials I reviewed also clearly demonstrate an ongoing pattern, spanning multiple days and circumstances, of federal agents indiscriminately firing pepper balls without warning and in a manner likely to cause serious bodily injury. Pepper balls should not be fired against people in the crowd posing no threat to law enforcement, including journalists, legal observers, and non-violent demonstrators. Even in situations where a person may pose a threat, proper training on firing pepper balls instructs officers to aim at the individual's feet and let the powder disorient the person rather than firing at their body causing them lasting injury.

58.     For example, one use we trained for at CBP was to shoot a pepper ball near someone scaling a wall to break into a facility we were defending. Even then, the appropriate force was to shoot near the person to disorient him, not to hit him directly.

59.     The dangers of shooting pepper balls at people became widespread public knowledge in 2004, and certainly became well-known in the policing field, after Victoria Snelgrove was killed by a pepper ball fired by a Boston police officer after the Red Sox beat the Yankees in the American League Playoffs.

60.     Based on these experiences, it goes against standard accepted practices and training for an officer to target pepper balls to strike a person, and it is an egregious departure from these standards and training to shoot a person in the head or above the waist. But the materials I reviewed show that federal agents are engaging in these types of extreme uses of less-lethal munitions that far exceed any legitimate law enforcement purpose or training for policing protests. Several reports show that federal agents were firing peppers balls, from the rooftop or on the ground, at protest attendees as a first report use of force, which is far from the standard practice of first de-escalating

and attempting to avoid uses of less-lethal munitions unless necessary to address an imminent threat of violence.

61.     For example, Ms. Lulay attests that on September 26 her reporters witnessed federal agents blanketly tear gas the crowd and then for the following hour and a half "officers fired pepper spray balls and tear gas canisters at protestors, organizers, journalists, and photographers alike." Lulay Decl. ¶ 14. She reported similar events previously occurred on September 19. Lulay Decl. ¶ 12. Other reporters attest to similar instances of indiscriminate use of less-lethal weapons against the crowd, without any predicate threat of violence or legitimate law enforcement purpose apparent from the materials and declarations that I have reviewed. Held Decl. ¶¶ 10-16, 19-20; Geary Decl. ¶¶ 7-12. Additional witnesses also attested to federal agents' indiscriminate use of pepper balls against the crowd of demonstrators and journalists, without any signs of the crowd posing any imminent threat, on September 19, 26, and 27. Roche Decl. ¶¶ 5, 7. Mr. Held, a CBS journalist, specifically attests to reviewing witness video showing federal agents firing pepper balls at a protester with a mobility aid, who was on the ground. Held Decl. ¶ 14.

62.     Shooting pepper balls from a rooftop indiscriminately into a crowd from a heightened position, where the likelihood of shooting someone above the waist is high, is a significant departure from accepted and standard practices and training for law enforcement in a protest context. And doing so for an hour and a half, as Ms. Lulay reports, is grossly disproportionate to the protesting activity that has been documented at Broadview.

63.     One vivid example is the pepper balls that federal agents shot from a rooftop at Reverend Black's head on September 19. His declaration describes (at ¶¶ 4-5), and the accompanying videos corroborate, a sequence of events in which DHS and other federal agents misused indiscriminate force against everyone who was present and extreme force against him

specifically. Like the previously discussed instance of federal agents misusing OC spray against Reverend Black, these events again demonstrate that federal agents specifically targeted him with pepper balls when he did not pose any imminent threat of violence. While Reverend Black was standing isolated from the crowd near the base of the Broadview Processing Center, federal agents repeatedly shot him from the rooftop of the building with pepper balls. In the video of these events, Reverend Black is seen being shot in the face repeatedly. Reverend Black was standing on ground-level and speaking to the officers on the rooftop. He clearly posed no threat of violence to law enforcement. Federal officers provided no warning that they would shoot him with pepper balls before they did so. Reverend Black reports that, in all, he was shot in rapid succession two times to the head and seven times total, as other protestors convened to try to block him from further harm.

64.     The federal agents' shooting pepper balls targeted at Reverend Black's head, while he was demonstrating and expressing his views and posing no threat, is a serious departure from standard practice and the accepted use of force training any competent officer would receive. Pepper balls should almost always only be used after sufficient warnings and waiting. It is a tactic meant for responding to imminent violent and threatening action. Even then, pepper balls are meant to be shot at the ground or at the violent actor's feet to disorient them, not to injure them.

65.     It is clear in standard practices and accepting training on this less-lethal munition that shooting pepper balls to strike someone above the waist, especially in the face, is not the proper use. The targeted pepper ball use against Reverend Black, as a non-violent demonstrator expressing his views, without warning, without any imminent threat to law enforcement, and including targeting his head, does not serve any apparent legitimate law enforcement purpose. It

is an extreme departure from accepted practices and standard training that any responsible officer would know in policing protests.

66.     Reverend Black's story is also not an isolated event. Other witnesses describe federal agents indiscriminately firing pepper balls from the rooftop on September 19, 26, and 27, where there is an obvious danger of striking a person above the waist and causing serious bodily injury. Ms. Sullivan and Ms. Lulay attest that they witnessed numerous such instances on September 19. Sullivan Decl. ¶¶ 6-8; Lulay Decl. ¶ 12. Ms. Lulay reports that federal agents also specifically targeted members of the media with pepper balls on September 19. Lulay Decl. ¶ 12. Ms. Kunkel reports that federal agents on the morning of September 26 repeatedly fired pepper balls from the rooftop into a peaceful, unarmed crowd of around 15-20 people for a span of forty minutes and she observed one person hit in the eye with a pepper ball fragment. Kunkel Decl. ¶¶ 3-5. More reports show that agents fired what appear to be pepper balls at head level from behind a fence. Boyle Decl. ¶¶ 14-15. An illustration of how the federal agents firing pepper balls indiscriminately and inappropriately, not in a targeted manner at the feet, are photos of broken windows in neighboring businesses caused by the agents. Boyle Decl. ¶ 15; also Kunkel Decl. ¶ 17.

67.     Photos and videos that I reviewed of the events on September 19, 26, and 27 further corroborate the dangerous and unjustified firing of pepper balls from the rooftop and from behind fences into a crowd of people, including shooting them toward the face. Thrush Decl. ¶¶ 14-16; Kunkel Decl. ¶¶ 4-5. They also show the significant bodily injuries that these misuses of force are likely to cause.[8] Decker Decl. ¶ 9; Kunkel Decl. ¶ 5.

---

[8] *Supra,* n. 5 at 0:45 and 1:07 – 1:36

68.     The materials I reviewed show that federal agents also targeted journalists with pepper balls, in addition to lumping them in with demonstrators in the crowd generally shot at indiscriminately. Ms. Geary provides testimony and photos of her being shot in the face with a pepper ball, on top of having been shot at several times before. Geary Decl. ¶ 9. Mr. Held shows that Ms. Geary was among the journalists targeted in this manner. Held Decl. ¶¶ 16, 20. Mr. Decker provides further testimony and photographic evidence of these occurrences. Decker Decl. ¶¶ 7-8. Shooting a journalist in the face with pepper balls far exceeds any legitimate law enforcement justification, accepted training, or standard practices for maintaining peace and appropriate journalist access at a demonstration. The targeting of journalists in these instances is unmistakable from the materials I reviewed, and there is simply no legitimate law enforcement reason to do so.

69.     Witness reports also show the misuse of rubber bullets and the larger version that are called soft nose rounds, in a manner that could cause serious harm and that exceed any legitimate law enforcement purpose or training. As with pepper balls, the standard rule is that rubber bullets should never be shot above waist-level unless that level of force is proportionate to an imminent threat of violence. This is because people have been killed by rubber bullets fired above waist-level.

70.     Yet Alderman Sigcho-Lopez reports (at ¶6) that federal agents shot rubber bullets from the rooftop of the Broadview Processing Center, leading to a high likelihood that someone was or would be hit above the waist or, even worse, in the head. This can be deadly and is not a reasonable use of force for protest response purposes.

71.     The journalist Mr. Mulcahy also reports that federal agents targeted him, a clearly identified member of the press, and shot him with a rubber bullet while he was filming an arrest on September 26. Mulcahy Decl. ¶¶ 7-9.

72.    A video from September 26 shows a demonstrator with welts across his torso after being shot with projectiles from the roof, even though in this situation demonstrators and agents were separated by a tall fence.[9] Mr. Decker, a journalist, reports and provides photos of the September 26 demonstrator. Decker Decl. ¶ 9. This is not the proper use of these less-lethal munitions consistent with accepted practices and standard training, and it risks serious injury.

73.    Mr. Thrush, a journalist, reports and provides video of an instance where he observed on September 26 federal agents shoot soft nose rounds from a rooftop, without warning, at a demonstrator who was peacefully playing her guitar. Thrush Decl. ¶ 18. The soft nose round, a large dense rubber projectile, went through the guitar and hit the woman in the leg. These soft nose rounds are used for riot control. There is no law enforcement rationale for shooting large rubber bullets from a rooftop at peaceful demonstrators simply standing around playing music who present no threat to public safety.

74.    Further showing the indiscriminate and undisciplined use of soft nose rounds is Mr. Thrush's report that he observed federal agents shoot soft nose rounds into a nearby business building that shattered two windows. Thrush Decl. ¶ 19.

75.    Mr. Shouse also reports that, on September 22nd, federal agents similarly shot paintball guns at demonstrators from the rooftop without warning, including hitting him multiple times and leaving bruises on his body. Shouse Decl. ¶¶ 3-5. Mr. Shouse's story suggests that the federal agents, who are trained marksmen, apparently targeted him with paintball shots even though he was not posing any immediate threat to law enforcement nor was he blocking any vehicles from entering or exiting the facility. Shooting non-violent demonstrators with a paintball

---

[9] *Supra*, n. 6 at 0:10-0:26

gun from a facility rooftop is a far departure from standard practices and training for protest control and the proportionate use of force.

76.     Overall, the testimony and video shows that federal agents repeatedly and indiscriminately shot several less lethal but dangerous projectile munitions, from behind a fence and on a rooftop, at a crowd that contained journalists and demonstrators who posed no apparent threat, and even when they were retreating and yards away from the building. Several people were injured. And federal officers often combined this misuse of force with widespread deployment of tear gas and OC spray that further disoriented people and halted their retreat to avoid the use of less-lethal munitions. This combined misuse of force—both of chemical irritants and less-lethal munitions—was more likely than not unnecessary and disproportionate to any risk the officers faced. And based on the materials I reviewed, the events strayed far from the accepted and standard practices and training in how to use these techniques and technologies in a measured approach when facing civil unrest. Because there was no apparent law enforcement purpose for either the targeted or indiscriminate use of less-lethal munitions that I reviewed, the more likely than not explanation is that some other reason or guidance pressed agents to take those actions.

   *f.   Disproportionate misuse of force in apprehending and arresting, or instead of arresting, at Broadview Processing Center.*

77.     In circumstances where demonstrators are using non-violent civil disobedience to block ingress or egress or to commit an alleged trespass, a trained law enforcement officer knows that the appropriate response is to apprehend the person, with proportionate force, and arrest them for the alleged lawbreaking. In other words, arrests for lawbreaking when supported by probable cause is the correct response to interference and trespass by demonstrators, rather than resorting to retaliatory or excessive force. If a law enforcement officer is compelled to use any force to effectuate an arrest of someone performing an act of peaceful civil disobedience, accepted law

enforcement practice and training teaches that they should only do so in ways that are sufficient to apprehend and arrest the person, nothing more. An arrest of a nonviolent protestor who is passively resisting arrest would, by definition, not require much force. Also, the standard practice and accepted training that officers receive dictates that the proportionate force against an individual who is resisting an arrest nonviolently would be minimal. Law enforcement should never use force to punish an individual performing civil disobedience or to send a message to demonstrators. Doing so is more likely than not to agitate and provoke tensions between police and demonstrators, rather than maintain peace and control.

78.     The materials I reviewed show that federal agents at the Broadview Processing Center are not abiding these standard practices and training, but are instead using disproportionate and in some cases life-threatening levels of force to penalize demonstrators for performing peaceful civil disobedience rather than simply performing an arrest where probable cause exists.

79.     A particularly alarming example of federal agents engaging in dangerous and even life-threatening misuse of force against a non-violent demonstrator is the testimony and video evidence of federal agents hitting Mr. Shouse with a truck. Mr. Shouse reports that, on September 24, he was walking in a parking lot adjacent to the Broadview Processing Center on his way to a gas station when a pickup truck that he saw carrying three federal agents drove up. Shouse Decl. ¶¶ 6-8. As Mr. Shouse stood before the vehicle, one agent exited the vehicle and shoved Mr. Shouse. After a verbal exchange, the federal agent got back into the truck and Mr. Shouse began walking away. The truck then accelerated rapidly and struck Mr. Shouse.

80.     Video evidence shows the vehicle rapidly accelerating toward Mr. Shouse, striking him, Mr. Shouse visibly and audibly rolling over the hood of the truck, and then the truck driving

quickly away through the parking lot.[10] News reports indicate that the local police are performing a criminal investigation.

81.     There is no remotely potential law enforcement explanation or justification for federal agents using their vehicle to strike a demonstrator who is not posing an imminent threat of violence against the officers in the truck. No training or standard permits using a vehicle to strike any non-violent demonstrator, much less one who is walking away from the vehicle after expressing his opposing viewpoints and posing no imminent threat to law enforcement. If Mr. Shouse had been trespassing or interfering, on which I do not opine, then the response in accordance with training and accepted practice is to arrest him with sufficient probable cause.

82.     Other witness statements and video evidence show several instances of hand-to-hand misuses of physical force against demonstrators. There are many examples of significant disproportionate physical force against demonstrators—including tackling and shoving people hard to the ground—without any apparent risk of violence from the affected person, and far disproportionate to the level of force that would be sufficient to apprehend and arrest lawbreakers. I recount only a few of those examples below.

83.     On September 26, news video shows that a sixty-year-old woman attempting to retreat was pushed to the ground while standing in the street, despite not blocking any vehicle entrance or exit during the recording video.[11] There is no apparently policing justification for pushing to the ground a sixty-year-old woman, who appears to be retreating, and continuing to

---

[10] Darius Johnson, *Video shows protester being hit by pickup truck outside Broadview, Illinois ICE facility*, (Sept. 25, 2025) available online at https://www.cbsnews.com/chicago/news/video-shows-protester-hit-pickup-truck-broadview-ice-facility/?intcid=CNM-00-10abd1h (last visited Oct. 5, 2025) at 0:36.
[11] @FordFischer, X.com post (Sept. 19, 2025 4:25 pm), https://x.com/fordfischer/status/1969150886422155594?s=46&t=kwXzoKXCNt-ZYuqA5Nrezw at 1:56-2:12.

pursue her while she is on the ground and laboring to get to her feet. This is against standard practice and accepted training in the field that seeks to take account of the demonstrator and de-escalate the situation.

84.     On September 19, video shows a young woman walking in front of a vehicle exiting the Processing Center. A federal agent removed her from blocking the vehicle across the street, about twenty feet away, to where she was no longer in front of the vehicle. Rather than leaving her removed at this distance, or making an arrest for the alleged lawbreaking, the federal agent forced her to the ground. Later the same day, the woman and others sat in the street before the driveway with signs, again showing no evident threat of violent action. Again, federal agents used disproportionate physical force to pick her up and push her across the street, without simply apprehending her and making an arrest.[12] Lulay Decl. ¶ 12; Sakiyama Decl. ¶ 14.

85.     That same day, video shows that federal agents tackled a man seen trying to de-escalate a situation with another demonstrator and then pummeled the man while he was on the ground.[13]

86.     The September 26 misuse of physical force against a single demonstrator, Judy Laut, is also instructive. In an apparent act of civil disobedience, Ms. Laut stood before a vehicle driveway holding a sign or banner and in a manner that blocked the exit of a departing van coming through the threshold. While federal agents were permitted to take steps to have Ms. Laut moved from the entrance, the use and escalation of force the agents employed frequently strayed from accepted practice and protest policing training. Among other things, after pointing a pepper ball gun at Ms. Laut's face and chest, three federal agents together forcefully shoved her to the ground

---

[12] @KatAbughazaleh, X.com post (Sept. 19, 2025 at 7:20 am),
https://x.com/KatAbughazaleh/status/1969013628398411810
[13] *Supra*, n. 6 at 1:02

and then other agents fired pepper balls at her while she was on the ground from what appears to be the rooftop. When Ms. Laut stood up and began to attempt to retrieve the banner she dropped when shoved to the ground, multiple federal agents shoved her again. This was force was not a de-escalation, it provoked the situation, and it ultimately resulted in Ms. Laut being OC sprayed at close range and her sitting down out of apparent pain. The vehicle Ms. Laut had stood before had long exited by this point and other protest attendees surrounded her to render aid. Although she was sitting down, immobilized with pepper spray, unarmed, and facing away from federal agents and the facility, federal agents again moved forward to push Ms. Laut and the individuals who came to assist her. No vehicle in view was approaching the driveway. After Ms. Laut got up and the crowd moved further into the street, a federal agent put Ms. Laut in a chokehold, while she stood holding her hands in a peace sign.[141516]

87. Other witness reports and videos show similar incidents with numerous other demonstrators, indicating a clear pattern of federal agents using physical force against demonstrators—whether engaged in civil disobedience or not—in a manner that is inconsistent with accepted practices and standard training for policing protests. Journalists have collected many of these reports and have themselves been subject to disproportionate uses of physical force. Lulay Decl. ¶ 12; Held Decl. ¶ 12.

88. On October 3, one reporter, Mr. Thrush, provides testimony and video evidence of federal agents confronting peaceful demonstrators, already standing about 500 feet back from the Broadview facility, and forcefully pushing them back further off the sidewalk and street and into a greenspace. Some federal agents were punishing peaceful protestors. Others grabbed and

---

[14] @FordFischer, X.com post (Sept. 19, 2025 4:25 pm),
https://x.com/fordfischer/status/1969150886422155594?s=46&t=kwXzoKXCNt-ZYuqA5Nrezw
[15] *Supra*, n. 5 at 1:50-58
[16] @fox32chicago, TikTok post (Sept 19, 2025), https://www.tiktok.com/t/ZTMhGh1nS/

detained demonstrators, forcing them to the ground and arresting them without any clear indication from the video what they had done, and certainly no indication that they posed a violent threat to law enforcement or public safety.[17][18] Thrush Decl. ¶¶ 35-37. Additional video evidence from October 3 corroborates that federal agents—and specifically the commanding officer, Mr. Bovino—charged demonstrators who had retreated to a greenspace and seemingly began grabbing them indiscriminately, throwing them on the ground, and detaining them.[19][20] In one video, Mr. Bovino is seen getting in a verbal confrontation with a demonstrator who is standing on a green space and separated from the street by a metal crash barrier. Mr. Bovino appears to be angered, climbs over the metal barrier, tackles the demonstrator to the ground and then Bovino appears to tackle a second person who is recording the events and knocks a phone out of his hand. Multiple other federal agents converge and knock down journalists who are covering Bovino tackling the demonstrators. [cite: 2025.10.03 Video of Bovino].

89.     The use of disproportionate physical force in effectuating an arrest, or the use of disproportionate force against someone engaged in civil disobedience with the absence of an accompanying arrest, are indications that the use of force was not for a legitimate law enforcement purpose. Such misuses of physical force instead indicate a retaliatory action to punish the person engaged in civil disobedience for the conduct they are performing. That conduct in this context appears to be the expression of disapproval of federal officers' activities.

### g. *Pointing live-round guns and threatening deadly force*

---

[17] Charles Thrush Video, Oct. 3, 2025, available at https://spaces.hightail.com/space/ib44OApQsB
[18] @Ronxyz00, X.com post (Oct. 3, 2025 11:32 am), https://x.com/ronxyz00/status/1974150663195275464?s=46&t=kwXzoKXCNt-ZYuqA5Nrezw at 0:00-0:15.
[19] *Supra*, n. 18 0:15-1:00
[20] Video, Oct. 3, 2025, available at https://spaces.hightail.com/space/ib44OApQsB

90.     Journalists report that federal agents at the Broadview Processing Center were drawing their live-round firearms at the protests to control demonstrators. Geary Decl. 14. There is no training or accepted standard that would justify drawing or using a firearm against demonstrators unless there is a serious threat of life-threatening violence that cannot be managed with less-lethal munitions or chemical irritants.

### h.  *Federal agents target and use indiscriminate force against identifiable journalists at Broadview Processing Center*

91.     Fourth, trained officers are equipped to identify journalists and ensure, to the extent possible, that they maintain their reasonable access rights to effectively observe, report, and record the news. Even if a valid dispersal order had been issued to demonstrators by federal agents during these events at Broadview Processing Center, the standard best practice is that it is both unnecessary and improper to disperse or assault journalists. This is because members of the press, peacefully recording or reporting on what is occurring and not interfering with law enforcement, pose no threat to law enforcement.

92.     Officers experienced in policing protests are capable of identifying and allowing members of the press to remain even in very chaotic circumstances. When I was the Police Chief in Seattle, we did not disperse press even if we declared an unlawful assembly. In fact, it is common for police to allow journalists behind their lines. We did so at the massive protests in Seattle. In the hundreds of protests I was responsible for, I do not recall any instance where someone pretended to be media so that they could get behind police lines and attack the police.

93.     The Portland Police Bureau was enjoined from ever dispersing journalists and legal observers during the large-scale 2020 protests, and complied with that injunction for years without danger to law enforcement. Federal policing units have also been under the same limits in Portland for years, as well as for nearly a month in Los Angeles. I have not seen any report or evidence that

an order preventing journalists from being dispersed when a protest violently escalates and needs to be dispersed is in any way an unsafe or unworkable limitation. And, regardless, using any force against a member of the press when they are off to the side of a protest is never consistent with best practices and accepted training.

94.     Even if a valid dispersal order had been issued (which it appears did not occur), it is unnecessary and improper to disperse or assault journalists, who are present to observe what is happening, not to participate in any way in a protest.

95.     It is against standard practice and accepted training to fire less-lethal munitions or chemical irritants at journalists simply reporting on the protest at all, or to use physical force against journalists who pose no threat of violence and are not actually impeding a lawful arrest.

96.     My discussion above of various misuses of force have included examples of such force used against journalists. And the videos I reviewed reveal that journalists have been the subject of indiscriminate tear gassing and rounds of pepper balls despite clearly being identifiable as members of the media.

97.     However, the specific witness accounts from several individual journalists warrant further emphasis.

98.     Ms. Lulay, from the publication Block Club Chicago, recounts that at least four of her colleagues who were wearing visible press credentials have been hit with pepper balls or subjected to tear gas while covering the events at Broadview Processing Center in recent weeks. Lulay Decl. ¶ 20; also Boyle Decl. ¶¶ 14, 17-19. The conditions on September 26 worsened to such an extent for one reporter that the publication decided to stop reporting on the news at Broadview on September 26. Lulay Decl. ¶ 28.

99.     Mr. Thrush, also from Block Club Chicago, reported similar events on September 19 and 26. He reported that on September 26, a federal agent fired a pepper ball directly at him while he was wearing press credentials and standing away from any protestors on a public street. Thrush ¶ 14. He reported that he personally observed a federal agent directly target a clearly identified journalist by throwing a full tear gas canister at him from fifteen feet away, injuring him and making him unable to walk. Thrush Decl. ¶ 25. Overall, he estimates that of the roughly fifty journalists who were covering the events at Broadview that day, federal officials hit the majority with pepper balls and subjected them all to tear gas.

100.     Journalists from the outlet Unraveled Press have attested to similar circumstances for their reporters. This includes one reporter, visibly wearing a press credential lanyard and a helmet and backpack labeled "PRESS," whom a federal agent appears to have specifically targeted, failed to warn, and then shot in the face with a pepper bullet on September 26. Geary Decl. ¶ 9; Held Decl. ¶ 20. This was not the first time Geary reports being specifically targeted as a member of the press. Geary Decl. ¶ 9; Thrust Decl. ¶ 26.

101.     The Unraveled Press members report another example on September 19, when a federal agent (specifically, ICE SRT)—who was witnessed choking a protestor—then shot pepper balls at an Unraveled Press reporter, Mr. Held, in the groin at close range after another federal officer pushed Mr. Held to the ground. Held Decl. ¶ 17; Geary Decl. ¶ 12. Mr. Held was later again shot in the hip, resulting in further bruising. Held Decl. ¶ 18.

102.     A journalist from the outlet Chicago Reader, Mr. Mulcahy, similarly reports that federal agents repeatedly targeted him and other members of the media recording the events at Broadview. Mulcahy Decl. ¶¶ 6-12. Despite wearing a helmet that says PRESS and carrying a notebook or filming equipment—clear signs that he is a journalist—agents used force against Mr.

34

Mulcahy, including shooting him with a rubber bullet while he was filming an arrest on September 26. Mulcahy Decl. ¶¶ 7–9.

103.    Mr. Goyette, a photojournalist, reports that he saw other clearly identifiable journalists subjected to tear gas and shot at with pepper balls on September 26 in an area where they were standing off to the side reporting on an incident. Goyette Decl. ¶ 8. Later, Mr. Goyette had to leave the protest because the federal agents were using tear gas canisters indiscriminately against the crowd, including journalists. Goyette Decl. ¶¶ 10–11.

104.    Mr. Decker, a photojournalist, attests and provides photo evidence from September 26 showing how he and another photojournalist-—wearing identification as press—were shot point blank with pepper balls above the waist, and specifically in the face, while they were taking photos of federal agents. Ms. Kunkel recounts and provides photos of the same event. Kunkel Decl. ¶¶ 8-15. The next day, on September 27, federal agents again shot pepper balls towards Mr. Decker's face, struck his camera from about 30 feet away, and then again shot pepper bullets into his legs from about a 4–5 foot distance while he was filming. Decker Decl. ¶ 12.

105.    These individuals posed no apparent threat of violence to law enforcement, especially given that the adjacent officers who appear to have shot them with pepper balls were behind a tall fence covered in barbed wire. Still, federal agents shot them in the face from behind the fence with pepper balls. Decker Decl. ¶¶ 8-9; Kunkel Decl. ¶¶ 8-15.

106.    Ms. Lulay reports that when federal agents fired pepper bullets at people from the facility rooftop on September 19, they targeted people who could have been identified as media because they were holding cameras and notebooks. Lulay Decl. ¶ 12.

107.    Numerous reports recount the September 27 arrest of a CBS journalist, Steve Held. Held Decl. ¶¶ 29-32; Goyette Decl. ¶ 14; Lulay Decl. ¶ 15. Held reports that the commanding

officer, Mr. Bovino declared that it was an "automatic arrest" zone for anyone who stepped in the street. This is not how policing works. No responsible trained officer would arrest someone, much less a clearly identified and known journalist, simply for stepping in the street when they were being instructed to back away from a different arrest occurring in the other direction. Held Decl. ¶¶ 28-31.

108. Ms. Lulay also reports that on September 28, federal agents targeted and shot a news reporter with a pepper ball while she was sitting inside her clearly marked news van, causing the chemical irritant to engulf her vehicle. Lulay Decl. ¶ 16. There is no legitimate law enforcement purpose for shooting a pepper ball into any vehicle that poses no threat of danger, much less one where a reporter is sitting off to the side.

109. Mr. Griswold attests to similar specific targeting of journalists in their clearly marked news vehicles, with two reporters forced from their vehicles into the thick cloud of tear gas and then one shot repeatedly in the chest with pepper balls despite being identifiable as journalists. Griswold Decl. ¶ 10. There is no valid law enforcement reason to force journalists sitting in news vehicles to enter tear gas and then shoot then with pepper balls. In both of the instances that Ms. Lulay and Mr. Griswold describe, the actions agents took against clearly marked members of the press depart from any standard practice or appropriate training for law enforcement interacting with journalists at protests.

110. Another witness, Ms. Breslin, witnessed and recorded video of federal agents pointing a taser at members of the news media on September 26th.[21] There is no legitimate law enforcement justification for pointing a taser at members of the media reporting on events, and it is inconsistent with what a trained officer would do under the circumstances.

---

[21] Video, Sept. 26, 2025, available at https://spaces.hightail.com/space/ib44OApQsB

111.    As I stated earlier, there is no legitimate law enforcement purpose for ordering the dispersal of journalists, who are at the protest only to observe and report on the events, even when there is a basis to disperse the demonstrators. Identifiable journalists who are performing their duties and not interfering are simply not a realistic threat to law enforcement. Additionally, the misuses of force against journalists that many witnesses recount in the descriptions above cannot be explained by any legitimate law enforcement purpose. To say the least, repeatedly shooting multiple journalists in the head and groin areas when they are reporting the news is not consistent with accepted practices or standard training that officers receive in crowd and protest control. Rather, the intentional targeting of journalists evident in the facts here indicates an effort to prevent journalists from performing their functions, rather than facilitating their role at protests.

### i.    *Many of the specific units reportedly at Broadview Processing Center lack experience in protest policing*

112.    Journalists' reports, photographs, and videos show that most of the agents were from various DHS agencies, including ICE, CBP, ERO, and SRT. There are also reports of agents from DOJ policing agencies, such as FBI, ATF, and Bureau of Prisons. Most of them, from the materials I reviewed, were wearing full tactical gear, which is very likely to create ambiguity among the crowd about which agent was from which agency, as Mr. Boyle recounts. Boyle Decl. ¶ 10-12; also Thrush Decl. ¶¶ 34-35.

113.    In my experience, many of these federal forces are simply not trained in urban crowd control and managing demonstrations. Policing protests is difficult even with the proper experience, but it can be done successfully with good leadership and correct guidance on appropriate use of force: agents are to adequately warn, wait, de-escalate; use no more force than necessary to address threats of violence or make arrests for alleged lawbreaking; respect the

Docusign Envelope ID: 48A6FDE8-8DF8-4621-A0B5-9DE44DC37032

particular interests of journalists and observers; and never use force in a manner that punishes the crowd for attending the protest.

114.     From the materials I have reviewed, it appears that many of the agents policing at Broadview Processing Center lack this guidance and leadership. Based on my experience as Commissioner of CBP and as Chief of Police in Seattle, where I helped police hundreds of protests, some of which exceeded 50,000 people and a large number greatly exceeded the crowd sizes at Broadview, it is my opinion that the training the likely DHS personnel present here received does not equip them to effectively police protests and urban civil unrest, given the focus of these teams and their other specialization and skills.

115.     Many, if not all, DHS agents lack specific training in riot control and mass demonstrations. While some DHS agents have training in crowd control in detainment/confinement facilities, that training is not applicable to a public protest, where First Amendment issues—among protestors and press alike—are due significant and unique considerations for how officers are to act.

116.     CBP operates primarily on the border. Taking enforcement action against people charging a border wall/fence to cross illegally is very different from policing people on a city street, who are exercising their First Amendment rights. Further, in their daily jobs, members of CBP, particularly the U.S. Border Patrol, often operate independently or sometimes with a partner. They are taught to take individual initiative to deal with threats, as opposed to what happens in a protest, which requires a collective measured response. In policing crowds/civil unrest, officers work in large formations and are instructed not to take individual actions, to essentially not break ranks, so as to ensure that responses are coordinated and measured. This discipline requires on-going training for the law enforcement personnel and their leadership.

117. As an illustration, the focus of the Special Response Team ("SRT") and Special Operations Group ("SOG") is unusual situations, such as terrorist threats, search and rescue, and warrant-execution. SRT is a tactical unit within DHS that is part of the CBP Office of Field Operations that executes warrants. It also provided security for me, when I was head of CBP. SOG combines the Border Tactical Unit ("BORTAC") and Border Patrol Search, Trauma, and Rescue Unit ("BORSTAR"). BORTAC is the equivalent of SWAT for the Border Patrol, and they participate in actions such as serving a search warrant at a "stash house" location where human traffickers are holding people, and other high-risk assignments. While the policing units here are excellent marksman and can surely distinguish journalists and legal observers from protesters in the heat of the moment, their skills are not particularly useful for the situation in Chicago, which requires a broad coordinated response and the strategic use of de-escalation tactics. The techniques used against the threats posed by heavily armed and dangerous criminals are far different than what is appropriate to use against the threats posed by people attending a protest.

118. Other agencies that appear to be involved here have no responsibility for urban crowd control, such as Homeland Security Investigations (HSI), which is a DHS component that typically conducts investigations. These officers are neither accustomed nor trained to police urban civil unrest.

119. Further, policing in an urban environment is far more than "training." New officers who have graduated from the Academy are paired with senior and more experienced officers to work in an urban area. They are evaluated in Field Training on the interactions they have in the community. Officers need experience to get things correct on their own. Absent that, officers unfamiliar with protest policing need further guidance, leadership, and coordination on the maintaining appropriate uses of force and respecting the rights of protest attendees.

## IV.    Opinion 2: The proposed injunction is safe for law enforcement

120.    It is my opinion that the restraints in the proposed injunction are consistent with well-established law enforcement standard practices and accepted training, are the methods that policing forces in urban centers already use in areas across the country, and are safe for law enforcement to follow in these circumstances.

121.    Absent a legitimate law enforcement purpose, use of force is unacceptable.

122.    There is no law enforcement purpose to use less-lethal weapons or chemical irritants other than in the ways that they are designed and supposed to be used, in narrow circumstances addressing a riot or imminent violent actions, and to minimize bodily injury to specific targets.

123.    In the context of supporting law enforcement operations, officers have no reason to target journalists or disperse them when they are not directly interfering and posing no threat to physical safety. They also have no reason to misuse chemical irritants, less-lethal munitions, physical force, or arrests against journalists in such circumstances.

124.    Just as local police are required to display their badge or identification when policing a protest, federal agents should do the same. This is a key part of maintaining public trust. It also serves to protect the officer, lessening the risk that an officer following standard and accepted practices and training would be incorrectly accused of acting improperly.

125.    Based on the evidence I have seen and my years of professional experience with policing hundreds of protests, ranging from entirely peaceful to volatile, I conclude that the protections in the proposed order for journalists and demonstrators not posing an imminent threat of violence do not pose a substantial safety encumbrance to law enforcement in the situation.

## V.    Opinion 3: The proposed injunction is workable for law enforcement

Docusign Envelope ID: 48A6FDE8-8DF8-4621-A0D5-9DE44DC37032

126. It is my opinion that the limitations of the proposed injunction are consistent with well-established law enforcement standard practices and accepted training, are the methods that policing forces in urban centers already use in areas across the country, and are workable for law enforcement to follow.

127. Absent a legitimate law enforcement purpose, law enforcement officers should deescalate rather than escalate violence. This is essentially what the ordered relief would prompt officers to do, and I have seen such limitations be workable for protest controls in many other contexts.

128. Police forces that are trained and experienced in civil disturbances are able to protect public safety without excluding press or violating any of the other restrictions in the proposed injunction.

129. Effective crowd control in the context of even volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress non-violent expressive activities. I have not seen such plans for the federal agents in this case. If de-escalation plans do not exist, it may help explain why the federal agents have been so unsuccessful in their policing efforts and why the proposed injunction would be workable to give a framework for such plans.

130. The protections in the TRO are workable for trained law enforcement. To the extent that the federal agents would have difficulty complying with the TRO, such problems arise from the failure of supervision and leadership, lack of experience, and failure of management to ensure that the agents are properly trained for civil disturbances/unrest.

131. Police who are experienced in maintaining public safety during protests, specifically protests where some individuals have engaged in violent and destructive acts (such as

41

the police in Seattle, where I was Chief of Police), are capable of assessing and managing the risks posed in these unique circumstances.

132.     It does not appear that the officers managing the federal response are similarly prepared.

133.     It is a basic principle of policing, that in any situation like this, there must be unity of command. An absence of a unity of command typically leads to chaotic and dangerous policing.

134.     Not only is a leadership structure important, so are leadership skills, particularly leadership rooted in public service, which is the nature of law enforcement.

135.     Unlike local police, the personnel in the federal agencies that were sent to Chicago appear to lack training and experience dealing with the types of protests that are ongoing. Putting less-lethal weapons in their hands and sending them to police the protests, without clear direction on the standard practices and accepting training on these uses, is a dangerous and ill-conceived policy.

136.     When I was Chief of Police in Seattle, protesters would often march past the federal office building, and Seattle Police would coordinate with FPS who generally remained inside the building because the local police had far more experience in dealing with the specific types of issues that arose in the local protests.

137.     It also appears that all the federal officers policing the protests were given less-lethal munitions. In dealing with this type of protest, it is critically important that only a small group of well-trained people who are familiar with the restraint necessary for policing this type of situation be given such weapons (for example, in Seattle, I limited such weapons to members of the SWAT team).

138.    The proposed order will inform these officers on the proper use of warnings, force, and dispersal order and encourage commanding officers to provide the necessary guidance.

139.    In sum, the protections in the TRO are workable for trained law enforcement, as seen with the Portland police and federal policing in LA this year and in Portland in 2020. To the extent that the federal agents are having any difficulties, such problems arise from the failure of supervision and leadership, lack of experience, and failure of leadership to ensure that the agents are properly trained for civil disturbances or unrest.

Date: _10/6/2025_____

Signed by:

RICHARD G KERLIKOWSKE
6BB62117B80044F...

GIL KERLIKOWSKE

## R. GIL KERLIKOWSKE

R. Gil Kerlikowske

15 Water Street

Charleston, South Carolina 29401

gilkerlikowske@hotmail.com

███████████████████

## Professional Experience

**February 2017 - Present**

Gil Kerlikowske LLC, Owner/Principal: A private consultancy specializing in border security, global supply chain security, public safety, and drug policy issues and practice.

Global Resilience Institute, Northeastern University, Distinguished Senior Fellow.

Rice University, Non-Resident Fellow (2017-2024)

Harvard University, John F. Kennedy School of Government, Institute of Politics, Resident Fellow, (Spring 2017).

Council on Foreign Relations, Member

**March 2014-January 2017**

Commissioner, United States Customs and Border Protection (CBP), U.S. Department of Homeland Security.

Nominated by President Barack Obama and unanimously confirmed by the U.S. Senate to head Customs and Border Protection (CBP). I was the only confirmed Commissioner in that Administration.  CBP is the largest law enforcement organization in the country. It has over 60,000 employees throughout the world and a budget of $13B. Comprised of the Border Patrol, Air and Marine, and Field Operations, CBP has the dual responsibility of protecting our nation's borders and ensuring the efficient movement of both trade and travel.  With Congressional approval I reorganized the executive staff, elevating trade to a direct report to me with an Executive Assistant Commissioner. I improved transparency and communication, oversaw a significant reduction in the use of force by Border Patrol agents, and implemented an electronic trade tracking system (ACE). Partnered with U.S. Chamber of Commerce on trade.  I authorized the largest fine ever imposed by CBP against VW. I negotiated pre-clearance preliminary agreements with over six countries and implemented pre-clearance in the UAE.  I significantly increased enforcement efforts on countries where the use of child labor violated U.S. law through Withhold Release Orders.  I utilized an approved advisory committee of private sector stakeholders

**Exhibit 1**

## R. GIL KERLIKOWSKE

from all disciplines of the trade and manufacturing centers to provide advice and guidance on how to improve Customs efforts to increase efficiency and effectiveness in global supply.

### May 2009-March 2014

Director, White House Office of National Drug Control Policy (ONDCP)

Nominated by President Barack Obama and confirmed by the U.S. Senate to lead the White House drug policy office. ONDCP is responsible for establishing the policies, priorities, and objectives for the Nation's drug control program. I was charged with producing the President's National Drug Control Strategy. The strategy directs the Nation's anti-drug efforts and establishes a program, a budget, and guidelines for cooperation among Federal, State, and local entities. I travelled the country extensively meeting with Governors, Mayors, Judges, law enforcement executives, community leaders, and individuals in treatment and recovery to re-balance the Nation's efforts and resources to focus on drug abuse as both a public health and a public safety problem. I met with leaders in over fifteen countries to enhance collaborative strategies to prevent drug abuse and to engage in law enforcement efforts to combat smuggling and transnational organized crime. I co-authored the President's Transnational Organized Crime Strategy with John Brennan.

### August 2000-May 2009

Chief of Police, Seattle, Washington

In 2007 Seattle recorded the lowest crime rate in 40 years. The department has over 1,900 employees to police a city of 680,000 residents. I restructured a significant critical area that was partially responsible for the chief's position becoming available—Demonstration Management. SPD is now requested for advice and consultation on managing crowds, from the G8 in Russia to the Presidential Inauguration. SPD achieved National Accreditation in 2003 and 2006.

The Seattle Police Foundation was formed in 2001 and provided over $500,000 annually to the organization. A Crime Scene Investigation unit was formed in 2004 and the Cold Case unit has solved a number of homicides, including one from 1969, at the time, the oldest cold case in the United States.

I implemented the first civilian oversight for the department. Responsibility for emergency preparedness for the entire city is a function of the department. A state-of-the-art Emergency Operations Center was designed and opened in 2008. New records management and computer aided dispatch systems were implemented in 2008. The City agreed to the first comprehensive and sustainable growth in the size of the force since the 1980's. The Seattle Police Department is regarded as one of the most professional and cutting edge big-city police departments in the Nation.

**Exhibit 1**

## R. GIL KERLIKOWSKE

**July 1998-August 2000**

Deputy Director, U.S. Department of Justice, Office of Community Oriented Policing Services (COPS).

This agency is responsible for providing grant funds for additional police officers and technology to local governments. As importantly, COPS supports community policing programs by providing training and educational material to law enforcement and community groups. I represented the Department at speaking engagements and media events throughout the country. I was responsible for two divisions that comprise over 60 percent of the total personnel and $6 billion in federal investments.

**January 1994-July 1998**

Police Commissioner, Buffalo, New York

As the first outside Commissioner in 30 years, I was selected by the Mayor to restructure the organization. The department was viewed as being isolated from the community and its culture did not support community policing. Over the last two decades the department was not in the forefront in using modem crime prevention and control methods, training, and advanced technology.

During my tenure, overall serious crime decreased by over 31%, violent crime by 46%, and homicides were reduced by 51%. A community policing implementation plan was developed and mini-precincts were opened. Two state-of-the-art district stations were opened and two more were planned and funded. This completed realignment from 14 precincts to five districts.

I initiated a Citizen Advisory Committee, Citizen Police Academy, Youth Police Academy, and high school dialogues between officers and students that improved communication and provided closer cooperation with the community. The Yale Child Development-Community Policing Program, an intervention for children exposed to violence, was implemented. A random drug-testing program was negotiated with the PBA for all officers including the Commissioner and command staff. I implemented an objective examination process for selecting detectives.

An independent management study by the International Association of Chiefs of Police (IACP) found the department "far more contemporary, professional and effective" under my leadership.

**January 1990-December 1993**

Chief of Police, Fort Pierce, Florida

Fort Pierce is a racially and ethnically diverse city that was experiencing significant crime problems. Programs such as Neighborhood Oriented Patrol, Victim Assistance and Mall

**Exhibit 1**

## R. GIL KERLIKOWSKE

Watch contributed to a reduction in crime and an improved relationship between the community and the department. A neighborhood police station was opened that provided a safe haven for a variety of programs such as scouting and after-school tutoring. The department was selected by the Mott Foundation as one of four national sites for implementing neighborhood policing centers. The department received the Attorney General's crime prevention award. National accreditation was achieved.

### April 1987-January 1990

Chief of Police, Port St. Lucie, Florida

Impact fees on new construction were implemented to pay for future police growth. The process to achieve national accreditation was begun and a new police headquarters was designed. The department received the Attorney General's crime prevention award.

### July 1985-April 1987

Commanding Officer, Lieutenant, Criminal Investigation Division, St. Petersburg (FL) Police Department

St. Petersburg is a city of a quarter million residents and faces the same challenges as other large urban police agencies. This division is responsible for the investigation of all major crimes. Responsibilities included management of all phases of criminal investigations, polygraph services, crime analysis, victim assistance, hostage negotiation, and a violent crimes unit. New programs such as a weekly tactical crime meeting (a forerunner of COMPSTAT), statistical reporting format, interaction with community groups, and a management review and reallocation of personnel were implemented.

### August 1984-July 1985

Visiting Fellow, United States Department of Justice, National Institute of Justice (NIJ).

Recipient of a one-year fellowship at the National Institute of Justice, the research arm of the Department of Justice and is on the leading edge of developments in the criminal justice field.

I was an advisor to the Director and also managed grants in excess of $3 million, including the Newport News Problem-Oriented Policing Project. Other responsibilities included developing new programs and drafting long and short-range plans for the Law Enforcement Division.

**Exhibit 1**

Docusign Envelope ID: 48A6FDE8-8DF8-4621-A0D5-9DE44DC37032

## R. GIL KERLIKOWSKE

**May 1980-August 1984**

Commanding, Lieutenant, St. Petersburg (FL) Police Department

Commanded several key sections of the St. Petersburg Police Department, including, Field Training, Vice and Narcotics, and Internal Affairs.

**February 1972-May 1980**

Police Officer, Sergeant, St. Petersburg (FL) Police Department

Patrol duty with an innovative inner-city team policing unit (a predecessor of community policing) and detective assignments in narcotics and later robbery-homicide. Began my career in St. Petersburg as a police cadet in 1969.

**February 1970-February 1972**

Security Team Leader, Army Military Police

Supervisor of one of the teams responsible for security of the presidential helicopter (President Richard Nixon).

## Select Awards and Offices

Chair, National Law Enforcement Explorers Board, (2015)
Women in Federal Law Enforcement, Award for "elimination of systemic barriers" (2015)
Penrith Award, National Executive Institute Associates (2014)
John P. McGovern Award for work in preventing drunk/drugged driving (2011)
Coordinating Council on Juvenile Justice and the Prevention of Delinquency (DOJ) (2011)
American Medical Association Nathan A. Davis Award (2011)
Honorary Doctorate, Humane Letters, University of South Florida (2010)
President, Major Cities Chiefs Association, elected twice (2007-2009)
Community Service Award, Association of Hispanic Chambers of Commerce, (2008) (WA)
Seattle University Community Leader Award, (2008)
Police Executive Research Forum *Leadership Award,* (2006)
Brotherhood/Sisterhood Annual Award, The National Conference (Christians and Jews) (1998)
President, Police Executive Research Forum (1996-1998)
Progressive Leadership Award, Citizen Action of New York (1996)
Vice Chair, Governor's Crime Laboratory Council (FL 1991-1994)
Gary P. Hayes Award for innovation in policing, Police Executive Research Forum, (1991)
U.S. Army Presidential Service Badge (1972) Outstanding Military Police Honor Graduate (1970)

**Exhibit 1**

## R. GIL KERLIKOWSKE

### Select Speeches and Presentations

Naturalization Ceremony, Faneuil Hall, Boston (2016)
Australian National University Symposium on Policing (2007)
John Jay College of Criminal Justice, Patrick V. Murphy lecture (2007)
Community Policing, Police Service of Northern Ireland, Belfast (2005) Presentation on anti-terrorist exercise, conference in Belfast (2003)
Meeting of British Chief Constables. London (2002)
BBC Television, Glasgow: Juvenile Curfews—A Policy Debate (1997)
F.B.L International Law Enforcement Academy, Budapest (1996)
 Secretary of Labor's Task Force on Labor/Management Cooperation (1995)
U.S. Conference of Mayors, Houston (1992)
 Testified before President's Commission on Missing Children (1986)
Speaker at annual meeting of Police Management Association, London (1985)

## Special Activities

Home Team Advisory Committee, Government of Singapore (2020)
Representative to Int'l Association of Chiefs of Police Executive Board (2015)
Panel member, National Academy of Sciences National Research Council, ***Protecting Individual Privacy: In the struggle Against Terrorists*** (2008)
Member of the Executive Session on Policing, Harvard University (2008)
International City Management Association, editorial advisor, ***Local Government Police Management***
Consultant to ***Early Warning-Timely Response, A Guide to Safe Schools***, developed by the Department of Justice and the Department of Education (1998)
Adjunct faculty Seattle University (graduate program), Florida Atlantic University, and Buffalo State College, Northeastern University, University of South Carolina
International Association of Chiefs of Police Legislative Committee
U.S. Conference of Mayors Police Policy Board
Advisory board member/speaker/lecturer on numerous national criminal justice projects
Book jacket or preface; ***Character and Cops (1994), Superpredators: The Demonization of Our Children by the Law*** *(1999),* ***Police Pursuits*** *(2000)*

## Select Publications and Papers

President's Transnational Organized Crime Strategy (2010)

Homeland Security Success through Law Enforcement Collaboration, *The Police Chief (2014)*

Co-author, A Comprehensive Approach to Internet Safety, *The Police Chief(2008)*

Contributor, Community Policing: A Contemporary Perspective, 2nd edition (1998)
 OP-ED, *Boston Globe,* with Elliott Richardson, on crime prevention through law enforcement partnerships to intervene in children's lives (1997)

**Exhibit 1**

## R. GIL KERLIKOWSKE

Co-author of article on community surveys, *The Florida Police Chief* (1989)

Co-author of article on visiting fellowships at the Department of Justice, *The Police Chief* (1985)

## Media Presentations

Extensive print, digital, radio, and television interviews domestic and international media outlets.

## Civic Involvement

National Board Chair, Fight Crime: Invest in Kids. Washington, D.C.
Hearing, Speech and Deafness Center, Seattle
United Way of King County, Seattle Advisory Board
Executive Board, National Conference (of Christians and Jews), New York
District Commissioner, Boy Scouts of America, New York and Florida
Board of Trustees, St. Mary's School for the Deaf,  New York
Board of Directors, Fort Pierce-St. Lucie County Chamber of Commerce
Campaign Chair, United Way of St. Lucie County (FL)
Board of Directors, Salvation Army. Seattle, New York and Florida
Board of Directors, "Success by 6", New York
Teacher in adult literacy program, Florida
Board of Trustees, Hospital Corporation of America, Port St. Lucie and Fort Pierce (FL)
Chair, School Superintendent's Advisory Committee, Fort Pierce (FL)
Chair, Advisory Committee of Rape Crisis Center, St. Petersburg (FL)
Board of Directors, Center Against Spouse Abuse, St. Petersburg (FL)

## Professional Development

National Executive Institute, FBI (1995)
Harvard University, John F. Kennedy School of Government National Executive Session on Policing (1988)
F.B.I. Law Enforcement Executive Development (1988)
F.B.I. National Academy (1984)
Florida Power Corporation, Total Quality Improvement (1988)
Senior Management Institute for Police (1983)

## Education

Master of Arts, Criminal Justice,  University of South Florida, Tampa (1985).
Emphasis in urban police administration.
Bachelor of Arts, Criminal Justice, University of South Florida (1978)

**Exhibit 1**