| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| | NORTHERN DISTRICT OF ILLINOIS | |
| 2 | EASTERN DIVISION | |
| 3 | | |
| | CHICAGO HEADLINE CLUB, BLOCK ) | Case No. 25 C 12173 |
| 4 | CLUB CHICAGO, CHICAGO NEWSPAPER ) | |
| | GUILD LOCAL 34071, NABET-CWA ) | |
| 5 | LOCAL 54041, ILLINOIS PRESS ) | |
| | ASSOCIATION, RAVEN GEARY, ) | |
| 6 | CHARLES THRUSH, STEPHEN HELD, ) | |
| | DAVID BLACK, WILLIAM PAULSON, ) | |
| 7 | AUTUMN REIDY-HAMER, and LEIGH ) | |
| | KUNKEL, ) | |
| 8 | ) | |
| | Plaintiffs, ) | |
| 9 | ) | |
| | v. ) | |
| 10 | ) | |
| | KRISTI NOEM, Secretary, U.S. ) | |
| 11 | Department of Homeland Security ) | |
| | (DHS); TODD LYONS, Acting ) | |
| 12 | Director, U.S. Immigration and ) | |
| | Customs Enforcement (ICE); ) | |
| 13 | MARCOS CHARLES, Acting Executive ) | |
| | Associate Director, Enforcement ) | |
| 14 | and Removal Operations, ICE; ) | |
| | RUSSELL HOTT, Chicago Field ) | |
| 15 | Office Director, ICE; RODNEY S. ) | |
| | SCOTT, Commissioner, U.S. ) | |
| 16 | Customs and Border Protection ) | |
| | (CBP); GREGORY BOVINO, Chief ) | |
| 17 | Border Patrol Agent, CBP; DANIEL ) | |
| | DRISCOLL, Director of the Bureau ) | |
| 18 | of Alcohol, Tobacco, Firearms ) | |
| | and Explosives (ATF); WILLIAM K. ) | |
| 19 | MARSHALL III, Director of the ) | |
| | Federal Bureau of Prisons (BOP); ) | |
| 20 | PAMELA BONDI, Attorney General ) | |
| | of the United States; U.S. ) | |
| 21 | DEPARTMENT OF HOMELAND SECURITY; ) | |
| | U.S. DEPARTMENT OF JUSTICE; ) | |
| 22 | UNIDENTIFIED FEDERAL OFFICER ) | |
| | DEFENDANTS; UNIDENTIFIED FEDERAL ) | |
| 23 | AGENCY DEFENDANTS; and DONALD J. ) | |
| | TRUMP, President of the ) | |
| 24 | United States, ) | Chicago, Illinois |
| | ) | October 6, 2025 |
| 25 | Defendants. ) | 2:49 p.m. |

```
1                    TRANSCRIPT OF PROCEEDINGS -
        EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
2             BEFORE THE HONORABLE SARA L. ELLIS

3   APPEARANCES:

4   For the Plaintiffs:    LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
5                               MR. LOCKE E. BOWMAN, III
                           311 N. Aberdeen Street, Third Floor
6                          Chicago, Illinois 60607

7
    For the Defendants:    U.S. DEPARTMENT OF JUSTICE
8                          BY:  MR. SEAN SKEDZIELEWSKI (via video)
                           950 Pennsylvania Avenue NW
9                          Washington, D.C. 20530

10

11

12

13

14

15

16

17

18

19
    Court Reporter:        KELLY M. FITZGERALD, RPR, RMR, CRR
20                         Official Court Reporter
                           United States District Court
21                         219 S. Dearborn Street, Room 1412
                           Chicago, Illinois 60604
22                         312-818-6626
                           kmftranscripts@gmail.com
23
                           *   *   *   *   *
24
                    PROCEEDINGS REPORTED BY STENOTYPE
25     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1          (Proceedings heard in open court:)

2                THE COURT:  All right.  You can all be seated.

3                THE CLERK:  We are here on case 25 CV 12173, Chicago

4     Headline Club, et al. v. Noem, et al.

5                THE COURT:  All right.

6                MR. LOEVY:  Good afternoon, Your Honor.  Jon Loevy on

7     behalf of the plaintiffs.

8                THE COURT:  All right.  Do we have anybody on behalf

9     of the government?  I...

10               MR. SKEDZIEWLEWSKI:  Your Honor, Sean Skedziewlewski,

11    counsel to the assistant attorney general, civil division, from

12    Washington, D.C. is here on behalf of the government.

13               THE COURT:  All right.  Thanks.

14               Rhonda, my screen's not working.

15          (Off the record.)

16               THE COURT:  And it's Mr. Skedziewlewski; is that

17    correct?  Am I pronouncing it correctly?

18               MR. SKEDZIEWLEWSKI:  Yeah, Mr. -- yes, Your Honor,

19    it's Skedziewlewski.

20               THE COURT:  Skedziewlewski.  Thank you.

21               MR. SKEDZIEWLEWSKI:  Thank you.

22               THE COURT:  All right.  So hold on,

23    Mr. Skedziewlewski.  We are going to get my screen working.  So

24    hold on one second.

25          (Pause.)

4

1     THE COURT:  Mr. Skedziewlewski, can you hear us?

2     MR. SKEDZIEWLEWSKI:  Yes, Your Honor.  Thank you.

3     THE COURT:  Okay.  Great.

4     All right.  Okay.  So we're here on the plaintiffs'

5  motion for a TRO.  And my understanding, just preliminarily to

6  kind of get things out of the way, is we do, given the

7  shutdown, have amended General Order 25-24, which is the

8  general order holding in abeyance civil matters involving the

9  United States as a party.  However, I don't find that the stay

10  order applies here because this would include an emergency

11  involving the safety of human life or the protection of

12  property, and further, that any litigant affected by the

13  general order may seek relief from the order by motion.

14     So does either party believe that the stay order

15  applies?

16     MR. LOEVY:  Not from the plaintiff, Your Honor.

17     MR. SKEDZIEWLEWSKI:  Not for federal defendants,

18  Your Honor.

19     THE COURT:  Okay.  All right.  So getting that out of

20  the way.

21     Okay.  All right.  So, Mr. Loevy, do you want to --

22     MR. LOEVY:  Thank you, Your Honor.

23     THE COURT:  -- go first then?

24     MR. LOEVY:  And I'm joined here by Locke Bowman, as

25  well as, it should be noted, a coalition of attorneys that --

1   you got the Mandel clinic from University of Chicago, the

2   Northwestern Bluhm clinic, the first -- the Protect Democracy

3   Project, First Defense Legal Aid, and the ACLU all have come

4   together representing a group of very courageous protesters,

5   people of faith, religious people, and members of the press

6   that are here on this very important First Amendment issue.

7           And taking a step back, the reason we're here is, is

8   as many of us know, the president has essentially declared war

9   on the city of Chicago.  And that's not hyperbole.  I'm, you

10  know, quoting.  It started in LA.  And he said he's going to

11  come and use force and knock some heads and -- and get people's

12  attention.

13          The problem is when he got here, when the federal

14  troops got here, there was nobody to fight.  There were no

15  mobs.  There were no lawbreakers.  There were no rioters.

16          And our friends in D.C., you know, may not -- may

17  believe that there's blood in the streets, but we've amassed a

18  whole lot of evidence that there is nothing -- when they came

19  looking for a fight, all they found was small groups of

20  protesters, obeying the law, exercising their cherished First

21  Amendment rights to speak up, to say, I don't like what you're

22  doing.  Groups of protesters who said, look, leave our

23  community alone, don't take our -- our neighbors who are

24  immigrants.  You can agree with them, disagree with them, but

25  there is no dispute that what they were doing was exercising

1    their right to free speech, to disagree.  They were doing it

2    peacefully and they were doing it within the law.

3         Because of that message, the federal agents attacked

4    them, used force, gassed them, shot them, pushed them.  Not

5    because they were standing peacefully, but because of their

6    message.  Literally they said, as the declarations attest,

7    things like, you know, shut up.  You're -- you know, in other

8    words, they'd be leaving -- people would be saying, Get out of

9    here.  Maybe, you know, in tones that the federal employees

10   didn't like, saying, you're not welcome here; they're throwing

11   tear gas at them out the window.  They are attacking because of

12   the message.

13        Secretary Noem made that clear.  She said, you know,

14   it's what -- what they're saying, what they're speaking.  She

15   said -- you know, and we're quoted in our -- in our papers, she

16   said that, you know, the more they protest, the high -- harder

17   ICE is going to come down on them.

18        So you have protesters, you have people of faith who

19   are holding signs, who are being attacked because of their

20   message.  It's not a -- as Tess pointed out, it wouldn't even

21   be an interesting law school problem about success on the

22   merits, because there's no subtlety.

23        Oftentimes, when you argue First Amendment, you say,

24   well, does the government's policy impinge on First Amendment

25   rights?  This is because of the message they're saying, we

1    don't like you, ICE, go away, ICE is pushing people, shoving

2    people, shooting people, and gassing people.

3         And of course, the press.  The press is out covering

4    these peaceful demonstrations, wearing signs that's -- that

5    mark them as press, equipment that mark them as press, no --

6    there's not going to be a dispute they were clearly identified

7    as press.

8         And that is why they were targeted, because they are

9    being press, bearing witness and reporting on what's happened.

10   So you have agents on rooftops shooting PepperBall bullets at

11   people -- at the press, trying to hit the press.  They are --

12   in their world, if the press wasn't covering this, they could

13   control the message.  They don't want the press to cover it.

14        And there's members of the press that are present.

15   Very brave people that are doing their job, covering these

16   protests, covering what these federal agents are doing, and

17   being attacked because of that.  It's not just, oh, you know,

18   in some fact patterns maybe there's a riot and a press get hits

19   with a bullet.  That's not this.  There's guys on top of

20   buildings shooting at the press, hoping to deter the press,

21   hoping that the press will go away, hoping there's a --

22   Reverend Black submitted an affidavit.  He's a religious man

23   who was -- was praying for ICE with his hands up.  Somebody on

24   the top of the building took a shot at him.  They don't like

25   the message; they're shooting them.

1          So this is not a complicated fact pattern.  It's --

2     it's unconstitutional.  What are we asking you to do?  We're

3     asking you to do what happened in LA.  In LA, a group brought a

4     similar case alleging similar harms, and a district court judge

5     there granted a preliminary injunction.

6          We have carefully modeled the TRO that we're asking

7     you to enter today after the LA order.  The LA order was

8     created in conjunction with an expert, a guy named

9     Gil Kerlikowske, who is a 50-year law enforcement guy; he's a

10    chief of police I believe in Seattle; and a very high-ranking

11    member of DHS.  And he is saying as a -- a former.  He was --

12    he had run part of the border.

13         And he is saying, look, this is not okay.  He has two

14    primary opinions.  He's saying the force being used against

15    peaceful protesters greatly out- -- exceeds any reasonable law

16    enforcement purpose.  You know, these are -- the -- the weapons

17    they're using are not like -- they're not -- they're --

18    they're -- they're being used disproportionately.  They're

19    using them indiscriminately.  They're using them targetedly.

20    Everything about this is wrong.

21         It's a -- it's a very persuasive affidavit.  We urge

22    you to take a look at it.  It's at the record 22-32.  And his

23    opinion is supplemented with all of the declarations in

24    evidence.

25         And I have a courtesy copy of printouts, if I could

1   tender it to Your Honor?

2           THE COURT:  Sure.

3           MR. LOEVY:  Thank you, Your Honor.

4           We've amassed a considerable amount of evidence

5   attesting to what I am telling you what's happening today --

6   what I'm telling you today, is that peaceful protesters are

7   being targeted and -- for their message.  They're basically

8   being told to shut up, stop criticizing ICE, and being met with

9   violence.

10          And what we would ask you to do is enter the same

11  injunction essentially that was entered in LA, and then there

12  will be a preliminary injunction hearing to be scheduled

13  either -- you know, in the future.  Our -- our request and

14  preference and position is the government should be enjoined

15  until that hearing happens.  If they want that hearing to

16  happen this week, we'll be here with witnesses this week.

17          So their harm will be incrementally small.  They will

18  only be enjoined for a short while.  If they want to do the

19  injunction in a month, we'll be here in a month.  We -- we --

20  we will be here when -- whenever they're ready.  But we are

21  asking you to hold the status quo and -- and to do what should

22  be noncontroversial.

23          The order -- the preliminary injunction, it's at the

24  record at 27.  It was filed today.  That's docket 27.

25          THE COURT:  No, I've -- I've got it.

1        MR. LOEVY:  Yep.  So --

2        THE COURT:  There are a few things that are in your

3    proposed order that were not in the order that Judge Vera

4    entered in LA, and so we would -- you know, I want to go

5    through some of those things, but -- and I guess some of the

6    questions I have are probably directed better towards the

7    government.

8        So anything further at this point, Mr. Loevy?

9        MR. LOEVY:  No.  Thank you for listening.

10       THE COURT:  Okay.  All right.

11       Now I'll hear from the government.

12       MR. SKEDZIEWLEWSKI:  Good afternoon, Your Honor.

13   Thank -- thank you for -- for having me remotely.  It --

14   it's -- it's appreciated.

15       So plaintiffs and organizational members are -- are

16   free to speak their minds however they -- they -- they -- they

17   prefer, but they cannot attack law enforcement officers, join

18   in groups that are engaging in riot, or in any other way

19   obstruct the law enforcement operations.

20       THE COURT:  And -- and Mr. Sked- --

21       MR. SKEDZIEWLEWSKI:  The idea that DHS --

22       THE COURT:  I'm sorry.  Whoops, I'm sorry,

23   Mr. Skedziewlewski.  I don't mean to interrupt you, but I don't

24   believe that there's anything in terms of the affidavits that

25   I've read or anything in the complaint where anyone -- any of

1    these affected individuals were doing anything other than

2    peacefully showing up at various facilities or various areas

3    within the Northern District of Illinois, so not limited to the

4    Broadview facility, and were not engaged in violent protests

5    but were simply there and simply expressing their views; or

6    simply doing their jobs if they were journalists.

7            So I would agree with you --

8            MR. SKEDZIEWLEWSKI:  Your Honor --

9            THE COURT:  -- if any of these individuals were being

10   violent that DHS and these ICE officers under the law would be

11   able to engage in appropriate crowd control to protect the

12   safety of the other protesters who are there protesting

13   peacefully, as well as themselves and fellow officers.  But

14   that's not what's alleged here in this complaint.

15           MR. SKEDZIEWLEWSKI:  Your Honor, I would not expect

16   plaintiffs to submit evidence harmful to their case.  And of

17   course the government has not yet had a chance, given that we

18   received these papers this morning, to submit our own rebuttal

19   evidence.

20           But what -- what I can tell the Court, based on my

21   conversations with the client that were admittedly rushed, and

22   our -- I will stipulate those are, you know, preliminary.  But

23   what we know from -- on our end is that officers have been hit,

24   punched by -- punched by rioters at Broadview.  Rioters have

25   shot fireworks at them, thrown bottles, rocks, and gas

1    canisters at officers.

2          An -- an individual drove his vehicle into an ICE

3    officer's vehicle intentionally trying to damage and injure

4    that officer, along with a litany of other attacks.

5          Now, I'm not alleging or -- or claiming, Your Honor,

6    that any named plaintiffs in this case are those perpetrators.

7    But just based on my, again, admittedly quick and cursory

8    review of plaintiffs' declarations this morning and some of the

9    video evidence submitted along with them, at -- at least one of

10   the named plaintiffs is in the middle of a -- of a crowd that

11   appears to be, you know, subject to an expansion of a secured

12   area by DHS.

13         And so that there's a very sort of obvious inference,

14   at least from my -- my point of view, that any injury or -- or

15   harm that may have come to -- to that individual, what is

16   incidental to DHS operations that are awful, that are directed

17   at securing the facility that many of these incidents occurred

18   at.  And it can't be the case that officers have to be -- well,

19   allow me to rephrase that.

20         It -- it can't be the case that there are exceptions

21   to the -- the rule.  When -- when DHS is -- has to secure a

22   facility -- and this facility from what I can tell, Your Honor,

23   has been under siege in these last few weeks.  So admittedly,

24   we have not yet submitted evidence to that effect --

25         THE COURT:  Well, but --

1    MR. SKEDZIEWLEWSKI:  -- but they have to be able to --

2    THE COURT:  -- but Mr. --

3    MR. SKEDZIEWLEWSKI:  -- secure the facility --

4    THE COURT:  But, Mr. Skedziewlewski, what -- I mean,

5    using the words "under siege" is fairly powerful language,

6    correct?

7    MR. SKEDZIEWLEWSKI:  Correct, Your Honor.  And -- and

8    we look forward to submitting evidence as soon as we can to --

9    to support that -- that claim.

10   Again, I -- I -- based on just plaintiffs' own

11   evidence, there -- there seem to be phalanxes of protesters

12   opposing the attempts by federal law enforcement officers to

13   permit the egress and -- and ingress to the Broadview facility

14   and to protect officers from attack, as I've mentioned with --

15   THE COURT:  Which -- which they're --

16   MR. SKEDZIEWLEWSKI:  -- and what we saw --

17   THE COURT:  -- but that's what they're allowed to do.

18   Not attack officers, right?  But they can peacefully protest by

19   standing in the driveway.  They can peacefully --

20   MR. SKEDZIEWLEWSKI:  No, Your Honor.

21   THE COURT:  -- protest by standing around the

22   perimeter of the building.

23   MR. SKEDZIEWLEWSKI:  Your Honor, as we -- as we --

24   THE COURT:  At -- at least --

25   MR. SKEDZIEWLEWSKI:  Oh, excuse me.  I thought you

1    were finished.

2           THE COURT:  Sorry.

3           I mean, at least, as I understand democracy, which may

4    not be how everybody understands it, but as I understand it,

5    you know, they -- protesters could stand in front of the

6    federal building, the -- here, the courthouse.  They can stand

7    on the sidewalks.  They could peacefully come into the lobby.

8    They could pray at the elevator banks if they want to.

9           Now, can they, you know, wait to ambush me and knock

10   me down as I come out of the elevator?  No, they can't.  But,

11   you know, this courtroom is full of people today.  And if

12   people are here praying or if they are protesting holding up

13   signs, under the First Amendment, they're allowed to do that.

14   They're allowed to express themselves.

15          I had a sentencing this morning.  If people disagreed

16   with the sentence that I was going to impose, there's nothing

17   to stop them from sitting in the back and holding up a sign and

18   expressing their opinion.  And they're allowed to do that.

19   They're not allowed to do that violently.  But they're

20   certainly allowed to do that peacefully under the First

21   Amendment.

22          And I am not allowed to do anything about it, right?

23   I can ignore the signs.  I can be bothered by the signs.  It

24   could bug me.  I could disagree with that.  But that doesn't

25   mean that -- unless they're being particularly disruptive such

1   that I can identify a compelling government interest, I can't

2   even remove them from the courtroom.

3           MR. SKEDZIEWLEWSKI:  Well, Your Honor, respectfully, I

4   think the analogy doesn't hold or apply to the facts here.  And

5   this -- and it's not our personal views that matter, but the

6   law.  And the Supreme Court was very clear in -- in the

7   *Adderley* case from the sort of civil rights era that even when

8   peaceful protesters are not engaging in any violent conduct but

9   are trespassing on -- in that case it was property that, you

10  know, breaking -- detaining them and arresting them for

11  trespass was not a violation of their First Amendment rights.

12          And I would also say just building on Your Honor's own

13  analogy, that it's not that these protesters are just sitting

14  in your courtroom holding up signs, but that they're

15  interrupting the operation of the courtroom by making it

16  impossible for the Court to conduct its business.

17          THE COURT:  But --

18          MR. SKEDZIEWLEWSKI:  That's not First Amendment

19  protected activity.

20          THE COURT:  Right.  But that's --

21          MR. SKEDZIEWLEWSKI:  And there's no case law to

22  suggest it is.

23          THE COURT:  Right.  But that's the burden, right, that

24  I would have to show before I did anything, is that they were

25  interrupting the proceedings to the extent that I have to order

1  them removed and that I need to show a compelling government

2  interest in order to do that, to override their First Amendment

3  rights.  It's not absolute.  Right?  The First Amendment right

4  is not absolute.  But I must, under strict scrutiny, show a

5  compelling government interest in order to curtail those rights

6  and show that the means by which I do that are the least

7  restrictive means.

8         MR. SKEDZIEWLEWSKI:  But, Your Honor, a strict

9  scrutiny does not apply here because there's no viewpoint-based

10 discrimination in this -- in this case.

11        If these protesters were chanting --

12        THE COURT:  No --

13        MR. SKEDZIEWLEWSKI:  -- the opposite of the --

14        THE COURT:  Hold on.  Hold on.  Hold on.

15        You can't possibly make that argument with a straight

16 face, right?  Like there's no way, right, absolutely no way.

17 If people were showing up and saying, I support ICE; if people

18 were showing up and saying, remove people who are not here

19 lawfully as fast as you possibly can, handing out sandwiches

20 and lemonade and whatever else to ICE officers, there is no way

21 on God's green earth that those officers would be using tear

22 gas, rubber bullets, or anything else.  I mean, we've got to

23 live in reality.

24        MR. SKEDZIEWLEWSKI:  Your Honor, this -- this argument

25 is well within reality.  Our -- the officers of DHS do not

1    target people because of their viewpoint.  What they do is they

2    enforce federal law.  And when individuals obstruct their

3    ability to enforce federal law, whatever their signs might say,

4    those individuals will be subject to expansions of a secure

5    area or be detained if they're engaging in criminal conduct or

6    otherwise be exposed to proper and appropriate and reasonable

7    use of crowd control devices.

8         But there's just simply no evidence in the record to

9    suggest that any officer at this Broadview site, or any other

10    site, took a special notice of a particular sign and was

11    offended by that particular language.

12         I mean, these officers, as I've mentioned,

13    Your Honor -- and we are -- look forward to getting this in the

14    record -- are being attacked.  They're responding to being

15    physically attacked.  And I don't know about you, Your Honor,

16    but if I was being attacked, I wouldn't really care whether the

17    person was on my side of the political aisle or the opposite

18    side of the political aisle.

19         And I think it's important for this Court, you know,

20    to not just assume because -- to say so, that each one of our

21    officers are motivated specifically to restrict plaintiffs'

22    First Amendment rights.

23         So -- so --

24         THE COURT:  So --

25         MR. SKEDZIEWLEWSKI:  -- because they had -- yes, Your

1   Honor.

2           THE COURT:  Go ahead.

3           I'm sorry.  Did you want to say something?

4           MR. BOWMAN:  I wanted to respectfully object --

5           COURT REPORTER:  Can you go in front of the mic,

6   please?

7           MR. BOWMAN:  Yes, ma'am.

8           COURT REPORTER:  Thank you.

9           MR. BOWMAN:  I wanted -- Locke Bowman -- to

10  respectfully object to the government's characterization of

11  what is in the record at this time.  There is a massive volume

12  of evidence to the contrary of what was just said.  There is

13  indeed evidence that individuals are being targeted

14  specifically and in response to their statements.

15          For example, Reverend Black, one of the named

16  plaintiffs, is -- in -- in his affidavit says that he made

17  certain statements standing -- and there's a video of this.  I

18  think it's Exhibit 41 in the record -- standing at a remove

19  from any ICE individual.  And it is clearly apparent in video

20  that in response to the statements he made he was shot in the

21  head.

22          There is evidence in this record that ICE officers

23  have said to protesters who were saying words to the effect of,

24  We don't want you here; we want to protect our neighbors; and

25  statements to that effect that in response ICE officers gassed

1   them, saying, That's enough, in -- and -- in -- in reference to
2   what they were saying.

3         So to characterize the record as the government has
4   done is false.  And I just wanted to respectfully object to the
5   characterization that was made.

6         THE COURT:  All right.  Thank you.

7         Go ahead, Mr. Skedziewlewski.

8         MR. SKEDZIEWLEWSKI:  Your Honor, it's -- the record is
9   obviously one-sided and contains only plaintiffs' side of the
10  story at this stage in litigation.

11        And as I said, I've reviewed the -- some of the same
12  evidence that plaintiffs are describing right now.  And I'm
13  sure Your Honor, if -- if she hasn't already, will do so as
14  well, and there are at least some cases -- I don't have the
15  number in front of me -- where whatever force is being used is
16  clearly in a -- in a crowd and individuals are in a sort of
17  chaotic melee, and there's a very logical inference to say
18  that -- that force used against nonviolent individuals in a --
19  in a scenario like that that's chaotic and where it's
20  impossible to distinguish, you know, nonviolent from violent
21  protester could be incidental and not motivated by viewpoint.

22        In fact, it's difficult to imagine how in some of
23  those sort of phalanx-like formations that anyone could take
24  note of the specific viewpoint of the individuals on the other
25  side who are, you know, engaged in a sort of melee.

1          MR. BOWMAN:  And may I -- may I also add that

2     defendant --

3          THE COURT:  You need the microphone.  Sorry.

4          MR. BOWMAN:  May I also add that defendant Noem -- and

5     this is on video, which is attached as an exhibit to our moving

6     papers -- has said to her subordinates, the ICE officers on the

7     street committing the infractions of the First Amendment that

8     we allege, said to them, You have full authority to arrest

9     them, to -- to attack them because of what they are saying, how

10    they are talking, and who they are associating with.

11         There could not be a more straightforward, indeed a

12    more gobsmacking admission that the purpose of the violence

13    that is alleged in the complaint and is apparent in the record

14    is to suppress speech, association, the reporting activities of

15    journalism, full stop.

16         MR. SKEDZIEWLEWSKI:  Your Honor, plaintiffs' counsel,

17    respectfully, is not fully representing the Secretary's

18    statements.

19         In their brief, for example, they cite a passage from

20    a speech that the Secretary gave, and they clip out the middle

21    of the sentence.  They quote her saying, The more they protest,

22    the harder ICE is going to come after them.  They leave off the

23    conjunction that says:  and commit acts of violence against law

24    enforcement officers.

25         What the Secretary is talking about when she talks

1   about words is incitement to violence.  We've seen an

2   unprecedented escalation of political assassinations.  That's

3   the kind of thing that the Secretary has in mind.

4          She -- we also know that ICE officers are being doxed,

5   followed to their homes, and their homes broken into, their --

6   their vehicles smashed and burglarized, because of this sort of

7   incendiary rhetoric painting them as fascists and -- and such

8   like as that.

9          That's the kind of thing that the Secretary has in

10  mind, not peaceful protests, not slogans, not telling the --

11  the federal government that the -- that people are unhappy with

12  their policies.  That's all, of course, fine and protected by

13  the First Amendment.  The -- the federal government, of course,

14  does not disagree with that.

15         What we -- what we disagree with is the idea that our

16  officers are engaging in some kind of a campaign to silence

17  these particular plaintiffs' speech.

18         So respect -- respectfully, Your Honor, while

19  plaintiffs may perceive that there's -- plaintiffs just

20  mentioned plaintiff Black, that he perceived that he was hit

21  because of his speech.  I can understand why he might have felt

22  that way.  But there's no evidence in the record suggesting

23  that the agent that hit him -- or may -- or is alleged to

24  have -- have fired upon him did so because of his speech.

25  That's a -- just an inference on their part.  That is just pure

1   assertion.

2         And so the -- this -- this idea that strict scrutiny

3   should apply to law enforcement operations outside of the

4   detention facility to secure that facility just is not

5   supported by -- by case law or -- or by the facts in this case,

6   Your Honor.

7         MR. LOEVY:  If I could rebut, Your Honor?

8         THE COURT:  Well, let's --

9         MR. LOEVY:  Okay.

10        THE COURT:  -- see if Mr. Skedziewlewski has anything

11   further you want to add on this.

12        MR. SKEDZIEWLEWSKI:  Would you like me to limit my

13   remarks, Your Honor, to the -- the sort of viewpoint -- the

14   viewpoint-based discrimination?  Is that what you -- or would

15   you like me to sort of make my full argument now?

16        THE COURT:  Why don't you make your full argument now,

17   and then I'll allow the plaintiffs to respond.

18        MR. SKEDZIEWLEWSKI:  Thank you, Your Honor.

19        So plaintiffs also argue that -- well, I should -- I

20   should back up, Your Honor, because in my -- in my eagerness to

21   respond to your questions, I -- I may have skipped over a thing

22   or two.

23        So first, I would just like to say, since this

24   injunction would be forward looking, plaintiffs lack standing.

25   Whatever injuries may have occurred, what the plaintiffs would

1    need to show now under the Supreme Court's precedent in *Lyons*

2    would be that all of DHS's officers going forward will always

3    engage in this kind of, as they allege, viewpoint

4    discrimination or excessive force each time they have an

5    encounter with these specific plaintiffs.

6            It's not enough for them to say that -- that there's,

7    you know, excessive force being used at the -- the Broadview

8    facility.  They would have to show that these plaintiffs will

9    be the ones targeted in the future.

10           THE COURT:  Well --

11           MR. SKEDZIEWLEWSKI:  And what the Supreme Court

12   said --

13           THE COURT:  -- no, that -- that's not exactly true,

14   right?  That these plaintiffs, in order to establish standing,

15   at least not the associational plaintiffs or organizational

16   standing -- or organizational plaintiffs, but the individual

17   ones simply need to show that because of what happened to them

18   in the past, right, is that they are not willing to go back and

19   protest in the future.  That gives them standing.  And so --

20           MR. SKEDZIEWLEWSKI:  Your Honor, respectfully --

21       (Unreportable crosstalk.)

22           THE COURT:  Right?

23           MR. SKEDZIEWLEWSKI:  Respectfully, Your Honor, I -- I

24   believe that's the -- the merits case for a retaliation claim.

25   For them to have standing to receive a prospective injunction,

1    they have to show that the specific type of harm that they have

2    suffered will occur in the future.  And there's just not

3    evidence of that in the record.  Because what -- if there was,

4    we would know that Agent X specifically targeted, you know,

5    Plaintiff Y because of that individual's speech.  But there's

6    nothing like that in the record.

7            THE COURT:  Well, it -- the other thing is that

8    you're, you know, looking at -- were looking -- I think you're

9    asking too much, right?  So first of all, one of the issues is

10   and one of the things that plaintiffs are asking for are that

11   the ICE agents wear some sort of identification, right?

12   Because obviously, no, you can't say, like, that Agent Smith is

13   going -- the plaintiffs will never be in a position to say,

14   Agent Smith is going to be working, you know, on Tuesday when I

15   plan on going back, and that Agent Smith then is going to use

16   excessive force on me when I'm at the Broadview facility on

17   Tuesday.  Like, that's not what standing requires, and that's

18   not what standing asks of any plaintiff.

19           All that the plaintiff has to show is a continuing

20   present adverse effect of a defendant's past illegal conduct or

21   sufficient likelihood that they will again be wronged in a

22   similar way; that the plaintiff can show that an injury is

23   likely to reoccur, either by showing that the injury stems from

24   the defendants' written policy or that the harm is part of a

25   pattern of officially sanctioned behavior violative of

1  plaintiffs' federal rights; and that the plaintiffs may rely on

2  the allegations in their complaint or whatever evidence they

3  submit to meet their burden to establish standing.

4         MR. SKEDZIEWLEWSKI:  Your Honor, in this case, there

5  is no policy of targeting individuals for their speech or of

6  using excessive force.  In fact, on the contrary, DHS's

7  policies around these issues are compliant and specifically

8  designed to comply with the Constitution.

9         And the statements that plaintiffs cite to try to show

10 that there's a tacit policy or some kind of an informal

11 affirmation of misconduct are -- are in each case

12 misrepresented.  So they cite the executive order, which is

13 titled "Countering Domestic Terrorism and Organized Political

14 Violence" as evidence for sort of sanctioning illegal conduct.

15        But, Your Honor, that executive order is specifically

16 designed to thwart political assassinations and to go after

17 domestic terrorism.

18        Plaintiffs misrepresent that order when they say that

19 it directs investigations into entities and organizations who

20 criticize support for law enforcement and Border Patrol.  Not

21 so, Your Honor.  That executive order says that portraying law

22 enforcement as fascists has been used to encourage violence and

23 then gives examples of the types of things that -- how people

24 have done that.  It's -- it's directing investigations into

25 that type of incitement to violence.

1      It's not giving *carte blanche* to DHS to fire upon, you

2  know, individual protesters.  And so since they say can't show

3  that there's a tacit policy of this --

4          THE COURT:  Well, it goes back --

5          MR. SKEDZIEWLEWSKI:  -- alleged misconduct --

6          THE COURT:  Look, it -- it's very similar and very

7  analogous to bringing a *Monell* claim in a 1983 litigation,

8  right, where you are holding the ultimate decision-maker

9  responsible when there's an express policy that you can look

10  at; or you look at the pattern and practice of the government's

11  behavior that establishes, essentially, unwritten policy.

12      And here, what the plaintiffs are saying is the

13  following:  This has been going on for weeks.  And that over

14  the last four weeks or so, that DHS agents have systematically

15  been using excessive force against peaceful protesters at the

16  Broadview facility, at various other places in the Northern

17  District of Illinois where agents are attempting to enforce

18  immigration laws by detaining, questioning, seizing various

19  individuals across the Northern District of Illinois, and that

20  as they are encountering protesters who are opposing what the

21  agents are doing, that the agents are responding in a way that

22  violates the Fourth Amendment.  And that gives them standing

23  that the -- this activity is going to continue.

24      There's nothing that I've read, and certainly I don't

25  think anything that you can tell me from the government's -- on

1   the government's behalf, that tomorrow ICE agents are going to

2   pack up and leave the Broadview facility; or that they are no

3   longer going to seek to enforce the immigration laws and

4   question people, stop people, go to a hospital and try and

5   question someone, as was seen on social media recently; that

6   they're not going to go to a school; that they're not going to

7   go to an apartment building; that this is going to continue.

8          Certainly, as long as this administration has made

9   this a priority, it will continue.  Therefore, these protesters

10  are going to go back to protest.  Journalists are going to go

11  and observe what is going on.  That gives them standing.  And

12  at this point, I don't believe that for any of the occasions

13  that have been listed by any of these plaintiffs or any of the

14  affidavits, that the government is going to come and tell me

15  that these agents did not act lawfully.  In each of these

16  instances you're going to say that they acted lawfully.

17         So I think that standing is kind of a nonissue here.

18  But I'm happy to hear more.

19         MR. SKEDZIEWLEWSKI:  Just -- just one more point on

20  standing, Your Honor.

21         The Court said that the -- the plaintiffs have

22  established -- or seems to believe that the plaintiffs have

23  established a pattern and practice of the alleged misconduct,

24  but it leaves off the cause of the actions that plaintiffs

25  complain of.

1     As I -- as I mentioned, and we look forward to getting

2  it into the record, officers are being hit and punched.

3  They're having fireworks shot at them, objects thrown at them,

4  their cars being smashed into by other assailants and -- and

5  vehicles.  Another officer was almost run down by someone else

6  in a vehicle and was only -- only escaped potential serious

7  bodily injury -- injury or death when he discharged his -- his

8  firearm.

9     So the -- the -- the resistance that DHS is

10  encountering as it tries to lawfully enforce federal

11  immigration law is not First Amendment resistance.  It's not --

12  it's not speech.  They're encountering the violence.  And so

13  the pattern and practice is a pattern and practice of officers

14  protecting themselves while they're engaging in law enforcement

15  action.

16     And so it sort of puts the cart before the horse, I

17  think, to say that they've established a pattern and practice

18  of misconduct without looking at the causes of this -- the

19  conflict.

20     THE COURT:  And, you know, it's important to keep in

21  mind the procedural posture that we're in right now, right,

22  which this is an emergency TRO and they simply need to amass,

23  you know, enough evidence for me to find that they have

24  standing.  It may very well be that by the time we get to a

25  preliminary injunction or before then that you can come back

1    and say that they don't have standing.

2         But certainly based on what is here in the record, I

3    do find that they do have standing.  It's not that any of these

4    plaintiffs, you know, just happen to be in the wrong place at

5    the wrong time.  It's rather that, you know, they are intending

6    on continuing to protest.  They are contending -- in- --

7    intending on continuing to act in a journalistic capacity.  And

8    therefore, there is a high likelihood that they may experience

9    what happened previously in the future.

10        So I do believe that at this point they have

11   established standing.  And it's not speculative as the court

12   found in *Lyons*, but rather, they can point to a high likelihood

13   that this would occur in the future, which is sufficient to

14   give them standing.

15        But go ahead.

16        MR. SKEDZIEWLEWSKI:  One final point on that Your

17   Honor, if I may.  The -- the plaintiffs have cited the *L.A.*

18   *Press Club* as authority, as -- or -- or persuasive authority, I

19   suppose, and no doubt the facts are in -- in a general sense

20   analogous.

21        But the -- the court there at the TRO stage actually

22   found that the plaintiffs lacked standing.  That was

23   Judge Wilson's order.  And he found they lacked standing for a

24   reason I haven't mentioned yet.  I just want to submit it to

25   the Court's attention, which is that DHS's role in future

1  protests is uncertain.  Local police may be involved, other

2  federal agencies may take over.  And -- and -- and so it's

3  just -- it is uncertain in a number of ways, but it's even

4  uncertain as to who plaintiffs should be, you know, addressing

5  their -- their concerns to.  And that -- that was how

6  Judge Wilson saw it in L.A. -- *L.A. Press Club*.

7         THE COURT:  Except, you know, when it got to the

8  preliminary injunction stage, you know, Judge Vera saw things

9  very differently, and -- and it had the benefit of some time by

10  the time they got to the preliminary injunction stage.  And I

11  don't believe, looking at the last four weeks, anyway, since

12  Operation Midway Blitz, or whatever we're calling it at this

13  point, started is that there doesn't seem to be -- and if, you

14  know, you've got other more recent updated information, I'm

15  happy to hear it -- but it doesn't seem to me that DHS is

16  intending to hand this over to anybody else, any other agency,

17  that it's been made abundantly clear, at least in the press,

18  that the City of Chicago has instructed the Chicago Police

19  Department not to participate, that it doesn't appear that

20  there are any other federal agencies that are ready, willing,

21  or able to jump in at this point.

22         I might be missing something, but this seems to be a

23  DHS initiative that DHS is going to be executing.

24         MR. SKEDZIEWLEWSKI:  Your Honor, just to the extent

25  that the Court mentioned social media posts, if I may mention

1   one of my own.  I've -- I've seen that National Guard troops

2   are expected in Chicago, but, like, I -- I cannot confirm that.

3   So I don't --

4          THE COURT:  Well, all I can tell you is that there is

5   on the 17th floor an equally packed courtroom right now and

6   that they're -- they're having a similar hearing.  So I have

7   not spoken to Judge Perry because I have been on the bench all

8   day, but I don't know that the National Guard will be here.

9   That's -- that's certainly the subject of a different lawsuit.

10          MR. SKEDZIEWLEWSKI:  Understood.  Thank you, Your

11   Honor.

12          So they may be there is -- is my only point, and that

13   creates uncertainty as far as the proper defendant.

14          So defendant -- plaintiffs also raise sort of

15   retaliation claims and claims under -- under RFRA.  I don't

16   want to impose too much on the Court's time.

17          THE COURT:  It's all right.

18          MR. SKEDZIEWLEWSKI:  Defense obviously --

19          THE COURT:  I'm here all day.  Go ahead.

20          MR. SKEDZIEWLEWSKI:  Okay.  Well, in that case I'll at

21   least make a couple of points on those -- on those issues.

22          So of course in order to make a retaliation claim,

23   plaintiffs have to be engaged in First Amendment protected

24   activity.  To the extent that any plaintiffs -- and, again, I

25   haven't, you know, had a chance to study the record carefully,

1    but to the extent -- extent that any plaintiffs are in the

2    middle of crowds that are engaged in unlawful activity, it's --

3    it's -- that's not First Amendment protected activity.  But if

4    lawful dispersal orders were issued, if -- if crowds are

5    becoming violent, you know, mixing in with those crowds that

6    have been ordered to disperse is no longer First Amendment

7    protected activity.

8            To the extent that plaintiffs were engaged in First

9    Amendment protected activity, as we saw in the -- in the sort

10   of analogous case *L.A. Press Club*, what -- what officers do is

11   they target violent offenders with the use of force.  And --

12   and there may be, because these crowds are dynamic, they're

13   shifting, these LLMs or sort of crowd control devices, they're

14   not -- they don't travel as fast as -- as bullets, and so it's

15   very easy for somebody to step in front of a PepperBall or --

16   or -- or a tear gas canister and have an incidental injury.

17   But that's not enough for a retaliation claim.

18           THE COURT:  But --

19           MR. SKEDZIEWLEWSKI:  So to the extent that --

20           THE COURT:  -- but --

21           MR. SKEDZIEWLEWSKI:  Yes, Your Honor.

22           THE COURT:  -- some of the things that the plaintiffs

23   have noted is that it wasn't incidental, right, but that it was

24   directed at that individual plaintiff based on that plaintiff's

25   protected First Amendment activity.

1    And, you know, again, we are in early stages where in

2  an emergency TRO situation, so I understand that the government

3  doesn't have the opportunity to conduct discovery or kind of

4  marshal any evidence of its own.  However, at least based on

5  what's before me in the record, that these plaintiffs are all

6  alleging that they were not engaged in any violence; they were

7  not around any violent protesters; and yet, they were on the

8  receiving end of these crowd control activities that were very

9  disproportionate to what was occurring at the time.

10    MR. SKEDZIEWLEWSKI:  Your Honor, just if -- if I may,

11 at least one of these videos that I was able to -- to watch

12 before this -- this hearing, I mean, it shows, as I mentioned

13 earlier, sort of two -- two phalanxes on either side.  And the

14 idea that in that type of an environment where a whole crowd is

15 being dispersed, that an individual can be retaliated against,

16 I -- I don't find that -- find that plausible.

17    But to the extent that plaintiffs have emphasized

18 incidents where an individual is standing apart and was -- and

19 was -- was hit, from my quick review of the record, it looks

20 like there may be a very small number of -- of cases that

21 are -- could even potentially fit that bill.  And if that's the

22 case, then there's no pattern and practice.  And so if they can

23 show a one-off here or there, that -- that doesn't get them the

24 pattern or practice that they would need for -- for -- for

25 standing.

1    I'll -- I'll move on if -- unless Your Honor has --

2    THE COURT:  Yes.

3    MR. SKEDZIEWLEWSKI:  -- questions to --

4    THE COURT:  Go ahead.

5    MR. SKEDZIEWLEWSKI:  -- the RFRA argument.

6    THE COURT:  Go ahead.

7    MR. SKEDZIEWLEWSKI:  So I -- I -- I had a chance to

8    quickly review some of the case law that -- that plaintiffs

9    cite on the RFRA issue, and none of it is -- is -- is

10   appropriate for -- for this situation.

11   They cite *Society of the Divine Word*.  But there, the

12   RFRA claim, it's -- lost their RFRA claim on a -- on a variety

13   of grounds, including that they failed to identify any specific

14   religious belief that the plaintiffs there would have been

15   required to violate or comply with.

16   Now, here, my understanding is that some individuals

17   pray outside of this facility.  But they're still free to pray

18   outside of the facility.  It may just be they're slightly

19   further removed than they're accustomed to doing.  They're not

20   required to, for example, say different prayers or -- or --

21   or -- or modulate their prayers in any way.  Their -- their

22   religious activity is -- is simply unaffected by the DHS agents

23   securing the area outside of the -- the entrance to that

24   facility.

25   They also cite *Korte v. Sebelius*.  But there, the --

1    the RFRA claimants were subject to governmental action merely

2    by operating, you know, preexisting businesses, right?  And so

3    rather than undertaking voluntary actions on their own

4    accord -- so therefore, it's -- it's -- the -- the time, place,

5    and -- or the extent of their activities were -- well, let me

6    rephrase that, Your Honor.

7            Their activities were going to be affected no matter

8    what they did in that case.  But here, the plaintiffs, while

9    they're free to pray anywhere in Chicago or the surrounding

10   area, they're just not free to, you know, interfere with

11   federal operations immediately outside of this -- of this

12   facility.

13           So -- so the cases are -- are I really think in a

14   pause.  In one of the other cases, *West v. Radtke* -- that's

15   R-a-d-t-k-e -- there it was a religiously devout prisoner who

16   was subjected to cross-sex strip searches.  And that just has

17   nothing in common with -- with this case; a person who is not

18   free to, you know, opt out.

19           Here, the plaintiffs can opt out by probably taking a

20   few, you know, hundred steps away.  That's being generous.

21           So there -- there's just -- whatever may be going on

22   here, the -- the idea that people's religious exercise is -- is

23   being challenged under -- under RFRA I think is -- is quite a

24   stretch.  Because RFRA requires that the government cannot

25   substantially burden the person's exercise.  But, I mean,

1   it's -- it's not a substantial burden to conduct their

2   religious exercise a few yards away from the ideal location.

3   Unless -- I mean, one could imagine, you know -- I'll --

4   I'll --I'll -- I'll skip that point, Your Honor.

5          So there's just not a burden on anyone's religious

6   exercise taking place at the -- at the ICE facility here.

7          I'll move on, Your Honor, to the -- to the use of

8   force claim if --

9          THE COURT:  Yep.

10         MR. SKEDZIEWLEWSKI:  -- unless Your Honor has

11  questions about RFRA.

12         THE COURT:  Go ahead.

13         MR. SKEDZIEWLEWSKI:  So to demonstrate excessive

14  force, plaintiffs have to show that the police use of force was

15  objectively unreasonable under the circumstances.  Again, here,

16  the record is -- is one-sided, but the Court should still

17  consider the government's countervailing interests that are at

18  stake and whether the -- the person who was the subject of

19  force posed an immediate threat to the safety of officers or of

20  others, and whether that person was actively resisting arrest.

21         My understanding is that there have been a number of

22  arrests outside of this facility and that, you know, the force

23  used in those arrests, consistent with DHS policy, is always

24  going to be tailored to the necessity of -- of the arrest.

25  Where -- where resistance is present, the force is greater.

1          THE COURT:  That -- so I --

2          MR. SKEDZIEWLEWSKI:  And so --

3          THE COURT:  I do have a couple of questions about

4     that.

5          So first, does DHS have a use of force policy?

6          MR. SKEDZIEWLEWSKI:  Yes, Your Honor.

7          THE COURT:  Okay.  And with that use of force policy,

8     does it get -- you know, are there steps in the use of force

9     such that, for example, first, the officers are trained and

10    instructed to, for example, give a verbal warning?  And then --

11         MR. SKEDZIEWLEWSKI:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MR. SKEDZIEWLEWSKI:  Oh, sorry.  Go ahead.

14         THE COURT:  No, no, go ahead.

15         MR. SKEDZIEWLEWSKI:  Yeah, so officers are -- are

16    strongly encouraged to use verbal warnings whenever the

17    operation allows for it, right?  So there may be circumstances

18    where warnings are simply not practicable.  You could imagine

19    if someone's about to strike you, a warning doesn't make any

20    sense.  But yes, as a general rule, warnings are the

21    preference.  The least amount of force that's effective is --

22    is what's called for in the policy.

23         And we're happy to get that in the record as soon as

24    possible, Your Honor.  But the -- the policy was designed with

25    case law in mind, with the Constitution in mind.  It's --

1    it's -- it's designed to ensure that DHS is complying with --
2    with the law.
3           THE COURT:  And has DHS's use of force policy changed
4    over time?  Like, when was this policy last revised?
5           MR. SKEDZIEWLEWSKI:  Going from memory here,
6    Your Honor, I believe that the current DHS use of force policy
7    was last modified in the Obama Administration.  But I would
8    want to make sure of that and double-check that for you --
9           THE COURT:  Okay.
10          MR. SKEDZIEWLEWSKI:  -- before committing to that.
11          THE COURT:  Okay.  And -- I thought I had another
12   question.
13          Oh, and the -- I know you probably had a chance to
14   look at the proposed TRO.
15          MR. SKEDZIEWLEWSKI:  Yes, Your Honor.
16          THE COURT:  How much of what's requested in there
17   aligns with DHS's use of force policy and/or the policies
18   regarding crowd control, if there's a separate policy as to
19   that?
20          MR. SKEDZIEWLEWSKI:  Your Honor, I think the only
21   piece that sort of tracks DHS's policy is that certain types of
22   projectiles should not be fired at individuals unless there's
23   an immediate threat of serious bodily injury.  Though I think
24   as this is written, it seems to include -- it -- it may include
25   types of -- of crowd control devices that are not actually part

1    of DHS's policy.

2         So, yes, it's true that DHS -- you know, you can't

3    fire a tear gas canister at someone's head under DHS policy

4    unless there's essentially -- you know, lethal force is

5    about -- is justified.  That's DHS's policy.

6         But many of these other prongs in the sort of various

7    paragraphs of the proposed order are -- they -- they diverge

8    from DHS's policy.  And we have declarations in the *L.A.*

9    *Press Club* case detailing exactly why there -- and some of

10   these are similar to that case, why -- why these -- why

11   these -- why the proposed order would just be unworkable and

12   actually endanger both law enforcement officers and the general

13   public in these volatile situations.

14        So I'm happy to walk through some of that with you,

15   Your Honor, if we have a few more minutes.

16        THE COURT:  Yeah.

17        MR. SKEDZIEWLEWSKI:  And maybe starting at sort of

18   the --

19        THE COURT:  Well, and it -- what I --

20        MR. SKEDZIEWLEWSKI:  -- sort of at its highest level.

21        THE COURT:  Well, what I want to do is kind of go

22   through the various sections of the proposed order.  But why

23   don't we kind of finish this piece up.  I'll let the plaintiffs

24   respond, and then we can kind of walk through the order.

25        The -- another one of the questions that I have,

1    though, is what's DHS's policy with regard to methods of crowd

2    control?

3           MR. SKEDZIEWLEWSKI:  That policy is many pages long,

4    Your Honor.  It's extensive.  It's very detailed.  It gets into

5    the nitty-gritty about this particular system; you know, this

6    particular crowd control device versus that one and what can be

7    done with it and what can't be done with it.

8           So, I mean, the -- the -- the overall principle is

9    DHS's use of force policy is designed to respect

10    the Constitution.  It's designed to protect human life and to

11    use the minimal amount of force necessary in whatever the

12    situation is to effectuate the end of the protection of human

13    life.  So that's sort of the overarching principle.

14           THE COURT:  And -- and is there --

15           MR. SKEDZIEWLEWSKI:  And we can, of course, get you

16    the full policy.

17           THE COURT:  Is there a separate policy regarding crowd

18    control, or is it folded into the use of force policy?

19           MR. SKEDZIEWLEWSKI:  The use of force policy I believe

20    covers both.  You know --

21           THE COURT:  Okay --

22           MR. SKEDZIEWLEWSKI:  -- hands-on -- hands-on crowd --

23    you know, crowd control and -- all the different devices.

24           THE COURT:  All right.  And would creating a First

25    Amendment zone, would that fall under one of the lawful methods

1    of crowd control in DHS policy?

2         MR. SKEDZIEWLEWSKI:  I don't believe, Your Honor, that

3    it was DHS that create -- I don't think plaintiffs are alleging

4    that DHS created a -- a First Amendment zone.  What DHS does do

5    in their policy is they will try, whenever it's possible, if

6    there are journalists present at a protest to -- if -- if there

7    needs to be an expansion of the secured area due to safety

8    concerns, they'll try to relocate those journalists to a

9    further remove so that they can still observe the protest but

10   not be subject to the expansion of the secured area.

11        So maybe something like that happened in this case,

12   Your Honor, and people may have interpreted that as a free

13   speech zone.  But to my understanding, DHS does not use that

14   category, and it's not a part of their use of force policy.

15        THE COURT:  Okay.  All right.  Then those were the

16   questions that I had regarding the Fourth Amendment and use of

17   force issues.

18        So I'll let you pick up where you left off.

19        MR. SKEDZIEWLEWSKI:  Thank you, Your Honor.

20        Since we're going to walk through the -- the proposed

21   order, I'll just make a couple of high-level points.

22        First, plaintiffs here are seeking a universal

23   injunction that's been, you know, prohibited by the Supreme

24   Court in the *Casa* decision.

25        THE COURT:  Oh, no.  That's --

1    MR. SKEDZIEWLEWSKI:  But that decision is often

2  misunderstood as according to --

3    THE COURT:  But that's not what I'm understanding that

4  they're asking for.  They are asking for an injunction that

5  covers the Northern District of Illinois; is that correct?

6    MR. LOEVY:  It is, Your Honor.

7    THE COURT:  Yeah.

8    So they're not asking for a universal injunction.

9  They're simply asking for an injunction within the district.

10    MR. SKEDZIEWLEWSKI:  Your Honor, but the word

11  "universal" here as the Supreme Court's decision doesn't refer

12  to geography.  It refers to classes of individuals.  So what

13  plaintiffs seek here are -- is relief for, in their words, any

14  person or journalists, full stop, or members of the press or

15  religious practitioners.  So that would cover any religious

16  practitioner that happens to enter into the Northern District

17  of -- of Illinois.  That's a universal injunction --

18    THE COURT:  No.

19    MR. SKEDZIEWLEWSKI:  -- not because it's -- of its

20  geography, but because it applies to plaintiffs who are not

21  before the Court -- or rather, parties who are not before the

22  Court.

23    THE COURT:  No.  So they're -- they are -- it would

24  only be those people, right, who are attempting to exercise

25  their First Amendment rights in a way that would cause them to

1    be engaged with ICE officers.  So it's not any person

2    exercising their religious beliefs or any person protesting or

3    any journalist covering any event.  It is limited --

4              MR. SKEDZIEWLEWSKI:  But, Your -- Your Honor, that's

5    their language.  Any person is their language.  That's not

6    mine.

7              THE COURT:  Well, and, you know, that's why I'm a

8    judge and I get to modify the language so that it doesn't

9    violate the Supreme Court precedent.

10             But go ahead, Mr. Bowman.

11             MR. BOWMAN:  I -- I -- and I just wanted to jump in

12   and be clear that we are asking for relief on behalf of the

13   individuals and the putative class that we represent, which is

14   defined specifically as you indicated, Judge, with the

15   additional proviso that it is those peacefully protesting --

16             THE COURT:  Mm-hmm.

17             MR. BOWMAN:  -- who comprise the class, and I -- I --

18   I think that responds to a lot that's been said here.

19             THE COURT:  All right.  Go ahead, Mr. Skedziewlewski.

20             MR. SKEDZIEWLEWSKI:  Well, just to respond to that,

21   the Court should -- can of course give whatever relief it

22   thinks is necessary to award complete relief to the parties

23   before the Court, including if there's a class, although no

24   class has been -- has been formed yet.

25             But it can't give relief to any peaceful protester,

1    which is I think what I just heard counsel for the other side

2    say.

3                THE COURT:  Well, no, and again --

4                MR. SKEDZIEWLEWSKI:  So that -- it's not --

5                THE COURT:  Yeah, no, I mean, it's not any peaceful

6    protester protesting anywhere at all any thing, right?  It's

7    any peaceful protester that would likely be encountering an ICE

8    official.  So, you know, if somebody wanted to come and protest

9    downstairs, this injunction would not cover that individual.

10   It's not any protester anywhere within the Northern District of

11   Illinois.  It is --

12               MR. SKEDZIEWLEWSKI:  It is any protester -- sorry,

13   Your Honor.  I didn't mean to interrupt.

14               But it would be any protester anywhere within the

15   Northern District of Illinois who encounters an ICE officer.

16   That's a universal injunction.

17               THE COURT:  That's not universal.

18               MR. SKEDZIEWLEWSKI:  It applies to any protester --

19               THE COURT:  Any protestor --

20               MR. SKEDZIEWLEWSKI:  -- in any case.

21               THE COURT:  -- and then caveated by all of these other

22   things.  That's not universal.  That's not universal.

23               So go ahead.

24               MR. SKEDZIEWLEWSKI:  Anyone outside of the parties

25   before the Court could fit that description is what makes it

1   universal.  The -- the fact that a bunch of nonparties to the

2   suit, including individuals who may not even be -- fit the bill

3   of the class description would -- would fall within the --

4   the -- the parts of this proposed order.

5          THE COURT:  Right.  But, again, that's something that

6   can be tweaked, and it -- and I intend on tweaking it so that

7   it tracks the proposed language -- or tracks the language of

8   the proposed class.  So it's not universal.  It is to cover

9   this proposed class of individuals --

10         MR. SKEDZIEWLEWSKI:  Okay.

11         THE COURT:  -- which doesn't make it universal.

12         MR. SKEDZIEWLEWSKI:  I'll --

13         THE COURT:  But go ahead.

14         MR. SKEDZIEWLEWSKI:  I'll touch on some of the

15  specifics in the proposed order, Your Honor.

16         They -- the plaintiffs ask for law enforcement

17  officers to display visible identification with their name

18  and/or badge number.  Unfortunately, thanks to -- to doxing, as

19  I -- I mentioned briefly earlier, agents have been followed

20  home from the facility in question here, their homes broken

21  into, property damaged.  I would submit to the Court that

22  requiring officers to display badges in this way could easily

23  endanger their lives --

24         THE COURT:  Well --

25         MR. SKEDZIEWLEWSKI:  -- given the -- the -- the --

1     threat by organizations who are intent on doxing them and their

2     families.

3          THE COURT:  Okay.  Except that, right, like, I can't

4     tell you how many judges have been doxed.  I can't tell you how

5     many judges have received death threats.  I can't tell you how

6     many judges have received death threats on the parts of --

7     on -- directed at family members, that they've had, you know,

8     pizza sent to their house, which is probably the least -- the

9     most innocuous and least harmful thing, all the way to having

10    family members shot right in front of them.

11         So it's unfortunately part of the cost of doing

12    business as a public servant in the government, that

13    unfortunately society has devolved to the point where anyone

14    who disagrees with how you do your job is subjected to threats,

15    is subjected to harassing activity, and at times subjected to

16    harm.

17         I don't know if DHS agents have a badge number that's

18    assigned to them, or in the parlance of the Chicago Police

19    Department, a star number, but something that is identifying.

20         And here's the issue and here's why I think it's

21    important:  The plaintiffs, whether it's these plaintiffs or

22    someone who is part of a putative class going forward, can't

23    bring a lawsuit against Joe or John or Jane Doe, agent, right?

24    And that if something happens and they cannot identify this

25    individual, their rights cannot be redressed.

1          And I am very sympathetic and completely understand

2  how difficult it is when someone disagrees with you and decides

3  to harass you, to threaten you, to follow you home.  It's

4  scary.  But that doesn't mean that then you get to do this job

5  and be anonymous.  That -- those two things don't match up.

6          MR. SKEDZIEWLEWSKI:  Your Honor, respectfully, while I

7  appreciate the sympathetic remarks, at the same time, this is

8  more than being scary.  ICE officers are being fired at with

9  weapons.  There was -- I mean, there was an attack in Texas

10  where a marksman is -- is -- was shooting at -- at ICE

11  officers.  Officers all over the country have been specifically

12  targeted with violent attack -- this is not just harassment.

13  These are individuals who are trying to kill ICE officers at

14  their homes while they're doing their job.

15          THE COURT:  And I hear you --

16          MR. SKEDZIEWLEWSKI:  It's not setting a --

17          THE COURT:  I hear you.  I do.  I really do.  But I

18  have to balance both of these things.  Look, if I didn't -- you

19  know, if I could be anonymous and issue opinions anonymously, I

20  would do that too, right?  I don't want to get threatening

21  e-mails and correspondence.  I don't want the marshals sitting

22  outside of my house.  I don't have to -- want to have to worry

23  about my family members.  But under the rule of law, it's

24  important to be transparent.  That's what makes it valuable.

25  That's what gives people trust in the system.

1          And I am sympathetic, trust me, to what these officers

2    are going through.  But -- but they need to have -- there needs

3    to be some way to identify them, whether it's by -- and that's

4    why I'm asking this question about, you know, is there a badge

5    number or a star number or some other means of identification

6    that at the very least somebody can take that down and say,

7    this is a unique identifier to this individual that did this to

8    me; and so when I am filing a lawsuit, this is the person that

9    I'm suing, and we can identify this person by this -- by this

10   number.

11         Does that exist in DHS?

12         MR. SKEDZIEWLEWSKI:  Your Honor, I don't have the

13   details of the badges that DHS gives to its agents or ICE and

14   CBP, and there may be variation across the component agencies

15   here.  I know as a -- I know that there are badges, but I -- I

16   don't know any details as to whether they're unique

17   identifiers, whether they're anonymous -- whether they

18   anonymize the -- the -- the agents.  That's something I have to

19   go to the client to get more information on.

20         But what I do know is that there's no rule of law

21   requiring the Court to have the officers display their badges.

22   And to the extent Your Honor feels that a balancing needs to be

23   done, I sympathize with that.  But the balance between human

24   life and constitutional harms is very clear.  It's human life

25   that prevails if that's the balance.

1    THE COURT:  Well, I'm not -- I am not proposing that I

2  would put the agents in harm's way, right?  And that's why I'm

3  asking about badge numbers or some other identifier that I

4  think appropriately balances any potential harm to an agent

5  versus someone's ability to use our court system to seek

6  redress for injuries that they have suffered.

7    MR. SKEDZIEWLEWSKI:  Your Honor, the specific agents

8  would have immunity regardless -- the lawsuit would be against

9  DHS regardless.

10    THE COURT:  Well, it would be against DHS regardless,

11  but we'd need to know in a *Bivens* lawsuit --

12    MR. LOEVY:  *Bivens*, yes; FTCA would be against -- the

13  government would substitute in.  But the plaintiff would want

14  to know who the defendant was so they could depose them --

15    THE COURT:  Right.

16    MR. LOEVY:  -- and hold them accountable.

17    MR. SKEDZIEWLEWSKI:  That would of course come out in

18  discovery.  That doesn't need to be on their chest in the

19  middle of a riot with violent terrorist organizations

20  attempting to dox ICE and their family.

21    THE COURT:  Well, I think we have a different idea of

22  what's going on in Chicago, but...

23    All right.  Anything else before I let the plaintiffs

24  respond?  Because we'll go through the order itself.

25    MR. SKEDZIEWLEWSKI:  Well, if we'll go through the

1    order itself, Your Honor, then the rest of what I have to say

2    can wait.

3         A quick point on the equities.  So just there is a

4    compelling interest here, the protection of federal property

5    and personnel.  Plaintiffs, while they do have an interest, of

6    course, in First Amendment expression, they don't have an

7    interest in joining in riots, nor do they have an interest in

8    thwarting the enforcement of federal law.

9         And the -- and the press does not have special

10   interests over and above the general public.  And so I think

11   the plaintiffs have failed to meet their burden of showing that

12   they're entitled to -- to preliminary relief for all the

13   reasons that I stated.  But I'm happy now after their rebuttal

14   to -- to say more about the proposed order, Your Honor.

15        Thank you.

16        THE COURT:  Okay.  Thank you.

17        Go ahead.

18        MR. LOEVY:  Thank you, Your Honor.

19        You know, in some ways we're talking past each other.

20   Nothing about the order we're asking you to enter would stop

21   DHS from confronting violent rioters or Antifa, chaotic melees,

22   or even thwarting law enforcement.  The order that we're asking

23   you to enjoin protects peaceful law -- protesters.

24        And, of course, it's not even clear why

25   Mr. Skedziewlewski would oppose that.  If the order did not in

1  any way inhibit law enforcement's ability to deal with violent

2  obstruction of law enforcement but did just protect peaceful

3  protesters, does the government even want to be able to attack

4  peaceful protesters for the -- for the message?  I mean, in

5  theory, why are they against it?

6          Now, we got to look at the posture here, and we're

7  just asking Your Honor to enter the TRO until there could be a

8  preliminary injunction.  And it's possible that the universe

9  will -- they'll satisfy you that there's blood in the streets,

10  there's riots, it's just a chaotic, you know, situation.  And

11  in that scenario -- because like counsel pointed out, you

12  haven't yet seen the evidence -- maybe you will say, you know

13  what, there's maybe a court doesn't need to be concerned about

14  protesters because there's a -- there's a revolution in the

15  streets.

16          But I don't think they're going to be able to prove

17  that.  You know, we have declaration after declaration

18  attached.  I've seen the videos.  It's a -- it's soccer -- a

19  lot of them are soccer moms yelling at these law enforcement

20  officers and, you know, skinny kids, and -- and they're --

21  they're not obstructing.  They're speaking.  They're exercising

22  very American rights.

23          And I get it that -- that the ICE agents don't want to

24  hear it, but that's not the same thing as a legitimate law

25  enforcement concern coming back.  And that -- so we'll see what

1    the hearing shows at the preliminary injunction hearing.

2          As counsel pointed out, you know, maybe there's a

3    one-off; maybe somebody pushed somebody in the last, you know,

4    month.  But for the most part, I think the evidence is going to

5    show people are -- are doing a very American thing, they're

6    protesting.  And against that backdrop, the TRO should be

7    entered and should be extended.

8          We submitted specific evidence.  It's opinion 2 in the

9    Gil Kerlikowske affidavit that the -- the injunction is safe

10   for law enforcement.  This is a guy who is a high-level DHS guy

11   who's saying, look, the injunction that I helped fashion in LA

12   and I helped fashion in Chicago doesn't impede law

13   enforcement's ability to do what they got to need to do.  It is

14   workable and it can protect everybody's rights and be the right

15   balance.

16         Counsel made the point about rhetoric.  You know, it

17   was a while ago, but I -- I thought it was worth mentioning

18   again.  He said, look, speakers are saying things and people

19   are assassinating people and speech is getting very -- very

20   sharp and very dangerous.  Your Honor, they're proving too

21   much.  They're really admitting -- like, we don't want people

22   speaking.  Next thing you know, there's going to be political

23   violence.  Next thing you know, people are going to, you know,

24   do terrible things.

25         Your Honor should -- is not here to debate the merits

1    of the First Amendment.  People can say to ICE agents, cut it

2    out, get out of here, we don't want you.  It's not a response

3    for counsel to say, well, look where that goes.  Maybe people

4    start assassinating people.  We live in a country for better,

5    for worse that has a First Amendment.  People can speak.  And

6    if other people are going to, you know, use that speech and

7    take it in bad directions, that's not a reason to not grant the

8    relief we're seeking.

9         I think the standing issue has been covered.  Just as

10   an aside, though, that it's an interesting analogy to the

11   policy and practice.  Really what you got here is continuing

12   the analogy is a failure to train because these are federal

13   agents who are counterterrorism agents.  They've been trained

14   to protect what they've been told is an invasion at the border.

15   They don't have any idea how to do urban crowd control in a

16   peaceful speech.  That's not what you train a counterterrorism

17   person to do.  So in a sense, it is a policy, it doesn't fit,

18   and there is standing.

19        I think the excessive force, the unreasonableness,

20   again, I'd -- I'd refer you back to Kerlikowske's affidavit.

21   He is saying that what these declarations show, what this video

22   shows, is indiscriminate violence.  The officers are saying, we

23   don't like what you're saying.  They're throwing tear gas out

24   the window.  You know, they're -- they are -- it's both

25   indiscriminate and targeted.  There's -- they're targeting the

1    press.  They are targeting people who they're, like, basically

2    saying to shut up.  But the -- the overall opinion that he's

3    given, which I believe is going to be unrebutted, is that this

4    is an unreasonable use of force and it should be -- it should

5    be enjoined.

6           The other point about the doxing.  You know, we live

7    in a country where law enforcement officers every day wear a

8    name tag.  You know, Chicago police officers wear a badge.  And

9    if you don't like how you're treated by that Chicago police

10   officer, you can go make a complaint.  And there's costs and

11   benefits.

12          I mean, you could make a lot of arguments why they

13   shouldn't wear a badge.  And you can make some arguments -- a

14   name tag.  You can make some arguments why they should.  We as

15   a society have come out the other way.  Yes, one in a million

16   could lead to a -- you know, a tragic outcome.  Although the

17   examples counsel say where somebody is like shooting at -- at

18   an ICE agent or attacking an ICE agent, that's -- they're doing

19   their job in the street out in the open.  There's always going

20   to be a risk people are going to retaliate against ICE agents.

21          You know, it's -- it's a -- it's a rhetoric just to

22   say, well, maybe they'll order pizzas, maybe they'll follow

23   them home.  Maybe.  You know, there is not any evidence that's

24   going to outweigh.

25          Because even if they had two examples where someone

1    got doxed, I want to bring it back to the enormous benefit that

2    we as a society get for having law enforcement officers

3    identify themselves.

4         You know, you made a great point, Judge, that how do

5    you sue if you don't know who to sue.  But I'm going to take it

6    one step further.  It's not just about that.  If you're a law

7    enforcement officer wearing a mask, confident that nobody knows

8    who you are, and there's going to be no accountability, that's

9    a bad formula.  And you're surrounded by your buddies who have

10   the same immunity and the same impunity, you know, you don't

11   have to be a great study of human history to know that when

12   people are anonymous and they're acting with their buddies and,

13   you know, maybe it is a chaotic situation, accountability is a

14   cost, but in a Democratic society, it's -- it's a tremendous

15   benefit.  And I hope you will decide to enter that as part of

16   the injunction.

17        You know, we don't know what's happening in the

18   streets.  I forgot to make this point.  And maybe in the future

19   it's going to be a lot harder to know what the truth is.  You

20   know, these deepfakes and stuff, you may have to judge two

21   years from now.  You don't know what's going in the streets.

22   You weren't there.  And you're -- nothing is going to be

23   reliable.

24        But we still do live in a world where we have evidence

25   about what's happening and we have declarations and we have

1   video.  And we've provided to this court and what that evidence

2   shows is peaceful protesters exercising their very American

3   rights being met with inappropriate violence, being gassed,

4   being shot at, and being -- having their First Amendment rights

5   violated.

6          So that brings you back to the *L.A. Press Club*.  It is

7   true that that -- that TRO was denied.  But you -- you nailed

8   it, Your Honor.  It was -- it was brought up just a few days

9   after it all started.  Nobody knew what -- what was going on;

10  nobody knew how long it was going to last.  This is an entirely

11  different procedural posture where we're months later, where

12  there's 40 affidavits, where there's a much more fulsome record

13  of targeted violence.

14         So in LA, once they did figure out what's going on,

15  they entered the injunction, and that was after the hearing.

16  And I believe Mr. Skedziewlewski might have been part of those

17  proceedings.  But the fact that the TRO was entered very

18  quickly, there wasn't enough grounds, shouldn't control this

19  outcome.

20         I think you should do what we suggested, is enter the

21  TRO now.  If the government says this is going to really cramp

22  our style and cause us all kinds of prejudice, then as quickly

23  as they'd like, have a hearing.  Instead of hearing about

24  Antifa riots, show us evidence of Antifa riots.  Let's see the

25  evidence, and then you can make a decision.  We'll do it fast,

1   slow, or medium, but I think the TRO should be entered in the

2   meantime.

3          THE COURT:  All right.  Anything further,

4   Mr. Skedziewlewski?

5          MR. SKEDZIEWLEWSKI:  Yes, Your Honor.

6          Plaintiffs' counsel mentioned that the order would not

7   affect law enforcement officers.  I guess we'll have a chance

8   to talk about this in a moment, but we have declarations in the

9   *L.A. Press Club* case, many of them, from high-level DHS

10  officers, CBP, ICE, DRO, explaining in detail how a very

11  similar order will not just impact operations, make it -- the

12  enforcement of federal law more difficult, but will be totally

13  unworkable and make the job of law enforcement dangerous.

14         It will -- it will put officers in a dangerous

15  catch-22 where they have to decide between doing what's

16  required by their job to protect themselves and the people

17  around them and being held in contempt when they are alleged to

18  have violated the order, or hesitating and exposing themselves

19  to serious harm.  That's Monday-morning quarterbacking of the

20  worst kind, and it's -- it's not warranted by the -- by the --

21  by the facts here, and is -- is also not tethered to the

22  specific allegations.

23         I mean, at most, even if we take all of plaintiffs'

24  allegations as true and that they've established their claims,

25  but at most a narrow injunction instructing DHS to stop

1    targeting specific plaintiffs who could establish their Article

2    III standing to sue for prospective relief would be

3    appropriate.

4         In other words, if plaintiffs were saying DHS

5    targeted Mr. Black, well, then, the injunction should say stop

6    targeting Mr. Black.  It's very simple.  They're asking for a

7    sweeping injunction that would essentially allow plaintiffs'

8    counsel and this Court to write a new DHS use of force policy.

9    The facts don't support it.

10        Also, we don't need to show that there's a revolution

11   in streets.  Maybe that was just rhetoric by the other side.

12   But all the DHS officers need to show in order to use force is

13   that there's a threat to safety, to theirs or to their

14   colleagues or to the public.  And that's -- what we saw in *L.A.*

15   *Press Club* is that DHS is not -- is not just using force

16   willy-nilly, but that depending on the degree of the violence

17   they're met with, that determines the use of force that -- that

18   they deploy.  In some instances, there's no force; in other

19   instances, there's more, and that's because of the violence

20   that they're met with.

21        THE COURT:  So --

22        MR. SKEDZIEWLEWSKI:  So it's a specific -- we don't

23   need blood in the streets and revolution.  It --

24        THE COURT:  No, it --

25        MR. SKEDZIEWLEWSKI:  -- but specific acts of violence

1 against officers is what we're responding to.

2 THE COURT: And I -- I don't believe that you need a

3 full-fledged revolution, right, but that you need to ensure

4 that DHS follows its own policies, that DHS follows the

5 requirements and limitations of the Fourth Amendment so that

6 when agents exercise force, that it has done so in a way that

7 is considered, that is lawful, and that is commensurate with

8 what is going on at that time with those particular officers.

9 So, no, you don't need a revolution in the streets.

10 But it cannot be the case, right, that DHS officers are given

11 *carte blanche* to use whatever force they believe necessary

12 regardless of the circumstances. And I know that's not what

13 you're saying, and that's certainly not what the plaintiffs are

14 saying, but it appears, based on the evidence before me, that

15 there have been instances where these plaintiffs have a

16 reasonable likelihood of success on the merits to show that not

17 only has DHS violated their Fourth Amendment rights, but also

18 their First Amendment rights. And so at this point that -- a

19 TRO would be appropriate here.

20 You said that the order entered in LA was unworkable

21 and that it was problematic.

22 In what ways was it unworkable?

23 MR. SKEDZIEWLEWSKI: Certainly, Your Honor.

24 So maybe one of the -- the biggest things to note

25 is -- is a similar definition of journalism here that's vague

1    and unworkable.  And I can say why.

2         The injunction doesn't specify, for example, which --

3    or the proposed order, Your Honor, rather, does not specify

4    which -- how many of so-called indicia of journalism or -- or

5    press membership are necessary for someone to qualify as a

6    journalist.

7         The proposed order also states that a journalist --

8    or -- is -- is anyone standing off to the side of a protest not

9    engaging in protest activities.  These are hopelessly vague

10   terms.  I mean, these protests involve crowds that are

11   constantly shifting and moving, and it's -- it's -- it would be

12   impossible for a DHS agent to determine who is engaged in a

13   protest activity.

14        In fact, my understanding of protests is really that

15   the main point is showing up.  And so presence is -- could be

16   understood as engaging in the protest.  So it's -- it's -- it's

17   far too vague.

18        THE COURT:  All right.

19        MR. SKEDZIEWLEWSKI:  Standing off to the side -- so

20   it's unhelpful --

21        THE COURT:  But --

22        MR. SKEDZIEWLEWSKI:  -- because, first of all, it's --

23        THE COURT:  But --

24        MR. SKEDZIEWLEWSKI:  Yes, Your Honor.

25        THE COURT:  So why don't we do this, because I don't

1    want to necessarily go down a rabbit hole, right, is that let's

2    go through -- you don't have anything specific, then, to tell

3    me, like this is our experience from trying to implement the LA

4    order.  Here are the issues that we have had.  You know, we've

5    been called into court --

6              MR. SKEDZIEWLEWSKI:  So --

7              THE COURT:  -- because of this issue or that issue.

8    And you don't have that?  Or do you?

9              MR. SKEDZIEWLEWSKI:  Everything I was just saying is

10   from -- is from declarations from CBP officers.  Not -- it's

11   not -- not attorney argument.  That's CBP's view of the

12   injunction.  And I have a lot more of that sort of thing that I

13   can describe where they're telling us, this is how -- this is

14   why we can't work with this order, our officers won't know what

15   to do, and -- and -- and the like.

16             We haven't yet been hauled back into court in the

17   Central District of California for, you know, contempt or

18   anything like that, but the order is quite new and we're

19   seeking a stay in that case presently for the same reasons that

20   I'm articulating now, mainly that DHS simply can't -- can't

21   live with this order.

22             THE COURT:  All right.  Well, it's been --

23             MR. LOEVY:  A month.

24             THE COURT:  It's been a month.

25             MR. LOEVY:  Yeah.

1      THE COURT:  So as of today, you don't have anything

2  super specific.  You haven't been hauled back in where the

3  plaintiffs have said they're violating this provision of the

4  order, that provision of the order, correct, over the last

5  month?

6      MR. SKEDZIEWLEWSKI:  No, Your Honor.

7      THE COURT:  Okay.  All right.  Then why don't we go

8  through the order, if that makes sense.

9      Okay.  All right.  So I'm looking at 1.a.  And the

10  question that I have is the last sentence in 1.a.  So it says:

11  "Defendants may ask a journalist to change location to avoid

12  disrupting law enforcement, as long as the instructions are

13  clear and the press have time to comply and sufficient

14  opportunity to report and observe."

15      The question that I have is the phrase "the

16  instructions are clear."  I'm not sure I know what that means

17  or that I would be able to -- if I -- right?  Like I'm reading

18  this order from the perspective of an ICE agent, right, and so

19  I want it all to be written in a way that if I am this agent, I

20  know what I can do and what I can't do.

21      "The instructions are clear" seems kind of vague to

22  me.  And I would be inclined to take that out and say that "The

23  defendants can ask a journalist to change location to avoid

24  disrupting law enforcement, as long as the press has time to

25  comply and sufficient opportunity to report and observe."

1          MR. LOEVY:  Maybe what they're getting at there is,

2   like, as long as the instructions are clear, if you're in a

3   situation and they say to the press guy, move, and he's like,

4   okay, you know, well, you're under arrest, because that's

5   what's been the problem, is that they're finding reasons to

6   arrest people and then release them.  So I think -- this is

7   taken verbatim from LA, and it was fashioned by the DHS expert,

8   but Mr. --

9          THE COURT:  Well, "the instructions are clear" part, I

10  don't know -- hold on.  I've got so many pieces of paper.

11         Yeah, that was not there.  That was not in the LA

12  order, and I think there's a reason why --

13         MR. LOEVY:  Huh.

14         THE COURT:  -- is that even using your example,

15  Mr. Loevy, you know, an agent may believe saying, I told you to

16  move is clear, right?  Could I be more clear?  Sure.  I can

17  tell you, move 20 feet away.  I can tell you, you know, move

18  down the sidewalk.  I can tell you, move into this particular

19  zone.  I can also just say, move, and expect that you will

20  move, and I believe that that's clear.

21         So that's -- that's my issue with this language.

22         MR. BOWMAN:  Could I suggest an alternative

23  formulation?

24         THE COURT:  Sure.

25         MR. BOWMAN:  So long as the instructions are specific

1    as to timing and location.

2          THE COURT:  I guess I can also see, though, where that

3    would be -- could be problematic, right?  If I were to say,

4    move over there now, that is specific, right, because I'm

5    saying there and I'm saying now, but that could be anything,

6    right?  And so I just -- I don't want to make it more

7    complicated or difficult than it needs to be.

8          I think that it is sufficient to say that "The

9    defendants could ask a journalist to move location, and give

10   the journalist time to comply and an opportunity to report and

11   observe."  Right?  So you can't tell somebody, go back behind

12   the building where you can't see anything, right?  And you also

13   can't give an instruction and immediately arrest somebody

14   because they didn't start sprinting away, right?

15         And I just don't want to make things more difficult

16   than they need to be or more confusing for the agents.  So I

17   would remove the phrase "the instructions are clear" so that it

18   would read -- that last sentence would read:  "Defendants may

19   ask a journalist to change location to avoid disrupting law

20   enforcement, as long as the press has" -- because I think press

21   is singular --

22         MR. LOEVY:  Mm-hmm.

23         THE COURT:  -- has time --

24         MR. LOEVY:  Maybe even reasonable time, reasonable

25   time.

1      THE COURT:  -- "to comply and sufficient opportunity

2  to report and observe."

3      Again, I -- I don't know that I want to add a bunch of

4  qualifiers like "reasonable time."

5      MR. LOEVY:  Plaintiffs could live with that language,

6  Your Honor.

7      THE COURT:  All right.  And I know that the government

8  objects to this entire process.  But, Mr. Skedziewlewski, can

9  you -- so understanding that you are not waiving the

10  government's objection, is this something that you can live

11  with?

12      MR. SKEDZIEWLEWSKI:  Your Honor, I think the issue for

13  defendants is more the first sentence than the second sentence

14  of this paragraph.

15      THE COURT:  Okay.

16      MR. SKEDZIEWLEWSKI:  In the past -- and if I may, in

17  the past, protesters have done things like throw Molotov

18  cocktails, say, at -- at DHS agents or shoot fireworks at -- at

19  federal buildings risking, you know, lighting the buildings on

20  fire.  In scenarios like that, the most effective response by

21  officers is to push the whole crowd back.  Because you have

22  violent offenders like that interspersed with what might

23  otherwise be a nonviolent crowd, but it's impossible to get at

24  them.

25      What we also saw in -- in LA was individuals, you

1  know, physically assaulting a DHS officer by, you know,

2  punching him in the face, retreating back into the supposedly

3  nonviolent crowd, but then purposefully shields that individual

4  from officers apprehending him.

5          And so sometimes the only solution is to disperse the

6  whole crowd.  If journalists are excepted from that, then you

7  have this problem with individuals potentially posing as

8  journalists behind the DHS line creating risk to officers.

9  It's just -- there needs to be an option here for DHS to be

10 able to disperse an entire crowd, without excepting

11 journalists.

12         MR. LOEVY:  Journalists have historically, you know,

13 enjoyed the ability to observe and -- and not be dispersed.

14 That's really a bedrock thing.

15         THE COURT:  No, that -- it's the -- I guess I don't

16 know how often or whether it's -- really happens that the

17 journalists are standing amongst the crowd, as opposed to apart

18 from the crowd, right?  So, I mean, at least -- and admittedly,

19 I have not read everything.  This case was filed this morning,

20 and I was on the bench until 1:30, so I had literally an hour

21 and 15 minutes to kind of read and absorb everything.  But at

22 least from what I've seen, it appears that the journalists are

23 standing apart, as opposed to within the crowd.

24         MR. BOWMAN:  That is true, and it's visible on the

25 videos.  So that the journalist has the opportunity from a

1    removed objective perspective to record with -- with a camera

2    or with a video recorder or in words the events unfolding to be

3    caught up into the events and -- and -- and treated as part of

4    the crowd defeats the journalistic purpose, which is to be the

5    objective eyes and ears of the community on -- on what is

6    occurring.  That's why this is so important.

7         THE COURT:  And, Mr. Skedziewlewski, are -- did you

8    hear that in LA this was causing a problem or an issue?  You

9    know, I know that you have said in the last month that no one

10   has come to the government and said this is what is happening

11   to journalists, that they are getting caught up in dispersal

12   actions as it relates to journalists.

13        MR. SKEDZIEWLEWSKI:  You know, Your Honor, you sort of

14   jogged my memory.  And so there actually has been a filing in

15   the *L.A. Press Club* case since the -- the Court gave -- gave

16   its order for the PI where another journalist does allege, you

17   know, similar -- you know, violations of -- of the preliminary

18   injunction order.  They didn't bring any kind of motion on that

19   basis.  It was used as rebuttal at our stay.

20        But so -- so there -- there is -- there are

21   allegations that, you know, we're violating the order in --

22        THE COURT:  What --

23        MR. SKEDZIEWLEWSKI:  -- Los Angeles.

24        THE COURT:  What if I were to add in, which I was

25   going to do at the end anyway, is that in the LA order at

1   No. 6, which is not present here, is the incidental language,
2   so incidental exposure.

3          So in the LA order it states:  "Defendants shall not
4   be liable for violating this injunction if a protestor,
5   journalist, or legal observer is incidentally exposed to crowd
6   control devices after such a device was deployed in a manner
7   that complies with the injunction."

8          MR. LOEVY:  Plaintiff could live with that language.
9   It makes -- sounds appropriate.

10         THE COURT:  And, Mr. Skedziewlewski, does that sort of
11  cover your concern?  So --

12         MR. SKEDZIEWLEWSKI:  No, Your Honor.

13         THE COURT:  Okay.  Go ahead.

14         MR. SKEDZIEWLEWSKI:  We -- we would be happy to have
15  that language added if an order is entered for other reasons.
16  But our concern for paragraph 1.a. would stand because what
17  agents often do to avoid having to use crowd control devices is
18  to just do a physical expansion of the area where officers sort
19  of form a line and they push the crowd out to either create an
20  opening for vehicles to come in or -- or what have you, or in
21  order to get access to a violent offender, as the case may be.

22         So as I understand paragraph 6 in the LA order, it
23  really just covers crowd control devices --

24         THE COURT:  Well, we can --

25         MR. SKEDZIEWLEWSKI:  -- not the kind of expansion of

1   the area.

2          THE COURT:  But we could expand that, right?  So, you

3   know, if they're exposed to a crowd control device or --

4          MR. LOEVY:  Tactic.

5          THE COURT:  -- physical force, right, if we add that,

6   then that would cover what you just described, which is there's

7   a journalist in the crowd.  The officers don't know and can't

8   see necessarily all the way into the crowd and decide to use

9   force to push the crowd back and expand whatever zone there is,

10  that then there is no liability, right, just because

11  essentially a journalist got caught up in that.

12         MR. SKEDZIEWLEWSKI:  I would worry about the

13  workability for officers, Your Honor.  Putting -- putting 1.a.

14  alongside the -- your proposed sort of modified paragraph 6,

15  they seem to be at odds.

16         So paragraph 1.a. says no dispersing of journalists

17  unless probable cause.  And then paragraph 6 says, oh, but you

18  can do it if you don't see them.  But what if they see them at

19  the last minute?  What if they -- I mean, that just creates all

20  kinds of sort of last-minute hesitations and problems for

21  officers.

22         THE COURT:  No.  I mean, what it does is that it

23  protects the officers from liability, right, where you can --

24  you know, you can push the crowd back and know that as long as,

25  you know, the person standing right in front of you is -- you

1   know, it's not a crowd of journalists, right, so you need to

2   ask -- if it's a crowd of journalists, you need to ask them to

3   move, and -- and give them time to do that.

4          If it's just a general crowd and you are using this

5   tactic, crowd control tactic of pushing them back, that you're

6   free to do that, as long as you don't know or reasonably should

7   have known that they're a journalist there.

8          So, you know, at least from what the plaintiffs have

9   provided up to now, it's that the journalists generally, not

10   always, but generally are off to the side.  And so it's not --

11   I don't think that these are two conflicting paragraphs.  It's,

12   you know, this is how you -- 1.a. is this is how you should

13   treat journalists.

14          And then, you know, 1, whatever this is going to be,

15   1 -- 1.k. will be that, you know, it covers the defendants

16   where they are otherwise following the order, the injunction

17   order, and that whether it's a journalist or a protester, that

18   they get incidentally caught up in what is happening because

19   the officers don't know or have reason to know.

20          MR. SKEDZIEWLEWSKI:  There's the -- the last clause of

21   1 -- paragraph 1.a., Your Honor, says:  "Unrelated to failing

22   to obey a dispersal order."  So I'm just imagining a scenario

23   with Your Honor's modified order where there could be a group

24   of journalists in an area that DHS needs to secure, they've

25   been asked to move, and they've not -- they've refused to move.

1        And so I think DHS needs to be able to disperse crowds

2   in these chaotic situations even if there's a group of

3   journalists off to the side; again, not to thwart their First

4   Amendment activity, but to secure a particular area.  And we've

5   seen lots of instances, Your Honor, and journalists here, we'll

6   get to the definition later, but people who pull out their cell

7   phone are filming and are they journal- -- they seem to be

8   journalists.

9        And so they're -- they're -- we're not necessarily

10  thinking -- we shouldn't necessarily think only about, you

11  know, your ABC and NBC news reporters here.  There are lots of

12  sort of amateur journalists that are -- we've seen interspersed

13  with these crowds who also occasionally join in the protests

14  and don't necessarily obey or -- or -- or even heed a request

15  to relocate.

16       So I think if we could strike that clause, the

17  unrelated to failing to obey a dispersal order, and this idea

18  that probable cause is required to disperse them, then -- then

19  it would be a lot more workable.

20       MR. LOEVY:  No, that would -- not it.  That -- that's

21  the whole purpose of -- of -- otherwise they could say it

22  becomes circular, and then they could do whatever they wanted.

23  You know, journalists cover wars.

24       THE COURT:  You need -- you need the microphone.

25       MR. LOEVY:  Sorry.

1          This is not inventing brand-new ground.  I started to

2     say, journalists cover wars.  I mean, they're -- they're used

3     to chaotic situations and their rights can be respected.

4          MR. SKEDZIEWLEWSKI:  A way to fix it for -- from DHS's

5     point of view, Your Honor, might be to say that -- that

6     journalists should be always asked when -- whenever it's

7     operationally possible, to relocate.  And then if they don't,

8     then they can be subject to an expansion of an area.

9          I don't think DHS -- you know, again, not interested

10    in thwarting a journalist's ability to cover a protest, but

11    they sometimes need to clear an area and quickly when

12    there's -- I mean, again, it's not one-offs that people are

13    bringing firearms to these incidents and shooting them at DHS

14    officers.  That's a -- you know, we can't wait for journalists

15    to relocate in that kind of an exigent circumstance.

16         MR. LOEVY:  Well, this sentence, you know, exists in

17    the LA order, and it is protection, and it does beg how you

18    define journalists.  But if you define journalist properly,

19    then they should be allowed to observe.

20         THE COURT:  All right.  All right.  Let me think about

21    this last phrase.

22         I mean, Mr. Bowman, what are your thoughts, right?  I

23    want to make this readily understandable to DHS agents, and do

24    understand that there may be circumstances where the dynamic is

25    fluid.  And I don't think it's correct that officers can't ask

1   anyone, including a journalist, to disperse from a particular

2   area.

3          MR. BOWMAN:  Indeed they can't.  And -- I -- I mean,

4   I -- I -- there's too many negatives floating around.

5          THE COURT:  Right.

6          MR. BOWMAN:  I -- I meant to say, it is certainly true

7   that journalists can -- can be directed to move.  And the point

8   of this order is to give the DHS officers the ability to

9   disperse a crowd where necessary.  And -- and it does, very

10  clearly.  You can -- they can ask a journalist to move.

11  There's a restriction on -- on that.  They -- they can't be

12  abusive about it.  That's essentially the essence of it.

13         THE COURT:  Right.

14         MR. BOWMAN:  But they -- they can say, y'all in the

15  press, you've gotta move out of here.  We've -- we've got an

16  issue.  And -- and that can happen.

17         THE COURT:  So then I guess what -- you know, what

18  this 1.a. is covering is when can DHS essentially use force or

19  some other means of crowd control, essentially where they are

20  showing -- can show a compelling government interest that

21  overrides the journalist's First Amendment rights, right?

22         I --

23         MR. BOWMAN:  I -- I -- I think that --

24         THE COURT:  And, again, we might be talking about

25  things that just aren't going to happen, but --

1      MR. BOWMAN:  I -- I --

2      THE COURT:  No, go ahead.

3      MR. BOWMAN:  I -- I -- I think that -- that -- that

4  what's going on here, and obviously we've all read ahead, there

5  is a definition of indicia or there's an explanation of indicia

6  of being a journalist that's rather restrictive in paragraph --

7  subparagraph J.

8      And I think that the -- the -- the point here is that

9  the act of professional journalism, to -- to be a journalist is

10  just a profession.  It's not somebody, as counsel indicated,

11  pulling out a cell phone and nominating themselves as a

12  journalist today.  It is a profession.  And that profession

13  gets the respect of not being subjected to force for failure to

14  go where folks -- folks in DHS tell them to go.  That's --

15  that's -- that's the restriction to address a problem that is

16  happening.

17      MR. LOEVY:  I guess I can come back to my point is

18  that they're -- the --

19      COURT REPORTER:  Microphone, please.

20      MR. LOEVY:  I'm sorry.

21      In the war analogy, I mean, the press, everybody is

22  just supposed to pretend that they're just going to stand there

23  and they have to be legitimately the press, and that's

24  Mr. Bowman's point about indicia, but they are subject to

25  special rules internationally and, you know, in chaotic

1    situations.

2           And, again, it's a cost-benefit because if they're not

3    subject to special rules, then you can -- you can bet they're

4    going to clear everybody right out of there, and that's the end

5    of that.  And the press gets a special privilege of being able

6    to report.

7           MR. BOWMAN:  Exactly.

8           MR. LOEVY:  Because that's what I meant by the

9    exception as well as the rule, because then all they say is,

10   you know what, I'm feeling a little chaotic right here,

11   everybody out.  The press is supposed to be exempt from that.

12          MR. SKEDZIEWLEWSKI:  Your Honor, what's happened in

13   the past with these expansions of a secure perimeter is that

14   press are asked to move.  Oftentimes they do move.  The

15   majority of them may move, and there will be a few remaining

16   members who refuse, and then they end up getting subject to

17   that expansion, whether they're in the middle of the group of

18   protestors or standing off to the side, because they may be

19   trying to clear a street, for example, not like a part of the

20   street.

21          THE COURT:  So --

22          MR. SKEDZIEWLEWSKI:  And so in that case --

23          THE COURT:  The --

24          MR. SKEDZIEWLEWSKI:  -- they would be in contempt of

25   this.

1        THE COURT:  So I guess -- so I -- in thinking it

2  through, I'm going to leave that phrase in there, "unrelated to

3  failing to obey a dispersal order," because of the second

4  sentence, which allows the defendants to ask the journalist to

5  move and then gives them time to move.  And that if they then

6  refuse to move -- you know, most move and one or two do not,

7  and then you are pushing the crowd back, I believe that that

8  last section that we were going to add in covers that, which is

9  the -- that DHS can come back and say, you know, during this

10  incident, we asked the journalists to move, eight of ten moved,

11  two did not, and we needed to create and expand the security

12  zone and we pushed everybody back.

13        I don't see that at this point plaintiffs' counsel

14  would come in and say that DHS has violated the -- the order in

15  those circumstances.

16        MR. LOEVY:  Particularly with B, Your Honor, which

17  we're -- we're neglecting also that --

18        THE COURT:  No, we're moving our way down.  We haven't

19  even gotten to B and it's 5:00.

20        MR. LOEVY:  But B helps your point on A, because if --

21  if the commanding officer finds there's a serious threat to

22  public safety, then they can disperse.

23        THE COURT:  So -- all right.  But I think we -- do we

24  have anything else to beat to death on A?

25        MR. LOEVY:  Not from the plaintiff.

1          MR. SKEDZIEWLEWSKI:  Well, I'll just note, Your Honor,

2     I -- I do think that this confers a special right.

3          Plus the First Amendment applies to everyone equally.

4     Journalists don't get a special exception.  Of course, you

5     know -- and there's case law to this effect.  You know, we'll,

6     of course, you know, cite to it in our briefing whenever we get

7     around to that, that people -- or everyone is entitled to the

8     same protections under the First Amendment, and journalists

9     don't get to have special treatment under -- under the First

10    Amendment.

11         And then this gives them that special treatment, and

12    in doing so, it creates a really challenging situation for DHS

13    officers.  If anything -- if -- or if nothing else, rather, we

14    would appreciate Your Honor adding -- and maybe this is

15    beating, although I don't see it that way because of the

16    commanding officer piece -- but officers need, if there's a

17    true emergency, to not be required to ask journalists to

18    relocate and just relocate them if someone's, for example,

19    firing a weapon at them from -- from immediately behind

20    journalists.

21         THE COURT:  So -- okay.  So let's turn to B.  So the

22    question that I have about B is the "justified by a commanding

23    officer's finding."

24         So the commanding officer is where I have a question

25    in that I can imagine in a lot of situations that there may not

1   be a chain of command where a decision to issue a dispersal

2   order goes up the chain of command, but instead, its those

3   particular agents right there are going to assess what's

4   happening and issue a dispersal order.

5          Am I incorrect?

6          MR. BOWMAN:  I --

7          MR. SKEDZIEWLEWSKI:  Your Honor,  that's exactly

8   right.  And if I could just quickly add, our -- our agents are

9   often operating in the field.  A lot of the incidents here stem

10  from a specific federal facility, but it would cover protests

11  that happen when agents are out on operations.  And in those

12  circumstances, the crews might be relatively small with no

13  supervisor traveling with the crew, and there would be -- and

14  can sometimes be no possibility of getting ahold of a

15  commanding officer in the middle of an exit.

16         And we see this repeatedly in the *L.A. Press Club* case

17  where officers are sort of swarmed by aggressive crowds when

18  there's maybe five officers out in the field on an operation.

19         But of course, even at a facility like this, the same

20  thing could occur if there's -- you know, where a commanding

21  officer might not be on site to see and specifically identify a

22  threat.

23         THE COURT:  Mr. Bowman.

24         MR. BOWMAN:  So -- so I -- I think three -- three

25  points.

1    Point one is dispersal is -- is the end of a protest.

2  You -- you get out of here.  All you people leave, go home.

3  And the issue that drove the phrase that we're talking about is

4  this cannot be the *ad hoc* determination of one individual.

5  This has to be a -- a judgment that is -- that is a -- a

6  relatively dispassionate assessment by a person with authority.

7    We take counsel's point that, you know, this -- this

8  can't be Bovino's determination if he's in Portland this week,

9  as opposed to here, but -- and so we're going to suggest that a

10  tweak is appropriate to specify that the -- that -- that the

11  justification be by a supervisor -- a supervisory officer on

12  the scene.

13    THE COURT:  So what -- are there DHS policies that

14  delineate what a serious threat to public safety is?

15    MR. SKEDZIEWLEWSKI:  Your Honor, the -- the -- the

16  language of serious, I -- I don't believe -- I'd have to go

17  check, but I don't believe that that's a term that's compatible

18  with -- or is used in DHS's policy.  I think their -- I think

19  that their policy, if I remember correctly, is a bit more

20  specific than that and gets into more detail about, you know,

21  threats, you know, to bodily injury and -- and -- and things

22  like that.

23    And I'll also add that as far as changing the language

24  to supervisor, that -- that -- that doesn't solve it because it

25  could be that there's not a supervisor out on an operation with

1    a small contingent, you know, CBP or -- or ICE officers, and

2    they would be unable to -- I mean, what we've seen it happen

3    where agents get surrounded and are unable to evacuate an area,

4    they just want to leave, they just want to get away from a

5    dangerous situation, and they're blocked in by people's

6    vehicles who have surrounded them.

7            And so being able to issue a dispersal order is

8    crucial because whoever law-abiding people may be part of a

9    crowd behaving like that, they may be then inclined to leave

10   and give officers an -- an opportunity to escape.

11           THE COURT:  So I -- you know, I'm just wondering if

12   there's a way to reflect back DHS policy, right?  So rather

13   than it be that it's justified by a commanding officer's

14   finding, because I -- I just think that there're going to be

15   lots of times where there is no commanding officer present, nor

16   are you going to be able to get ahold of that person in the

17   moment, right?

18           So if, for example, there is a protest, you know,

19   officers find out that they're going to a restaurant, right,

20   and they want to talk to everybody who's working in the kitchen

21   and the soccer mom group sees officers heading towards the

22   restaurant and word goes out and all of a sudden, right,

23   there's a protest at the restaurant, and not only are there

24   soccer moms, but now there are also other individuals that are

25   really unhappy with what's going on and they decide to become

1    violent, that you might have two officers or three that are

2    there at the restaurant, something happens, and it's now become

3    violent, say, they're, you know, breaking the windows of the

4    restaurant or whatever, trying to get in, that at that moment

5    in time, those two or three officers are not going to try to

6    track down a commanding officer.  They are just going to tell

7    the crowd to leave so that they can leave.

8         I don't want to add things on that I -- I know may or

9    may not happen or may not be possible to happen.  What I would

10   rather do is reflect back DHS policy where, you know, the

11   officers have been trained that these are the circumstances

12   where you are allowed to issue a dispersal order.

13        Does that make sense?

14        MR. LOEVY:  That makes a lot of sense, Your Honor,

15   because they've confronted this exact question.  We don't have

16   to reinvent it.  You know, it's how they do it.  And, you know,

17   I was going to guess or suggest justified by the ranking

18   officers finding a serious threat.  But I suspect you're

19   exactly right, is that they've thought about this and come up

20   with a lawful and organized way to solve this problem.

21        And as far as where that leaves us here, I mean, maybe

22   we need to really look at DHS policies and try to graft it on.

23        THE COURT:  Mr. Skedziewlewski --

24        MR. SKEDZIEWLEWSKI:  Your Honor --

25        THE COURT.  -- is it possible to -- you know, I don't

1    necessarily want to have this, you know, where we're inserting

2    the policy and it's all of these factors.  What I would like to

3    do is find a way to kind of summarize this so the agent knows,

4    or the officer knows, if I'm issuing a dispersal order that I

5    have to comply with whatever DHS says in terms of when I can do

6    that.

7         MR. SKEDZIEWLEWSKI:  Understood, Your Honor.  I would

8    like to quickly correct the record.  I said earlier that the

9    DHS use of force policy was last updated in the Obama

10   Administration.  That wasn't right.  It was during the -- just

11   the previous President Biden Administration --

12        THE COURT:  Oh.

13        MR. SKEDZIEWLEWSKI:  -- in 2023.  So I just want to

14   correct it.  I'm looking at it now.

15        And maybe one thing that helps in this scenario where

16   we -- we all don't have the papers in front of us is, the

17   policy leaves a lot of leeway to officer discretion.  And I'll

18   give you just one example that kind of solves a lot of these

19   issues.

20        Under the heading "Exigent Circumstances," it says:

21   "In an exigent situation for self-defense or defense of

22   another, DHS law enforcement officers are authorized to use any

23   available object or technique in a manner that's objectively

24   reasonable in light of the circumstances."

25        So that -- it's that kind of -- that -- that's

1   characteristic of the policy, Your Honor, and it -- it would --

2   if we had something like that, then, you know, dispersing would

3   be fine in an exigent circumstance; and issuing dispersal

4   orders would be fine, if there was an exigent circumstance; and

5   so on.

6           So I -- I just submit that for the Court's

7   consideration.  I mean, there's obviously a lot more detail in

8   the rest of the policy, but that -- it probably would be tough

9   to work through right now in this manner.  But, again, as a

10  general matter, I -- I think trying to make -- if we're going

11  to have a -- a TRO here, it should as closely as possible match

12  the existing policies.

13          THE COURT:  So I guess, you know, I would want

14  something like that, and -- and I realize it's a little hard to

15  draft on the fly.  So, you know, one of the things that I would

16  be suggesting we do is we can kind of go through this today,

17  like, go through all of these, and then come back together

18  tomorrow to just make sure everybody's kind of on the same

19  page.

20          Because, to be honest, I probably shouldn't say this

21  in front of a courtroom full of people, but my brain is tired

22  at 5:20 after being on the bench all day.  And I know I don't

23  like the commanding officer language.  I also know I don't like

24  exigent circumstances language because I think that gives a

25  little too much leeway, in that anything can be an exigent

1    circumstance.

2           So I want something in between, which -- which

3    describes what a threat -- kind of what a threat would be.

4           All right.  So --

5           MR. LOEVY:  You mean --

6           THE COURT:  Hold -- hold on.

7           I just want to give a shout-out to my newest, amazing

8    law clerk Annie who just sent me the use of force policy.

9           Okay.  Just give me one second.

10          Okay.  So it looks like the policy itself doesn't

11   define what an exigent circumstance is.

12          MR. LOEVY:  Imminent danger to the safety of a person

13   or property.

14          THE COURT:  Let's see.

15          Ah, here we go.  Here's the definition on page 12 of

16   the policy.  It says:  "A situation that demands unusual or

17   immediate action that may allow LEOs to circumvent usual

18   procedures in order to preserve life or prevent catastrophic

19   outcomes."

20          MR. LOEVY:  Catastrophic outcomes.

21          MR. BOWMAN:  Yeah, that's good.  That's good.  I like

22   that.

23          MR. LOEVY:  Yeah, I think that captures the, you know,

24   the serious of the exception, that it's not just I'm feeling

25   exigent.

1    THE COURT:  So one of the things that we could do to

2    kind of alter this or fix it is we could say:  "Issuing a

3    dispersal order requiring any person to leave a public place

4    that they lawfully have a right to be, unless dispersal is

5    justified by exigent circumstances as defined by the DHS use of

6    force policy."

7    MR. LOEVY:  We would make a pitch, Your Honor, that if

8    you didn't like the commanding officer as being ambiguous, that

9    at least is the highest-ranking officer at the scene, capturing

10   that concept.  If there's three guys out there by themselves,

11   then they are the highest-ranking guys at the scene.  But a

12   dispersal order terminates a protest.  There probably is a

13   chain of command requirement there.

14   THE COURT:  I don't know that that would be true.

15   Mr. Skedziewlewski, would that be true in terms of how

16   to --

17   MR. SKEDZIEWLEWSKI:  Is the question -- yeah, I -- I

18   can't speak to how each different component handles the issue

19   of dispersal orders, and there may be some variation.  Here

20   we're looking at the DHS policy, but, you know, CBP and ICE

21   each have their own component-specific operational, you know,

22   directives.  So I would -- I don't think I have a good answer

23   for Your Honor, but that's something we could certainly try

24   to -- to track down.

25   What -- what I can say is that there definitely will

1  be circumstances where there's -- there's no superior officer

2  on hand, even if it's only a little bit -- you know, the next

3  guy up, it could be that they're all on the same, you know,

4  scale on an operation.

5       MR. LOEVY:  That would be covered by my proposal

6  because if it's just three line guys, then they have enough

7  authority.

8       THE COURT:  Yeah.  I'm just wondering, you know, we've

9  got to think about all the various ways that it can play out,

10 right?  And I'm concerned even if we say the highest-ranking

11 officer, as opposed to referring them back to a policy is that

12 you may not know, right?  Somebody might come on the scene that

13 is higher ranking than you are and you don't know.  And maybe

14 you don't -- yeah, you should've asked that person.  I think

15 rather than having somebody make a decision and that we're

16 looking up the ladder, it is better to just refer them back to

17 their own policy, which is, this is when you can issue a

18 dispersal order to someone who's there lawfully.  That way, you

19 know, what we're trying to avoid is confusion and, you know,

20 people hesitating in a dynamic or changing situation.

21      So let's -- since we are going to come back tomorrow,

22 let's kind of put a star next to this and work on it, but

23 that's where I would go, is that I would much prefer to refer

24 back to a policy than to have them look up to have somebody

25 make a decision.

1          MR. LOEVY:  Understood.  Thank you, Your Honor.

2          THE COURT:  Okay.  So C and D are -- seem to mimic the

3     LA order.

4          I'm not sure if the government has an objection to

5     either of those.

6          MR. LOEVY:  Oh, I bet they do.

7          MR. SKEDZIEWLEWSKI:  We -- we -- we do, Your Honor.

8          THE COURT:  Why am I not surprised.

9          MR. SKEDZIEWLEWSKI:  We have a variety of -- we have a

10    number of declarations walking through the details from,

11    you know, DHS and subcomponent officers as to why instructions

12    substantially like these here are -- are not workable.

13         One of the issues is that, as I understand these,

14    there's -- as written, there's -- there's no allowance for

15    incidental contact, though I think Your Honor had suggested --

16         THE COURT:  Well --

17         MR. SKEDZIEWLEWSKI:  -- that --

18         THE COURT:  -- but we've got that --

19         MR. SKEDZIEWLEWSKI:  -- the Court will fix that.

20         THE COURT:  -- at the end.

21         Yeah, we're going to add that --

22         MR. SKEDZIEWLEWSKI:  Right, right.

23         I think also this -- the -- the idea that the agents

24    on the ground can identify members of the press and religious

25    practitioners and -- and distinguish them I think is -- is not

1    realistic.

2         And -- and the idea of imminent threat to -- of

3    physical harm, I think it's vague and leaves -- leaves officers

4    asking questions when -- when they are trying to make these

5    tough decisions.

6         THE COURT:  I -- and I -- I get that they are going to

7    be, you know, having to make kind of on-the-fly, difficult

8    decisions, but they have to do that all the time, right?  Like

9    when you're executing a warrant, when you're really engaging

10   with members of the public at any time, things can go sideways,

11   and that's why they're trained, is to be able to handle it when

12   it happens.

13        So I -- I have full faith that these officers are

14   going to make -- be able to make these assessments on the

15   ground in a dynamic and changing situation.  It's -- you know,

16   I don't want it to get unwieldy and I don't want it to be very

17   confusing, but these two do make me less concerned in that this

18   is how they're trained anyway as -- as it relates to use of

19   force.  You know, they've all received training on use of

20   force.

21        MR. SKEDZIEWLEWSKI:  Yes, Your Honor.  Just -- just

22   two points.

23        This adds the -- the threat of contempt to their

24   decision, which I think from what our officers have said will

25   increase the hesitancy on -- on the part of officers and

1    potentially increase their risk of -- of injury.

2         And also, I'm not certain, without having the chance

3    to compare this particular formulation with the use of force

4    policy, if it does actually track, though I'm not representing

5    that it doesn't.  I just haven't had a chance to look at them

6    side by side, so I'd appreciate Your Honor having us back

7    tomorrow.

8         I -- I would like to ask the Court to let us run this

9    by the client to see if in their view it does track with the --

10   with their current policy.  Because what happens with these

11   orders is the -- like you say, the officers have all been

12   trained, but now there's a new order and so now they have to

13   sort of rethink all their training and -- and line it up with

14   this -- this new, you know, order.

15        THE COURT:  All right.  So, yes, because it is late

16   so, I mean, I'll let you go back and look and see.  But I -- my

17   inclination is that I don't see these two sections as

18   necessarily problematic and are certain that they can certainly

19   make those assessments in the field and on the ground.

20        Anything that the plaintiffs want to add on those two?

21        MR. LOEVY:  I think you -- you've got it, Your Honor.

22   I mean, I heard counsel say that he is concerned there would be

23   some hesitancy, but that's why we're here.  We would like them

24   to hesitate before shooting priests and journalists without the

25   threat of physical harm.  That -- that -- that's what we're

1    trying to do.

2              THE COURT:  Okay.  All right.  Turning to E and F.  So

3    both of these were kind of condensed in the LA order.  And the

4    one thing I would note in both of these is that they're kind of

5    not internally consistent.  So, you know, I don't know that

6    there's a difference between imminent threat and immediate

7    threat, but it needs to be one or the other.

8              MR. LOEVY:  I don't know that there's a distinction

9    between those words that would be enforceable or --

10             MR. BOWMAN:  I think it's a scrivener's error.

11             THE COURT:  Okay.  So we can work on that.

12             And I don't even want to ask because I know what the

13   answer is, but, Mr. Skedziewlewski, what's -- I know that the

14   government has an objection, right?

15             MR. SKEDZIEWLEWSKI:  That's right, Your Honor.

16             So just quickly, I -- I think part of the issue is

17   that some of these all become sort of "follow the law" orders,

18   which obviously DHS knows it has to follow the law and wants to

19   follow the law.  But adding, you know, on top of that is -- is

20   problematic.  And at least in the Ninth Circuit where we argued

21   this before, it's -- it's contrary to case law there to have

22   these sort of "follow the law" injunctions.

23             So, yeah, you're right, the DHS policy already

24   prohibits using certain weapons, you know, targeted at the

25   head, for example.

1    But here, I -- I would ask that -- that we specify

2  exactly which weapons and not leave it sort of open-ended.

3  Here we have large riot control weapons.  I don't know what

4  that means.  I'm not sure our DHS officers know what that

5  means.  There are examples, but then those examples don't

6  necessarily seem to be exclusive.

7    I would at least request that the types of weapons

8  that this covers are specifically delineated.

9    THE COURT:  And I think we can do that.

10    MR. LOEVY:  Yeah, that's not a problem.

11    THE COURT:  We can make that change and -- and make it

12  very specific.

13    MR. LOEVY:  And, you know, this concept that it's the

14  follow the law, I mean, one of the reasons we're here is

15  they're not following the law --

16    THE COURT:  I know, Mr. Loevy.

17    MR. LOEVY:  -- and this order would --

18    THE COURT:  I know.

19    MR. LOEVY:  -- require them --

20    THE COURT:  I know.

21    MR. LOEVY:  -- to disseminate.

22    THE COURT:  You don't have to -- I mean, it's 5:30.

23  You don't have to pick up every bait that's dropped.

24    MR. LOEVY:  Got it.

25    THE COURT:  Okay.

1          MR. LOEVY:  That's what I do.

2          THE COURT:  You don't.  You really don't.

3          Okay.  And I assume that for G, because, again, that

4     is -- so it's not in the LA order.

5          I presume that the government's objection is this is

6     another "follow the law" provision.  And that would be the

7     basis of your objection; is that correct?

8          MR. SKEDZIEWLEWSKI:  At a minimum, yes, Your Honor.  I

9     mean, I'm just also thinking of an incident that I saw, you

10    know, from these incidents where an individual, you know, spits

11    on an ICE officer.  In that -- in that case the individual

12    didn't run away, but if he had, he would have perhaps presented

13    no further physical harm, no threat of physical harm to the

14    officer, but the officer would have still been well within his

15    rights and obligations to -- to detain that person.  If he's

16    fleeing, that could've -- that could look rather aggressive.

17         So I'm just -- this doesn't seem consistent with just

18    typical law enforcement conduct --

19         THE COURT:  Although it is giving --

20         MR. SKEDZIEWLEWSKI:  -- because it doesn't specify.

21         THE COURT:  -- at the end, that last phrase, "unless

22    necessary and proportional to effectuate an apprehension and

23    arrest."

24         So in your example, if somebody spat on an officer and

25    then took off running, you don't -- the officer would not be

1  violating this provision if the officer then chased the

2  individual and, you know, used force to stop that person from

3  running, as long as the force used was proportional to

4  effectuate the apprehension and arrest, right?

5          MR. LOEVY:  Exactly.

6          THE COURT:  So, you know, you're not allowed to kick

7  the person in the head, but you're certainly allowed to grab

8  him by the arm.

9          MR. SKEDZIEWLEWSKI:  Your Honor, I -- I wonder what

10  the Court's understanding of this phrase kettling is.  My

11  understanding is that this is not very different from

12  relocating journalists from one location to another.

13          THE COURT:  And what -- what is the definition that

14  you're using of kettling?

15          MR. BOWMAN:  I understand the term to refer to

16  trapping a group of protesters by herding individuals into a

17  confined area where they have no way of getting away.  It can

18  happen in a variety of different ways.  But, you know, it's

19  basically you're -- you're -- you're surrounded, you're stuck.

20  You may wish to disperse, but there's nothing you could do

21  because you're confined in this area, not -- not through your

22  own desire.

23          THE COURT:  All right.  And Mr. Skedziew- -- oh, God,

24  how many -- Mr. Skedziewlewski, I'm going to get it right at

25  some point.

1           Mr. Skedziewlewski, what is the government's objection

2  to this phrase kettling?  Is it that it's vague and not sure

3  what it means?  Or is it that it is something that is -- that

4  the government doesn't believe is -- falls under using force or

5  a combination?

6           MR. SKEDZIEWLEWSKI:  A combination.  Vague.  But also

7  if we -- even just accepting plaintiffs' counsel's definition,

8  I don't -- I don't think that -- it could involve force, of

9  course.  You could imagine kettling done with force, but I

10 think you can also imagine it done without force.  And so I

11 think it just creates additional ambiguities there.

12          Can -- can they kettle without force under this?

13 That's not clear to me.

14          MR. BOWMAN:  You -- you know, given the lateness of

15 the hour, the -- the paragraph is supposed to be about uses of

16 force.  I -- I think the point is well taken.  Kettling is not

17 really an inapplication of force.  It's something different.

18          THE COURT:  Okay.

19          MR. LOEVY:  So we're okay removing that word.

20          THE COURT:  So we can remove it?

21          MR. BOWMAN:  We can just take it out.

22          THE COURT:  Okay.  All right.  And then H, the last

23 sentence, I'm not sure how the officer would be able to know

24 that the audience was unable to hear the warnings.  So I'm

25 not -- I -- I guess I'm not sure why this last sentence is

1    there, because the first sentence requires two separate

2    warnings and at a level -- sound level where --

3            MR. BOWMAN:  We'll take --

4            THE COURT:  -- it can be heard?

5            MR. BOWMAN:  We'll take it out.

6            THE COURT:  Okay.

7            MR. BOWMAN:  Let's take it out.

8            THE COURT:  All right.  And then the remainder of

9    that, what's the government's position on that?

10            MR. SKEDZIEWLEWSKI:  Your Honor, the -- the DHS policy

11   addresses warnings and it -- it -- it recommends them, but

12   there's -- it doesn't require them, and there's specific

13   language about what -- what the exception would be.  And I

14   would just ask the Court to have a look at that maybe tomorrow

15   and we could maybe try to mold this paragraph to be more in

16   line with the policy.

17            THE COURT:  So it says that the limiting language is

18   when feasible so that the law enforcement officer has to

19   identify themselves and issue a verbal warning to comply with

20   the officer's instructions, and then lists some considerations

21   for when it is feasible to give the warning.  And that's on

22   page 4.

23            So I -- I think, though, that this first sentence

24   does -- actually, the first two sentences I do think

25   encapsulate the policy.  So I'd be inclined to leave it as is,

1    but we can talk about it tomorrow too.  But I'm inclined to

2    leave it as is.  I do think that it covers the feasibility

3    issue, and I'll be -- point two under warnings, which allows

4    the individual the opportunity to comply before applying force.

5         So I do think that's captured in here, and it -- you

6    know, it might be worthwhile as we're just revising things that

7    if you have the use of force policy, which is at the DHS.gov

8    site, so this is almost in the negative, right?  This is almost

9    written in the negative, whereas the use of force policy seems

10   to be written in the positive, that maybe we switch some of

11   this language to more mimic the policy.

12        So, you know, where feasible, you -- so instead of

13   saying it's infeasible, to say where feasible, you give the

14   warning and that -- you know, describe where -- how it's not

15   feasible is you can kind of incorporate this, and then say you

16   also have to give people the means to leave or comply.

17        Is that --

18        MR. BOWMAN:  We'll get on the website --

19        THE COURT:  Does that make sense?

20        MR. BOWMAN:  We'll get on the website and we'll review

21   the policy that appears on the website and we'll come -- come

22   with that in hand tomorrow morning.

23        THE COURT:  Okay.  All right.

24        And then I, which is the Fourth Amendment, seems to be

25   the Fourth Amendment issue that's being tracked here, what is

1    the government's objection to that?

2           MR. SKEDZIEWLEWSKI:  It's the "follow the law"

3    injunction again, Your Honor.

4           THE COURT:  Okay.  You know, I think in some ways it's

5    worthwhile to have these reminders and have something in hand,

6    and I don't know that it's confusing to just remind officers

7    that they can't seize someone without probable cause or arrest

8    someone without probable cause.

9           All right.  And then J.  So this is the definition of

10   a journalist.

11          MR. LOEVY:  Yes.

12          THE COURT:  I do think it is worthwhile to add the

13   language in the LA order that also has the -- that shielding

14   language, right, which is that if somebody claims to be a

15   journalist but doesn't have this indicia that defendants would

16   not be liable, right, because it's an unintentional violation

17   of the order, that what we want is agents to be able to readily

18   identify who's a journalist and who isn't.

19          If someone later comes back and says, I didn't have a

20   press pass, I didn't have a camera, I didn't have a recording

21   device, you know, I was wearing civilian -- I was wearing a

22   hoodie and jeans and -- but, by the way, I work for ABC and I

23   was there in my capacity as a journalist and you violated

24   the -- this order, I think defendants can't be held liable for

25   something that they had no reason to know.

1      MR. BOWMAN:  That's fair.

2      MR. LOEVY:  That's language that's in the LA version

3  that's not in this one?

4      THE COURT:  Yes.  So it says:  "Defendants shall not

5  be liable for unintentional violations of this order in the

6  case of an individual who does not carry or wear a press pass,

7  badge, or other official press credential, professional gear,

8  or distinctive clothing that identifies a person as a member of

9  the press."

10      MR. LOEVY:  Sounds good, Your Honor.  That's

11  acceptable to the plaintiff.

12      THE COURT:  All right.  And what's the government's

13  position on J if we add this additional language that exempts

14  the defendants?

15      MR. SKEDZIEWLEWSKI:  I think that addition is welcome,

16  Your Honor, but its intention with that first clause of the

17  last sentence in the current paragraph J that says, "these

18  indicia are not exclusive," that seems to swallow the

19  exception.

20      If -- if these -- if these indicia are exclusive and

21  any old indicia other indicia that a potential plaintiff thinks

22  up can count, then we could be held liable for someone wearing

23  indicia that we're not aware are supposed to be indicia of

24  being a journalist.

25      MR. LOEVY:  They complement each other, those two

1    sentences, the new sentence and the old one.

2         THE COURT:  I -- I -- yeah, I would agree with

3    Mr. Loevy, I do think that they complement each other.  It's

4    not that you're -- you know, what this is is that the officer,

5    the agent, needs to reasonably see that this person is a

6    journalist.

7         So you don't have to carry everything, right?  You

8    don't need the press pass plus a badge, plus a hat, plus a

9    cam -- you know, plus camera gear, standing off to the side,

10   you know, so plus, plus, plus, plus, plus, and you have to hit

11   all of these things.

12        It's would a reasonable officer, agent, in that

13   person's position be able to identify this individual as a

14   journalist.  And here are some things to consider, but it's not

15   exclusive in that you might not be wearing a hat but you've got

16   a press pass on you.  You might be not carrying camera

17   equipment but you've got a microphone.

18        So there may be, you know, a mix and match and you

19   don't have to do everything.  But if you are simply standing in

20   a crowd and later come back and say, I'm a journalist and

21   you've got nothing that, you know, the agents can't expect to

22   know that.

23        MR. SKEDZIEWLEWSKI:  Your Honor,  I think that the

24   explanation that the Court gave makes sense for the second

25   clause of that sentence that a person need not exhibit every

1    indicium.  Agreed that, you know, it doesn't make sense for --

2    to ask the journalist to wear 15 different identifiers.  But

3    the fact that the identifiers listed are not exclusive means

4    that there could be any -- theoretically, any number of other

5    indicia that would count.  And -- and our officers just won't

6    know what those are.

7              MR. LOEVY:  I mean, that's a true statement that

8    they're not exclusive.  What if the person was holding a sign

9    that said, I'm a reporter.  You know, it seems like that

10   language doesn't hurt anything.

11             THE COURT:  All right.  That -- let's think on that

12   piece of that clause.  Instead of saying that they're not

13   exclusive, you know, it might be worthwhile to say that they

14   are illustrative --

15             MR. LOEVY:  That's the same --

16             THE COURT:  -- right?

17             MR. LOEVY:  That -- that would solve the purpose.

18             THE COURT:  Which kind of is alerting the officers to

19   say, this is what you should be looking for and considering.

20             MR. LOEVY:  We could live with that modification,

21   Your Honor.

22             THE COURT:  So -- and it might be that, you know,

23   somebody comes up with something better by tomorrow morning,

24   which I'm happy to hear.

25             Okay.  We're going to find out on 2 about the visible

1   identification.  So I do want to know at some point tomorrow

2   what do these agencies do.  So, you know, do they have a number

3   that is unique to that officer?  And, you know, I -- as I said

4   earlier, I don't -- I am sympathetic to the issues of doxing

5   and harassment and being followed home and being threatened and

6   having people shoot at you or destroy your car or your house or

7   threaten your family members.  I mean, I am sympathetic to all

8   of that.

9          However, I think that a reasonable middle ground is

10  that the agents have some visible identification on them in the

11  form of a badge number or an agent number that if there is a

12  particular issue that the plaintiff -- and I understand

13  obviously under *Bivens* that the officers are not named, but you

14  still need to know who they are, right?  And it is much easier

15  to figure out, this is the person that hit me.  This is the

16  person that fired a rubber bullet in me because here is the

17  number, and you can go back and figure out who that person is.

18  So that I think is one factor.

19         And then the other factor, as I said before, is

20  transparency and a faith in the rule of law that if we're doing

21  what we're supposed to be doing and doing it lawfully, that it

22  should be okay that people to some extent know who you are,

23  right, that they -- that you know you can be identified.

24         I know I can be identified because I have to put my

25  name on every opinion I issue.  And the public knows that I

1    issued this particular opinion, and they can look at it and

2    they can read it and they can disagree with me.  They can agree

3    with me.  It doesn't matter.  But I know that my name is on

4    that, and that what that does is it prevents me as a judge from

5    going off the rails because I have to do it publicly.

6         And here, I think it is important that these officers

7    and agents know that at some point along the -- the way they

8    could be identified.  And so it serves multiple purposes.  And

9    I think that we can balance any concerns which are valid about

10   their own individual safety or the safety of their family by

11   using badge numbers or something that is similar to that.

12        So I'd like to know tomorrow what -- whether it's DHS,

13   ICE, CPB -- CBP -- what their policies are and -- and how they

14   identify particular officers internally.

15        Okay.  I think that's it.  The rest of this is fairly

16   standard and straightforward.

17        Anybody disagree with the rest?

18        MR. LOEVY:  Not for plaintiff.

19        THE COURT:  Mr. Skedziewlewski?

20        MR. SKEDZIEWLEWSKI:  Yes, Your Honor.  Without any

21   desire to prolong these proceedings any further, just -- just

22   briefly point that paragraph No. 4 requests the -- the

23   defendants to file with the Court any instructions implementing

24   the guidance.  That -- that guidance is going to be written up

25   by, you know, DHS attorneys and it's going to be sort of

1  attorney-client privileged, and I don't think it's standard

2  practice for those to be submitted to the Court, and I'm sure

3  that DHS would oppose --

4       THE COURT:  Yeah.  So I think what we are trying to

5  get at here would be that whether it is a general order or, you

6  know, I'm not sure what the language of DHS is in terms of what

7  gets pushed out to officers, right?  So whether it's a policy,

8  a general order, whatever it is, is that what the plaintiffs

9  are looking for, and I think what I would want, is not the

10  communications between counsel and DHS, but instead, you know,

11  here's the order that went out, Judge, that is instructing

12  officers to follow this order, right?

13       So it's sort of like the use of force policy, right,

14  that I wouldn't be asking you to give me communications between

15  the lawyers that drew up the use of force policy and the -- and

16  DHS, but instead that, you know, this is the policy.

17       Does that make sense?

18       MR. SKEDZIEWLEWSKI:  It does make sense, Your Honor,

19  but the concern remains, because what -- the way DHS will do

20  this is they're going to draft up what they think is the best

21  way to communicate this to officers.  And when I say "they," I

22  mean their attorneys, and -- and they're going to put it into

23  the language that their officers are familiar with.  And that

24  document, whatever it looks like when it's done, it will be

25  much better than I could do, they're the experts on -- on, you

1    know, their agency, is itself going to be an -- an attorney

2    work product.

3          THE COURT:  Well, but you can -- you could say that

4    this use of force policy is an attorney work product, right?

5          MR. SKEDZIEWLEWSKI:  Oh, of course, but it was -- but

6    DHS decided to -- to publish that, you know, for all the world

7    to see.  This is a slightly different situation.

8          THE COURT:  So let's talk it through tomorrow, but

9    this is what I would want to know, is I want to make sure that

10    what is going out to the officers is consistent with the order,

11    right?  And so that's why I want to see it, is to know that

12    this is what is consistent -- that this -- what officers are

13    being told to do is consistent with this order.

14          And that if it changes during the period of the order,

15    I want to know that too.  Because what I don't want is -- which

16    I know would never, ever happen, is that something goes out to

17    the officers that says, yeah, there's this crazy judge in

18    Chicago that issued this order and forget what she says; you

19    don't have to do that, right?  That would not be consistent

20    with this order.  I know that would never, ever happen.  But,

21    you know, it might be that things get lost in translation and

22    what the officers are being told they can or cannot do is not

23    consistent with this order.  So I just want to make sure that

24    everybody's on the same page and rowing in the same direction.

25          I know that DHS and its officers are -- value the

1  democratic ideals that underpin this country, that they value

2  the rule of law, that they have no intention or desire to break

3  the law, and that they want to conform their behavior and

4  decisions and policies with the law.

5         So with that as the foundation, I just want to make

6  sure that what they are being told they can or cannot do is

7  consistent with what we have hashed out.

8         So however that works, you know, whether we want to

9  call it you're going to come up with a policy and you're going

10 to let me see the policy, and the policy simply could be,

11 here's the order, follow it, right?  Could be that.  And that

12 would be, like, great, you're telling them to follow this order

13 that has been legally entered.  Awesome.  We're done.

14        So that's my intent.  And, you know, you can go back

15 and talk to your client and figure out how it is that we'll get

16 there.

17        Anything -- okay.  So anything with 5, 6, or 7?

18        MR. SKEDZIEWLEWSKI:  It's -- it's challenging for

19 paragraph 5 to respond within 24 hours to an alleged violation

20 of the order.  I'm not sure if that's standard for -- for your

21 court, Your Honor, but for DHS to muster evidence in response

22 to an allegation, 24 hours is -- is essentially imp- --

23 it's well near impossible for -- for us to --

24        THE COURT:  How about --

25        MR. SKEDZIEWLEWSKI:  -- put that together.

1          THE COURT:  How about as ordered by the Court?

2          MR. LOEVY:  That works for the plaintiff, Your Honor.

3          MR. SKEDZIEWLEWSKI:  That is fine.

4          THE COURT:  Okay.

5          MR. SKEDZIEWLEWSKI:  And, you know, I would also just

6    add, Your Honor, on paragraph 6, we would ask the Court to

7    require security.  This is going to require lots of resources

8    on -- on DHS's part to implement and potentially retrain

9    officers and so --

10         THE COURT:  Well, that's not the -- but that's not the

11   point of the security, right?  The security is there in case

12   the TRO is entered improperly, right?  So that -- that's the

13   point of the security.

14         MR. SKEDZIEWLEWSKI:  Right.

15         THE COURT:  Right?

16         MR. SKEDZIEWLEWSKI:  Well, that's right, Your Honor.

17   So we of course -- I think that if you -- if your court -- the

18   Court has -- has indicated it enters a TRO that it will have

19   been done improperly and it will hopefully come to see as we

20   present our case that it has done so improperly and that

21   that -- but -- the -- our understanding of the dollar amount to

22   be sort of linked to the burden on the -- the person that the

23   order is issued against.

24         THE COURT:  All right.

25         MR. SKEDZIEWLEWSKI:  So that was my only reason for

1    noting it.  There will be some substantial burdens to DHS in

2    implementing an order of the kind we've been discussing.

3            THE COURT:  All right.  Well, we can take that up

4    tomorrow.

5            MR. SKEDZIEWLEWSKI:  Great.

6            THE COURT:  Okay.  All right.  So I think we're good

7    on all of this.

8            And then I think the parties can kind of see where I'm

9    going in terms of the ultimate decision, but I'm going to do

10   that tomorrow because I want to make sure I cover all my bases.

11   And with a tired brain, it's probably not a good idea.

12           So let's look at tomorrow.

13       (Off the record.)

14           THE COURT:  So why don't we -- can we say 2:30 again

15   tomorrow?

16           MR. LOEVY:  We'll be here, Your Honor.

17           MR. BOWMAN:  Judge, I have a commitment at 5:00

18   tomorrow.  I'm hopeful that we'll --

19           THE COURT:  I'm hopeful too.

20           All right.  Mr. Skedziewlewski, do you -- can you do

21   2:30 Central time tomorrow?

22           MR. SKEDZIEWLEWSKI:  So long as it's all right with

23   the Court if I appear remotely again --

24           THE COURT:  Yeah.

25           MR. SKEDZIEWLEWSKI:  -- that's not a problem.

1          THE COURT:  Yeah.

2          MR. SKEDZIEWLEWSKI:  Okay.

3          THE COURT:  Yep, that's totally fine.

4          MR. SKEDZIEWLEWSKI:  Then that's fine, Your Honor.

5          THE COURT:  Okay.  And that will give you enough time

6  to kind of run down some of these things that we talked about

7  today?

8          MR. SKEDZIEWLEWSKI:  I'll -- I'll do my best.  I mean,

9  I -- we would certainly prefer another day so I can get all

10  this squared away with the client.  They're very busy, but

11  I'll -- I'll do my -- my best if it has to be tomorrow.

12          THE COURT:  I mean --

13          MR. SKEDZIEWLEWSKI:  I'll put it this way, Your Honor.

14  I may have better answers for you on Wednesday than I will have

15  by tomorrow afternoon, just as far as the things you're asking

16  for.

17          THE COURT:  What do you think?

18          MR. BOWMAN:  I -- I will not be available on

19  Wednesday.  If the Court will excuse me, I -- I -- that's the

20  only --

21          THE COURT:  What do you think, Mr. Loevy?

22          MR. LOEVY:  Well, Your Honor, you could make a case

23  that Mr. Bowman is important too.  I think our preference would

24  be Tuesday, but if you did this on Wednesday, we understand.

25          THE COURT:  Or -- or Thursday morning?  So here's --

1     here's my thinking on it, and I understand you filed it today

2     and that's why I wanted to do the TRO this afternoon, is that

3     obviously things are ongoing.

4             I will say that, you know, at this point, DHS is on

5     notice, so I would certainly expect that whatever has happened

6     in the past would not continue to occur if I push out entering

7     this order to Thursday is one thing that I just want to make

8     abundantly clear.

9             That being said, what I don't want to do is tinker and

10     tinker and tinker with the order over time as it's been entered

11     because I do feel like that creates and sows unnecessary

12     confusion, that the order should be the best order that we can

13     put together that provides the best guidance and is most clear

14     to the officers and agents who are expected to abide by the

15     order.

16             So --

17             MR. BOWMAN:  Your Honor --

18             THE COURT:  -- I would not have a problem doing this

19     Thursday morning if it allowed the government to get

20     information based -- you know, for some of these things that

21     I've asked for, like something that is particularly I think

22     important and vital is this identification issue.  So I would

23     much rather give it a couple of days to allow us --

24             MR. BOWMAN:  And -- and --

25             THE COURT:  -- to get those answers, but --

1          MR. BOWMAN:  To be clear, Judge, the -- the position

2  of the people we represent is they desire the order entered at

3  the earliest possible time.  And I say that again just to

4  clarify one point.

5          THE COURT:  Mm-hmm.

6          MR. BOWMAN:  I -- I'm out of pocket for the rest of

7  the week.  So --

8          THE COURT:  Oh.

9          MR. BOWMAN:  -- moving it to Thursday --

10          THE COURT:  Okay.

11          MR. BOWMAN:  -- doesn't address my issue.

12          THE COURT:  Okay.

13          MR. BOWMAN:  And the preference would be to do it on

14  Wednesday --

15          THE COURT:  Okay.

16          MR. BOWMAN:  -- if it is not going to happen

17  tomorrow --

18          THE COURT:  Okay.

19          MR. BOWMAN:  -- which would --

20          THE COURT:  Okay.

21          MR. BOWMAN:  -- be first preference.

22          THE COURT:  Okay.  And, Mr. Skedziewlewski, do you --

23  how realistic do you think it would be that you'd get the

24  information that we're looking for by tomorrow at 2:30?

25          MR. SKEDZIEWLEWSKI:  I think it's a slim chance that I

1    would have, like, vetted answers for you that I can attest to

2    confidently by tomorrow at 2:30, Your Honor.

3            THE COURT:  Okay.  And I would much rather have real

4    answers than speculative answers.

5            MR. BOWMAN:  Understood.

6            THE COURT:  And that's what -- if we're doing this.

7            So if we're looking at Wednesday then, I've got an MDL

8    hearing at 1:30 that shouldn't take more than a half an hour.

9            So what about 2:00 on Wednesday?

10           MR. LOEVY:  We'll be here, Your Honor.

11           MR. SKEDZIEWLEWSKI:  I'm available as well,

12   Your Honor.

13           THE COURT:  Okay.  All right.  So we'll say 2:00,

14   then, on Wednesday.

15           And if the parties can talk between now and then as

16   well, right, and knowing that obviously the government objects

17   to the imposition of any order and not waiving that objection,

18   you know, if I can see what the parties kind of have come to

19   before Wednesday, and then you can kind of highlight for me

20   where we have issues, and I think it can be just a more

21   efficient use of time.

22           Does that make sense?

23           MR. LOEVY:  Makes a lot of sense.  We'll -- we'll do

24   our best to try to narrow the disputes as appropriate.

25           THE COURT:  Does that make sense?

1           MR. SKEDZIEWLEWSKI:  Yes, Your Honor.

2           THE COURT:  Okay.  All right.

3           Okay.  Anything else, then, that we need to take up?

4           MR. LOEVY:  We do want to thank you for your time,

5  Your Honor.  You put a lot of time and effort into it --

6           THE COURT:  You're welcome.

7           MR. LOEVY:  -- and much appreciated.

8           THE COURT:  You're welcome.

9           All right.

10          MR. BOWMAN:  Yes.

11          THE COURT:  Then we'll see everybody Wednesday at

12  2:00.

13          MR. SKEDZIEWLEWSKI:  Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.

15          And sorry for butchering your name multiple times

16  throughout the hearing.  I'll do better on Wednesday.

17          MR. SKEDZIEWLEWSKI:  That's all right.  Thank you,

18  Your Honor.

19          THE COURT:  Thanks.

20     (Concluded at 6:18 p.m.)

21                   *  *  *  *  *

22     I certify that the foregoing is a correct transcript of
the record of proceedings in the above-entitled matter.

23

24  */s/ Kelly M. Fitzgerald*          *October 7, 2025*
       _____     _____
Kelly M. Fitzgerald, RPR, RMR, CRR

25  Official Court Reporter