UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-12173 |
| | ) | |
| KRISTI NOEM, Secretary of U.S. | ) | Judge Ellis |
| Department of Homeland Security, in her | ) | |
| official capacity, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

### Introduction

Plaintiffs seek a Temporary Restraining Order ("TRO") to dictate crowd-control policy in ways that would tie the hands of federal law enforcement officers ("LEOs") even in circumstances of imminent danger and would risk bogging this Court down in micro-management of crowd-control decisions by federal LEOs. Plaintiffs further seek to micro-manage use of crowd-control measures against "any person" in this district—without any tie to any particular plaintiff. These inflexible and vague constraints are untenable on their face, and the resulting second-guessing of U.S. Department of Homeland Security ("DHS") decisions is inconsistent with established law and endangers officer safety.

Plaintiffs' request for relief is overbroad and untethered to the harms alleged. Plaintiffs have not limited their request for relief to the parties before this Court as required by the Supreme Court's recent holding in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). Plaintiffs' requests for inflexible rules to govern crowd control are inappropriate and not tailored enough to meet this

Circuit's standards for injunctive relief. *Nat'l Inst. of Fam. & Life Advocs. v. Treto*, 777 F. Supp. 3d 867, 879 (N.D. Ill. 2025).

To be clear, Defendants oppose entry of a TRO for the reasons explained during the hearing on October 6, 2025. The Court indicated, however, that Plaintiffs had met the standard for such relief and directed the parties to address the scope of a proposed order. As explained below, any TRO entered in this case should be narrowly tailored and set forth workable and administrable standards for LEOs to avoid the myriad problems presented by Plaintiffs' proposed TRO. Defendants' proposed order, which is consistent with these principles, is attached. *See* Ex. 11.

## Background

### A. Attacks on Federal Law Enforcement at the Broadview Facility

The DHS operates a facility at 1930 Beach Street in Broadview, Illinois, that it uses for the intake and processing of individuals arrested by U.S. Immigrations and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). Ex. 1, Declaration of Russell Hott ("Decl. Hott") ¶ 8. The site has been operative for more than 40 years and sits near the dead-end of a cul-de-sac. *Id.*

Since the first week of September 2025, rioters and protesters have targeted the DHS facility and its employees. *Id.* ¶ 9. The protests interfere with immigration operations throughout the region, because the facility is the only intake-and-processing facility in the area. *Id.* Early on, protesters blocked access to the facility and physically assaulted DHS employees attempting to go to or leave work. *Id.* ¶ 10. Employees who parked in the facility's open lot had to call the facility's office on arrival so that four officers could come out to escort them into the building. *Id.* Vandals slashed car tires and in at least one instance poured flour into a gas tank. *Id.* This resulted in DHS employees parking farther away from the facility, requiring DHS to send a van to retrieve them and resulting in multiple attacks on the van by protesters. *Id.* Moving cars traveling to the facility

were also attacked more than a dozen times: a protester would jump on the hood of a car, another would stand immediately behind the car, and when the car came to a stop others would slash the tires. *Id*. Indeed, this attack was perpetrated on DHS's declarant's car. *Id*.

Protesters also caused property damage in the form of graffiti on the facility, the facility's flagpole, and nearby surfaces and signs. *Id*. ¶ 12. Protesters also damaged the facility's exterior plumbing system. *Id*. Most troubling of all has been the increase in physical assaults on DHS employees, including non-officer employees. *Id*. ¶ 14. Protesters have hit and punched officers on several occasions, and the assaults became more significant and more violent as the size of the crowds grew from a handful of people in early September to more than 300 on the night of September 22-23. *Id*.

The weekends of September 12-14 and 19-21 were particularly violent: protesters threw bottles, rocks, and tear gas cannisters at officers. *Id*. ¶ 16. During the second weekend, DHS found a round, green ball with a wick that the Bureau of Alcohol, Tobacco, Firearms, and Explosives identified as an improvised explosive device. *Id*. ¶ 19. Some of the agitators appear to be organized: they arrive by van and are regularly collected by van and replaced by reinforcements, and they come armed with shields, gas masks, and tools indicating that they are prepared or expecting to physically engage with law enforcement. *Id*. ¶ 21.

The attempts to harm officers have been effective: more than 30 officers have been injured during the assaults on law enforcement, including multiple hospitalizations. *Id*. ¶ 22. At least one officer was followed home from the facility and aggressively confronted there, and 10 days later his garage was broken into and his government-owned vehicle was broken into and damaged. *Id*. ¶ 23.

DHS took steps to respond to the violence as the facility's staff became increasingly overwhelmed. *Id*. ¶ 24. Beginning around September 8, Special Response Team officers—who are

3

trained to serve in high-risk situations—began staffing the facility in 12-hour shifts. *Id*. These officers created paths for DHS vehicles and pushed crowds away from the facility as rioters threatened violence. *Id*. DHS solicited assistance from additional Special Response Team officers on at least 25 occasions given the escalating risks, including an anticipated crowd of 800 protesters scheduled for September 19-20. *Id*. ¶¶ 25-26. DHS also installed lights around the facility's perimeter to improve visibility at night. *Id*. ¶ 27.

In the first days of the protests, when the crowds were small, Broadview's police were present and made a small number of arrests. *Id*. ¶ 28. But the police did not return after the publication of an article criticizing their presence. *Id*. DHS called for help from the Broadview police more than eight times on September 12-13, but the police responded that they had been directed not to respond to such requests for help (but that they would respond to requests from protesters). *Id*. ¶ 29.

Following the Broadview police's disengagement, local police did not assist in controlling protests; rather, DHS and its federal partners were solely responsible for controlling the violence outside the facility, including on municipal property. *Id*. ¶ 30. DHS has arrested around 50 individuals for assault, obstruction, trespassing, and other charges. *Id*. Three individuals arrested on September 26-27 were carrying concealed semiautomatic weapons. *Id*.

On October 2, the Illinois State Police ("ISP") established a protest zone and placed concrete barriers on Beach Street, creating a restricted area. *Id*. ¶ 37. The ISP also maintained security in the area on October 3. *Id*. They did not manage the area on October 4-5, but they did respond to DHS's repeated requests for assistance on both days. *Id*.

### B. Legal Authority to Protect Federal Property, Personnel, and Functions

The federal government has broad authority to protect federal property, personnel, and government functions. Congress has authorized DHS to "protect the buildings, grounds, and

property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a). In addition, the Constitution grants the President the "executive Power," U.S. Const. art. II, § 1, cl. 1, and affords him both the authority and the responsibility to "take care that the Laws be faithfully executed." *Id.* These provisions authorize the President to enforce laws enacted by Congress as well as to protect federal officials, federal property, and the performance of federal functions. *See In re Neagle*, 135 U.S. 1, 64-68 (1890) (holding that the President has inherent authority to provide bodyguards, immune from state law, to protect judicial officers under the Take Care Clause). "The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights entrusted by the Constitution to its care." *In re Debs*, 158 U.S. 564, 582 (1895).

In exercising this authority, DHS has issued policy guidance on the use of force by its officers. *See* Ex. 2, DHS Policy on the Use of Force (Feb. 6, 2023) ("DHS Policy"), Exhibit 1 to the Declaration of Eddy Wang ("Decl. Wang"). DHS policy authorizes officers to "use only the level of force that is objectively reasonable in light of the facts and circumstances confronting [the officer] at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy § II.B. The policy states that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* § III.C. Further, officers must demonstrate proficiency with less-lethal force devices, such as impact weapons or chemical agents, before using such devices. *Id.* § IV.

In all events, DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* at. III. DHS also has instructed its employees about the importance of respecting activities protected by the First Amendment. *See* Ex. 3, DHS Memo re: Information Regarding

First Amendment Protected Activities (May 17, 2019). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1. The DHS policy requires officers, when feasible under the circumstances, to issue warnings prior to the use of force and to allow individuals a reasonable opportunity to comply. *Id.* § III.E. Crowd control devices and less-lethal devices are only utilized after events have become unlawful. Ex. 4, Declaration of Matthew S. Harvey ("Decl. Harvey") ¶ 5.

**The Relief Requested is Improper**

## I. The Injunction Impermissibly Seeks Relief on Behalf of Nonparties

The injunctive relief sought by Plaintiffs cannot be granted because it violates the Supreme Court's recent landmark holding in *CASA*, forbidding the use of universal (*i.e.*, non-party specific) injunctions. Plaintiffs ask this court to enjoin Defendants from engaging in various forms of crowd-control measures directed at "journalists," "any person," "members of the press," "protestors," and "religious practitioners." Proposed TRO ¶ 1. Not even one of Plaintiffs' many proposals is limited to named individual plaintiffs or named organizational plaintiffs and their members. An injunction directed at "any person" simply cannot be squared with *CASA*.

In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that bar the defendant from enforcing "a law or policy against *anyone*," in contrast to injunctions limited to the plaintiff. *CASA, Inc.*, 145 S. Ct. at 2548. The Court found that the statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Id.* at 2551 (citation modified). And "[n]either a universal injunction nor any analogous form of relief was available … at the time of the founding." *Id.* Rather, "suits in equity were brought by and against individual parties." *Id.* "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 2554. At most, a court granting equitable relief

6

"may administer complete relief *between the parties*." *Id*. at 2557. "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id*. And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id*. at 2558. Plaintiffs' proposed injunction violates these basic principles by seeking district-wide relief on behalf of any "Journalists" and "any person" in the Northern District of Illinois. *See generally* Proposed TRO. The fact that Plaintiffs seek only district-wide, as opposed to nationwide relief, is irrelevant: the injunction violates *CASA* because it goes beyond providing complete relief to *Plaintiffs* specifically.

Plaintiffs may argue that a narrower injunction than the one sought would not work, because it would be impractical to expect agents to inquire into whether someone is a plaintiff before releasing tear gas or issuing a dispersal order. But *CASA* cannot be so easily brushed aside. The Court warned that "[c]omplete relief" is not "synonymous with universal relief," but is instead "a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at 2557. Thus, although "the complete-relief principle has deep roots in equity[,]" it does not "justif[y] award of relief to nonparties." *Id.* at 2556. To be sure, there are cases where "afford[ing] the plaintiff complete relief[] [leaves] the court [with] only one feasible option[,]" which has "the practical effect of benefiting nonparties"— but any such "benefit to nonparties … [is] merely incidental." *Id.* at 2557. But *CASA* rejected the argument that relief to non-parties can be justified as "the only practical" solution; as the Court reiterated, "the policy pros and cons" of universal relief "are beside the point." *Id.* at 2558, 2560. Any logistical hurdles present a compliance issue for the government to address; not an excuse for courts to exceed their powers.

Here the benefit to nonparties is anything but incidental: Plaintiffs seek an injunction benefitting "any person." Proposed TRO ¶ 1.b, e, and f. It is difficult to imagine a *more* universal injunction than Plaintiffs'. *CASA* does not allow that. Plaintiffs fail to make any effort at meeting the standards for relief in *CASA*.

## II.     Any Relief Should Be Limited to the Broadview Facility

If the Court were to enter an injunction (it should not), any injunction should be narrowly tailored to the Broadview facility only and permit DHS to continue to protect its facility. Separately from the Supreme Court's holding in *CASA*, and under Seventh Circuit precedent, "[i]njunctive relief must be tailored to the scope of the violation and the specific harm established." *Nat'l Inst. of Fam. & Life Advocs.*, 777 F. Supp. 3d at 879 (citation omitted). "And, if a federal court is required to grant injunctive relief, the relief should be no more burdensome than necessary." *Id.* (citation omitted); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Lewis v. Casey*, 518 U.S. 343, 360 (1996) (injunction should not provide "a remedy beyond what [is] necessary to provide relief").

The evidence offered in support of Plaintiffs' claims stems from allegations of misconduct occurring at the Broadview facility. *See* Mot. for TRO, ECF 21 at 7-11. Allegations from other locations are sporadic, minor, and do not support Plaintiffs' First or Fourth Amendment claims, or their statutory claims. *See id.* at 11-12 (describing only two incidents where force was allegedly used at locations other than the Broadview facility: one teargas cannister was allegedly used in Logan Square; less-lethal devices were allegedly deployed on one occasion in Brighton Park). Since the overwhelming majority of Plaintiffs' evidence stems from the Broadview facility, any relief this Court grants should be limited in scope to that facility, not the entire Northern District of Illinois.

### III.     The Relief Sought is Unworkable and Untethered to Plaintiffs' Alleged Injuries

Courts are properly reluctant to micromanage law-enforcement officers responding to unpredictable and violent protests. *See*, *e.g.*, *United States v. Patane*, 542 U.S. 630, 642 (2004) ("It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts."); *Menotti v Seattle,* 409 F.3d 1113, 1155 (9th Cir. 2005) (declining "to hold unconstitutional the City's implementation of procedures necessary to restore safety and security" when confronted by protesters with "violent and disruptive aims" that "substantially disrupt civic order"). The various components within DHS serve a variety of functions that will cause them to be in different types of operational situations, each requiring differing responses. The proposed TRO is unwarranted for two main reasons:  (1) the proposed TRO is unworkable from an operational standpoint and will put LEOs and the public at increased risk; and (2) the sweeping proposed relief is untethered to the alleged injuries. Responding to each unreasonable restriction in turn, as explained further in the attached declarations, Defendants respectfully request that the Court deny Plaintiffs' request due to overbreadth and unworkability.

***Proposed TRO ¶ 1.a*** is impracticable in the context of the varying and dynamic law enforcement components of DHS, the law enforcement operations in which they are involved, and the threats they face because it allows Journalists to ignore dispersal orders. *See* Ex. 5, Supplemental Declaration of Brian Szemes ("Supp. Decl. Szemes") ¶ 4. This can expose officers to someone who wishes to harm them or damage federal property just by wearing fraudulent press credentials, or as required by the injunction, simply waiting off to the side and then identifying themselves as a journalist before unleashing their attack. *Id.* Even the time and effort it will now take for officers to identify and negotiate with journalists about whether or not they will move to a more appropriate location—since this injunction allows them to ignore dispersal orders—can

subject officers to risk. *Id*. If officers are constantly distracted by attempting to identify who is and is not covered by this order, they will only leave themselves vulnerable to additional opportunistic, violent attacks.

The broad-brush restriction placed on law enforcement's ability to disperse violent protestors, whether gathered in the immediate vicinity of law enforcement operations or a large-scale violent protest, will only subject law enforcement and/or the public to danger. *See* Ex. 6, Declaration of Manuel Molina Jr. ("Decl. Molina") ¶ 7. "In an environment where officers are under assault, and the threat to officer and public safety is high and constantly changing, these steps are especially burdensome, impractical, and dangerous . . . and could even prove deadly to [Enforcement and Removal Officers ("ERO")] officers." Supp. Decl. Szemes ¶ 4. Allowing Journalists special access by ignoring dispersal orders is not only contrary to law and common sense, but may further disrupt lawful enforcement operations. This is especially true where the Court requires so little of Journalists to adequately identify themselves that it will only lead to confusion by officers as to what devices they may use in the face of violence, whom they may clear from an area for the benefit of public safety, and potentially subject them to violence (as has already occurred) by individuals who may gain access under the guise of journalist credentials only to harm officers. *See* Ex. 7, Supplemental Declaration of Roger Scharmen ("Supp. Decl. Scharmen"), ¶ 4, Exhibit 1 (despite identifying as a member of the press and even holding a microphone, when asked to "get back" a female journalist shouted "no" and then assaulted an officer, striking her in the arm).

***Proposed TRO ¶1.b*** requires a commanding officer to make a finding that a serious threat to public safety exists before issuing a dispersal order. Since, as currently worded, the proposal would require the commanding officer to make a finding, the proposal amounts to a requirement that only an on-scene supervisor can permit dispersal orders to be issued. This is too restrictive in

a number of ways. First, it may be that an off-site supervisor makes a determination based on intelligence that a serious threat to public safety exists. Second, it has repeatedly happened that officers are surrounded by hostile crowds while out on patrol when a supervisor may not be present. *See generally*, Ex. 12, Declaration of Kyle C. Harvick. In such scenarios, a requirement for supervisor approval would tie the hands of officers, leaving them vulnerable. *See* Decl. Harvey ¶ 13 (discussing a similar request for relief in *LA Press Club* requiring on-scene supervisor approval before use of kinetic impact projectiles). Third, even if a supervisor is present, the supervisor may not be able, in chaotic and dynamic situations, to identify the threat or communicate an instruction to issue a dispersal order. Fourth, alternatives like "highest ranking officer on site" do not improve on the "commanding officer" language because, as the Court noted at oral argument, agents in the middle of crowd control efforts may not know who the highest-ranking officer on site is at any given moment.

Even if the "commanding officer" language is stricken, the requirement that dispersal orders only be given when a "serious threat to public safety" exists is a vague standard at odds with DHS policy, which allows that "[i]n an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances." DHS Policy at 4. Ordering individuals to disperse is not a use of force and any restraint on this technique leaves LEOs with fewer options, many of which involve direct use of force. Insofar as Plaintiffs complain of Defendants' use of force, Mot. for TRO, ECF 21 at 34-38, burdens on dispersal orders are antithetical to their own aims in this litigation. And contrary to Plaintiffs' claims at oral argument, a dispersal order is not the end of First Amendment activity. Protestors remain free to protest elsewhere.

***Proposed TRO ¶¶1.c, d*** impermissibly restrict the ability of law enforcement to utilize *crowd control* devices when faced with situations dangerous not only to LEOs but the public at

large. By myopically focusing on individual "members of the press, protestors, or religious practitioners," the proposals ignore the specific threat of unruly *crowds* that such individuals may have unwittingly joined. It is undisputed that violent attacks have been inflicted against LEOs at a variety of locations and in response to differing crowds and assailants. *See Los Angeles Press Club v. Noem,* 2025 WL 2658327, at *2 (C.D. Cal. Sept. 10, 2025) ("To be clear, the Court expresses no sympathy for those private individuals who engaged in violence during this period."); *see generally* Decl. Hott. When faced with violent riots—including violent individuals opportunistically shielding themselves from detection while committing assaults by throwing Molotov cocktails or shooting fireworks at officers and agents—crowd control devices are necessary to protect both officers and the public at large. Supp. Decl. Scharmen ¶¶ 4-5. In situations where violent opportunists use the anonymity of crowds to assault officers, crowd control devices are key to preventing further assault. Supp. Decl. Szemes ¶ 6. Unfortunately, rioters' use of fireworks and Molotov cocktails have become somewhat of a fixture throughout these protests. Supp. Decl. Scharmen ¶ 6. Often the perpetrators of these criminal acts commit their crimes from within the group of protestors and use non-violent protestors to hide themselves. *Id.* Given the legitimate law enforcement action of pushing back the crowd and the shielded rioters therein, restricting officers' ability to use crowd control devices is impractical, as officers have an interest in preventing harm to federal personnel and damage to property from catching fire—even if Journalists are present in that crowd. *Id.*

Plaintiffs' request for relief also creates the vague requirement that LEOs be able to distinguish "religious practitioners" from other individuals who are not religious practitioners and apply a more deferential standard requiring an "imminent" threat rather than the flexible "reasonableness" standard that the Constitution requires. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

Furthermore, less-lethal devices are an appropriate tool even when a crowd does not pose a specific imminent threat to a LEO but rather obstructs transportation and fails to comply with law enforcement orders. Decl. Harvey ¶ 10. Plus, "anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and refusal to leave a restricted area." Decl. Wang ¶ 24. "Crowd control devices are used after crowds have been ordered to disperse, failed to do so, and/or engaged in criminal and assaultive behavior toward LEOs and the public." Ex. 8, Declaration of Brian Szemes ("Decl. Szemes") ¶ 14. The prospect of rioters refusing to disperse is not speculative. On September 26, rioters at the Broadview facility refused to disperse. *See* Ex. 9, Declaration of Daniel I. Parra ("Decl. Parra") ¶ 9.c. Due to the nature of some crowd control devices, such as CS gas and flash-bangs, which disperse widely, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to LEOs, may nonetheless be impacted, due to their proximity to persons who are engaged in violent and/or criminal behavior.

The proposed TRO sweeps so broadly that it appears to include arrest tactics unrelated to protest or other First Amendment activities. Specifically, oleoresin capsicum ("OC") spray may be used for purposes other than crowd control, including when dealing with an individual resisting arrest and during handcuffing. Decl. Molina ¶ 10. When facing an individual resisting arrest or a third party actively trying to prevent an arrest, OC spray may be required for the officer to gain compliance from the individual and prevent harm to the officer. *Id.* ¶¶ 10-12. For example, during an arrest in early August, an officer used a one-second burst of OC spray to subdue a woman using physical force against the officer to prevent a lawful arrest of a man actively resisting and trying to climb over a fence. *Id.* ¶ 12. Under the Court's Order, however, an agent involved in this type dynamically evolving action would have to consider whether the injunction applied to this situation, whether the interfering woman was a protester, whether her actions pose a threat of

imminent harm, and the threat was so serious and imminent that the agent could not provide two separate warnings to the woman before using the OC spray in addition to dealing with a physically resistant subject of an arrest. *Id.* Such restrictions improperly limit law enforcement's ability to engage in legal enforcement operations, while increasing the potential for injuries to CBP agents, members of the public interfering with law enforcement operations, or arrested subjects. *Id.* ¶ 10.

DHS component agencies have very specific guidelines for each type of less-lethal device they are authorized to use. For example, CBP has separate policies for various devices and types of force. *See* Ex. 10, CBP Use of Force Policy ("CBP Policy") at 14-20. OC spray is appropriate for use "on a subject offering, at a minimum, active resistance." *Id.* at 15. But electronic control weapons are appropriate for use "on a subject offering, at a minimum, active resistance in a manner that the Authorized Officer/Agent reasonably believes may result in injury to themselves or to another person." *Id.* at 16. Yet another standard applies to collapsible straight batons, which may be used "on a subject offering, at a minimum, assaultive resistance." *Id.* It is simply not this Court's role to draft new guidelines for devices it knows little about for a job it has never performed.

***Proposed TRO ¶1.e*** fails to acknowledge that the use of deadly force is already tightly limited by DHS policy and may be used "only when necessary, that is when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person." *See* DHS Policy at 7. To the extent that the tactics described in paragraph 1.e. amount to deadly force, such tactics are already appropriately limited. Prohibiting their use by TRO is unnecessary and unwarranted. Supp. Decl. Szemes ¶ 9; Decl. Molina ¶ 13; and Supp. Decl. Scharmen ¶ 7. Given that this restriction is already a part of training components, this "restriction" seems only to serve or promote the ability of third parties to bring legal action based on disputed events, even where these types of munitions may have been thrown or kicked by violent rioters injuring a third party. Supp. Decl. Szemes ¶ 9.

14

*Proposed TRO ¶1.f* fails to account for the fact that, as discussed above, the use of less-lethal devices varies among the different component agencies of DHS based on their unique requirements and operational focus. *See* DHS Policy at 6 ("All Components shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques, authorized less-lethal devices, and necessary training and certifications—both initial and recurring.").

Standards vary for the deployment of less-lethal devices. Some systems are considered intermediate force weapons, while others have a heightened standard, such as deadly force, for their use. Less-lethal devices may also have an intermediate or heightened standard, depending on how they are used. *See generally*, CBP Policy, Chapter 3.

Plaintiffs' proposal would prohibit targeting a subject's torso with less-lethal devices. This limitation is not consistent with CBP policy and would severely curtail the ability to use kinetic projectiles, allowing them to be deployed only at the feet. *See id.* Chapter 3, § 8.d ("Authorized Officers/Agents shall not intentionally target the head, neck, groin, spine, or female breast."). If the torso is excluded, there is essentially nothing left that would not be a "sensitive area."

This Court lacks the expertise and agency-specific knowledge to craft a new policy in the form of a TRO that will govern how each DHS component uses and deploys less-lethal devices when faced with threats to officer safety and the destruction of property. Even if the Court had the requisite expertise, this proposal is fatally vague and overbroad. Any area of the body is potentially a "sensitive area," so the proposal amounts to a blanket prohibition on the use of less-lethal devices "unless that person poses an immediate threat of serious bodily injury." Proposed TRO ¶1.f; *see* Decl. Harvey ¶14.

*Proposed TRO ¶¶1.g and i* are inconsistent with the Fourth Amendment reasonableness standard. The "objective reasonableness" standard is "not capable of precise definition or

mechanical application," and its "proper application requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In fact, the Supreme Court explicitly counseled that "[n]ot every push or shove, *even if it may later seem unnecessary* in the peace of a judge's chambers, violates the Fourth Amendment" *Id.* (citation and quotation omitted) (emphasis added). This Court should not enter an injunction that would open LEOs to contempt every time Plaintiffs ask the Court to use "20/20 vision of hindsight" to Monday-morning quarterback the "split second judgements—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97; *see also Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *4 (U.S. Sept. 8, 2025) (Kavanaugh, J.) (criticizing district court injunction that creates the "prospect of such after-the-fact judicial second-guessing and contempt proceedings" because it will "inevitably chill lawful immigration enforcement efforts").

**Proposed TRO ¶1.h** fails to adequately account for the nature of the large scale and/or ad hoc protests that Defendants have been facing. As with the other blanket requirements, the two-warning requirement arbitrarily subjects Defendants to he-said-she-said disputes and invites unnecessary legal challenges over whether warnings were subjectively sufficient to individuals. Supp. Decl. Szemes ¶ 8. The response of officers is largely predicated on the violence before them. *Id.* Law enforcement officers already have training and operating procedures related to the deployment of crowd control devices commensurate with the threat they are facing. Supp. Decl. Scharmen ¶¶ 6-7. The threat of potential contempt proceedings "for decisions made under pressure in chaotic and unpredictable circumstances" may serve to do nothing more than "chill officers" ability to respond to protests that have turned violent. *Id.* Furthermore, requiring LEOs to somehow

identify "a sound level where it can be heard by the targeted individual(s)," TRO ¶1.h, imposes a "subjective standard … which is beyond the control of federal officers." Decl. Wang ¶26.

The policy in place for CBP already lays out in detail when warnings may be dispensed with due to a variety of factors, including where the "resulting delay by issuing the warning is likely to … a. Increase the danger to the officer/agent or others …; b. Result in the destruction of evidence; c. Allow for a subject's escape; or d. Result in the commission of a crime." CBP Policy at 4-5.

***Proposed TRO ¶ 1.j*** is unworkable because it would require federal officers confronted by violent rioters in unpredictable circumstances to defer actions that might protect the officers' lives and the public until they examine each and every person present at the riot to determine whether any of them has a "press badge," "professional gear," "distinctive clothing," is distant from "protest activities," or has some other indicia of being a Journalist. The vagueness of the standard makes identifying Journalists a guessing game. For example, journalists or other members of the press may use cellphones as their photographic equipment, and, in that respect, are indistinguishable from protesters or other members of the public. Thus, the definition of Journalist fails to provide law enforcement officers with sufficient guidance to avoid confusion about whether a person with a cellphone is, on the one hand, a protester who must comply with an order to disperse or, on the other hand, a journalist who may disobey a lawful dispersal order. There is also no "distinctive clothing" that Journalists are known to wear. Since the proposed TRO does not prohibit members of the press from engaging in protest activities or intermixing with protestors engaged in protest activities, the likelihood of confusion and mistakes will be increased. As a result, LEOs may not be able to distinguish between an actual journalist and a protester or rioter that is trying to move into a position to cause harm to law enforcement personnel or who does not qualify for the special access and exemption from dispersal orders.

Federal officers faced with dangerous crowds will be left with the impossible choice between risking their safety and risking contempt. The injunction inhibits legitimate federal law enforcement activities, deprives the public of necessary government protection during these dangerous riots, and puts the public's dedicated servants and necessary infrastructure at risk. The proposed TRO is also overbroad because it does not attempt to connect the sweeping scope of relief to the strictures of the First Amendment. Any order should be narrowly tailored to what the First Amendment requires in this unique context.

Individuals have historically presented press credentials (whether real or fake) to obtain access to areas and information they would typically not be afforded. Supp. Decl. Scharmen ¶¶ 4, 8. While Defendants do not concede that, under the law, Journalists have any special access beyond that of the general public, the lack of identification required in the proposed TRO will only subject officers and the public to increased risk of harm. *Id.* ¶¶ 7-9; Supp. Decl. Szemes ¶¶ 4-5, 10-14; Decl. Molina ¶¶ 7-10, 14-15. For Journalists, the proposed TRO merely suggests that they wear identification and states that merely standing off to the side could be sufficient, *although still not a requirement*. Proposed TRO ¶1.j. ("These indicia are not exclusive."). The lack of any requirement for individuals to visibly identify as press using narrowly defined indicia will cause uncertainty and hesitation by officers and agents faced with making split-second decisions in chaotic and violent situations. Those potential gaps in operational security create opportunities for violent opportunists to gain that special access afforded by the injunction's prohibition on enforcing dispersal orders against any self-proclaimed Journalist or Legal Observer. *See* Supp. Decl. Szemes ¶¶ 4-5, 11-13; Supp. Decl. Scharmen ¶¶ 4, 7-10; Decl. Molina ¶¶ 7, 9-11, 14-15.

Even if the indicia were narrowly defined and even if members of the press were required to wear them, "[p]ress markings are publicly available and officers' ability to differentiate between actual press and those who have come by press markings through fraudulent means cannot be

determined in real-time." Decl. Wang ¶ 23. The possibility for exploitation of this special press privilege by bad actors—which sometimes includes *bona fide* members of the press—requires little imagination. Supp. Decl. Scharmen ¶ 4. ("After the female reporter and male videographer were ordered to 'get back' by a FPS officer, the reporter yelled 'no' and shot a projectile at the officer's arm."). "Requiring federal law enforcement officers to discern whether someone is a legitimate Journalist or Legal Observer as described in the PI is unworkable as a practical matter." *Id.* ¶ 8.

The proposed TRO's behavioral indicia of "standing off to the side of a protest" introduces ambiguity. "Without clear, mandatory behavioral criteria, ERO officers may struggle to differentiate [Journalists] from protesters or other individuals present at the scene, particularly in dynamic and chaotic protest environments." Supp. Decl. Szemes ¶ 12. "Protests are dynamic events with the location of the crowd shifting rapidly and without notice. Just because a group of Journalists … are standing off to the side at a particular location does not mean that that location was 'off to the side' or will remain so." Supp. Decl. Scharmen ¶ 9. Add to these concerns the fact that mere presence at a protest could be considered a "protest activity" and the vagueness of the proposal means that everyone counts as a Journalist under these criteria.

***Proposed TRO ¶1.k***, a paragraph the Court proposed to add to a potential TRO, does little to alleviate Defendants' concerns "for balancing security versus personal liability since … officers can be held in Contempt of Court and may face monetary fines or incarceration." Supp. Decl. Szemes ¶ 10; *see also* Supp. Decl. Scharmen ¶¶ 7, 10. The added personal liability this injunction makes available will chill officers' ability to use crowd control devices, leaving officers and innocent "individuals at greater risk of harm if officers are less willing to act when quick action is needed." *Id.* To the extent the Court decides to issue a TRO, Defendants request that this paragraph

be included, but with the addition that chemical dispersal agents be included among those devices for which incidental exposure will be permitted.

**Proposed TRO ¶2**, if it requires LEOs names to be displayed, will endanger their lives. It is no secret that law enforcement—particularly federal LEOs and agents involved in immigration enforcement—have been under attack since early this summer. Nationwide, "ICE officers are facing a more than 1000% increase in assaults against them, including vehicles being used as weapons towards them, and doxing campaigns targeting federal officers and their families." https://www.dhs.gov/news/2025/09/22/despite-1000-increase-assaults-ice-officers-governor-newsom-signs-unconstitutional. An "Anti ICE" shooter fired upon ICE officers in Texas and killed two individuals. https://perma.cc/F99X-ZU36. There have been dozens of other attacks, some of them highly coordinated attacks by political extremists to ambush officers and fire upon them. https://perma.cc/JZG2-6JMK.

Many of these incidents have occurred at the Broadview facility. On September 26 and 27, ICE ERO arrested 17 violent rioters on multiple charges including assault against federal officers, obstruction, and trespassing. Decl. Parra ¶ 30. ICE ERO Chicago, only one of many component agencies assisting in DHS operations, has arrested approximately 50 rioters for similar charges. *Id.* Some of those arrested were concealing semi-automatic weapons. *Id.* Any requirement that agents display their names in this climate is reckless. Given these serious threats, LEOs and their supervisors require operational flexibility to wear or not wear badges as safety concerns dictate. While some LEOs are required to carry their badge (but not display it) at all times, others are required to display them unless certain exceptions apply. LEOs on a plainclothes detail will carry their badge but not necessarily display it. Undercover LEOs do not carry government identification at all. This standard practice is in place to protect LEOs from detection while they are operating undercover. Any TRO entered should contain exceptions allowing all LEOs, but especially

plainclothes officers and undercover officers, to be exempt from outwardly visible badge display requirements as required by Federal Law. *See* 10 U.S.C. § 723 (creating exceptions for plainclothes and undercover agents to display identification).

DHS and component agencies sometimes wear alphanumeric badges that do not contain their names. Protecting the officer's identity is crucial given the frequency with which doxing and violence against LEOs has been perpetrated. The use of anonymous identification numbers is explicitly permitted by Federal Law. *See* 10 U.S.C. § 723. When responding to a "civil disturbance" LEOs shall "visibly display (1) the individual's name *or* other individual identifier that is unique to that individual; and (2) the name of the … Federal entity … by which such individual is employed." *Id.* (emphasis added).

More fundamentally, an order compelling names or badge identifiers would be inappropriate because it would not remedy any of the alleged harms that form the basis of the TRO. As noted above, injunctive relief must be tailored to remedy the specific harm alleged. But Plaintiffs' First Amendment and RFRA claims for injunctive relief against Federal Defendants are unrelated to any alleged difficulties in distinguishing among individual law enforcement officers. This is not a damages case against individual officers, nor have Plaintiffs claimed a statutory or constitutional right to have each individual law enforcement officer identified in a unique way.

In any event, the relief Plaintiffs seek is also unnecessary. Federal LEOs already "wear vests marked with ICE/ERO or Homeland Security" and "clearly identify themselves as law enforcement while wearing masks to protect themselves from being targeted by highly sophisticated gangs like Tren de Aragua and MS-13, criminal rings, murderers, and rapists." https://www.dhs.gov/news/2025/09/22/despite-1000-increase-assaults-ice-officers-governor-newsom-signs-unconstitutional.

Furthermore, any TRO should specify that actions by protesters, violent opportunists, or other third parties that obscure an officer's markings are an intervening cause that does not render an officer's uniform noncompliant. Any TRO should also make clear that officers are permitted to take operationally important actions that might incidentally obscure a unique identifier.

*Paragraph 3* requires unnecessarily wide distribution of any TRO the Court may issue. CBP alone has over 60,000 employees, making it one of the world's largest law enforcement organizations.[1] Many of those employees, including employees stationed within the Northern District of Illinois, will be unaffected by a TRO in this case. The Court should specify that any TRO only need be distributed to those LEOs and their supervisors who are or will be deployed to the Broadview facility.

*Paragraph 4* could require Defendants to file a document on the public record that is attorney-client privileged and attorney work-product. In response to a TRO, DHS counsel may draft and send compliance instructions to field offices to be shared with field officers. Such communications, since they would contain attorney-client privileged information and attorney-work product, should not be ordered to be disclosed publicly. Instead, should a TRO issue, the Court should simply require a declaration from a DHS employee under penalty of perjury stating that the Court's TRO was distributed to affected LEOs, employees, and their supervisors.

*Paragraph 5* requires a response from Defendants within 24 hours of an alleged violation of the proposed TRO. That timeframe is unworkable and leaves Defendants little to no opportunity to rebut allegations of a violation with sworn testimony or other evidence. Officers are often in the field, not in an office, and are not easily reached on short timelines for evidentiary purposes. The Court's proposal to modify the 24-hour requirement to a time to respond set at the discretion of

---

[1] U.S. Customs and Border Protection, *About CBP*, (last visited October 7, 2025)  https://www.cbp.gov/about.

the Court could avert this issue so long as the Court affords a reasonable time for Defendants to respond, which should never be less than a week.

***Paragraph 6*** would not require Plaintiffs to provide a security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. But Defendants will incur substantial costs to comply with any TRO the Court may issue, such as legal costs and potential modifications to LEO deployment to accommodate the reduced ability for officers to defend themselves. Therefore, the Court should require Plaintiffs to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R Civ. P. 65(c).

## IV.    Obey-the-Law Injunctions are Improper

To the extent the Court finds that any of Plaintiffs' proposals are simply consistent with what the law requires, they are improper. Obey-the-law injunctions are disfavored in the Seventh Circuit and are inconsistent with traditional equitable principles. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) ("An obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation."). There are several concerns with such injunctions including "overbreadth," and "vagueness," which stem from respect for "due process." *Id.* at 841-42. "[A]n 'obey the law' injunction 'impermissibly subjects a defendant to contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged." *Id.* (quoting *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 767 (4th Cir. 1998)). Such injunctions also often lack the specificity required by the Federal Rules. *Id.*; *see also* Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction and every restraining order must … describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). As the Supreme Court has explained in *Schmidt v. Lessard*, 414 U.S. 473,

23

476 (1974), Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Reiterating existing law as an injunction does not perform this function. Therefore, any paragraph in the proposed TRO that the Court finds is an obey-the-law injunction should be stricken from any potential TRO.

## V.  Stay Pending Appeal

Finally, if the court were to award injunctive relief (it should not), Defendants request that any relief be stayed pending the disposition of any appeal authorized by the Solicitor General.  At a minimum, Defendants request that any relief be administratively stayed for seven days to allow defendants to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

### Conclusion

For the above reasons, the court should deny the Plaintiffs' motion for TRO.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
ANDREW I. WARDEN
Civil Division, Federal Programs Branch

By: s/ *Sean Skedzielewski*
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave NW
Washington, D.C. 20530
(202) 860-9960
sean.skedzielewski@usdoj.gov

24