# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendants. | Case No. 2:25-cv-05563 <br><br> **DECLARATION OF MATTHEW S. HARVEY** |

## DECLARATION OF MATTHEW S. HARVEY

I, Matthew S. Harvey, declare and affirm as follows:

1. I am employed by U.S. Customs and Border Protection (CBP). CBP employs more than 45,000 law enforcement employees in addition to thousands of employees in trade and support capacities.

2. I am the Director of the Less-Lethal Training Branch of the Law Enforcement Safety and Compliance Directorate of the CBP. The Less-Lethal Training Branch educates, trains, and certifies tactical instructors who deliver training to CBP personnel. I have been employed in the Less-Lethal Training Branch as the Assistant Director from June 2022 to November 2024 and as the Director since November 2024.

3. I have served as a border patrol agent and supervisory border patrol agent in sectors on the Southern and Northern borders of the United States. Prior to my selection as the Assistant Director and Director of the Less-Lethal Training Branch, I was a liaison to CBP's Office of Professional Responsibility assigned to its Use of Force Incident Team in Washington D.C. from 2020 to 2022. I also served as an instructor in the

215

Advanced Physical Techniques Department for two years at the Border Patrol Academy in New Mexico where I delivered training that included empty hand, ground, and edged weapons defense. More information concerning my law enforcement experience is detailed in a true and correct copy of my resume, which is attached hereto as Exhibit 1.

4. CBP officers and agents, including law enforcement employees of the U.S. Border Patrol (USBP) and the Office of Field Operations (OFO), must comply with CBP's Use of Force Policy, which originally went into effect in 2010 and was subsequently modified in 2014, and then most recently updated to the current policy in January 2021. A true and correct copy of the CBP Use of Force Policy dated January 2021 is attached hereto as Exhibit 2. The policy is directly derived from constitutional law and federal statutes and regulations. Pursuant to the CBP Use of Force Policy, officers and agents may use objectively reasonable force only when it is necessary to carry out their law enforcement duties. The "reasonableness" of a particular use of force is based on the totality of circumstances known by the officer or agent at the time of the use of force and weighs the actions of the officer or agent against the rights of the subject, considering the circumstances surrounding the event.

5. CBP policy addresses the deployment of less lethal devices and outlines the circumstances in which they may be utilized. Again, the use of less-lethal force must be both objectively reasonable and necessary to carry out the officer's or agent's law enforcement duties. Crowd control devices and less-lethal munitions are only utilized after events have become unlawful. Due to the dynamic and often rapidly evolving situations encountered during these events, giving warnings and/or commands and time for a subject or subjects to comply with them is not always feasible. Under CBP policy, chemical irritants may be utilized as a compliance tool on a subject offering, at a minimum, active resistance. Active resistance is a type of resistance where a subject physically opposes an officer's or agent's control efforts. Kinetic impact can be used on a subject in response to assaultive resistance. Assaultive resistance under CBP policy is

defined as resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self. This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent. The Policy explains that less-lethal force is force that is not likely or intended to cause serious bodily injury or death. The use of less-lethal devices or weapons is meant for situations where empty-hand physical techniques are not sufficient, practical, or appropriate.

6. Basic training for OFO and USBP officers and agents on less-lethal force includes arrest and control techniques, counter assault techniques, select less-lethal devices, scenario-based training, and the legal application of force. After basic training, all authorized officers/agents are required to participate in training in less-lethal techniques, tactics, and/or devices on a quarterly basis. Training includes arrest and control techniques, counter assault techniques, CBP authorized devices, and scenario-based training. More advanced training is provided in Mobile Field Force (MFF) training. MFF I and MFF II are available, but not mandatory, for all officers and agents. MFF I training includes crowd control familiarization, basic formations, and gas mask proficiency. MFF II training expands into shield and baton proficiency, multiple formations and movement, CS gas exposure, and mass arrest procedures. Additional training through CBP's specialty teams that include the Border Tactical Team (BORTAC), Border Search Trauma and Rescue Team (BORSTAR), Mobile Response Team (MRT), and Special Response Team (SRT) may include munitions that include the Controlled Noise Light Distraction Device (CNLDD) and Fogger. Officers and agents are required to obtain certifications for the use of each CBP authorized less-lethal device they carry and must complete an annual recertification on them each fiscal year.

7. Mr. Kerlikowske stated in his Supplemental Declaration that DHS agents including the Special Response Team (SRT) "are not accustomed to policing urban civil unrest; nor are they trained to do so." CBP SRT units do more than execute warrants,

**217**

they deploy in a number of situations including but not limited to: combating national threats through specialized capabilities, advancing integration across DHS and other federal law enforcement agencies, and providing technical expertise. Furthermore, they receive training for responses to civil unrest in urban areas and have consistently deployed in direct response to crowd control situations in urban environments over the last several years. Similarly, BORTAC agents, who are part of the U.S. Border Patrol, conduct special operations in both urban and rural environments, and frequently integrate with other agencies supporting multiple functions. They also receive extensive training for responses to civil unrest in urban areas. Currently, the USBP Special Operations Group (SOG), which oversees the BORTAC, BORSTAR, and MRT teams, is responsible for the delivery of the MFF certifications.

8. CBP officers and agents are trained and equipped, depending on individual certifications, to use a wide variety of less-lethal equipment, including crowd control devices. Less-lethal equipment used by CBP officers and agents includes Oleoresin Capsicum (OC) spray (also referred to as pepper spray), collapsible straight batons, Electronic Control Weapons (ECWs and also referred to as TASERs), compressed air launchers that include the Pepperball Launching System (PLS) and FN303, munition launchers that include the 40MM, and Controlled Noise and Light Distraction Devices (CNLDD and commonly referred to as a flash-bang). Smoke canisters may also be used for crowd control purposes. The use of CBP authorized less-lethal devices have varying effective distances and application of force depending on the subject's actions and are primarily used against people exhibiting active or assaultive resistance. Some devices, such as the PLS, may be used for various levels of resistance. The PLS may be used with an area saturation deployment for active resistant subjects but may also be used for kinetic impact against assaultive subjects. The PLS projectiles are filled with micro pulverized OC powder that causes irritation to mucus membranes. Other device options include handheld chemical devices that can deploy smoke, CS gas, or OC. CNLDDs,

**218**

which Plaintiffs refer to as flash-bangs, are designed to produce a momentary burst of intense light and deafening sound to disorient and confuse individuals without causing permanent harm to intended targets or the general public. This crucial window of distraction enables officers and agents to gain control of situations, neutralize threats, and protect lives while individuals are distracted. CNLDDs may be used as handheld equipment or launched aerially for air bursts by munition launchers. CBP officers and agents do not use nor are they equipped with rubber bullets. CBP also does not use nor are its agents and officers in California equipped with an LRAD (long-range acoustic device) for crowd control purposes.

9.  I have reviewed Plaintiffs' proposed order submitted with their motion for a preliminary injunction. The conditions set forth in the proposed order are not workable, are vague, and will endanger the safety of law enforcement personnel. Prohibiting the use of crowd control or less-lethal equipment in response to riots and protests may result in the use of physical force if these less harmful, less-lethal measures are constrained as requested in Plaintiffs' proposed order. By removing less-lethal means as an option, the requested relief would leave officers and agents with only physical techniques to control crowds.

10. Plaintiffs' request in Section III, Subsection 2, of the proposed order to enjoin or prohibit the use of potentially any crowd control weapons, including, but not limited to, kinetic impact projectiles, chemical irritants, or flash-bangs, on persons not posing a threat of imminent harm to a law enforcement officer or another person is unworkable. This request effectively bars the use of crowd control devices for some of the purposes for which they were designed and are authorized under CBP policy. Under the current CBP policy, crowd control devices are used only in appropriate situations. For example, a compressed air launcher or a munitions launcher deploying certain chemical irritants may be used as compliance tools in situations where a person or persons are offering active resistance or disobeying a lawful order, including crowd situations where a crowd

**219**

or an individual is not obeying a lawful order to disperse or to stop obstructing the lawful operations or activities of law enforcement personnel. However, the use of a compressed air launcher delivering kinetic impact projectiles or a munitions launcher deploying specialty impact munition is restricted to situations when a CBP officer or agent is confronted with assaultive resistance where the intended target(s) or crowds pose a threat of physical injury to the officer or agent or the other persons. In Mr. Kerlikowske's declaration, he stated, "a person or persons throwing water bottles is not grounds for deploying force without warning" and that "a plastic water bottle poses little or no real threat to officers in full riot gear." In both situations, an object is being thrown towards CBP officers or agents. Furthermore, rioters or protesters also often throw other dangerous objects such as glass bottles, bricks, or other heavy or flammable objects. Regardless of the object, this act raises the level of force by a subject or subjects to assaultive resistance. If deemed reasonable and necessary, an officer/agent is authorized to respond with force up to and including kinetic impact with specific less-lethal devices. Plaintiffs' proposed order also fails to address situations where the use of less-lethal devices for crowd control is reasonable and necessary. For example when CBP officers or agents are addressing a crowd or protest that is obstructing transportation, such as ingress or egress to or from a location where lawful immigration arrests are occurring, and the crowd is failing to comply with law enforcement orders but there is not a specific imminent threat of harm to a person, less-lethal devices can be deployed as an effective and appropriate tool. In this situation, the use of a crowd control device may be necessary to obtain compliance with the lawful order.

11. Plaintiffs' request in Section III, Subsection 3, of the proposed order to enjoin or prohibit the use of any crowd control weapon involving the use of kinetic impact projectiles or flash-bangs when a person not posing a threat of imminent harm to a law enforcement officer or another person could possibly be injured is not workable. All CBP authorized officers or agents certified in Mobile Field Force operations and various

authorized less-lethal devices are trained to consider the environment in which these crowd control devices are used and the possible collateral harm caused by their use. However, these devices are generally designed to have an impact upon a specific area and/or are deployed towards a particular subject. In crowd control or riot situations the devices are designed to impact one or more subject(s) at a time, within the range of deployment. As stated previously, CNLDDs are designed to produce a loud noise and a flash of light that may inadvertently impact people who are in or near proximity to an identified person engaged in assaultive resistance to a CBP officer or agent or failing to disperse in response to a lawful order. They may also be launched aerially in order to affect large groups and therefore may collaterally affect persons in a crowd. Prohibiting the use of CNLDDs, which are designed to momentarily disorient, confuse, or distract, but not bodily injure, intended targets threatening to cause imminent harm to a CBP officer or agent or other persons, because of the mere possibility that a third party may be affected would prevent law enforcement officers from using a valuable less-lethal device to protect themselves and others while limiting and minimizing the level of force used on any one subject or multiple subjects.

12. Plaintiffs' requirement in Section III, Subsection 4, of the proposed order, that CBP officers and agents cannot use any crowd control weapon in any situation without giving at least two separate warnings, in a manner and at a sound level where it can be heard by the targeted individuals, and where the targeted individuals must be given sufficient time to avoid the use of force, is not feasible. To the extent that this restriction prohibits any use of crowd control weapons without giving at least two separate warnings, it places CBP officers and agents and the public at risk. Crowd control devices are often used in unstable situations in which there is no reasonable opportunity to issue warnings in a manner and sound level that can be heard by the targeted individuals or crowds with sufficient time to change their behavior. This warning requirement is not always feasible during an active riot or under exigent circumstances,

**221**

such as when a rioter or protester may imminently throw a brick, Molotov cocktail or other incendiary object, or brandish a firearm. Crowds, even at "peaceful" protests, can become loud and quickly unruly, which lessens the feasibility of issuing warnings in these tense, uncertain, and rapidly developing situations. CBP officers and agents are trained to provide warnings when operationally feasible. Prior to the deployment of less-lethal force, such as kinetic impact projectiles, the individual officer or agent is trained to analyze the use of force based on the necessity and reasonableness of the action under the totality of the circumstances.

13. Plaintiffs' requirement in Section III, Subsection 5, of the proposed order, that the use of kinetic impact projectiles containing a chemical irritant is prohibited unless expressly approved by an on-scene supervisor who personally witnesses the specific acts of violence is untenable. The requirement of on scene supervisor approval prior to the deployment of these devices places CBP officers and agents and the public at risk of injury and creates an undue burden for CBP personnel. CBP supervisors are likely to be overseeing the conduct of multiple officers or agents at any given time. They may only be available by radio communications when CBP officers or agents are confronted by a situation requiring the immediate use of kinetic impact projectiles or chemical irritants to protect themselves or the public from a risk of harm. Additionally, even if a supervisor is on scene and readily available for approval, the supervisor is likely unable to observe all actions by all subjects in which an officer/agent may deem it necessary to deploy some level of force involving kinetic impact projectiles or chemical munitions. Moreover, during a crowd control situation, a CBP officer's or agent's proximity to a supervisor is unpredictable.

14. Lastly, Plaintiffs' request in Section III, Subsection 6, of the proposed order to enjoin the deployment of gas canisters or flash-bang grenades so as to strike any person, or firing kinetic impact projectiles or other crowd control weapons at the head, neck, groin, spine, or other sensitive areas, unless that person poses an immediate threat of

death or serious bodily injury is unnecessary and unreasonably vague. CBP's use of force policy already prohibits the intentional targeting of the head, neck, spine, or groin of the intended subject by compressed air launchers or munitions launchers, unless the use of deadly force is reasonable. Although this subsection of the proposed order implicitly refers to the use of such launchers for deployment of tear gas cannisters, flash-bang grenades, and kinetic impact projectiles, its reference to "other crowd control devices" is vague and lacks the specificity necessary to provide guidance to CBP officers and agents. Furthermore, the subsection's reference to "other sensitive areas" is also vague, because any part of a person's body may be sensitive to the impact of kinetic impact projectiles or other items launched from compressed air launchers or munition launchers. Thus, this language in Subsection 6 improperly and severely limits the use of such launchers or CNLDDs even when their use is warranted to protect CBP officers and agents or the public under conditions where harm to them is threatened that is less than serious bodily harm.

15. Furthermore, it is also important to consider the total impact of all of the subsections of Plaintiffs' order acting in concert. For example, if an individual or small group of CBP officers or agents, without an on-the-scene supervisor, are conducting an immigration arrest and they are assaulted by a group of individuals contesting the arrest, these officers/agents will not under the terms of Plaintiffs' proposed order be able to use a crowd control device to defend themselves even if they had sufficient time to issue two warnings. A similar situation could occur during a riot where an individual officer/agent is confronting an imminent risk of harm, has insufficient time to provide the assaulting person or persons with two warnings, and is prohibited from using a kinetic impact launcher or a CNLDD to protect themselves because the possibility that another member of the riot who is not assaulting the officer/agent might be affected by the impact of pepperballs, CS gas, or the noise and light caused by the CNLDD.

**223**

224

16. This declaration does not assess any of the alleged individual instances of uses of less-lethal force or crowd control devices set forth in Plaintiffs' declarations in support of their motion for preliminary injunction. The right to supplement opinions and opine upon particular incidents is reserved until discovery, including depositions, is conducted.

I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my information, training, and knowledge.

Executed this 1st day of August, 2025, at Harpers Ferry, West Virginia.

Dated: August 1, 2025

*Matthew S. Harvey*
MATTHEW S. HARVEY

# EXHIBIT 1

# Matthew S. Harvey

440 Koonce Rd Harpers Ferry, WV 25425
Work Phone: 304-535-5369

---

**CURRENT TITLE AND GRADE:** Director, Customs and Border Protection Law Enforcement Safety and Compliance Directorate
Service EOD: 11/27/2000|

---

**PROFESSIONAL EXPERIENCE:**

**DIRECTOR**  11/3/2024-PRESENT
*Law Enforcement Safety and Compliance-Harpers Ferry, WV*

***Less Lethal Training Branch 6/5/2022-Present:*** Assigned as the Director of the Less Lethal Training Branch (LLTB). I am responsible for the less-lethal training program that requires quarterly mandated training for ~45,000 CBP uniformed personnel. I oversee a subordinate staff that includes one Assistant Director, 14 Course Developer/Instructor (CD/I) CBP personnel from USBP, OFO, and AMO, two Mission Support Specialists, and up to five TDY staff.

I am responsible for ensuring the LLTB fulfills numerous collateral responsibilities that fall to the scope of the cadre that include briefings to DHS, CBP, and component executives. My duties also include overseeing the development and delivery of the following programs:
- Less Lethal Instructor Training Program (LLITP)
- Professional Development Evaluation Course (PDEC)
- Less Lethal Specialty Impact-Chemical Munitions (LLSI-CM)
- Controlled Noise Light Distraction Device (CNLDD)

**ASSISTANT DIRECTOR**  6/5/2022-11/3/2024
*Law Enforcement Safety and Compliance -Harpers Ferry, WV*

***Less Lethal Training Branch 6/5/2022-11/3/2024:*** Assigned as the Assistant Director of the Less Lethal Training Branch (LLTB). I am responsible for supervising 15 direct report Course Developer/Instructor (CD/I) CBP personnel from USBP, OFO, and AMO. My duties also include overseeing the development and delivery of the following programs:
- Less Lethal Instructor Training Program (LLITP)
    - 3-week program for basic level instructors that includes: arrest and control techniques, counter assault tactics, CBP approved less-lethal devices, de-escalation, report writing and articulation, legal application of force, and scenario-based training.
- Professional Development Evaluation Course (PDEC)
    - 1-week course for returning instructors within a 5-year valid certification period that includes: arrest and control techniques, counter assault tactics, CBP approved less-lethal devices, de-escalation, legal application of force, and associative phase drills.
- Less Lethal Specialty Impact-Chemical Munitions (LLSI-CM)
    - 2-day course that covers all CBP approved handheld chemical munitions, 40MM launcher, and legal application of force.
- Controlled Noise Light Distraction Device (CNLDD)

**226**

- o 1-day course for CBP specialty team members that includes U.S. Border Patrol BORTAC/BORSTAR and Office of Field Operations SRT covering legal application of force.

I led the research, development, and implementation of instructional material, reference material, and guidance for new defensive tactics considerations for field-level instructors to access following CBP's revised grooming standards. This material will directly address assaults on agents and officers through hair and gear grabs by assailants.

*Acting Director 7/16/2023-5/4/2024:* Assigned as Acting Director of the Less Lethal Training Branch. In addition to the main duties as Assistant Director, I was responsible for managing the branch budget, overseeing two Mission Support Specialists, and approving all changes to the branch curriculum. This required me to accurately track expenditures by the branch in direct support of our training mission, ensure all administrative actions are completed timely, and that all course content is updated and accurate. I appointed three branch CD/Is to the role of Acting Assistant Director and mentored them in the roles and responsibilities of the position.

**OPERATIONS OFFICER**  *10/14/2018-6/4/2022*
*Office of Border Patrol Headquarters -Washington, D.C.*

**CBP Office of Professional Responsibility (OPR) 1/5/20-6/4/2022:** Assigned as the U.S. Border Patrol liaison to the OPR Investigative Operations Division Use of Force Incident Team where I provided subject matter expertise knowledge in U.S. Border Patrol policy to OPR agents regarding potential violations. I was responsible for reviewing all CBP-wide Enforcement Action Statistical Analysis and Reporting (E-STAR) events (approximately 2000k per year) and determining if they qualify for local (approximately 600-700 per year) or national Use of Force review. I reviewed national level cases and recommended clarification where needed in the investigation prior to submission to the executive review board.

Presented a training plan for armed personnel response to the Commissioner's Duress Alarm. This included cross training armed personnel from varying agencies in the SITROOM and the Commissioner's Armed Security Detail. The training would include basic room clearing and small team tactics.

**DEPUTY PATROL AGENT IN CHARGE**  *2/05/2017-10/13/2018*
*Buffalo Border Patrol Station - Tonawanda, New York*

Managed the operational functions of a complex station consisting of Supervisory Border Patrol Agents (SBPAs) and Border Patrol agents (BPAs). The area of responsibility consisted of linear international border, serrated coastline (riverine and lake environment) and counties of land-based patrols that cover over 4,000 square miles. Operations included line-watch, city patrol, transportation check, and specialty units. Maintained a risk-based enforcement posture by identifying, prioritizing, and targeting threats.

*Acting Patrol Agent in Charge-Buffalo Station:* Called upon to provide leadership coverage whenever the PAIC was out of the office for any length of time. Duties included responding to any inquiries by sector personnel, fulfilling administrative roles and attending any liaison-based meetings with outside entities.

**SUPERVISORY BORDER PATROL AGENT**                               **2/20/2011-2/04/2017**
*Niagara Falls Border Patrol Station-Niagara Falls, New York*

Supervised a patrol group of agents that included specialty units such as Marine and Bike patrol. Held various collateral responsibilities that included Disrupt Unit SBPA, coordinating the annual Self Inspection Program (SIP), Primary Firearms Instructor (PFI), training coordinator, and assisted in station budget projections.

***Acting Deputy Patrol Agent in Charge-Niagara Falls Station:*** Assigned to the Niagara Falls Border Patrol Station (NIB) as Acting Deputy Patrol Agent in Charge (DPAIC) for 60 days from September to October 2016. I was responsible for running operations and carrying out the vision of the Patrol Agent in Charge.

***Interim Deputy Commander Buffalo Sector SOD-Niagara Falls Station/Buffalo Sector:*** As a BORTAC member assigned to Buffalo Sector (BUN), I was instrumental in creating the first ever Buffalo Sector Special Operations Detachment (SOD). As the interim Deputy Commander, my team involvement led to integral partnerships and training with other agency teams. Along with another member of the team, we laid the foundation of what eventually became a successful implementation of an SOD within BUN. This work included independent team and multiple agency joint training within the SOD mission set.

I was the Co-Chair for the Western New York Tactical Operations Group. Along with Coast Guard representatives, I coordinated training and exercises for a multi-agency team response to waterborne threats on Lakes Erie and Ontario. The Coast Guard command also requested training for response to hostile activity on their base. I coordinated and delivered training that included threat-based response, team movement, and other agency response coordination. This culminated with a full-scale exercise to test the Coast Guard capabilities, resources, and other agency interaction. The results were presented to the base chain of command and allowed them to make decisions on how to better prepare their personnel in the event of an actual incursion.

***Training Coordinator-Buffalo Sector:*** From April 2013 to May 2014, I was detailed to the Buffalo Sector (BUN) Training Unit. Responsible for training large groups of agents in quarterly qualifications, quarterly use of force and active shooter scenarios.

**SUPERVISORY BORDER PATROL AGENT CD/I**                     **5/24/2009-2/19/2011**
*Border Patrol Academy-Artesia, New Mexico*

Assigned to the Advanced Physical Techniques Department with six other CD/I personnel that taught the Physical Techniques Instructor and senior agent courses. I developed an export defensive tactics program for various sectors within the Border Patrol. This included standing empty hand techniques, ground, and edged weapons defense. I was an intricate member of a departmental workgroup that created the CBP Physical Fitness standard (known as PTFIT) that promotes an overall better culture of fitness within CBP. We were responsible for creating standards that would be a median for all CBP to include Border Patrol Agents, Air and Marine Officers, and Customs and Border Protection Officers.

Detailed to instruct basic academy class #921. I was responsible for instructing all levels of techniques to include empty hand, arrest, intermediate weapons, and ground defense and how they relate to the CBP Use of Force policy to prepare new interns for field readiness.

**228**

**BORDER PATROL AGENT** *4/15/2007-5/23/2009*
*Houlton Border Patrol Station-Houlton, Maine*

Performed Border Patrol duties that included line-watch, roving patrol, ATV, snowmobile, bus checks and intermittent checkpoint operations. I was the primary defensive tactics instructor and responsible for station level annual training in all use of force weapons and policy. I instructed the Houlton Police Department in the use of the collapsible straight baton so they could implement it as one of their intermediate force options into their use of force policy.

***Intermediate Force Instructor-Advanced Training Center Harpers Ferry, West Virginia:*** From January-June 2008, I was detailed to the Advanced Training Center in Harpers Ferry, West Virginia as an Intermediate Force Instructor. I was responsible for assisting permanent instructors and instructing CBP Intermediate Force classes that included Border Patrol Agents, Air and Marine Agents, and Customs and Border Protection Officers (CBPO). I also taught classes for OFO Advanced Admissibility, Secondary Processing, and Enforcement Officer Training.

**BORDER PATROL AGENT** *11/27/2000-4/14/2007*
*Tucson Border Patrol Station-Tucson, Arizona*

Performed Border Patrol duties of line-watch, roving patrol, checkpoint, highway interdiction, and operating the infrared scope trucks. I successfully apprehended and processed numerous alien and narcotic cases. I was the primary defensive tactics instructor at the station level. From September 2003-April 2007, I coordinated and led the annual ASP and OC recertification as well as all other aspects of defensive tactics authorized within the CBP Use of Force policy.

**SPECIALIZED TRAINING:**

CUSTOMS AND BORDER PROTECTION
- *Daigle Law Group Use of Force Summit 2022*
- *Advanced Law Enforcement Rapid Response Training for Active Shooter Scenarios 2013*
- *The Cooper Institute Law Enforcement Fitness Specialist 2010*
- *Border Patrol Firearms Instructor 2009*
- *FLETC Law Enforcement Instructor Training Program 2009*
- *Intermediate Force Instructor 2006*
- *Border Patrol Physical Techniques Instructor 2003*
- *Incident Command System/National Incident Management System 100, 120a, 130, 200, 230b, 235b, 300, 700a, 775, 800, 800b*

## TRIAL AND COURT EXPERIENCE

Testimony as an expert witness in Customs and Border Protection Use of Force techniques and policies:

United States District Court, District of New Mexico:
- *United States v. Oscar Orrantia* [2:22-cr-1360 MIS-1] (December 2023)
- *United States v. Oscar Orrantia* [2:22-cr-1360 MIS-1] (November 2023), Daubert Hearing

United States District Court, Western District of Texas:
- *United States v. Miguel Angel Delgado Jr* [23-CR-00466-KC] (April 2024)

**229**