# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No. 2:25-cv-05563<br><br>DECLARATION OF BRIAN SZEMES |

### SUPPLEMENTAL DECLARATION OF BRIAN SZEMES

I, Brian Szemes, hereby declare:

1. I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Assistant Field Office Director (AFOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since January 2016.

2. The purpose of this declaration is to provide an update on the current conditions on the ground in the Los Angeles Area of Responsibility (AOR) with respect to immigration enforcement operations and describe how our officers will be impacted by the Order Granting Plaintiffs' Motion for Preliminary Injunction issued September 10, 2025. This declaration supplements the information in my August 15, 2025 declaration filed with the Defendants' Memorandum in Opposition to Notice of Motion and Motion for Preliminary

1

Injunction. *See* Decl. of Brian Szemes, ECF No. 47-2.

3. Since July 2025, the frequency and volume of violent protests in the Los Angeles AOR where ERO Los Angeles has had a presence has significantly decreased, ERO Los Angeles assists Federal Protective Service (FPS) on an as-needed basis.

4. I have reviewed the Order Granting Plaintiffs' Motion for Preliminary Injunction, and the relief requested is unworkable and poses significant risks to the safety of law enforcement personnel and the public. First, the Order enjoining DHS from dispersing, threatening, or assaulting any person whom they know or reasonably should know is a Journalist or Legal Observer unless ERO officers have probable cause to believe the individual has committed a crime unrelated to failing to obey a dispersal order is unreasonable and impractical in dynamic and high-risk situations. For example, during the enforcement action in Camarillo on July 10, 2025, after multiple dispersal orders were issued, ERO Los Angeles SRT officers deployed CS gas (tear gas), pepper ball rounds, and sponge rounds when protesters refused to clear the main routes of access along Laguna Road leading to the federal criminal warrant operation at the marijuana grow site. Protesters obstructed vehicle access to and from the facility and threw rocks and bottles at federal officers. In this scenario, if a Journalist or Legal Observer were positioned near or among the protesters—perhaps to document the event from a better vantage point—ERO officers would have been prohibited from issuing a dispersal order without first making a determination as to whether or not Journalists or Legal Observers were nearby. This would have endangered the safety of the ERO officers by preventing effective dispersal of violent

protestors, thereby subjecting them to continued assault from the individuals in the crowd and endangering the individuals in the vehicles that were attempting to pass. To comply with the Order, officers might be required to perform one or more affirmative steps, such as: 1) identify and determine whether individuals are Journalists or Legal Observers; 2) ask those who self-identify as Journalists or Legal Observers to relocate to avoid disrupting law enforcement operations; 3) negotiate with the Journalists or Legal Observers to discover where they should be relocated so they have a sufficient opportunity to report and observe; and 4) wait until the Journalists or Legal Observers move to the location. Only after proceeding through these steps could officers take action to allow the enforcement operation to proceed by deploying less lethal munitions, all in an environment where they are facing physical threats to themselves and others from multiple individuals in multiple locations who avoid detection and arrest by hiding in crowds of other protestors and people. In an environment where officers are under assault, and the threat to officer and public safety is high and constantly changing, these steps are especially burdensome, impractical, and dangerous. In scenarios where shots are fired at federal officers, as they were in Camarillo on July 10, 2025, such steps could even prove deadly to ERO officers. In that scenario, imposing a requirement to identify Journalists or Legal Observers, then asking them to relocate, diverts federal officers' attention from the immediate threat posed by the targeted individual, thereby reducing the time available for the officer to effectively neutralize the immediate threat. Time spent checking for credentials, issuing relocation commands, or attempting visual confirmation under stress and potentially limited

visibility, is time not spent responding to violent rioters, moving to cover, or communicating critical updates. Additionally, efforts to move Journalists or Legal Observers during such a scenario can trigger sudden movement that may draw fire.

5. These problems are compounded by the injunction's extraordinarily broad definitions of "journalist" and "legal observer." Press markings, press clothing, professional photographic equipment, and green hats are all publicly available. Officers are not able to reliably differentiate, in dynamic situations, actual press and legal observers from those who have acquired press and legal observer indicia through easy-to-access means and misrepresent themselves as press or legal observers. When ERO officers give a dispersal command for safety reasons, all parties are expected to comply. Any delay in compliance or the ability to respond to a lack of compliance poses a risk to officer safety, public safety, and the safety of any press or legal observers who may be present.

6. Second, the Order enjoining DHS from using crowd control weapons, chemical irritants, batons, and flash-bang grenades on members of the press, legal observers, and protesters who are not posing a threat of imminent harm to law enforcement or another person ignores the realities of protecting both officers and the public from violent opportunists who use the anonymity of crowds to assault law enforcement officers. Crowd control devices are used after crowds have been ordered to disperse, failed to do so, and/or engaged in criminal and assaultive behavior toward law enforcement officers and the public. Due to the nature of some crowd devices, such as CS gas and flash-bangs, which disperse widely, persons who fail to disperse pursuant to lawful orders, but are not posing

an immediate threat to law enforcement officers may be impacted, due to their proximity to persons who are engaged in violent and/or criminal behavior. These crowd control devices are designed and used not to cause physical injury but to protect law enforcement officers and the public from violent attacks. Moreover, consistent with the DHS Use of Force Policy, ICE officers only use force that is necessary and reasonable based on the totality of the circumstances. ERO officers are trained to engage those individuals who pose the greatest threat based on this reasonableness standard. The ERO officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community. This responsibility is jeopardized by the Order which effectively bans crowd control devices that disperse more widely because such crowd control devices are deployed "on" whomever is near the violent opportunists officers target with such crowd control devices.

7. Third, this Court enjoined DHS officers from firing kinetic impact projectiles or flash-bang grenades at identified wrongdoers, if doing so could foreseeably result in injury to the press, legal observers, or protesters, who are not posing an imminent threat to law enforcement or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person. This requirement is unnecessary and may well be counterproductive. To my knowledge, no ERO SRT officers have used kinetic impact projectiles, other than sponge rounds on July 10, 2025, as described above in paragraph 4, against any individuals during any protests identified in the Plaintiffs' preliminary injunction motion. Also, consistent with the DHS Use of Force Policy, ERO SRT officers

5

are trained to utilize direct impact munitions only on those individuals who pose a direct threat of serious physical harm to law enforcement and the public. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include the utilization of chemical munitions. ERO SRT officers are trained to give dispersal orders prior to the utilization of any of the aforementioned law enforcement tools wherever practical, and those individuals who do not heed these orders may be exposed to any or all of these, especially if they are near a person physically harming law enforcement and the public. Additionally, this requirement means that any individual impacted by kinetic impact projectiles or flash-bang grenades can challenge the officer's conduct by bringing contempt charges. This threat may deter officers from responding to protests that have turned violent.

8.  Fourth, this Court enjoined DHS officers from using any crowd control weapon without first giving at least two separate warnings in a manner and at a sound level where: (1) the warnings can be heard by the targeted individuals, (2) the messages explain that officers may employ crowd control weapons, and (3) the officers allow the targeted individuals sufficient time to avoid the use of force, unless the threat is so serious and imminent that a warning is infeasible. This requirement is unworkable for several reasons. A blanket requirement for two separate warnings prevents officers from responding effectively to exigent circumstances where the immediate use of these tools could prevent harm to the public or officers. For example, during the Camarillo enforcement action on July 10, 2025, protesters threw rocks at officers and blocked vehicles from entering or

exiting the facility where federal law enforcement officers were conducting a criminal warrant operation. In such situations, the behavior of the crowd dictates the timeline for warnings and deploying crowd control measures. If the crowd's actions require an immediate response, officers cannot and should not compromise safety to meet an arbitrary two-warning standard. While the Order includes an exception for situations where the threat is "so serious and imminent" that a warning is infeasible, the terms "so serious and imminent" are subjective and open to interpretation. This creates uncertainty for ERO SRT officers and exposes them to potential future litigation over whether their actions met this undefined threshold. Additionally, the requirement to allow targeted individuals "sufficient time" to avoid the use of force is vague and impractical, as it fails to account for the unpredictable and rapidly evolving nature of crowd dynamics. Delaying action to meet this standard could escalate danger and increase the risk of harm to the ERO SRT officers and the public. Furthermore, situations requiring the use of less lethal munitions are often loud, chaotic, and spread over large areas. The Order's reliance on whether targeted individuals can hear verbal warnings imposes a subjective standard that is beyond the control of federal officers. Noise levels, crowd density, and environmental factors may prevent individuals from hearing or understanding warnings, regardless of the officers' efforts. This creates an impractical enforcement standard and invites legal challenges over whether the warnings were adequate. While ERO SRT officers can provide verbal commands and warnings when feasible, they cannot guarantee or be expected to establish that the targeted individuals were able to hear and understand these warnings.

Consequently, an individual affected by crowd control devices could challenge an officer's conduct in court by asserting that they were unable to hear the verbal commands. The operational realities of such situations demand flexibility and rapid decision-making, which this requirement undermines. In short, the Order imposes impractical, subjective, and burdensome requirements that hinder the ability of officers to act decisively and safely in volatile and high-risk environments.

9. Fifth, this Court enjoined DHS officers from firing tear gas canisters or flash-bang grenades so as to strike any person, or firing kinetic impact projectiles or other crowd control weapons at the head, neck, groin, back, or other sensitive areas, unless that person poses an immediate threat of death or serious bodily injury. This requirement is unwarranted. Consistent with the DHS Use of Force Policy, ERO SRT officers are trained to utilize direct impact munitions only when individuals pose a direct threat to law enforcement or other members of the public. Furthermore, the DHS Use of Force Policy specifies that ERO SRT officers may only use the level of force that is objectively reasonable under totality of the circumstances. To my knowledge, no ERO SRT officers targeted any person in any sensitive body areas with any tear gas canisters, flash-bang grenades, kinetic impact projectiles or other crowd control weapons, during any protests identified in the Plaintiffs' motion for a preliminary injunction. In many cases, once chemical munitions are deployed by federal officers, violent opportunists kick or throw the chemical munition cannisters causing injury to others. Additionally, because kinetic impact projectiles travel relatively slowly, dynamic movements—such as a person turning

8

so their back faces the officer, or a bystander stepping into the line of fire—can result in an inadvertent strike to a sensitive area and expose the officer to contempt proceedings. This risk imposes a significant chilling effect on officers' ability to respond to protests that have turned violent.

10. Sixth, the Order provides that defendants shall not be liable for violating this injunction if a protester, journalist or legal observer is incidentally exposed to crowd control devices after such a device was deployed in a manner that complies with this injunction, does not alleviate my concerns for balancing security versus personal liability since ERO SRT officers can be held in Contempt of Court, and may face monetary fines or incarceration. Due to this potential added risk of personal liability, ERO SRT officers will now be more likely to hesitate to use any less lethal munitions and/or crowd control devices in situations where the use of force is necessary to protect ERO SRT officers from harm. This in turn can leave other individuals at greater risk of harm if officers are less willing to act when quick action is needed. Additionally, this so-called safe harbor does not adequately protect officers because it hinges on two ambiguous determinations: what qualifies as incidental exposure and what constitutes the use of nonlethal force consistent with the injunction. The resulting uncertainty – both about how the district court will evaluate specific conduct and how plaintiffs might characterize it – forces officers to choose between performing their duties and risking protracted contempt proceedings by those seeking to litigate every use of nonlethal force in district court.

11. Seventh, the Court's definition of Journalists protected under the Order is not only

9

unclear and imprecise but also sets forth a roadmap for abuse. The Order outlines certain indicia for identifying Journalists, including visual identification as a member of the press, such as by carrying a professional or authorized press pass, carrying *professional gear* such as *professional photographic equipment*, or wearing a professional or authorized press badge or other official press credentials, or distinctive clothing, that identifies the wearer as a member of the press. Additionally, the Order states that it also shall be an indicium of being a Journalist under this Order that the person is standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, *although these are not requirements*. The phrase "standing off to the side" is inherently ambiguous, and its practical meaning can change rapidly as crowd dynamics and conditions evolve during a protest. The caveat "[t]hese indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this Order" essentially means that none of the listed indicia need to be present and that additional indicia (unclear by whose standards) can suffice for "visual identification" of a Journalist. The lack of a clear standard for what constitutes "professional gear," such as "professional photographic equipment," further complicates matters. Since high-quality video and photography can be captured using smartphones—devices in ubiquitous use by the general public—any individuals recording protests on their smartphones could well attempt to argue they are Journalists for the purposes of the Order. Similarly, the reference to "distinctive clothing" as an indicium is problematic, given the widespread availability of press vests, hats, and other identifiers for purchase online by anyone, regardless of their

actual affiliation with the press. *See* Amazon, *Search Term: Press Vest*, available at https://www.amazon.com/s?k=press+vest&crid=W8X1POBDMI9A&sprefix=press+vest%2Caps%2C344&ref=nb_sb_noss_1 (last visited September 15, 2025). Beyond these challenges, practical considerations such as distance, weather conditions, low visibility during nighttime hours, and the use of ERO officers' equipment, such as helmets, protective eyewear to guard against laser attacks, and shields, may make it exceedingly difficult to visually identify individuals as Journalists in real-time. These ambiguities and practical obstacles create significant challenges for ERO officers tasked with implementing the Order and could lead to inconsistent and subjective determinations by the Court of who qualifies as a Journalist causing further litigation and possible sanctions.

12. Eighth, the Court's definition of Legal Observers protected under the Order is likewise unclear and unworkable. The following shall be considered indicia of being a Legal Observer: wearing a green National Lawyers Guild-issued or authorized Legal Observer hat (typically a green hat) or wearing a blue ACLU-issued or authorized Legal Observer vest. It also shall be an indicium of being a Legal Observer protected under this Order that the person is standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, *although these are not requirements*. This framework is flawed for several reasons. The identifiers of a green National Lawyers Guild-issued or authorized Legal Observer hat (typically a green hat) or a blue ACLU-issued or authorized Legal Observer vest are not unique or inherently secure. Similar hats and vests can be purchased online or replicated by individuals

11

unaffiliated with the National Lawyers Guild or the ACLU, making it difficult for ERO officers to verify authenticity. In addition, the Order did not provide any photographs of these hats and vests, and it is unclear whether the Order requires DHS officers to treat anyone wearing a green hat as an authorized legal observer allowed to disobey a dispersal order. This creates uncertainty about whether the clothing truly signifies Legal Observer status. This uncertainty creates hesitation that a violent opportunist can use to seriously harm officers and the public. Additionally, the optional nature of the behavioral indicia of standing off to the side of a protest, introduces ambiguity. Without clear, mandatory behavioral criteria, ERO officers may struggle to differentiate Legal Observers from protesters or other individuals present at the scene, particularly in dynamic and chaotic protest environments. Moreover, even if the indicia were present, practical obstacles such as distance, poor lighting, adverse weather conditions, crowd density, and the use of law enforcement equipment (e.g. helmets with shields, protective eyewear) can make it difficult to visually identify individuals based on clothing and behavior. These real-world challenges further exacerbate the lack of clarity in the indicia.

13. Lastly, the Court did not provide guidance on the identification of a Protester yet has included them in the group of individuals who are entitled to protections under this Order. Without specific indicia or criteria to identify Protesters, ERO officers are left to make subjective judgments about who qualifies as a Protester. This ambiguity can lead to inconsistent application of the Order, as ERO officers may struggle to differentiate Protesters from journalists, legal observers, bystanders, counter-protesters, or other

individuals at the scene.

14. In my experience, ERO officers have no interest in preventing any journalist or legal observer from doing their jobs and protestors from peacefully exercising their First Amendment rights, but the Order creates real dangers to federal officers who are enforcing federal laws in the face of violent persons who seek to injure and prevent these officers from enforcing federal law. The Order provides ambiguous criteria to identify journalists and legal observers protected by the Order, which can easily be taken advantage of by persons seeking to cause harm to law enforcement officers and the public, and imposes subjective, burdensome, and conflicting requirements that would result in more litigation and possibility liability for officers doing their best under difficult, chaotic conditions to protect themselves and others from criminal activity and significant physical injury.

15. Allegations of excessive force and civil rights violations are taken seriously by DHS and ICE. ICE officers are subject to an expedited internal review process set forth in 8 C.F.R. § 287.10 for public complaints lodged against them. ICE's Office of Public Responsibility receives these complaints and investigates allegations of employee misconduct. *See* ICE Office of Professional Responsibility website, available at: https://www.ice.gov/about-ice/opr (last visited on Sept. 12, 2025).

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 19th day of September, 2025, at Los Angeles, California.

Brian Szemes
Assistant Field Office Director
DHS ICE ERO Los Angeles