# EXHIBIT 6

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB; *et al.,* | Case No. 2:25-cv-05563-HDV-E |
| Plaintiffs, | |
| v. | **DECLARATION OF MANUEL MOLINA JR.** |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.,* | |
| Defendants. | |

## <u>DECLARATION OF MANUEL MOLINA JR.</u>

I, Manuel Molina Jr., declare and affirm that the following is true to the best of my knowledge, information, and belief:

1.     I am employed by U.S. Border Patrol (USBP), an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS).  CBP is charged with enforcing the Nation's immigration laws to protect national security and uphold the integrity of the immigration system.  As part of this mission, CBP Border Patrol Agents are responsible for preventing the unlawful entry of unauthorized individuals into the United States, apprehending, in accordance with the Constitution, those who attempt to enter illegally or who have violated the immigration laws, including the Immigration and Nationality Act, and other applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure enforcement of the immigration laws of the United States.

2.     I am currently the Incident Commander of the USBP assets supporting Operation At Large in Los Angeles, California.  In this role, I have oversight of all operations and

1

administrative functions for all USBP personnel supporting Operation At Large. This includes management of all enforcement teams and support branches including intelligence, logistics, and personnel. Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of material, but also the requisite training needed to operate in such a complex and fluid environment, including instruction in constitutional law. As the Incident Commander, I report directly to the National Incident Command Center. I assumed this assignment on September 2, 2025. Prior to this assignment, I was the Operations Section Chief in support of Operation At Large, Los Angeles, from June 7, 2025, to September 1, 2025. In that role, I had oversight and visibility on daily operations of all USBP enforcement teams that deploy to the Los Angeles area and was responsible for reporting daily activities to the Lead Field Coordinator.

3. My permanent duty location is at the Indio Station/El Centro Sector where I am the Patrol Agent in Charge. I have been in this role since March 13, 2022. Between May 11, 2021, and March 13, 2022, I also served as the Acting Patrol Agent in Charge at the Indio Station/El Centro Sector. In this role I have operational oversight and am responsible for Border Patrol personnel working in the Indio Station Area of Operations. I ensure the daily operations of the station are aligned with the goals and expectations of the Sector Chief Patrol Agent and consistent with the U.S. Border Patrol national strategy. I also have oversight of the administrative functions of the organization pertaining to the workforce and the facilities in Indio, including personnel training, budgeting, logistical and resource requirements.

4. I entered on duty on February 1, 1998, at the Blythe Station/Yuma Sector as a Border Patrol Agent. I was promoted to the supervisory ranks in July 2006. I have served as a Supervisory Border Patrol Agent in Blythe Station/Yuma Sector, Calexico Station/El Centro Sector, and El Centro Sector Headquarters in Imperial, CA. I served as the Special Operations Supervisor at El Centro Sector Headquarters before

transferring to the Blythe Station/Yuma Sector as a Watch Commander. I returned to Calexico Station/El Centro Sector as the Deputy Patrol Agent in Charge before I took on my current role as the Patrol Agent in Charge at the Indio Station/El Centro Sector.

5. On June 6, 2025, to support U.S. Immigration and Customs Enforcement, CBP agents were deployed to Los Angeles, California, as part of a national, multi-agency operation. The operation focuses on enhancing public safety and enforcing immigration law through law enforcement efforts. As part of this operation, CBP agents, in coordination with other federal agencies, are involved in a variety of different law enforcement encounters and enforcement actions.

6. The purpose of this declaration is to set forth some law enforcement operational and safety concerns created by the district court's order granting Plaintiffs' Motion for Preliminary Injunction on September 10, 2025 (Court's PI Order). This declaration supplements the information in the other declarations submitted by the DHS in opposition to Plaintiffs' Motion for Preliminary Injunction. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

7. The Court's PI Order adds additional uncertainty and complications to an already complex and potentially dangerous operational environment when CBP agents are confronted by people protesting, rioting, or actively interfering with enforcement operations. Additionally, this Order creates circumstances that could be easily exploited by bad actors, something that puts both agents and the public at a greater risk of harm.

8. One of the challenges with this order is its use of the broad, generic "protest" to potentially cover all types of public confrontations our agents in the field face while trying to carry out their lawful duties – whether a large-scale planned protest that begins peacefully and later descends to violence, to the more common gathering of individuals at the site of an ongoing enforcement action where members of the public actively

interfere, assault, or impede agents in an effort to prevent them from executing lawful enforcement actions. While CBP agents have clearly encountered the large protest situations, what they face on a routine, if not daily, basis in the field are gatherings that spring up around agents conducting enforcement operations at various locations throughout Southern California, such as car washes, restaurants, Home Depots, targeted arrests of illegal immigrants, and operations involving the execution of criminal warrants. This type of *ad hoc* protest typically involves active public interference, where crowds quickly grow, often outnumbering and surrounding agents, in an effort to impede agents carrying out their lawful enforcement actions. These interferences can range from direct confrontation to people physically blocking, grabbing, or assaulting agents, blocking or pulling on subjects, blocking or sabotaging law enforcement vehicles, or preventing egress of law enforcement vehicles from the location. This type of public interference escalates the risk of harm to CBP agents and the public as it creates an even more chaotic and rapidly evolving threat environment in which agents must monitor multiple potential risks, respond to those actively interfering or attacking, all while trying to complete their enforcement action safely and protect themselves and others. It is a very challenging and dangerous environment to operate in, and agents must rely on their years of training and experience to respond reasonably with only what force is necessary to get their job done. Limitations on the CBP agents' use of less-lethal devices in these types of chaotic, dynamic, and rapidly changing environment, whether confronting a large scale violent protest or an *ad hoc* crowd enforcement actions may cause them to hesitate to use the less-lethal measures that they are trained to use and place the agents and the public at greater risk of harm.

9. Paragraph 1 of the Court's PI Order creates potential enforcement problems when CBP agents are confronted by people protesting or interfering with enforcement operations. The Court's PI Order permits the press and legal observers to disobey orders to disperse even when the orders are issued for officer or public safety reasons or for the

4

safety of the press. Furthermore, while the Court's PI Order permits CBP agents to request that the press and legal observers change their location to avoid disrupting law enforcement operations, it does not set forth any rules or requirement for the press or legal observers to comply with law enforcement orders, regardless of the amount of interference or disruption being caused by their location in front of, adjacent to, or behind the CBP agents. Furthermore, because of the ambiguity about the definition of Journalist and Legal Observers discussed below, the lack of these rules or requirements poses a likelihood of harm to the CBP agents from persons either posing as members of the press or legal observers or having personal interests in the protests or interference in the law enforcement operations during a chaotic and dynamic environment.

10.     The injunction imposes subjective standards and ambiguous requirements that create legal uncertainty for agents. The Court's definition of "crowd control weapons" in Paragraphs 2, 4, and 5 of the Court's PI Order is overbroad and limits CBP agents' ability to conduct law enforcement operations. The Court limits law enforcement officers' use of "crowd control weapons" to situations when members of the public, such as protesters, pose a threat of imminent harm to a law enforcement officer, but fails to permit the use of these devices when incident to a lawful arrest or when these less-lethal measures are being used for reasons other than crowd control. For example, CBP agents use oleoresin capsicum (OC) spray (commonly referred to as "pepper spray") for purposes in addition to crowd control. OC spray is primarily used for targeted individuals because it has a limited range of approximately 4 to 6 feet and is not effective for area operations. It is sometimes used when CBP agents are dealing with a person resisting arrest and handcuffing, which might not involve a threat of imminent harm to the officers or the public, but may necessitate the use of limited force. The overly broad nature of the Court's PI Order is likely to cause uncertainty about the less-lethal measures available to CBP agents and may cause harm to officer safety. The Court's PI Order arises from crowd control situations, but its language is so overbroad

that it is not limited to crowd control situations and the terms of the order limit a law enforcement officers' legal enforcement options. This limitation will increase the potential for injuries to CBP agents, members of the public interfering with law enforcement operations, or arrested subjects.

11.     The Court's overbroad definition of "crowd control weapons," as I describe above, also causes the warning provisions in Paragraph 4 of the Court's PI Order to be overbroad and likely to negatively affect CBP agents' ability to conduct law enforcement operations. Warning limitations might be applicable to peaceful protests but negatively affect other law enforcement operations. Less-lethal devices such as batons and OC spray are different than compressed air launchers, such as the Pepperball Launching System (PLS) and FN303, or munition launchers, such as the 40M, which are area saturation devices meant to be used from distances, but the Court's PI Order does not distinguish among them. Batons and devices such as OC spray are used for close encounters which a CBP agent's ability to use them requires their ability to immediately respond with split-second decisions to protect themselves and others. An overbroad requirement for CBP agents to consider whether one, two, or any warnings are infeasible, whether such warnings can be provided at an adequate sound level, or whether sufficient time is being provided for the targeted individual to avoid the use of force is inconsistent with the protective function of their less-lethal devices and increases the likelihood that the agents have insufficient time to react to an aggressor and become injured.

12.     CBP agents have deployed OC spray at least four times during the past 60 days during the arrests of actively resistant subjects. An incident on August 7, 2025, demonstrates the problems caused by the restrictions imposed by the Court's PI Order and its generic reference to protesters. A CBP agent was trying to arrest a male subject who was resisting arrest by grasping a chain link fence with his hands. Another CBP agent was trying to assist by attempting to remove the male subject's fingers from the

6

fence. A woman started screaming from an adjacent property for the agents to leave the male subject alone. She tried to assist the resisting the male subject by pulling him over the fence. She was unsuccessful, but the male subject continued to resist arrest. Two men arrived next to the woman. An agent delivered a one second burst of OC spray to the male subject, then, immediately afterwards, while the agent's arm was still extended, the woman struck his arm with her hand. In response, the agent delivered a one second burst of OC spray at the woman. As a result of the deployments of OC spray, the male subject released the fence and was arrested and the woman backed away from the action. Under the Court's PI Order, a CBP agent involved in this dynamically evolving action would have to consider whether the interfering woman was a protester, whether her actions pose a threat of imminent harm, and whether the threat was so serious and imminent that the agent could not provide two separate warnings to the woman before using the OC spray as additional factors in addition to dealing with a physically resistant subject of an arrest.

13.     Paragraph 5 creates uncertainty about when CBP agents can use less-lethal devices, generally referred to as "crowd control devices" in the Court's PI Order, for any law enforcement purposes. CBP's Use of Force Policy already prohibits the intentional targeting of the head, neck, spine, or groin of the intended subject by compressed air launchers or munitions launchers, unless the use of deadly force is reasonable. This paragraph's reference to "other sensitive areas" is vague, because any part of a person's body may be sensitive to the impact of a baton, kinetic impact projectiles, OC spray, or other less-lethal devices. As a result, CBP agents may be at risk of harm as they hesitate to use any less-lethal devices during crowd control or other law enforcement operations for fear of violating the Court's PI Order by striking unidentified "sensitive areas" of a violent offender or protester's body.

14.     The district court's definition of "Journalists" in Paragraph 7 of its PI Order is too vague and both overbroad and underinclusive thereby creating the likelihood of

confusion and mistake during protest operations. First, it is vague and underinclusive in its reference to "professional gear such as professional photographic equipment" as an indicium of being a journalist. Many journalists or other members of the press often use cellphones as their photographic equipment, and, in that respect, are indistinguishable from protesters or other members of the public. Second, similarly, the definition of journalist is vague and overboard in its reference to "distinctive clothing" as an indicium of someone being a journalist because, based on my experience, there is no uniform attire worn by journalists ranging among bloggers, small and large newspaper reporters, and television network reporters. Third, while the Court's PI Order seemingly sets forth "indicia" for a journalist, it also states that these "indicia" are not exclusive and implies that a Journalist need not exhibit any of these factors to be considered a Journalist under the PI Order. Furthermore, it is unclear how "standing off to the side of a protest" might provide an indication that a person is a Journalist as opposed to any other person observing or resting during a protest. Fourth, a member of the press is not prohibited from engaging in protest activities or intermixing with persons engaged in protest activities, which increases the likelihood of confusion and mistakes, especially if a protest evolves into a riot or if protesters try to conceal or disguise themselves by wearing the "distinctive clothing" of a Journalist. Thus, for example, the district court's definition of Journalist fails to provide law enforcement officers with sufficient guidance to avoid confusion about whether a person with a cellphone is, on the one hand, a protester who must comply with an order to disperse or, on the other hand, a journalist who may disobey a lawful dispersal order under the terms of the Court's PI Order. As a result, a CBP agent may not be able to distinguish between an actual journalist and a protester or rioter that is trying to move into a position to cause harm to law enforcement personnel or who does not qualify for the special access and exemption from dispersal orders provided by the Court's PI Order.

15.    The district court's definition of "Legal Observers" in Paragraph 8 of its PI Order

is also too vague and fails to establish a firm definition that will permit compliance with the PI Order during a protest or riot. Although the definition of "Legal Observer" superficially appears to define a Legal Observer as wearing certain National Lawyer's Guild or ACLU attire, it does not require it. The definition also permits Legal Observers to engage in protest activities or be intermixed with protesters, which increases the likelihood that an error causing harm to a law enforcement officer or a Legal Observer will occur, especially because the Court's PI Order permits a Legal Observer to disobey a lawful dispersal order. Moreover, green hats and blue vests are all publicly available, and a CBP agent is likely to have difficulty distinguishing a legitimate legal observer and a protester or rioter during real-time, dynamic situations that may pose a risk to officer safety or public safety. Furthermore, it is unclear how "standing off to the side of a protest" might provide any "indicia" that a person is a Legal Observer as opposed to any other person observing or resting during a protest. As a result, a CBP agent may not be able to distinguish between an actual Legal Observer and a protester or rioter that is trying to move into a position to cause harm to law enforcement personnel or who does not qualify for the special access and exemption from dispersal orders provided by the Court's PI Order. Fears of personal liability may also deter officers from taking necessary actions, even when justified, because, while Paragraph 7 of the Court's PI Order provides a measure of liability protection when there is ambiguity about a person's status as a member of the press, Paragraph 8 of the Court's PI Order does not provide similar liability protection when there is ambiguity about a person's status as a Legal Observer.

16.     Finally, the Court's PI Order as written is easily exploited by persons with bad intentions. In the current operational environment, where the targeting of CBP agents is a constant and immediate threat, the ease in which bad actors could weaponize the problems with this Order to avoid detection to perpetuate violence is a serious and legitimate concern. One of the exploitable problems in the PI Order is the difficulty

agents face in chaotic and dynamic situations, such as riots or some *ad hoc* protests, because it does not differentiate between Journalist's and Legal Observer's obligations during protest activity that is peaceful and protest activity that becomes violent. The order's failure to make it a requirement for members of the press or legal observers to stand to the side, not engage in protest activities while acting as Journalists and Legal Observers, and not intermixing with persons engaged in violent protest activities, permits those acting as Journalists or Legal Observers to effectively act as shields for the violent protesters. By using Journalists or Legal Observers as a shield, those engaged in violent assaults will be able to obscure their actions, making it much more difficult for CBP agents to identify a specific threat or source of an attack. Less-lethal crowd control devices play an important role in these types of chaotic situations by helping CBP agents disperse violent crowds and protect ongoing enforcement operations with a significantly reduced likelihood of causing permanent injury to any person affected.

17.     Under the Court's PI Order, when Journalists or Legal Observers are allowed to act as shields, either inadvertently or intentionally, for violent protesters by permitting these protected individuals to intermix with them, those engaging in violent activity are effectively protected from CBP agents' ability to use less-lethal measures against them because of the agents' concern about violating the protections provided to Journalists and Legal Observers by the Court's PI Order. This impact is further aggravated if protesters disguise themselves in the supposedly distinctive clothing of Journalists, a green hat, or a blue vest, and use this attire or a fraudulent self-identification of themselves as a Journalist or Legal Observer to maneuver close to or behind CBP agents in order to attack them or engage in other malicious conduct. It may also lead to potentially deadly hesitation by agents trying to reconcile suspicious or threatening behavior, with a bad actor's disguised appearance of a Journalist or Legal Observer.

18.     These enforcement problems, including the lack of clear definitions of Journalists and Legal Observers, create officer safety concerns for CBP agents when they are

engaged in immigration enforcement or enforcement relating to protests, particularly when combined with the Court's PI Order's limitations on the use of certain crowd control or less-lethal devices. CBP agents' inability to use less-lethal measures on individuals obstructing enforcement operations but not imminently threatening harm may escalate the risks of injury to law enforcement officers and the public by causing the CBP agents to hesitate to respond effectively to increasing threats. Under CBP's Use of Force Policy, agents may only deploy an objectively reasonable level of force in response to the facts and circumstances at the time force is used. They are trained to use various tactics, including less-lethal force, to control a situation to promote public safety and officer safety while minimizing the risk of unintended injury or serious property damage. These policies preserve officers' flexibility to respond to tense, uncertain, and rapidly evolving situations in which split-second judgments are often required. The district court's prohibition on the use of most less-lethal devices, except to prevent an immediate harm to a law enforcement officer or other person, imposes an inappropriate limitation on officer conduct and may cause CBP agents to hesitate before responding with less-lethal measures in a chaotic protest environment turning violent with potentially serious consequences to the agents or the public.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 19th day of September, 2025, at Long Beach, California.

MANUEL MOLINA JR.