# EXHIBIT 8

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., | Case No. 2:25-cv-05563 |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, | DECLARATION OF BRIAN SZEMES |
| Defendants. | |

**DECLARATION OF BRIAN SZEMES**

I, Brian Szemes, hereby declare:

1. I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Assistant Field Office Director (AFOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since January 2016. Among other things, I have management and supervisory responsibilities over the Los Angeles training unit, which includes identifying training requirements and developing plans for training new and existing employees. Prior to that, I served as an AFOD over the San Bernardino sub-office located in San Bernardino, California. I have worked in various other positions within ICE and the former Immigration and Naturalization Service since September 9, 2001.

2. The statements contained in this declaration are based upon my personal knowledge

1

or upon information provided to me in my official capacity.

3. As the AFOD for ERO Los Angeles, I supervise the ERO Los Angeles Special Response Team (SRT) and have knowledge of that Team's actions with regard to two operations referenced in Plaintiffs' motion for preliminary injunction: the MacArthur Park operation on July 7, 2025, and the Camarillo Glass House warrant operation on July 10, 2025.

4. I did not witness, nor am I aware of, any ICE employee knowingly targeting journalists, legal observers, or peaceful protestors with less lethal munitions and/or crowd control devices.

5. The only ERO employees who are authorized to use chemical crowd dispersal devices and diversion devices are highly trained elite deportation officers who are members of the ERO SRT.

6. ERO SRT officers are bound by the DHS Use of Force policy titled, *Update to the Department Policy on the Use of Force* (Feb. 6, 2023) (Use of Force Policy), available at: https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf.

7. I understand that Plaintiffs allege that ICE officers and special agents were present at various locations where federal enforcement operations took place. ERO Los Angeles SRT officers provided assistance as requested by the lead component or agencies of the operations, such as ICE Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP).

8. I understand that Plaintiffs allege that ICE officers and special agents were present at MacArthur Park in Los Angeles, California, on July 7, 2025. While some ERO SRT officers were present, they did not use force or deploy or threaten to deploy any less lethal munitions and/or crowd control devices. During this enforcement action, protesters slashed one of the tires of an ERO transport van. As protesters approached the van with ICE personnel still inside, ERO SRT's Bearcat blocked the protesters, allowing the van to leave, forcing it to drive on a flat tire.

9. I understand that Plaintiffs allege that ICE officers and special agents were present at Glass House Farms in Camarillo, California, on July 10, 2025. I can confirm that 15 ERO Los Angeles SRT officers were present at this enforcement site. During this enforcement operation, the ERO Los Angeles SRT officers were tasked with securing the main access point to the location of the search warrant. They also protected main roads and ensured the main routes along Laguna Road were clear for Government-Owned Vehicles (GOV) transporting federal personnel and/or arrestees entering or leaving the warrant location. Additionally, ERO Los Angeles SRT officers escorted transport vehicles in and out of the warrant location with the Bearcat and HSI support.

10. The federal officers engaged in the Camarillo enforcement operation were attacked by rioters and protesters. These individuals assaulted federal officers, including ICE employees, and significantly damaged property by throwing rocks, bottles, and other objects at officers. In one case, a protester appears to have fired a handgun at officers. Rioters also damaged dozens of GOVs with baseball bats and rocks. Federal officers on

3

the line were hit by rocks and water bottles, causing multiple injuries. Additionally, protesters broke the window of an ERO Los Angeles assigned GOV, also smashing the front bumper and hood with a baseball bat. The tires of this vehicle and several other vehicles were also flattened as protesters dumped several boxes of screws in the road to disable the tires on the transport vehicles. Numerous protesters threw rocks at the convoys of GOVs exiting the facility, including the vans that were transporting 10-15 arrested illegal aliens in each van, which caused heavy damage to the vehicles. Once the convoy was underway, protesters and rioters in vehicles followed the convoy in an attempt to block the road and run the GOVs off the road by driving on sidewalks and in between lanes, which not only endangered the lives of the federal officers and detainees, but also the lives of civilians traveling on the road at that time.

11. After providing multiple warnings that less lethal munitions and/or crowd control devices would be employed when protesters refused to clear the main routes along Laguna Road, where vehicles were attempting to enter and exit the facility at Camarillo, California, consistent with the DHS Use of Force Policy, the ERO Los Angeles SRT officers deployed CS gas (tear gas), pepper ball rounds, and sponge rounds toward individuals who were throwing rocks and other items at the federal officers present. In addition, I can confirm that announcements to disperse were made by DHS officers at least ten times and by CBP officers at least once, consistent with the DHS Use of Force Policy, before deploying the CS gas and pepper ball rounds. Federal officers did not specifically target peaceful protesters or journalists during the deployment of any less lethal munitions and/or crowd

4

control devices.

12. I can confirm that ERO Los Angeles SRT officers were not present at the following locations, where I understand that Plaintiffs also allege that ICE was present: 1) Xpress Carwash in Maywood, California, on June 20, 2025; 2) Home Depot in Marina Del Ray, California, on June 23, 2025; and 3) Metropolitan Detention Facility in Los Angeles, California, on July 4, 2025.

13. I have reviewed Plaintiffs' proposed order submitted with their motion for a preliminary injunction. The relief requested is unnecessary and would endanger the safety of law enforcement personnel and the public. First, Plaintiffs' request that this Court enjoin DHS from dispersing the press or engaging in behavior that may be perceived as "threatening" or "assaulting" by the press or legal observers and only allowing ERO officers to ask press or legal observers to change location to avoid disrupting law enforcement as long as the press or legal observers have sufficient opportunity to report and observe. This is simply unworkable. ERO officers are responsible for securing an impacted area and may be unable to differentiate between members of the press and other participants, especially while in the midst of a chaotic and violent situation where there is imminent physical danger to ICE law enforcement officers and members of the public, such as when shots were fired at federal officers in Camarillo on July 10, 2025. Press markings are publicly available, and while officers may have no reason to limit press access, their ability to differentiate between actual press and those who have come by press markings through fraudulent means cannot be determined in real-time. Legal observers

are even less easily identifiable. When ERO officers give a dispersal command for safety reasons, all parties are expected to comply. Any delay in compliance or the ability to respond to a lack of compliance poses a risk to officer safety, public safety, and the safety of any press or legal observers who may be present.

14. Second, Plaintiffs' request to enjoin DHS from using crowd control weapons, chemical irritants, and flash-bangs on people who are not posing an immediate threat to law enforcement or another person ignores the realities of protecting both officers and the public from violent opportunists who use the anonymity of crowds to assault law enforcement officers. Crowd control devices are used after crowds have been ordered to disperse, failed to do so, and/or engaged in criminal and assaultive behavior toward law enforcement officers and the public. Due to the nature of some crowd devices, such as CS gas and flash-bangs, which disperse widely, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers may be impacted, due to their proximity to persons who are engaged in violent and/or criminal behavior. These crowd control devices are designed and used not to cause physical injury but to protect law enforcement officers and the public from violent attacks. Moreover, consistent with the DHS Use of Force Policy, ICE officers only use force that is necessary and reasonable based on the totality of the circumstances. ERO officers are trained to engage those individuals who pose the greatest threat based on this reasonableness standard. ERO officers are trained to give verbal commands and those individuals who do not comply with these commands may be perceived as a potential threat. The ERO

6

officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and refusal to leave a restricted area.

15. Third, Plaintiffs' request that this Court enjoin DHS officers from firing kinetic impact projectiles or flash-bangs at identified wrongdoers, if doing so could result in injury to a person who is not posing an imminent threat to law enforcement or another person. This is unnecessary and unworkable. To my knowledge, no ERO SRT officers have used kinetic impact projectiles, other than sponge rounds on July 10, 2025, as described above in paragraph 11, against any individuals during any protests identified in the Plaintiffs' preliminary injunction motion. As stated previously, flash-bangs may inadvertently impact persons who fail to disperse pursuant to a lawful order and are in near proximity to an identified person engaged in violent and criminal behavior toward law enforcement officers and members of the public. Prohibiting the use of flash-bangs, which create a bright light and loud noise, would take away a valuable less-lethal tool for law enforcement officers to protect themselves and others. Also, consistent with the DHS Use of Force Policy, ERO SRT officers are trained to utilize direct impact munitions only on those individuals who pose a direct threat to law enforcement. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include the utilization of kinetic impact or chemical munitions and/or diversionary devices. ERO SRT officers are trained to give dispersal orders prior to the

7

utilization of any of the aforementioned law enforcement tools wherever practical, and those individuals who do not heed these orders may be exposed to any or all of these. In short, those individuals who do not disperse when receiving the command to do so, identify themselves as a potential threat to law enforcement.

16. Fourth, Plaintiffs' request that this Court enjoin DHS officers from using any crowd control weapon without giving at least two separate warnings in a manner and at a sound level where: (1) it can be heard by the targeted individuals, (2) the messages explain that officers may employ crowd control weapons, and (3) the officers allow the targeted individuals sufficient time to avoid the use of force. This is both unnecessary and unworkable. Consistent with the DHS Use of Force Policy, ERO SRT officers are trained to give warnings when operationally feasible. A blanket requirement for two separate warnings would prevent officers from responding to exigent circumstances where the utilization of these tools could prevent harm to the public or officers, such as when shots were fired by a protester at federal officers. It is the subject's behavior that dictates the timeline of the utilization of these tools, and if the subject or crowd behavior requires a more immediate response, officers cannot and should not compromise safety to meet an arbitrary two-warning standard. In addition, situations where the use of less lethal crowd control measures are needed are often loud, chaotic, and spread over a large area. Plaintiffs' request relies on a subjective standard of whether the protestors, journalists, legal observers, or others can hear verbal warnings before any use of force is employed, which is beyond the control of federal officers. Indeed, it is solely within the control of the

8

crowd. While ERO SRT officers can provide verbal commands and warnings, when possible to do so as explained previously, they cannot guarantee or be able to prove everyone in the crowd was able to hear and understand these warnings. In short, ERO SRT officers will give commands and warnings to avoid unnecessary exposure, however, ERO SRT officers are permitted to use necessary force as appropriate based on the totality of circumstances.

17. Fifth, Plaintiffs' request that this Court enjoin DHS officers from using kinetic impact projectiles containing chemical irritants unless expressly approved by an on-scene supervisor in response to specific acts of violence that the supervisor personally witnessed. This is unworkable. The on-scene commander approves all operational contingency plans which may include the use of any impact projectiles and chemical munitions prior to the start of the operation. The dynamic nature of operations does not always allow the supervisor to be on scene or personally witness rapidly evolving situations which may require the use of such munitions. Nor would a supervisor on scene necessarily see the act of violence in question. ERO SRT officers are trained to use discretion and follow all policies when deploying chemical munitions and specialty impact munitions. Regardless of circumstance, all law enforcement officers are held to the necessary and reasonable standard. The deployment of these tools is dictated by the totality of circumstances facing the officer in real-time. The delay required by supervisory notification or presence would unnecessarily place law enforcement officers and community members in harm's way.

18. Lastly, Plaintiffs' request that this Court enjoin DHS officers from firing tear gas

9

canisters or flash-bang grenades so as to strike any person, or firing kinetic impact projectiles or other crowd control weapons at the head, neck, groin, spine, or other sensitive areas, unless that person poses an immediate threat of death or serious bodily injury. This is both unnecessary and unworkable. To my knowledge, no ERO SRT officers targeted any person in any sensitive body areas with any tear gas canisters, flash-bang grenades, kinetic impact projectiles or other crowd control weapons, during any protests identified in the Plaintiffs' motion for a preliminary injunction. In many cases, once chemical munitions are deployed by federal officers, violent opportunists kick or throw the chemical munition cannisters causing injury to others. As stated previously, consistent with the DHS Use of Force Policy, ERO SRT officers are trained to utilize direct impact munitions only when individuals pose a direct threat to law enforcement or other members of the public, including those who fail to comply with a dispersal order since they are identified as a potential threat to law enforcement. Consistent with the DHS Use of Force Policy, ERO SRT officers may only use the level of force that is objectively reasonable under totality of the circumstances.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 15th day of August, 2025, at Los Angeles, California.

10

Brian Szemes
Assistant Field Office Director
DHS ICE ERO Los Angeles