IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, et al., | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 25-cv-12173 |
| v. | ) ) ) | Honorable Sara L. Ellis, District Judge |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity, et al. | ) ) ) ) ) | |
| *Defendants* | ) | |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM BRIEF IN SUPPORT OF
AMENDED PROPOSED TEMPORARY RESTRAINING ORDER**

Plaintiffs respectfully submit the following supplemental memorandum brief in response to the Court's inquiries during the October 8, 2025, hearing as follows:

**I.      Paragraphs 1(c), 1(d), 1(e), and 1(f)**

The Court invited an additional submission concerning the competing proposed language for paragraphs 1(c), 1(d), 1(e), and 1(f), prohibiting the use of certain types of force and using certain types of weapons against Plaintiffs, except when particular circumstances are met. Here, the Court has already found that Plaintiffs' reporting, religious observance, and protesting rights have been violated and are chilled absent effective injunctive relief because federal agents have used excessive, retaliatory, and indiscriminate force to abridge their First Amendment rights.

Under these circumstances, other courts in the most relevant cases to this one, *LA Press Club v. Noem* and *Index Newspapers v. USMS*, have not hesitated to impose restrictions on the use of force that leave appropriate but precise exceptions for situations involving the risk of

1

physical injury.[1] Plaintiffs have proposed that force cannot be used in response to protected First Amendment activity unless there is an "immediate and serious threat of physical harm to a person," Dkt. 36-1 ¶¶ 1(c) & 1(d), and that deadly force cannot be used, except when "the person poses an immediate threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force," Dkt. 36-1 ¶¶ 1(e) & 1(f). As Plaintiffs argued in Court, these circumstances justifying the use of force are consistent with constitutional standards, can be clearly communicated to officers, and are capable of implementation in the field because the analogous or materially identical injunctions against federal agents were in place for weeks in *LA Press Club* and *Index Newspapers* without any apparent issue. Additional support for Plaintiffs' proposals includes:

A.   **A Similar Injunction Has Worked in *L.A. Press Club***

The injunction entered in *Los Angeles Press Club v. Noem*, No. 2:25-CV-05563-HDV-E, 2025 WL 2658327, at *25 (C.D. Cal. Sept. 10, 2025), which is substantially similar to the language Plaintiffs propose, has been in place for a month without issue. There, the Court entered an injunction prohibiting the use of "crowd control weapons (including kinetic impact projectiles ("KIP"s), chemical irritants, batons, and flash-bang grenades" absent "a threat of imminent harm to a law enforcement officer or another person"; prohibited the "[f]iring [of] kinetic impact projectiles or flash-bang grenades at identified targets" unless "necessary to stop an immediate and serious threat of physical harm to a person"; and prohibited "[f]iring tear gas

---

[1] *See also, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 885 (9th Cir. 2012) ("[T]he application of pepper spray to individuals such as Nelson and his associates, whose only transgression was the failure to disperse as quickly as the officers desired, would violate the Fourth Amendment"); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 274 (S.D. Ohio 2021) ("[A]ny possible benefit police officers could gain from deploying chemical agents, projectiles, or striking weapons against demonstrators who pose no threat and are not resisting lawful commands is outweighed by the irreparable harm peaceful protestors could face.")

2

canisters or flash-bang grenades so as to strike any person, or firing KIPs or other crowd control weapons at the head, neck, groin, back, or other sensitive areas" unless the target "poses an immediate threat of death or serious bodily injury." *Id.* The Government represented in court that there was an issue raised by them with respect to problems with the Los Angeles injunction in their motion to stay briefing. There was not. There was no specific issue raised in any of their declarations related to any issue with complying with the injunction after it was issued on September 10, 2025. *See* Dkts. 58 (and exhibits 1-5); 65 (and exhibit 1). It does not cite a single incident showing a workability or safety impairment to law enforcement since the district court issued the injunction while no stay has been in place. If this Court were to reject Plaintiffs' proposed language in these paragraphs, it should alternatively enter the language ordered by the district court in *L.A. Press Club*.[2]

### B. A Broader Injunction in *Index Newspapers* Worked

The preliminary injunction in *Index Newspapers* was less precise than what Plaintiffs propose here, enjoining the federal agents from "using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained

---

[2] Plaintiffs' proposed limits on using less-lethal (but still potentially deadly) force on peaceful protesters, journalists, and religious observers are less restrictive than injunctions that have been entered against police departments across the country. *See, e.g.*, *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 520 (E.D. Mich. 2020) (forbidding use of striking weapons, chemical agents, and rubber bullets against any peaceful protester or demonstrator who "does not pose a physical threat to the safety of the public or police"); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1091 (N.D. Cal. 2020) (enforcing complete ban on "stinger grenades, wooden bullets, rubber or rubber coated bullets, pepper balls, and similar munitions" and allowing use of "chemical agents, flashbang grenades and foam projectiles" only when "there is an imminent threat of physical harm to a person or significant destruction of property and where use of these munitions may pose less of threat to the public than physical force"); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1216 (W.D. Wash. 2020) (enjoining City of Seattle from using "employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations" and allowing use of tear gas only if "alternative crowd measures" are exhausted and chief of police concludes that tear gas "is the only reasonable alternative available"); *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1294 (D. Colo. 2020) (prohibiting use of KIPs and all other non- or less-lethal projectiles to the head, pelvis, or back and prohibiting shooting of KIPs and all other non- or less-lethal projectiles indiscriminately into a crowd).

below), unless the Federal Defendants have probable cause to believe that such individual has committed a crime." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1156 (D. Or. 2020). Still, in that case, the DHS defendants were able to comply with the injunction for weeks without significant reported incident and despite more volatile protests in Portland in 2020 than anything close to the nearly entirely peaceful activity seen in the Northern District of Illinois this year. Plaintiffs offer more precision in the proposed provisions 1(c), 1(d), 1(e), and 1(f) here in response to the Court's October 6 direction to focus on specific weapons and technology, and in an effort to be sufficiently protective of First Amendment rights while making clear that the injunction permits lawful uses of force against any few violent violators who are no longer engaged in protected expressive conduct.

### C. Plaintiffs' Proposal Is Tied to the Facts; Defendants' Is Not

The relief Plaintiffs seek is justified by and tailored to the facts on the ground. It is necessary to prevent the use of the continued weapons described in these paragraphs against people peacefully exercising their First Amendment rights, except in the circumstances where the person acts or will imminently act violently and no longer within the protection of the First Amendment. Plaintiffs present a mountain of unrebutted evidence establishing a pattern spanning weeks of DHS agents repeatedly using severe force against individuals for exercising their expressive and reporting rights. Dkt. 21 at 37. In light of this record, the Court has discretion to fashion an effective remedy to ensure that "First Amendment freedoms [have] breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief"); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 889 (7th Cir. 1996) (same).

4

### D. CBP's Use of Force Policies Are Not Meant for Policing Protests

CBP's use of force policies were designed to guide officers on the use of force for arresting people at the border, not in protest or crowd control contexts. *These are not the same*; guidance applicable for one is not necessarily transferable to another. Specifically, what may be appropriate conduct for an officer apprehending and arresting a lawbreaker who may be attempting to escape such apprehension and detention is different from the appropriate conduct in the context of protest policing, which requires specific de-escalation tactics, standard practices and accepted training on uses of less-lethal force, and respect for constitutional interests not at issue in a typical immigration enforcement action. The 2023 DHS and 2021 CBP use of force policies that Defendants present do not use the words "civil disturbance," "First Amendment," "journalist," "crowd," "protest," or even "riot." They are not the standard guidance for policing in those settings. Defendants' declarant from *L.A. Press Club* concedes that protest policing is not mandatory training for CBP officers but is covered separately in optional training, and therefore not included in the general use of force training and guidance for them. Dkt. 35-4 at 4.

And as Gil Kerlikowske—an expert in both protest policing and the practices and scope of CBP—further explained in his declaration,

> [M]any of these federal forces are simply not trained in urban crowd control and managing demonstrations. Policing protests is difficult even with the proper experience, but it can be done successfully with good leadership and correct guidance on appropriate use of force: agents are to adequately warn, wait, de-escalate; use no more force than necessary to address threats of violence or make arrests for alleged lawbreaking; respect the particular interests of journalists and observers; and never use force in a manner that punishes the crowd for attending the protest.

Dkt. 22-32 ¶ 113.

These policies are not, and should not be, the touchstone for how officers act at protests to provide sufficient respect for First Amendment interests. *Cf. Lamb v. City of Decatur*, 947 F.

Supp. 1261, 1265 (C.D. Ill. 1996) ("This is not a typical excessive force case where the police were struggling with a fleeing felon or a rebellious prisoner. Instead, the police were monitoring a peaceful, lawful and constitutionally protected demonstration.").

> E. **The Government's Proposal Vests Too Much Discretion in Officers and Existing DHS Policies Already Fail to Constrain Them**

The government's proposed standards are prone to abuse and extremely broad. "Active resistance" is defined as "[a] type of resistance where physical attributes are being used to resist an officer/agent's control efforts. The efforts are not directed toward the officer/agent but rather appear intended to thwart an officer's/agent's control efforts." Dkt. 35-10 (CBP Policy, 2021) at 60. Terms like "control effort" and "physical attributes" are not defined, and the action of an individual need only "appear" to thwart an officer's control, and so this standard may be satisfied even when there is no justification for force under the Fourth Amendment (e.g., when someone is running away or backing away). Because it is so vague, this standard vests complete discretion on the use of force in the line officer, rather than instructing officers when they may lawfully use force in a protest setting. Protection of the First Amendment against the federal agents' significant, widespread, and ongoing pattern of violations seen in the Northern District of Illinois requires more than the permissive, discretionary standards that are already failing to properly instruct DHS agents.

## II. Body-Worn Cameras

The Court inquired whether there are rules or regulations promulgated by Defendants regarding the use of body-worn cameras. There are at least some such regulations. U.S. Customs and Immigration Enforcement has a policy promulgated in February 2025 providing in relevant part that:

6

> It is ICE policy to utilize [body-worn cameras] according to the processes, procedures, requirements, and limitations set forth in this Directive and Department of Homeland Security (DHS) policy, including activation as soon as practicable at the beginning of an Enforcement Activity and deactivation when the activity is concluded.

ICE Directive No. 19010.3, Body Worn Camera, Sec. 2 (Feb. 19, 2025) (attached as Ex. 1). This written policy could be utilized for guidance by this Court.

### III.  Paragraph 3

The government's proposed language in paragraph 3(b) of the proposed order creates ambiguity about to whom in DHS the Court's restraining order must be distributed. This Court should include a paragraph 3(b) that provides:

> all employees, officers, and agents of Federal Agents with supervisory or management authority over any law enforcement officers or agents currently or subsequently deployed in the Northern District of Illinois, up the chain of command to and including the Secretary of Homeland Security and other named Defendants.

RESPECTFULLY SUBMITTED,

/s/ Elizabeth Wang

*One of Plaintiffs' Attorneys*

| | |
|---|---|
| Jon Loevy | Craig B. Futterman |
| Locke Bowman | **MANDEL LEGAL AID CLINIC** |
| Steve Art | University of Chicago Law School |
| Heather Lewis Donnell | 6020 S. University |
| Theresa Kleinhaus | Chicago, IL 60637 |
| Matt Topic | (773) 702-9611 |
| Lindsay Hagy | futterman@uchicago.edu |
| Jordan Poole | |
| Dominique Gilbert | Hayden Johnson* |
| Justin Hill | Katie Schwartzmann* |
| Aaron Tucek | Conor Gaffney* |
| Alexandra Wolfson | **PROTECT DEMOCRACY PROJECT** |
| **LOEVY + LOEVY** | 2020 Pennsylvania Ave NW, Ste 163 |
| 311 N. Aberdeen Street | Washington DC 20006 |
| Chicago, Illinois 60647 | (202) 579-4582 |
| (312) 243-5900 | hayden.johnson@protectdemocracy.org |
| steve@loevy.com | katie.schwartzmann@protectdemocracy.org |
| | conor.gaffney@protectdemocracy.org |

7

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
℅ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2224
wally.hilke@law.northwestern.edu

*Application for pro hac vice forthcoming*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org

8