FOR OFFICIAL USE ONLY

EXHIBIT 1

# U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**ICE Directive 19010.3: Body Worn Camera (BWC)**

| | |
|---|---|
| **Signature Date:** | February 18, 2025 |
| **Issue Date:** | February 19, 2025 |
| **Superseded:** | ICE Directive No. 19010.2, Body Worn Camera (BWC) (Nov. 17, 2023). |

1. **Purpose/Background.** This Directive establishes policy for the use of Body Worn Cameras (BWCs) by U.S. Immigration and Customs Enforcement (ICE) Law Enforcement Officers and Agents (LEOs).

    ICE recognizes that many law enforcement agencies are expanding their use of BWCs in their daily operations. The use of BWCs in appropriate circumstances may be beneficial to the execution of many of ICE's operations and may also promote public trust; enhance service to the community by accurately documenting events, actions, conditions, and statements made by encountered individuals; and increase officer and public safety, accountability, and transparency.

2. **Policy.** It is ICE policy to utilize BWCs according to the processes, procedures, requirements, and limitations set forth in this Directive and Department of Homeland Security (DHS) policy, including activation as soon as practicable at the beginning of an Enforcement Activity and deactivation when the activity is concluded.[1]

2.1. **Authorization.** This Directive requires ICE LEOs to use BWCs subject to the guidelines set forth herein. ICE LEOs will use BWCs to collect audio and video recordings of interactions with the public during Enforcement Activities according to procedures set forth in this Directive.

2.2. **Scope.** Until such time BWCs have been issued enterprise-wide, this Directive applies only to ICE personnel in Areas of Responsibility (AORs) where the use of BWCs and BWC responsibilities have been implemented.

2.3. **Implementation.** Enterprise-wide implementation shall be dependent on availability of appropriated funding resources.

3. **Definitions.** The following definitions apply for purposes of this Directive only.

3.1. **Body Worn Camera (BWC).** ICE-approved audio/video/digital recording equipment combined into a single unit, designed to capture a first-person perspective, which is

---

[1] Enforcement activities are complete and cameras should be deactivated once scene is secure as determined by the supervisor or team leader on scene.

_____
Body Worn Cameras

FOR OFFICIAL USE ONLY

    typically worn on clothing or otherwise secured to a person.[2]

**3.2. BWC Coordinator.** An individual selected by the FRO at each Field Office to be primarily responsible for administering and monitoring BWC equipment in accordance with the requirements in this Directive.

**3.3. BWC Recording.** Any audio and/or video data recorded by an ICE LEO using a BWC during their official duties.

**3.4. BWC Review Group (BWCRG).** The BWCRG is activated in the event a BWC captures a Serious Bodily Injury or Death in Custody, and consists of the ICE Deputy Director; the OFTP DAD; the ORAP DAD for Policy; the OPR DAD; the OIGP DAD; a representative of OPLA's District Court Litigation Division (DCLD); a representative of OPLA's Government Information Law Division (GILD); a representative from the involved directorate/program office headquarters office, and a representative from the directorate/program office's OPLA Division (i.e., Homeland Security Investigations Law Division (HSILD) or the Enforcement and Removal Law Division (EROLD)).

**3.5. Critical Incident.** An event in which ICE employees, or other individuals required to report, are directly involved in actions that result in the death of an individual(s), the use of deadly force, the use of force resulting in serious bodily injury, or the disappearance of any individual.

**3.6. Enforcement Activities.** All aspects of ICE Enforcement Activities, planned and orchestrated in advance, conducted by ICE LEOs with certain exceptions listed at 3.7. Such activities include but are not limited to:

    1) At-large arrests, including searches incident to such arrests;

    2) Brief investigatory detentions, including frisks conducted during brief investigatory detentions;

    3) Executing, and attempting to execute, criminal and administrative arrest warrants and in-person issuance of subpoenas;

    4) Executing and attempting to execute a search or seizure warrant or order;[3]

    5) Execution of a Removal Order,[4] to include aboard Special High-Risk Charter

---

[2] No personally owned BWCs will be authorized.
[3] BWCs are to be deactivated when the scene is secure as determined by the supervisor or team leader on scene. Documentation of search(es) subsequent to execution will be conducted in accordance with existing guidance for searches, including evidence recovery, and search and seizure.
[4] After such time as implementing guidance and SOPs have been produced.

Body Worn Cameras

AILA Doc. No. 25032002. (Posted 3/20/25)

2

FOR OFFICIAL USE ONLY

    Flights;[5] and to conduct verification of Commercial Removal;[6]

    6) Deploying to protect Federal Government facilities;

    7) Responding to public, unlawful/violent disturbances at ICE facilities;[7]

    8) Interactions with members of the public while conducting the above-listed activities in the field;[8] and

    9) When responding to emergencies.[9]

**3.7. Exceptions.** Enforcement Activities where BWCs will not be worn or activated. Such activities include:

    1) Where agents are conducting undercover activity or confidential informants will or may be present;

    2) Information-gathering surveillance activities where and when an Enforcement Activity is not planned;

    3) Onboard commercial flights;

    4) Controlled deliveries;[10] and

    5) Custodial interviews conducted inside jails, prisons, detention centers, or ICE owned or leased facilities.

**3.8. Field Responsible Official (FRO).** The highest-ranking official in each of the ICE field locations. This includes Special Agents in Charge, Field Office Directors, ICE Attachés, OPLA Chief Counsel, and any other officials who have been designated, in writing, by the Director.

**3.9. Headquarters Responsible Officials (HRO).** Executive Associate Directors (EADs) for ERO, HSI, and Management and Administration (M&A); the Principal Legal Advisor;[11] the Associate Director for the Office of Professional Responsibility (OPR); and the Assistant Directors (ADs), or equivalent positions who report directly to the Director, Deputy Director, or Chief of Staff, including the AD for the Office of

---

[5] Special High-Risk Charter Flights are chartered flights by ICE and are distinct from Commercial Flights where civilians may have purchased a ticket and be traveling on the same flight as ICE personnel and an alien who is being removed.

[6] BWCs are not authorized for wear or use aboard commercial flights. Commercial flights are distinct from aircraft chartered by ICE for the purposes of transport and/or removals.

[7] Not to include activities conducted within ICE detention facilities.

[8] Notwithstanding the provisions of section 5.6.

[9] If already outfitted with a BWC. LEOs should not delay in responding to an emergency to outfit themselves with BWCs.

[10] As defined in HSI HB 19-02, Controlled Deliveries Handbook.

[11] This Directive applies to the Office of the Principal Legal Advisor (OPLA) to the extent it is not inconsistent with directives, policies, or formal guidance issued by the General Counsel of the Department of Homeland Security (DHS). DHS Delegation No. 0400.2, Delegation to the General Counsel (Sept. 14, 2004).

---

FOR OFFICIAL USE ONLY

> Firearms and Tactical Programs (OFTP), AD for the Office of Congressional Relations (OCR), the AD for the Office of Regulatory Affairs and Policy (ORAP), the AD for the Office of Civil Rights Compliance (OCRC), and the AD for the Office of Public Affairs (OPA).

3.10. **ICE Law Enforcement Officer or Agent (LEO).** ICE personnel authorized by statute to enforce the laws of the United States, carry firearms, and make arrests in the performance of their assigned duties.

3.11. **ICE Personnel.** All ICE employees and contractors authorized to utilize or service BWCs and/or view, review, or redact BWC footage. Solely for the purpose of this Directive and definition, ICE personnel may include Task Force Officers (TFOs) on ICE-led Task Forces per section 5.3.

3.12. **Personally Identifiable Information (PII).** PII is any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual, regardless of the citizenship or immigration status of the person. Sensitive Personally Identifiable Information (SPII) is a subset of PII, which, if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. For the purposes of this document, PII and SPII are treated as the same.

3.13. **Redaction.** The censoring or obscuring and muting of video and/or audio portions of BWC recording for legal, policy, or security purposes. Items to be redacted may include but are not necessarily limited to the following:

   1) Facial features, name tags, and badge numbers of LEOs;

   2) Law Enforcement Sensitive Information, i.e., information that would disclose techniques, procedures, and/or guidelines for law enforcement investigations or prosecutions if such disclosure would reasonably be expected to risk circumventing the law;

   3) Victim or potential victim identity information;

   4) Interactions with Confidential Informants or sources and any footage that would compromise same; and

   5) Personally Identifying Information (PII) of individuals the release of which is prohibited by regulation, policy, or law.

3.14. **Serious Bodily Injury.** Injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

3.15. **Task Force Officer (TFO).** A law enforcement officer working jointly with law enforcement officers from other law enforcement agencies.

___
Body Worn Cameras

FOR OFFICIAL USE ONLY

**4.** **Responsibilities.**

**4.1.** **HROs** are responsible for:

1) Ensuring overall compliance with this Directive within their respective Directorate or Program Office;

2) Monitoring within their respective Directorate or Program Office spending associated with the BWC program, including establishing the requisite project codes, running status of funds, and validating spending reports with programs;

3) Ensuring that any personnel within their respective Directorate or Program Office who are issued BWCs or who have a need to review BWC recordings have the appropriate training;

4) Ensuring that relevant FROs within their components and the OPLA Field Location Chief Counsel are notified prior to the public release of any BWC Footage;[12]

5) Managing all contact with the media, in coordination with OPA, when there has been a Critical Incident, Serious Bodily Injury, or Death in Custody captured by BWCs in their headquarters (HQ) area of responsibility; and

6) Developing and issuing any necessary implementation guidance specific to their Directorate or Program Office, in coordination with the ORAP.

**4.2.** **FROs** at each Field Office are responsible for:

1) Implementing the provisions of this Directive within their respective Office;

2) Identifying and appointing LEO BWC Coordinators and designee OPLA Attorney to coordinate with the United States Attorney's Office (USAO) within their AOR;

3) Overseeing compliance with this Directive and ensuring ICE personnel have the appropriate training, equipment, and direction to successfully utilize BWCs and access BWC recordings;

4) Notifying involved ICE LEOs, and, as appropriate, OPLA representatives and USAO in their AORs prior to the release of any BWC recording to the public;

5) Reporting to HROs, through the appropriate supervisory channels, all potential privacy or civil liberty violations related to the use of BWCs within their office as soon as practicable;

6) Notifying OFTP and OPR when a Serious Bodily Injury, Death in Custody, Reportable Use of Force,[13] or Critical Incident, has been captured by BWC(s);

---

[12] In accordance with the requirements of 5.11, below.
[13] *See* ICE Firearms and Use of Force Handbook Chapter 4: Use of Force Reporting Requirements (August 2, 2021) or as updated.

Body Worn Cameras

FOR OFFICIAL USE ONLY

7) Ensuring allegations of misconduct involving the use or misuse of BWCs, are reported to OPR or DHS Office of Inspector General as soon as practicable; and

8) Ensuring that all ICE personnel in their Field Offices receive appropriate training, as required by this Directive in section 5.9, at least yearly.

4.3. The **OCR** is responsible for:

1) Notifying DHS OCR prior to any release of BWC recordings to staff or members of Congress;

2) Coordinating with the Office of Information Governance and Privacy (OIGP) to review and approve redaction of BWC data prior to the release of any BWC footage to staff or Members of Congress; and

3) Coordinating with OIGP, OFTP, ORAP, OPLA, the Deputy Director's Office, and OPR prior to the release of any BWC footage to staff or Members of Congress to ensure that release of the recording is timely, appropriate, and has been approved for release.

4.4. The **ORAP** is responsible for:

1) Reviewing and approving directorate and program office policies and implementing guidance as required by this Directive;

2) Providing representation at the Deputy Assistant Director (DAD) level, or designee, to the BWCRG in the event it is activated; and

3) In coordination with OFTP and OPLA, developing and providing training on BWC policy.

4.5. The **OFTP** is responsible for:

1) In coordination with the ORAP, drafting, developing, and updating a Standard Operating Procedure (SOP) for the deployment, issuance, wearing, and activating of BWCs;

2) In coordination with the Office of the Chief Information Officer (OCIO) and the Office of Acquisition Management (OAQ), identifying, testing, and evaluating BWC technology and supporting the continued procurement of BWC technology to support the BWC program;

3) Through its Program Management Office (PMO), managing and overseeing the ICE BWC Program, as well as implementing BWC requirements;

4) Providing oversight of operational and logistical aspects of the BWC Program, including guidance to local offices and BWC Coordinators on program operations and

---

Body Worn Cameras

      requirements, technical and material support, and maintaining oversight of BWC Program data storage systems;

5) In coordination with OPLA, and ORAP, creating, developing, and circulating training material for the deployment, operation, activation, and proper categorizing and labeling of BWC footage;

6) Procuring equipment and maintaining sufficient reserve stock of equipment to account for equipment loss, damage, and/or to replace lost, damaged, or inoperable equipment;

7) Ensuring that BWCs are configured to automatically record at least 30 seconds of video prior to activation;

8) Providing training—prior to roll out by AOR—to designated BWC Coordinators;

9) Identifying equipment needs for each Field Office and AOR prior to rollout by AOR;

10) Providing representation at the DAD level, or designee, to the BWCRG in the event it is activated;

11) In coordination with OPR, OIGP, and OPA, supporting the review of Use of Force incidents by providing any relevant BWC recordings, if requested; and

12) Coordinating with the OIGP to review and approve redaction of BWC data prior to the public release of any BWC footage.

**4.6.** The **OIGP** is responsible for:

1) Ensuring compliance with all privacy-related requirements pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a, the E-Government Act of 2002, and other federal privacy laws, regulations, and policies, as applicable;

2) Establishing privacy safeguards and solutions to mitigate and address privacy risks for the program;

3) Drafting, circulating, publishing, and maintaining privacy compliance documentation Privacy Threshold Analysis and Privacy Impact Assessment, in addition to any other privacy-related documents, required to implement this Directive;

4) Handling the investigation, notification, and mitigation for all privacy incidents involving BWC footage;

5) Assisting, and providing oversight and guidance, with respect to the development of SOPs, Rules of Behavior, training requirements, or other governance documents required by this Directive;

6) Providing representation at the DAD level, or designee, to the BWCRG in the event it is activated;

7) Creating and publishing notices to the public regarding information collections that impact PII, minimizing data collection, identifying authorized disclosures or sharing of information (including FOIA, 5 U.S.C. §552, requests), and managing information releases related to ICE's use of BWCs;

8) Providing any appropriate guidance, in coordination with OCRC, involving the protection of individual privacy; the ethical use of collected information through ICE's use of BWCs; and, in coordination with OCRC, the protection of civil liberties, and the ethical use of collected information through ICE's use of BWCs;

9) Managing the appropriate redaction of BWC data prior to any release, including but not limited to, public releases in response to FOIA requests;

10) Facilitating and providing ICE Privacy Officer clearance on all public releases of BWC footage; and

11) Redacting BWC footage prior to any release.

**4.7.** The **OPA** is responsible for:

1) Notifying DHS OPA prior to any external release of BWC recordings involving Serious Bodily Injury or Death in Custody;

2) Coordinating with OIGP, OFTP, ORAP, OPLA, the DD's Office, and OPR prior to the public release of any BWC footage;

3) Coordinating with the BWCRG for the expedited release of BWC footage capturing any Serious Bodily Injury or Death in Custody;

4) Coordinating with OIGP to receive ICE Privacy Officer clearance on proactive or responsive public releases of BWC footage;

5) Confirming, prior to release, that affected LEOs[14] have been notified that footage will be released;

6) Where applicable, coordinating with OPLA to receive confirmation that consultation has taken place with the U.S. Attorney's Office in the responsible Federal District prior to any expedited release of BWC data;

7) Confirming, prior to release, with OPLA and OPR that release of footage will not interfere with any ongoing investigation(s) or litigation; and

8) Confirming with the Office of the Director that release is approved.

**4.8.** The **OCRC** is responsible for:

---

[14] Includes any LEO captured by the footage and the LEO capturing the footage.

1) Assisting with the development of training material on Civil Rights, Civil Liberties, and the First Amendment in relation to the use of BWCs.

**4.9.** The **OPR** is responsible for:

1) In the event that a Serious Bodily Injury or Death in Custody is captured by BWC Footage, convening the BWCRG; and

2) Providing representation at the Assistant Director level, or designee, to the BWCRG in the event it is activated.

**4.10.** The **OCIO** is responsible for:

1) Ensuring IT compatibility for the upload and storage of data to designated BWC storage repositories;

2) Providing oversight and guidance with respect to records/data retention and disposition of BWC recordings;

3) Supporting, evaluating, and upgrading—prior to the full implementation of this policy any IT infrastructure improvements necessary for completion of component-wide issuance of BWCs, and any subsequent upgrades; and

4) Designating a dedicated IT Program Manager (ITPM) to provide ongoing and continued support the BWC Program in coordination with the PMO.

**4.11.** The **BWC Coordinator** at each Field Office is responsible for:

1) Delivering, scheduling, and tracking BWC training to BWC end-user officers, agents, and other ICE personnel at their respective office;

2) Identifying a secure storage location for BWCs when not in use;

3) Overseeing the receipt, issuance, and periodic inventory of BWC equipment; and

4) Maintaining sufficient quantities of supplies to allow for training of personnel and replacement of damaged or malfunctioning equipment; and

5) At the request of the HRO or FRO, ensure BWC footage is properly categorized in accordance with ICE policy.

**4.12.** **Supervisors** are responsible for:

1) Ensuring ICE LEOs utilize BWCs during Enforcement Activities;

2) Verifying that ICE personnel upload BWC footage after each operation or as soon as practicable but not to exceed 24 hours following an Enforcement Activity's

FOR OFFICIAL USE ONLY

completion, and that all uploaded BWC recordings are correctly categorized and labeled within 72 hours,[15] but no later than 12 hours after upload where the footage captures a Reportable Use of Force, Critical Incident, Serious Bodily Injury, or Death in Custody;[16]

3) Accepting, logging, tracking, and reporting to the FROs all reported allegations of privacy violations as soon as practicable;

4) Ensuring ICE personnel adhere to this Directive;

5) Ensuring allegations of employee misconduct captured on BWC, including but not limited to alleged civil liberty violations, are reported to OPR as soon as practicable;[17]

6) Immediately placing an additional "Litigation Hold" label on stored recordings when informed of litigation or probable litigation concerning the recorded event;

7) Ensuring that no live BWC recordings are used in any facial recognition system or facial recognition queries and immediately reporting any such unauthorized use to the BWC Coordinator; and

8) When notified by an ICE LEO that he or she has captured a Reportable Use of Force, including use of Deadly Force, a Critical Incident, a Serious Bodily Injury, or a Death in Custody, securing the BWC from the LEO, uploading the footage, and labeling and categorizing the footage on the LEO's behalf as soon as practicable.

4.13. **ICE LEOs** are responsible for:

1) Complying with the requirements of this Directive, as well as all other applicable laws, regulations, policies, and procedures;

2) Wearing BWCs and activating BWCs to capture BWC recordings during Enforcement Activities as required by this Directive and deactivating cameras at the conclusion of the Enforcement Activity;

3) Activating BWCs when engaged with the public in response to an emergency;[18]

4) Reporting all problems or malfunctions with BWCs to their supervisor and the BWC Coordinator as soon as practicable;

---

[15] Except where exigent circumstances or the remote location of the activity make doing so impossible. In such cases, upload, categorization, and labeling must be done as soon as practicable.
[16] In the event the incident is captured on a Special High-Risk Charter Flight, the footage will be uploaded and labeled as soon as practicable on return.
[17] *See generally* ICE Policy No. 17001.1, Functions of the Office of Professional Responsibility (Feb. 3, 2005), or any successor policy.
[18] If already wearing a BWC. LEOs should not delay in responding to an emergency call solely to don a BWC.

Body Worn Cameras

FOR OFFICIAL USE ONLY

5) In consultation with OPLA and supervisor, preparing BWC recordings for sharing as required, such as with USAO or Task Force Agency lead;

6) Reporting all potential privacy violations, or any violations of this Directive, to their supervisor as soon as practicable;

7) Utilizing only ICE issued BWC equipment, unless participating in a Task Force where there is an agreement requiring ICE LEOs to wear host-agency issued equipment;

8) Advising individuals that they are being recorded as soon as practicable and safe to do so, unless doing so would jeopardize the safety of the ICE LEO or any other person;[19]

9) Accessing BWC recordings only when authorized by section 5.8 of this Directive;

10) Stating in reports whether BWC footage was viewed prior to the completion of the report;

11) Docking BWCs and uploading BWC footage as soon as practicable after conclusion of an Enforcement Activity, but no later than 24 hours following conclusion of an Enforcement Activity;[20]

12) Turning BWCs that have captured a Reportable Use of Force, Critical Incident, Serious Bodily Injury, or Death in Custody into their Supervisor for docking, uploading, categorization and labeling at the conclusion of the Enforcement Activity;

13) Except where the footage includes a Reportable Use of Force, Critical Incident, Serious Bodily Injury, or Death in Custody, correctly categorizing and labeling footage within 72 hours of upload;

14) Memorializing in any official reports related to an Enforcement Activity whether a BWC recording was collected or produced;

15) Ensuring that no live BWC recordings are used in any facial recognition system or facial recognition queries and immediately reporting any such unauthorized use to the BWC Coordinator; and

16) Completing all training requirements.

**5.     Procedures and Requirements.**

---

[19] Then notice shall be given only when operationally feasible, and with the overarching understanding that safety of ICE personnel or any other person is of paramount importance in all interactions. Absent an immediate threat or exigency, an ICE LEO may not obfuscate when asked by an individual if he or she is being recorded.
[20] Except where exigent circumstances or the remote location of the activity make doing so impossible. In such cases, upload, categorization, and labeling must be done as soon as practicable.

___

Body Worn Cameras

FOR OFFICIAL USE ONLY

- 5.1. **General.** Except as outlined in section 5.3, below, on-duty ICE LEOs will use only BWCs approved by ICE for use, and such use will only be for official law enforcement purposes as outlined in this Directive. There is no limited personal use exception for ICE-owned BWC equipment, hardware, or software. The use of personally owned BWCs is strictly prohibited.

    ICE personnel are prohibited from tampering with, dismantling, or attempting to repair BWCs except as part of assigned duties. BWC recordings will only be accessed, downloaded, reviewed, transferred, or disclosed by authorized personnel. ICE personnel are strictly prohibited from deleting, editing, or modifying BWC recordings outside what is expressly permitted by this Directive. The existence of BWC recordings does not relieve ICE personnel from preparing written reports or field reports or from fulfilling any other responsibilities required by applicable law, policy, and procedures.

- 5.2. **Safety.** ICE LEO and public safety must always be the primary consideration, not the ability to collect BWC recordings. ICE LEOs should not place themselves or others in unnecessary or dangerous situations for the sole purpose of collecting BWC recordings.

- 5.3. **Task Force Participation.** Absent a signed agreement to the contrary, when ICE LEOs are assigned as TFOs on a Task Force led by another Law Enforcement Agency, they shall follow the BWC policies, procedures, and/or agreements established by the agency leading the Task Force. This includes, if required, the wearing of equipment provided by Task Force Agency lead. Where there is no signed agreement requiring such, ICE LEOs will follow this policy and utilize ICE-issued BWC equipment. Any BWC recordings captured by an ICE LEO utilizing ICE-owned or ICE-leased equipment, are deemed to be federal record(s) owned by ICE and subject to appropriate federal retention and information access laws, regulations, policies, and procedures. Where the ICE LEO is a TFO on a Task Force led by another Law Enforcement Agency that requires the use of the Task Force lead equipment, BWC recordings captured by an ICE LEO TFO are deemed to be federal record(s) owned by the Task Force Agency lead.

    Where ICE is the lead component of a Task Force, ICE shall establish agreements with participating law enforcement agencies to document the requirements for BWC use and data management, and ensure all task force participants are aware of, and comply with, the BWC requirements. Unless the agreement between ICE and the participating Law Enforcement Agency provides other terms, the terms of this Directive will control. If a TFO assigned to an ICE-led task force does not have BWC equipment assigned to them by their parent agency, ICE, to the extent possible and depending on resource availability, will make the ICE BWC equipment and training available to the TFO. Written agreements will make clear that BWC recordings captured by TFOs wearing ICE equipment are deemed to be federal records owned by ICE and subject to federal retention and information access laws, regulations, policies, and procedures.

    For joint international operations or foreign law enforcement Task Forces, absent Memoranda of Understanding or Agreement to the contrary, ICE LEOs shall follow this BWC policy to the extent permitted by host country's law and Chief of Mission guidance.

- 5.4. **Protection of Federal Property.** When ICE LEOs are deployed to assist with assigned

_____
Body Worn Cameras

duties related to protection of federal property, BWCs will also be deployed. As noted in section 5.6, BWCs will not be activated solely for the purpose of recording individuals who are engaged in activity protected by the First Amendment. However, if a situation becomes violent, dangerous, or otherwise unlawful, and requires law enforcement action, ICE LEOs will activate BWCs as required by the other provisions of this Directive.

**5.5.** **Recording.** ICE LEOs must activate BWCs to capture footage of Enforcement Activities at the start of the activity or, if not practicable, as soon as safely possible thereafter.[21] Once a BWC is activated, ICE LEOs should only deactivate the BWC when the scene is secure as determined by the supervisor or team leader. If ICE LEOs fail to activate their BWC, they must provide a written statement explaining, or detail in after-action case summaries or records of encounter, the reason that they failed to activate the BWC. ICE LEOs activating BWC for an Enforcement Activity are required to document the existence of any BWC recording in any reports in accordance with any additional operating procedures. ICE LEOs must provide a statement detailing the reason for any interruption in BWC recordings (e.g., BWC deactivated, malfunction, etc.) during Enforcement Activities. ICE LEOs must notify their supervisor and the BWC Coordinator if they become aware of any unintentional BWC recordings, including Prohibited Recordings (see section 5.6 below).

**5.6.** **Prohibited Recordings.** ICE personnel are prohibited from intentionally making BWC recordings for the purpose of recording any of the following activities and/or locations:

1) For the purpose of recording an activity if doing so places the ICE LEO or others in a dangerous situation;

2) For the sole purpose of recording individuals who are engaged in activity protected by the First Amendment, e.g., people who are lawfully exercising their freedom of speech, press, association, assembly, religion, or the right to petition the government for redress of grievances. This prohibition does not preclude use of BWCs where ICE LEOs are otherwise addressing unlawful activity, or while engaged in enforcement activities as defined in Section 3.7, or if a situation becomes violent, dangerous, or otherwise unlawful, and requires the LEO to take an Enforcement Action as described in 5.4 above;

3) Solely for conducting or supporting a personnel investigation, disciplinary action, or employee performance assessment, unless such assessment is used in a BWC training environment in support of student-instructor feedback;

4) For the purpose of recording undercover personnel, confidential informants, confidential sources, or any undercover activity;

5) Within healthcare facilities;

6) Within courtrooms during proceedings;

---
[21] BWCs shall be configured to automatically record at least 30 seconds of video prior to the BWC's activation.
_____

7) Any non-enforcement activities, such as actions and conversations of ICE personnel when not actively engaged in an Enforcement Activity;

8) Privileged communications;

9) In places or areas where cameras generally are not allowed or permissible, unless related to an Enforcement Activity;

10) Inside detention facilities or government facilities that otherwise prohibit the use of recording equipment;

11) For the purpose of conducting facial recognition in conjunction with live recording;[22]

12) For personal reasons unrelated to official duties; and.

13) For the sole purpose of recording a particular person based on the person's race, color, religion, national origin,[23] sex, age, disability, sexual orientation, marital status, parental status, personal appearance, or political affiliation.

**5.7. BWC Recording Retention and Storage.** All BWC data captured by ICE LEOs are considered official ICE records, and as such, must be maintained indefinitely until an approved National Archives and Records Administration (NARA) records schedule has been implemented. Once a NARA records schedule is in place, all footage must be maintained and/or disposed of in accordance with the established schedule. Any footage subject to a litigation hold may not be disposed of until the litigation hold has been lifted regardless of NARA-approved records schedule.

BWC-recorded data must only be stored on a designated ICE-approved system or media. BWC-recorded data must not be downloaded or recorded for personal use or posted onto a personally-owned device or website. ICE personnel and BWC Coordinators must take reasonable steps to determine whether a BWC recording has investigative or evidentiary value to mark the footage appropriately for storage and tracking purposes for future litigation, investigation, and/or FOIA requests. The evidentiary value of particular BWC recordings cannot always be immediately determined (e.g., information which seems insignificant at the time of recording, may subsequently play an evidentiary role in an investigation).

Any ICE BWC software or storage mechanism must have appropriate safeguards and audit trails in place to restrict access and viewing of recorded data to those with an official need-to-know as described in section 5.8 below. Such safeguards will include: logging ICE personnel access to a recording (including date, time, and location of access), requiring

---

[22] Searches using facial recognition tools utilizing still pictures derived from BWC video data that has been downloaded into a system of record, in compliance with applicable privacy requirements and protections, and in support of authorized law enforcement activities is, however, authorized.

[23] These self-imposed limits, however, do not apply to antiterrorism, immigration, or customs activities in which nationality is expressly relevant to the administration or enforcement of a statute, regulation, or executive order, or in individualized discretionary use of nationality as a screening, investigation, or enforcement factor.

FOR OFFICIAL USE ONLY

ICE personnel to log the purpose of accessing or viewing recorded data, and prohibiting the deletion, editing, or modification of any recording unless expressly permitted by this Directive.

**5.8. BWC Footage Review.** Each instance of footage review will be documented with the identity of the reviewer and the reason for the review.

1) **By the ICE LEO of Self-Captured Footage.** ICE LEOs are permitted to review their own BWC recordings prior to the submission of official reports. ICE LEOs may also review their own BWC recordings in the following circumstances:

   1. Prior to a required formal statement about a Use of Force incident;

   2. When they are the subject of an allegation of misconduct or personnel complaint;

   3. As part of training;

   4. To complete authorized actions in an investigation, including preparation of official reports or A-file materials;

   5. Prior to courtroom testimony, courtroom presentation, or the potential thereof; and

   6. To prepare for administrative investigations and/or interviews.

   Notwithstanding the foregoing, ICE personnel are not entitled to copies of OPR administrative investigative materials, including OPR's copies of any BWC recordings.

   In all instances where ICE LEOs review their own BWC recordings prior to completing a report, the report must accurately reflect that fact.

2) **By Other ICE Personnel.** ICE personnel may review BWC recordings other than their own only for auditing, official training purposes, for the defense of federal litigation or if there is an official need-to-know and a responsibility to do so as detailed in section 4. Additional use for training is addressed in section 5.9 of this Directive.

   Only members of the BWCRG, HROs, OFTP, OPLA, and OPR representatives may review an ICE LEO's BWC recording if the recording has been identified as containing evidence of misconduct or an allegation of misconduct.

3) **ICE and DHS Headquarters.** HROs, including appropriate ICE HQ personnel with an official need-to-know, are permitted to review BWC recordings to assess, evaluate, or address any officer action, technological, policy, legal, operational, financial, civil liberties, or any other issues. In certain circumstances, ICE may share BWC recordings with DHS HQ personnel (e.g., Office of Civil Rights and Civil Liberties (CRCL), Privacy, Office of General Counsel) or DOJ counsel where appropriate.

**5.9. BWC Training.** BWC recordings used in a training environment will only be utilized for training student/instructor feedback process. Only authorized ICE instructors[24] will utilize the recorded data for feedback purposes. BWC recordings created in the training environment will not be placed into official training records. Any BWC recordings created in the field may only be used for training purposes only after all PII is removed.

HROs and FROs will ensure that their assigned ICE personnel, including any necessary support staff, are trained on BWCs, and have completed all applicable refresher training, prior to their authorization to use BWCs or to accessing BWC-recorded data. The appropriate training for users must occur annually and must include:

1) BWC operation, maintenance, and care;

2) Appropriate handling of BWC recordings;

3) Privacy compliance and proper procedures for redacting and sharing BWC data (e.g., labeling and categorizing);

4) Required wear and activation, optional wear and activation, deactivation, and non-permissible uses of BWCs;

5) Officer/agent and public safety considerations when wearing/operating BWCs;

6) The laws, regulations, or policies governing the use of BWCs, including updates on changes;

7) Proper labeling and categorizing of BWC footage;

8) Civil rights and civil liberties considerations;[25] and

9) Any other additional training HROs or FROs deem necessary.

**5.10. Redaction.** Redaction of BWC footage will only be done for legal reasons, privacy reasons, or to prevent the unauthorized public release of law enforcement sensitive information. Any redaction process must maintain the integrity of the original footage and be marked accordingly. Any BWC footage that will be released to the public[26] must be reviewed by OIGP to ensure ICE LEO facial features, PII, victim identity information, and law enforcement sensitive information, at a minimum, are appropriately redacted. BWC data systems will log the identity of individuals redacting or otherwise modifying BWC footage.

---

[24] ICE personnel who have been trained and certified by ICE to conduct training on Use of Force programs.
[25] This portion of training must be developed in coordination with OCRC and DHS CRCL.
[26] For the purpose of this Directive, release to the public does not include release where required as part of litigation or Discovery. Appropriate redaction for those purposes must be determined in consultation with OPLA, and it may be appropriate for OPLA to work with the Department of Justice to obtain a protective order to prevent further dissemination of the footage.

FOR OFFICIAL USE ONLY

**5.11. Release.** BWC records are subject to all applicable laws, regulations, and DHS and ICE Directives, including but not limited to the FOIA, 5 U.S.C. § 552, as amended; the Privacy Act of 1974, 5 U.S.C. § 552a, as amended; and 8 U.S.C. § 1367. Prior to any external release of BWC recordings other than release pursuant to litigation, or in response to FOIA requests, the releasing office must also complete DHS Form 191, Privacy Act Disclosure Record, and submit a copy to OIGP. Release of a BWC recording to a DHS Component or office must be consistent with DHS policy and the requesting DHS Component's or office's need to know. In all cases, prior to the public release of BWC footage, the ICE LEO who captured the footage, as well as any LEO captured in the footage, must be notified.

Any public release of BWC recordings must be coordinated with OPA. Additionally, releases of BWC recordings to staff or Members of Congress must be coordinated through OCR. Releases of BWC recordings to the media must also be coordinated through OPA. The specific nature of the release of BWC footage may require further coordination with HROs, OFTP, OPLA, ORAP, OCR, OPA, and the FRO(s) in the impacted operational office(s). If the footage contains officers or agents from outside law enforcement agencies, it may also be appropriate to provide advance notice to the impacted agencies. As appropriate, DHS HQ offices including, but not limited to DHS Office of the General Counsel, CRCL, DHS Privacy, and DHS OPA may require notification prior to any external release of BWC recordings.

1) Expedited Release. In the event a Serious Bodily Injury or Death in Custody is captured by a BWC, ICE will expeditiously review the footage. If it is determined that it is in the best interests of the agency to publicly release the BWC footage, ICE will, as soon as practicable, expedite the public release of such footage.[27] Generally, this process should occur within 72 hours of recording of a Serious Bodily Injury or Death in Custody, or as soon as operationally feasible. If there are specific and compelling circumstances justifying an objection to public release that cannot be resolved by redaction or other means, when determined by the ICE Director or his or her designee, ICE may withhold or indefinitely delay the release of the BWC footage.

   Prior to any expedited release:

   a) The FRO is responsible for notifying OFTP and OPR that a Serious Bodily Injury or Death in Custody incident has been captured by BWC(s). Upon receiving notification from the FRO, OPR is responsible for several immediate steps:

   - Notifying the Office of the Deputy Director that a Serious Bodily Injury or Death in Custody incident has been captured by BWC(s);
   - Notifying the BWCRG of the need for an imminent meeting;
   - Coordinating with OFTP in preparing briefing materials for the BWCRG meeting;

---

[27] If there are specific and compelling circumstances justifying an objection to public release that cannot be resolved by redaction or other means, ICE may withhold release of the BWC data.

Body Worn Cameras

FOR OFFICIAL USE ONLY

- Engaging in any required coordination with outside investigative agency(ies) regarding their policy(ies) on release of footage and determine if any deconfliction or delay in release will be required.

b) The BWCRG will convene, and the Deputy Director or his or her designee will review relevant BWC recordings and relevant OPR and OFTP briefing materials and, based on the totality of available information and in consultation with the BWCRG, make a recommendation to the ICE Director as to whether the expedited release of BWC footage is in the best interest of the agency and warranted.

c) ICE OPA will coordinate with relevant ICE directorates and program offices, OPLA and OIGP to determine whether there is information about individuals protected under 8 U.S.C. § 1367 (Section 1367) and initiate the release process as described in the *ICE Privacy Guidance Memorandum: Limited Authorization to Release Personally Identifiable Information to the News Media; Procedures for Requesting Privacy Officer Approval for Media Release* (Nov. 18, 2019), along with notification as to whether Section 1367 information is contained therein.

d) OIGP will redact PII, law enforcement sensitive, and other protected information, and clear the redacted footage through the ICE Privacy Officer.

e) The BWCRG will provide OIGP input based on review of the footage regarding redactions, especially regarding Law Enforcement Sensitive Tactics and Procedures, requirements under 8 U.S.C. § 1367, and any incidental capture of prohibited recording as detailed in section 5.6. Upon completing redactions, OIGP is responsible for notifying the BWCRG that the process is complete and will advise OPA that the footage is ready to be downloaded and released.

f) ICE OPA will notify the DHS Office of Public Affairs, the Office of the Director, OPR, OPLA, OCR, and OPE prior to external release;

g) The SAC or FOD in the AOR, or their designees, in coordination with OPLA, will notify the United States Attorney's Office in the responsible federal district, as well as any other relevant investigative agencies;

h) Prior to any release, ICE OPA must confirm with OPLA and OPR that release of the redacted footage will not interfere with any ongoing investigation(s) or litigation, with the component that the affected LEO(s) have been notified and that the release will not interfere with ongoing investigation(s), and that the Director or his or her designee has not determined that the footage should not be released.

2) Release Pursuant to Litigation. Release of BWC footage pursuant to any litigation requirement will be done in accordance with existing procedures for any other type of evidence, including consultation with OPLA and DOJ as appropriate.

6. **Recordkeeping.** All relevant documents produced or provided in accordance with this Directive must be maintained in accordance with a General Records Schedule (GRS) or a NARA-approved agency-specific records schedule. If the records are not subject to a

___

Body Worn Cameras

records schedule, they must be maintained indefinitely by the agency until an approved records schedule is in place. In the event the records are subject to a litigation hold, they may not be disposed of under a records schedule until further notification.

7. **Authorities/References.**

7.1. 8 U.S.C. § 1357 (Powers of immigration officers).

7.2. 8 U.S.C. § 1367 (Penalties for disclosure of information).

7.3. 19 U.S.C. § 1589a (Enforcement authority of customs officers).

7.4. Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq. (Aliens and Nationality).

7.5. 5 U.S.C. § 552 (Public information; agency rules, opinions, orders, records, and proceedings).

7.6. 5 U.S.C. § 552a (Records maintained on individuals).

7.7. 44 U.S.C § 3101 (Records Management).

7.8. DHS Policy Statement 045-07, *Department Policy on Body Worn Cameras* (May 22, 2023).

7.9. Fed. R. Civ. P. 37(e) (Failure to Preserve Electronically Stored Information).

7.10. Fed. R. Evid. 401 (Relevance).

7.11. ICE Policy 17001.1, Functions of the Office of Professional Responsibility (Feb 3, 2005).

7.12. ICE Directive 19009.3, Firearms and Use of Force (May 26, 2023).

7.13. ICE *Firearms and Use of Force Handbook* (Aug. 2, 2021).

7.14. ICE Privacy Guidance Memorandum, *Limited Authorization to Release Personally Identifiable Information to the News Media; Procedures for Requesting Privacy Officer Approval for Media Release* (Nov. 18, 2019).

7.15. *ICE Employee Code of Conduct* § 4.4 (Aug. 7, 2012).

8. **Attachments.** None.

9. **No Private Right Statement.** This Directive provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

FOR OFFICIAL USE ONLY

_____
**Caleb Vitello**
**Acting Director**
**U.S. Immigration and Customs Enforcement**

_____
Body Worn Cameras

20