UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 12173 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| KRISTI NOEM, Secretary, U.S. Department | ) | |
| of Homeland Security, in her official capacity, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The Court grants Plaintiffs' emergency motion for temporary restraining order ("TRO") [21]. The Court has set forth the terms of the TRO in a separate document. The Court sets a preliminary injunction hearing for October 23, 2025 at 9 a.m. See Statement.

## STATEMENT

This case arises from protests in the Chicagoland area—including in and around the Immigration and Customs Enforcement ("ICE") facility in Broadview, Illinois, and on the streets of Chicago—regarding the federal government's immigration enforcement operations and deployment of federal agents to Chicago, which have increased over the past several months. Plaintiffs allege that federal agents have targeted peaceful individuals, religious practitioners, and members of the media participating in or reporting on these protests with excessive force, threats, and/or detainment. Among other things, Plaintiffs allege that federal agents have fired rubber bullets and pepper balls, launched flashbang grenades, and indiscriminately sprayed tear gas at protesters, religious practitioners, and journalists without legal justification or adequate warning.

On October 6, 2025, Plaintiffs[1] filed this suit against Defendants Kristi Noem, the Secretary of U.S. Department of Homeland Security ("DHS"); Todd Lyons, the Acting Director of ICE; Marcos Charles, the Acting Executive Associate Director of Enforcement and Removal Operations at ICE; Russell Hott, the Chicago Field Office Director of ICE; Rodney S. Scott, the Commissioner of U.S. Customs and Border Protection ("CBP"); Gregory Bovino, the Chief Border Patrol Agent of CBP; Daniel Driscoll, the Director of the Bureau of Alcohol, Tobacco,

---

[1] Plaintiffs divide themselves into two groups. The journalist Plaintiffs consist of Chicago Headline Club, Block Club Chicago, The Chicago Newspaper Guild Local 34071 (CNG), NABET-CWA Local 54041, Raven Geary, Charles Thrush, and Stephen Held. The protester Plaintiffs consist of David Black, William Paulson, Autumn Reidy-Hamer, and Leigh Kunkel. Black, an ordained minister in the Presbyterian Church, also represents religious practitioners.

Firearms, and Explosives; William K. Marshall III, the Director of the Federal Bureau of Prisons; Pamela Bondi, the Attorney General of the United States; DHS; U.S. DOJ; Unidentified Federal Agencies; Unidentified Federal Officers; and Donald J. Trump, the President of the United States (collectively, "Defendants").[2]  Plaintiffs bring claims against Defendants for (1) violations of their First Amendment rights, including First Amendment retaliation; (2) violation of the Religious Freedom Restoration Act (the "RFRA"), 42 U.S.C. § 2000bb-1; (3) excessive force and unreasonable seizure in violation of the Fourth Amendment; (4) violations of the Administrative Procedures Act; and (5) conspiracy to violate Plaintiffs' constitutional rights.  Plaintiffs seek to proceed on behalf of a class of "all persons who are or will be peacefully present at demonstrations in the Northern District of Illinois, and who intend to non-violently participate in, observe, or record the demonstrations, or engage in news gathering, reporting, or prayer."  Doc. 1 ¶ 119.  They also seek to proceed with a religious exercise sub-class for their RFRA claim of "all persons who are or will be present at the demonstrations in the Northern District of Illinois, and who intend to pray or otherwise engage in their religious practice there."  *Id.*

Plaintiffs now seek a TRO to enjoin Defendants from continuing to violate their constitutional rights to peacefully protest, exercise their religion, and/or report in the Northern District of Illinois.  Plaintiffs base their TRO request on their First Amendment, RFRA, and Fourth Amendment claims.  The Court held hearings on October 6 and 8, 2025.  The Court orally set forth its ruling on October 8, 2025 and further documents that ruling here.

## I.      Legal Standard

To obtain a TRO, Plaintiffs must satisfy three threshold requirements: (1) some likelihood of success on the merits; (2) an inadequate remedy at law; and (3) irreparable harm if the relief is not granted.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).  If Plaintiffs satisfy these three factors, the Court conducts a balancing test, "weigh[ing] the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it."  *Mays*, 974 F.3d at 818.  "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa."  *Id.*  The Court also considers the public interest, which includes taking into account any effects on non-parties.  *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

---

[2] The Court raises the question of whether the TRO can be directed at President Trump.  Injunctive relief is generally not available against the President, although courts do have "a limited ability to enjoin the President to carry out ministerial, nondiscretionary duties." *Slaughter v. Trump*, 2025 WL 2551247, at *9 n.2 (Rao, J., dissenting) (D.C.Cir. Sept. 2, 2025); *see Gonzalez v. Gor*, 2025 WL 2813829, at *14-15 (D.P.R. Oct. 3, 2025) (collecting cases).  Because Plaintiffs can obtain relief to remedy the harms they face without enjoining the President directly, the Court finds it unnecessary to resolve this question and excepts President Trump from the scope of the injunction at this time.

## II.    Analysis

### A.    Standing

Before turning to the merits of a TRO, the Court must address Plaintiffs' standing, which Defendants have challenged.  To establish standing to seek injunctive relief, Plaintiffs must allege (1) "an actual or imminent threat of suffering a concrete and particularized 'injury in fact,'" which (2) Plaintiffs can fairly trace to the defendant's conduct and that (3) a favorable judicial decision will likely prevent or redress.  *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019).  A plaintiff "must face a 'real and immediate' threat of future injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citation omitted).

Here, Defendants argue that Plaintiffs have not established that their injuries are likely to recur so as to warrant injunctive relief, but the Court disagrees.  The individual Plaintiffs' risk of future injury is not speculative, given the ongoing, sustained pattern of conduct that Plaintiffs have documented over the prior month that shows no sign of stopping.  Plaintiffs also indicate that they intend to continue their reporting, ministering, and protesting.  Therefore, the Court finds that Plaintiffs have standing to pursue their claims.  *See Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010) ("a record showing a persistent pattern of similar police misconduct" could provide a basis for "persons intending to engage in protected speech and expression" to have standing for prospective injunctive relief against future misconduct); *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) ("Plaintiffs have alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice in tandem with allegations that CPD officers repeatedly subjected them to unconstitutional stops and frisks, which leads to the reasonable inference of the likelihood that CPD officers will unlawfully stop and frisk Plaintiffs in the future.").  Further, for their First Amendment claims, Plaintiffs also have standing based on the chilling effect of Defendants' conduct, given that some Plaintiffs have expressed that Defendants' actions have caused them to limit their activities.  *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638–39 (7th Cir. 2020) (to establish injury in fact for First Amendment claim, "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result").

The news organizations—Chicago Headline Club, Block Club Chicago, Chicago Newspaper Guild Local 34071, and NABET-CWA Local 54041— have standing to sue on behalf of their members and for their own injuries.  An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  To have standing in their own right, organizations must show that "defendants' conduct impaired (i.e., 'directly affected and interfered with') their ability to" conduct their business or services "(i.e., a 'core business activity')."  *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 C 839, 2025 WL 975967, at *7 (N.D. Ill. Mar. 31, 2025) (citations omitted).  The news organizations meet these requirements with respect to both associational and organizational standing.  *See L.A. Press Club v. Noem*, --- F. Supp. 3d ----, 2025 WL 2658327, at * (C.D. Cal. Sept. 10, 2025) (finding news organizations in similar case had both associational and

3

organizational standing). With standing established, the Court turns to the substantive requirements for issuance of a TRO.

**B.    Likelihood of Success**

The first factor for injunctive relief is likelihood of success. To meet this requirement, the "plaintiff must demonstrate that 'its claim has some likelihood of success on the merits.'" *Mays*, 974 F.3d at 822 (citation omitted). "What amounts to 'some' depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach," *id.*, but it at least requires a "strong" showing that "normally includes a demonstration of how the applicant proposes to prove the key elements of its case," *see Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). A "mere possibility of success" does not meet this standard. *Id.* at 762. The Court considers each of Plaintiffs' claims in turn.

**1.    First Amendment Retaliation**[3]

To prevail on a First Amendment retaliation claim, Plaintiffs must ultimately show that they "(1) [] engaged in activity protected by the First Amendment; (2) [] suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citations omitted).

Here, the allegations in the complaint, supported by Plaintiffs' submitted evidence, establish that this claim has some likelihood of success. Plaintiffs submit evidence that Defendants retaliated against them while they were engaged in newsgathering, religious exercise, and/or protesting, which are activities protected by the First Amendment. *See, e.g.*, *L.A. Press Club*, 2025 WL 2658327, at *16 ("Newsgathering, observing government conduct, and protest are each considered paradigmatic protected activities."). This retaliation allegedly involved being "shot with impact or chemical munitions, gassed, pepper sprayed, hit with near-lethal grenades, and/or otherwise threatened with arrest," Doc. 21 at 34, which would likely deter First Amendment activity in the future, *see L.A. Press Club*, 2025 WL 2658327, at *16 ("Neither can Defendants meaningfully dispute that being subjected to rubber bullets, tear gas, pepper balls, and other crowd control weapons would deter individuals of ordinary firmness from continuing to engage in the protected activity."); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 117 (D. Minn. 2021) (agreeing that "dispersal orders, harassment, use of chemical agents and less-lethal weapons, threats, detention, and arrests, would chill a person of ordinary firmness").

Finally, Plaintiffs have sufficiently suggested at this stage that they can meet the third element of this claim, that their First Amendment activities were motivating factors in Defendants' conduct. Proof of motive can be established through either direct or circumstantial evidence, including "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other [people] in the protected group." *Kidwell v. Eisenhauer*,

---

[3] Plaintiffs also claim that Defendants have systematically violated their First Amendment rights through their actions, with the actions unable to survive strict scrutiny. The Court does not analyze this aspect of the First Amendment claim separately at this early stage, given that the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment retaliation claim.

679 F.3d 957, 965–66 (7th Cir. 2012) (quoting *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)); *see Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1005 (N.D. Ill. 2024) (inferring motivation where police officers insulted and used excessive force against peaceful protesters "who were protesting *police violence*"); *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020) ("[I]t also seems likely that [police officers'] actions were motivated by the content of plaintiffs' demonstrations against police violence."); *L.A. Press Club*, 2025 WL 2658327, at *17 ("Defendants' excessive and indiscriminate response evinces strong and persuasive evidence of retaliatory intent."). Plaintiffs have provided such evidence here, including public statements made by Defendants regarding protesters and declarations and evidence that federal agents have used excessive force against those peacefully protesting the federal agents' presence and operations in the Chicagoland area.

## 2. RFRA

The RFRA prohibits the federal government "from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means." *Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020); *see* 42 U.S.C. § 2000bb-1. In passing the RFRA, Congress sought to "create[ ] a broad statutory right," *Korte v. Sebelius*, 735 F.3d 654, 671 (7th Cir. 2013), that "provide[s] greater protections for religious exercise than is available under the First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Under the RFRA's burden-shifting framework, "[o]nce a RFRA claimant makes a prima facie case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny." *Korte*, 735 F.3d at 673 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006)).

Earlier this year, the Seventh Circuit, analyzing a line of relevant Supreme Court cases, identified three ways a plaintiff can prove a government policy or act substantially burdens their religious practice: if the governmental policy or act "(1) compelled them to perform acts undeniably at odds with fundamental tenets of [their] religious beliefs, (2) put[ ] substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs, or (3) bears direct, primary, and fundamental responsibility for rendering [a] religious exercise effectively impracticable." *Soc'y of Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 450 (7th Cir. 2025) (quoting *Korte*, 735 F.3d at 682) (internal quotation marks omitted). "In assessing whether a burden is substantial, we 'focus[ ] primarily on the intensity of the coercion applied by the government' and not the centrality of the religious practice in question." *West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022) (quoting *Korte*, 735 F.3d at 683).

Rev. Black and the proposed putative class argue that they are likely to succeed on a RFRA claim because Defendants' use of violent force against people peacefully praying, including clergy members and lay practitioners alike, substantially burdens their exercise of religion. Doc. 21 at 41. Plaintiffs argue that Defendants' use of violent force puts substantial pressure on Rev. Black and other similarly situated people to modify their behavior and violate their beliefs under highly coercive threats of violence. Plaintiffs contend that Defendants have engaged in a policy, pattern, and practice of targeting people visibly engaged in prayer and other religious exercise with pepper balls, tear gas, and other physical violence without provocation. In support, Plaintiffs submit declarations from Rev. Black and others describing Defendants' targeted actions against religious practitioners. *See, e.g.*, Doc. 22-1 ¶¶ 4–6 (Rev. Black

describing Defendants (1) shooting him with multiple pepper balls, including to the head; (2) pushing and shoving him; and (3) spraying him directly in the face with liquid chemicals); Doc. 22-3 ¶¶ 5–11 (ordained minister describing Defendants deploying tear gas, pepper balls, and rubber bullets against religious groups praying and singing hymns); Doc. 22-17 ¶¶ 10 (journalist describing Defendants firing "less-lethal" munitions at clergy praying). Further, Plaintiffs argue that Defendants' actions force Rev. Black and others to choose between their health and safety on the one hand or authentically practicing their faith on the other. For example, Plaintiffs have submitted a declaration from Father Curran, who states that he has restricted whom he invites to join prayer vigils at Broadview and stopped using the vigils as an opportunity to provide religious education to Catholic students because of the high risk of violence. This alleged coercion is enough to show that Plaintiffs are likely to establish that the government has substantially burdened Rev. Black's religious practice. *See West*, 48 F.4th at 845 (holding substantial burden occurs when the government "attaches some meaningful negative consequence to [a person's] exercise of religious exercise, forcing him to choose between violating his religion and incurring that negative consequence").

Because Plaintiffs are likely to meet their burden under the substantial burden prong, the Court then considers whether Defendants will be able to demonstrate that their policy, pattern, and practice of using force against people praying or otherwise practicing their religion "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1. The compelling interest test generally requires a "high degree of necessity." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 804 (2011). The government must "identify an 'actual problem' in need of solving, and the curtailment of [the right] must be actually necessary to the solution." *Id.* at 2738 (citations omitted). In the free-exercise context, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). The Court recognizes that Defendants have a compelling interest in protecting federal property, personnel, and governmental functions. But even assuming this, the Court does not find it likely that the government can carry its burden to demonstrate that its unprovoked use of force against Rev. Black and others engaged in religious exercise is the least restrictive means of furthering this governmental interest. The record is replete with evidence of Defendants using less-lethal force against religious personnel. As discussed, Defendants have targeted Rev. Black, visibly attired in clerical garb, with multiple pepper ball shots, including in the head, *see* Doc. 22-1 ¶¶ 2, 5, and have fired tear gas, pepper balls, and rubber bullets against religious groups praying and singing hymns, Doc. 22-3 ¶¶ 9, 11. Certainly, less restrictive means exist to protect federal property, personnel, and governmental functions, particularly given the peaceful nature of Rev. Black's and others' exercise of their religion. Accordingly, the Court finds that Plaintiffs have shown they are likely to succeed on their RFRA claim.

### 3. Fourth Amendment

Next, Plaintiffs contend that Defendants' actions are unreasonable and constitute excessive force in violation of the Fourth Amendment. "Excessive force is a form of unreasonable seizure in violation of the Fourth Amendment." *Tate v. City of Chicago*, No. 19 C 7506, 2020 WL 6715660, at *4 (N.D. Ill. Nov. 16, 2020). These types of claims "are evaluated based on whether the officer's actions were objectively reasonable under the circumstances." *Watson v. Fulton*, No. 15 C 11559, 2020 WL 1248678, at *6 (N.D. Ill. Mar. 16, 2020) (citing

*Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[C]ourts give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations," but "[that] latitude ends . . when police officers employ force that is clearly excessive or unreasonable under the circumstances." *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009). Reasonableness "must be judged from the perspective of a reasonable officer on the scene" and not on hindsight. *Graham*, 490 U.S. at 396. The "proper application [of the standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Plaintiffs have shown a likelihood of success on their Fourth Amendment excessive force claim. Plaintiffs have presented declarations and evidence that Defendants have assaulted and deployed tear gas, pepper balls, rubber bullets, flashbang grenades, and other munitions against peaceful protestors who are engaged in the lawful expression of their First Amendment rights. A seizure occurs under the Fourth Amendment when an officer "by means of physical force or show of authority has in some way restrained the liberty of a citizen." *Duran v. Sirgedas*, 240 F. App'x 104, 110 (7th Cir. 2007). Here, Plaintiffs have made a strong showing that they will be able to show that Defendants' use of tear gas, pepper balls, and other munitions, as well as physical attacks, amounted to a seizure for Fourth Amendment purposes and that, given the alleged lack of justification for its use, constituted excessive force. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) ("[O]fficers may not, without provocation, start beating, pepper-spraying, kicking, and otherwise mistreating people standing around a restaurant parking lot (even in the middle of the night)."); *Duran*, 240 F. App'x at 112–113 (use of pepper spray could be considered excessive force if used without justification, noting that "[a]ssaulting citizens who are safely detained without any provocation violates clearly established constitutional principles"); *Nelson v. City of Davis*, 685 F.3d 867, 877–83 (9th Cir. 2012) (use of projectile filled with pepper spray amounted to seizure and was unreasonable where the plaintiff posed no visible threat and did not demonstrate an unwillingness to comply with officers' orders).

### C.    Irreparable Harm/Inadequate Remedy at Law

Having found that Plaintiffs have shown a likelihood of success on their claims, the Court next considers whether Plaintiffs have demonstrated irreparable harm and that they have an inadequate remedy at law as to each of their claims.

### 1.    First Amendment and the RFRA

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Accordingly, "[u]nder Seventh Circuit law, irreparable harm is presumed in First Amendment cases." *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022) (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). Also, "[a]lthough the claim is statutory, RFRA protects First Amendment free-exercise rights," so courts apply the First Amendment irreparable harm analysis to RFRA claims. *Korte*, 735 F.3d at 666. Moreover,

quantifying a First Amendment injury "is difficult and damages are therefore not an adequate remedy." *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982).

Because the Court concludes that Defendants' conduct likely violates the First Amendment and the RFRA, Plaintiffs have established they will suffer irreparable harm and that they have an inadequate remedy at law if the Court denies the TRO. *See Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 992 (N.D. Ill. 2025) (finding that the plaintiff made a sufficient showing of irreparable harm because the Court found that the plaintiff established a likelihood of success on the merits of its First Amendment claim).

### 2.      Fourth Amendment

A Fourth Amendment violation stemming from an illegal search or seizure does not presumptively cause irreparable harm or suggest an inadequate remedy at law because it is a "constitutional tort" analogous to a "personal-injury" claim where money damages will be awarded. *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004). An "[i]nadequate remedy at law does not mean wholly ineffectual," however, although "the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Here, Plaintiffs have shown irreparable harm because of the ongoing nature of the alleged violation of their Fourth Amendment rights, with monetary damages insufficient to compensate them for the repetitive constitutional violation. *See Campbell*, 373 F.3d at 835 (noting that the right party to bring suit for injunctive relief for Fourth Amendment violations is someone to whom "the same events are likely to happen again"); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." (citing *Burns v. Elrod*, 509 F.2d 1133 (7th Cir. 1975), *aff'd*, 427 U.S. 347 (1976))); *see also Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (collecting cases); *Back v. Carter*, 933 F. Supp. 738, 754 (N.D. Ind. 1996) ("'When violations of constitutional rights are alleged, further showing of irreparable injury may not be required' if what is at stake is not monetary damages." (quoting *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1032 (W.D. Wis. 1989), *modified on other grounds*, 710 F. Supp. 1532).

### D.      Balance of Harms/Public Interest

Next, the Court "weigh[s] the harm the denial of the preliminary injunction would cause the plaintiff[s] against the harm to the defendant[s] if the [C]ourt were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice versa." *Id.* "When the government is a party, the balance of equities and the public interest factors merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v Kempthorne*, No. CV 06-745, 2006 WL 8443876, *5 (D.N.M. Sept. 15,

2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes.").

### 1. First Amendment and the RFRA

Once the moving party establishes a likelihood of success on the merits in First Amendment cases, the balance of harms "normally favors granting preliminary injunctive relief" because "injunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 679 F.3d at 590 (quoting *Christian Legal Soc'y*, 453 F.3d at 859). And just as with irreparable harm, the same analysis applies to Plaintiffs' RFRA claim. *See Korte*, 735 at 666 (applying First Amendment balancing analysis to a RFRA claim). Because Defendants' conduct likely violates the First Amendment, the balances of equities on these two claims weighs in favor of a TRO. *See Chicago Women in Trades*, 778 F. Supp. 3d at 993 (finding the balance of harms and public interest weighed in favor of granting a preliminary injunction because "injunctions protecting the First Amendment freedoms are always in the public interest" (quoting *Alvarez*, 679 F.3d at 589)).

### 2. Fourth Amendment

"[I]t is difficult to conceive of how an injunction requiring [a party] to comply with the Constitution could be harmful." *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016). The balances of equities favors Plaintiffs because, without a TRO, they will be subject to Defendants' ongoing violation of their Fourth Amendment right to be free from excessive force, and the public interest is served when courts uphold constitutional rights. *See Gutierrez v. City of E. Chicago*, No. 2:16-CV-111, 2016 WL 5819818, at *3 (N.D. Ind. Sept. 6, 2016) (finding the balance of harms favored the plaintiff because, without injunctive relief, "she will be faced with an ongoing violation of her [Fourth Amendment] right to be free from warrantless criminal searches; and the public interest is served when constitutional rights are upheld"), *report & recommendation adopted*, 2016 WL 5816804 (N.D. Ind. Oct. 5, 2016).

Therefore, the Court finds that Plaintiffs have satisfied the requirements for entry of a TRO with respect to their First Amendment retaliation, RFRA, and Fourth Amendment claims. The Court now turns to the scope and workability of the relief that Plaintiffs seek.

### E. Scope of Relief

Defendants argue that Plaintiffs are improperly requesting a universal injunction, seeking relief on behalf of nonparties. In June 2025, the Supreme Court clarified that federal courts cannot issue universal injunctions, in other words, injunctions that "prohibit enforcement of a law or policy against *anyone*." *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). Pursuant to *CASA*, then, the Court must ensure that it does not issue an injunction "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. But this does not mean that the Court's injunction cannot incidentally benefit a nonparty. *See id.* at 851. Here, in awarding complete relief to Plaintiffs, the injunction will necessarily incidentally benefit other protestors, journalists, and religious figures present at protests. Plaintiffs contend that Defendants have indiscriminately used force against them, even though they have not engaged in

any violent or noncompliant actions. Given the scale of the protests, Defendants likely cannot determine who among protestors is a Plaintiff in this case. Moreover, Plaintiffs could not be assured that the injunction has any force if Defendants could engage in the crowd control tactics addressed in the injunction with respect to other protestors, journalists, or religious figures present near them, given the fact that these crowd control tactics are designed to have an impact beyond just one individual. For this reason, the injunction does not violate *CASA*'s prohibition on universal injunctions, because the effects on nonparties are incidental to the need to provide complete relief to the named Plaintiffs.[4] *See Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 733–34 (7th Cir. 2025) (noting, without deciding, that "[t]o the extent the plaintiff media organizations rely on information and observations from ordinary citizens going about their day as source material for stories, enjoining the buffer law's enforcement statewide may be necessary to provide the *plaintiffs themselves* with complete relief"); *L.A. Press Club*, 2025 WL 2658327, at *22 (finding that "an injunction applying to journalists, legal observers, and protesters in this judicial district is necessary to afford Plaintiffs complete relief"). Only Plaintiffs can enforce the TRO's terms. *See CASA*, 606 U.S. at 852 (noting that an "injunction's protection extends only to the suing plaintiff—as evidenced by the fact that only the plaintiff can enforce the judgment" and that if another individual not party to the suit wants to enjoin similar conduct, "she must file her own suit").

Defendants also argue that the Court should limit the TRO's reach to only the Broadview ICE facility. Given the record before the Court, however, the Court does not find that the issues are limited to Broadview but rather are also happening throughout the District. For example, on October 3, 2025, an ICE officer threw a tear gas canister out of his vehicle in front of an elementary school in Chicago without any warning or apparent justification. The following day, federal agents pointed weapons and threw tear gas into crowds of protesters in Brighton Park, a Chicago neighborhood. Defendants cannot dispute that their immigration enforcement operations span the entire District. And Plaintiffs indicate a desire to peacefully protest and to report on Defendants' actions wherever necessary. The Court therefore refuses Defendants' request that the Court limit the TRO to the Broadview facility and instead will allow it to apply throughout the District.

The Court notes Defendants' concern that the TRO merely tells Defendants to obey the law, which they claim is improper. The Seventh Circuit, however, does not have a per se ban on obey the law injunctions, unlike some other circuits. *See EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841–42 (7th Cir. 2013); *Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 410–11 (6th Cir. 2016) (collecting cases from other circuits). While "obey the law" injunctions raise overbreadth and vagueness concerns, the Court does not find the provisions in the TRO here overbroad or vague.

---

[4] Additionally, while the Court has not yet considered a class certification motion, Plaintiffs seek to proceed on behalf of a putative class of peaceful and non-violent individuals who are present at demonstrations to participate, observe, record, report, or pray. To the extent that Plaintiffs conditionally show that class certification pursuant to Rule 23(b)(2) is appropriate, Defendants' concern about universal injunctions would evaporate. *See CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) ("[I]n the wake of the Court's decision, plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide.").

The TRO's provisions instead comply with Rule 65(d)'s requirements that the injunction specifically state and describe in reasonable detail the acts the Court has restrained or required.

### F. Security

Rule 65(c) provides that, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, "the case law has somewhat weakened the force of the 'no order shall issue' language" in Rule 65(c). *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980) (citing *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 700 (7th Cir. 1977) ("Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)"); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (the district court retains discretion to determine if a bond must be posted despite the mandatory language in Rule 65(c)).

Seventh Circuit caselaw identifies two scenarios in which a district court may forgo requiring a bond. First, a court may not require bond if the enjoined party does not demonstrate it will "incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Second, a court may forgo a bond when "a bond that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay, and the district court balances (often implicitly) the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.*

Both scenarios support waiving the bond requirement here. First, the Court does not find the training costs that Defendants identified to be significant, particularly because the TRO essentially directs agents and officers to follow the training they have already received on crowd control, as well as what the Constitution demands of them. More importantly, when a court implicitly balances the potential cost of injunctive relief against the harm to speech if an injunction is denied, free speech prevails. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (waiving bond after imposing a preliminary injunction to prevent the violation of First Amendment rights); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 695 (N.D. Ill. 2023) (same). That is the case here. The Court therefore declines to require Plaintiffs to post a bond.

### G. Stay Pending Appeal

Finally, Defendants have requested the Court stay any relief pending appeal. When deciding whether to issue a stay pending appeal, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34. Here, Defendants did not address any of these factors in their request for a stay or explain why a stay would be warranted.

Because Defendants did not meet their burden and none of the factors favor a stay, the Court refuses to stay its order pending appeal.

Pursuant to Federal Rule of Civil Procedure 65(d)(1) and *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922 (7th Cir. 2019), the Court has entered the terms of the TRO in a separate document.

Date:  October 9, 2025                                   /s/__Sara L. Ellis_____