IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO HEADLINE CLUB, BLOCK )  Case No. 25 C 12173
CLUB CHICAGO, CHICAGO NEWSPAPER )
GUILD LOCAL 34071, NABET-CWA )
LOCAL 54041, ILLINOIS PRESS )
ASSOCIATION, RAVEN GEARY, )
CHARLES THRUSH, STEPHEN HELD, )
DAVID BLACK, WILLIAM PAULSON, )
AUTUMN REIDY-HAMER, and LEIGH )
KUNKEL, )
)
                Plaintiffs, )
)
        v. )
)
KRISTI NOEM, Secretary, U.S. )
Department of Homeland Security )
(DHS); TODD LYONS, Acting )
Director, U.S. Immigration and )
Customs Enforcement (ICE); )
MARCOS CHARLES, Acting Executive )
Associate Director, Enforcement )
and Removal Operations, ICE; )
RUSSELL HOTT, Chicago Field )
Office Director, ICE; RODNEY S. )
SCOTT, Commissioner, U.S. )
Customs and Border Protection )
(CBP); GREGORY BOVINO, Chief )
Border Patrol Agent, CBP; DANIEL )
DRISCOLL, Director of the Bureau )
of Alcohol, Tobacco, Firearms )
and Explosives (ATF); WILLIAM K. )
MARSHALL III, Director of the )
Federal Bureau of Prisons (BOP); )
PAMELA BONDI, Attorney General )
of the United States; U.S. )
DEPARTMENT OF HOMELAND SECURITY; )
U.S. DEPARTMENT OF JUSTICE; )
UNIDENTIFIED FEDERAL OFFICER )
DEFENDANTS; UNIDENTIFIED FEDERAL )
AGENCY DEFENDANTS; and DONALD J. )
TRUMP, President of the )
United States,              )  Chicago, Illinois
)  October 8, 2025
                Defendants. )  2:40 p.m.

TRANSCRIPT OF PROCEEDINGS -
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE SARA L. ELLIS

APPEARANCES:

For the Plaintiffs:      LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
                              MR. STEVEN E. ART
                         311 N. Aberdeen Street, Third Floor
                         Chicago, Illinois 60607

                         LOEVY & LOEVY
                         2060 Broadway, Suite 460
                         Boulder, Colorado 80302


For the Defendants:      U.S. DEPARTMENT OF JUSTICE
                         BY:  MR. SEAN SKEDZIELEWSKI (via video)
                         950 Pennsylvania Avenue NW
                         Washington, D.C. 20530

Court Reporter:          KELLY M. FITZGERALD, RPR, RMR, CRR
                         Official Court Reporter
                         United States District Court
                         219 S. Dearborn Street, Room 1412
                         Chicago, Illinois 60604
                         312-818-6626
                         kmftranscripts@gmail.com

                         *   *   *   *   *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: All right.

Ms. Johnson.

THE CLERK: Case 25 CV 12173, Chicago Headline Club, et al. v. Noem, et al.

MR. LOEVY: Good afternoon, Your Honor. Jon Loevy for the plaintiffs.

MS. WANG: Elizabeth Wang for the plaintiffs.

MR. ART: And Steve Art for the plaintiffs. Good afternoon, Your Honor.

THE COURT: All right. Good afternoon.

And --

MR. SKEDZIEWLEWSKI: Sean Skedziewlewski for defendants, Your Honor. Good afternoon.

THE COURT: All right. Good afternoon, Mr. Skedziewlewski.

Nope, say it again for me, because I'm going to get it right today.

MR. SKEDZIEWLEWSKI: Skedziewlewski.

THE COURT: Skedziewlewski. Okay. Thank you.

Okay. All right. So, first, I want to thank everybody for giving me the two kind of redlined versions of a proposed TRO.

Here we go. Okay.

Is there anything anybody wants to add or have me

consider or bring up?  I've read the government's response.  So thank you for getting that to me, Mr. Skedziewlewski.  And I know it was a quick turnaround, so I appreciate that.

So I've read that.  I've read the competing redlined orders.

Anything anybody wants to add at this point?

Mr. Loevy?

MR. LOEVY:  Your Honor, it's our understanding that there are loose ends that were left over from Monday that we're trying to narrow things and, you know, resolve.  So we will stand on -- on where it all is.

THE COURT:  All right.

And Mr. Skedziewlewski?

MR. SKEDZIEWLEWSKI:  I'll just highlight one point that we made in the brief, Your Honor, that I think if we were to come to agreement on early would make our discussion of the rest of the proposals perhaps a lot simpler and easier to come to agreement on, and that's the scope of the relief.

We propose in the -- in our brief that the relief should be limited to the Broadview facility.  And we make a suggestion in our proposed redline TRO as to how we might do that, but I think we're flexible on exactly what that would look like.

But if that's in place, then a lot of our concerns about how the TRO would impact, you know, operations in the

field that aren't, at least from defendants' point of view, related to plaintiffs' claims, since those wouldn't be impacted, we would have a lot fewer concerns and it could potentially streamline the rest of today's hearing.

THE COURT: So I saw that. And given the record before me, however, these issues are not limited to Broadview. And if I were -- if I felt secure that this was only happening at the Broadview facility and was not happening out in the field, I would be happy to limit it to Broadview, but I don't believe that that is the case. And so I'm not going to limit the TRO simply to Broadview.

MR. SKEDZIEWLEWSKI: Understood, Your Honor.

THE COURT: Okay. I -- I know --

MR. SKEDZIEWLEWSKI: In that case, I'm happy to move on. Yep.

THE COURT: Okay. And I -- I understand that you are disappointed, but that's where I come out on that.

So other than what's been filed and what we discussed on Monday, though, you've got nothing more to add and you're okay with me kind of getting to the nitty-gritty of my ruling?

MR. SKEDZIEWLEWSKI: Your Honor, defendants look forward to being able to submit a sort of substantive merits argument in the future with rebuttal evidence, but at this time we -- yes, we stand on our arguments in this Court on Monday -- on Monday. And without waiving our objections to an

entrance -- any potential entrance of a temporary restraining order, we're amenable to -- to proceeding, sort of discussing the -- the workability and breadth of an order that the Court might decide to enter.

THE COURT: Okay. Great.

All right. So, first, I'm -- so in order to obtain a TRO, plaintiffs need to satisfy three threshold requirements: First, that there's some likelihood of success on the merits; second, that there's an inadequate remedy at law; and third, that irreparable harm will result if the relief is not granted.

If the plaintiff satisfies these three factors, then I conduct a balancing test: weighing the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if I were to grant it. And here it's a temporary restraining order rather than a preliminary injunction, but the standards are the same.

The balancing process involves a sliding scale approach. The more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in its favor and vice versa. I'm also to consider the public interest, which includes taking into account any effects on nonparties.

So the first issue before the Court is standing. I need to address plaintiffs' standing, which the defendants have challenged. To establish standing to seek injunctive relief,

the plaintiffs must allege an actual or imminent threat of suffering a concrete and particular -- particularized injury in fact, which plaintiffs can fairly trace to the defendants' conduct and that a favorable judicial decision will likely prevent or redress.

In order to have standing, plaintiffs must face a real and immediate threat of future injury.

And while the defendants argue that the plaintiffs have not established that their injuries are likely to recur, I disagree. The risk of future injury is not speculative given the ongoing and sustained pattern of conduct that plaintiffs have documented over the last month that show no signs of stopping.

Plaintiffs indicate that they intend to continue their reporting, ministering, and protesting. Because defendants have acted indiscriminately in the past, the risk of reoccurrence is not speculative, and I find that plaintiffs have standing to pursue their claims.

For their First Amendment claims, plaintiffs also have standing based on the chilling effect of defendants' conduct, given that some of the plaintiffs have expressed the defendants 'actions have caused them to limit their activities.

The organizations have standing to sue on behalf of their members and for their own injuries. An organization has standing to sue on behalf of its members when its members would

otherwise have standing to sue in their own right, the interest it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Organizations demonstrate an injury in fact if they show that defendants' conduct impaired, which means to directly affect and interfere with, their ability to conduct their business or services.

I find that plaintiffs have met these requirements in this case for both associational and organizational standing. Plaintiffs' news organizations indicate that defendants' activities have frustrated their efforts to defend journalist safety and working conditions.

So having found that the plaintiffs have standing, then I go through the various factors.

So the first is likelihood of success. To meet this requirement, a plaintiff must demonstrate that its claim has some likelihood of success on the merits. What amounts to some depends on the facts of the case at hand because of the Seventh Circuit's sliding scale approach. But it at least requires a strong showing that normally includes a demonstration of how the applicant proposes to prove the key elements of its case. A mere possibility of success does not meet this standard.

So turning to the First Amendment retaliation claim. To prevail, plaintiffs must ultimately show that they engaged in activity protected by the First Amendment, that they suffered a deprivation that would likely deter First Amendment activity in the future, and the First Amendment activity was at least a motivating factor in defendants' decision to take the retaliatory action.

Here, the allegations in the complaint establish that this claim has some likelihood of success. Plaintiffs allege that the defendants retaliated against them while they were engaged in news gathering and/or protesting, which are both activities protected by the First Amendment. This retaliation allegedly involved being shot with impact or chemical munitions, gassed, pepper sprayed, hit with near lethal grenades and/or otherwise threatened with arrest.

All of this conduct would likely deter First Amendment activity in the future.

I also find that plaintiffs' allegations are likely sufficient to infer that their First Amendment activities were the motivating factors in defendants' conduct. Proof of motive can be established through either direct or circumstantial evidence, including suspicious timing, ambiguous, oral, or written statements, or behavior towards or comments directed at other people in the protected group.

Turning to the RFRA claim. RFRA prohibits the federal

government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means.

Under the burden shifting framework of RFRA, once a claimant makes a *prima facie* case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny.

A plaintiff can prove a government policy or act substantially burdens their religious practice if the government policy or act compelled them to perform acts undeniably at odds with fundamental tenets of their religious beliefs; two, put substantial pressure on them to modify their behavior and to violate their beliefs; or three, bears direct, primary, and fundamental responsibility for rendering a religious exercise effectively impracticable.

In assessing whether a burden is substantial, we focus primarily on the intensity of the coercion applied by the government and not the centrality of the religious practice in question.

Here, Reverend Black and the putative religious exercise class argue that they're likely to succeed on their claim because defendants' use of violent force against people peacefully praying, including clergy members and lay practitioners alike, substantially burdens their exercise of

religion.

And what is relevant here is the second factor, which is to put a substantial pressure on them to modify their behavior and violate their beliefs.

Plaintiffs argue that defendants' use of force puts substantial pressure on Reverend Black and other similarly situated people to modify their behavior and violate their beliefs under highly coercive threats of violence. They allege that defendants have engaged in the policy, pattern, and practice of targeting people visibly engaged in prayer and other religious exercise with PepperBalls, tear gas, and other physical violence without provocation.

They argue that this forces Reverend Black and others to choose between their health and safety on the one hand and authentically practicing their faith on the other.

Plaintiffs submitted declarations from Father Curran who states that he's restricted who he invites to join prayer vigils at Broadview and has stopped using the vigils as an opportunity to provide religious education to Catholic students because of the high risk of violence.

This alleged coercion is enough to show a likelihood of success on the merits of plaintiffs' RFRA claim.

I also find that defendants' policy, pattern, and practice of using force against people praying or otherwise practicing their religion cannot survive strict scrutiny

because I have not identified a compelling government interest using the least restrictive means.

Turning to the Fourth Amendment claim. Plaintiffs contend that defendants' actions are unreasonable and constitute excessive force in violation of the Fourth Amendment. Excessive force is a form of unreasonable seizure in violation of the Fourth Amendment.

We normally evaluate these claims based on whether the officers' actions were objectively reasonable under the circumstances. And courts should give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations. But that latitude ends, however, when police officers or law enforcement officers employ force that is clearly excessive or unreasonable under the circumstances.

Reasonableness must be judged from the perspective of a reasonable officer on the scene and not in hindsight.

Here, plaintiffs have presented declarations and evidence that defendants have assaulted and deployed tear gas, PepperBalls, rubber bullets, flash-bang grenades, and other munitions against peaceful protesters who were engaged in the lawful expression of their First Amendment rights. The seizure occurs under the Fourth Amendment when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.

And there are courts that have found that the use of pepper spray and similar projectiles amount to a seizure for Fourth Amendment purposes.

And I find here that the plaintiffs have demonstrated a likelihood of success on the merits here because they have presented evidence that the protesters and members of the putative class have been protesting peacefully and the expression of force in relation to those protests is unreasonable and excessive from the defendants here, that the use of pepper spray could be considered excessive force if it's used without justification, that assaulting citizens who are safely detained without any provocation violates clearly established constitutional principles.

All right. So then the next factor is irreparable harm or inadequate remedy at law. If I find that the plaintiffs have shown a likelihood of success on the merits, then I would consider whether the plaintiffs have demonstrated irreparable harm and that they have inadequate -- an inadequate remedy at law.

In First Amendment cases, the likelihood of success on the merits will often be the determinative factor.

The loss of First Amendment freedoms, even for a minimal period of time, unquestionably constitutes irreparable injury. Thus, under Seventh Circuit case law, irreparable harm is presumed in First Amendment cases. Moreover, quantifying a

First Amendment injury is difficult, and damages are therefore not an adequate remedy.

Turning to RFRA. Although that claim is statutory, RFRA protects First Amendment free exercise rights. So courts supply the First Amendment irreparable harm analysis to those claims as well. Because I found that defendants' conduct likely violates the First Amendment, plaintiffs have established that they will suffer irreparable harm if the Court denies their motion for a TRO.

Turning to the Fourth Amendment, it is a closer question on irreparable harm. A Fourth Amendment violation stemming from an illegal search or seizure does not presumptively cause irreparable harm because it's a constitutional tort analogous to a personal injury claim where money damages will be awarded.

However, plaintiffs here have shown irreparable harm because of the ongoing denial of Fourth Amendment rights, which is an irreparable harm in and of itself. And the Seventh Circuit noted that in *Campbell v. Miller*, 373 F.3d 834 at 835, noting that the right party to sue for injunctive relief for Fourth Amendment violations is someone who the same events are likely to happen to again.

The Seventh Circuit noted that as well in *Preston v. Thompson*, 589 F.2d 300 at 303, Footnote 3. The existence of a continuing constitutional violation constitutes proof of an

irreparable harm, and its remedy certainly would serve the public interest.

All right. The next factor is balance of harms -- or the next two factors I consider together would be the balance of harms and public interest.

If the plaintiffs meet all the threshold requirements, the Court then weighs the harm the denial of the TRO would cause the plaintiffs against the harm to the defendants if I were to grant it. This balancing process involves a sliding scale approach. The more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in the plaintiffs' favor and vice versa.

When the government is a party, the balance of equities and the public interest factors merge. And the public has a strong interest in having a government that conducts itself fairly and according to its stated regulations and policies, as well as the Constitution and laws.

So looking at the First Amendment and RFRA claims, once -- once the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting injunctive -- preliminary injunctive relief because injunctions protecting First Amendment freedoms are always in the public interest. And just as with irreparable harm, the same analysis applies to the plaintiffs' RFRA claim.

Because I find defendants' conduct likely violates the

First Amendment, the balances of equities weighs in favor of granting the TRO.

Turning to the Fourth Amendment, it is difficult to conceive of how an injunction requiring a party to comply with the Constitution could be harmful. The balances of equities favor plaintiffs because without a TRO, they will be subject to defendants' ongoing violation of their Fourth Amendment right to be free from excessive force, and the public interest is served when courts uphold constitutional rights.

All right. So now we will turn to the scope of relief. So the first issue that the defendants raised is that an injunction -- any injunction that I issue would violate the Supreme Court's prohibition on universal injunctions. But I find that any injunction that I enter would not violate that prohibition on universal injunctions because the effects on nonparties are incidental to the need to provide complete relief to the named plaintiffs.

And if I were to limit a TRO solely to the named plaintiffs, it would be utterly unworkable. And while I haven't yet considered a class certification motion, plaintiffs do seek to proceed on behalf of a putative class of peaceful and nonviolent individuals who are present at demonstrations to participate, observe, record, report, or pray.

And while I might have some concerns about the ascertainability of the class, I do note that to the extent

that plaintiffs can conditionally show that class certification pursuant to Rule 23(b)(2) is appropriate, the concern about universal injunctions is also addressed then by proceeding as a class.

And I would ask that at the preliminary injunction hearing that we deal with the class certification issue.

I am limiting the TRO to this district. And at this stage, it's time-limited given that it's only a TRO and we will be having a preliminary injunction hearing.

And I'm not limiting the TRO to Broadview because I do find that plaintiffs have provided sufficient evidence to demonstrate that this is occurring throughout the district and it is not limited to the Broadview facility.

I do note that the defendants have a concern that the TRO merely tells the defendants to obey the law. The Seventh Circuit, however, does not have a per se ban on "obey the law" injunctions, unlike other circuits. And while "obey the law" injunctions raise overbreadth and vagueness concerns, I don't find the provisions in the TRO here are overbroad or vague. Instead, they comply with Rule 65(d)'s requirements that the injunction specifically state and describe in reasonable detail the acts that are restrained or required.

As to the scope of relief, finally, I do raise the question of whether the TRO can be directed at President Trump. Injunctive relief typically is not available against the

President, although courts do have a limited ability to enjoin the President to carry out ministerial, nondiscretionary duties. Because I find that plaintiffs can obtain relief to remedy the harms they face without enjoining the President directly, I find it unnecessary to resolve that question, and I except President Trump from the scope of the injunction at this time.

Then the last issue is security. Rule 65(c) provides that the Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The Seventh Circuit case law identifies two scenarios where I may forgo requiring a bond.

First, I may not require a bond if the enjoined party does not demonstrate it will incur any damages from the injunction. Second, I may forgo a bond when a bond that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay, and the district court balances often implicitly the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction or a temporary restraining order that he may need desperately.

Both scenarios support waiving the bond requirement here.

First, the government has not offered any expected damages that would result from an erroneous TRO. The training costs that the government brought up previously I find are not going to be significant here. The TRO that will be entered essentially directs agents and officers to follow the training that they've already received on use of force, that they've already received on crowd control, and is essentially directing them to follow their own rules, policies, regulations, the laws that apply to them, and the behavior that the Constitution demands.

So I don't find that requiring plaintiffs to post a bond, I -- I can't even put a number on what it would be to cover these alleged training costs.

More importantly, when a court implicitly balances a potential cost of injunctive relief against the harm to speech if an injunction is denied, free speech prevails. That is the case here. So I will decline and am declining to require plaintiffs to post a bond.

And then the last issue before we get to the language of the TRO is the stay. So defendants have asked me to stay my order pending appeal.

When deciding whether to issue a stay pending appeal, courts consider whether the stay applicant has made a strong

showing that they are likely to succeed on the merits, whether the applicant will be irreparably injured absent a stay, whether issuance of a stay will substantially injure the other parties interested in the proceeding, and where the public interest lies. The party requesting the stay bears the burden of showing that the circumstances justify an exercise of that discretion.

Here, in requesting a stay, defendants did not address any of these factors in their request for a stay or explain why a stay would be warranted. Because defendants have the burden of demonstrating these factors and have not done so and I find that the public interest lies in issuing the TRO and preventing continuing constitutional violations and I do not find that the defendants have made a strong showing that they are likely to succeed on the merits, I don't find that they will be irreparably injured absent a stay, and I do find that issuing a stay will substantially injure the plaintiffs who are interested in this proceeding. I am not going to stay my decision pending appeal.

So having ruled, now comes the painful part.

All right. So does everybody have the competing proposed orders?

MR. ART: Yes, Judge.

MR. SKEDZIEWLEWSKI: Yes, Your Honor.

THE COURT: Okay. All right. Let me just organize

myself here for a second.

All right. So I'm looking at both versions. So what I'm looking at, so that everybody is on the same page, I am looking at the redline of plaintiffs' initial proposed order to the updated proposed order on plaintiffs' side. And then on defendants' side, I'm looking at defendants' proposed order that is redlined to the plaintiffs' I think original proposed order.

All right. And it's going to be a little messy, but we will do our best.

Okay. So I am looking at paragraph 1. So the first full paragraph, defendants requested that I add the language "when deployed in and around or operating within 500 feet of the Broadview ICE facility." I'm not including that, because I'm not limiting the TRO to that.

All right. Then A. And I noticed that plaintiffs put in headings throughout the TRO. I actually like the headings.

Mr. Skedziewlewski, do you have any objections to those headings? There's just two of them. It's A and B, which is the -- basically journalists and then others.

Do you have any objection to that?

MR. SKEDZIEWLEWSKI: No -- no objection to the headings, Your Honor.

THE COURT: Okay. All right.

Then turning to 1.a., so the government suggested that

we strike out "or reasonably should know is a journalist." I'm not going to take that out. That covers the later section where we discuss the indicia that officers would consider, and so it should -- "reasonably should know" needs to be included there to cover that.

I've had some time to think, and I know we had a discussion about the last phrase at the first sentence, which is unrelated to failing to obey a dispersal order. And in thinking it through, I think it is more appropriate to remove that phrase, that I think this section reads better if that phrase is removed and makes more sense.

Journalists still, while they are protected and have protected rights, they still, I think, under the Constitution could be ordered to disperse and leave a particular area, which doesn't mean that they couldn't continue to report from a different area, but I do think that they could be told everybody needs to leave this one particular area and you can report from over here.

So to not make things more complicated or more difficult, I am going to remove that last phrase.

So it'll read: "Unless defendants have probable cause to believe that the individual has committed a crime."

The defendants wanted to change "ask" to "order." I don't know that that really makes a difference one way or the other. They --

MR. LOEVY: Not from the plaintiff.

THE COURT: Okay. And they issue orders. They generally don't make requests. So we'll change that to "order."

Then we've got the switch from "press" to "journalist." So we'll keep it "journalist has time to comply."

So, again, I think, Mr. Skedziewlewski, if I start inserting things like "a reasonably adequate time" or "a reasonable opportunity," that we're getting a bit more complicated than we need to be; that we want to give the journalist time to comply and an opportunity to report and observe.

I'm happy to hear if anybody has anything they want to add on that, unless the plaintiffs want to add that language, the reasonably language.

MR. LOEVY: Your Honor, I think we're fine with the language as -- as you've proposed it.

THE COURT: All right. Mr. Skedziewlewski, do you want to add anything like that?

MR. SKEDZIEWLEWSKI: Would "objectively reasonable" make it more appealing?

THE COURT: All right. Yes. Because I don't -- I just want to keep it out of -- what I don't want is fights later on where an officer or an agent says, you know, I said

this and the person didn't move.  And now we're fighting over, you know, is two minutes enough time?  Is 30 seconds enough time?

Is there an objection to qualifying this to "objectively reasonable"?

MR. LOEVY:  Plaintiffs could live with that too, Your Honor.

THE COURT:  Okay.  All right.

So then it will read:  "Defendants may order a journalist to change location to avoid disrupting law enforcement, as long as the journalist has objectively reasonable time to comply and an objectively reasonable opportunity to report and observe."

Okay.  And then the government suggests adding a sentence -- or sentence, phrase, I suppose:  "Nonetheless, if the journalist fails to promptly change location, federal agents may use reasonable force, including less-lethal devices to clear the area or effectuate an arrest."

That's redundant, I think, and so I'm not going to include that.

All right.  Turning to B.  So B did not turn out the way I had asked on either side.  So I'd like it to read something along these lines:  "Dispersal of others.  Issuing a dispersal order requiring any person to leave a public place that they lawfully have a right to be, unless dispersal is

justified by exigent circumstances as defined by the Department of Homeland Security use of force policy, updated February 6, 2023." And I guess it would be Section III.F and XII.E.

So I didn't -- I'm rejecting the "ranking officer determination." I think that's too complicated. And I'm rejecting the "reasonable under the totality of the circumstances." I think that's way too vague and does not fall under the specific requirements that I need to place in here pursuant to Rule 65.

Okay. Moving along. Paragraphs C and D. So people have -- some of these are overlapping and then some of them are quite -- are different, right, in terms of what these -- what -- what's listed here. And I have to be honest with you, I don't even know what some of these are.

Okay. So C, at least, will read: "Using riot control weapons, including" -- so you both have "kinetic impact projectiles." So that can stay in. Then you've got "compressed air launchers."

What's the difference between LS and FN 303 versus "for kinetic impactor marking"?

MS. WANG: Judge -- Judge, so that's -- there's a typo there. It should say PLS.

So these words, these terms, are from the Department's own policies describing less-lethal weapons. And so we had originally listed -- you know, called them different things,

more -- more layperson terms like flash-bang and stinger and things like that. But -- and especially after we saw the defendants' version, which also used the words, it -- it's okay with us to use the words that they describe their own weapons. And so that's why these specific words are in here.

And just to -- to say in response to one of your earlier comments, the reason why there's different paragraphs addressing different things for different weapons is because some weapons are not meant at all to be --

THE COURT: Right.

MS. WANG: -- shot at a person. And so that's why there's some things in some sections and some things in other sections.

THE COURT: Right. But I guess my -- it seems like there's some things that were stricken in yours that were not stricken in the government's. So it doesn't seem like we're looking at the same universe of things in paragraph C, for example, right?

So, Mr. Skedziewlewski, do you -- so I'm looking at compressed air launchers. Would the department prefer the example of -- for kinetic impactor marking versus, for example, PLS and FN 303?

MR. SKEDZIEWLEWSKI: Your Honor, the reason for the parenthetical in defendants' version is to try to capture a concept that's in the CBP policy, which is that some of these

same weapons systems are appropriate for use on subjects based on different types of resistance. And they can be used in different ways based on the type of resistance that the officer is met with.

So the two big categories are active resistance, which tolerates -- or which enables some of these systems or devices to be used in one way, and then assaultive resistance allows them to be used in a different way. And so that was what we were trying to capture here by having that parenthetical.

We don't have an objection to listing examples of specific types of compressed air launchers, but we would ask that there's also the specification that, for example, compressed air launchers can be used for kinetic impactor marking. And, you know, we go on to say: "On individuals demonstrating assaultive resistance." At -- at -- at least that's what we have in paragraph C.

And so that -- that's all just pulled right from the CBP --

THE COURT: Yeah.

MR. SKEDZIEWLEWSKI: -- policy.

THE COURT: Yeah. And I'm looking at the CBP policy now and that it defines active resistance as a type of resistance where physical attributes are being used to resist an officer/agent's control efforts. The efforts are not directed toward the officer/agent, but rather appear intended

to thwart an officer/agent's control efforts.

And then assaultive resistance, there are two. There's physical injury and then serious bodily injury or death.

All right. So what is the plaintiffs' position on making the point clear so it's very specific that -- I guess the question -- well, in thinking it -- you know, I'm kind of thinking this through as we're going through this.

There are two ways of kind of structuring C in that -- this whole TRO really is meant to tell agents what they cannot do for -- towards peaceful protesters or journalists. And if that's the case, then it in some ways presumes, right, we're presuming that people are peaceful. Therefore, they are not providing either active resistance or either type of assaultive resistance.

So the TRO is not intended to tell the officers or agents that they cannot follow -- it's way too many negatives -- but that they aren't to follow their own internal agency policies regarding the use of force and what they can do, right?

So if someone is resisting, if they are an active resister, they are still allowed to do what they are permitted to do under the policy and obviously under the circumstances. But this TRO is not meant to tell them they can't do that, right? It's only meant to say, if someone is peaceful, you are

not to use these tactics with respect to them.

So, I guess, you know, I'm a little concerned about telling the agents what they can do when people resist, depending on the level of resistance, when that's not the class of people that we're talking about.

Does that make sense?

MS. WANG: Yes, Judge. Yes. It does -- it doesn't make sense to import these concepts about assaultive resistance and active resistance, which are designed for a different purpose, into this TRO. And that's exactly right, it -- it -- the TRO presumes that we're dealing with members of the press and religious, you know, exercisers and protesters who are peaceful. And so doing this the way they've suggested overly complicates it and doesn't really make sense.

Furthermore, our language in 1.c. is modeled from the injunction entered by Judge Vera in the *L.A. Press Club* case.

THE COURT: Mr. Skedziewlewski, what's your -- do you -- do you see where I'm going with that? I -- I'm -- I'm worried about saying -- importing the idea of active or assaultive resisters when the TRO is not meant to cover them.

MR. SKEDZIEWLEWSKI: Yes, Your Honor, I see where the Court is going.

Our concern -- and maybe this could be addressed in the sort of catchall paragraph that is -- the Court suggested adding in 1.k. We just want to make sure that when -- whatever

the TRO says, that officers won't be sort of held in violation of the TRO when they're following CB -- you know, following the policy in the use of less-lethal devices. Whatever the standard, whether it's assaultive or -- or active resistance or -- or -- or deadly force that they're facing, and so maybe we could tweak that paragraph K to incorporate that concept without going into all the details that we laid out in paragraph C.

THE COURT: Okay. So I will put a little placeholder once we get to K, and we'll pick that up and deal with that.

So in terms of what the plaintiffs then laid out in C with these examples, do you have any objection to that?

MR. SKEDZIEWLEWSKI: No, Your Honor, provided that the Court agrees to -- to strike that 37 millimeter --

THE COURT: Yes.

MR. SKEDZIEWLEWSKI: -- launcher, because I've heard from the client that that's just not used. They do use the 40 millimeter.

THE COURT: Yeah. And it looks like they actually -- so they struck soft-nosed round. So should that be still back in? You didn't strike it.

MR. SKEDZIEWLEWSKI: I don't --

THE COURT: They did.

MR. SKEDZIEWLEWSKI: Yeah, I didn't -- I don't see that in our policy manual, so I -- I think it should probably

be stricken. It may have been an oversight on our part that --

THE COURT: Okay.

MR. SKEDZIEWLEWSKI: -- that we didn't strike it.

THE COURT: Okay. So we'll strike the soft-nosed rounds. We'll keep 40 millimeters. They had struck 40 and 37. So we'll keep 40.

All right. And then the last part. The question that I had for the plaintiffs is, where it says: "And members of the press, protesters, or religious practitioners who are not themselves posing a threat of immediate physical harm to a law enforcement officer or another person," I am -- I'm wondering what your thoughts are on instead of saying "posing a threat of immediate physical harm to a law enforcement officer or another person" to instead say "who are not themselves demonstrating either active resistance or assaultive resistance as defined in the CBP policy."

MR. ART: Judge, I think our concern with that is the -- the standard for using that level of force -- and -- and this will apply in D and E and F as well -- is not fully defined by that definition in the DHS policy.

So in other words, if you're complying with the DHS policy, presumably you're complying with the Fourth Amendment.

THE COURT: Right.

MR. ART: But we think the direction from this Court should be based on the Fourth Amendment on this particular

point and not DHS policy.

So in other words, if they're following their policy as co-counsel -- or our opposing counsel has said, they'll be complying with this order. You know, if the class of plaintiffs is the one we have defined, they'll be -- you know, they will not trigger that Fourth Amendment standard, right? But I think that from this Court, the direction should be one based on the Constitution.

THE COURT: So I guess the issue brought up that I see in the government's draft is that they split out the weapons, right, and different things to be used, that certain of these can be used only when the officer is experiencing assaultive resistance and others would be limited or used for active resistance.

And so if we've got everything kind of listed here, it does make it a little bit messy. That's the -- that is my only concern with this, is if we don't refer them back that -- for example, pepper spray. So pepper spray would be used with an active resister. You would -- I forget what it is, the -- basically a Taser, the electronic control weapon.

What is it? They're these compressed air launchers. So the compressed air launchers can only be used for somebody demonstrating assaultive resistance but couldn't be used if you were demonstrating active resistance. And so to simply say immediate physical harm to a law enforcement officer or other

person, their policy does break -- break it down where, you know, assaultive resistance is serious bodily injury or death or physical injury.

MR. ART: I -- I think that assaultive resistance as defined by the DHS encompasses all of the Fourth Amendment standards, right? The Fourth Amendment standard for using force in the first place, the Fourth Amendment standard for using deadly force.

What we've tried to do in C and D is take those mechanisms that are the use of force, as this Court has found in its ruling so far, and say, those can't be used unless the Fourth Amendment has been satisfied that they can be used, right? And so if DHS is defining standards for using force differently than the Fourth Amendment, then those policies can't be enforced consistent with the Constitution in this --

THE COURT: Right.

MR. ART: -- case.

THE COURT: But I -- I -- we might be talking past each other, is that where we're delineating specific weapons, because some of those weapons can be used in one instance and other weapons cannot be used, I am -- what I don't want to do is kind of go contrary to either CBP's or DHS's use of force policies that are consistent with the Fourth Amendment.

You see what I'm saying?

MR. ART: I think that if their policies are

consistent with the Fourth Amendment and this Court's order in this case says, you have to satisfy that standard, then they will be able to use the mechanisms in the situations defined by their policy consistent with the Fourth Amendment.

And all we have done is we have taken those mechanisms that are use of force in C and D and that are deadly force in E and F and we have said, to use those things, you have to satisfy the applicable Fourth Amendment standard.

It -- it -- if what they are saying is no, our policies provide that in some circumstances when there is active resistance, as defined by our policy, we can use particular devices against people, and the Fourth Amendment isn't satisfied, then we would have a conflict and this Court should order the Fourth Amendment relief.

If what counsel for the government is saying is, no, we can only those weapons in circumstances that satisfy the Fourth Amendment, then I don't think that we would need to change the language we've proposed. The Court could say, here's the Fourth Amendment standard. You can only use force when the Fourth Amendment is satisfied, and there is no need to discuss DHS policies in this circumstance.

THE COURT: So --

MR. ART: In other words, Judge, I think our concern is that the government --

THE COURT: I guess -- I guess, would it -- so I

35

think -- so can we think about it this way?  Can we break out -- because we're using -- we're talking about specific weapons.  Can we break out -- and maybe we already have -- but can we break them out, like C could cover whatever they are allowed to use with active resisters, right, and then whatever they could use with regard to assaultive resisters?

Does that make sense?

MR. ART:  I think that that's what we have done, Your Honor, is we've included all of the weapons in C, because they are all uses of force.

THE COURT:  Right.

MR. ART:  And I think that the problem, Judge, is that if the definition of active resistance that the government is using is less than the standard required to use any force under the Fourth Amendment, then we are displacing the Fourth Amendment with a DHS defined policy.  We don't want to do that. So I think we sort of, like, stand on our proposal in these sections that that last clause explaining the Fourth Amendment law to the government is important.

In terms of what weapons are included, they're all in C, because they're all uses of force --

THE COURT:  Right.

MR. ART:  -- when they are used against class members.

And then in E, you know, we are using a subset that are deadly force.

THE COURT: Okay.

MR. ART: And then in F, we are simply saying that when you use particular weapons in a particular -- if you shoot them at a person, as they have in a particular place --

THE COURT: Mm-hmm.

MR. ART: -- that is also deadly force, right? And thus, you know, a -- a greater showing is required under the Fourth Amendment.

So I think that the -- the clearest command possible is to say, here's what the Fourth Amendment requires for any use of force, that's C and D; and here's what it requires for deadly force, that's E and F. And if the DHS policies as written are implemented the way they should be and haven't been, as the Court has found --

THE COURT: Mm-hmm.

MR. ART: -- then they're going to comply with the language that the Court orders if the Court adopts plaintiffs' proposal.

MS. WANG: And -- and just to -- to mention that the definition 1.c. that we proposed was adopted a month ago in LA --

THE COURT: Mm-hmm.

MS. WANG: -- and they have not come to the court saying, you know, that the -- the officers don't know how to apply that.

THE COURT: Okay.

MR. SKEDZIEWLEWSKI: But we -- we actually have come to the court and asked for a stay for exactly that reason, that officers don't know how to apply the order.

But, Your Honor, if -- I think I could shed a little bit of light on this.

THE COURT: Yep, go ahead.

MR. SKEDZIEWLEWSKI: Defendants aren't saying -- well, allow me to rephrase that.

This -- this last clause in C -- in paragraph C does not actually lay out the -- the correct Fourth Amendment standard. And the -- the ambiguity in the first sentence listing all the devices but not specifying how they're used will lead to confusion.

Just to give one example, the compressed air launchers are allowed to be used when responding to active resistance for what they call in the policy saturation. That's where you're firing small balls containing a pepper chemical at the -- at the sort of ground near individuals, you know, showing active resistance. That's -- and as written in plaintiffs' version, that's -- that nuance is not captured, and it's just a blanket prohibition against using compressed air launchers against people posing a threat of immediate harm.

But, of course, by policy and consistent with the Fourth Amendment, those launchers can be used against

individuals who are not posing a threat of immediate physical harm when used to saturate an area, rather than as a kinetic impact projectile.

MR. ART: Your Honor --

MR. SKEDZIEWLEWSKI: So -- so it's -- it's that nuance that we're trying to capture and to avoid a blanket prohibition against using these devices, in -- in fact, in ways that are less -- and, in fact, can be, you know, no force at all.

So plaintiffs' version would actually sort of channel agent's actions into a higher level of force by prohibiting a lower level. And -- and so I think that's just counter -- runs counter to what they're actually trying to accomplish here.

MR. ART: Your Honor, that explanation is exactly why the Court should enter an order that says, here's the Fourth Amendment standard that you have to meet to use force. What counsel is saying is, no, we actually use this kind of force against protesters who aren't posing any imminent threat of harm to an officer or another person, so we want to be able to do that.

And the point here is that that's unconstitutional. The Court has found that that use of force on the scene ongoing is unconstitutional. And obviously, the government needs an order saying you can't use that kind of force.

THE COURT: Okay. All right. So anybody want to add anything else on, I guess it would be C, D, E, and F? No?

MR. ART: Anything?

Not from the plaintiffs.

THE COURT: Okay. All right. So as you know, as I have ruled, I am entering -- going to be entering a TRO.

It's not going to be today. It will be tomorrow morning. I need a little time to just figure out these sections, because I do think that it is extremely important if what we are telling these officers and agents that they are not to do. If we're listing out specific weapons, and I can envision some circumstances where consistent with the Fourth Amendment, right, what is a reasonable use of force might be the use of a pepper spray where there is not an imminent threat of harm to the officer and they're not -- and it's not even necessarily becoming violent.

But, you know, I'm thinking if there's a medical emergency in the crowd and the crowd refuses to move, for example, the crowd's not causing a medical emergency, they're not threatening the person suffering the medical emergency, but it's so chaotic that the agents want to get into the crowd to get that person assistance, that, you know, they could potentially -- and I don't -- I'm just kind of thinking out loud, right -- that there may be a use of force that is consistent with the Fourth Amendment in order to get the crowd to comply.

I just -- I think we're close, and I -- and I

understand the plaintiffs' position. I'm not obviously going to include standards that are -- that don't meet or are contrary to the Fourth Amendment requirement or less than the Fourth Amendment requires. But because this is -- this is what we're telling them they can or cannot do, and it's laying out specific types of weapons, I just think I need a little longer to figure out how to adjust this.

MR. ART: Understood, Judge. Could I make one more point?

THE COURT: Yep.

MR. ART: In the example that the Court just offered, I think that that is completely consistent with what we've proposed because in that situation, the class of plaintiffs here is posing a risk of imminent harm to another person, right?

So I think the Court's quite right that there are situations like that, but I think they are going to be consistent with this order. And I think that when it comes to enforcement, you won't see us coming in and saying, you know, they cleared the way when no one would move to get the guy who had a heart attack, right?

And so I think that that's consistent with our order. And I also think that K, which we're going to get to --

THE COURT: Mm-hmm.

MR. ART: -- covers that sort of incidental exposure

scenario. So with that --

THE COURT: Yeah.

MR. ART: -- we understand.

THE COURT: Okay. So I just need to think about this a little bit more.

All right.

MR. SKEDZIEWLEWSKI: Your Honor, would -- would I be able to just quickly --

THE COURT: Yeah.

MR. SKEDZIEWLEWSKI: -- provide another counterexample?

THE COURT: Absolutely.

MR. SKEDZIEWLEWSKI: So I -- I think -- I think your -- the Court's example is -- is a good one, but we actually have one in our brief that is -- is apropos here.

In -- in LA, you know, an officer was trying to detain an individual, and a bystander who was sort of not presenting a threat to the officer but was interfering with the arrest. So the officer wasn't in any danger of physical harm but was unable to, you know, complete the arrest.

And so in that case, you know, a -- an area of saturation or pepper spray is sort of the -- you know, it's the lowest level of force the officer could use without, you know, sort of going hands-on or -- or using some elevated level of force.

So this -- that -- so just another example of why this language of immediate physical harm is just -- is a little too restrictive because there are going to be scenarios where these devices are appropriate at that lower level of, you know, active resistance.

MR. ART: That person's not in the class, and that person satisfies the Fourth Amendment standard as well.

THE COURT: Yeah. So I just need to think it through a little -- just a little longer, because we all know that this is not the only time that a judge is going to look at this order. So I just want to make sure that we've covered what we need to cover.

And then for -- oh, the -- so we're going to jump over these, but --

MR. SKEDZIEWLEWSKI: Your Honor, I have one point on -- on F, if -- if we're sort of moving past that now.

THE COURT: Yes. Just give me one second. I wanted to go back to D for a second.

Do the plaintiffs have an objection to the -- to having it be "reasonably foreseeable" as opposed to simply "foreseeable"?

MR. ART: No, Your Honor.

THE COURT: Okay. And what are your thoughts on "objectively reasonable under the totality of the circumstances," as opposed to "necessary to stop an immediate

and serious threat of physical harm to a person"?

MS. WANG: So --

MR. ART: I think -- oh, go ahead.

MS. WANG: No. I mean, I -- I -- we would object to that because, again, the, you know, presumption of, you know, who -- our plaintiffs and the -- the class is that they're not engaged in activity that is assaultive or interfering or obstructing or any of those things. And this just takes it back to a very -- a -- it's -- it's not as specific as what we need in a specific circumstance, which is, you know --

THE COURT: Right.

MS. WANG: -- ordering officers to do something specific or not do something specific.

THE COURT: Okay. You know, it seemed a little vague to me, but I just wanted to get your -- okay.

So then you wanted to go to F.

Go ahead.

MR. SKEDZIEWLEWSKI: Yes, Your Honor.

And just going back to -- to D for a moment, it's been mentioned a few times now that the -- that the TRO will only apply to -- I think it's been said a few -- a couple of different ways, but to peaceful, you know, protesters --

THE COURT: Right.

MR. SKEDZIEWLEWSKI: -- or to class members.

THE COURT: Right.

MR. SKEDZIEWLEWSKI: If we could just have that in the order somewhere that it's -- it's limited to peaceful protesters and, you know, plaintiffs -- individual plaintiffs and class -- putative class members, that would just give defendants a little bit of comfort on this issue that when we're dealing with, you know, violent offenders, that -- that we can use the type of force the policy allows.

MR. ART: There's nothing about the proposed order that prevents the defendants in this case from using all of their law enforcement power when they have probable cause, when the Fourth Amendment is satisfied. We don't need to narrow it in some artificial way, right, whether it's geography, as the government argued earlier, or the particular people to which they're going to apply it.

The Court has to fashion relief that can be administered on the scene with all kinds of people present. Our plaintiffs are peaceful, and they are the ones entitled to relief. But as the Court said in the LA case, the relief is going to have to necessarily be broadly stated to make sure that all of the plaintiffs get the relief they are seeking.

And it shouldn't be that the government's, you know, saying, there's Reverend Black, I'm not going to shoot him, but I'm going to shoot someone else, right?

THE COURT: Right.

MR. ART: It doesn't work.

THE COURT: No, I mean, it's just unworkable to do that.

Okay. So G --

MR. SKEDZIEWLEWSKI: I can raise that point about F --

THE COURT: Yeah. Go ahead.

MR. SKEDZIEWLEWSKI: -- F, Your Honor, if you don't mind.

THE COURT: Yep. Go ahead.

MR. SKEDZIEWLEWSKI: So I believe -- I'm sorry. I'm looking at our version, but let me take a look at plaintiffs' version here. They have this -- this prohibition about use of these systems on the torso. That's -- all the rest of what plaintiffs have there in that sentence, the head, neck, groin, other sensitive areas, that's all consistent with policy, but torso is not. The torso is the only place that is not a sensitive area, excepting what the policy does add is sort of the -- the female breast area.

So I would just request that that particular clause line up with policy, which should say head, neck, groin, spine, a -- a female breast. And then other -- other sensitive area kind of swallows the delimitation, so that should be stricken.

MR. ART: We have no objection to that proposal.

THE COURT: Okay. So we will make that change.

Did you guys get that? Okay. Okay.

All right. And then turning to G, then we've got this

extra section that the government's added about objectively reasonable and factors to determine what's objectively reasonable.

MR. ART: Yeah, Judge, we -- we discussed this one a bunch last time and concluded that kettling wasn't a use of force --

THE COURT: Right.

MR. ART: -- and that this is setting out the use of force standard under the Fourth Amendment. Everything the government added would be sort of like if we were having an argument about how you or a jury would determine if excessive force had been used.

THE COURT: Right.

MR. ART: I don't think it needs to be something that boots on the ground are told about what to do and not to do.

THE COURT: So I'm not sure why the government added this piece in here for G.

MR. SKEDZIEWLEWSKI: I think -- I think the client liked that being in there, Your Honor, just to make sure that we were agreed as to what the standard is. Because as we go through the proposal, you know, it -- the -- the exceptions to -- you know, where -- where agents can use force aren't repeatedly stated in a way that's too restrictive, right?

So immediate threat of physical harm is just not the standard. The standard is objectively reasonable under the

facts and circumstances.  So we just want to -- there can't be -- immediate threat of physical harm is exactly the kind of mechanical application that the -- you know, that the case law says we shouldn't impose on officer conduct.

MR. ART:  It -- it -- the Court has to order some relief that defendants can follow.  And what the Court is saying is you can't use force unless something --

THE COURT:  Mm-hmm.

MR. ART: -- that I define is happening.

The Court is not saying you can use force if --

THE COURT REPORTER:  Make sure you stay closer to the microphone.

MR. ART:  I'm so sorry.

You can use force, if, for example, you know, I would judge you from the perspective of a reasonable officer on the scene rather than 20/20 vision hindsight could use force. That's not something that the Court can tell an officer and get a result.

THE COURT:  Well, and it seems to me this is something that looks a lot more like a jury instruction that I would give, Mr. Skedziewlewski, as opposed to something in a TRO order where an officer/agent can look at it and say, yes, I can do X, or no, I can't -- you know, I can't do Y.

And I'm -- you know, my overarching goal with this TRO is to make it as clean and plain and directed as possible so

that when the agents -- it really needs to be from the perspective of the officer or agent who looks at this and says, in this particular situation, I can do X; I can't do Y.  And this I think just makes it a bit more cumbersome than it needs to be, and I don't know that it adds to anything.

Okay.  Turning to H about the warnings, so I did want to track the -- kind of the language of -- of the policies.

So I actually do prefer what the government had proposed in -- but I do want that it is two warnings.  You can give the two warnings, you know, kind of back-to-back, but I do think that that second warning is a backstop so that if you missed it the first time, you're going to hear it the second time.

And it does describe or let them know how to determine when something's feasible in that it lets -- you know, they're to give these two warnings, explain what they're going to do, and then give people time to comply before they do it.

MR. ART:  I don't think we have any objection to that in principle, Your Honor.

I think that the -- in addition to the two warnings that at a sound level where it can be heard --

THE COURT:  Mm-hmm.

MR. ART:  -- is important, and we would ask that the Court include that in a version of --

THE COURT:  Sure.

MR. ART: -- the government's proposal.

THE COURT: Do you have an objection to that, Mr. Skedziewlewski?

MR. SKEDZIEWLEWSKI: Yes, Your Honor. Just -- yes, just to the extent that it's subjective and officers, you know, can't know, especially in, you know, more chaotic situations whether an announcement, even when it's been given over a professional-grade PA system, is heard. I mean, we saw in the LA case that individuals said they didn't hear warnings when our officers issued warnings over an industrial-grade PA system for every five minutes for 45 minutes straight and still people said they didn't hear.

THE COURT: Well, so --

MR. SKEDZIEWLEWSKI: So I just -- I could just see --

THE COURT: -- I can --

MR. SKEDZIEWLEWSKI: -- officers doing everything that they can to -- sorry.

THE COURT: No, that's okay. I didn't mean to interrupt you. But, you know, I can put in at a sound level where it can be reasonably heard, right, in that we're going back to the objective reasonable person standard and if it's on a -- you know, blasted on a sound system and you're not listening, well, that's on you. But, you know, this is meant to be, which I don't think would happen, but meant to be where the officer whispers a warning and nobody can hear it and then

employs force.

So, you know, we've got two warnings which will ensure that if somebody -- if it's chaotic and somebody happens to miss it the first time, that it's the second, you know, you have this opportunity to comply because there have been two warnings and that it's a sound level where it can be reasonably heard. Reasonable certainly seems to cover an example where if it's broadcasted over a sound system, then yes, you know, a reasonable person would be able to hear that.

All right. And then I, why did the plaintiffs take out "who is not resisting a lawful dispersal order"?

MR. ART: We thought that the --

COURT REPORTER: Microphone, please.

MR. ART: We thought that the Court's instruction last time, that your prohibit -- the -- the sort of double negative made it confusing, and so we -- that's -- that's why we took that out.

THE COURT: Okay.

MR. ART: We don't think that the government's alternative proposal, though, should be accepted. You -- you know, this is -- this -- the standard procedure is that you have probable cause to believe that the person you are seizing has committed a crime, not that you have some belief yourself that maybe a lawful dispersal order was given and not followed. So we think it needs -- that -- that -- the government's

language there does not fly given the Fourth Amendment violations the Court has already found.

THE COURT: All right. So in -- just on further thought -- I'm just trying to think of the class members and how this TRO is going to cover them.

I think maybe it does make more sense to put it back in, "who is not resisting a lawful dispersal order."

MR. ART: We're fine with that, Judge. I mean, our -- our concern is the very, very common practice that we are seeing on the ground of a demonstrator being dealt with by being seized for no reason, taken out of the protest, and then rarely ever charged and released back onto the street the next day.

THE COURT: Mm-hmm.

MR. ART: And that's blatantly unconstitutional. And so, you know, we took that out to make it more readable; but if the Court wants to put it back in, we are fine with that.

THE COURT: Okay. So we'll put that back in.

And I don't -- I don't think that the government's addition to paragraph I is needed. I think that is covered. And, again, you know, we've got the catchall at the end. So where the officer believes that they're following the TRO, I -- I just don't know that we're going to get a bunch of people coming back in and complaining about I. I think it's pretty clear.

All right.  J, the --

(Counsel conferring.)

THE COURT:  So I'm going to go with the plaintiffs' change, which is instead of "shall be considered," it will be "are examples of indicia of being a journalist."  And their change from "it shall also be" to "other."

So it will read:  "Other indicia include that the person is standing off to the side of a protest."  You know, a substantial distance away from a protest, I don't even know what that means.  I think that just is confusing, whereas, you know, you can kind of look and see if somebody is standing off to the side and that they're not engaging in the protest activities.

Is -- do you have an objection to "the government breaks down protest activities"?

MS. WANG:  I -- I mean, there's many -- that's some ways that somebody could be protesting, but I -- I would think that the word -- the phrase "protest activities" is just sufficiently clear to an officer.

THE COURT:  Well, I mean, if we want to make it clear, right --

MS. WANG:  Because otherwise --

THE COURT:  -- because they've got "otherwise protesting" --

MS. WANG:  "Otherwise protesting."

THE COURT: -- right?

MS. WANG: Okay. Yeah.

THE COURT: And if what we're trying to do is say we want to make this clear that these activities -- you know, if you see a journalist chanting or holding up a sign that they're engaging in a protest activity and not acting as a journalist.

MR. ART: I guess we would advocate for removing "shouting," you know, if they're shouting, "Don't fire that bullet at me."

THE COURT: Yeah. And, Mr. Skedziewlewski, what -- I mean, do you -- you have an objection to removing "shouting"?

MR. SKEDZIEWLEWSKI: I understand the point. Maybe there's a way we could modify it to keep something like that in there, because just the concern is, at least from -- from our point of view, being at a protest is sort of -- it could be construed as a protest activity, right? I mean, sort of the point is showing strength in numbers, showing support for a cause by your presence, but of course journalists are also present at protests. So we're just trying to get a clear line -- as clear a line as we can get, between journalists and protesters so that this definition is actually workable. "Shouting slogans," maybe, or something like that.

THE COURT: I don't necessarily have an issue with "shouting slogans." I don't --

MR. ART: Neither do we.

THE COURT: -- think that any journalist is going to be saying --

MS. WANG: Shouting slogans.

THE COURT: Right?

MS. WANG: Right.

THE COURT: You're not going to be saying -- you know, as a journalist, you're not going to be yelling "down with ICE," right?

MS. WANG: Right.

MR. LOEVY: That's right.

THE COURT: If you're going to be yelling something, it's, you know, "Take your hands off that guy" or "Don't shoot at me."

So -- okay. So we'll include "shouting slogans."

I bet the people in this courtroom observing never imagined that law would be so exciting.

Okay. And then I don't know that we need to say that a sufficient number of indicia must be present. Basically what we're trying to tell the officers is if you see somebody that is acting -- you know, if it -- what is it, walks like a duck, talks like a duck, quacks like a duck, it's probably a duck. If they're acting like a journalist, they're probably a journalist. They don't have to tick every box, but you need to believe -- have a reasonable belief that they are. And because -- because we've got this last sentence that states,

"so the defendants will not be liable for unintentional violations of the order in the case of an individual who does not carry or wear a press pass, badge, or other official press credentials, professional gear, or distinctive clothing that identifies a person as a member of the press."

So it's, you know, this clause at the end that basically says, if you did your best, right, and this person -- you didn't have a reason to believe essentially that this person is a journalist, you're not liable.

MR. SKEDZIEWLEWSKI: Your Honor, could I make or suggest one small tweak to that sentence?

THE COURT: Sure.

MR. SKEDZIEWLEWSKI: We've seen it where a journalist was carrying their press pass, but it's tucked away in their pocket and then they, you know, joined in the -- in a lawsuit against DHS. So could we just strike the word "carry" and make -- it has to be that they're wearing it?

THE COURT: Any objection to that?

MR. LOEVY: If we can have one moment, Your Honor.

THE COURT: Mm-hmm.

(Counsel conferring.)

MR. LOEVY: We're okay with that, Your Honor.

THE COURT: Okay. So then we'll strike "carry."

Okay. And then I don't know about that last sentence about -- the defendants proposed: "Participating in any form

of violence or threat of violence immediately disqualifies a person from being considered a journalist for purposes of the order."

I mean, the order is supposed to protect people behaving in a nonviolent way. And it doesn't apply if somebody is behaving in a way that is violent or threatening violence, then the order doesn't apply by its terms.

MR. LOEVY: We agree, Your Honor. If it's -- so to the extent it's redundant or confusing or could be misconstrued, it's not necessary.

MR. ART: And I guess the other point we'd add, Judge, is that that doesn't make someone not a journalist, and all we're trying to do here is define journalist. It makes it a journalist that they can take law -- law enforcement action against.

THE COURT: What are your thoughts on that, Mr. Skedziewlewski?

MR. SKEDZIEWLEWSKI: Maybe I'm just missing something, but could the Court point me to the -- the terms that limit the order only to peaceful journalists, protesters, or other individuals?

THE COURT: Let's see.

MR. ART: I think what we're talking about, Judge, is each of the clauses in C, D, E, F, G that state when law enforcement action can be used to effect a seizure.

MR. LOEVY:  And A and B.

MR. ART:  You want to read A?

MS. WANG:  It's covered by A too.

THE COURT:  So, you know, the defendants have to have probable cause to believe that the journalist committed a crime before they could use force.  And so threatening violence or using violence would fall under committing a crime.  Therefore, they wouldn't be prevented from dispersing, arresting, threatening to arrest, threatening or using physical force against that person even --

MR. SKEDZIEWLEWSKI:  Maybe the issue, Your Honor, is I'm -- oh, excuse me.  I didn't mean to interrupt.

THE COURT:  No, that's fine.

MR. SKEDZIEWLEWSKI:  Maybe my -- my mistake is that there's some equivocation on the -- the -- the term "dispersing" in paragraph 1.a.  I -- I understand this -- that term here to mean, you know, issuing a lawful dispersal order and then directing people to disperse.  But if -- if -- if the Court understands "dispersing" to mean some use of force, you know, physically causing someone to be dispersed, that -- that seems to make a difference.

MR. ART:  So paragraph A, first, covers dispersing, arrest, use of force, explicitly as separate concepts.  So I -- I don't think the objection applies to what we're talking about here.

But I think it -- to the extent the Court wants to define "dispersal order" in some way, because it's not a crowd control entity, that DHS has no policy like that, but the Chicago Police Department does, and -- and a dispersal order is a lawful command given by a department member to all persons to leave a designated area.  And if the Court wants to define "dispersal order" in its order that way because it prevents confusion or equivocation, we have no objection to that.

THE COURT:  Okay.  So can you give us a copy of that?

MS. WANG:  We have a copy of the order.

THE COURT:  Okay.

MS. WANG:  The general order.

THE COURT:  Great.

MR. ART:  We're -- you know what we will do?  We can submit that language to the Court --

THE COURT:  Perfect.

MR. ART:  -- right after this hearing.

THE COURT:  Yep.  That would be great.

MR. ART:  Okay.

THE COURT:  Okay.  All right.  Then K.

MR. ART:  K is the language from Los Angeles that the Court wanted added --

THE COURT:  Yeah.

MR. ART:  -- at the last hearing.

THE COURT:  And I wanted to add -- so it only has

"crowd control devices."  And the government has added "chemical dispersal agents or physical force."  And I think that covers everything that we were talking about anyway.

MR. LOEVY:  We agree, Your Honor.  We don't -- we understand why it would need to be in there.

THE COURT:  Okay.  So we'll include those.

And then I think the "otherwise warranted" language, though, is redundant because we are covering that in other sections.

So as long as, you know, you are using force in a manner that complies with the injunction, if other people are caught up in that, then you're not liable.

Okay.  Then 2 -- and this is a question that I've got for you, Mr. Skedziewlewski, is what is the policy for ICE agents and CPB -- or CBP, sorry -- agents with the use of body cams?

MR. SKEDZIEWLEWSKI:  With the use of body cams, Your Honor?

THE COURT:  Mm-hmm.  Are they required to wear body cams?

MR. SKEDZIEWLEWSKI:  Oh, I don't know.  I would have to ask the client about whether there are requirements.  I know that they sometimes use them.  I don't know that there's a requirement.

THE COURT:  Okay.

And I guess one of the things I would be interested in knowing -- and we will unfortunately be back tomorrow morning just to tie up all our loose ends so I can get this entered -- this order entered.

But the one thing that I'd like to know is are these agents -- so we're talking about ICE agents and Border Patrol agents under DHS. Are there any other agents that are operating?

MR. SKEDZIEWLEWSKI: The claims in this case, Your Honor, are -- seem largely limited to ICE and CBP. But FPS, HSI, ERO, there are a number of other component agencies that could -- could be involved that they -- that were involved, say, in the *L.A. Press Club* case.

But, for example, FPS's role is, you know, typically limited to protecting federal property. The Broadview facility at issue here where most of the claims stem from is a detention facility, so it's sort of being handled -- I think is handled by ICE with assistance from CBP.

THE COURT: Okay. So I just kind of wanted to know the lay of the land of the different agencies involved and whether they have a consistent policy on the use of body cameras and what that would be.

Yes, go ahead.

MS. WANG: I mean, I -- I don't know the answer about the body cameras, but I understand where Your Honor is going,

which is I presume if there's body cameras, that would be a way of identifying them. Or no?

THE COURT: If there's body cameras and there's a consistent policy that they need to be turned on, then I want them on.

MS. WANG: Yes. And the -- the -- in the Denver protest case from 2020, the Court did exactly that thing, and then the Colorado legislature passed a law requiring officers policing protests to turn on their body cameras.

THE COURT: So I don't know as I sit here right now what the policy is regarding body-worn cameras, but I would like to know what that is and how feasible it is to order that they be used.

So 2, the -- I've got the statute. So the 10 U.S.C. § 723, which is requirements for use of members of the Armed Forces and federal law enforcement personnel, supportive federal authorities in response to civil disturbances. And it talks about when law -- federal law enforcement personnel need to visibly display identifying information.

The exceptions -- so the default is that they need to provide some sort of identifier that's unique to that person and the agency under which they're employed. And the exception is essentially if they're not wearing a uniform or other distinguishing clothing or equipment in the regular performance of their official duties or they're engaged in undercover

operations.

So I think that I have a problem with plainclothes in the government's version, in that draft. So I'm okay with excepting those assigned by a superior officer to undercover duties. That covers kind of the exception here that's in the statute. But otherwise, everybody else needs to be wearing something that identifies them numerically and by agency.

MR. ART: I guess our concern with undercover, particularly -- so we don't have a lot of experience with DHS doing crowd control and protest control obviously. Other police agencies don't use undercover police officers to do that work ever. And we will be concerned by the situation where suddenly a bunch of undercover officers are doing this work.

THE COURT: No. Well, it's that they are assigned to undercover duties, right? So, like, if you're in the middle of the crowd, right, as an undercover officer, it defeats the purpose that you've got your badge on --

MR. ART: I think --

THE COURT: -- but, right, one would presume that the people doing crowd control are not acting in an undercover capacity at that moment, and it would blow your cover if all of a sudden you whip out a rocket launcher and blast it at people. Then you're not undercover anymore.

So I think "undercover" tracks the language of the statute with the exception. But it presumes that in -- whoever

is doing crowd control is not acting in an undercover capacity because it doesn't make sense.

MR. ART:  Very good, Judge.

MS. WANG:  One moment, Judge.

(Counsel conferring.)

MR. SKEDZIEWLEWSKI:  Your Honor, I -- I understand maybe they're concerned about the plainclothes phrasing, but that term is just meant to capture the exception in paragraph (b)(1) of the federal law, those officers who are not -- who are designated to not wear uniforms for specific functions. You know, if the -- if the Court prefers to have the language match the Section 1720 -- 723, that's -- that would be fine and it would -- it would capture what defendants are looking for there with the plainclothes language.

THE COURT:  Okay.  I mean, I think the understanding is that those -- as to 1 and 2, that it covers undercover operations.

And then my reading of 1 is that it's, you know, not -- it's not meant to cover Secretary Noem, right?  It's not meant to cover the person working in HR, right?

MR. SKEDZIEWLEWSKI:  I think that's right, Your Honor. But I think it also is meant to encompass sort of nonpublic-facing duties.  So, you know, when CBP or ICE officers are engaged in sort of their public-facing law enforcement role like has been at issue -- or is at issue in

this case with, you know, crowd control, you know, in those circumstances they're wearing, you know, the alphanumeric identifier. But if they're engaged in some kind of investigation, they might not be undercover. They might be -- so undercover typically means they're not carrying a badge at all because they're trying -- they need to conceal their identity for the purposes of their investigation.

Plainclothes or what -- or paragraph (b)(1) covers officers who will be carrying their badge, it's in their pocket, they will display it if it's necessary, but they're -- they're not engaging in a public-facing role, and so they wouldn't just have it on display all the time, though they may be engaged in duties in the field, not -- not just, you know, at -- at the desk, at an office.

MR. ART: Judge, I think that ex- -- that definition swallows the whole requirement of identification. The statutory language that the Court has quoted, "excepting those who are engaged in undercover operations or do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties," we would have no objection to.

THE COURT: Yeah. So that's -- it -- I wanted to track the language of the statute.

MR. SKEDZIEWLEWSKI: That -- that works for defendants, Your Honor.

THE COURT: Okay. All right. And I'm not going to add the request that "unless such visible identification creates an imminent risk of harm based on specifically identifiable threat." I think that's too vague. I think that the compromised position here where it's we don't have anybody's name and it is a number that is unique to that individual that I think provides sufficient cover and safety for -- for those officers.

And again, you know, if there's something where you believe this is not workable or there are specific risks inherent in this, then obviously you can always come back to me. But what I don't want is to hear that the officers somehow thought that there was some risk and then, you know, put tape over whatever the number is so that they can't be identified because I just -- I -- I just feel like then we're getting into where, you know, there's always a risk.

MR. SKEDZIEWLEWSKI: Yes, Your Honor. The -- the thing that defendants have in mind with that additional exception is -- is very narrow, and maybe it wasn't worded as narrowly as it should have been.

But we're just worried about the scenario where there's a specific threat tied to the alphanumeric. So, you know, there's a gang, for example, has singled out Officer XYZ123 and they've put out a bounty on that officer. And we've seen bounties placed on officers by name. But --

THE COURT: So -- so --

MR. SKEDZIEWLEWSKI: -- it could easily be done by alphanumeric.

THE COURT: Right. But if that were to happen and you were to hear that, then come back in, and I will exempt that person, right, and --

MR. SKEDZIEWLEWSKI: We could add a supervisor -- that only a supervisor at DHS could make that determination? But the -- the --

THE COURT: No.

MR. SKEDZIEWLEWSKI: -- in other words, the officer can't just make that determination themselves. They'd have to get supervisory authority.

THE COURT: Yeah. But, no, I mean, the point is that you come back to me, right, and I will hear you out. And if I find that the threat is credible as to this specific person, then we'll deal with this specific person. But I just don't want to leave it up to either that person or the supervisor. Because what I don't want is, you know, this pervasive belief that there are these threats and then that gets around the whole point of this Section 2.

All right. 3. Oh my gosh, we are -- we are at the last page. Hallelujah.

Okay. So I could split the baby and make it 48 hours. I -- I think some of -- the reality is that this is going to

get entered tomorrow morning. I don't want to wait till Sunday for this to go out. I understand that, you know, it's a lot of people, but -- so I'm willing to give you 48 hours, but I -- I want this disseminated. Because the reality is, you know, these protests are ongoing every day. So the sooner it gets out and is disseminated, the better it is.

MR. ART: Can -- can we make one proposal on that point given that if the Court enters the order on Friday, we are --

THE COURT: No, I'm --

MR. LOEVY: Thursday.

THE COURT: -- entering it tomorrow.

MS. WANG: We lost track of the days.

(Unreportable crosstalk.)

MR. ART: I just forgot what day it was today. Sorry, Judge.

THE COURT: That's okay.

MR. ART: That the Court say something like it should be distributed immediately on a rolling basis but no later than 48 hours after the entry of the order so that we have some hope of making sure that by the weekend this is in place?

THE COURT: Any objection to that?

MR. SKEDZIEWLEWSKI: No, Your Honor. And I can, you know, say to the Court that DHS is going to do its level best to get it out by the end of the day Friday because they're not

going to want to do it Saturday morning.  So...

THE COURT:  Right.  That's fine.  Okay.

All right.  And I'm not limiting it to the Broadview ICE facility.

And we'll keep it as, you know, Operation Midway Blitz, or whatever we want to call this operation, if it changes names.

And then any objection to the addition under B for "first line" as opposed to "any"?

MR. ART:  Only that we don't completely understand the distinction.  If the notion here is it's going just to the immediate supervisors of on the ground first-line personnel, we have an objection to it.  We think it should go to all of the supervisory chain of command in the defendant organization so that it is clear to all of those folks, including the Secretary of the Department of Homeland Security, what the order is.  But if it means something different that we're not understanding, we -- we would be open to that.

THE COURT:  Okay.  And I'd only ask that you stand closer to the microphone --

MR. ART:  I'm so sorry, Judge.

THE COURT:  -- so that you don't --

MR. ART:  I apologize.

THE COURT:  -- torture my court reporter.

MR. ART:  I'm sorry.

THE COURT: I like her a lot, and I can't have her leave.

So what is the difference between "any supervisor" versus "first-line supervisory or command authority"?

MR. SKEDZIEWLEWSKI: Your Honor, going from memory here, I -- I would rather consult notes, but I -- I can't get them at this very second.

My understanding is that's designed to -- to get this to the people that it's relevant for; in other words, the supervisors who have a role in crowd control, not the supervisors who were far away from the scene in an office not having anything to do with -- with crowd control.

And it's the same reason that we tried to add in paragraph A "law enforcement personnel" rather than "employees" because that -- "employees" will cover our -- you know, our IT professionals who are working on computers and fixing up Wi-Fi and things like that.

THE COURT: Okay. So I'm okay with law enforcement personnel, officers, and agents.

MR. ART: We are too, your -- Your Honor.

THE COURT: Okay.

MR. ART: I think the concern with "first line," though, is that you've got the Secretary on the roof of the facility directing troops. So...

THE COURT: Yeah. Let's think about -- so if folks

can send me, either later tonight or tomorrow morning, a way to capture both concerns.

So this, you know, doesn't need to go to somebody who has no operational responsibilities in the Northern District of Illinois. But I think if there's a way to also include the kind of executive, top-line folks who should know that this was the order that we entered, right, who are ultimately responsible for the operations in Chicago.

Does that make sense?

MR. ART: Yes, Judge, from plaintiffs.

MR. SKEDZIEWLEWSKI: Yes, Your Honor.

THE COURT: Okay.

So then 4, what is the government's objection to the plaintiffs' proposal?

So I do want to order the defendants to tell their employees, so the officers and agents, that they need to implement the order, right? Like I don't want to take that language out. I want to be able to order essentially DHS to not simply disseminate the order but that they need to follow it.

MR. SKEDZIEWLEWSKI: No objection to that, Your Honor. All we are trying to address with our edits to paragraph 4 is just withholding attorney-client privilege. So we -- we thought it would be most sort of expeditious to just have the relevant individuals at DHS submit a -- a very brief

declaration just saying yes, we've sub- -- we've disseminated the order; yes, we've instructed -- and if -- and we'll add this language. It sounds like Your Honor wants in there, yes, we've instructed all relevant, you know, officers to comply.

THE COURT: And that I would want to know if those instructions change over time. I don't anticipate that they would, because that would be crazy, right? There would be no way that that would ever happen. But I want to make sure that that doesn't. So I would want to know, is it changing, right? So have --

MR. SKEDZIEWLEWSKI: We'll --

THE COURT: -- the instructions changed.

MR. SKEDZIEWLEWSKI: Your Honor, I can envision the instructions changing in response to, you know, an enforcement motion in this Court or something to that effect. But we're fine with that language, you know, being included in there.

THE COURT: Okay.

And then I --

MR. ART: Judge, could I speak on that -- that point --

THE COURT: Uh-huh.

MR. ART: -- if the Court's moving on?

I think it -- it is important for the reasons that the Court has identified that not only is there a sworn statement that the order has been distributed and the instructions given

but that the actual instructions get filed with this Court.  I struggle to imagine how they could be privileged if -- if agency personnel are telling line-level personnel here's what you've got to do.

And -- and --

THE COURT:  And I guess --

MR. ART:  -- I would --

THE COURT:  Sorry to interrupt you, and I'm just trying to kind of --

MR. ART:  Yes, Judge.

THE COURT:  -- move us along a little, is that -- so what I am looking for here, I'm not looking for anything that's attorney-client privileged, right?  And these policies, like these use of force policies, are not attorney-client privileged.  And so I'm not looking for e-mail correspondence, right, between counsel for -- either in-house DHS counsel or between Main Justice counsel in DHS.  I'm not interested in any of that.

What I'm interested in is if there is a directive that's issued that essentially says the Court issued this TRO and you are supposed to follow the TRO -- I mean, if I were DHS, that's what I would do because it would keep it real clean and real simple and real easy and not be trying to explain what I want them to do or not do.

So I don't run DHS, nor do I want to.  But I think

that when you are talking to the client that that is the cleanest, simplest, easiest way to comply, right, is just to say, the Court entered this order; here is the order; follow the order, and not try to rewrite or explain what is said in there. That's why I'm trying to keep this as simple as possible and direct as possible.

MR. SKEDZIEWLEWSKI: Understood, Your Honor. Just, you know, the -- the in-house attorneys at DHS know better than I do how to communicate with field officers so they -- they may feel the need in their expertise to provide a further explanation. I don't -- I'm not saying that they will in this case. I don't know. But in the past they've certainly done that and found it necessary.

THE COURT: Yeah. I just, you know, in my experience in representing the Chicago Police Department in instances like this, it is a lot easier and simpler to just simply say this is the order, you are directed to follow the order, and not attempt to rewrite the order or do anything or explain the order. Because I think that is where folks get into trouble because those DHS attorneys weren't here and they didn't sit through all of this, and they don't know what was discussed and let go or pushed to the side, and they don't know why. And so I just think it makes life a lot easier if they kind of go down that path; but, again, that's just some friendly advice.

All right. And then 5, I think what we had discussed

before was rather than "any time," it's just simply "as ordered by the Court."

MR. LOEVY: That's our memory too, Your Honor.

THE COURT: Right?

So I think you actually do better, on both sides, frankly, if there's no time limit in there but instead that I will -- you know, plaintiffs will come in and seek relief for any alleged violation, and then I'll let you know when you need to respond in consultation with you.

Does that make sense?

MR. SKEDZIEWLEWSKI: That makes sense, Your Honor.

The other piece we were trying to get in there was just a meet-and-confer requirement before the plaintiffs come to the Court so that we -- we might be able to address the concern and obviate any need for further, you know, motions before the Court.

THE COURT: I've got --

MR. LOEVY: I -- go ahead. I see that too.

THE COURT: I mean, I've got no objection to that. I think 72 hours might be too long, because if something is happening immediately, I would want to hear about it and deal with it. But I also do appreciate the concept of that if plaintiffs believe that there is a violation, that you would meet and confer before filing anything.

MR. ART: I think --

MS. WANG: And -- I'm sorry.

On -- the only -- I mean, if the Court want -- the -- it -- if it -- there -- if there's going to be a meet-and-confer, some language in there about that, it should say -- made, you know, a good faith attempt to meet and confer within some shorter period of time --

THE COURT: Yeah.

MS. WANG: -- because if we can't reach Mr. Skedziewlewski or what have you, even though we tried, that should not hold us up because we couldn't actually speak with him.

MR. LOEVY: I mean, we'd -- we'd be incentivized to try to resolve it with the government and if -- if that was the easiest way to do it. And every situation is going to be different. If it's a super emergency, then we don't want to be foreclosed.

MR. ART: I -- we're -- all the plaintiffs' attorneys are talking. Sorry about that, Judge, but --

THE COURT: That's okay.

MR. ART: -- I think if the Court says, follow my standing orders and the local rules and procedures and I'll order briefing schedules on things, that we can do that because we do in every case. And if there's an emergency and we can't get the government, we can tell you that.

THE COURT: Yeah.

So why don't -- why don't we do this. I will say that the parties need to make a good faith effort to meet and confer at least 24 hours before plaintiffs file any request for relief. And obviously if it's not practicable, I'm not going to reject it out of hand, but I would want to know from the plaintiffs why a meet and confer wasn't appropriate or possible.

MR. LOEVY: Understood.

THE COURT: I think -- does that satisfy everybody, more or less?

MR. LOEVY: It does, Your Honor.

THE COURT: All right.

Mr. Skedziewlewski?

MR. SKEDZIEWLEWSKI: Yes, Your Honor, that's helpful.

THE COURT: Okay. All right.

Oh my gosh, we're almost done.

6.

MR. LOEVY: And you've dealt with 6.

THE COURT: I already dealt with because I said there won't be a bond or any security posted.

And 7, there were no changes.

MR. LOEVY: Super.

THE COURT: Woo-hoo. All right. I feel like I should throw some confetti or something.

All right. We did it. So I just want to think about

C, D, E, and F.  If the parties have a further proposal, you can kind of send it to me tonight.

So -- because I want to get it right, I don't want to just get it done, so how about 10:30 tomorrow morning?

MR. LOEVY:  Works for us, Your Honor.

MR. ART:  Works for the plaintiffs.

THE COURT:  All right.

Mr. Skedziewlewski, does that work for you?  Which would be 11:30 your time?

MR. SKEDZIEWLEWSKI:  Yes, Your Honor, provided that --

THE COURT:  Always --

MR. SKEDZIEWLEWSKI:  -- we wrap --

THE COURT:  -- happy to see you --

MR. SKEDZIEWLEWSKI:  -- we don't go quite as long as we have been.

THE COURT:  No.  And I'm always happy to see you on a video so remote is fine.  And I think it will be very quick tomorrow.  It's just hammering out the -- these last sections about use of force.  And then we'll get the order entered and go from there.

So then the last thing, and then we will call it a day, is the preliminary injunction hearing.  So when do the parties want to do that?  And I know from the plaintiffs you'll come in ten minutes from now and do it, but I guess I should direct this to the government.

MR. SKEDZIEWLEWSKI: Your Honor, I'll have to circle back with the client on that question. And I'm not sure -- I'll do my best to have an answer by tomorrow if that -- if that works, but --

THE COURT: Yeah. That's fine.

MR. SKEDZIEWLEWSKI: -- but hard to say. There's a lot going on at DHS right now so tough -- tough to do something like this on a very short timeline, which we would prefer, but we'll need time to develop the re- -- our own record.

THE COURT: Yeah. And so, you know, the default, of course, is 14 days. So if that's what DHS wants, that works, and we could do that because -- let's see.

Okay. So allegedly I am supposed to be on trial starting October 20th on a gun case, but that presumes that the government's actually open and we can pay jurors.

So what we could do -- so we could hold -- okay. So I can hold October 23rd, which is a Thursday, which would be 14 days from when I enter the TRO tomorrow. If my trial is going, it will be done by then. And we can just use this as a placeholder for people to kind of plan around things.

MR. LOEVY: You'd envision a one-day proceeding?

THE COURT: I'm thinking. I mean, I can do, you know, the 20 -- Thursday and Friday if we need it, but I don't know that we do. But we can see.

What do you think about that, Mr. Skedziewlewski?

79

Just as a -- when you're talking to the client and just kind of as a placeholder to plan?  And you can then change your mind tomorrow, but...

MR. SKEDZIEWLEWSKI:  That's fine as a placeholder, Your Honor.  I'll actually be out on parental leave sometime in the next two weeks expecting a -- a newborn so I'll have to -- to find some additional coverage.  So it may be a little bit more complicated for me to get an answer as to date.  But we'll -- I'll endeavor to do that as quickly as possible.

THE COURT:  Okay.  All right.  We'll be sorry to miss you, but hopefully you'll be doing something a lot more fun.

MR. LOEVY:  Mm-hmm.

THE COURT:  All right.  So we'll hold those two days as a placeholder for now just so that everybody can kind of plan ahead and then we can see where we are tomorrow.

And I think -- I think I said 10:30, right?

MR. LOEVY:  10:30 you said.

THE COURT:  Okay.  Okay.

All right.  Anything that I've missed or we need to keep talking about?

MR. LOEVY:  Can juror -- can private parties pay the juror pool?

THE COURT:  They cannot.

MR. ART:  Nothing further from the plaintiffs.

THE COURT:  They cannot, no.  No.  What we can all do

is hope that the government reopens and we get back to regular business.

All right. All right, everybody.

MR. ART: Thank you, Judge.

THE COURT: We will see you tomorrow.

MS. WANG: Thank you.

COURT SECURITY OFFICER: All rise.

THE COURT: Thank you.

(Concluded at 5:17 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kelly M. Fitzgerald*          *October 10, 2025*

Kelly M. Fitzgerald
Official Court Reporter