IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, BLOCK CLUB CHICAGO, CHICAGO NEWSPAPER GUILD LOCAL 34071, NABET-CWA LOCAL 54041, ILLINOIS PRESS ASSOCIATION, RAVEN GEARY, CHARLES THRUSH, STEPHEN HELD, DAVID BLACK, WILLIAM PAULSON, AUTUMN REIDY-HAMER, and LEIGH KUNKEL, | ) ) ) ) ) ) ) ) ) ) | Case No. 25 C 12173 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations, ICE; RUSSELL HOTT, Chicago Field Office Director, ICE; RODNEY S. SCOTT, Commissioner, U.S. Customs and Border Protection (CBP); GREGORY BOVINO, Chief Border Patrol Agent, CBP; DANIEL DRISCOLL, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); WILLIAM K. MARSHALL III, Director of the Federal Bureau of Prisons (BOP); PAMELA BONDI, Attorney General of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF JUSTICE; UNIDENTIFIED FEDERAL OFFICER DEFENDANTS; UNIDENTIFIED FEDERAL AGENCY DEFENDANTS; and DONALD J. TRUMP, President of the United States, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Chicago, Illinois October 16, 2025 |
| Defendants. | ) | 8:30 a.m. |

TRANSCRIPT OF PROCEEDINGS - IN-COURT HEARING
BEFORE THE HONORABLE SARA L. ELLIS

APPEARANCES:

For the Plaintiffs:     LOEVY & LOEVY
                        BY:  MR. STEVE ART
                        311 N. Aberdeen Street, Third Floor
                        Chicago, Illinois 60607

                        MANDEL LEGAL AID CLINIC
                        BY:  MR. CRAIG B. FUTTERMAN
                        6020 S. University Avenue
                        Chicago, Illinois 60637

                        COMMUNITY JUSTICE AND CIVIL RIGHTS CLINIC
                        BLUHM LEGAL CLINIC
                        NORTHWESTERN PRITZKER SCHOOL OF LAW
                        BY:  WALLACE B. HILKE
                        375 E. Chicago Avenue, 8th Floor
                        Chicago, Illinois 60611

For the Defendants:     U.S. DEPARTMENT OF JUSTICE
                        BY:  MR. SEAN SKEDZIELEWSKI (remote)
                        950 Pennsylvania Avenue NW
                        Washington, D.C. 20530

Court Reporter:         KELLY M. FITZGERALD, RPR, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        219 S. Dearborn Street, Room 1412
                        Chicago, Illinois 60604
                        312-818-6626
                        kmftranscripts@gmail.com

                        *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK:  25 CV 12173, Chicago Headline Club, et al. v. Noem.

MR. ART:  Good morning, Your Honor.  Steve Art for the plaintiffs.

MR. HILKE:  Wallace Hilke for the plaintiffs.

MR. FUTTERMAN:  Good morning, Judge.  Craig Futterman also for plaintiffs.

MR. SKEDZIELEWSKI:  Good morning.  Sean Skedzielewski for defendants.

THE COURT:  All right.  Good morning.  Thanks for everybody to come with some short notice.  But -- and I'm looking around, and it's all gentlemen, gentlemen.  We need some women around here.

I live in Chicago if folks haven't noticed.  And I'm not blind, right?  So I don't live in a cave.  I have a phone; I have a TV; I have a computer; and I tend to get news.

I'm a little startled, frankly, that since Thursday when I issued the TRO over the last week, I'm getting images and seeing images on the news, in the paper, reading reports where, at least what I'm seeing, I'm having serious concerns that my order is being followed.  So that's why we're here today.

I haven't gotten anything from the plaintiffs, other than what was filed this morning.  What I do not want is at a

4

preliminary hearing to get a boatload of violations dumped on me. If you see something, say something.

MR. ART: Judge, we have conferred with the government yesterday about two examples.

THE COURT: Yesterday, right? And then I get this this morning. This -- I read about events that happened Friday; happened over the weekend; happened on Monday; it happened on Tuesday. It is now Thursday. And I called this hearing.

So this is what we're going to do. On Monday, I want the field director here. And the field director is going to explain to me why I am seeing images of tear gas being deployed and reading reports that there were no warnings given before it was deployed out in the field; where I am seeing images of ICE agents, and if I cannot see the alphanumeric identifier on the pictures that I'm seeing in the paper, why is that so?

The other thing is, I am now modifying the TRO. And I am adding that all agents who are operating in Operation Midway Blitz are to wear body-worn cameras and they are to be on.

So, Mr. Skedzielewski, I'm not happy. I'm really not happy. And before I jump into any conclusions, I want to hear from the field officer on Monday on what's going on. I want to know how this order was disseminated. I want to know what people were told they had to do and what they could not do to comply with the order, and specifically what is being done to

comply with this order.

So why don't I hear from you first about anything you want to say, add, any concerns of mine that you want to address.

MR. SKEDZIELEWSKI: Thank you for the opportunity, Your Honor.

As far as, you know, what you've seen on sort of TV or sort of the media, I -- I don't know all of what you've seen.

Plaintiffs have raised with us two specific incidents that were widely reported; one in Albany Park where the reporting, Your Honor, is just inaccurate. And I don't know whether that's true in all of the cases that you've seen, but at least in that case, the reporting says that no warnings were given before tear gas was deployed. And that's just simply not the case based on what my client's preliminary review of those facts has shown.

So I -- I would encourage the Court to -- to -- or ask the Court, rather, to -- to not make emendations to the TRO on the basis of one-sided and selectively edited media reports that we've already confirmed in at least one case are simply not the full story.

It's very easy to start a video, you know, after a warning has been given. And, of course, that's when you would expect a video to pick up, right? When -- when everything's peaceful, people are less inclined to film things. And then

when things get out of hand, warnings are given, then the -- the phones come out and individuals may start filming. And so what we see is -- is not always the full -- the full story. And we know that that's the case in at least the Albany Park incident.

As for -- I -- I would just ask Your Honor to confirm --

THE COURT: What about -- what about the incident that occurred on the southeast side? The article that I have from the *Sun-Times* was dated on the 14th.

MR. SKEDZIELEWSKI: Your Honor, plaintiffs haven't raised that particular incident with us, so I don't have any -- we haven't looked into that.

MR. ART: So excuse me --

THE COURT: I'm sorry. All right. So -- so -- hold on.

So I want information on Monday on this incident that occurred. It would be 105th Street and Avenue N on the southeast side of Chicago that occurred on Tuesday.

The other question that I have arising out of this incident on Tuesday as well is that at least -- at least, according to the *Sun-Times*, that there was a car chase in a residential neighborhood.

And I have to tell you, again, like, there's a reason the Chicago Police Department has policies about car chases and

where they occur and when you need to stop. And I am -- I would like information -- as we're going to talk about that incident on Monday, I would like information about how and why that -- you know, what the agents are being told is okay.

Because, again, right, here's the basis of my concern. We're not on the border. We are in an urban, densely populated area where crowds are going to converge when there's a commotion, where appropriate crowd control is important, where trying to apprehend and detain people is very, very different when you're in an urban setting than when you're out on the border.

And so as we're working through these issues, I want to make sure that DHS is aware different settings are going to call for different policies. Underlying all of these policies obviously is that everyone has to abide by their constitutional obligations. But I am profoundly concerned about what has been happening over the last week since I entered this order.

So I hear you that, you know, what I am seeing is what's in the newspaper; you know, what's in the *Chicago Tribune*; what's in the *Chicago Sun-Times*, both of which are mainstream newspapers; what's being post -- you know, what's being shown on WTTW and WGN and NBC 5 and ABC7. I haven't seen CBS, but I have seen those over the last week.

And, you know, sure, it -- it could certainly be that these journalists got it wrong, which is why I want to hear

from the field director on Monday. But there's enough there that definitely gives me pause and concern, which is why I brought everybody in today.

So why don't I hear from the plaintiffs. And then I'll come back to you, Mr. Skedzielewski.

MR. ART: Judge, I suppose we'd have one additional request for modification of the TRO, to change the conferral requirement in advance of reporting what we consider to be violations. We reached out to the government on Friday to confer and didn't hear back, likely because of the holiday, until Tuesday. And so we waited to confer, tried to make a good faith effort.

I think we would like to file a daily outline of incidents that we consider to be violations of the TRO, if the Court will accept that.

THE COURT: I think -- I still think the meet-and-confer is important. You know, certainly with these incidents, you know, it might be that the parties are just at an impasse, right? You say this is a violation; the government says no. But it certainly could be times where, as Mr. Skedzielewski noted, you know, what we see is it doesn't appear that a warning was given, but we go back -- and that's why I want the body cams, is because that's a good way, right, of easily going back and you can look at the video and see were there warnings given, and if it's running, then great, right?

We look and see, yep, warnings were given, not a violation, end of story.

So I think it is worthwhile to have the meet-and-confer in place. I can understand how we're kind of where we are right now, given the holiday weekend. But I do want to keep this 24-hour meet-and-confer in place to give the parties time. If there is something where we've got crossed wires or a misunderstanding, we can take care of that.

MR. ART: Very good, Judge.

THE COURT: Anything else?

MR. ART: Do you want a new proposed TRO with the language about body cams that you read into the record submitted?

THE COURT: Yes.

MR. ART: Okay. And then we have a motion for expedited discovery up, and then --

THE COURT: I -- I saw that.

So, first, Mr. Skedzielewski, is the government going to be prepared to go forward with a preliminary injunction hearing next Thursday?

MR. SKEDZIELEWSKI: So, Your Honor, we had conferred with plaintiffs as to an alternative schedule, and we made our proposal to them. They had a counterproposal. I'm happy to lay that out for the Court now --

THE COURT: Yep.

MR. SKEDZIELEWSKI: -- or we could file a joint status report if the Court prefers.

THE COURT: No. No. You can just tell me now.

MR. SKEDZIELEWSKI: Sure.

So we proposed having the preliminary injunction hearing on November 5th. That keeps the hearing within the sort of 28-day limit of the TRO.

We propose that plaintiffs file their -- their motion this Friday, tomorrow, the 17th, with us filing a response on October 30th. That's 13 days to respond. They would have had about 16 days to prepare the motion. We think that's pretty balanced. And then plaintiffs can reply sometime before November 5th. Whether that's the 4th or the 3rd, we leave that to them.

Yeah, so that was our proposal, Your Honor.

I -- I would like if -- whether now or later, Your Honor, to make a few additional points about the -- the proposed changes to the TRO as well --

THE COURT: Sure.

MR. SKEDZIELEWSKI: -- but I leave that to -- to the Court.

THE COURT: Sure. Let --

MR. SKEDZIELEWSKI: So -- so --

THE COURT: -- let -- hold -- hold on. Let me --

MR. SKEDZIELEWSKI: Okay.

THE COURT: -- put this to bed so that I don't forget.

Let's start with the date first. Does the 5th work for a PI hearing?

MR. ART: Yes, Judge.

THE COURT: Okay.

MR. ART: I believe that with the two-week extension, the 6th is also available.

THE COURT: I'd prefer not to do the 6th.

MR. ART: Okay.

THE COURT: So, yeah, let's do the 5th, and we'll start at 9:00.

And then in terms of a briefing schedule, what do you want to do?

MR. ART: Judge, from plaintiffs' perspective, we are going to file three things: an amended complaint, a motion for preliminary injunction, and the class cert motion that the Court asked for. We're going to file them all at the same time.

We'd prefer to do that Tuesday or Wednesday of next week because we are going to submit additional evidence of compliance, or lack thereof, with the Court's TRO at the same time. I think that we -- we -- we can submit the reply as close to the government's response to our filings as the Court wants. We don't need a lot of room there, we don't think. But we would prefer to file those three things to kick off the PI

process next Wednesday.

THE COURT: All right. What -- all right.

So, Mr. Skedzielewski, if I gave the plaintiffs until the 22nd and I gave you to the 31st, would that work for you or no? And --

MR. SKEDZIELEWSKI: Hearing now that -- yeah, go ahead, I'm sorry.

THE COURT: Oh, and I was going to say I understand that at some point in this process you're going to switch out and we're getting somebody else, right?

MR. SKEDZIELEWSKI: At least for a period of time, that's right, Your Honor.

THE COURT: Right. So does that work with whoever is coming in for you?

MR. SKEDZIELEWSKI: I -- I think given the -- the fact that there will be new evidence and that that evidence is presume -- presumably going to be cumulative from the -- the TRO, I mean, I think Monday would -- would be more realistic for defendants to be able to put a full record before the Court; the -- the 20th for plaintiffs to submit all of this. That would leave us ten days to respond.

And it's -- again, it's not so much the briefing, Your Honor, as it is evaluating the evidence and tracking down everything with the client --

THE COURT: All right.

MR. SKEDZIELEWSKI: -- so we can make sure that we've got a full picture.

THE COURT: All right. Why don't I cut the baby in half.

All right. So the plaintiffs will have till the 21st, which is Tuesday.

The government would have till the 31st. So that would give you ten days.

MR. SKEDZIELEWSKI: That -- that's workable, Your Honor.

THE COURT: All right.

MR. SKEDZIELEWSKI: Thank you.

THE COURT: And then can I get the reply no later than the 3rd?

MR. ART: Sure, Judge.

THE COURT: Okay. I just want to make sure that I've got enough time to sit with everything before the 5th.

MR. ART: Absolutely.

THE COURT: Okay. All right. So we've got that done.

MR. ART: Could I raise one more point on that --

THE COURT: Sure.

MR. ART -- schedule, Judge?

The government would like to do the hearing on paper. We think it's important to at least have a couple live witnesses at the hearing for the Court to -- to hear from. And

so our preference is to do that hearing on the 5th with live witnesses.

THE COURT: Yeah, I would be expecting that I'd hear from a few people, right? Because I may have questions.

MR. SKEDZIELEWSKI: Your Honor, the government doesn't plan to put any witnesses forward on the 5th, though if plaintiffs, you know, prefer to do so, we don't object to that.

THE COURT: Okay.

MR. SKEDZIELEWSKI: But if they prefer to put on their own witnesses, I mean.

MR. ART: We'll probably call some witnesses who can speak to the federal government's justification for the deployment of federal forces in Chicago.

MR. SKEDZIELEWSKI: We would oppose that, Your Honor.

THE COURT: What do you mean? You mean --

MR. ART: So -- so some of the folks whose --

THE COURT: DHS agents?

MR. ART: Yes, or --

THE COURT: Yeah.

MR. ART: -- other officials in the government, we would call in our case to demonstrate that there is no justification for the action that the federal government has taken here.

We, I suppose, don't have an objection to those folks appearing remotely if that is more convenient and it is

acceptable to the Court, but we would plan to disclose and call those witnesses in the PI hearing.

THE COURT: Okay. So some of the folks that, you know, you have mentioned in your motion, right, were -- so we're not calling Kristi Noem, and we're not calling Stephen Miller. We can talk about Chief Bovino, maybe. Maybe. But I think the field director is important, right?

Mr. Skedzielewski, if I am correct, it's Field Director Hott who is essentially managing the operations here in Chicago, correct?

MR. SKEDZIELEWSKI: He's certainly involved, Your -- Your Honor. Whether he's the only one managing, I would leave that to him to -- to discuss.

THE COURT: Right. But, you know, certainly -- I guess what I'm getting at is that he's overseeing kind of the day-to-day ground operations in Chicago, correct? Just -- just --

MR. SKEDZIELEWSKI: I don't --

THE COURT: -- generally as how a field director operates, right? I'm not --

MR. SKEDZIELEWSKI: I just don't want to overstate his role, Your Honor, that's all, is, you know, there are many subcomponents here that are involved, and they only have management oversight over certain personnel, not others.

THE COURT: Okay. So, you know, let's start there and

see where we go. But I, you know, I'm not going to have Kristi Noem in at this point. I think we can achieve what we need to achieve short of that.

MR. ART: Can I make one point on -- on that point, understanding the Court's --

THE COURT: Sure.

MR. ART: -- preference?

Our concern is that in these cases the courts of appeals have expressed a real deference to the Administration and a viewpoint that there is nothing for the federal bench to review if the Administration has made a determination that the conditions on the ground in various municipalities in the United States require the deployment of force. It's going to be our position in this hearing that no such analysis has taken place, and this is pure ideological viewpoint-driven deployment of federal forces in retaliation for views that the Administration doesn't like.

We would like to be able to show that, and we think it's important to try -- for us to try to put that in the record before the Court. And so that's the reason that folks higher up the chain are on our list.

THE COURT: And I hear you, but at least -- and I know you're going to be filing an amended complaint. But at least on the operative complaint that I have, right, the issue is that DHS is using force in a manner that violates the

constitutional rights of peaceful protesters, journalists, and essentially, clergy members.

Whether the Administration -- you know, what its ideological motivation is for having agents in Chicago enforcing immigration laws is kind of irrelevant based on this complaint.

What I'm looking at is how are these agents enforcing the laws? Are they doing so in a manner that is violating other people's constitutional rights? If that's the case, that has to stop, right? And these agents have to conform how they are enforcing the laws to the Constitution.

What Secretary Noem or Mr. Miller or anybody else says, I don't really care, right? It's are the agents being told on the ground that you have to use force commensurate with the threat that is there. And if you've got a bunch of peaceful protesters, if you have journalists, whether they're at the Broadview facility or they're out on the street in the Northern District of Illinois, then you can't shoot them in the head. You can't deploy tear gas. You can't use flash-bang grenades. You can't drive a car through a crowd. So that's what my focus is.

Should you file an amended complaint that, you know, brings up other issues, we'll deal with it. But on this complaint, this is what I'm looking at. This is what the PI hearing is based on. So this is my focus.

MR. ART: Understood, Judge. Thank you.

THE COURT: Anything else?

MR. ART: On -- on the remainder of our discovery -- I -- I sort of think we're into the discovery that's going to be allowed, we understand the Court to be saying taking the deposition of Hott might be relevant to the upcoming PI hearing.

THE COURT: It -- it might be. You know, I think I'm going to hear from him on Monday.

MR. ART: Yep.

THE COURT: And if there's more after that, yes, I would allow you to depose him.

MR. ART: Okay. And then I think we would ask for Bovino certainly who has been directing the operation in Chicago, much like he did in Los Angeles.

And then if there is a third dep, it would be of Parra, who's the deputy chief, and the government has relied on Parra so far in these proceedings.

THE COURT: Okay.

MR. ART: And we can get -- Judge, we can get those depositions done as quickly as the Court orders, and they can be as long as the Court orders. We don't think we need --

THE COURT: I don't --

MR. ART: -- long depositions.

THE COURT: Yeah, I don't think they need to be long

depositions.

MR. ART: And then the last two pieces of the discovery motion are, we don't think interrogatories and requests for admission are going to be useful at this stage. But we do think that document requests will be, particularly requests directed at justifications for the operation, the guidelines that have been given to agents in connection with Operation Midway Blitz.

And so I think in our motion we said we'd like to serve a complete set of Rule 34 requests. I think we could serve ten; confer about them with the government on an expedited basis and get those documents that we need into the record.

So we -- I guess we would ask for ten Rule 34 requests, and then mutual disclosure of witnesses and exhibits at some point before the hearing.

THE COURT: Yeah. So let's -- what I would like the parties to do is, in terms of discovery, that you meet and confer. Because, Mr. Skedzielewski, I -- I don't know that you've had a chance to really talk about it.

MR. ART: We could --

THE COURT: That -- I mean, this motion was filed yesterday so, you know, I -- and late yesterday, so I suspect you haven't really had a chance to --

MR. ART: We conferred yesterday about it, and they

object to any discovery.

THE COURT: All right.

Go ahead, Mr. Skedzielewski.

MR. SKEDZIELEWSKI: Yeah -- thanks, Your Honor.

We think that if the plaintiffs are going to seek production of documents, that -- that that -- or those requests, those specific requests should be filed, you know, with the Court so that we have a chance to respond to whether or not these -- you know, this motion for expedited discovery generally and any specific request, whether it be depositions or production of documents, are -- are proper or improper, as the evidence may be. We -- we expect, based on what we've seen in the motion for expedited discovery, to oppose.

And, you know, we'd like to put a brief before the Court as to why the Court should not grant expedited discovery. But we -- we think it would be much more useful to the Court if we could do that with whatever requests for production the plaintiffs are looking for in advance.

THE COURT: All right. So then what I'd like the plaintiff to do is, now that you understand where I'm coming from, file a new motion for expedited discovery and lay out what it is specifically you're looking for.

Then, Mr. Skedzielewski, if you can respond -- so if you can do that today.

If you could respond by the end of the day tomorrow,

and then we can take it up on Monday. And at least we're not burning time before the hearing. So then I can tell you yes or no on what you can do before the hearing.

And then, Mr. Skedzielewski, I know you wanted to talk about the body cams.

MR. SKEDZIELEWSKI: That -- that's right, Your Honor.

And if I could as well just note, it sounds like the Court has already made up its mind as to calling Director Hott in -- into the court on Monday. I'll just note, you know, that's a quick turnaround when many of these incidents, you know, Director Hott may not have been present at them. He's going to need to review documents, perhaps speak to, you know, his officers to get a full picture of what happened in any of the particular incidents.

So I would ask --

THE COURT: He --

MR. SKEDZIELEWSKI: -- for a bit more time.

THE COURT: No. He can tell me, I don't know. He can tell me, I haven't had a chance, right? But some of the things I think he can figure out sort of what happened, and I think that he would be able to, and I would hope, right, as field director that he's got enough information as to what is happening day to day that we can have an intelligent conversation about what's going on.

So, you know, I -- I don't expect him to be able to

talk about the nitty-gritty of this agent was on this corner at this particular time and this -- you know, this was what was done. But generally and broadly speaking, I think yes, he should be able to tell me what's been happening over the last week. And that's what I want to happen on Monday.

So I don't expect him to have all the answers, but I expect him to have some based on the fact that he's the field director.

MR. SKEDZIELEWSKI: Understood, Your Honor.

And I'll move on, then, to the proposed modification to the -- the temporary restraining order. My understanding from ICE is that the body camera program has not been rolled out for -- enterprise-wide. That is, it has only been -- you know, acquisitions have been made and the program has been implemented only in select areas of responsibility. The Chicago AOR is not one of them.

And so -- and --

THE COURT: And --

MR. SKEDZIELEWSKI: -- if the TRO goes into effect --

THE COURT: I'm -- I'm sorry to interrupt you. Just what's AOR?

MR. SKEDZIELEWSKI: Oh, apologies, Your Honor. It's area of responsibility.

THE COURT: Okay.

MR. SKEDZIELEWSKI: It's the region -- the Chicago

region that includes -- it's the Illinois lines and surrounding states.

THE COURT: Okay. And for the Chicago region, does that cover -- tell me how are agents assigned. So, like, for example, I know that we've got a lot of ICE agents here that normally aren't assigned to Chicago, right, for this particular operation?

MR. SKEDZIELEWSKI: That's right.

THE COURT: Okay.

MR. SKEDZIELEWSKI: That's right.

THE COURT: So -- okay. So does the body cam rollout -- for example, if it's Texas, right, where everybody -- just as an example -- everybody has body cams in Texas. If you are in Texas but you are now assigned to Chicago for this operation, do you then have a body camera or -- do you see where I'm going?

MR. SKEDZIELEWSKI: Yes. Yes, Your Honor. I think there are likely some agents in the Chicago AOR who have body cams from -- you know, if they've come from an AOR that has already rolled this program out. We don't know how many that is. I've asked the client about that. They haven't been able to identify that yet. And they might not be able to because the numbers are changing probably daily, and it's not a set -- a fixed amount.

So -- and during the -- considering the lapse of

appropriations that sort of we're dealing with, I -- I -- I don't believe that it would be possible on a short timeline to roll out a body cam program in the Chicago AOR for ICE.

My understanding for CBP is that it's been rolled out more broadly, and so it may be more workable for CBP. But in any -- in any event, these -- these sort of -- the policies associated with these cams do not provide for continuous recording. And that's for a host of reasons. And some of those are listed in the policy documents filed by those plaintiffs and defendants last week.

It's privacy concerns, respect for First Amendment rights, you know, law enforcement sensitive information, and -- and -- and so on all -- all counsel, you know, against a continuous recording. So the policies I believe require if -- if an agent is a, you know, participant in the program, that they record whenever they're engaged in, quote, law enforcement activity, and that's defined in the policies, or -- or some -- something to that effect, Your Honor.

So if -- if -- we would oppose of course this -- this modification, but if the Court is set on it, we would at least ask that it -- it model the policy documents that we've provided so that the agents at least have some idea of what they're supposed to be doing and -- and they've already been trained on it; and -- and that there be a -- a carveout for, you know, those agents that don't have these cameras.

25

THE COURT: Right.

So what I'd like the parties to do is meet and confer about this modification. I understand, and I would not require people to turn on a body camera that they don't have. But if they do have a body camera and this -- you know, as you're talking to Field Director Hott, this is something that I would want information on, is how many agents, whether it's ICE or CBP in Chicago that are working on Operation Midway Blitz, how many of them have been issued body cameras, and does it look like the Chicago region would be -- is supposed to be getting them? If so, when are they supposed to be getting them?

Again, I want to make it workable. And we can use the --

(Brief interruption.)

THE COURT: I don't know why -- oh, there's somebody I think on the line that's not muted.

Okay. If I've got the CBP policy and the DHS policy regarding body cameras, like we did with other aspects of the TRO, I want it to mirror the language of the policies so that people understand and they've already been trained on how and when they need to turn their cameras on. So whatever the definition of law enforcement activity is, that's what we should be mirroring.

And, Mr. Skedzielewski -- and I -- you can tell me you don't know if you don't know. But from my memory reading

these, that a law enforcement activity would include, for example, if they're out in the field and they are going to detain someone or question someone to ascertain someone's immigration status and, you know, a crowd forms, that that would fall under a law enforcement activity. Or am I missing something?

MR. SKEDZIELEWSKI: I don't know for sure, Your Honor. I -- I wouldn't want to speculate. I think that the -- the definition was relatively broad and would probably cover a lot of different scenarios. Maybe that would be one of them. I'm not sure.

THE COURT: Okay. So I just want to make sure that in the -- you know, in this modification to the TRO that it's clear, right, that essentially when they're engaging in the operation of their enforcement duties, that we turn the cameras on.

And frankly, Mr. Skedzielewski, this is going to help the agency, right? If there are issues and we say, you know, either I have a concern or plaintiffs' counsel has a concern and comes to you and says, hey, we think there was a violation here, we can go back. That's why we've got the cameras for a reason, right, is you can go back and document and say, hey, we pulled it, we looked at it, here it is, you know. The warnings were given. This was -- you know, this was the force coming from the crowd at this particular time.

And that's the nice thing about body-worn cameras is that they pick up events before the triggering event happens. And, yeah, you know, once somebody hits the ground, all the cameras come out, all the cell phones come out, and you don't see what happened before that. So at least we'd have a much better picture of what's going on and a much better understanding of whether any violations occurred.

MR. SKEDZIELEWSKI: We understand the Court's reasoning, Your Honor. I would just like, if I can, to get it into the record that -- that we do oppose this modification, not only because it's not tethered to any specific complaint or injury that the plaintiffs have -- have levelled. They haven't alleged that they're unable to -- to find out what the source of the injuries that they -- they allege.

In fact, they've -- they've sued DHS. They -- they found the agency that they're looking for. But -- but that also -- and maybe more importantly for the Court's consideration, it's not a simple matter to pull these videos. My understanding is that it takes a considerable amount of time. They're highly secured for obvious reasons, to protect, you know, the individuals who are being filmed and the officers, and redactions are required to protect people -- you know, the public and the officers alike.

So this is part of the unworkability of this TRO in general, is that it will require a tremendous amount of

resources for DHS to sort of each time plaintiffs think that the TRO has been violated, and as we've already seen, they -- they think that happens essentially every time there's a forceful interaction between DHS and the public, that that's going to mean, you know, a nonstop sort of crew dedicated to, you know, reviewing, redacting.

And, of course, with the body cam footage, it's extensive, right? So even if you're only filming during law enforcement operations, that could mean dozens of hours, you know, from one officer in -- in -- in a given week. And so that's all got to be viewed, pared down. I mean, it's -- it's -- it's not as simple as it might seem at first -- at first glance. So --

THE COURT: I --

MR. SKEDZIELEWSKI: -- I just ask the Court to consider that in its decision.

THE COURT: Oh, I consider it, and I -- and I hear it. There's, you know, a simple way to not have to do that, though, right?

So, Mr. Skedzielewski --

MR. SKEDZIELEWSKI: Not enforce federal law, Your Honor? I don't think that's an option. I think we're going to enforce federal law.

THE COURT: No, you can enforce the law, and I've -- and I have never, ever, ever since we started taken the

position that the government is not allowed to enforce laws that have been validly passed by Congress. Never.

What I do have a problem with is if we have allegations that government agents are enforcing the law in a way that violates the Constitution. Don't violate the Constitution, we never have to pull any video from anybody, ever.

MR. SKEDZIELEWSKI: Respectfully, Your Honor, we're going to be pulling video each time there's an allegation of a constitutional violation even if we've not committed any constitutional violations.

THE COURT: Right.

MR. SKEDZIELEWSKI: That -- that's the burden.

THE COURT: Right. But -- but, again, right, if we're not in these -- if we don't get into these types of events where it gets -- you know, I'm seeing things -- again, seeing photographs in the *Sun-Times* or the *Tribune* that cause me concern, right?

So it's not hard, and I'm not saying that it's -- you know, these situations aren't dynamic and they don't change, but really it's -- it's not that hard. And so if everybody kind of follows what's outlined in this TRO, conforms their decisions and behavior to what the Constitution demands, then, you know, it's all copacetic and we can go on and live our lives.

So I want to work out this modification, so we'll do that. And then you can send it into me.

And then on -- did I tell you what time on Monday? I don't think I did.

So how about 10:30 on Monday? Does that work for folks?

MR. ART: Works for the plaintiffs.

MR. SKEDZIELEWSKI: I couldn't quite hear, Your Honor. Was that 10:30?

THE COURT: 10:30.

MR. SKEDZIELEWSKI: Yes, that's fine.

THE COURT: Okay.

MR. SKEDZIELEWSKI: I mean, for me. I'll have to see about Director Hott.

THE COURT: Yeah. Well, tell him that, you know, we can -- I -- you know, if there's -- if he needs to change it, you know, that it be later in the day, that works for me too. So -- but let's shoot for 10:30.

And, again, you can appear remotely.

MR. ART: Judge, do you want the plaintiffs prepared to ask questions, or is the Court going to ask questions?

THE COURT: If there are additional -- if there are a set of questions that you'd like me to ask, you can just send them to me and send a copy to Mr. Skedzielewski. But I -- I was going to ask questions of Director Hott just to get a

better idea of kind of what's going on.

MR. ART: Very good, Judge.

THE COURT: All right. Is there anything else? Have I missed anything?

MR. ART: Not from plaintiffs, Your Honor.

THE COURT: Mr. Skedzielewski, is there anything else you'd like to bring up or ask?

MR. SKEDZIELEWSKI: Your Honor -- and this may be just my -- I -- maybe I misheard something earlier. Did -- did the Court propose modifica- -- other modifications to the TRO besides the body-worn cameras?

THE COURT: No, that was it.

MR. SKEDZIELEWSKI: Okay.

THE COURT: That's it.

MR. SKEDZIELEWSKI: Nothing further from defendants then.

THE COURT: Okay. All right. Then I'll see everybody Monday at 10:30.

If there's anything that the plaintiffs want me to ask Director Holt -- or Hott -- sorry -- if you get it to me by tomorrow.

MR. ART: No problem, Judge.

THE COURT: Okay. All right. And, again, it would also go to Mr. Skedzielewski.

MR. ART: Yes, Judge.

32

THE COURT: Okay. All right. We'll see everybody Monday then.

MR. ART: Thank you, Judge.

MR. FUTTERMAN: Thank you, Your Honor.

THE COURT: Thank you.

MR. SKEDZIELEWSKI: Thank you.

(Concluded at 9:25 a.m.)

\* \* \* \* \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ KELLY M. FITZGERALD*                    *October 16, 2025*
KELLY M. FITZGERALD, RPR, RMR, CRR
Official Court Reporter