2025 WL 2896819

2025 WL 2896819
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division,
EASTERN DIVISION.

VILLAGE OF BROADVIEW, Plaintiff,
v.
U.S. DEPARTMENT OF HOMELAND SECURITY, et al., Defendants.

Case No. 25 C 12164
|
Filed: 10/09/2025

**MEMORANDUM OPINION AND ORDER**

LaShonda A. Hunt United States District Judge

**\*1** Plaintiff Village of Broadview sued Defendants U.S. Department of Homeland Security ("DHS"), Kristi Noem, in her official capacity as Secretary of DHS ("Secretary Noem"), Todd Lyons, in his official capacity as Acting Director for U.S. Immigration and Customs Enforcement ("Acting Director Lyons" and "ICE", respectively), and Russell Hott, in his official capacity as Director of the Chicago Field Office for ICE ("Field Office Director Hott") (collectively, the "Federal Defendants") for trespass, public nuisance, and violations of the Administrative Procedures Act ("APA") under 5 U.S.C. § 706, based on the Federal Defendants' construction of a security fence on the Village's property. This matter is currently before the Court on the Village's emergency motion for a temporary restraining order and preliminary injunction. (Mot., Dkt. 10). For the reasons discussed below, the Village's motion is granted as set forth herein.

**BACKGROUND**

DHS operates a facility located at 1930 Beach Street, Broadview, Illinois 60155, that is used for the intake and processing of individuals arrested by ICE. (Defs.' Resp., Ex. A, Hott Decl. ¶ 8, Dkt. 26). The site has been in operation for more than 40 years and sits near the dead-end of a cul-de-sac. (*Id.*). It is well documented that after DHS announced "Operation Midway Blitz," on September 8, 2025,[1] and began arresting residents of the Chicagoland area,[2] protests began at the processing facility.[3]

[1] *ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Aliens Terrorizing Americans in Sanctuary Illinois*, DHS (Sep. 8, 2025) https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal (last visited Oct. 8, 2025, 4:40 p.m.).

[2] *DHS Arrests More than 800 Illegal Aliens Including Worst of the Worst Criminals in Operation Midway Blitz Despite Sanctuary Politicians and Violent Riots*, DHS (Oct. 1, 2025) https://www.dhs.gov/news/2025/10/01/dhs-arrests-more-800-illegal-aliens-including-worst-worst-criminals-operation (last visited Oct. 8, 2025, 4:40 p.m.).

[3] Todd Feurer, *Broadview mayor signs order limiting protest times outside ICE facility*, (Oct. 6, 2025), https://www.cbsnews.com/chicago/news/broadview-mayor-executive-order-protest-times-ice-facility/ (last visited Oct. 8, 2025, 4:40 p.m.).

On the night of September 22, 2025, DHS's Enforcement and Removal Operations team coordinated a vendor to set up a large metal fence on Beach Street, just north of the processing facility. (*Id.* ¶ 31). The fence is over 8-feet high and 16-feet wide and runs across the entirety of Beach Street blocking access to the government and commercial buildings located near the cul-de-sac, including the processing facility. (Mot., Ex. 3, Martin Decl. ¶¶ 6-7, Dkt. 10-3). DHS installed the fence without any permit or warning to the Village. (*Id.* ¶ 8). The fence's gate is secured by a padlock and manually operated by DHS, which means passing through the fence is contingent on DHS approval. (*See id.* ¶¶ 9-11).[4]

[4] There is a second gate on a nearby vacated street that provides access to the relevant area; however, that gate is controlled by DHS, secured by a four-digit code, and the opening is insufficiently small for the necessary fire apparatus in the event of an emergency. (Martin Suppl. Aff. ¶¶ 18-27, Dkt. 30).

**\*2** On September 26, 2025, the Village's mayor, Katrina Thompson, wrote to Field Office Director Hott, ordering DHS to "dismantle the fence" because it was "illegally constructed"

**EXHIBIT 76**

and prevents "Broadview Fire Department access to the area in case of an emergency." (Mot., Ex. 4, Thompson Ltr., at 99-100, Dkt. 10-4). [5] Acting Director Lyons wrote back that same day stating that they will not remove the fence and that "[t]here will be no change in our operational posture until" the "unlawful assemblies" cease. (Mot., Ex. 5, Lyons Ltr., at 102, Dkt. 10-5). The parties have remained at an impasse, and the fence remains in place.

[5] Page numbers in citations refer to the "PageID" in the CM/ECF header, not "Page __ of __" in the CM/ECF header or any page number appearing in the footer.

As a result, the Village commenced this lawsuit by filing a verified complaint on October 3, 2025, (Compl., Dkt. 1), along with the instant motion for injunctive relief. The Village argues that the Federal Defendants' construction of the fence on Beach Street violates state and federal law and requests an order directing its removal. (*See* Compl. at 24). The Federal Defendants responded to the motion on October 6, 2025, (Defs.' Resp., Dkt. 26), and the Court held a hearing on the motion the following day. (*See* Minute Entry, Dkt. 29). After the hearing, the Federal Defendants filed additional exhibits to their response that were discussed at the hearing (Exs. C & D, Dkt. 28). A day later, the Village's Acting Fire Chief Matthew Martin filed a supplemental affidavit (Martin Supp. Aff., Dkt. 30). The Federal Defendants have now sought leave to respond to the supplemental affidavit by October 13, 2025 (Mot. for Leave, Dkt. 32); the Village objects to their request (Resp., Dkt. 33).

Having considered the parties' filings, the arguments and representations made at the October 7, 2025 hearing, and other matters concerning the Broadview facility that are subject to judicial notice, [6] the Court is ready to rule and thus declines to allow any further filings.

[6] *See Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely take judicial notice of the actions of other courts or the contents of filings in other courts."). Specifically, the Court takes notice of other proceedings in the Northern District regarding the deployment of Texas National Guard forces to Illinois and the alleged ongoing violations of the constitutional rights of journalists and other protesters at the Broadview facility. *See State of Illinois v. Trump*, No. 25 C 12174 (N.D. Ill.) (Perry, J.) (deployment); *Chicago Headline Club v. Noem*, No. 25 C 12173 (N.D. Ill.) (Ellis, J.) (First Amendment and Fourth Amendment claims).

## LEGAL STANDARD

A temporary restraining order ("TRO") is "an extraordinary remedy [that is] never awarded as of right." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (internal quotations omitted). A TRO is therefore a form of preliminary relief used "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). In the Seventh Circuit, the standards for a TRO and a preliminary injunction are functionally identical. *Frederick Atkins, Inc. v. Carson Pirie Scott & Co., Inc.*, 1999 WL 1249342, at *1 (N.D. Ill. Dec. 13, 1999).

In order for a TRO (or preliminary injunction) to issue, a party must make a threshold showing that: (1) it has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm in the interim period prior to final resolution of its claims if the injunction is not granted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Ferrell v. United States Dep't of Hous. and Urban Dev.*, 186 F.3d 805, 811 (7th Cir. 1999). Assuming that the moving party establishes these factors, the Court then "balances the harms" to both of the parties that would result from the TRO using a "sliding scale" analysis, while additionally considering the effect that granting the injunction will have on the public. *Girl Scouts*, 549 F.3d at 1086. Because the granting of an injunction is extraordinary relief, a plaintiff is required to make a "clear showing" of the above factors. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

## DISCUSSION

\*3 The Village asserts state and federal claims for trespass (Count I), public nuisance (Count II), APA violations under 5 U.S.C. §§ 706(2)(C) (Count III), 706(2)(B) (Count IV), 706(2)(D) (Count V), 706(2)(A) (Count VI), and an impermissible *ultra vires* action (Count VII). As discussed below, this Court finds that the Village is likely to succeed on its claim that the Federal Defendants' unilateral decision to put up a fence restricting access on Beach Street exceeds their statutory authority and therefore violates the APA, 5 U.S.C. § 706(2)(C), and were *ultra vires*. Because this Court finds that the Village is likely to succeed on these claims,

the Court need not decide the likelihood of success on its remaining claims. Further, the Court finds that the Village has shown irreparable harm in that the construction of a fence controlled by the Federal Defendants on the Village's property prevents the Village from protecting the health, safety, and welfare of the public. Finally, the Court finds that the balance of equities and public interest weighs in the Village's favor because both the Village's need for unfettered access to its property to enforce its police powers and the public interest in government agencies abiding by the law outweigh the risk of harm to the Federal Defendants absent the fence.

### A. Likelihood of Success on the Merits

The Seventh Circuit instructs that "although the party seeking the injunction need not demonstrate likelihood of success by a preponderance of the evidence, that party must nevertheless make a 'strong' showing that reveals how it proposes to prove its case. Similarly, a mere possibility of irreparable harm will not suffice." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023). The Village argues that it is likely to succeed on the merits of its 5 U.S.C. § 706(2)(C) claim because nothing in the Immigration and Nationality Act ("INA") grants the Federal Defendants the authority to construct and maintain a fence on the Village's municipally-owned street without approval. (Mot. at 75-76). The Federal Defendants respond that the Village's clam is not ripe because "law enforcement from all levels of government are continuing to come together to address a volatile situation," and the claim will not be ripe "until that volatility is resolved." (Resp. at 148). Even if the claim is ripe, the Federal Defendants contend that they have "inherent authority to protect [their] property," and 40 U.S.C §§ 1315(a)-(b) grants them authority to maintain the fence. (*Id.* at 146, 150). The Court disagrees with the Federal Defendants.

Regarding ripeness, the APA limits judicial review to "final agency action[s]." 5 U.S.C. § 704. An agency's action is a final action if the decision in question "mark[s] the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (internal quotations omitted).

Based on the evidence available at this stage in the proceeding, the Village has made a strong showing that the Federal Defendants' action is indeed final. At the October 7, 2025 motion hearing, counsel for the Federal Defendants indicated that there is no plan to take the fence down and that Operation Midway Blitz currently has no end in sight. In addition, Acting Director Lyons stated in his response letter to the Village that ICE has an issue with "unlawful assemblies" of protesters and "[t]here will be no change in our operational posture" until the protests "cease." (Mot., Ex. 5, at 102). In other words, the Federal Defendants' current operations are indefinite and the protests—which Acting Director Lyons seemingly considers to fall into the category of "unlawful activities," (*see id.*)—will undoubtedly continue.

Under these circumstances, the Court concludes that because the persistent protests are a direct response to the Federal Defendants' ongoing operations, there is no reason to believe that they will end and that the fence will be voluntarily removed any time soon. As such, the Federal Defendant's argument that their decision is not final holds little weight. Just as the increased immigration enforcement operations at Broadview do not appear to be temporary, neither do the protests nor the fence to control the protestors. Thus, the construction and maintenance of the fence on the Village's property reflects the consummation of the Federal Defendants' decision-making process with respect to current and future operations at the facility. For purposes of determining reviewability under the APA, this constitutes a final agency action from which legal consequences flow. *See Louisiana v. Biden*, 622 F.Supp.3d 267, 291 (W.D. La. 2022).

**\*4** Moving on to the merits of the Village's § 706(2)(C) claim requires analysis of the APA and the enabling statute identified by the Federal Defendants. By its terms, the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). To determine whether the Federal Defendants have exceeded their authority, the Court must look to the text of the enabling statute. In doing so, courts must assume "that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (citations omitted). And when considering whether statutory language has a plain and unambiguous meaning, courts consider not only the language itself, but also "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Courts should not "construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous." *United States v. Misc. Firearms, Explosives, Destructive Devices and Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004) (citation omitted).

Section 1315(a) states that the DHS Secretary, *i.e.*, Secretary Noem, "shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof and the persons on the property)." 40 U.S.C § 1315(a). Subsection (b)(1) gives Secretary Noem the authority to "designate employees of [DHS] ... as officers and agents for duty in connection with the protection of" the aforementioned property, "including duty in areas outside the property to the extent necessary to protect the property and persons on the property." 40 U.S.C § 1315(b)(1). Subsection (b)(2) specifically enumerates what DHS employees are permitted to do while on duty protecting DHS property. *See* 40 U.S.C § 1315(b)(2). DHS employees may:

> (A) enforce Federal laws and regulations for the protection of persons and property;
>
> (B) carry firearms;
>
> (C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;
>
> (D) serve warrants and subpoenas issued under the authority of the United States;
>
> (E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and
>
> (F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

40 U.S.C §§ 1315(b)(2)(A)-(F).

In sum, this enabling statute allows designated agents to enforce laws, carry firearms, make arrests, serve warrants, and conduct investigations. But nothing in the plain text of the statute allows the Federal Defendants to build a barricade on a public street or commandeer municipal property indefinitely without local consent. On this point, the Federal Defendants rely on general references to their "inherent authority" to protect their property under 40 U.S.C § 1315 and the INA. But while 40 U.S.C § 1315(a) charges Secretary Noem with the duty of protecting federal property and 40 U.S.C § 1315(b) authorizes certain actions to carry out that task, unilaterally installing a fence on the Village's property does not fit neatly into any of those categories. Even the broadest provision, 40 U.S.C § 1315(b)(2)(F), which permits "such other activities for the promotion of homeland security as the Secretary may prescribe" must be read in context—*i.e.*, among a list of common law enforcement activities—and therefore does not likely include fortification of the Broadview facility through construction of a fence on and across the Village's property. For these reasons, the Court finds that the Village has met its burden to establish it has a strong chance of success on its APA claim under 5 U.S.C. § 706(2)(C). [7]

[7] For the same reasons, the Court finds that the Village has met its burden regarding its *ultra vires* claim. *Ultra vires* actions allow courts to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–1129 (9th Cir. 2023) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 790–91 (1992); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949)); *see also Merrill Tenant Council v. United States Dep't of Hous. & Urban Dev. (HUD)*, 638 F.2d 1086, 1093 (7th Cir. 1981) (acknowledging *Larson*'s prohibition against *ultra vires* acts). Because the Court concludes *supra* that the Village has met its burden and established that the Federal Defendants may have exceeded their statutory authority as outlined in 40 U.S.C § 1315, it has also established a likelihood of success on the merits on the *ultra vires* claim (Count VII).

### B. Irreparable Harm and Adequate Remedy at Law

*5 Having demonstrated a likelihood of success on the merits, the Village must also establish that it is likely to suffer irreparable harm if the TRO is denied and it has no other adequate remedy at law. "The finding of irreparable harm to the plaintiff if the injunction is denied is a threshold requirement for granting a preliminary injunction." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017). And an "[i]nadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered."

*Foodcomm*, 328 F.3d at 304 (citing *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir. 1985)).

In this case, the Village asserts that the Federal Defendants' "continuing illegal occupation of the Village's property is by itself irreparable harm for which an injunction is proper." (Mot., at 78). The Village has demonstrated, *supra*, a likelihood of success on the merits that it will suffer an injury due to the Federal Defendants' exercise of power outside their statutory authority. And as a result of the Federal Defendants prohibiting the Village from having unencumbered access to its municipal street, the Village argues it is prevented from applying its ordinances to "protect the health, safety, and welfare of the public" which constitutes irreparable harm. (*id.*). The Court agrees.

During the October 7, 2025 hearing, the Federal Defendants suggested that the Village's access was not significantly restricted (and, in fact, is almost unrestricted) despite the Beach Street fence due to an alternative entrance via Harvard Street. But further development of the record reveals that is not necessarily true. Martin's supplemental affidavit states that the Harvard Street entrance is blocked by a gate that is privately owned but controlled by the Government Services Administration and/or Defendant DHS. (Martin Suppl. Aff. ¶¶ 20-24, Dkt. 30). In fact, the Federal Defendants have been using that road to enter and leave the Broadview facility. And while the Village has a limited easement to traverse this private property and possesses the Harvard Street gate's access code, similar to the situation with the Beach Street fence, the right to access ultimately rests with DHS. (*Id.* ¶¶ 21, 24, 26).

The Federal Defendants also posited at the hearing that the Village's emergency vehicles would have unfettered access to Beach Street through the Harvard Street gate, but the Court is unconvinced for two reasons. First, as the Village noted both at the hearing and in its papers, neither the Beach Street fence nor the Harvard Street gate are wide enough for some of the Village's fire apparatus—namely, the ladder trucks. And in the event of a fire at one of the industrial buildings on Beach Street, the Village has said that the ladder trucks are necessary. Second, the Village reports that on October 4, 2025, an ambulance responding to an emergency at the facility itself was prevented from passing through the Beach Street fence since "the ICE agents on duty were unable to grant them access because they did not personally know the code to the padlocks used to lock the Beach Street fence." (*Id.* ¶ 35). This fact alone directly undercuts the Federal Defendants' contention that "it is DHS, its employees, nearby businesses and their employees, detainees, and the protestors themselves who face the prospect of irreparable injury" if the Court orders injunctive relief. (Defs' Resp., at 151). Indeed, the presence of the DHS-controlled gate delayed the Village's efforts to provide necessary medical care for someone at the Broadview facility.

**\*6** Absent an injunction, the Village is unable to ensure the health, safety, and welfare of the public, which Illinois courts have held to be a municipality's most important power. *See Des Plaines v. Gacs*, 382 N.E.2d 402, 405 (Ill. App. Ct. 1978) ("[T]he most important police power possessed by a municipality is its power to protect the health and safety of the community."). The Village has therefore established that allowing the Beach Street fence to remain would cause irreparable harm. Furthermore, this encroachment on the Village's police power is "unquantifiable" such that the Court finds money damages would not fully compensate the Village for its loss and therefore, it possesses no adequate remedy at law. *Shenzhen Langmi Tech. Co., Ltd. v. P'ships*, No. 25 C 1966, 2025 WL 1823103, at \*4 (N.D. Ill. July 2, 2025).

### C. Balancing of the Public Interest

As the Federal Defendants concede, (Defs.' Resp., at 152), if the Village has made a stronger showing that it will be successful on the merits, the balance of harms need weigh less heavily in its favor. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018); *see also Roland Machinery Co. v. Dresser Indust., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). In this so-called "balancing phase," "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia*, 883 F.3d at 966. "When conducting this balancing, it is also appropriate to take into account any public interest, which includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation." *Girl Scouts*, 549 F.3d at 1100. This analysis is "subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.* (quotes omitted).

The stakes in this case are important. Broadly, the Village's suit implicates principles of federalism and the "longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs." *Oregon v. Trump*, 2025 WL 2817646, at \*15

(D. Or., 2025). And as other courts have noted, "there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 213 (5th Cir. 2024). "That interest is protected by ensuring that the actions taken by federal agents to enforce immigration law do not unnecessarily intrude into the rights of ... property owners." *Id.* The Village is appropriately asking the Federal Defendants to abide by their own laws—and refrain from violating local laws—here.

At a granular level, this case is about the Village losing unencumbered access to its municipal streets and fixtures like fire hydrants. (Martin Suppl. Aff. ¶¶ 11-13). The two access points to the facility (and the other buildings located around the cul-de-sac) consist of the fence DHS placed on Beach Street about 100 feet north of the facility, and the privately-owned gate on Harvard Street that DHS controls. (*Id.* ¶¶ 15, 19-20). The following map [8] provides an illustration of the area:

[8] *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013) ("We have taken judicial notice of—and drawn our distance estimates from—images available on Google Maps, a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining general distances.").

Tabular or graphical material not displayable at this time.

*7 The gate and parking lot on Harvard Street are on private property owned by Oyster Two Illinois Owner, LLC, and do not belong to the Village. (*Id.* ¶ 20). The Village has limited access to Harvard Street via an easement and only to "maintain, operate, repair, and replace ... any poles, wires, pipes, conduits, sewer mains, water mains, or any other facility or equipment ... located in the vacated Harvard Street." (*Id.* ¶ 21). DHS, on the other hand, has a lease for the right to control several parking spots on Harvard Street and installed the Harvard Street gate, which it exclusively maintains and controls. (*Id.* ¶¶ 22-25). Put differently, the Village does not control Harvard Street or the gate connecting it to Beach Street, whereas DHS has leased part of Harvard Street and dictates entry and exit through the gate. Thus, the Village cannot unilaterally access this portion of Beach Street without DHS's approval.

The record establishes that this situation does not comport with the Village's local ordinances related to health and safety. While the Village's Fire Department currently possesses the four-digit security code to operate the Harvard Street gate, DHS can forbid access at any time, (*id.* ¶ 26), and the width of the gate (16-17 feet) does not comply with the 20-foot requirement of the International Fire Code adopted by the Village. (*Id.* ¶¶ 2, 6, 27). Likewise, DHS's gate on the Beach Street fence is manually operated and controlled by DHS and is only 16 feet wide in violation of the Village's code. (*Id.* ¶¶ 6, 9). Both fences therefore prevent the Fire Department from mobilizing and maneuvering the required number of fire trucks—the Village requires five or more, including three larger trucks with ladders—to address a fire at any of the industrial buildings located south of the Beach Street gate. (*Id.* ¶ 11).

DHS's Beach Street gate creates a quasi-federal zone where the Village's ability to respond to emergencies is hindered and only allows it to provide lifesaving services at the whims and fancies of the Federal Defendants. *Triple A Servs. v. Rice*, 545 N.E.2d 706, 712 (Ill. 1989) ("Certainly, the city's interest in ensuring that emergency vehicles, medical personnel and medical clients will have easy access to the medical facilities within the District is an interest which does not begin or end at any particular hour of the day or on any particular day of the week."). And as noted above, this situation harms the Village because it encroaches on its police power and restricts its ability to protect the health and safety of the public.

The Federal Defendants' gatekeeping has also led to a predictable scenario. Due to the conflicts on Beach Street, the Village's Fire Department has requested police escort when responding for emergency assistance at the processing facility. (Martin Suppl. Aff. ¶ 22). Recently, a call came from the facility requesting emergency medical assistance. (*Id.* ¶ 34). When the police escort and emergency medical technicians arrived at the scene via the Beach Street fence, the ICE agents on duty were unable to open the gate because they did not know the code. (*Id.* ¶ 35). Indeed, one of the officers informed the Village personnel that only "certain" ICE officials at the facility knew that information. (*Id.* ¶ 36). The police escort then went around to the Harvard Street gate which significantly delayed their provision of emergency medical services. (*Id.* ¶¶ 37-38). The Beach Street fence thus does not pose "theoretical harm" as the Federal Defendants declare—it has already had real consequences to the Village's ability to protect persons in its jurisdiction. (Defs.' Resp., at 153). All of the aforementioned harms weigh in favor of granting the Village's motion.

The Federal Defendants argue that the motion should be denied due to the harm that would be inflicted upon their agents, property, and operations should the fence be removed. (Defs.' Resp., at 152-154). The Court is especially sympathetic to the real concerns about protecting federal employees who are targeted simply for doing their jobs. For example, Field Office Director Hott outlines in his declaration how ICE officers have been assaulted by protesters and had their tires slashed, and asserts that vandalism has occurred around the facility. (Hott Decl. ¶¶ 10-14). Hott also details how ICE's operations have been impeded by protestors blocking vehicles at the facility. (*Id.* ¶ 10). However, there is evidence in the record and in the public domain that reflects the Federal Defendants' safety concerns are being addressed.

**\*8** Since the erection of the fence, the local government and state law enforcement officers have taken steps to reduce tensions. On October 2, 2025, the Illinois State Police established a "protest zone" and placed concrete barriers on public land. (Hott Decl. ¶ 37). The next day, the Illinois State Police established a Unified Command Center and now maintains security on Beach Street to create a comprehensive response to protests at the facility. (*Id.*). And on October 6, 2025, Mayor Thompson signed an executive order creating a curfew for protests at the Broadview facility, which restricts "the hours that people can protest or gather" to 9:00 a.m. to 6:00 p.m. Central Time. [9] These are the types of collaborative efforts between governmental entities that best serve the public interest in alleviating safety concerns.

[9] *See* Village of Broadview Executive Order No. 2025-01, https://broadview-il.gov/media/33thwv3u/vob-executive-order-no2025-01.pdf (last visited Oct. 8, 2025). *See also Brady for Smith v. SSC Westchester Operating Co. LLC*, 533 F. Supp. 3d 667, 674 n.3 (N.D. Ill. 2021) (taking judicial notice of a state governor's executive orders).

There is also evidence in the record that the Beach Street fence is not preventing disruption of ICE activities. In his declaration, Deputy Chief Patrol Agent Daniel Parra states the obstruction of ICE vehicle access to the facility has continued on Harvard Street, along the other access point to the facility through the gate managed by DHS, even after construction of the Beach Street fence at issue. (Defs.' Resp., Ex. B, Parra Decl. ¶ 8, Dkt. 26). Therefore, even if the illegally constructed fence remains, that is no guarantee that protesters exercising their First Amendment rights will cease their activities near the facility. In this regard, the harm the Federal Defendants would endure to their operations if the TRO were granted is minimized because the fence is not a fool-proof method serving their operational purpose in the way that they claim. (*See* Defs.' Resp., at 153) (stating that equities favor "DHS to keep the fence in place ... to prevent obstruction of law enforcement").

As Acting Director Lyons stated in his letter to the Village's mayor, "[i]f our officers were provided the support they need, the crowd control measures referenced in your letter would not be necessary." (Mot., Ex. 5, at 102). The state and local officials have now responded and provided that support. [10] The Court is mindful that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Still, "[f]ederalism, central to the constitutional design, adopts the principle that National and State Governments have elements of sovereignty the other is bound to respect." *Id.* at 398. Based on the above, the Court finds that the balance of the equities and public interest weighs in favor of granting relief for the Village.

[10] The Federal Defendants agree that the letter stands for the proposition that "if Broadview is able to keep the peace, then the temporary fence will be unnecessary." (Defs.' Resp. TRO, at 152).

## CONCLUSION

For all the foregoing reasons, the Village's motion for a temporary restraining order (Dkt. 10) is granted. The Federal Defendants will be temporarily enjoined from maintaining and operating the metal fence occupying Village property on Beach Street and its adjacent sidewalks near the Broadview processing facility at 1930 Beach Street, Broadview, Illinois 60155, and ordered to dismantle and remove the fence by a date and time certain to be determined. The parties are to submit a proposed order to this Court's proposed order inbox by 2:00 p.m. Central Time on Friday, October 10, 2025. While the Court would prefer an agreed proposed order, the parties may submit separate proposals (with all counsel cc'd on any communications) if they are unable to reach a compromise. The proposed order should also address the Federal Defendants' request in their response brief that the motion for a temporary retaining order be converted to a motion for a preliminary injunction. If the Village does not oppose that approach, then the proposed order(s) submitted

should be in the nature of a preliminary injunction. If the Village opposes this procedure, then its proposed order should include a brief footnote stating its position on the issue. Finally, the parties must include a provision regarding the posting of bond under Rule 65(c).

**\*9 ENTERED**:

**All Citations**

Slip Copy, 2025 WL 2896819

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.