| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
      CHICAGO HEADLINE CLUB, BLOCK    )  Case No. 25 C 12173
 4    CLUB CHICAGO, CHICAGO NEWSPAPER )
      GUILD LOCAL 34071, NABET-CWA    )
 5    LOCAL 54041, ILLINOIS PRESS     )
      ASSOCIATION, RAVEN GEARY,       )
 6    CHARLES THRUSH, STEPHEN HELD,   )
      DAVID BLACK, WILLIAM PAULSON,   )
 7    AUTUMN REIDY-HAMER, and LEIGH   )
      KUNKEL,                         )
 8                                    )
                     Plaintiffs,      )
 9                                    )
           v.                         )
10                                    )
      KRISTI NOEM, Secretary, U.S.    )
11    Department of Homeland Security )
      (DHS); TODD LYONS, Acting       )
12    Director, U.S. Immigration and  )
      Customs Enforcement (ICE);      )
13    MARCOS CHARLES, Acting Executive)
      Associate Director, Enforcement )
14    and Removal Operations, ICE;    )
      RUSSELL HOTT, Chicago Field     )
15    Office Director, ICE; RODNEY S. )
      SCOTT, Commissioner, U.S.       )
16    Customs and Border Protection   )
      (CBP); GREGORY BOVINO, Chief    )
17    Border Patrol Agent, CBP; DANIEL)
      DRISCOLL, Director of the Bureau)
18    of Alcohol, Tobacco, Firearms   )
      and Explosives (ATF); WILLIAM K.)
19    MARSHALL III, Director of the   )
      Federal Bureau of Prisons (BOP);)
20    PAMELA BONDI, Attorney General  )
      of the United States; U.S.      )
21    DEPARTMENT OF HOMELAND SECURITY;)
      U.S. DEPARTMENT OF JUSTICE;     )
22    UNIDENTIFIED FEDERAL OFFICER    )
      DEFENDANTS; UNIDENTIFIED FEDERAL)  CONTAINS SEALED
23    AGENCY DEFENDANTS; and DONALD J.)  PROCEEDINGS
      TRUMP, President of the         )
24    United States,                  )  Chicago, Illinois
                                      )  October 20, 2025
25                    Defendants.     )  10:35 a.m.
```

1                TRANSCRIPT OF PROCEEDINGS - IN-COURT HEARING
                    BEFORE THE HONORABLE SARA L. ELLIS

2

3   APPEARANCES:

4   For the Plaintiffs:    LOEVY & LOEVY
                       BY:  MR. STEVEN E. ART

5                           MS. HEATHER LEWIS DONNELL
                           MS. THERESA H. KLEINHAUS

6                       311 N. Aberdeen Street, Third Floor
                       Chicago, Illinois 60607

7

                       MANDEL LEGAL AID CLINIC

8                       BY:  MR. CRAIG B. FUTTERMAN
                       6020 S. University Avenue

9                       Chicago, Illinois 60637

10

11  For the Defendants:    U.S. DEPARTMENT OF JUSTICE
                       BY:  MR. SAMUEL HOLT
                       950 Pennsylvania Avenue NW

12                      Washington, D.C. 20005

13                     U.S. DEPARTMENT OF JUSTICE
                       BY:  MR. SEAN SKEDZIELEWSKI (remote)

14                      950 Pennsylvania Avenue NW
                       Washington, D.C. 20530

15

   Also Present:          MR. RICHARD CODY GILES

16                      MR. JEREMY NEWMAN
                      MS. NICOLE KALUPA

17

18

19

   Court Reporter:       KELLY M. FITZGERALD, RPR, RMR, CRR

20                     Official Court Reporter
                     United States District Court

21                     219 S. Dearborn Street, Room 1412
                     Chicago, Illinois 60604

22                     312-818-6626
                     kmftranscripts@gmail.com

23                  *   *   *   *   *

24               PROCEEDINGS REPORTED BY STENOTYPE

25     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1       (Proceedings heard in open court:)

2          THE CLERK:  We're here on Case 25 CV 12173, Chicago

3  Headline Club, et al. v. Noem, et al.

4          Please be seated and come to order.

5          MR. ART:  Good morning, Your Honor.  Steve Art for the

6  plaintiffs.

7          MS. LEWIS DONNELL:  Good morning, Your Honor.  Heather

8  Lewis Donnell on behalf of the plaintiffs.

9          MS. KLEINHAUS:  Good morning, Your Honor.  Theresa

10  Kleinhaus on behalf of the plaintiffs.

11          THE COURT:  Okay.  Good morning.

12          And then for the government?

13          MR. HOLT:  I'm sorry.  Do I go here?

14          THE COURT:  Sure.  Mm-hmm.

15          MR. HOLT:  Good morning, Your Honor.  Samuel Holt for

16  defendants.  And I also have with me Richard Cody Giles; Jeremy

17  Newman, also from Department of Justice Civil Division.  And

18  then also in the courtroom I have Nicole Kalupa, who is counsel

19  at CBP.  And then currently in the courtroom, we also have

20  Ms. Kyle Harvick from CBP.

21          And as we indicated in our notice, there's also a

22  witness from ICE, Mr. Shawn Byers.  He is currently at the U.S.

23  Attorney's Office in -- a few floors below, just so that,

24  you know, the witnesses don't hear their testimony.

25          THE COURT:  Okay.  That's fine.

1          MR. HOLT:  Yeah.

2          THE COURT:  Okay.  Great.

3          And then we've got Mr. Skedzielewski.  Good morning.

4          MR. SKEDZIELEWSKI:  Good -- good morning, Your Honor.

5     Here from DC.  Thank you for permitting -- permitting me to

6     appear remotely.  Mr. Holt will -- will handle the hearing,

7     yeah.

8          THE COURT:  Okay.  Well, feel free to jump in anytime.

9          Okay.  All right.  So why don't we start with the

10    testimony, and then we can deal with the discovery issues after

11    that.

12         Does that make sense to folks?

13         MR. ART:  Yes, Judge.

14         MR. HOLT:  Yes, Your Honor.

15         THE COURT:  Okay.  All right.

16         All right.  So we first have Customs and Border

17    Protection Deputy Incident Commander Kyle Harvick; is that

18    correct?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  Okay.  All right.  Why don't you come on

21    up.

22        (Witness sworn.)

23         THE COURT:  All right.

24            KYLE HARVICK, WITNESS HEREIN, DULY SWORN

25                        EXAMINATION

1   BY THE COURT:

2   Q.   All right.  Good morning, Mr. Harvick.

3   A.   Good morning, Your Honor.

4   Q.   All right.  So why don't you first start out and tell me

5   what your responsibilities are at CBP.  And then I'll -- okay,

6   I'm going to preview what I'd like us to talk about this

7   morning, is what your responsibilities are; what I'd like to

8   understand is during this enforcement operation in Chicago

9   which agency has responsibility for which types of things; and

10   then we'll talk about how the TRO has been disseminated to the

11   agents.

12          I -- we'll talk a little bit about what the training

13   is for the agents in terms of crowd control or when they

14   encounter protesters.  And then lastly, there are just a few

15   incidents that I want to talk about and sort of get an idea of

16   what happened during those incidents, because I have a few

17   concerns that the TRO wasn't being followed, but I'm looking at

18   it from the outside.  So I'd just like some information from

19   the inside.

20          Does that make sense --

21   A.   Yes, ma'am.

22   Q.   -- about where we're going this morning?

23   A.   Yes, ma'am.

24   Q.   Okay.  Good.

25          All right.  So why don't you tell me a little bit,

1    first, about your role at CBP.

2    A.   Sure.

3            So, Your Honor, just a little bit about me.  I entered

4    on duty with the Border Patrol in September 10th of 2000.

5    Q.   And, Mr. Harvick, my court reporter is amazing.  She's

6    great and very competent and well qualified.  I depend on her

7    like my life depends on her.  If she quits on me, I am in deep

8    trouble.  So we have to go slowly so that she can take

9    everything down.

10   A.   Understood.   Apologize.

11   Q.   That's okay.

12   A.   My name is Kyle Harvick.  I entered on duty with the U.S.

13   Border Patrol September 10, 2000, so just over 25 years'

14   experience.

15           I was a Border Patrol agent.  I was a first-line

16   supervisory Border Patrol agent.  I've been a second-line field

17   operation supervisor, and then watch commander overseeing that

18   shift.  I've been a deputy patrol agent in charge of a Border

19   Patrol station.  I've been an assistant chief patrol agent at

20   each sector.  My current position is a patrol agent then in

21   charge of the El Centro Border Patrol station.  And prior to

22   arriving in Los Angeles, California, now Chicago, I was an

23   acting division chief over operations for El Centro sector.

24           My role here as the deputy incident commander is I'm

25   second-in-command for all Border Patrol operations being

1  conducted in Chicago and the surrounding areas.

2  Q.   Okay.  And what are the responsibilities that CPB has --

3  I'm sorry -- CBP has in the Chicagoland area?

4  A.   So, ma'am, we've been tasked by Secretary Noem to come to

5  the Chicago area to conduct Title 8 enforcement.

6  Q.   And what falls under Title 8 enforcement?

7         So my -- I'd like to understand sort of what Customs

8  and Border Protection would do, what those agents would do

9  versus what ICE agents would do; so to understand kind of the

10  different responsibilities.

11  A.   Sure.  So I can speak to CBP, Your Honor --

12  Q.   Yes.

13  A.   -- and what we do --

14  Q.   Yes.

15  A.   -- under INA 287, which gives us the authority to determine

16  people's citizenship within the United States.

17         So we were tasked by the Secretary to come to this

18  area and see if there's any illegal immigration happening,

19  persons that are here present illegally to conduct our -- our

20  duties under Title 8.

21  Q.   And so would that then encompass talking to people in the

22  community to determine their legal status here?

23  A.   Yes, ma'am.  So we operate under two lines of effort, one

24  being targeted individuals whom we have intelligence and

25  evidence that they are present illegally in the United States,

Harvick - examination

8

1    and the other being targeted enforcement.

2         Targeted enforcement is derived from intelligence from

3    whether it's Border Patrol intelligence agents, our OFO

4    partners, HS --

5    Q.   When -- so --

6    A.   Excuse me.

7    Q.   So I know in the government there's always acronyms, but it

8    would be just helpful the first time to just say what it is.

9         So when you say --

10   A.   Yes, Your Honor.

11   Q.   -- OFO, what -- what is that?

12   A.   That's the Office of Field Operations.

13   Q.   Okay.

14   A.   Also Homeland Security Investigations, HSI.

15   Q.   Okay.

16   A.   Immigration Customs Enforcement, Enforcement and Removal

17   Operations, which is ICE-ERO.

18        So whatever intelligence they have, the local offices,

19   is also shared with us and that helps us to assign our agents

20   in certain areas and locations where there is known illegal

21   immigration activity happening.

22   Q.   Okay.  When we see in the news, for example, that agents

23   are going to a Home Depot parking lot or agents are going to an

24   ice cream shop in Rolling Meadows, that the agents that are

25   going to those locations would be CBP agents?

Harvick - examination

1   A.   Yes, ma'am.

2   Q.   Okay.

3   A.   We have.

4   Q.   Okay.  All right.  So then turning from that to kind of

5   what CBP's responsibilities are here.

6           And would CBP agents also be at the Broadview

7   detention center, or would that fall under ICE's

8   responsibility?

9   A.   So we have Border Patrol processing coordinators within the

10  Broadview detention center tasked with assisting with

11  processing individuals.

12  Q.   Okay.  But they would be inside Broadview, not on the

13  perimeter of Broadview protecting the facility itself?

14  A.   Correct, Your Honor.  Those BPPCs they're known as.

15  Q.   What -- BB --

16  A.   Border Patrol processing coordinators.

17  Q.   Okay.  Thank you.  Thank you.

18          The -- so we -- I had entered a TRO about a week and a

19  half ago and then modified it on Friday.  I saw what the

20  government attorneys filed in terms of the dissemination to all

21  the agents here.  So essentially there was an e-mail that went

22  out to all the agents that were operating in the Chicagoland

23  area, so the Northern District of Illinois, telling them this

24  is a TRO; you should be aware of what's in it; is that correct?

25  A.   Yes, Your Honor.

Harvick - examination

1    Q.  Is that fair to say?

2         Okay.  And then when I modified it on Friday, it was

3    then the modification was sent out, and it was the full TRO

4    with the additional component relating to body-worn cameras.

5    And that all went out?

6    A.  Yes, Your Honor.

7    Q.  Okay.  And normally, when either the law changes or

8    something changes, you know, there's an internal policy change

9    or something that covers how agents are supposed to operate in

10   the field, you similarly send out a directive to all the agents

11   saying this -- there's been this change, to make them aware of

12   changes; is that fair?

13   A.  Yes, Your Honor, of course.

14   Q.  Okay.  All right.

15        And this was in line with what normally the agency

16   does; is that right?

17   A.  Similar, yes, ma'am.

18   Q.  Okay.  All right.

19        With the body-worn cameras, tell me what the agency's

20   policy is regarding who gets the cameras; how many agents;

21   like, is everybody issued a camera, body-worn camera?

22   A.  So, Your Honor, I will speak for -- in El Centro sector,

23   there's three stations:  El Centro station, Calexico station,

24   Indio station.  I oversee El Centro station, and I do not have

25   body cameras due to -- it's more of an infrastructure, power

Harvick - examination

1    issue.  They have to be uploaded on a docking station, which

2    requires a lot of power, and we're working on the

3    infrastructure piece.

4          I will tell you, here for Operation Midway Blitz, we

5    are assigning every Border Patrol agent a body-worn camera.

6    Q.  Okay.  And does every agent as of today have a body-worn

7    camera, or are you in the process of assigning folks?

8    A.  Every -- every agent, ma'am, has a body-worn camera.

9    Q.  Okay.  And what training do the agents go through before

10   they receive the camera?

11   A.  So there is the -- the body-worn camera training, which is

12   put on by the training department, per CBP policy.

13   Q.  Okay.  And the -- they're trained on how to operate the

14   camera; is that right?

15   A.  Yes, ma'am; how to operate it and reporting requirements.

16   Q.  Okay.  And that they are also trained on when they need to

17   turn it on and when they should be turning it off?

18   A.  Yes, Your Honor.

19   Q.  Okay.  And that's consistent with the policies that I've

20   received; is that right?

21   A.  I'm not exactly sure what policy you have, ma'am, but it's

22   consistent with CBP policy.

23   Q.  Okay.  So right now everybody -- it -- I may not have asked

24   you this.

25          How many CBP agents are currently operating in the

Harvick - examination

1    Chicago operation?

2    A.  For Border Patrol, ma'am, we are allotted 201, including

3    command staff.

4    Q.  Okay.  And is that fully filled then at this point?  So

5    we've got 201 Border Patrol agents that are working in Chicago?

6    A.  Yes, Your Honor.  The last actually two weeks, we had a

7    surplus.  There was some overlap, so we were around 232.  But

8    they will be departing tomorrow, I believe, and will be back

9    around that 201 number.

10   Q.  Okay.  And so all of those agents then, including the

11   command staff, everybody has body-worn cameras that have been

12   assigned to them?

13   A.  Yes, ma'am.

14   Q.  Okay.  And they've all received training on how to use

15   those cameras now that they have them?

16   A.  Yes, ma'am.  Before they're issued one, they are certified

17   and trained to use -- utilize it.

18   Q.  Okay.  And they are aware that the TRO requires that if

19   they have them that when they are engaging in an enforcement

20   activity, they need to turn them on subject to the exceptions

21   that are in the TRO?

22   A.  Yes, Your Honor.

23   Q.  Okay.  All right.

24        With crowd control, how are agents trained in

25   controlling, if they are at all, trained in controlling crowds

Harvick - examination

1    that might gather when they're doing enforcement activities?

2    A.   Sure.  So, Your Honor, there is a basic crowd control

3    training conducted at the U -- U.S. Border Patrol Academy.

4         Afterwards, we have mobile field force training, which

5    consists of crowd control training.  That's not required of

6    every agent, but that is one of the crowd control training

7    that we -- we do have available.

8         I would say our special operations detachment agents,

9    some of them are cross-designated under the Federal Protective

10   Service in crowd control.

11        And those are pretty much the -- the crowd control

12   trainings that we -- we have.

13   Q.   And of the -- let's just use the 201 number of agents that

14   are here in Chicago.

15        So of that approximately 200 agents, they've all gone

16   through at least the basic crowd control training.  And some of

17   them have gone through additional crowd control trainings.

18        Would that be fair?

19   A.   I would say that's accurate, ma'am.

20   Q.   Okay.  And if you know, what percentage of those officers

21   that are here have had that additional crowd control training?

22   A.   So I know all of my special operations detachment have, and

23   that's around 100 of -- of our 201 force.

24   Q.   Okay.  And what -- what makes somebody a special operations

25   detachment agent?  What -- what do they do that other agents

1    don't do?

2    A.  Sure.

3         So I'm not a special operations detachment, but we

4    have BORTAC which is our tactical unit, similar to a SWAT team;

5    and then we have BORSTAR.  The "STAR" is search, trauma, and

6    rescue.  So medics, paramedics, EMTs, they provide the medical

7    assistance.  And then we have mobile response team agents,

8    which are -- they're not BORTAC, but they have a little more

9    advanced tactical training than your regular Border Patrol

10   agent.

11        BORTAC agents, it's -- first of all, it's extremely

12   demanding to even pass that course and become a member of

13   BORTAC.  They're highly trained in tactics.  They respond to

14   the most dangerous situations that a Border Patrol agent may

15   encounter.  They have a multitude of capabilities.  There's

16   precision marksmen.  They're skilled in building entry, serving

17   high-risk search warrants, things of that nature.

18   Q.  And what -- what's the nature of the crowd control training

19   that agents get when they're either going through the academy

20   training or this separate sort of specialized training?

21   A.  Ma'am, I haven't attended the -- the more specialized

22   training.  I -- I can only speak to my personal experience in

23   crowd control training --

24   Q.  Sure.

25   A.  -- which was a formation, a line.  If you needed to move

1    subjects back, it was in unison; get back, get back, many

2    warnings.  I will say this was 24 years ago so technology has

3    evolved as far as certain less-lethal weapons and the like.  I

4    believe we had a hickory stick then that was utilized.  There

5    was a shield and maybe a helmet.

6    Q.   Okay.  Turning to use of force training, what use of force

7    training do agents get throughout their career?

8    A.   Sure.

9         So many, many hours of use of force training.  Every

10   Border Patrol agent is required to attend use of force training

11   quarterly.  So four times a year, eight hours, eight hours a

12   course, 32 hours.  And that's every year.

13   Q.   And what's covered in that use of force training over a

14   particular year, over a calendar year?

15   A.   So all -- all aspect -- all aspects of anytime we use any

16   type of force, whether it's handheld techniques, whether it's a

17   use of your intermediate weapons, your collapsible steel baton,

18   your oleoresin capsicum spray, which is OC spray; if you are

19   certified and trained with the PepperBall launching system,

20   that's the PLS; the CS gas, and the other less-lethal devices.

21        But the use of force, that's what's covered and when

22   we may use that force.

23   Q.   And are driving tactics also covered under use of force as

24   well?

25   A.   Yes, ma'am.  Some -- some aspects of driving as well.

Harvick - examination

16

1  Q.  Okay.  And when an agent uses force, are there policies or

2  requirements that the agent has to document what force was used

3  and why and how?

4  A.  Yes, ma'am.

5  Q.  Okay.

6  A.  Any use of force, a Border Patrol agent is required to

7  notify their supervisor, and it's documented in a system called

8  E-STAR.

9  Q.  And how do they document it?  Does the agent fill out a

10 particular form?  Does the supervisor fill out a form and it's

11 held in E-STAR?  How -- how does that work?

12 A.  So the agent goes into the E-STAR system and they write

13 their narrative within there and provide all -- a bunch of

14 other information regarding the event.

15 Q.  Okay.  If you can give me one minute.

16        And with the left -- sorry -- the less-lethal force,

17 so you mentioned PepperBall launchers or the tear gas, that

18 you've got to go -- an agent needs to go through specialized

19 training to use that; is that correct?

20 A.  Yes, Your Honor.

21 Q.  Okay.  And then they are certified in using that next level

22 of force?

23 A.  Yes, Your Honor.

24 Q.  Okay.  You mentioned when you were talking about your own

25 training that you were told you'd have to tell a crowd to move

Harvick - examination

1   back.

2          Is -- what is the training in terms of giving the

3   public either a warning or a direction to move or to leave

4   before an officer or an agent uses any force?

5   A.  So, Your Honor, I will tell you, I arrived in Los Angeles

6   around June 6th and I was present at Paramount, which turned

7   into a riot situation.  My first experience in something like

8   that.

9          When chunks of cinderblocks, fireworks, other objects

10  started coming at me and our way and my Border Patrol agents, I

11  remember at one point when it was so disruptive and unruly,

12  that we pulled up the vehicle, and on the loud speaker, it was

13  announced, Gas will be deployed; gas will be deployed, at least

14  three times.  Again, this is my first experience.

15  Q.  Mm-hmm.

16  A.  After that advisal, there was a good amount of time before,

17  and then at that time, too, there wasn't anything being thrown

18  at us.  But once that again happened, there was another warning

19  that gas was going to be deployed, and then Border Patrol

20  agents deployed hand-thrown munitions and other less-lethal

21  devices.

22          So I know part of the TRO spoke to warnings.  And in

23  my experience there, I was also at Broadview one day where no

24  gas was deployed.  But I have spoken to my agents that have

25  been involved in these incidents and a warning is given before

1   you deploy gas.

2   Q.   Okay.  And they -- and the agents, it's part of their

3   training to give a warning before deploying?

4   A.   Ma'am, I haven't been through that training, Your Honor --

5   Q.   Mm-hmm.

6   A.   -- but I saw -- I've seen it -- witnessed it happen.

7   Q.   Okay.  So your -- you would presume that because it's

8   happening, agents have been trained on it?

9   A.   Yes.  And per our use of force policy, it -- actually you

10  should warn, advise of deployment of less lethal.

11  Q.   Okay.  And before the CBP agents came to Chicago -- so it

12  started in early September.  So before everybody came, was

13  there specific training to the agents who were coming to

14  Chicago on either crowd control or crowd management?

15  A.   Not specific, Your Honor.  I had a good number from

16  Los Angeles come here to Chicago where in Los Angeles we had

17  multiple incidents or deployments of less lethal.

18  Q.   Okay.  All right.

19          So then I want to talk about three incidents.  The

20  third you may not be aware of.  So if you're not and you don't

21  have any information on it, that's totally fine.

22          So the first incident occurred October 12th in Albany

23  Park.  And are you aware of that incident?

24  A.   Yes, Your Honor.

25  Q.   Okay.  And there, that was CBP agents in Albany Park; is

Harvick - examination

19

1   that correct?

2   A.  Yes, Your Honor.

3   Q.  Okay.  When those agents went to Albany Park, was there

4   somebody in command over all of that?  What happened there?  Or

5   can you explain to me kind of what the command structure is?

6   A.  Yes, ma'am.

7           So that day, a team, which consists of a team lead,

8   usually a supervisory Border Patrol agent, they were conducting

9   Title 8 enforcement duties.  And so there was a supervisor in

10  that area.

11  Q.  Okay.  So you've got a supervisor who's the team lead,

12  right?

13          And then you've got a certain number of agents under

14  that supervisor; is that right?

15  A.  Yes, Your Honor, correct.

16  Q.  And then if we're going up, how does it -- who would that

17  team lead then report to?

18  A.  So that team lead reports back to the tactical operations

19  center.  We call it the TOC.  And there we have an operations

20  chief, we call him.

21  Q.  And keep going up for me.

22  A.  Then it's me.

23  Q.  Okay.

24  A.  And then it's the incident commander.

25  Q.  Okay.  All right.

1    And do you know whether a dispersal order was given to

2  the crowd before the tear gas was used?

3  A.   Yes, Your Honor.  I was told it was.

4  Q.   Okay.  And that order would've come from the team lead?

5  A.   I spoke to a supervisor who deployed the CS gas.  When he

6  arrived, he told me he was aware that they had been warned, and

7  he, too, gave a warning before deploying that.

8  Q.   Okay.  And whose decision is it to make -- to use nonlethal

9  force?  So is it up to the individual agents that are there, or

10  is it something that the team lead decides at this point, yes,

11  we need to use nonlethal force, and this is what we're going to

12  use in this particular incident?

13  A.   It can be any agent, Your Honor.  Based on objective

14  reasonableness, reasonableness coming from the totality of the

15  circumstances of that incident.

16  Q.   Okay.  And in that case, it just happened to be the team

17  lead who made the decision to use CS gas, but it could have

18  been any of the agents that were there?  Is that --

19  A.   Correct.

20  Q.   -- it?

21  A.   Correct, Your Honor.

22  Q.   Okay.  And then once the team lead deployed the CS gas,

23  then the team lead went back into the -- is it the E-STAR

24  system?

25  A.   Later on in that shift, yes, ma'am.

Harvick - examination

1    Q.   Okay.  And documented in the system the use of the CS gas

2    and why he made the decision to use it at that time, and if he

3    gave a warning, what warnings were given?

4    A.   Yes, Your Honor.

5    Q.   That's fair?  Okay.

6         And have you reviewed what that team lead put into the

7    system to explain the use of the CS gas?

8    A.   I have not reviewed the report, Your Honor, but I spoke

9    with him.

10   Q.   Okay.  And in speaking with him, did you have any concerns

11   that the requirements of the TRO were not being followed in

12   that particular incident?

13   A.   I did not, Your Honor.

14   Q.   Okay.  So can you tell me why you believe that it was

15   appropriate in that instance to use CS gas?

16   A.   Sure.

17        So, first of all, that scene was an enforcement

18   action.

19   Q.   Mm-hmm.

20   A.   This isn't a planned protest.  This was steady state

21   enforcement duties of a Border Patrol agent.  And I say that

22   because if you're at a location of a planned protest, known

23   protest, you're equipped differently.  You have a helmet.  You

24   may have a gas mask, things of that nature, a little more

25   protection, okay.

Harvick - examination

22

1          During an enforcement action, an arrest was made.

2    Subjects then surrounded Border Patrol agents and then would

3    not allow them to leave the scene.  We have found that the

4    longer we loiter on the scene and subjects come -- if they're

5    just protesting our presence, that's fine.

6    Q.   Mm-hmm.

7    A.   But if others come that become assaultive, the situation

8    gets more and more dangerous the longer we are there.  And

9    that's a safety concern, not just for my Border Patrol agents,

10   but for the detainee we may have in custody, for other people

11   that have come out to see what's going on, numerous things.

12   It's a dynamic situation.

13          In speaking to my supervisor, the subjects that --

14   that were blocking our egress had linked their arms together,

15   which is active resistance.  They were given lawful orders to

16   get out of our way so we may depart and continue with our

17   duties, which they disobeyed multiple times.

18          And the supervisor, who is very experienced, when he

19   arrived at that scene and with the totality of the

20   circumstances, he deemed it necessary for the safety of the

21   agents and all that I mentioned for us to get out of that area

22   as soon as possible.

23   Q.   And there are different levels of force that agents can

24   use, right?

25   A.   Yes, Your Honor.

Harvick - examination

23

1  Q.  So it can be, you know, the lowest level of force is

2  basically saying, you need to leave and let us get through,

3  right?

4  A.  Yes, Your Honor.

5  Q.  So a verbal command.

6      And then the highest level would be deadly force.  So

7  lethal force --

8  A.  Correct.

9  Q.  -- right?

10     And you would agree with me that the level of force

11 the agents can use has to be kind of commensurate with the

12 danger that they are perceiving?

13 A.  Yes, Your Honor.

14 Q.  Okay.  And at least what you're describing for Albany Park

15 is that the supervisor, so the team lead that was there, it's

16 one and the same, right?

17     So the supervisor that arrived on the scene was also

18 the team lead, or were they two different people?

19 A.  No, he -- he is a team lead.

20 Q.  Okay.  And he was the team lead for that enforcement

21 activity or no?

22 A.  I would have to clarify that, Your Honor.  I'm not sure if

23 he was in the area or if that -- those were his -- his actual

24 agents assigned to him.

25 Q.  Okay.  But nonetheless, he -- he comes and he makes an

1   assessment seeing that there were members of the public that

2   had linked arms and did not want the agents to leave?

3   A.   Yes, Your Honor.

4   Q.   Okay.  And so then in response to that where those members

5   of the public had not followed the orders to let the agents

6   leave, he deployed the tear gas, the CS gas?

7   A.   Yes, Your Honor.

8   Q.   Okay.  And at that time, none of the members of the public

9   who had linked arms were throwing anything at the agents; is

10  that correct?

11  A.   It was stated, Your Honor, there were objects thrown at --

12  at some point.  I know vehicles were banged on, but the linking

13  of the arms and the situation being what it was and past

14  experience of more people to come, the situation becoming more

15  and more dangerous the longer we were there due to, you know,

16  everybody has a cell phone these days --

17  Q.   Mm-hmm.

18  A.   -- and they -- they put out where we're at, people come,

19  people -- not only the people that -- in that immediate area,

20  but others come from outside with vehicles, which then block us

21  in and makes it even more dangerous.  That was the -- the

22  incident that day.

23  Q.   Okay.  All right.  So then after the supervisor deployed

24  the tear gas, what happened after that?

25          Was it only one canister of tear gas?  Do you know how

Harvick - examination

1  many canisters were deployed?

2  A.  I saw one -- one canister deployed from what I saw on the

3  body cam footage.  So it was deployed.  One individual

4  attempted to pick that up.  It was a -- it's called a

5  Triple-Chaser, which they get hot.  So it's hot, he dropped it.

6  But then he did pick it up again and threw it back towards the

7  agents that deployed it.  Then people started to part away.

8  They unlinked their arms, which provided a gap for our vehicles

9  to egress out.

10  Q.  Okay.  So as far as you know, only one canister was

11  deployed?

12  A.  That's all I saw on the footage, Your Honor.

13  Q.  And when somebody deploys less than lethal force, I know

14  they have to document the fact that they did it.

15       Do they have to also document, you know, we used three

16  canisters, one canister, six canisters?  Is it that specific?

17  A.  I would say it varies, Your Honor.  The -- the most

18  important thing is they report that up that CS was deployed.

19  Q.  Okay.

20  A.  And then we will see the details in the report --

21  Q.  Okay.

22  A.  -- later.

23  Q.  And because this was an enforcement activity, pursuant to

24  CBP policy, their body-worn cameras should have been recording

25  during that time; is that correct?

Harvick - examination

26

1    A.   Yes, Your Honor.

2    Q.   Okay.  All right.  And you looked at least at one of the

3    cameras?

4    A.   I saw two, two angles.

5    Q.   Okay.  And in that you saw one canister that had been used?

6    A.   Yes, Your Honor.

7    Q.   Okay.  And in terms of identification, I know that the TRO

8    had required agents to have at least an alphanumeric identifier

9    on them while they're doing enforcement activities.

10         Were you able to see that on the body-worn camera?

11   A.   So I -- I was more focused on the deployment I think,

12   Your Honor.  I -- and of course the individual wearing the

13   camera, I can't see --

14   Q.   Right, obviously.

15   A.   -- their uniform --

16   Q.   Right.

17   A.   -- but -- and then others, I don't recall, you know,

18   specifically looking at that.

19   Q.   Okay.  And the agents -- so every agent has a number

20   assigned to him or her; is that correct?

21   A.   Yes, Your Honor, a star number.

22   Q.   A star number.  Okay.

23         So I used to work for the City and represented the

24   police department for a number of years, so I'm very familiar

25   with star numbers.

1        So every agent then has a star number, right?

2  A.  Yes, Your Honor.

3  Q.  And that star number is unique to that agent?

4  A.  Yes, Your Honor.

5  Q.  Okay.  And is there already a CBP policy that requires

6  agents to have the star number somewhere on them at all times,

7  or no?

8  A.  I don't believe so, Your Honor.  I will say our special

9  operations detachment advised us of that when we were in Los

10  Angeles, because we found in a big event where there were

11  multiple deployments, we needed to ensure -- we needed to see

12  who each agent was that did that.

13        So -- so not only are these reported in E-STAR, but it

14  also requires us to report it to the Office of Professional

15  Responsibility for any use of force, which is also done.  So

16  that helps us identify exactly who was who.

17        So if something's covered on your person by your

18  bulletproof vest or other gear, we started having the agents

19  put tape on their shoulders with their star number, which would

20  at least help us, especially if they have a helmet and a mask

21  on and we couldn't clearly identify who he or she was.

22  Q.  And so has that carried over into Chicago, that at least

23  these hundred agents that are -- the special detachment; is

24  that right?

25  A.  Yes, Your Honor.

Harvick - examination

28

1   Q.   -- special detachment agents, that they were all told

2   before coming that they needed to have their star number on

3   their -- visible on their shoulders?

4   A.   Yes.  And they actually have a patch that -- on their left

5   shoulder for theirs, or they might apply it on their front

6   carrier.

7   Q.   Okay.  And then the other agents, what are -- what have

8   they been told?

9   A.   That's -- those are the agents that utilize the -- the

10  tape, duct tape actually, yellow duct tape --

11  Q.   Okay.

12  A.   -- and a Sharpie with their number.

13  Q.   Okay.  And for them, are they told where they need to put

14  it?  Is it on their left shoulder as well or --

15  A.   I don't know if we specified, Your Honor.  It -- it just

16  turned out most of them were on their left side from what I --

17  I'm seeing.

18  Q.   Okay.  All right.  And that it should be visible at all

19  times?

20  A.   Yes, Your Honor.

21  Q.   Okay.  And not covered up by their bulletproof vest or

22  anything else?

23  A.   Correct.

24  Q.   Okay.  All right.

25           And you mentioned masks.  And is there a specific CBP

1   policy that either requires the agents to wear a mask when

2   they're doing enforcement or allows them to wear a mask?

3   A.   So when I went through the basic academy, we were exposed

4   to gas where we had to apply a mask.

5   Q.   Okay.  But like a gas -- that would be like a gas mask,

6   right?

7   A.   Correct, Your Honor.

8   Q.   But I think what I'm seeing in -- in pictures in the news

9   and on the newspaper are essentially people wearing like

10   bandannas pulled up as a mask.

11        And is that to prevent breathing in gas or what --

12   what's the purpose of the mask?

13   A.   I think mostly, Your Honor, it's for doxing cases that

14   we've experienced, through agents and/or their families.

15   Q.   Okay.  So it -- it's not to protect against gas.  It is to

16   essentially hide their identity?

17   A.   It is.  I would -- I would -- from personal experience,

18   that's all I had at Paramount was one of those, and I doubled

19   it up and it helped a little bit, not -- it didn't prevent all

20   the gas from me breathing it in.  But it -- I used it in that

21   fashion for that reason.

22   Q.   Okay.  But agents that are going out and doing regular

23   enforcement activity most of the time are not anticipating that

24   they're going to be using tear gas, right?

25   A.   I would -- it just depends on I guess their -- their

Harvick - examination

30

1  assignment for that day, Your Honor.

2  Q.  Okay.  All right.

3       But generally I guess most of them, though, you know,

4  they're going out into the community, it might be in the back

5  of your head that the public will come and congregate, but the

6  hope is that, you know, you wouldn't need to use tear gas or

7  deploy tear gas.

8       And so if you're wearing a mask, most of the time it's

9  to conceal your identity, as opposed to being worried that

10 you're going to be exposed to tear gas?

11 A.  Sure.  And -- and I think there's various situations.  We

12 wear them in the cold as well.  A lot of the people are on bike

13 patrol or ATVs and is privy to wear those gaiters as such.

14 Q.  Okay.  And -- but right now, I mean, we're not -- since

15 September hasn't been cold in Chicago, right, or where you need

16 to be protected from the elements of Chicago yet -- I mean, we

17 can talk in February.  It might be a different story.

18      But at least September through October, that hasn't

19 been the case, right?

20 A.  Sure.  I agree with that.

21 Q.  Okay.  All right.

22      Okay.  I think with respect to Albany Park we're good.

23      And then there was another incident, October 14th, on

24 the east side of the city.

25      And are you aware of that incident?

Harvick - examination

31

1   A.   Yes, Your Honor.

2   Q.   Okay.  And, again, this was CBP agents that were there; is

3   that correct?

4   A.   Yes, Your Honor.

5   Q.   Okay.  And I had asked you previously about driving and car

6   chases and things like that, how officers -- that officers are

7   trained with respect to use of force and some driving

8   maneuvers.

9        Is that fair to say?

10  A.   Yes, Your Honor.

11  Q.   Okay.  And you're aware that in that incident on

12  October 14th, that there was a car chase, correct?

13  A.   Yes, Your Honor.  We -- we followed a vehicle after it

14  intentionally struck a government vehicle.

15  Q.   Okay.  Are there CBP guidelines in place that will tell

16  agents when they need to stop a pursuit?

17  A.   Yes.  And it's up to that individual involved in that

18  pursuit.

19  Q.   Okay.  For example, like, I'm aware that the Chicago Police

20  Department has policies in place that will tell officers you

21  need to stop pursuing a vehicle under a variety of

22  circumstances.  So when the public is gathered, you know, if

23  it's -- there are a lot of other vehicles in the area.  So

24  essentially when the danger to everybody else outweighs the law

25  enforcement goal essentially in apprehending this particular

1 person, the policy is you stop the pursuit because it's just

2 too dangerous to everybody around you.

3    Are there similar policies with CBP?

4 A. Yes, Your Honor.

5 Q. Okay. And did you review the body-worn cameras for this

6 incident as well?

7 A. I did not, Your Honor.

8 Q. Okay. And did you talk to the team lead for this incident?

9 A. I spoke to a supervisor that was involved towards the --

10 the end.

11 Q. Did you talk to anybody that participated in the car

12 pursuit?

13 A. I have not, Your Honor.

14 Q. Okay. Do you know what the circumstances were surrounding

15 the pursuit?

16 A. I do.

17    So agents, once again, conducting enforcement

18 activities. There was some subjects they suspected as being

19 illegally present in a vehicle. As they approached the

20 vehicle, the vehicle -- and the agents were on foot -- the

21 vehicle went towards the government vehicle and struck it

22 intentionally.

23    After it struck the vehicle, it then drove away. The

24 agents got back in their vehicle and attempted to follow.

25 During that time, they requested backup, other units to

Harvick - examination

1  respond.  And that's how it began.

2  Q.  Okay.  And as far as you know -- and I'm not holding you to

3  anything -- holding you to anything, because you haven't seen

4  the video of body-worn camera yet, are the cars equipped with

5  dashboard cameras or no?

6  A.  So some of our vehicles are rental vehicles which we put

7  red and blue portable lights in, yes.

8  Q.  But they don't have -- those rental vehicles do not have

9  cameras in them; is that correct?

10  A.  No, Your Honor.

11  Q.  Okay.  And then there are some other agency vehicles that

12  would have dashboard cameras or no vehicles have dashboard

13  cameras?

14  A.  No, Your Honor.  Border Patrol, we do not have any type of

15  cameras in our vehicles.

16  Q.  Okay.  So the only cameras would just be the body-worn

17  cameras; is that correct?

18  A.  Correct, Your Honor.

19  Q.  So knowing that you haven't reviewed any of the body-worn

20  camera footage and you haven't talked to the officer -- or the

21  agents that were in the car, is it your belief that that car

22  pursuit was consistent with CBP policy regarding pursuits?

23  A.  Your Honor, I haven't seen the -- the reports.  But as it

24  was reported to me, they were following and attempting to get

25  other units in the area, and then an accident occurred.

Harvick - examination

34

1    Q.   Okay.  And in that incident, the accident occurred.  And

2    then it's my understanding, and you can correct me if I'm

3    wrong, that that's when the crowd formed, was after the

4    accident; is that fair?

5    A.   Correct, Your Honor.

6    Q.   And in that incident, agents deployed CS gas; is that

7    right?

8    A.   Correct, Your Honor.

9    Q.   What happened before the agents deployed the gas?

10   A.   So after the accident, the two subjects fled on foot, which

11   agents pursued and apprehended both subjects who were found to

12   be illegally present in the United States.

13        We then had a -- a scene, an accident scene, crime

14   scene.  Chicago PD was contacted for that piece, for -- for the

15   accident, and we needed to maintain that scene and preserve it

16   so it would not get contaminated.

17        People came out.  Obviously, they -- they heard maybe

18   the accident or what transpired, came out of their homes.  And

19   then more and more people started to come, and some of those

20   individuals started throwing objects.  I heard eggs, bricks,

21   and metal objects of some sort.

22        I know one office of -- a field operations officer was

23   struck in his head with a -- by an egg.  So, again, the longer

24   you're on scene, the more people come.  And lawful orders were

25   given to scoot back, which were disobeyed, so much so that we

1    had two vehicles' tires were slashed and the rear window was

2    broken out, and that's one -- the other reasons we need to push

3    the crowd back in a safe -- to a safe distance.

4    Q.   And by the time there was damage to -- it was two vehicles?

5    A.   Yes, Your Honor.

6    Q.   Okay.  By the time there was damage to those two vehicles,

7    were Chicago police on the scene at that point?

8    A.   I would have to look at the timeline, Your Honor.  I

9    believe the damage occurred prior to Chicago PD arriving.

10   Q.   Okay.

11   A.   I would have to clarify that, though.

12   Q.   All right.  And was Chicago PD there when agents deployed

13   the tear gas?

14   A.   For at least one deployment, yes, I'm -- I'm aware of their

15   presence.

16   Q.   And how many times was tear gas deployed in that incident?

17   A.   I saw three in the report I read.

18   Q.   Okay.  And, again, it's three instances of deployment, not

19   necessarily three canisters of tear gas?

20   A.   Yes, Your Honor.

21   Q.   Okay.  And do you know why it was done three times as

22   opposed to once or twice?

23   A.   So, Your Honor, as the report indicated, the -- the scene,

24   again, was just becoming unsafe.  And I have seen -- after a

25   deployment to a particular area to get people to comply or that

1   are active resistance, things tend to calm down.  And then

2   others come or the situation ramps back up.

3            That was near an intersection, so there was almost

4   four fronts, if you will, to kind of preserve and be in front

5   of.  So at each of those locations when things became

6   assaultive and officer safety, you know, was -- was in danger,

7   those agents made the decision and they had all those -- the

8   totality of the -- the circumstances, the propensity for

9   violence, and it becoming an unsafe environment and they made

10  the decision to deploy.

11  Q.  And then do you know the time period that elapsed from the

12  first deployment to the third deployment?

13  A.  There is a timeline on the report I read, Your Honor.  I --

14  I want to say there was 12 minutes in between the first and

15  second, and I can't accurately tell you the -- the time between

16  that last one and when they departed in that last deployment.

17  Q.  Okay.  And each time prior to these three deployments,

18  there were warnings given?

19  A.  I was told there were warnings given, Your Honor.

20  Q.  Okay.  And did you see any video around the time of the

21  deployments?

22  A.  No, Your Honor.

23  Q.  Okay.  So this is just based on what you were told, that

24  the warnings were given?

25  A.  Yes, Your Honor.

Harvick - examination

37

1    Q.   Okay.  At -- and in this incident, have you seen any of the

2    publicly available photographs from this incident?

3    A.   I have seen a few.

4    Q.   Okay.  And in one of the photographs there is an agent

5    pointing a weapon at -- at an individual who's kind of crouched

6    backwards from the agent.

7         Do you know the -- do you recollect the -- the

8    photograph I'm referring to?

9    A.   If it's the same one, Your Honor, yes.  And I believe we

10   detained that subject.  He was assaultive, and we were going to

11   place him under arrest.

12   Q.   Okay.  And was he ultimately placed under arrest?

13   A.   Ma'am, it was determined that he was a minor, so yes, he

14   was detained and arrested, but he was released.

15   Q.   Okay.  And does CBP have a policy specific to the treatment

16   of juveniles?

17   A.   In -- in what specific instance, Your Honor?

18   Q.   Whether you can arrest them; whether it's appropriate;

19   under what circumstances it's appropriate to arrest or detain

20   juveniles; what use of force could be taken against juveniles

21   if they're arrested; you know, do you need to call their

22   parents before you speak to them?

23        Is there anything around the treatment of juveniles?

24   A.   So, sure.  There -- there are custodial policies on that,

25   and -- and they -- there are certain things within our use of

Harvick - examination

38

1    force policy regarding juveniles.

2    Q.   Okay.  And do you believe then that -- how that particular

3    juvenile was treated was consistent with CBP's use of force

4    policies with respect to juveniles?

5    A.   So just from that photograph, Your Honor, and not having

6    the context, I mean, that -- that was a moment in time.  I

7    don't know if he looked like a juvenile or, you know, a lot of

8    our policy has to do with children.  And I believe he was 17.

9    Q.   Okay.

10   A.   So -- so based on that and not having the context or what

11   led to -- to that moment in time of that picture, Your Honor, I

12   haven't heard otherwise.  We are -- we are held to very high

13   standards, and if I see a fellow agent doing something out of

14   policy, it's my duty to report that as well.

15   Q.   In terms of discipline, just to pivot for a second since

16   you brought that up, what -- what is the agency's policies

17   regarding discipline of agents that violate at the very minimum

18   agency policies regarding use of force?

19   A.   So first off, Your Honor, it -- it's not tolerated.  It

20   could be administrative or it could be criminal.  I told you

21   that we are required to report any use of force to the Office

22   of Professional Responsibility.

23            And then I also know that all uses of force, they go

24   in front of a use of force review board, and that is comprised

25   of each component of CBP, which is Office of Field Operations,

Harvick - examination

39

1    U.S. Border Patrol, Air and Marine Operations.  Office of Chief

2    Counsel is also in the room, and Office of Professional

3    Responsibility.

4              And I am speaking for El Centro sector.  I -- I -- I

5    don't know if every Border Patrol sector is the same, but I was

6    a voting member on a use of force review board for a year.  You

7    go through the report.  All the voting members, you're asked

8    several questions on whether anything administrative was

9    violated per policy and you vote doing that use of force within

10   policy or -- or not.

11   Q.   And that occurs every time force is used?

12   A.   Yes, ma'am, to my knowledge.

13   Q.   Okay.  And because these incidents, these two that we're

14   talking about now, happened last week, it would be unusual for

15   anybody to have reviewed those reports in the normal course of

16   the agency operations, right?

17   A.   Correct, Your Honor.  And I -- obviously I can't speak for

18   the Office of Professional Responsibility who is notified of

19   that incident, and, you know, their -- their -- what their

20   requirement is.

21   Q.   Okay.  But you wouldn't expect anything internally to occur

22   with CBP for something that happened last week; that it takes a

23   little time to put the reports in and then review the reports

24   and go through that process.  Would that be fair?

25   A.   Correct.  Yes, Your Honor.

Harvick - examination

1    Q.  So generally, what is the timeline?  If somebody uses

2    force, how soon do they need to report that into the system and

3    to their supervisor?

4    A.  So as soon as practicable when they can safely do so,

5    hopefully within an hour.  But for sure within by the end of

6    their shift.

7    Q.  Okay.  And then once that goes into the system, then it's

8    reviewed by a supervisor; is that correct?

9    A.  Sure.  There's the official verbal notification that a use

10   of force event transpired, and then the agent is required, once

11   he or she returns, to get into the E-STAR system and -- and

12   submit that report.

13         They have to do that within 24 hours, and it must be

14   completed within 72 hours.

15   Q.  And then who reviews the report once it's in the E-STAR

16   system?

17   A.  So a supervisory Border Patrol agent will review it, and

18   then I know in our sector, our less-lethal training department

19   also review them.

20   Q.  Okay.  And what essentially is the timeline from once

21   somebody puts a report into the system that it's reviewed the

22   next two layers up?

23   A.  I -- I think it varies, Your Honor.  It -- it's also based

24   off of operational tempo, which here there's been multiple

25   incidents, so there's many reports to go through.

1  Q.  Okay.

2  A.  I -- I couldn't give you a -- an accurate answer.

3  Q.  Okay.  That -- that's fine.  That's fair.

4       Then the third one that I wanted to talk about, which

5  you may not be aware of, but that there was a recent incident,

6  I want to say within the last couple of days, in

7  Rolling Meadows, and that there were -- it looks to be CBP

8  agents outside of an ice cream shop on Algonquin Road, that

9  they appeared to be, again, engaged in enforcement activities

10 and that they were driving away, that members of the public

11 filmed them while they were driving away, and that there is an

12 allegation based on the video that there was an agent pointing

13 a weapon towards bystanders from the back seat of a truck with

14 the window rolled down.

15       And this was noted in the *Chicago Tribune*.  It was

16 published yesterday at about 7:00 p.m. at the end of an article

17 discussing an operation in Mount Prospect.

18       And so I was -- first of all, do you know anything

19 about that particular incident?

20 A.  I'm not familiar with that one, Your Honor.

21 Q.  Okay.

22 A.  What was the date?  Do you know the date?

23 Q.  It -- it doesn't say in the article, but I think it was

24 fairly recent.  So I know the Rolling Meadows -- or I'm

25 sorry -- the Mount Prospect -- yeah, it doesn't -- the Mount

Harvick - examination

42

1   Prospect one says it occurred on a Sunday, but I don't know if

2   it was this past Sunday or -- I think it was this past Sunday.

3   So the Rolling Meadows incident I think happened somewhere in

4   the last couple of days.

5           And I guess, again, you know, what concerns me is an

6   agent pointing a weapon at bystanders from an open window of a

7   truck going by.  You could understand how I might be concerned,

8   right, that -- again, that that might be a use of force that is

9   not commensurate with any threat that the agents are getting

10  from people passing by.

11  A.  With -- without knowing the -- the context, Your Honor,

12  of -- of that situation or -- or not familiar with it, you

13  know, I would -- that -- I would have to have more information,

14  more facts in front of me.

15  Q.  Yeah.  And -- and that's why, you know, if you don't -- if

16  you're aware of that -- and I wasn't aware of this until I saw

17  it in the paper yesterday.  But those are the types of things

18  that, again, not knowing the full context, but those are the

19  types of things that would give me concern.

20  A.  Me as well, Your Honor.

21  Q.  Okay.  All right.  Okay.

22          THE COURT:  Unless there's anything else, I have asked

23  the questions and explored the areas that I want to explore.

24          Is there anything else from the parties?

25          MS. LEWIS DONNELL:  Yes, Your Honor.  Would you like

1  me to approach?  We have a few questions if we're permitted

2  some leeway to follow up or --

3       THE COURT:  Nope.  You can let me know what areas you

4  would want me to follow up on.  I think I've heard what I need

5  to hear, but I'm happy to hear if there are other areas.

6       MS. LEWIS DONNELL:  Sure.  It's not other areas per

7  se.  I guess there's one other area, but it would be a little

8  bit of additional questioning on these areas for additional

9  clarification, not -- not very much.  We could present them to

10  you and see if you think it's appropriate to ask.

11       THE COURT:  Yeah.  Why don't you do that?

12       MS. LEWIS DONNELL:  Okay.  That sounds good,

13  Your Honor.

14       THE COURT:  Do you need a couple of minutes?

15       MS. LEWIS DONNELL:  Okay.  That would be great.

16       THE COURT:  Okay.  So why don't you do this.

17       MR. HOLT:  Could defendants' counsel also receive

18  those questions?  Could we see them, at least?

19       THE COURT:  Oh, sure.  Yeah, you can see them.  And,

20  you know, I may ask them; I may not.

21       MR. HOLT:  Yeah.

22       THE COURT:  We'll see.

23       All right.  So we will take -- what do you need, five

24  to ten minutes?

25       MS. LEWIS DONNELL:  Is ten okay to --

1          THE COURT:  Sure.  So why don't we take a ten-minute

2     break.

3          You can step down.  And then we should be able to wrap

4     up in a couple of minutes.

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          THE WITNESS:  Thank you.

8          THE CLERK:  All rise.

9      (Recess at 11:53 a.m., until 12:15 p.m.)

10          THE CLERK:  All rise.

11          THE COURT:  All right.  You can all be seated.

12          Okay.  All right.  So just a couple of follow-up

13     questions.

14     BY THE COURT:

15     Q.  So to clarify -- and I know that you had -- we had talked

16     about this earlier, but before LA, there wasn't anything

17     specific that agents were trained on regarding crowd control or

18     protests or spontaneous protests, other than what's covered in

19     the basic academy and what other specialized training agents

20     might have, right?

21     A.  Correct, yeah.  So our -- our mobile field force agents had

22     had that more advanced training, along with our special

23     operations detachment.

24     Q.  Okay.  And after LA, there wasn't, as you had told me, when

25     folks got to Chicago, there wasn't any specialized training to

1  deal with crowd control or protests or spontaneous protests,

2  right?

3  A.   Not specifically crowd control, Your Honor, but more use of

4  force or the TROs that were also in -- in Los Angeles.

5  Q.   Okay.  The training with regard to the TRO in Los Angeles,

6  that wasn't done in anticipation of coming to Chicago, correct?

7  A.   No, Your Honor.  Just -- I mean, the -- the general

8  messaging and reminder of the use of force policy.  But I will

9  say, the personnel responding to a protest -- protest event,

10  first, is going to be our QRS, our special operations teams,

11  that have that medical side, the MRT agents that have more

12  advanced training, and our BORTAC operators.

13  Q.   Okay.  But there's nothing -- when the agents were coming

14  from LA to Chicago, there wasn't any specific training, at

15  least with a TRO that was entered in LA to say, you need to be

16  aware of what might be happening in Chicago?

17  A.   No, there wasn't anything specific for, hey, we're going to

18  Chicago.  Nothing specific like that.

19  Q.   Okay.  But once the TRO got entered in LA and then the

20  preliminary injunction in LA, those officers were notified of

21  what the TRO and the preliminary injunction either required

22  them to do affirmatively or told them that they could not do;

23  is that correct?

24  A.   Correct, Your Honor.

25        And I will say, you know, we take these TROs very

1    seriously.  I mean, these are your orders and -- for us, and we

2    want to ensure we're operating, so much so that, you know, we

3    talked about it was disseminated electronically, but also we

4    have morning briefings before the agents are deployed.  And at

5    that time, it was also messaged verbally, and if there were any

6    questions.

7            I will also tell you today we are receiving around

8    40 new agents coming in, rotating.  And this afternoon, the TRO

9    will be in front of them.  They will sign a roster.  We will

10   discuss it.  And if there's any questions, we will address any

11   questions those agents have.

12   Q.   Okay.  So not only was it disseminated electronically,

13   then.  You're telling me that as of Friday -- the Friday

14   morning after I entered the TRO and as soon as I guess it would

15   have been this morning or Saturday morning after I entered the

16   modification on Friday, at roll call, the TRO and the

17   modification were discussed?

18   A.   Yes, Your Honor.

19   Q.   Okay.  And are there -- is there anything that the agents

20   need to sign or any acknowledgement that they need to make to

21   say we've received the TRO and we're aware of what's in it?

22   A.   The -- the team leads, Your Honor, they're assigned agents

23   under them so they received it electronically.  And then I

24   think at the briefings, when the -- the team leads discuss, and

25   that's, again, verbally reminded.  That's -- that's kind of our

Harvick - examination

1   face-to-face time to -- to ensure, and -- and also if there's

2   any questions regarding such, that that's addressed.

3   Q.   Okay.  And -- but there isn't anything that the agents need

4   to sign an acknowledgement or e-mail something back and say

5   yes, I got it?  Nothing like that?

6   A.   From the -- the agents, no, Your Honor.  From -- from the

7   managers and the command staff, yes.

8   Q.   Okay.  And then is there -- so I know for -- we've been

9   calling it Operation Midway Blitz, but this enforcement

10  operation in Chicago that falls under the umbrella of DHS,

11  right, but it's got ICE agents, CBP agents, potentially Federal

12  Protective Service agents are all participating in this one

13  operation; is that right?

14  A.   Yes, Your Honor.  And -- and I can't specifically speak to

15  other agents' specific role within this operation.

16  Q.   Is there somebody that is overall in charge of the

17  operation, or is it that you've got three -- let's say it's

18  three -- three different agencies that are participating in the

19  operation but they don't -- you know, once you hit the chain

20  of -- top chain of command in CBP, it's not that there's

21  anything -- anybody over that individual who's running the

22  entire operation?

23  A.   So, to my knowledge, Your Honor, Chief Patrol Agent

24  Greg Bovino, he has been in the -- delegated the tactical

25  commander of all DHS assets for -- so Department of Homeland

1    Security assets.

2    Q.  And when you say "assets," you mean the agencies within

3    DHS?

4    A.  Correct, Your Honor.

5    Q.  Okay.  So the person that ultimately is in charge of this

6    operation in Chicago is Greg Bovino; is that correct?

7    A.  Yes, Your Honor.

8    Q.  Okay.  And he's with CBP?

9    A.  Yes, Your Honor.

10   Q.  Okay.  And the policies that CBP has for body-worn cameras,

11   that would also cover vehicle pursuits.  So when they're

12   engaged in enforcement -- at least as I've read the policies

13   that are -- that have been submitted to me, that when officers

14   are engaged in enforcement activities, they are to turn on

15   their cameras and they are to remain on while they're

16   conducting that enforcement activity.

17        If a vehicle pursuit happens during the course of

18   that, the body-worn cameras are still to be on, correct?

19   A.  Yes, Your Honor, I believe so.

20   Q.  Okay.  And is there anything with the vehicle pursuit

21   policies that specifically addressed the use of body-worn

22   cameras, or no?

23   A.  Not that I recall, Your Honor.  I -- I would have to review

24   it to ensure that.

25   Q.  Yeah.

1  A.  But not that I recall.

2  Q.  Okay.  And then lastly, are you aware of whether any

3  officers or any agents have been -- have received discipline

4  for a use of force violation, either in the Los Angeles

5  operation or the Chicago operation?

6  A.  No, Your Honor, I'm not.

7  Q.  Okay.

8         THE COURT:  All right.  That's what I'm going to

9  cover.

10        MS. LEWIS DONNELL:  Your Honor, may we be permitted

11  one -- just one additional follow-up?  It had to do with the

12  dissemination of your TRO.  Just to get clarity, I just want to

13  make sure I heard it appropriate -- correctly.

14        THE COURT:  Well, what do you think you haven't heard?

15        MS. LEWIS DONNELL:  I wanted to -- I -- initially I

16  heard that it was disseminated to all Custom and Border Patrol

17  agents electronically, to all agents, and I thought it was now

18  just communicated it was just to the team leads.  And I just

19  want to clarify that.

20        THE COURT:  All -- all the agents received it

21  electronically; is that correct?

22        THE WITNESS:  Yes, Your Honor.

23        THE COURT:  Okay.

24        THE WITNESS:  The team lead sent it to the individual

25  agents electronically.

1          THE COURT:  Yeah.  So it went to the team leads who

2    then disseminated it electronically.

3          MS. LEWIS DONNELL:  Got it.  Yep.

4          THE COURT:  Okay.  All right.  I'm sure nothing else

5    from the government?

6          MR. HOLT:  Nothing further, Your Honor.

7          THE COURT:  Okay.  And nothing further from

8    plaintiffs.

9          All right.  Thank you very much.  I appreciate it.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  All right.

12          MR. HOLT:  Your Honor, before the next -- I think we

13    do have the next witness.

14          Can somebody check to see if the next witness is

15    available?

16          And I wondered if we could have a brief bench

17    conference about something that I'd like to discuss kind of

18    with the Court before that next witness, if that's okay.

19          THE COURT:  Sure.

20          MR. HOLT:  It will be very brief.

21          THE COURT:  Yeah.  So why don't we get the next

22    witness.

23       (Pause.)

24          THE COURT:  All right.  So put your headphones on, and

25    then we'll do the white noise machine.

* * * SEALED PURSUANT TO COURT ORDER * * *

51

 1          (Off the record.)

 2               MR. HOLT:  Just so for clarity, Mr. Harvick, he can

 3     leave --

 4               THE COURT:  Oh, yes, I'm sorry.  I -- I thought I

 5     excused you.

 6               THE WITNESS:  Thank you, Your Honor.

 7               THE COURT:  Thank you.  I appreciate it.

 8               But then Mr. Skedzielewski may not -- he's just going

 9     to hear the white noise, though, is --

10               MR. HOLT:  I -- I think that's fine, Your Honor.

11               THE COURT:  That's okay?

12               MR. SKEDZIELEWSKI:  Your Honor, that -- that's okay.

13     Yeah, my colleague can handle this.  I know what they're --

14     yeah, that's fine.

15               THE COURT:  Okay.  All right.

16          (Sealed proceedings heard at sidebar:)

17               THE COURT:  Okay.

18               MR. HOLT:  Your Honor, so the concern that we wanted

19     to raise is there is a sketch artist in the court, and our

20     concern is with this specific witness, our understanding from

21     him is that there is a -- I think a $50,000 bounty on him, and

22     I think that even involves potentially his family.

23               And so we're just concerned about specifically this --

24     this witness, there being a sketch of him.  And so that --

25     it -- that's the only part of, you know, the sketching that we

1    would be concerned about as it relates to this hearing.  We

2    wanted to raise that to the Court's attention and see if the

3    Court would be amenable to directing the sketch artist not to

4    sketch the witness.

5         THE COURT:  What's the plaintiffs' position?

6         MR. ART:  We would object to that, Your Honor.  These

7    are public proceedings.  This is a witness testifying in an

8    open court.  We're not sure how a sketch of the witness

9    testifying in open court has anything to do with an alleged

10   bounty on the witness.  But -- but the press is here to report

11   and the proceedings are public, and to the extent that there

12   was some real concern about security, it should have been

13   raised before the hearing.

14        MR. HOLT:  Your Honor, we were not aware the sketch

15   artist was going to be here, and it was kind of raised to our

16   attention later.  But, you know, for us, you know, we have a

17   duty to protect our witness when we know about it, and we're

18   trying to do that, and we tried to do it promptly.

19        We note -- we realized it after the first witness was,

20   you know, testifying, and the -- this is the witness that we're

21   specifically worried about.  So we're not trying to just do it

22   blanketly for every witness for every situation, but kind of

23   specifically for this situation.

24        THE COURT:  And what's the -- what's the nature of the

25   threat?

* * * SEALED PURSUANT TO COURT ORDER * * *
53

1          MR. HOLT:  Your Honor, I don't have all the details.

2  My understanding is that I -- I think it was a gang bounty.

3  And I -- my understanding was that it also involves maybe his

4  family as well.

5          THE COURT:  All right.  I think before ruling on it,

6  I'd want to hear from him.

7          MR. HOLT:  Sure.

8          THE COURT:  I'm just trying to think logistically

9  what's the best way to do this.

10         I think I'll clear the courtroom.

11         MR. HOLT:  Okay.

12         THE COURT:  Hear from him, bring everybody back in,

13  and make a decision.

14         MR. HOLT:  Thank you, Your Honor.

15         THE COURT:  Okay.

16   (Proceedings heard in open court:)

17         THE COURT:  All right.  Ladies and gentlemen of the

18  public and press, I need to clear the courtroom for about five

19  minutes, and then we'll have you come back in and pick up where

20  we left off.

21         All right?  So you can just all wait in the hall for

22  about five minutes.

23   (Off the record.)

24         THE COURT:  All right.  So we just -- we've got an

25  overflow courtroom, so we just have to cut the volume to that,

* * * SEALED PURSUANT TO COURT ORDER * * *

54

1    and then you can be seated.  Everybody can be seated.  As soon

2    as we have that squared away, then we can pick this up.

3        (Off the record.)

4        (Sealed proceedings heard in closed court:)

5            THE COURT:  All right.  Hi, Mr. Byers.  How are you?

6            MR. BYERS:  Pretty good.  Thank you.

7            THE COURT:  So lawyers for the government just raised

8    a concern that you have -- that you had received a threat.

9            MR. BYERS:  There's a credible threat of -- well,

10   there's a bounty on all senior ICE officials here in Chicago

11   right now, which I am the most senior-ranked ICE official here

12   and permanent ICE official here in Chicago right now.  Also,

13   there's a $50,000 bounty issued by the cartels for me, 10,000

14   for all my family members.

15           THE COURT:  Okay.  And it is directed specifically to

16   you?

17           MR. BYERS:  Well, all senior ICE officials.  So it's

18   not just me.  It's both HSI and ERO, so all -- all the senior

19   ICE officials here in the Chicago area.

20           THE COURT:  Okay.  And when -- when were you aware of

21   that threat?

22           MR. BYERS:  It's been about a week or so I believe

23   that was issued.

24           THE COURT:  Okay.  And in the last week, what have you

25   done in response to the threat to protect yourself or your

* * * SEALED PURSUANT TO COURT ORDER * * *

1  family?

2      MR. BYERS:  We've engaged in multiple avenues of

3  trying to limit social media exposure, including what, you

4  know, family members and such to try to reduce the footprint,

5  make it easier to disconnect so that it can initially be traced

6  directly to me.  Even coming in here today, you know, took

7  additional precautions for that, for obvious reasons; you know,

8  expect a little bit more protests in that.  You know, my name

9  is out there.  I've been doxed as -- as recently as over the

10  weekend.  So my name is out there, but my face has not been

11  connected to my name yet, so that's what I'm trying to prevent

12  from happening.

13      THE COURT:  Okay.  And what happened over the weekend?

14      MR. BYERS:  I found that my additional social media

15  has been doxed and -- and put on some of the ICE lookout

16  websites and stuff that's out there.

17      THE COURT:  And was your image connected to the social

18  media?

19      MR. BYERS:  Some of them have been, but it -- I don't

20  have it necessarily in there.  For the ones that they've gotten

21  the hold of, it's usually a generic image, not necessarily of

22  me.  So that's where some have just the name.  And so

23  without -- with a generic image that's not my picture, that's

24  kind of the -- the point, is trying to not to connect the two.

25  There's, you know, photos of me right now from the Broadview

* * * SEALED PURSUANT TO COURT ORDER * * *

56

1  facility last week.  They don't know that it's me in those

2  photos.  That's what I'm trying to prevent, is that -- is they

3  don't put two and two together and realize that it's -- it's me

4  in the photos that they're seeing.

5      THE COURT:  Okay.  And are these threats, do you know

6  whether they're being investigated by, for example, you know,

7  in connection with the U.S. Attorney's Office or the FBI?

8      MR. BYERS:  FBI, yes, have active investigations

9  against all the threats.  And I believe as everybody has seen,

10 there was also the -- the bounty put out by the Latin Kings

11 against Chief Bovino, which they did make an arrest in that, I

12 believe, last week.

13     Following that arrest, there was an additional one put

14 out by the cartels themselves, you know, for additional Border

15 Patrol and, you know, ICE.  That -- that's, you know, why I

16 brought the -- the issue up now.

17     THE COURT:  Okay.  So what's the plaintiffs' position?

18 I'm -- I'm inclined to ask the sketch artist to blur Mr. Byers'

19 face enough that it's not recognizable.  I mean, it's -- and

20 this is no disrespect to any sketch artist at all, but they

21 also tend not to be -- I'm trying to think of the best --

22     MR. ART:  Photographic?

23     THE COURT:  -- it's not photographic, I suspect is

24 probably the best way to -- to put it.  I have a hard time

25 recognizing myself in a lot of these sketches.  So I guess I'd

* * * SEALED PURSUANT TO COURT ORDER * * *

57

1   be inclined to ask the sketch artist to blur the features

2   enough that they're not recognizable.

3           Would the plaintiffs have an objection to that?

4           MR. ART:  No, Your Honor.

5           But to state our position for the record, our strong

6   view is that these are public proceedings.  A generalized

7   threat of a cartel taking out a bounty on the entire senior

8   leadership of a huge federal agency and doxing individuals in

9   that same position, we do not think justifies secrecy of these

10   proceedings in any way, and we intend as the case proceeds,

11   particularly with respect to this alleged Latin King bounty on

12   Bovino, to contest that those facts justify any sort of relief.

13           But understanding that the Court wishes to move along

14   today, we have no objection to the Court's sketch artist being

15   instructed to blur the image.

16           THE COURT:  Okay.  And I just found the press release

17   that was dated October 14th from, it looks like, Homeland

18   Security.  And it says that they're detailing information from

19   ongoing investigations and it says that there's a tiered bounty

20   system.  There's $2,000 for gathering intelligence or doxing

21   agents, including photos and family details; 5- to 10,000 for

22   kidnapping or nonlethal assaults on standard ICE CBP officers;

23   and up to 50,000 for the assassination of high-ranking

24   officials.

25           So this is from DHS's press release.

* * * SEALED PURSUANT TO COURT ORDER * * *

1          And, you know, I agree with the plaintiffs that these

2   are public proceedings and, you know, that's why we have a full

3   courtroom and an overflow courtroom, is that this is public.

4   But I am also sensitive to striking a balance for Mr. Byers'

5   safety concerns.  You know, having received a multitude of

6   threats myself, it's, you know, whatever we can do to keep the

7   proceedings open, but while still trying to prevent any

8   violence I think is a good balance to strike.

9          MR. ART:  Thank you, Judge.

10         THE COURT:  All right.  So I guess what I would like,

11   Rhonda, is if -- it's just one sketch artist that I saw.

12         THE CLERK:  Yes.

13         THE COURT:  Okay.  If you could just ask him to come

14   in.

15         THE CLERK:  Okay.

16         THE COURT:  And then I'll instruct him, and then we

17   can go forward.

18         MR. HOLT:  Your Honor, can I just give the

19   government's position briefly?

20         THE COURT:  Sure.

21         MR. HOLT:  I think our position would be that we would

22   ask the Court not to have any sketch of the witness.  We --

23   I -- I understand the Court's position.  I think there is some

24   case law indicating that, you know, there isn't a First

25   Amendment right for a -- for a sketch artist to sketch in the

1    courtroom, so I do think that, you know, those -- those

2    rights -- and that's not really -- it's not really implicated

3    here, and I do think that the safety of Mr. Byers is -- is

4    paramount here.  And so we would ask that, but we also

5    understand the Court's position.  But we just wanted to make

6    our position clear.

7            THE COURT:  Okay.  Yeah.  I think that this, you know,

8    is a reasonable position that keeps access to the proceedings

9    open without creating -- you know, I'm going to ask the sketch

10   artist to blur your features, Mr. Byers, so that there's --

11   you're just another guy on the stand, and that I think it will

12   be difficult to then link the two.

13           MR. HOLT:  And thank you, Your Honor, for --

14           THE COURT:  You're welcome.

15      (Off the record.)

16           THE COURT:  So this portion that we have where I've

17   cleared the courtroom, I'm going to put this section under

18   seal.

19           Anybody have an objection to that?

20           MR. ART:  No objection from plaintiffs, Your Honor.

21           MR. HOLT:  No objection, Your Honor.

22           THE COURT:  Okay.

23           Hi.

24           MR. QUESTEL:  Hello.

25           THE COURT:  How are you?

* * * SEALED PURSUANT TO COURT ORDER * * *

60

1          MR. QUESTEL:  I'm fine.

2          THE COURT:  And you're good.

3          MR. QUESTEL:  Should I go to the podium?

4          THE COURT:  You're fine right there.

5     That I know you've been sketching today's proceedings.

6          MR. QUESTEL:  Yes, ma'am.

7          THE COURT:  And you are I presume working for one of

8     the TV stations?

9          MR. QUESTEL:  Yes, ma'am.

10         THE COURT:  So my request for you for this next

11    portion is that you blur Mr. Byers' face.  So as you're

12    sketching, you can sketch me, the courtroom, everything.  But

13    the features on his face, if you could blur them so that

14    Mr. Byers has -- is it all right to state why or prefer not?

15         MR. HOLT:  I think we'd prefer not to.

16         THE COURT:  Okay.  So that is my request to you.

17         MR. QUESTEL:  Yes, ma'am.

18         THE COURT:  Thank you.  Thank you.

19         And then you can go back to your seat where -- where

20    you were.  And then we can let everybody else in.

21         MR. HOLT:  Thank you, Your Honor.

22         THE COURT:  All right.  Thanks.

23         THE WITNESS:  Thank you, Your Honor.

24    (Pause.)

25    (Witness sworn.)

1    SHAWN BYERS, WITNESS HEREIN, DULY SWORN

2    EXAMINATION

3    BY THE COURT:

4    Q.   All right.  Mr. Byers, if you can state your name and your

5    last name and what office or position you hold with Immigration

6    Customs Enforcement.

7    A.   Shawn Byers, deputy field office director for Immigration

8    Customs Enforcement, Enforcement and Removal Operations.

9    Q.   Okay.  And what is your role at ICE?

10        I know you gave me the title, but -- but what -- what

11   do you do?

12   A.   I oversee our docket management and our administrative

13   operations is the best way to describe it.  So, you know,

14   we're -- we're broken up into three main missions; you know,

15   arrests, detention, and removal operations.  So I have two of

16   those three.

17   Q.   The detention and removal?

18   A.   Yes.

19   Q.   Okay.  And we just had Mr. Harvick on the stand from CBP,

20   and he explained that their job duties are essentially

21   enforcement and going out into the community and determining

22   whether somebody is here on a legal status or nonlegal status,

23   and then either arresting that person or detaining that person.

24        For ICE, generally what -- what role or responsibility

25   does ICE have under the enforcement of the immigration laws?

Byers - examination

1   A.  Like I just said a moment ago, we have three main missions.

2   We have the enforcement mission.  We have the detention

3   mission, which we do for all DHS components, which is CBP, as

4   well as our own, or any other partner, or even Department of

5   Justice, that may make immigration-related arrests.  And then

6   of course we have -- we're the sole holdover of the removal

7   mission.

8           So we -- we bring people through the whole immigration

9   process.  As far as the enforcement side of it, when somebody

10  gets a removal order and they don't surrender themselves, we

11  have to go out and find them.  And in pursuit of those, we

12  also -- you know, that's why when we say we do target

13  enforcement, that's what we mean by that.

14          If we run across other people during the pursuit of

15  those individuals we're looking for, that's when we also do

16  additional or arrests for those individuals that are in the

17  interior of the United States.

18  Q.  And would it be fair to say that ICE essentially operates

19  on the border and CBP, for the most part, operates on the

20  interior?

21  A.  The opposite of that.

22  Q.  Okay.

23  A.  CBP is at the border.  We're in the interior.

24  Q.  Okay.  And so when CBP is doing enforcement, generally

25  they're doing enforcement on the border?

Byers - examination

63

1   A.   Yes.

2   Q.   Most --

3   A.   Yes.

4   Q.   Most of the time?

5   A.   Because they're -- they're typically -- you know, you have

6   two different portions of CBP and they -- they do -- they're

7   surrounding port of entry and across the border security, yes.

8   Q.   Okay.  And then if there are specific operations, like the

9   one in Los Angeles or the one in -- currently in Chicago,

10  that's when those agents would be pulled in to the interior?

11  A.   Yes.

12  Q.   Okay.  And for ICE, when ICE is doing enforcement, as you

13  said, it's normally targeted enforcement --

14  A.   Mm-hmm.

15  Q.   -- in that somebody received a removal order, did not

16  present themselves for removal, now ICE agents would go out and

17  find that particular individual in order to effectuate the

18  removal order; is that fair?

19  A.   By and large, yes.

20  Q.   Okay.  With respect to the Broadview facility, that

21  detention facility, that is under ICE jurisdiction, correct?

22  A.   Yes, that's an ICE-owned facility.

23  Q.   Okay.  And individuals will come to Broadview for

24  processing after they've been arrested either by ICE agents or

25  CBP or, you know, if there was an immigration detainer against

Byers - examination

1    somebody and then they were arrested by a different agency or

2    even, you know, state or county police, they -- everybody gets

3    processed through Broadview; is that right?

4    A.   If a state or county in Illinois honored the detainers,

5    yes.  But yes, within the surrounding area, within Indiana and

6    such, that -- that's where everybody comes into to get

7    processed once they get apprehended.

8    Q.   Okay.  And my understanding is that Broadview is not meant

9    to be a long-term detention facility, but instead, simply a

10   processing facility where people are intended to be there for a

11   short period of time; is that right?

12   A.   Correct.

13   Q.   Okay.  And by short period of time, it would be hours.

14   It's not set up where you're there for days or weeks at a time,

15   correct?

16   A.   Correct.  That's -- that's the intention of the facility.

17   Q.   Okay.  So with the -- because Broadview is an ICE facility,

18   then is it ICE agents who would protect the perimeter of the

19   facility?

20   A.   It's a combination of, you know, underneath the statute,

21   you know, FPS is, you know, the designated.  But we are also

22   delegated authority within ICE.  You know, CBP also has the

23   delegated underneath the department and -- and from FPS to be

24   able to protect federal property.

25   Q.   And specifically with the Broadview property, since the

Byers - examination

1    beginning of this operation in Chicago at the beginning of

2    September, it was ICE agents who've been primarily protecting

3    the perimeter or where -- how -- what's the percentage of

4    agents, say, ICE, CBP, and then FPS?

5    A.   Initially it was exclusively ICE.  You know, in August,

6    September, it started getting a little bit of support from

7    local CBP.  As things started progressing, getting, you know,

8    larger numbers of crowds and a little bit more violent, we

9    started getting additional support from Border Patrol and --

10   and the TDY staff from CBP at large that was here in Chicago.

11   Q.   And TDY is?

12   A.   Temporary detail.

13   Q.   Okay.

14   A.   So they were here temporarily for the operation.

15   Q.   Okay.  How many ICE agents are in the -- is it the Chicago

16   region?  How -- how do you break it down?

17   A.   So we have six states that we cover.

18   Q.   Okay.

19   A.   Our actual total staff is -- is right around 300 across six

20   states.  Here in Chicago itself, we -- we run -- actual

21   officers is running right about 85 total staff, not just

22   enforcement staff.  That's to cover everything that we do.

23   That's alternative to the detention program, that's our docket

24   managements, that's, you know, detention --

25            COURT REPORTER:  That's to cover -- go back.

1          THE WITNESS:  I'm sorry.

2          COURT REPORTER:  The program you said?

3          THE WITNESS:  -- our -- our alternative to detention

4    program, which is our ankle bracelets and such, that's our

5    docket management program, you know, the Criminal Alien

6    Program, and then plus our at-large operations.

7          COURT REPORTER:  Programs -- slow down a little bit.

8          THE WITNESS:  I'm sorry.

9          Our Criminal Alien Program, that's the jails, and then

10   our at-large program, you know, which is only a portion of our

11   staff as well.

12   BY THE COURT:

13   Q.   Okay.  And so out of the 85 officers that you have here in

14   Chicago, how many of those would be involved in protecting the

15   Broadview facility?

16   A.   Typically none.

17   Q.   Okay.

18   A.   Because we haven't had to up until recently in the 43 years

19   that that building has been there.

20   Q.   And over the last -- so let's just go back to the beginning

21   of September.

22        How many officers are protecting the ICE facility, the

23   detention facility?

24   A.   Individual shift, I think the most we've had at any given

25   time is probably 40 to 50 before the fence got installed.

Byers - examination

1    Because it was getting -- you know, with the size of the

2    crowds, just to try to make -- try to get crowds to move away

3    so we can actually get vehicles through.  It -- it was getting

4    a very large number of staff there to be able to try to get

5    it -- vehicles in and out of there.

6    Q.  And on -- since the beginning of September, on any given

7    day, on average, how many individuals -- so how many agents are

8    there to protect the Broadview facility?

9    A.  Now or then?  Now is probably -- you know, well, we're

10   running in shifts right now.  We're probably running 12 to

11   15 per shift.

12   Q.  Okay.  And how many agents are there overall?  So that

13   understanding now that you've got maybe 12 to 15 ICE agents,

14   but there are going to be other agents there from CBP, how many

15   individuals in total?

16   A.  Well, we also have Bureau of Prisons has a -- what they

17   call a SORT team.  That's assisting as well now.  We have some

18   CBP that will -- will do some shifts as well with some of

19   theirs.  It's still running about 12 to 15.  So it's a mixed

20   bag of all the different entities, you know, taking shifts

21   right now, trying to help protect the facility.  And of course

22   inside we have, you know, all the staff, you know, working --

23   Q.  Right.

24   A.  -- you know, trying to process and all that for the

25   individuals being arrested.

1    Q.   Okay.  So -- but outside the facility during any particular

2    shift, it's about 12 to 15 agents outside the facility and

3    they're made up of either ICE, CBP, or Bureau of Prisons?

4    A.   Right now, yes.

5    Q.   Okay.  And that's been the case generally since the

6    beginning of September?

7    A.   Typically, yes.  I mean, in -- when we get toward the

8    weekends, we usually have to beef that up because it seems when

9    the protests are more -- larger, we'll have to have more

10   staffing there, and then we'll have to stage it based on what's

11   anticipated to happen.

12   Q.   Okay.  And are these agencies, ICE agents, have they been

13   brought in from other areas of the country or are these ICE

14   agents that are assigned to Chicago?

15   A.   Both.  We have -- so the ones doing security are special

16   response team members.  So we have our own team members from

17   Chicago, but we also have some, again, detailed staff from

18   other parts of the country that are here as well.

19   Q.   And what are the responsibilities of a special response

20   team member?

21   A.   They're the only ones, at least within our program, that

22   has the -- you know, the additional crowd control devices and

23   stuff like that.  Typical line officers, you know, that are

24   doing everything else doesn't have those tools.

25   Q.   And what training have those officers gone through to be

1   part of the special response team?

2   A.   They have a pretty arduous amount of -- of training they go

3   through just to become an SRT member and -- you know, because

4   it's a whole trial program and everything like that.  And then

5   each of the different types of devices has its own unique

6   training.  Chemicals has a 40-hour training by itself and an

7   ongoing recurring training as well.  So each of those different

8   ones has a different type of training associated with it.

9   Q.   And is the use of force part of that training?

10  A.   Use of force is something that -- it is, and it's something

11  that is also recurring, ongoing every quarter, because it -- it

12  all goes back to our standard use of force training program

13  that we have for all staff.  And that's ongoing for all the

14  staff.

15  Q.   And that's quarterly?

16  A.   Yes.

17  Q.   Okay.  And how many hours is it quarterly?

18  A.   An officer that's actually on the street is 16 hours a

19  quarter.

20  Q.   Okay.

21  A.   SRT actually has more than that.  They're required to do --

22  let me think about this.  I think they have to do 70 --

23  72 hours a month of training, and I think an additional

24  100 hours a quarter.

25  Q.   Specifically on use of force?

Byers - examination

1    A.  Well, on their overall training for all aspects of -- of

2    the stuff that they have because of the additional equipment

3    and everything that they have.

4    Q.  Okay.  When -- and the only officers that are doing the

5    protection of Broadview --

6    A.  Mm-hmm.

7    Q.  -- are SRT officers; is that right?

8    A.  Yes.

9    Q.  From -- from ICE?

10   A.  Yes.  Yes.

11   Q.  Okay.  When either an ICE agent or an SRT officer uses

12   force, is there a requirement that they have to document it?

13   A.  If it's individual use of force, yes.  When -- like if

14   you're in the field doing an arrest or something like that,

15   yes, we do through -- we do have a reporting system that it has

16   to go into.

17           When you're doing a -- something like we have going on

18   in Portland and what's been happening at Broadview, they do

19   more of a general summary of what's been transpiring.  And

20   exactly how they're recording that and where, I'm -- I'm not

21   exactly familiar with because they have a different type of

22   system that they put that into.

23   Q.  Okay.  So if somebody is on the street and they use force,

24   what system does that go into?

25   A.  It's called a SEN system, significant event notification

Byers - examination

1  system.

2  Q.  Okay.  And in that system, they have to essentially write a

3  report about what happened --

4  A.  Mm-hmm.

5  Q.  -- and what force was used, and then their justification

6  for the use of that force; is that fair?

7  A.  By and large, yes.

8  Q.  When there is a larger event, then it would not -- the

9  reporting of a use of force would not go into that system.  Is

10 that what I'm understanding?

11 A.  Typically not.  When you're doing large mass events,

12 because it would be -- it would be harder to be able to do that

13 when you -- because it's usually the individual is when it

14 would go into a -- the SEN system, because it's an individual

15 leading to an arrest.  But for the mass events, for like crowd

16 control and stuff like that, they -- it's dealt with a little

17 bit differently, because it's considered crowd control, not

18 necessarily what you use in the typical use of force.

19      Because when you use of force you're thinking Taser

20 deployment, baton deployment, or -- or use force, firearm when

21 you have a lethal use of force.  You know, even takedowns,

22 because, you know, if we put somebody on the ground during an

23 arrest that -- we consider that a use of force --

24 Q.  Right.

25 A.  -- and we even document that for -- when we're doing an

Byers - examination

1    arrest.

2            Crowd control is dealt with a little bit differently.

3    And so that's where it's more of a summary because you're using

4    so much so quickly and it's -- you -- you don't have an

5    individual to tie it to, if that makes sense.

6    Q.  You -- you don't have an individual who received the force

7    to tie it to?

8    A.  Correct.

9    Q.  Okay.  So where do these summaries go?

10   A.  It's more of a SharePoint, I believe.  I don't have access

11   to that particular database.

12   Q.  Okay.  And is there a specific report that agents create?

13   Or what would it look like?

14   A.  I haven't seen one to know for sure because most of

15   that has been mostly been being dealt with at like in Portland.

16   Here it's rather new.  That's something I would have to look

17   into to see exactly what format and how they're doing that.

18   Q.  Okay.  And is it -- I know it's not tied to an individual

19   that received the force.

20           Is it tied back to an agent that used the force?

21   A.  Not necessarily.  I think it's more of they're -- they're

22   accounting for what's being used and why.  And so they want to

23   account for, you know, the -- the amount of -- of chemical

24   munitions and such that's being used and, you know, probably

25   the -- and my assumption is their rational of what it was being

Byers - examination

1   used for and, you know, what was being deployed for those

2   particular encounters.

3   Q.   Are you aware of whether the use of force policy requires

4   that the agents give warnings to the crowds before deploying

5   force?

6   A.   Whether they give it or not, I have given instruction, at

7   least here in Chicago, to do that, back in May when we were

8   starting to have the protests at the court here.

9   Q.   Okay.  And so the instruction that you gave the SRT

10  members --

11  A.   Actually, all staff.

12  Q.   So all staff --

13  A.   Mm-hmm.

14  Q.   -- that prior to using any force, they needed to give a

15  warning before doing that?

16  A.   When it came to protesters.

17  Q.   Okay.

18  A.   Not any force, but when it came to -- when -- when you

19  have -- because you have two different types of force.  You

20  have immediate force because you have an active threat that you

21  have to deal with and then you have a calculated use of force,

22  which, in other words, you have a protester you need to --

23  that's blocking your vehicle and whatnot, you give them -- I

24  instructed the staff, I gave them -- that you needed to give

25  them three commands with the pauses in between each to give

Byers - examination

74

1 them the opportunity to, you know, comply with the command.

2 After the third one, that's when you need to go in

3 and -- and attempt to move the individual if they're resisting.

4 That's when we have to do what we got to do.

5 Q. And do you -- did you instruct them to give a warning that

6 force would be used? Or was it a -- simply just a command?

7 So just to clarify my question, I think there's a

8 difference between saying you need to leave, right, so give a

9 command to leave --

10 A. Mm-hmm.

11 Q. -- versus if you don't leave, we're going to deploy tear

12 gas, right?

13 A. Mm-hmm.

14 Q. So there's a difference between the two, which one is, you

15 need to leave; the other is, if you don't do what we say, this

16 is what's coming.

17 A. Yes.

18 Q. So is it the former that you instructed, which was, you

19 gave a command for people to leave, and you need to give them

20 time to comply; or is it the second, that you're telling them

21 what to do, but you're also telling them what's coming next?

22 A. It was more along -- it was more along the lines of giving

23 them the instruction what they need to do, but also -- because

24 I don't know what each officer is going to do is based on the

25 nature of what is happening. So they have to have the ability

Byers - examination

1    to, you know, make the decision of what they're faced with,

2    because I'm not with every situation, size of crowd, size of

3    the officer.  Those are all factors in of -- of what they're

4    facing and what they need to do.

5            You know, if I have, you know, a 100-pound female

6    facing five protesters, she's not going to be able to move

7    those people by theirselves, and she's going to have to use

8    something else.  And so they have to make those determinations

9    of what they're going to articulate to that person of, I'm

10   going to move to you; I'm going to deploy X.

11           And that's what the instruction was, that you -- you

12   give them the commands to do with what they need -- you know,

13   what the consequences are, yes.

14   Q.  Okay.  So you --

15   A.  Or face arrest, yes.

16   Q.  -- you instructed them -- yes, that not only did they have

17   to tell the protesters what to do, but also that -- what the

18   consequence would be if they didn't comply?

19   A.  Yes.

20   Q.  And you did that in May?

21   A.  Yes.

22   Q.  Okay.  And presumably, there's been changes in the agents

23   who have been here since May that some come in, some have left,

24   others have come in.

25           You've continued to give that instruction to every new

Byers - examination

1   person that's come in?

2   A.  Well, as far as my SRT team, it hasn't changed, but some of

3   the staff -- the -- the TD -- the temporary staff that's come

4   in, that's changed some.  I have not reiterated this -- the

5   instructions to them, no, I have not.

6          Now, there is a -- so -- and to go back to your

7   original question, there is a -- there -- in the policy when

8   there's a calculated use of force, there is the requirement to

9   give the notice and command to vacate the premises or -- or,

10   you know, and all that.  So there is a requirement in there to

11   do so.  Because we actually have equipment for that.  It's

12   called an LRAD, a long-range acoustical device.  And with

13   Broadview it was being used.

14   Q.  Okay.

15   A.  Because I actually witnessed it being used because I was

16   out there at some of those events that happened.

17   Q.  All right.  And when there is force used, whether it's

18   against a particular individual that goes into this -- the SEN

19   database --

20   A.  Mm-hmm.

21   Q.  -- or it's the use with the public in the context of

22   protests where there's a summary and it goes into a different

23   database --

24   A.  Mm-hmm.

25   Q.  -- who then reviews what was submitted?

Byers - examination

1   A.  So that system goes to a couple different entities, because

2   of course it goes to ICE leadership, but also goes to our

3   Office of Professional Responsibility.  But ultimately there's

4   a -- there's a sub thing called use of force -- UFAB is what

5   we -- we call it that actually goes up and there's a review

6   committee in our office -- our Office of Firearms and Tactical

7   Programs that actually would go through and -- and they meet

8   monthly to go and -- and review the uses of force, and then

9   they'll come back and see if there's -- you know, if it was

10  a -- if it met the policy and such, and then they'll do a

11  recommendation to go along with that.

12  Q.  And that's done when it's directed at an individual; is

13  that correct?

14  A.  Yes.

15  Q.  And then what about when you've got protesters and it's a

16  bigger crowd, and you said it goes into a different system.

17          Who reviews those reports?

18  A.  The same group also has access to that system as well.  So

19  I'm assuming they are doing the same process.  Because I don't

20  have visibility to it, but it's -- I know it goes to the same

21  group because they have ultimate oversight over the SRT folks.

22  They have the -- I want to say general -- general programmatic

23  oversight for them.  And so my assumption would be they're

24  doing the same for that as well.

25  Q.  And the SRT folks, do they -- they fall under the

Byers - examination

1   enforcement prong of ICE?

2   A.   Yes.

3   Q.   Okay.  Because we've got enforcement detention removal.

4   A.   Mm-hmm.

5   Q.   They fall under enforcement?

6   A.   Mm-hmm.

7   Q.   And who's in charge of enforcement for the Chicago region?

8   A.   Officially, it's DFOD Tammy Marich.  She's actually --

9   she's actually been TDY to another AOR as an acting field

10  office director just recently.  We have an acting -- one of our

11  assistant field office directors who has just recently taken

12  over is acting for her.  A lot of actings in the agency right

13  now.

14       But the SRT team actually reports to me because I've

15  been the longest-serving permanent senior leader here in

16  Chicago for several years now.  My counterparts, they've been

17  here a little over a year.

18       You know, field leadership, as we know, with Mr. Hott

19  and several others, he's the 12th that's been through -- 12th

20  field office director that's been here -- through here in five

21  years, so it's been a little bit of a revolving door so once --

22  one of the reasons why I'm sitting here.

23  Q.   Okay.  And I bet you're really happy to be here too.

24       So how long has the SRT been reporting to you?

25  A.   Since I got to the office in June of '22.

Byers - examination

1  Q.  Okay.  And then would you be reviewing these reports or

2  summaries or whatever it is that those team members would

3  create with the protest events at Broadview?

4  A.  I would think so, because I review all our operational

5  plans and such.  But I have not had any submitted to me yet.

6  So I am -- that's something that I've been -- recently been

7  asking about as far as those formats.

8        I know initially when things were starting they were

9  taking notes about different aspects of them for their

10 reporting, but they haven't come up through me so that's

11 something I have to follow back up on exactly how they're doing

12 their reporting on -- on the events.

13 Q.  Okay.  Because you would anticipate, correct, that an

14 incident occurs, force is used, and you can look back --

15 sorry -- you can look back over the last six weeks and you know

16 here are at least five times where force was used.

17       You would expect then to see some report, right?

18 A.  The -- yes.

19 Q.  Okay.

20 A.  Because officially if they wrote something up, it should

21 have come through me for clearance; but unfortunately, I

22 haven't seen anything for clearance, so they may have submitted

23 it without my clearance.

24 Q.  Okay.  And is there a policy on how quickly they should

25 submit these reports?

Byers - examination

1  A.  Not necessarily for -- typically for a -- a use of force,

2  you know, that goes in our SEN system is 24 hours.  For the

3  crowd control scenarios, they're a little bit different because

4  there seems to be -- you know, they develop rather quickly.

5          And to caveat things a little bit, the group that was

6  actually responsible at our office for the firearms and

7  tactical programs was actually here and running our joint

8  operations center for the beginning of the operation for quite

9  a bit.  So when a lot of this was going on, they were actually

10 here so they may have gotten it directly themselves and that's

11 maybe why it didn't come through me, because when we have

12 multiple teams, they have operational control.  I don't

13 locally.  And that may be one of the reasons why I'm not seeing

14 it and it's going directly to them, because we have multiple

15 teams simultaneously.  I lose local control when it's multiple

16 teams present, and that's what we have right now.

17 Q.  And so when you have multiple teams present, who is

18 responsible?

19 A.  The oversight --

20 Q.  Yes.

21 A.  -- flips to headquarters.

22 Q.  Okay.  DHS headquarters?

23 A.  Our ICE headquarters.

24 Q.  ICE headquarters?

25 A.  At least for the ICE portions of the staff.

Byers - examination

1  Q.  Okay.  And what person would be responsible for that?

2  A.  I will have to get back to you on that.  I don't know that

3  off the top of my head.

4  Q.  Okay.  Can you just briefly walk me through the chain of

5  command for ICE?

6          So we've got -- the country is broken up into areas

7  of --

8  A.  We have 25 field offices.

9  Q.  Field offices?

10  A.  Yes.

11  Q.  Okay.

12  A.  Because you have ICE is two enforcement sides.  You have

13  Homeland Security Investigations and you have Enforcement and

14  Removal Operations.  HSI is our special agents, and then ERO is

15  our deportation officers.

16          And of course -- so we have our acting director, you

17  know, Mr. Lyons; then you have a deputy, which is Ms. Sheahan

18  right now; and then you have -- well, we have executive

19  associate directors.  Then below them we have our assistant

20  directors, and so field office directors report to an assistant

21  director for field operations.

22  Q.  Okay.  And so as a deputy field office director, you would

23  report to the field office director?

24  A.  Yes.

25  Q.  Who then reports to the assistant?

Byers - examination

1   A.   Director, yes.

2   Q.   Director?

3   A.   Yes.

4   Q.   And the assistant director, would that person be

5   responsible for more than one field office?

6   A.   They have all 25.

7   Q.   Okay.  Okay.  And are the field offices -- are they grouped

8   together in any way?

9   A.   Well, we do have an east and west division with the deputy

10  assistant director over them where they're kind of -- well, we

11  call them DADS, deputy assistant directors.  They're more your

12  day-to-day operational control.  The DADs are the ones that are

13  actually ultimately responsible for the field offices and the

14  field office directors.

15  Q.   Okay.  And remind me again, who is -- who would be the

16  field office director, at least acting for Chicago?

17  A.   Right now the interim is Sam Olson.

18  Q.   Okay.

19  A.   At least for today.

20  Q.   Okay.  Well, that's all we can do, right, is today.

21       Okay.  And do SRT officers have body-worn cameras?

22  A.   Chicago ones do not.

23  Q.   Okay.  And you've got some SRTs from other parts of the

24  country, so other field offices?

25  A.   Correct.

Byers - examination

1   Q.  Do any of those SRTs that are currently in Chicago, do they

2   have body-worn cameras?

3   A.  I don't believe so.

4   Q.  Okay.  So as far as we know, the SRTs at Broadview have not

5   been issued body-worn cameras?

6   A.  Correct.

7   Q.  And is there any -- has there been any directive as to

8   issuing body-worn cameras to all SRTs?

9   A.  The prior administration and Congress has started a

10  body-worn camera program with ERO.  And they had started a

11  deployment.  It only went to I believe one or two field offices

12  and then stopped.  Currently, it would have to be reauthorized

13  by Congress with funding to move forward because there's a lot

14  involved beyond buying cameras.

15  Q.  Right.  Right.

16  A.  You've got to have all of the cloud storage.

17  Q.  Exactly.

18  A.  And, you know, each office has to have that alliance, you

19  know, increased for the transfer of the data, all that has to

20  go behind it, you know the NARA, your schedule installed

21  with -- with the national archives and all that stuff.  And I

22  think there's a whole lot of that behind it that would have to

23  be done, you know, on top of, you know, getting money from

24  Congress to do it too.

25  Q.  Okay.  All right.  So do ICE agents have identification

Byers - examination

1  numbers or star numbers or badge numbers that are unique to

2  them?

3  A.  Yes.

4  Q.  Are there any policies that require that they have those

5  numbers visible on them?

6  A.  Yes.

7  Q.  Okay.

8  A.  If you would like to see it, ma'am.

9  Q.  Okay.

10  A.  Each -- each badge has a unique identifier on it.

11  Q.  Okay.  And are the officers required to wear the badge on

12  them while they're conducting enforcement activities?

13  A.  Yes.

14  Q.  Okay.  In terms of crowd control, what training do agents

15  get or officers get in crowd control?

16  A.  So when it comes to crowd control -- now, are we talking --

17  so we're talking about like a government property type

18  scenario?

19  Q.  Let's -- sure, let's start with that.

20  A.  Okay.

21       For like Broadview, for instance.

22  Q.  Yeah, let's do Broadview.

23  A.  We have to get a cross-designation from Federal Protective

24  Service.  With that also comes with the delegation of authority

25  and as well as training that goes along with that, which has --

Byers - examination

1    there's a couple of different techniques, so to speak, as far

2    as crowd control.  And so that's when -- you know, shield

3    techniques and stuff like that.

4         So we have -- we have two different ways we do that.

5    One is of course the formations and stuff that you have to do

6    with that, which like our -- for the start of this operation,

7    we had a lot of our fugitive op team members go through that

8    training as well, but they still don't have access to the

9    chemical munitions and stuff that SRT does because that's

10   exclusively for them because of the additional training beyond

11   all that.

12        You know, standard officer only has, you know, the --

13   the only options -- they don't all carry it, but they only have

14   Taser, baton, and OC spray, that's it, for a less than lethal

15   option.  Only SRT members have the additional kinetic stuff,

16   and -- and CS gas and all that stuff.

17        And so there is training involved in that for when it

18   comes to crowd control for people to be able to do that.  And

19   once they get the delegated training -- and not every officer

20   has that.  It's only the ones who get cross-designated through

21   FPS.

22   Q.  And if I understand you correctly, before the start of the

23   Chicago operation, anyone that was going to be protecting

24   Broadview went through this cross-designation and training if

25   they weren't an -- already an SRT member?

Byers - examination

1  A.  Yes.  I had -- I wasn't anticipating Broadview necessarily.

2  I was expecting it more with the field office, but yes.

3  Q.  Okay.  And -- and then the SRT members had this training

4  plus the additional training on the other weapons that they

5  were using?

6  A.  Yes.  And they have some crowd control as part of their

7  normal training anyways.

8  Q.  Okay.  And as part of the crowd control training, it

9  essentially incorporates use of force and when officers can use

10 a particular amount of force in response to a perceived threat;

11 is that fair?

12 A.  By and large, yes.

13 Q.  Okay.  And was there any other specialized training that

14 occurred prior to the Chicago operations starting in the

15 beginning of September?

16 A.  Well, we always have our -- our refreshers for use of

17 force, all use of force.  Fourth Amendment, we always -- you

18 know, we require that everybody is current, you know, for those

19 types of annual training that we -- we have for everybody.

20         I made sure both us and Border Patrol were familiar

21 with some of our other ongoing situations.  We have like our

22 Castañon Nava, you know, litigation that was previously going

23 on here --

24 Q.  Right.

25 A.  -- to make sure they can articulate, you know, probable

Byers - examination

1    cause for arrests, stuff like that.  So we had some -- we had

2    some of that go through as well.

3         But beyond -- just some of the routine stuff that we

4    would normally do for our at-large operation.

5    Q.   Okay.  And then overall, who is in charge of the Chicago

6    operation, this -- this increased enforcement operation?

7    A.   For ICE, it's ICE; Border Patrol is in charge of the Border

8    Patrol portion; or CBP is in charge of the CBP portion.

9    Q.   And is there somebody who overall is in charge of the

10   entire operation or is it split out into silos?

11   A.   Silo would be the best way to describe it, is where we're

12   running parallel but independently is the best way to -- to

13   describe how it's currently operating.

14   Q.   Okay.  So would Mr. Bovino be only in charge then of the

15   CBP portion of the operation, but not the overall operation

16   itself?

17   A.   Correct.

18   Q.   Okay.  Is there anyone kind of managing the whole

19   operation?  Or is each agency just operating independently of

20   each other?

21   A.   We're -- we're operating independently of each other

22   because we have a little bit different of how we operate.  Like

23   I said, we're still doing targeted enforcement as we always

24   have and -- and we're continuing to do so.  You know, they --

25   they do a little bit differently, as everybody has seen.  So

Byers - examination

1   they -- it is, you know, two different -- underneath the same

2   umbrella of Operation Midway Blitz, but we're operating

3   independently.

4         We do -- you know, like if we have requests for

5   assistance, we go through what's the -- called the National

6   Incident Command Center, NICC, where we have requests for

7   assistance from each other, or we just go to each other's --

8   you know, they have an executive operation center.  We have a

9   joint operation center where we will, you know, ask each other

10  for assistance.  Like if we are getting overwhelmed somewhere

11  or we -- we have a -- an incident somewhere, we'll ask for

12  assistance or they'll ask us.  Or we'll ask them like if they

13  have -- you know, if we know they have a ramming incident or

14  something like that, we'll ask them if they need assistance.

15        So we'll do some of the crosstalk.  And of course, we

16  have a deconfliction mechanism we had to build in because also

17  we start finding ourselves at some of the same addresses, so we

18  had to, you know, develop a mechanism to deconflict those that

19  we were targeting.

20  Q.  And -- so how do you do -- for example, you know, you show

21  up at an apartment building at an address where you believe

22  somebody is living who is subject to a removal order, and

23  they're there as well, who decides who goes in?

24  A.  Well, that was starting to happen early on, and then we

25  basically had the two operation centers, you know, basically

Byers - examination

1    pushed down the staff to figure out a mechanism to deconflict

2    the individual targets from each other so we didn't have that

3    happening anymore.

4    Q.   Okay.  The enforcement operation on the apartment building

5    on the south side of Chicago that occurred, I don't know, a

6    couple of weeks ago, a month ago, was that an ICE operation

7    then or was that a CBP?

8    A.   That was CBP operation.

9    Q.   CBP?

10   A.   Yes.

11   Q.   Okay.  All right.  I think I might be almost done.

12            Have you reviewed any of the incidents that have

13   happened at Broadview regarding protesters since the beginning

14   of September?

15   A.   What do you mean by reviewed?

16   Q.   Either looked at any reports that were filed or talked to

17   any of the agents that were present, talked to any of their

18   supervisors?

19   A.   Yes.

20   Q.   Okay.

21   A.   And I've been there for some of the protests.

22   Q.   Okay.  And are you -- have any of the officers that have

23   participated in any of those incidents, have any of them been

24   disciplined for violating any ICE policies regarding use of

25   force?

Byers - examination

1   A.   No.

2   Q.   Okay.  With the TRO that I entered, how specifically did

3   the officers and agents operating in Chicago receive the TRO?

4   A.   So we sent it out two different ways.  One, we had via the

5   acting director send it out nationally, so everybody got it.

6   We also sent it out locally through the field office director

7   to all the local staff as well.  So we made sure we -- we

8   covered our bases in both directions.

9   Q.   And did the officers have to acknowledge that they got it

10  in any way?  Like send an e-mail back saying yes, got it, or

11  sign anything or anything like that?

12  A.   We did not do that, no.

13  Q.   Okay.  When the officers start their shift, do you normally

14  do like a roll call where you'll provide information or talk

15  about various things that are happening at the beginning of a

16  shift?

17  A.   We're not a police department where everybody shows up at a

18  location and gets vehicles and then drives out.  Most people

19  have vehicles and they meet at a -- a -- with their team lead

20  and they'll meet in the field somewhere, so we don't

21  necessarily work along those lines.  So no, ma'am, they -- we

22  don't -- we don't necessarily operate like that.

23  Q.   Okay.  So when Mr. Harvick was here, he explained that at

24  the beginning of the shift, like the day after that I issued

25  the TRO and then right after I issued the modification, they

Byers - examination

1    essentially -- their team supervisors gave basically an oral

2    explanation of the TRO, that it was entered, and then they

3    asked for any questions.

4            Did anything like that happen to date?

5    A.  So what I -- what I did was I spoke with our SRT trainer

6    and our SRT commander about the TRO and -- because the -- they

7    both had contacted me about the applications and implications

8    of it, so we had a discussion about that, and then assumably

9    they'd passed it on to the individual members, both TDY and

10   local.  And considering they haven't -- they all at the time --

11   and except for they just started going back to the field within

12   the last week, they've been at Broadview this whole time,

13   because we haven't had a deployment of any type of chemical

14   munitions, everything at Broadview since October 3rd.

15   Q.  Okay.  So --

16   A.  And -- and that was CBP then too.

17   Q.  Okay.  So the last deployment of any chemical weapons was

18   October 3rd?

19   A.  At Broadview, yes.

20   Q.  Okay.  And in that incident, it was CBP who deployed it?

21   A.  Mm-hmm.

22   Q.  Okay.  And of all the incidents of chemical deployment that

23   occurred over, so let's call it September, how many of those

24   were ICE deployments versus CBP deployments?

25   A.  At Broadview?

Byers - examination

92

1   Q.   Yes.

2   A.   I could not begin to tell you.

3   Q.   Okay.  That's fine.  That's fine.

4        If any protesters had been arrested at Broadview, who

5   was responsible for arresting them?  Was it ICE or CBP?

6   A.   When people would get arrested at Broadview, either/or with

7   an arrest, and then they would be detained and then we would

8   either have FBI or Homeland Security Investigations and they

9   would come in and do the follow-up actual prosecution of it.

10       So anybody that was dealing with whoever is doing

11  protection of the building at that particular time would do the

12  arrest, and then they would hold for HSI or FBI to respond.

13  Q.   And what training do ICE agents have on arresting

14  protesters while you're at, you know, protecting the facility

15  like Broadview?

16  A.   Well, it's our use of force, and we've -- we've had

17  training through the U.S. Attorney's Office, stuff like that,

18  on what qualifies as an arrestable offense, you know, based on

19  whether it's obstruction, whether it's, you know -- you know,

20  what's active resisting, stuff like that.  It's under 18 U.S.C.

21  111.  Because we also have the ability to do -- issue the civil

22  citations for misdemeanor versus a felony for those as well.

23  Because, you know, everybody has seen on social media, we have

24  plenty of people attempting to block our vehicles in and such

25  like that.

1          And then we also have literally physically assaulting

2     officers and agents, you know, coming and going, you know, from

3     Broadview because we've had a fair amount of officers get

4     injured.  You know, people throwing rocks and -- and fire --

5     and shooting fireworks and throwing bottles at officers and

6     agents at Broadview, so we had a myriad of different situations

7     that developed in people getting arrested, you know, tackling

8     officers, and that kind of stuff.

9     Q.   Okay.  And do you know approximately how many people have

10    been arrested at Broadview in association with these protests?

11    A.   Specifically at Broadview, I do not.  I just know the

12    operation overall, between -- at large, in the street as well

13    as at Broadview.

14    Q.   Okay.  And how many arrests have occurred?

15    A.   About 75.

16    Q.   Okay.  And those are all relating to protesters, correct?

17    A.   Well, it's people trying to either obstruct or assault

18    officers that are interfering or -- or assaulting an officer or

19    something like that.

20    Q.   Okay.  And that -- so that is to be -- to -- just to be

21    clear, that is separate from any arrest that ICE agents have

22    made in the enforcement of looking for targeted individuals?

23    A.   That's just United States citizens that's attempting to

24    either obstruct or -- or cause harm to one of the officers or

25    agents conducting an arrest --

Byers - examination

94

1    Q.   Okay.

2    A.   -- of an alien.

3    Q.   Okay.  And that 75 number includes people at Broadview and

4    people out --

5    A.   Yes.

6    Q.   -- within the Northern District of Illinois?

7    A.   Yes.

8    Q.   And do you know of that 75 how many people have been

9    prosecuted?

10   A.   I do not.

11   Q.   Okay.  Have ICE agents or specifically SRT members received

12   special instructions about how to deal with the press at

13   Broadview, or -- or even out in the -- out in the field?

14   A.   We have.  Generally speaking, we pretty much refer press to

15   our public affairs to deal with.  You know, we give an

16   instruction that, you know, press have the right to observe

17   and -- and record when we're in public spaces.  Pretty much

18   they're hands off, as long as they're not in the way or -- or

19   obstructing what we're doing.

20   Q.   And that -- is there anything specific to the press related

21   to use of force?

22   A.   As long as they are in their area, as long as they're not

23   in -- in the immediate area, there is -- you know, there

24   shouldn't be an issue with press, because when we give them the

25   opportunity -- like where we've discussed before, you know,

1    they're -- we give them warnings like we're supposed to when we

2    have a calculated use of force.

3            You know, has there been times when they have

4    incidental contact with -- with some of the chemical munitions

5    used?  Yes.  You know, that's very obvious that that's

6    happened.

7            You know, as far as, you know, direct -- you know,

8    there's not supposed to be any direct attack on any member of

9    the press.  And I don't believe in any that I know of at least

10   has anything -- you know, been in anything directed at a member

11   of the press, that it hasn't been complaining, oh, we're

12   supposed to go or anything like that, from an actual

13   professional journalist.

14   Q.   Okay.  And when you say professional journalists, you're

15   making a distinction among journalists?

16   A.   There's people with cell phones calling themselves

17   journalists.

18   Q.   Okay.  But if you --

19   A.   With no press credentials.

20   Q.   -- were to see, you know, press credentials or, you know --

21   A.   Different story.

22   Q.   -- a big camera, right?

23   A.   Different story.  Yeah, yeah, different story.

24   Q.   Okay.  All right.  And agents are instructed that they --

25   when they are having a calculated use of force, that they are

Byers - examination

1   to not direct it towards journalists?

2   A.   Correct.  And that's why you're always giving them warnings

3   so the journalists know to move away.  And if they don't,

4   you know, unfortunately they're going to get exposed to other

5   things.

6   Q.   Okay.  And what about people engaged in religious

7   practices?  So some of the press coverage for Broadview has

8   been individuals that are praying outside the facility.  I

9   think there was a procession of clergy members that went to

10  Broadview maybe a couple of Sundays ago that wanted to enter

11  the facility.

12       Is there any special training as to either clergy

13  members or people that are engaging in a religious activity

14  outside the facility, is there anything that relates

15  specifically to them in terms of crowd control or use of force?

16  A.   Clergy and the rest are, you know, they're treated like,

17  you know, you would anybody else that's, you know, peaceful

18  protester is the best way to put it.  You know, follow the

19  commands given.  You know, they're -- they're -- they're

20  allowed to give -- you know, move along where they're supposed

21  to.

22       The one instance that I'm aware of that I believe

23  is -- has become a subject of controversy is somebody that was

24  not following commands and ultimately got hit by PepperBalls.

25  And I believe that's because there's an edited version of -- of

Byers - examination

1    events that are -- been social -- circling on social media.

2    Q.  So you -- so you believe that the video that -- or the

3    photographs that have been distributed publicly about that

4    individual being hit with PepperBalls, that that has been --

5    those images have been edited?

6    A.  What's not being shown is he was given multiple commands to

7    remove himself from government property and didn't.

8    Q.  Okay.  Did -- were you present during that incident?

9    A.  I've seen -- I've seen the video footage off our

10   surveillance cameras.

11   Q.  Okay.  So there is surveillance cameras around the

12   Broadview facility?

13   A.  Yes.

14   Q.  Okay.  And how long are those videos kept for?

15   A.  Right now we're about 28 days.

16   Q.  So you keep everything for 28 days?

17   A.  Yeah, it writes over itself.

18   Q.  Okay.  And have you received any orders or directives to

19   preserve the surveillance footage from outside the Broadview

20   facility for the incidents that have occurred over the month of

21   September?

22   A.  I've been attempting to do so anyways.

23   Q.  You've been attempting to preserve them?

24   A.  Yes.

25   Q.  Okay.

Byers - examination

1    A.  I just had the server removed on Saturday, installed a

2    different server to try to preserve everything that we could.

3    Q.  Okay.  Okay.  So as far as you know, nothing has been

4    written over?

5    A.  Early September has.  I think -- I think we're probably up

6    to the 18th has been lost.  We may have had it for something

7    else we were trying to copy over, but we're not sure.  We

8    haven't been able to check yet.

9    Q.  Okay.

10   A.  Something I've been working on for about a week trying to

11   get everything preserved as fast as I could, but --

12   Q.  Okay.

13   A.  -- it takes a little bit of time in the middle of a

14   shutdown to come up with the money it takes to buy a

15   120-terabyte server.

16   Q.  Oh, I can understand the shutdown makes things more

17   difficult than it needs to be.

18          And are you aware of whether DHS or ICE received an

19   instruction not to write over the -- these videos, like right

20   after this lawsuit was filed?

21   A.  I know there's a preservation notice for e-mails and stuff

22   like that.  But camera footage is a little bit harder because

23   you still got to keep the camera system in place.  So that's

24   why we've been attempting to try to preserve it the best we

25   can.

1   Q.  Okay.  All right.

2   A.  We had a -- we had a different mechanism attempting to.  We

3   just haven't been able to check and see how much of it's been

4   preserved.

5   Q.  Okay.

6   A.  That's why we were trying to find another method.

7   Q.  Okay.  Give me one second.

8           THE COURT:  So, Mr. Holt --

9           MR. HOLT:  Yes, Your Honor.

10          THE COURT:  -- I'm looking at the complaint.  I am

11  seeing that the earliest date listed in the complaint is

12  September 19th, which puts us --

13  BY THE COURT:

14  Q.  You said, Mr. Byers, that the last --

15  A.  I believe I have the 19th.

16  Q.  You have the 19th?

17  A.  I -- I believe I have the 19th.

18  Q.  Okay.

19  A.  I'm right there at the cusp of it.

20  Q.  Okay.  So -- and you --

21  A.  That -- that was the date I was trying to make sure we had.

22  Q.  Okay.  And you've got the -- so you have the -- the server

23  was removed on the --

24  A.  Sat- -- this last Saturday.

25  Q.  This last Saturday, which --

Byers - examination

1  A.  I had other drives that's been on it for a week trying to

2  capture everything while we were trying to get this server in

3  place.  We just don't know how much it was capturing, trying to

4  copy while we were waiting for the server to come in.

5  Q.  All right.  So it was removed on the 18th?

6  A.  Yes.

7  Q.  And you -- have you checked to be sure that you've got the

8  19th of September captured or preserved?

9  A.  We -- we -- we have not yet.  We have to check between the

10  two different devices we used for the backup, whether the

11  server or the other devices.  We have not been able to do that

12  yet.

13        THE COURT:  Okay.  So if there hasn't been a

14  preservation order given, it needs to be given.

15        MR. HOLT:  Yes, Your Honor.

16        THE COURT:  Right?  This lawsuit was filed

17  October 6th.  I would expect that all of the video, the

18  surveillance video from around Broadview going back 28 days

19  from the 6th, you know, we want to make sure that we have that.

20        MR. HOLT:  Yes, Your Honor.  We will, you know --

21  right now we can have people making sure that that's being

22  looked at and --

23        THE COURT:  The other thing that I did not ask

24  Mr. Harvick was how long the body-worn camera footage is

25  maintained.  But -- so same thing.

1          MR. HOLT:  Yes, Your Honor.

2          THE COURT:  Right?  All of that needs to be preserved.

3          MR. HOLT:  Yes, Your Honor.

4          THE COURT:  Because what I don't want to happen,

5    right, is that we come to a preliminary injunction hearing and

6    I'm being told this was all written over and it's gone.

7          MR. HOLT:  I understand, Your Honor.

8          THE COURT:  Okay.

9    BY THE COURT:

10   Q.  Unless -- can you tell me, you mentioned that there was

11   a -- essentially a joint task force between ICE and CBP in

12   Chicago, or what --

13   A.  We have a joint operation center --

14   Q.  Okay.

15   A.  -- is what we call that we have, but that's because we have

16   HSI, ERO, and some of our DOJ partners working with us.

17         And then CBP has what they call executive operations

18   center and -- but in between the two, there's a little bit of a

19   crosstalk to deconflict targets.

20   Q.  Okay.  And the only coordination then is just to deconflict

21   targets, but not operationally for this particular Chicago

22   operation?

23   A.  No.

24   Q.  Okay.

25         THE COURT:  All right.  Any additional questions?

Byers - examination

102

1    MS. LEWIS DONNELL:  Your Honor, may we have just five

2    minutes this time?  And we can keep it short.

3    THE COURT:  That's fine.

4    All right.  So, Mr. Byers, if you want to step down

5    for five minutes, we'll take a five-minute break and see if

6    they have anything that I have missed, and then I'll have you

7    back on the stand.

8    MR. ART:  Thank you, Your Honor.

9    (Recess at 2:07 p.m., until 2:18 p.m.)

10    THE COURT:  All right.  You can all be seated.

11    All right.

12    BY THE COURT:

13    Q.  Then, Mr. Byers, who -- who would be the highest commanding

14    officer for ICE in Chicago as of today?

15    A.  The interim field office director, Sam Olson.

16    Q.  Okay.  And before Friday, this past Friday, it was Director

17    Holt?

18    A.  Hott, yes.

19    Q.  Or I'm sorry, Hott?

20    A.  Yes.

21    THE COURT:  All right.  Any other questions?

22    Okay.  Thank you.  You can step down.

23    THE WITNESS:  Thank you.

24    THE COURT:  All right.  Then why don't we take up --

25    okay.

1        All right.  Then we'll take up the issue of discovery

2   before the preliminary injunction hearing.

3        All right.  So I've got the plaintiffs' request for

4   production, and then that there were three requests for

5   depositions.

6        So I'll take the depositions first.

7        So the plaintiffs have asked for Chief Patrol Agent

8   Bovino, Field Director Hott, and Deputy Chief Patrol Agent

9   Parra.

10       And do plaintiffs -- given what you've heard today,

11  does that change any of those requests?

12       MR. ART:  I think that it will make our question -- it

13  changes our questioning in the following respect.  We can have

14  that deposition last for a shorter period of time given the

15  information that the Court has just gotten from these

16  witnesses.

17       Our concern, though, is with respect to Hott and Parra

18  that the declarations that they've submitted are entirely

19  uncross-examined at this point and we want to ask them

20  questions about what they have set out in those declarations.

21  So those two, in our view, are essential.

22       For Bovino, not only is our understanding that he's

23  the commander of Operation Midway Blitz responsible for all of

24  the operations on the ground, despite the test- -- some of the

25  testimony that we heard today, but he has -- has been onsite at

1    Broadview with The Secretary of Homeland Security saying things

2    like, this is the free arrest zone, referring to the First

3    Amendment zone that has been set up there, and has been

4    hands-on directing arrests and use of force against

5    demonstrators, and we think that showing that he is directing

6    this operation and engaged in direct viewpoint discrimination

7    is essential to our case, and so we'd ask for a very brief

8    deposition of Bovino as well.

9         THE COURT:  All right.

10        Mr. Holt.

11        MR. HOLT:  Your Honor -- Your Honor, we would -- we

12   object and oppose all depositions.  I think -- I will say I

13   think all of the discovery, you know, has to be taken into

14   consideration here because I think, you know, the defendants

15   needed a chance to have a meaningful opportunity to oppose the

16   preliminary injunction motion and, you know, it sounds like

17   there's also a class cert motion coming, and we haven't had an

18   opportunity to actually put forth a defense.  And so, you know,

19   there's ten -- I think actually 'cause one of the requests for

20   production has eight subparts, but, yeah, I'm --

21        THE COURT:  I'm getting there next.

22        MR. HOLT:  Yeah.  But I'm just saying that with all of

23   it, it -- you know, I think it makes the most sense -- I mean,

24   I think our position is that there shouldn't be depositions.

25   It makes sense that this should be decided on the papers, and,

1   I mean, plaintiffs also have declarations that they're relying

2   on; we have declarations we're relying on, and so I would say

3   that.

4         But then I would say if the Court is, you know,

5   wanting to grant depositions, I think it makes sense to have,

6   you know, one person from CBP, one person from ICE.  Because

7   the -- you know, the purpose of expedited discovery is to be

8   narrow and narrowly tailored to, you know, what needs to be

9   solicited for a preliminary injunction motion.

10        And I would just add that, you know, there's case law

11   in the Seventh Circuit, you know, courts are supposed to

12   protect defendants from, you know, unfair, broad expedited

13   discovery, and we are asking the Court to do that here.

14        THE COURT:  Yeah.  I'm not opening up the barn door at

15   this point and telling plaintiffs to have at it, right?  But in

16   terms of a preliminary injunction hearing, it's important for

17   both sides, right?  If the government came to me and said, we'd

18   also like, you know, a limited deposition of these two

19   plaintiffs or these three plaintiffs, I would allow that too.

20   I think it makes sense to have a deposition from someone from

21   CBP and ICE.

22        Mr. Byers had some information today that he could

23   provide, but there were other areas where he didn't.  So, you

24   know, I was a little I guess surprised might be the best word

25   that he had not seen any of the reports that were generated

1    from the calculated use of force at Broadview; that if he's in

2    charge of the SRT officers, and according to him, those

3    officers are the ones that deployed force at Broadview during

4    September, I'm -- had expected that he would have seen those

5    reports or reviewed those reports before coming today to talk

6    about them a bit.

7         So there definitely should be somebody from ICE.  I

8    think because Director Hott was there up until Friday and he

9    was certainly the director at the time these incidents occurred

10    and was essentially the highest commanding officer in Chicago,

11    he should know what occurred over the last month and should be

12    aware.

13         So I will limit the depositions, especially given that

14    we've spent most of today here, limit those depositions to two

15    hours.

16         MR. HOLT:  Sorry.  Which depositions?

17         THE COURT:  So for Mr. Parra, Mr. Hott, and

18    Mr. Bovino.  And that those depositions are limited to two

19    hours.  They are limited to the events that are identified in

20    the motion for preliminary injunction, and you can talk -- you

21    know, you can ask questions briefly about the scope of their

22    responsibilities and, you know, foundationally how do they know

23    what they know.

24         But, again, it's two hours.  So we're not getting into

25    a long chapter and verse of things that are not relevant to the

1   preliminary injunction hearing.

2           So, for example, questions about the Administration's

3   goals or objectives in a stepped-up enforcement operation in

4   Chicago, not relevant.  I don't think that it matters what the

5   Administration's objectives are or what goals they have or what

6   ideology is pushing this enforcement action.  It doesn't

7   matter.

8           This lawsuit and this preliminary injunction hearing

9   is all about how our ICE officers and CBP officers enforcing

10  the laws that they are enforcing and using the force that they

11  are using to enforce those laws.  So -- and whether the manner

12  in which they're doing it implicates the First Amendment, the

13  Fourth Amendment, or the religious freedom statute.  I can

14  never remember the acronym, but you know what I mean.  That's

15  what we're focused on.

16          So, you know, we'll -- I will get to the production

17  requests, but, you know, anything about the justification for

18  this enforcement activity and the need for the enforcement

19  activity, you know, any questions relating to how many people

20  they believe are living in the Northern District of Illinois

21  that do not have legal documentation, not relevant.

22          So it needs to be limited and focused to preparing for

23  the preliminary injunction hearing.  And, you know, if I am

24  getting phone calls during the deposition of, you know, Judge,

25  this was a question that they asked, I don't want to get those

1     phone calls.

2          MR. ART:  Understood.

3          MR. HOLT:  Your Honor, may I raise just one --

4          THE COURT:  Sure.

5          MR. HOLT:  -- thing that defendants are concerned

6     about?

7          We appreciate you keeping it topic-limited, but I

8     think a concern we have is we haven't seen their preliminary

9     injunction motion.  They are not filing it until I assume

10    probably, you know, the end of the day tomorrow.  And they have

11    kind of indicated that they're potentially pursuing a very

12    different theory or adding a theory, and we don't even know

13    what it is.

14         And, I mean, I just am concerned about that because if

15    they're adding something about all the things you just said,

16    that were, you know, not appropriate, I -- I'm just concerned,

17    because we don't know what their preliminary injunction motion

18    is; we don't know what their first amended complaint is.  We

19    don't know.

20         THE COURT:  Mr. Art?

21         MR. ART:  All of the theories that were in our initial

22    complaint are the same theories in our amended complaint.

23    Those theories do include a First Amendment viewpoint

24    discrimination claim, which contends, as the original complaint

25    does, that the Administration and the DHS officials on the

1   ground in Chicago are taking action to chill particular speech

2   with particular content and are retaliating against particular

3   speech with a particular content, but that's nothing new in the

4   case.

5            THE COURT:  Okay.  Well, that -- and you're right.

6   Like, that's not anything that's new.  That also doesn't

7   implicate the government's justification for increased

8   enforcement of the immigration laws in Chicago, right, that as

9   long as the -- essentially, as long as these agents are

10  seeing -- if I'm following your theory -- the agents are seeing

11  protesters saying, we don't like what you're doing, we want you

12  to leave, we don't agree with you, that the agents then are

13  retaliating against that particular viewpoint.

14           MR. ART:  Or -- or suppressing it from the outside

15  because of its viewpoint.

16           THE COURT:  Okay.  Okay.

17           MR. ART:  Right?  So -- so it will -- it will -- the

18  questioning will be about what is going on the ground -- on on

19  the ground and the reasons for it.  But, for example --

20           THE COURT:  Wait.  But when you say the reasons for

21  it, what are you saying?

22           MR. ART:  I -- I mean, I think I can be transparent

23  and say, if Secretary Noem is at the Broadview facility saying

24  to everybody there, we are going to go after them harder the

25  more they protest, that's viewpoint of discrimination --

1    THE COURT: Oh.

2    MR. ART: -- from the Secretary of Homeland Security.

3 And we intend to introduce that at the preliminary injunction

4 hearing.

5    THE COURT: Yeah. And I think that's fair in that if,

6 you know, that occurred and somebody was there, you can ask,

7 did that happen, right? But what I -- what I really don't want

8 to get into, though, is the why are you here, broadly, right?

9    MR. ART: Understood.

10    THE COURT: That is not at all relevant, that the

11 Administration is seeking to enforce the immigration laws in

12 Chicago versus in Austin, Texas, right, versus in, you know --

13 pick another city, right? Somewhere in Maine versus anywhere

14 else; somewhere in Wyoming. It doesn't matter. That is not

15 relevant.

16    MR. ART: We understand the Court's ruling.

17    THE COURT: Okay. Okay.

18    MR. HOLT: I mean, yeah, obviously, I -- I think I've

19 made the record clear that we object to it, but we understand

20 the Court's ruling as well.

21    THE COURT: Okay. All right. So two hours for those

22 three witnesses, and I think that should be enough time given

23 the information that you got today.

24    All right. So then turning to the requests for

25 production.

```
 1              All right.  So, No. 1, no, you cannot ask that.
 2              The -- and, Mr. Holt, do you have them in front of
 3   you?
 4              MR. HOLT:  Sorry.  Let me pull them up.
 5              THE COURT:  No, that's okay.
 6              MR. HOLT:  Sorry, Your Honor.
 7              Thank you.
 8              Okay.  Yes, I have them.
 9              THE COURT:  Okay.  Great.
10              All right.  So No. 1 is no.
11              No. 2, are we -- what are you looking for specifically
12   there?
13              MR. ART:  I think that it's narrower than it reads.
14   We're looking for any documents that reflect a determination by
15   the defendants that a use of force here in the Northern
16   District of Illinois against the plaintiffs was justified under
17   the circumstances.  Right?  So if they --
18              THE COURT:  So against -- well, it's not simply the
19   plaintiffs, right?  So it would be --
20              MR. ART:  All uses of --
21              THE COURT:  -- putative class members, correct?
22              MR. ART:  Correct, Your Honor, yes.
23              THE COURT:  Okay.  So -- so this would specifically
24   except any uses of force against any individuals whom ICE or
25   CBP were attempting to arrest.
```

1       MR. ART:  Not really, because we think the -- some of

2  those folks are in the -- the class, right, because --

3       THE COURT:  Well, I guess I'm -- that they are

4  attempting to arrest in connection with the enforcement of the

5  immigration laws.  So either anyone that they are targeting for

6  arrest, right?  So somebody didn't show up for their removal,

7  and they, on the ICE side, that they're going out to arrest

8  that particular person, or an individual on the CBP side where

9  they are attempting to detain somebody to determine their

10  immigration status.

11       MR. ART:  I think as long as that interpretation is

12  narrowed, that that is correct, right?  And I think our request

13  No. 5 is closely related to this.  You know, if there's a use

14  of force against civilians, journalists, clergy, demonstrators,

15  that provokes one of these reporting requirements and then

16  there's a determination made that that use of force was

17  justified under the circumstances, we just want the

18  documentation for that.

19       I don't understand based on the testimony we heard

20  today that regular enforcement operations are going to generate

21  those use of force reports.  But maybe I'm wrong about that.

22       THE COURT:  No, I thought it was anytime any agent

23  used force, they had to fill out a report.  So that's why I

24  want it limited.  I don't want in particular CBP, which it

25  seems like they're the ones that are doing most of the

1    enforcement activity currently, I'm not having them pull every

2    report where it's not related to what is at issue here.

3            MR. HOLT:  Your Honor, I -- I -- and, you know, for

4    the record --

5            THE COURT:  I know.  You object.

6            MR. HOLT:  -- yeah, we oppose.  And so -- but I am

7    trying to work with the Court on, you know --

8            THE COURT:  Mm-hmm.

9            MR. HOLT:  -- and I have been trying to talk with the

10   agencies about, like, what we can do, because we are looking at

11   nine days --

12           THE COURT:  Uh-huh.

13           MR. HOLT:  -- or I guess it would be 11 business days

14   I think after today.

15           So we're -- you know, we have -- I think if there's

16   going to be any document discovery, it needs to be like very

17   discrete things that we can do in a quick amount of time and,

18   I -- you know, based on what it seems like what the Court is

19   looking for and potentially would be helpful for plaintiffs,

20   I'm just wondering if it would make sense to have like after

21   action report, something like that, for CBP, ICE, related to

22   the incidents that they have outlined in their complaint

23   instead of just everything that's possibly happened.

24           THE COURT:  So the -- I know that the preliminary

25   injunction hearing is going to encompass more incidents than

1    what they captured in the complaint, and that's why we're

2    getting an amended complaint --

3            MR. HOLT:  Sure.

4            THE COURT:  -- right?

5            I think what would be helpful is if the plaintiffs

6    were able to identify the dates of specific incidents that you

7    want to move on for the preliminary injunction, right?  There

8    may be other things out there, but for the preliminary

9    injunction, it's not like you need every single instance.

10           So I think it would be helpful then to identify the

11   dates, provide those dates to Mr. Holt, and then you can go

12   back and look and see, okay, here are the specific dates.  Are

13   there after incident reports that were created after these

14   dates?  Are there reports in the E-STAR or SEN system; and then

15   Mr. Byers was talking about some other amorphous database.  I'm

16   not sure what that was.

17           MR. HOLT:  Sure.

18           THE COURT:  I suspect you know what that is, to check

19   there as well to see what reports or summaries were generated.

20           MR. HOLT:  Mm-hmm.

21           THE COURT:  Does that make sense?

22           MR. HOLT:  It does make sense, Your Honor.

23           THE COURT:  And can plaintiffs do that?

24           MR. ART:  Yes, Judge.

25           MS. LEWIS DONNELL:  Yes.

1          MR. HOLT:  Okay.  I would just like to raise again,

2     I -- and I get -- I am a little concerned about, you know,

3     and -- plaintiffs being able to provide just any date that they

4     want.  I -- I -- I just am concerned about our time.  And,

5     again, based on how they've been -- these -- these requests are

6     all so broad, and then we're kind of leaving it to them to tell

7     us what we're going to produce, and I just am concerned we're

8     going to get all these dates, all these things, and we're

9     trying our best.  Like, we each have such limited time, and

10    we're -- we're trying --

11         THE COURT:  I -- I understand.

12         Are you willing to limit it to a certain number of

13    incidents?

14         MS. LEWIS DONNELL:  I mean, we can, Your Honor, for --

15    for -- the preliminary --

16         THE COURT:  Yeah.

17         MS. LEWIS DONNELL:  -- for purpose of the preliminary.

18    I think we can -- you know, it sounds like by the testimony

19    today that it's not so difficult, that it's the sten -- the

20    E-STAR system, the SEN system, and then these -- I think

21    Director Byers was calling them summary reports that went into

22    the database, it seems like that's kind of narrow actually for

23    the use of force report.  So I think if we can provide dates

24    and locations, then that's not -- that is tailored to what

25    we're looking for.

1    THE COURT:  Yeah.  But I -- Mr. Holt's concern is that

2    he's going to get 50, right, and that he's got to turn around

3    and look at -- look through 50 different incidents and then try

4    to pull all of the reports for those in time to get it to you

5    to do the depositions before November 5th.

6    So can we limit it to, say, three and three?  So, you

7    know, three Broadview, three out in the field.

8    MS. LEWIS DONNELL:  Your Honor, because we're also

9    wanting to make sure that we have some of these incidents from

10   outside of the City of Chicago --

11   THE COURT:  That's why I'm saying "out in the field."

12   MS. LEWIS DONNELL:  Out in the field.  But just -- but

13   also outside of Chicago, representing --

14   THE COURT:  Uh-huh.

15   MS. LEWIS DONNELL:  -- some of the things like Mount

16   Prospect --

17   THE COURT:  Uh-huh.  Uh-huh.

18   MS. LEWIS DONNELL:  -- or Aurora, would it be possible

19   to have just a few more?  Maybe, you know -- I mean, you're

20   saying three for city --

21   THE COURT:  No, I'm saying three Broadview for ICE.

22   MS. LEWIS DONNELL:  Yeah.

23   THE COURT:  Three CBP for out in the field.

24   MS. LEWIS DONNELL:  I think our concern is that to

25   have both the incidents in Chicago but also some of the

1    suburban representation for the ones in the field, could we

2    have just a few more of them?  So we can maybe do two, maybe

3    four.  So it would be three for Broadview and then four in the

4    field.  So we can represent what's happening not just in the

5    city of Chicago.

6             MR. HOLT:  Your Honor, I mean, I will say, I -- I

7    think this kind of discovery -- again, I appreciate the Court

8    trying to narrow it for us so we can actually produce in time.

9    I -- I don't even know when the depositions are going to be, so

10   it's also concerning that, you know, they're expecting it to be

11   produced before the depositions.  I'm -- I'm not totally -- you

12   know, we'll have to figure that out.  But, yeah, I am concerned

13   about that.  I -- I think that three and three makes the most

14   sense.

15            THE COURT:  Yeah.  But now she's asking for three and

16   four, right?  Like one more is not going to kill you.

17            So why don't we do three and four.  So three Broadview

18   and -- and the Broadview, you know, it might be, like I -- as I

19   was just skimming through the complaint again, looking at the

20   dates, you know, it certainly might be that, you know,

21   Broadview is, these incidents occurred on one date, right?

22            So it's, for example, September 27th.  Like use of

23   force was used with this person and then this person, you know,

24   a few hours later.  So it might make it very easy, right, to

25   look for the reports.

1        MR. HOLT:  Yes, Your Honor.

2        THE COURT:  So I think 3 and 4 makes -- it's -- it's

3   not unduly burdensome.  And it's limited in timing, right?

4        MR. HOLT:  Yes, Your Honor.

5        THE COURT:  Because I'm certainly not expecting the

6   preliminary injunction to go for days and days and days, right?

7   So I will be in the middle of a -- yet another trial and so I

8   am -- we have put aside a day, right?  So I'm not expecting

9   that it's going to go on and on.

10        So I think that takes care of 2.

11        For 3, again, I don't think mission objectives is

12   relevant.  If there is anything beyond the use of force

13   policies that have been already provided, and I'm sure that

14   you're -- they will be provided because that's going to be

15   No. 4.  So it's is there anything extra, right, that is

16   targeted to Operation Midway Blitz.

17        So I think, Mr. -- was it Mr. Byers?  No.  I don't

18   think it was.  I guess not.  It must have been that Mr. Harvick

19   I think recalled -- that I recalled him saying -- there was

20   some discussion or testimony about before the operation in

21   Chicago started, that between LA and Chicago there was some

22   instruction about this is how we're going to operate in

23   Chicago.  I know it's here and I could skim up and find it, but

24   there was something along those lines.

25        That's what I would allow here, right?  So if there's

1   a specific instruction on either crowd control, use of force,

2   you know, permissible enforcement tactics essentially that are

3   directed specifically to Operation Midway Blitz, then that's

4   what you should provide for No. 3.  Okay.

5           MR. HOLT:  And just to clarify the request, is it

6   just, again, are we kind of focusing the use of force to -- is

7   it just generally, even like, you know, general immigration

8   enforcement?  Is that -- I mean, I don't -- I don't know what's

9   out there so I'm not saying there is.  I'm just asking to try

10  to clarify the scope of this.  And I -- I would ask that, you

11  know, if there is going to be that we kind of narrow it to

12  what's really going on here which is, you know, use of force

13  with the public, things like that, not just --

14          THE COURT:  Right.  So --

15          MR. HOLT:  -- generally.

16          THE COURT:  -- if it's related to the public, right,

17  so, for example, if coming out of LA they found that vehicle

18  pursuits were problematic, right, and it was because LA is an

19  urban area that's densely populated so you're going to be

20  running into trouble when you're doing these vehicle pursuits.

21  Now that we're going to Chicago with a similarly densely

22  populated city and an urban setting, you know, lessons learned,

23  this is what we're doing.  That -- that's what I'm looking for.

24  It may not exist.

25          MR. HOLT:  Yeah.

1      THE COURT:  But it's -- do you see what I'm saying?

2      MR. HOLT:  Yeah, I do.

3      THE COURT:  Where it's not -- it touches on either ICE

4  or CPB's -- CBP's interactions with the public.

5      MR. HOLT:  I understand.

6      THE COURT:  Right?  So even though it's in an

7  enforcement setting, it's their interactions with the public.

8      MR. HOLT:  That clarifies it.

9      THE COURT:  Does that make sense?

10     MR. HOLT:  Yes.

11     THE COURT:  Okay.  No. 4, so this I think, you can

12  satisfy this -- and I'm happy to hear if I've missed anything

13  from the plaintiffs.  But I think you can satisfy this with ICE

14  and CBP policies and regulations relating to use of force and

15  the crowd control training that we heard about, that there's

16  some crowd control training that's provided in the academy.

17  The SRTs get specialized training in crowd control.  So

18  documents that reflect that training under those kind of

19  umbrellas.

20     MR. HOLT:  Your Honor, I -- I am concerned about No. 4

21  and even what the Court is describing only because, you know,

22  training can be very sensitive.  You know, and I understand --

23     THE COURT:  Oh --

24     MR. HOLT:  -- the public, you know, the public

25  information I'm not saying that, you know, directions about how

1  you handle force, I'm not talking about that, but just, like,

2  you know, that can be used against officers if we're having to

3  disclose things.  I don't think ICE's use of force is public

4  right now.  So I think --

5         THE COURT:  So --

6         MR. HOLT:  -- that would have to be subject to a

7  protective order --

8         THE COURT:  And --

9         MR. HOLT:  -- and that's all going to have to be

10  litigated and --

11         THE COURT:  It doesn't have to be litigated.  Like,

12  I've got a standing order on -- for protective orders and that

13  I don't anticipate that there's going to be a lot of issues on

14  a protective order to get these policies.  I mean, we can get

15  that entered tomorrow, right?  That's not going to be a big

16  deal.

17         MR. ART:  We can take them attorneys' eyes until

18  there's a protective order in place.

19         MR. HOLT:  I -- I guess I'm also not totally sure, I

20  mean, because the description seemed kind of broad, like just

21  training in general.  And there was a lot of training

22  discussed, you know, from the academy, from, you know --

23         THE COURT:  Okay.  So to make it simple, right, you

24  should turn over the use of force training, so whatever

25  policies are provided at the academy for use of force.

1    There -- I know that there is quarterly training, right, in

2    both agencies for use of force.  I don't know how much it

3    changes over time.  So what I don't necessarily want to get

4    into is going back five years and a reporter pulling all the

5    training.  So --

6         MR. ART:  We're looking for just in connection with

7    this Operation Midway Blitz.

8         THE COURT:  Well --

9         MR. ART:  So I think what the Court just said --

10        THE COURT:  -- but that gets confusing, right?

11        MR. ART:  You could even see the most recent training

12   for ICE and CBP, right?  What we don't -- I think we're asking

13   this request because we intend to show that there's very little

14   training on these use of force and crowd control subjects,

15   right, and that's part of the reason that we see the unlawful

16   use of force going on, right?  So we just don't want the

17   government coming in later and saying, oh, these people are

18   trained, you know, on 20 different occasions on crowd control

19   and use of force, right? We heard testimony today that there is

20   some basic training.  There is some on-the-job training.  We

21   didn't hear a lot about the content of that training.  We don't

22   need every single document for every single federal officer in

23   the Northern District produced.  We just need to know what are

24   the governing policies and recent trainings provided to these

25   folks who are part of this operation on the use of force and

1    crowd control.

2              THE COURT:  Okay.  So then I'm going to limit it to

3    this.

4              You should provide the ICE and CBP written policies on

5    use of force, which I suspect they're, you know, condensed and

6    in one place.

7              Then whatever the most recent quarterly training on

8    use of force for ICE and CBP.  So it either would have been,

9    you know, in the third, in the second quarter, or third

10   quarter, since we're already into the fourth.  So whatever it

11   was.  They say that there's quarterly training in both

12   agencies, so just whatever the most recent one was.

13             MR. HOLT:  Understood.

14             THE COURT:  Okay.

15             MR. HOLT:  Okay.

16             MS. LEWIS DONNELL:  Your Honor, I believe there was

17   testimony earlier about SRT for the CBP officers getting a

18   special mobile unit training on use of force.

19             THE COURT:  No, SRT is ICE, and the mobile unit was

20   CBP.

21             MS. LEWIS DONNELL:  So does this include the mobile

22   unit for CBP, their use of force training?

23             THE COURT:  If it's --

24             MS. LEWIS DONNELL:  I thought there was an academy

25   training and then one that it was like a mobile unit additional

1    training.

2          THE COURT:  It was somebody.  I think it was the

3    something dispatch.

4          MS. LEWIS DONNELL:  It's CBP's mobile field force.

5    Maybe that was the additional use of force training that

6    Director Harvick spoke about earlier today.

7          Your Honor, that's crowd controlling, so maybe that's

8    why it's...

9          THE COURT:  All right.  So it's the special operations

10   detachment agents, and then they have mobile response teams

11   operating under them.

12         All right.  So he said, agents get quarterly training

13   and that -- all right.

14         MS. LEWIS DONNELL:  Your Honor, I thought -- and I

15   apologize.  I thought I heard that the mobile field force or

16   the special ops detachment group got an additional training.

17   And it may have been with respect to crowd control, the

18   suspected use of force.

19         THE COURT:  Hold on.  I got to find it.

20         MS. LEWIS DONNELL:  Sure.

21         THE COURT:  All right.  So he said that there is a --

22   there's mobile field course training which consists of crowd

23   control training and the special operations detachment agents

24   who are cross-designated under the Federal Protective Service

25   in crowd control.

1          So if you provide the crowd control training --

2          MR. HOLT:  The most recent one?

3          THE COURT:  Yes, which is the mobile field force

4    training.

5          MR. HOLT:  I -- I will say I'm a little bit concerned

6    about that one just because based on, you know, we were talking

7    about it with it being, you know, FPS is involved so there

8    would probably need to be -- you know, the agencies would both

9    need to have to review it and check it.  And I'm just -- I'm

10   just trying to figure out how we can, you know, do this in

11   whatever -- I don't even know if we have nine days because if

12   they want it before the depositions, we're talking about --

13         THE COURT:  Whatever you can do, Mr. Holt, right?

14         MR. HOLT:  Okay.

15         THE COURT:  So it looks like there's specialized

16   training in crowd control, whatever that is.  And the most

17   recent --

18         MR. HOLT:  Okay.

19         THE COURT:  -- if you just can provide it to them.

20         If FPS has to sign off but it doesn't -- I'm not

21   immersed in that world so I don't know how the agencies

22   interact with each other, but it may be that they don't and

23   it's just CBP.  If you are running into roadblocks, let me

24   know --

25         MR. HOLT:  Okay.

1      THE COURT:  -- and then we'll figure it out.

2      MR. HOLT:  Yeah.  I just know, you know, when we have,

3  like, two agencies involved, usually one agency can't just let

4  it go out the door.  And so it's just like an extra layer.

5  And, you know, I'm not -- I'm not trying to, you know, complain

6  to the Court, but I am just trying to be like, you know,

7  understand what my clients can do in just a limited amount of

8  time.  And so --

9      THE COURT:  I understand.

10     MR. HOLT:  Yeah.

11     THE COURT:  Okay.  And then any policies regarding

12 body-worn cameras, which I think we have them, actually, but

13 just to confirm that these are the most recent ones.  And if

14 there's something separate -- which in the testimony today I

15 don't know that there is.  But if there's anything that either

16 specifically deals with protests, but I think that would fall

17 under the crowd control.  So I suspect, you know, E, F, G, and

18 H all fall under their crowd control policies.

19     MR. HOLT:  Okay.

20     THE COURT:  If there happens to be something wacky out

21 there that is directed at this, produce it.  But I would be

22 surprised if that existed.

23     MR. HOLT:  Yes, Your Honor.

24     THE COURT:  Okay.  And we talked about 5 already.

25     6, no.

 1          And then 7, I don't think that's relevant to the

 2     issues raised in the preliminary injunction hearing now.

 3          MR. ART:  Could I --

 4          THE COURT:  Yeah.

 5          MR. ART:  Could I raise an example?

 6          THE COURT:  Sure.

 7          MR. ART:  In the Trump against Illinois litigation,

 8     there is an e-mail from Hott to the director at the Illinois

 9     State Police praising the Illinois State Police for keeping

10     calm at Broadview.  To the extent that the Administration or

11     the government is taking the position in this case that the use

12     of force here is because there are violent uncontrolled

13     protesters including in that Hott declaration and there's

14     communications out there with local law enforcement saying

15     everyone is doing a great job keeping it calm, we think that is

16     relevant to the case.

17          I think that part of that is subsumed in what we're

18     asking for in 8 so maybe we can start there with a narrower

19     request for things relating to the Hott declaration that the

20     government submitted and the Parra declaration that the

21     government submitted.

22          But we think that to the extent they're communicating

23     with local government and saying local government is sufficient

24     here, we don't need to interact with protesters at all, that's

25     relevant to the use of force that we're seeing against the

1    plaintiffs and the putative class members here.

2         MR. HOLT:  And, you know, I also would just like

3    the -- you know, I think when we're talking about expedited

4    discovery, it's not just what -- you know, what might be

5    relevant later on, right?  You know, this could be something

6    that would be -- and I'm not saying that it would be.  I'm not

7    saying that we would agree to it, but, like, you know, it's

8    something that could, you know, come out later in the merits,

9    assuming it gets there.

10        So I just -- I'm concerned about this too because,

11   like, I don't know if there would need to be, you know,

12   interactions with them about communications.  I just think this

13   is, like, very much on the -- it's really irrelevant, but if

14   there's -- it has marginal relevance.  And I think when we're

15   talking about limited discovery, it just -- this just doesn't

16   feel like what's needed to rule in a preliminary injunction.

17        THE COURT:  All right.  Since that -- that e-mail is

18   out there, right, at least in the case before Judge Perry.  You

19   can produce that one.

20        I see where you're going with this, but I guess I --

21   just for purposes of the preliminary injunction hearing, I

22   don't know that we need to get into all the communications,

23   particularly because, you know, we know how that ISP is present

24   at Broadview and is conducting some of the arrests that are

25   occurring at Broadview.

1       So I -- I don't -- I just think we're opening a door.

2  They're not a defendant in this case.  We are opening a door to

3  a lot of things that we don't need to for the preliminary

4  injunction hearing.

5       MR. ART:  Understood, Judge.  We'll let 7 go for now

6  at this stage of the case.

7       THE COURT:  Okay.

8       And then 8.

9       MR. ART:  8 is really A, B, and C, Judge.  And what

10 we're looking for there is the documents that we need to

11 cross-examine those witnesses who have already provided

12 declarations in the case.  So to this -- to the extent they're

13 going to say, you know, in order to provide this in my

14 declaration, I reviewed this document, and that's what made me

15 say that whatever the fact is, we want to have that document to

16 be able to ask questions about it at the limited deposition.

17 So that's all we wanted from that request.

18      THE COURT:  What's the universe of these documents,

19 Mr. Holt?

20      MR. HOLT:  Your Honor, I'm not -- I'm not honestly

21 sure.  I -- I -- you know, I don't know if I was -- we had one

22 day to respond so I'm not sure if I was able to get into each

23 one of these things.  I think -- I'll try to go back to my

24 opposition, and I think there was potentially some really

25 privileged or, you know, stuff that would be -- I think there

1   would have -- there could be a fight over protective order --

2         THE COURT:  All right.  Let me take --

3         MR. HOLT:  Sorry.

4         THE COURT:  That's all right.  Let me take a look.

5         So I think what -- so I think what the plaintiffs are

6   looking for is this.  All right.  So I'm just looking at

7   Director Hott's declaration.  And he states in his declaration

8   that there were acts of violence at the Broadview facility.

9   And he's noting, for example, that flour was poured in a gas

10   tank.  A car had its tires slashed, that he had his own tires

11   slashed for his car, that there was broken downspouts and

12   plumbing, that there were fireworks shot at officers stationed

13   outside the Broadview facility, and that tear gas was thrown at

14   officers on the weekend of September 12th through the 14th and

15   19th through the 21st.

16         If there were reports created, right, so if there

17   were -- that the agency has, right?  So it could be that

18   somebody comes out and sees that their car was vandalized and

19   they file a police report, but they don't have -- the police

20   has a copy of the report.  CPD has a copy of the report.

21   Broadview police has a copy of the report and nobody else does.

22   I don't expect you to produce that.

23         If there are any reports that ICE has to substantiate

24   what was said in the declaration, that's what I want you to

25   produce.

1     MR. HOLT:  Just generally in the declaration?  I mean,

2  every paragraph?

3     THE COURT:  Not -- not every paragraph, but what -- I

4  think what you're looking for, Mr. Art, right, is that Director

5  Hott was detailing incidents of violence against ICE officers

6  at Broadview that justified the subsequent use of force against

7  protesters at Broadview.  And so they want to test through any

8  documentary evidence that might exist whether these incidents

9  described occurred.

10     So if -- if there are reports, then ICE should provide

11  those reports.  If there are none, then there are none, right?

12  And it very well could be that there are none, right?  I would

13  not expect ICE to keep police reports filed with the Broadview

14  Police Department because somebody came out and their tires

15  were slashed, right?  So it's whatever ICE has that would

16  document these incidents.

17     MR. HOLT:  I understand, Your Honor.  I guess one

18  thing I would say is I -- I -- I'm not sure why plaintiffs

19  couldn't just say that, you know, if we -- if this is his

20  testimony and we don't have anything, we don't produce

21  anything, why can't they just say, we don't have a report?  You

22  know, that's like a cross question, that they could just say,

23  you know, we don't -- you don't have any documentation of this,

24  do you?  You know, that's -- that's what you can do in cross.

25  So I --

1           THE COURT:  I mean --

2           MR. HOLT:  -- I'm just trying to like -- I'm trying to

3  limit what we can -- I'm trying to realistically, you know,

4  think about what we can do.  And I guess --

5           THE COURT:  -- they --

6           MR. HOLT:  -- if there's nothing, that just seems like

7  that's what you can do in cross.

8           THE COURT:  They -- they could, right?  They could.

9  What I think what they're trying to prevent is that when

10  they're deposing Mr. Hott that they say you don't have any

11  reports on any of this, and he says, but, my friend, why, yes,

12  I do.  And then they say, well, we didn't get any, and then he

13  says, well, you never asked for them.  That's what they're

14  trying to avoid.

15          So it might be that there aren't any.

16          MR. HOLT:  Okay.

17          THE COURT:  And if there aren't any, that's fine.  And

18  there could be a very reasonable reason for why there aren't

19  any.  And it's not that the events didn't happen.  It's that

20  ICE is not in the business of creating reports for things that

21  happened in their parking lot.

22          MR. HOLT:  So just to clarify, is it kind of like

23  official reports that we're talking about, that you're looking

24  for, that would support, you know, incidents, kind of official

25  reports of law enforcement?  Is that what we're trying to

1    narrow to 8?

2          MR. ART:  Judge, we don't -- we see don't this as

3    expansive.  They've provided a declaration.  It said -- it says

4    this limited set of events occurred.  If they have a report

5    that supports that or refutes it or a video that supports it or

6    refutes it or any kind of document as that term is defined, if

7    the Court said it refutes it, they should provide it because

8    it's what their witness is saying.  We're going to cross that

9    witness.  And as Your Honor says, we would like the cross to be

10   forceful to the extent that it can be, or if the witness is

11   corroborated by extrinsic evidence, then we will know that that

12   is evidence that we are contending within this case.  But it's

13   not a huge set of documents that requires some huge search.

14   It's going to the declarant and saying, do you got anything

15   that supports that or refutes that?  And the declarant will say

16   yes or no.

17         THE COURT:  Yeah.  So I don't know that he or anyone

18   else, right, is going to make an official report because I

19   don't know what that is exactly, right?  But if he has

20   something, I got an e-mail from these three agents who came out

21   and they found flour in their gas tank, okay.  There was, you

22   know, some video that an agent sent me saying this is what

23   happened, great.  If there is some sort of report, provide the

24   report.  But it doesn't have to be the sun, the moon, and the

25   stars.  It's just if there's anything that backs up these

1    incidents of violence that he's describing in his declaration,

2    that's what it should be.

3            Does that make sense?

4            MR. HOLT:  I think, Your Honor, and that's for

5    Mr. Parra?

6            THE COURT:  And that would go for Mr. Parra as well.

7            MR. HOLT:  And, Your Honor, I -- I don't know if the

8    plaintiffs would likewise -- I think they should also be

9    producing anything that they are relying on for all of their

10   declarants as well.

11           MR. ART:  We will happily accept a document request

12   along the same lines, and we will produce those documents.

13           THE COURT:  Yeah.  I mean, nothing is preventing you

14   from, you know, using this time period to request any

15   depositions that you want or any document requests.  So, you

16   know, it's good for both sides and just limited to these issues

17   that we're discussing at the preliminary injunction hearing.

18           MR. HOLT:  Okay.

19           MR. ART:  We withdrew 9 in the reply, Your Honor.

20           THE COURT:  Okay.

21           MR. ART:  And we're going to withdraw 10 right now so

22   we're done.

23           THE COURT:  Great.  And we're done.  And we're done.

24           Kelly, for one second.

25       (Off the record.)

1      THE COURT:  Anything else that we need to deal with

2  today?

3      MR. ART:  Our team, Your Honor, is asking us to

4  request that we have another -- one additional date to file the

5  three motions so that we can digest and include the testimony

6  that was given today.  Obviously we are at the mercy of the

7  schedule and the Court's order.  So we're making the request.

8      THE COURT:  I hear your request.  I feel for you, but

9  you've got a big team, and we're already very condensed and on

10  an expedited schedule.  So if I give you one day, I get one

11  less day to read everything and prepare.  So, sorry.  There's

12  more of you than there are of me.

13      MR. ART:  Understood, Judge.

14      THE COURT:  Anything else?

15      MS. KLEINHAUS:  The motion -- we have a motion,

16  Your Honor, to enforce the Court's temporary restraining order

17  that was noticed up for today.  I don't know if you want to

18  handle that now.

19      THE COURT:  I don't.  We'll take it up as part of the

20  preliminary injunction hearing.  I think, you know, the -- some

21  of the information I got today, I would need more information

22  to determine whether those violations, those specific

23  violations occurred.

24      Of course, Mr. Holt, my understanding is that

25  certainly going forward, you know, I'm not going to be getting

1   any reports from the plaintiffs that agents and officers are

2   violating either the original TRO or the modified TRO in their

3   interactions with the general public.  You know, the

4   obligation, of course, is to just simply follow the law.

5         So I'll take it up during the preliminary injunction

6   hearing, and if there are any additional incidents, we can take

7   those up.  I think at that hearing that's when I can get more

8   information about those specific incidents and allegations.  I

9   don't know that these two witnesses would be able to answer the

10  questions that I had regarding those anyway.

11        MS. KLEINHAUS:  Yes, Your Honor.  Thank you.

12        THE COURT:  Anything else?

13        MR. HOLT:  Nothing further from the government.

14        THE COURT:  Okay.  All right.  So then if the lawyers

15  hang on and then we'll clear the courtroom just to talk about

16  this issue.

17        Okay.  Thanks, everybody.

18     (Off the record.)

19        THE COURT:  This could go under seal.

20        MR. SKEDZIELEWSKI:  Your Honor, will I be able to hear

21  this next part of the hearing?

22        THE COURT:  Yes.  So that's why we're --

23        MR. SKEDZIELEWSKI:  If I'm intended to be able to

24  hear, I can't, just --

25        THE CLERK:  Oh, you can't?

* * * SEALED PURSUANT TO COURT ORDER * * *

137

1          THE COURT:  You can't hear us?

2          MR. SKEDZIELEWSKI:  Now I can.  Something just

3    changed.

4          THE CLERK:  Okay.  So the out of room has to be on,

5    but Alex hasn't let me know he shut it off in 1903 yet.

6          THE COURT:  Okay.

7          THE CLERK:  So we're still waiting to hear back.

8          Okay.  1903 is off.

9       (Sealed proceedings heard in closed court:)

10         THE COURT:  Okay.  Great.

11         So with Mr. Byers, you know, I had the sketch artist

12    not use his facial features.  And the sketch artist showed me

13    the picture, and it's him from the side and you can't tell who

14    it is.

15         However, and you might want to pass this on to

16    Mr. Byers.  Should you do a quick Google search of his name,

17    his LinkedIn profile comes up along with his photograph.  So,

18    you know, I am very sensitive to any concerns and any threats,

19    right?  And, again, like in my position, people know my name.

20    I have to sign my name to things.  As of this last week, my

21    picture has literally been everywhere over nation -- national

22    media organizations.  You know, I had people staring me down at

23    the farmer's market on Saturday.

24         So I know it's disconcerting, but it's also the cost

25    of being a public servant.  Mr. Skedzielewski's name is all

* * * SEALED PURSUANT TO COURT ORDER * * *

1 over the place too.

2      You've got almost as much ink in the *New York Times* as

3 I did over the last couple of days.

4      MR. SKEDZIELEWSKI:  And they spelled my name right,

5 Your Honor, so that's all to the good.

6      THE COURT:  So, but, you know, going forward, though,

7 I got to say, you know, I feel slightly foolish in trying to

8 protect Mr. Byers when, you know, a simple Google search pulls

9 up his name and his picture.  And these proceedings have to be

10 public.  I mean, that's part of what we have agreed to as a

11 society.

12      So I understand folks' concerns.  But if we're in a

13 courtroom in public, I don't know that I would do that again,

14 right, especially for somebody that doesn't take a quick look

15 on Google and see that -- if I could find his picture in two

16 seconds with his name, it just looks a little silly to be

17 asking the courtroom sketch artist to blur his features when

18 he's received a threat.

19      MR. HOLT:  I understand, Your Honor, and I do want to

20 say, you know, it was kind of a quickly evolving.  You know, I

21 didn't know a sketch artist was going to be here.  Maybe I

22 should have anticipated it before and kind of thought about all

23 of that beforehand.  So I do want to, you know, represent to

24 the Court that it was not my intention in any way to create

25 that kind of a situation.  We were just trying to protect our

* * * SEALED PURSUANT TO COURT ORDER * * *

1   witness based on the information we had.

2          So I do want to represent to the Court that we, you

3   know -- we -- I was not aware of that and was definitely not

4   trying to create any kind of -- make the Court feel that way.

5   So I -- I do want to represent that.

6          THE COURT:  Okay.  So I just want to make it clear.

7          You know, I know that going forward we're going to

8   have other folks coming for the preliminary injunction hearing

9   and certainly as the case progresses, right, if we end up

10  having a trial or wherever we end up, this isn't the last time

11  we'll be in a courtroom.  And I will just be much more hesitant

12  to kind of obscure somebody's identity.

13         MR. HOLT:  I understand, Your Honor.

14         MR. SKEDZIELEWSKI:  Your Honor, will I be able to

15  quickly ask about whatever you saw on Google?  I quickly pulled

16  up his -- Mr. Byers' LinkedIn, and I'm seeing the ICE logo as

17  his profile picture.  So I hate to make a whole big thing out

18  of this, but I'm wondering if maybe you could have one of your

19  clerk's forward us whatever you saw or --

20         THE COURT:  So it was earlier today -- it was earlier

21  today, and it was his LinkedIn profile and it was his picture.

22  And it said Shawn B, I believe.  Yep.  It's right here.  So

23  it's him.  LinkedIn, and it says Shawn B, Deputy Field Office

24  Director at U.S. Immigrations and Custom Enforcement, ICE,

25  Chicago, Illinois, United States.  He's got 257 connections.

* * * SEALED PURSUANT TO COURT ORDER * * *

140

1   And he last reposted something from the GEO Group, that they

2   were now hiring.

3         MR. SKEDZIELEWSKI:  And just so I can inform him,

4   Your Honor, I'm looking at that page now too for Shawn B with

5   the same title, and I can't see his picture.  So I'm wondering

6   maybe if whatever -- whoever is searching if they're logged

7   into LinkedIn.  I'm not.  Maybe he didn't know that he took his

8   picture down publicly but left it available to people who are

9   logged in.

10         THE COURT:  Yeah, I don't know.  But, yes, we're

11   logged in, and his picture pops up.

12         MR. SKEDZIELEWSKI:  Okay.  Thank you, Your Honor --

13         THE COURT:  You're welcome.

14         MR. SKEDZIELEWSKI:  -- for the clarification.

15         THE COURT:  No, that's all right.

16         So, you know, while I am not on logged in -- or on

17   LinkedIn, you know, there are lots and lots of people who are

18   that can easily find him.

19         So, all right.  Anything else --

20         MR. HOLT:  Nothing from the government.

21         THE COURT:  -- before I leave you today?

22         MR. ART:  Nothing from the plaintiffs, Judge.  Thank

23   you.

24         THE COURT:  All right.  Thanks everybody.

25     (Proceedings heard in open court:)

1  THE COURT:  Oh, sorry.  The last thing would be maybe

2  a day before the hearing if I can get a list of the witnesses

3  that folks intend to call just so that I can prepare and then

4  any documents from either side that people intend to use with

5  those witnesses.  So you can get me an exhibit binder a day

6  before.

7  MR. ART:  We will do that, Judge.

8  I guess I would propose that the parties exchange

9  those lists a week in advance in case there are issues?  Or I

10  guess as close as possible to the response date so that we can

11  resolve any issues that come up with witnesses?  I just --

12  there have been issues with witnesses who we might say we would

13  like to call them.  They're government witnesses that seem to

14  be arising at the last minute.  We don't want those to arise

15  the day before the hearing.  We want them to arise maybe that

16  Friday, the 31st, when the government files its brief.

17  THE COURT:  Yeah.  I mean, if you know now who you

18  want to call, nothing prevents you from providing that list to

19  the government, and you can update it.

20  MR. ART:  Okay.

21  THE COURT:  That's fine with me.  I don't care.  I

22  mean, the sooner that you -- the sooner you see a problem,

23  don't wait and just let me know, and we'll deal with it.  But I

24  would just like a list of knowing who's coming and timing wise

25  because I'm in the middle -- I will be in the middle of a

1    criminal trial.  You have Wednesday.  So --

2           MR. ART:  Understood.

3           MR. HOLT:  Your Honor, I mean, I guess I'm -- on the

4    witnesses for the PI hearing, I -- I think our position would

5    be that especially given that they have depositions, and I

6    think, you know, the legal arguments are going to be quite

7    complicated and extensive and there's evidence, I think it

8    makes more sense to, you know, have it on the papers.  We have

9    the deposition testimony.  I am -- again, I'm just concerned

10   about the time that we -- you know, we all have to expend for

11   each piece of that.

12          THE COURT:  So --

13          MR. HOLT:  We're running out of -- I mean, defendants,

14   you know, need an opportunity to, you know, prep the witnesses,

15   produce -- you know, oppose the opposition, oppose the class

16   certification, and then, you know, we have to prepare witnesses

17   for the PI hearing.

18          I just -- again, I just am asking the Court for -- you

19   know, we need the chance to provide a defense.

20          THE COURT:  I understand.

21          MR. HOLT:  And I just think the -- oh,sorry,

22   Your Honor.

23          THE COURT:  No, I understand.  You know, I don't know

24   at this point who the plaintiffs intend to call at the PI

25   hearing.  And it may be, right, that there won't be many people

1    that you need to call for live testimony if you've taken their

2    deposition already and you've got documents, that most of it, I

3    anticipate, will be argument on this is why we think they have

4    violated folks' First and Fourth Amendment and religious

5    freedom rights.

6            So let's kind of run over that bridge when we get to

7    it.  I would anticipate that you'll talk to each other ahead of

8    time.

9            I mean, Mr. Art, how many witnesses are you

10   anticipating?

11           MR. ART:  I mean, I think we'll call as few as

12   possible considering that we have one day.  The thing that

13   causes us concern is if the government comes back in its

14   response brief and says here's all these witnesses who are

15   providing testimony and we have no discovery into them, no

16   ability to cross-examine them, we may have to call some of

17   those witnesses to cross-examine them at the hearing about what

18   they've said or the reasons that an injunction shouldn't issue.

19           MR. HOLT:  Your Honor, given their representation, I

20   would just ask that, you know, they'll only be allowed to call

21   witnesses that don't get deposed to the extent we rely on them

22   because, you know, they have that.  They have -- their whole --

23   their position is they want to test the government.  They can

24   do that in the depositions.

25           So we would just ask that, you know, if they have

1   taken those witnesses' deposition, they can use that.  They can

2   talk about were they cross-examined, were they impeached, were

3   they -- you know, that seems fair.

4        MR. ART:  If the government doesn't rely on those

5   witnesses to say anything new, we probably will be able to rely

6   on the depositions.

7        MR. HOLT:  I mean, I think the concern about anything

8   new, I mean, that's very expansive.

9        THE COURT:  No, I think what Mr. Art is trying to say

10  is if they -- for example, they depose Mr. Bovino and the

11  deposition occurs before the government's response.  And in the

12  response, Mr. Bovino says, and here are six other reasons why

13  the use of force was justified that wasn't covered in the

14  deposition, right, they would then want to ask about those six

15  other reasons that weren't discussed before, if the government

16  is relying on that to say a preliminary injunction should not

17  issue.

18       MR. HOLT:  I understand.  I guess I'm just concerned

19  about, you know, I don't think there's going to be a perfect

20  match as it's very unlikely that there's going to be --

21  everything is going to be matched up perfectly.  And so it's

22  like there's one or two things that's different and then we

23  have to have a hearing about -- you know, an evidentiary

24  hearing about those two things.  And, you know, and I

25  understand they're advocating for their client so it's kind of

1    their duty to try to seek as much as they can, and so I have no

2    doubt that if there's just any slight discrepancy we're going

3    to be fighting about this.

4              THE COURT:  Well --

5              MR. HOLT:  And I'm just concerned about our time and

6    our ability to, you know, do all of this and we're, you know,

7    wanting to also present our case and have the time to do that.

8              THE COURT:  And I understand.  I don't anticipate,

9    though, that any of the witnesses -- you know, there's only

10   three that are going to get deposed.  I don't anticipate that

11   any of them are then later going to say something or provide a

12   declaration that is either wildly different than what they

13   testified to in their deposition or discusses things, you know,

14   brand-new things that they were not deposed about.  You know,

15   they should have knowledge, the three of them, about what has

16   been happening from the beginning of September to the middle of

17   October.

18             And now that the TRO is in place, I certainly don't

19   anticipate, for example, that we're going to have further

20   incidents at Broadview.  I -- you know, Mr. Byers said they

21   haven't deployed a chemical weapon since October 3rd.

22             MR. HOLT:  Sorry.

23             THE COURT:  Oh, that's okay.

24             Since October 3rd, right?

25             So I just suspect that with the TRO in place, having

1   had these hearings now over multiple days, being all over the

2   news, things are going to quiet down and that nobody wants any

3   more attention on these issues.

4         So I don't think that from -- you know, if Mr. Bovino

5   were to be deposed Friday, for example, that from when he's

6   deposed Friday to when you file your response the following

7   Friday, that if there's a declaration attached to your response

8   from him that it's going to say all of these other things that

9   happened over that week.  I don't anticipate that that's going

10  to happen.

11        MR. HOLT:  I -- I -- I just want to kind of clarify,

12  though, because, you know, for example, if there's -- we're

13  talking about -- I'm just going to pick a random date, you

14  know, September 17th.  I don't know if anything happened that

15  day --

16        THE COURT:  Yeah.

17        MR. HOLT:  -- but, you know, if something happened,

18  you know, they're going to probably get into very specific

19  things that helps their case --

20        THE COURT:  Mm-hmm.

21        MR. HOLT:  -- and they might not get into other things

22  that happened on September 17th, you know, for their own case.

23  So if we come in and we provide extra context that they didn't

24  want to ask about --

25        THE COURT:  That's --

1          MR. HOLT:  -- and that suddenly turns into more --

2          THE COURT:  But that's fine.  Then you live with it,

3     right?  Like that's what happens, you know, on summary judgment

4     all the time, is that somebody gets deposed for strategic

5     reasons.  The other side doesn't ask about it.  And then, you

6     know, you provide a declaration in support of your motion for

7     summary judgment that says X, Y, Z, you know, if they didn't

8     ask about it, that's too bad.

9          MR. HOLT:  I -- I guess what I'm asking is, though,

10    are we going to have to then bring in that witness because they

11    chose not to ask those questions about the September 17th

12    incident?  I guess that's -- I'm just trying to figure out,

13    like, how broad -- I feel like if -- if we're talking about

14    totally different incidents that they didn't -- but they --

15    they're going to be strategic about what they bring up and

16    then, you know, if we don't bring -- if we bring in something

17    else that they didn't want to talk about, then --

18          THE COURT:  Well then --

19          MR. HOLT:  -- you know, we're penalized and we have to

20    bring in the witness for that.

21          THE COURT:  Not necessarily, right?  And I think

22    it's -- if it's something that -- if it's an issue, I will look

23    at it.  But if it's something that the plaintiffs had the

24    opportunity to ask about and then didn't, for whatever reason,

25    right, then I'm not necessarily going to say, okay, well, now

1    this person is going to come in and we're going to talk about,

2    whatever, September 17th or whatever happened on that date.

3    It's -- you know, you've got to live with the record you've

4    created.  And that's what we'll do.  Okay?

5         MR. HOLT:  Yeah.

6         THE COURT:  It's more that if in the declaration he's

7    talking about here are these other reasons or other things that

8    if the plaintiffs ask, so what were the justifications for

9    using force on this specific day with this specific incident.

10   And then just use -- I'm going to just keep it consistent and

11   use Mr. Bovino as the example.  And he says, here are the five

12   things that happened that went into the decision to use force

13   on this day regarding this incident.

14        Then we get a declaration, and he says, oh, yeah,

15   there are also seven more, right?  That's the problem.

16        MR. HOLT:  I understand.

17        THE COURT:  Right?

18        MR. HOLT:  Yeah.

19        THE COURT:  So that if the plaintiffs follow up that

20   question with, is there anything else?  And he says, nope,

21   that's it.  And then the declaration says, well, no, actually,

22   there were seven more.  Then, yeah, right?

23        MR. HOLT:  Mm-hmm.

24        THE COURT:  Like, that's -- then I want to know --

25        MR. HOLT:  Yeah.

1   THE COURT:  -- from him why are we now getting seven

2   more, right?

3   MR. HOLT:  That makes sense.  I just wanted it to be

4   clear that, you know, if they have the opportunity to ask about

5   it, they strategically choose not to, that we don't get

6   penalized.  I think it makes sense if there's a discrepancy

7   between the deposition and we provide all of this extra stuff

8   as you said, that makes sense to say, okay, well, you need to

9   come in here and explain that.

10   THE COURT:  Right.

11   MR. HOLT:  But I just don't want it to be like they

12   chose -- choose -- specifically choose for whatever reason, you

13   know, not to talk about September 17th and we want to talk

14   about September 17th.

15   THE COURT:  Sure.

16   MR. HOLT:  I just -- I just don't want it to be like

17   well, you know, there's -- we didn't get -- you know, you had

18   the opportunity to talk about September 17th.

19   THE COURT:  Mm-hmm.

20   MR. HOLT:  And so I -- I appreciate the Court -- you

21   know, that distinction.

22   THE COURT:  Okay.  So -- and, you know, what could

23   easily happen if something like that occurred where

24   Mr. Bovino -- and I'm not picking on him, but just as my

25   example -- were to come in and say, oh, yeah, there's seven

1   more, it could be too that we don't call him and then the

2   inference is that these seven additional things, it's just not

3   credible --

4           MR. HOLT:  Sure.

5           THE COURT:  -- right?

6           MR. HOLT:  Yeah.

7           THE COURT:  Because you had the opportunity to ask

8   about it or talk about it.  You chose not to.  Now you're

9   coming up with these extra things.  You know, the options are

10  you come in and testify and explain why you didn't talk about

11  it, or I just simply find that you are not credible.

12          So I don't -- again, I think everybody can be

13  reasonable and recognize that, you know, we are in an expedited

14  process.  So it's not going to be the sun, the moon, and the

15  stars and that we are focused only on the issues that were --

16  that are going to be presented in the motion for preliminary

17  injunction, right?

18          MR. HOLT:  Yes, Your Honor.

19          THE COURT:  And then we'll go from there and then we

20  open it up to the sun, the moon, and the stars.  But for now,

21  that's not what we're doing.

22          MR. HOLT:  And I think the government would ask that,

23  you know, to the extent that this issue does come up where, you

24  know, we have he's -- the declarant is adding on extra

25  justifications that he didn't provide to plaintiffs that, you

1   know, if the Court does want to hear from that witness, you

2   know, depending on which way the Court wants to go, whether

3   just, you know, negative inference or wants to hear, that, you

4   know, it's limited to those things as opposed to, you know,

5   rehashing the whole deposition again.

6           THE COURT:  Yeah.  And so, Mr. Holt, I know you

7   haven't practiced here in my courtroom with me.  I don't allow

8   folks to sandbag each other, right?  And if you haven't noticed

9   yet, I try to be fairly efficient, right?  And so -- and keep

10  things pretty targeted, right?

11          So I can promise you that there is no way that I have

12  the patience or inclination to sit through somebody's testimony

13  when they've already been deposed and I've got the deposition

14  transcript in front of me and I've already read it.  I -- I

15  don't even watch reruns.  Like, I just don't have the patience

16  for it, right?

17          So I can promise you that's not going to happen.

18          MR. HOLT:  I appreciate that, Your Honor.

19          THE COURT:  Okay.  Okay.

20          Anything else?

21          MR. ART:  Nothing from plaintiffs.

22          MR. HOLT:  I'm sorry to add on.  I know this is

23  getting long.  I'm really sorry, Your Honor.

24          I guess one clarification on, you know, relying on

25  declarations and, you know, would that apply to the witnesses

1    that came here, you know, could we rely upon them and, you

2    know, assuming, you know, that the same rule would apply, you

3    know, if they talked about the things that Your Honor asked

4    about, we could rely upon that as well without having to have

5    them come in and testify again?

6         THE COURT:  Well, I'm not going to hear again from

7    somebody on topics that I already heard from.  So I don't

8    anticipate that the plaintiffs would seek to call Mr. Byers

9    again to talk about what he talked about here, right?

10        MR. ART:  I can't -- I can't imagine we would, but if

11   Mr. Byers submits a declaration that's like guess what, I

12   didn't tell the judge about all these things that justified the

13   use of force at Broadview during my tenure there, then of

14   course we're going to call him.

15        THE COURT:  Yeah.  But I -- I don't anticipate -- I

16   mean, you can rely on their testimony that they gave today.  I

17   don't want to hear from them again live unless they have

18   something new to tell me, but I don't want to sit through this

19   again, right?

20        MR. HOLT:  Yeah.

21        THE COURT:  Okay.

22        MR. HOLT:  Thank you, Your Honor.

23        THE COURT:  I hate to ask this again.

24        There's nothing else, right?

25        MR. HOLT:  There's nothing from the government.

1          MR. ART:  Nothing from plaintiffs.

2          THE COURT:  All right.  Woo-hoo.  Then we're done.

3          MR. ART:  Thank you, Judge.

4          THE COURT:  We're done.

5          MS. LEWIS DONNELL:  Thanks, Judge.

6          THE COURT:  All right.

7      (Concluded at 4:05 p.m.)

8

9

10                          *   *   *   *   *

11      I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13  */s/ KELLY M. FITZGERALD*                    *October 21, 2025*
    KELLY M. FITZGERALD, RPR, RMR, CRR
14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25