Docusign Envelope ID: 22E56E2A-24D9-4FF3-A3A9-8769B3467DA5

<u>FIRST SUPPLEMENTAL DECLARATION</u>
<u>OF GIL KERLIKOWSKE</u>

I, Gil Kerlikowske, declare the following is true and correct:

1.      I submit this declaration as a supplement to my initial declaration, available at Docket No. 22-32.

2.      My significant law enforcement policy and practical experience, spanning nearly five decades, is described in my prior declaration.

3.      I am a recognized expert in the policy, practices, and training of federal immigration policing and enforcement. Among other relevant roles in the federal government, I served as Commissioner of U.S. Customs and Border Protection (CBP), which is a component of the Department of Homeland Security (DHS). In that capacity, I managed the largest law enforcement organization in the country, with over 60,000 employees and a budget of $13 billion.

4.      I am also a recognized expert in protest policing. Again among other relevant experiences, I served for nearly a decade as the Chief of Police of Seattle. In that and other positions, I have set department policy, supervised line officers, and personally participated in the policing and crowd control response to hundreds of protests, some of them very large and some turning volatile.

5.      I have been asked to offer my professional opinions about the use of force and protest policing standards and training applicable to DHS agents and whether federal agents in Broadview, Illinois and other areas in the Chicago metropolitan area are meeting those standards. This report expands upon my initial report on these matters.

6.      I have also been asked to evaluate and opine on the public safety impact of federal agents' conduct in response to protests in the greater Chicago area.

7.      I have also been asked to evaluate whether federal agents in the Chicago

**EXHIBIT 78**

metropolitan area have been performing protest policing tasks that fall outside the scope of their training and experience.

8.      Finally, I have been asked to evaluate and opine on the size and nature of the protests that federal agents have met with force in the Chicago area in recent months and the size and nature of law enforcement response warranted.

9.      I base this declaration on my nearly fifty years of experience in local and federal law enforcement, as further detailed in my initial report, including with respect to protest policing, the use of force, and the training of federal law enforcement.

10.     My conclusions are as follows:

**Opinion No. 1**: In my initial report, I evaluated materials that showed many instances of federal agents using force and less-lethal munitions against protestors and journalists at the Broadview Processing Center in a manner that significantly departs from the standard practices and accepted training for policing in a protest setting. In this supplemental report, I evaluate materials from several other locations, including in dense residential areas in Chicago, and conclude that the uses of force and less-lethal munitions that I reviewed are also inconsistent with the standard practices and accepted training for policing in a protest setting.

**Opinion No. 2**: DHS is directing its law enforcement officers to conduct operations, particularly concerning protest policing, that exceed the scope of their training, experience, and expertise.

**Opinion No. 3**: DHS agents have not been following the agency's own general policing use of force standards in the Chicago metropolitan area, including by using force against people who are not an imminent threat of violence, misusing crowd-control

2

munitions and chemical irritants, and indiscriminately using disproportionate force that needlessly injures people who pose no threat to law enforcement.

**Opinion No. 4**: DHS's policing tactics in response to protests in the Chicago area are often creating additional public safety issues and provoking escalation among the demonstrators, rather than reducing such issues.

**Opinion No. 5**: Neither the protests outside the Broadview Processing Center, nor any others I have become aware of that have prompted a federal response in the greater Chicago area, are of an unusual size or nature, such that they are well within the normal scope of the response abilities for trained local law enforcement, and do not require an extraordinary response like the level of force described in my initial report and that I have observed in video.

11.     For this supplemental report, the materials I considered are

- Declaration of Rudy Villa
- Declaration of Trevor Mack
- Declaration of Andrea Pedroza
- Declaration of Manuel Garcia
- Declaration of David Beale
- Supplemental Declaration of Paul Goyette
- Video: 2025.10.12 Albany Park, blsky
- Video: 2025.10.14 East Side, blsky
- Video: 2025.10.03 Logan Square (block club, youtube)
- Video: 2025.10.03 Logan Square (reddit vid)
- Video: 2025.10.04 Brighton Park video starting
- Video: PIT maneuver on East Side, sun-times
- DHS July 2020 internal Briefing Memorandum titled "Driveby viewing of Mark

O.Hatfield U.S.Courthouse/Federal Partners Roundtable Meeting"

- DHS 2023 Policy on the Use of Force

- CBP 2021 Use of Force Policy

- DHS Office of the Inspector General Report OIG-21-31 titled "DHS Had Authority to Deploy Federal Law Enforcement Officers to Protect Federal Facilities in Portland, Oregon, but Should Ensure Better Planning and Execution in Future Cross-Component Activities"

- DHS Office of the Inspector General Report OIG-21-05 titled "Management Alert - FPS Did Not Properly Designate DHS Employees Deployed to Protect Federal Properties under 40 U.S.C. § 1315(b)(1)"

- 2023 American Immigration Council report, summarizing FOIA record requests, titled "Beyond the Border: U.S. Customs and Border Protection (CBP) Presence at Racial Justice Protests in Summer of 2020"

12.     My opinions summarized above are explained more fully below.

I.      **Opinion 1: Like for the materials I reviewed at Broadview, federal agents at other locations in the Chicago area are failing to follow standard practices and accepted training for policing in a protest setting**

13.     As I described in my prior report, I reviewed significant materials concerning the protests at the Broadview facility where "federal agents repeatedly engaged in" several types of "misuse of force after failing to adequately warn, wait, or de-escalate," including specifically that "federal agents repeatedly deployed pepper balls, tear gas canisters, flash bangs, rubber bullets, soft nose rounds, stinger grenades, and physical force without first providing adequate audible warning, time to comply, or otherwise first using de-escalation tactics" with protestors. Initial Report at 30. I have reviewed materials of spontaneous protests at several other locations that show federal agents also misusing this type of force against protestors and journalists after failing to adequately warn, wait, or de-escalate the situation.

14.     A common pattern I reviewed across the materials is the federal agents' indiscriminate and disproportionate use of tear gas against crowds that gathered in response to

4

immigration enforcement actions in a particular residential area.

15. In general, as I also described in my initial report, it is ill-advised to use tear gas in an urban residential area without taking specific precautions and considerations of the environmental factors. The reason for this limitation is that tear gas is a strong chemical irritant that can cause significant collateral harm to people who are not the target of the use of force. In a densely populated residential area, the likelihood of significant collateral harm occurring is much higher, and includes risks of injuring innocent bystanders that could include the elderly or young people.

16. Additionally, the use of tear gas canisters is a significant escalating response even against a person who may be seen as posing a threat, and should be used carefully and sparingly even in those situations. Agents should avoid deploying tear gas canisters over the head because hitting someone in the head with a tear gas canister can lead to serious bodily injury or death.

17. I reviewed materials that show federal agents are using tear gas in an indiscriminate manner in urban residential areas where it appears that many innocent people are in fact being harmed. I saw video and photos of tear gas thrown over the head of the crowd. I reviewed witness statements and video of federal agents deploying tear gas when leaving a scene. I reviewed materials showing agents deploying a very large amount of tear gas that far exceeds the needs for the crowd size even if the demonstration were to be turning into a riot (which I did not see happening in the materials I reviewed).

18. I also evaluated video and reviewed witness statements showing that federal agents' widespread misuse of tear gas included gassing local police trying to establish safety in the situation. This shows a failing of communication and coordination between federal agents and local law enforcement that hinders appropriate protest policing responses.

19.     The federal agents' misuses of tear gas that I reviewed depart from standard practices and accepted training. If officers can leave a scene with safe egress and there is no need to form a perimeter around federal property, a well-trained officer knows that they should leave the scene rather than stay and continue engaging with protestors and then escalating to using tear gas. If protest attendees are performing civil disobedience by blocking egress, a well-trained officer should know that the first response is to warn, wait, and de-escalate the situation. Federal agents can make arrests when they have probable cause to believe a person has committed a crime for which the agent has authority to make the arrest. And a well-trained federal agent should know to seek to pre-plan for interactions with protestors and facilitate opportunities for local law enforcement to handle the situation.

20.     Throwing tear gas canisters is not a first resort tactic under the standard practices and accepting training for protest policing. In the majority of circumstances where the situation is tense but there is not a clear imminent threat of violence, like in many of the materials I reviewed about spontaneous protests in the Chicago area, tear gas should not be used. It is a significant escalation permitted after lesser interventions are attempted and fail.

21.     In situations where tear gas is necessary based on an imminent threat of violence and riotous conduct, the tear gas used should also be proportionate to the scope of the threat and number of threatening people. For smaller demonstrations that are escalating to a riot (which I did not see occurring in the materials I reviewed), small amounts of tear gas can be sufficient. The large amounts of tear gas I saw being used and filling an entire intersection in residential areas appears highly disproportionate even if there were threats the agents faced that justified using some tear gas.

22.     Tear gas canisters should not be directed at individuals or deployed in a manner

that risks striking a person above the waist. Law enforcement should refrain at virtually all costs from deploying tear gas near schools, hospitals, nursing homes, or other sensitive places. Trained law enforcement officers should also avoid using tear gas without EMS readily available and without active monitoring of the wind conditions.

23. Overall in the materials I evaluated, federal agents are not abiding the standard practices and accepted training for permissible uses of tear gas in a crowd control response.

24. For example, I reviewed materials concerning the federal agents' use of force against protestors and journalists in the Logan Square neighborhood on October 3, 2025. I have read the witness statement provided by David Beale, who describes encountering DHS agents in SUV vehicles on the street, and viewing others in a helicopter overhead, while he was in the area near his child's preschool. Beale Decl. ¶¶ 2-3. Mr. Beale states that people began to gather near the vehicles and officers taunted him and others. Beale Decl. ¶¶ 4-5. He states that federal agents then, without warning or an apparent imminent threat of violence, threw a tear gas canister at the assembled crowd, and Mr. Beale provides photos of this occurrence. Beale Decl. ¶¶ 7-11. I reviewed two videos that also show a large amount of tear gas deployed in a dense urban area with many assembled people before it appears that the DHS agents' vehicle leaves the scene.[1]

25. I reviewed materials concerning the federal agents' dispersal and use of force against protestors and journalists in the Brighton Park neighborhood on October 4, 2025. For example, the witness statement of Rudy Villa recounts a spontaneous protest that occurred at two intersection areas that he estimates included about 175 people total. Villa Decl. ¶ 4. Mr. Villa recounts seeing federal agents in a large military-style vehicle called a Bearcat and an agent aimed a pepper ball gun at the crowd. Villa Decl. ¶¶ 9-10. Mr. Villa saw one or two water bottles thrown

---

[1] https://tinyurl.com/4wxrvvcp; https://tinyurl.com/7xsbwavv

at the federal agents' vehicles. Villa Decl. ¶ 12. After that, without warning, the agents started firing pepper balls at the crowd and Mr. Villa recalls three separate firing rounds, without marking off the area and creating a safe perimeter. Villa Decl. ¶¶ 13-14, 17. Mr. Villa says that he had to assist a mother with two young girls to escape the agents firing pepper balls and the chemical irritants they released. Villa Decl. ¶15. He also saw federal agents deploy tear gas without any reported threat of imminent physical harm or audible warning. Villa Decl. ¶¶ 19-20. The federal agents tear gassed protestors and identifiable journalists. Villa Decl. ¶ 22.

26.     The witness statement of Paul Goyette further describes how the Brighton Park events unfolded from the journalists' point of view. He described many federal agents, including from the photos what appear to be tactical units, at the scene carrying a mix of less-lethal munition launchers and live round firearms. Goyette First Supp. Decl. ¶¶ 8-9. He reported that Chicago police stood between the federal agents and protestors at the part of the block where he witnessed about 75-100 civilians. Goyette First Supp. Decl. ¶ 13. Then, without apparent warning or response to an imminent threat of violence, federal agents launched multiple tear gas canisters in the residential area, gassing the demonstrators, journalists, observers, and local police. Goyette First Supp. Decl. ¶¶ 15-17. Mr. Goyette also provided a statement and photos showing a federal agent dropping a flashbang grenade from a vehicle near him, with noting that the agent issued a warning. Goyette First Supp. Decl. ¶¶ 18-19.

27.     Video that I reviewed further shows these incidents in Brighton Park of a crowd assembling along the street, federal agents escalating instead of de-escalating the situation, and then deploying a large volume of tear gas in the crowd of demonstrators, clearly marked members of the press, and nearby Chicago police officers. The video I reviewed contains no audible warning or opportunity for the protest attendees to conform and avoid tear gas being deployed. These

actions appear to heighten the tensions with the crowd and devolve the gathering into further chaos rather than calm any agitation. The federal agents then immediately speed away in their vehicles, almost all of them unmarked other than the military-style Bearcat vehicle the witnesses described. Video also shows that the large volume of tear gas that federal agents deployed filled the air of multiple areas on the block, including appearing to affect the group of Chicago police officers on the scene.[2]

28. As detailed above, this indiscriminate large volume of tear gas deployed as federal agents departed a scene, without apparent warning and imminent threat of violence, does not serve a legitimate policing purpose and falls far below the standard practices and accepted training for handling crowd control situations and doing protest policing. The same can be said for the flashbang grenade Mr. Goyette describes and provides in a photo, where a federal agent from a car dropped a flashbang grenade next to a journalist who was not posing a threat of harm.

29. I reviewed materials concerning the federal agents' dispersal and use of force against a crowd in the Albany Park area on October 12. This includes the witness statement of Trevor Mack, who observed a confrontation between demonstrators and federal agents around midday. Mack Decl. ¶ 2. Mr. Mack reports that the incident began with around five to ten people standing around about three parked unmarked vehicles containing federal agents, and assembly grew to about fifteen civilians. Mack Decl. ¶¶ 3-6. The federal agents were armed with firearms carrying live ammunition, including what Mr. Mack describes was an AR15-style rifle. Mack Decl. ¶ 6. Some of the people were standing in front of the vehicles in an apparent act of civil disobedience. Mack Decl. ¶¶ 7-8. Without warning, federal agents deployed tear gas canisters at the demonstrators. Mack Decl. ¶¶ 9-10. Video of the events show the tear gas filling the air and

---

[2] https://spaces.hightail.com/space/jTjpgxmPFI

Docusign Envelope ID: 22E5652A-24D9-4FF3-A3A9-8769B3467DA5

there was neither an audible warning that the use of force would be deployed nor an opportunity to comply to avoid being subjected to the force.[3] There does not appear to be a law enforcement justification for this indiscriminate use of tear gas against the group of demonstrators that, from Mr. Mack's statement and from the video, did not appear to pose an imminent threat of physical harm to the officers. Instead, it is inconsistent with standard practices and accepted training for law enforcement to use tear gas solely to move people engaged in civil disobedience, in particular while in a dense residential area like the Albany Park intersection appears to be.

30. Finally, I reviewed materials concerning the federal agents' crowd dispersal and use of force against an assembled group in the East Side of Chicago, reportedly near the intersection of E. 105th St. and Avenue N., on October 14. The witness statement of Manuel Garcia provides details of this incident, which reportedly began with a car crash after DHS agents crashed into a vehicle during a pursuit through a residential area. Garcia Decl. ¶¶ 2-4. I have also reviewed video of the car crash, which appears to occur from federal agents in an unmarked SUV engaged in a car chase and then performing a precision immobilization technique (PIT) maneuver against another vehicle.[4] This is a highly dangerous tactic and especially so in a residential area. Trained law enforcement officers know that if the public observes such dangerous tactics used in their neighborhoods, it is not unexpected that people may react by expressing fear and anger.

31. After the crash, Mr. Garcia reports that he and other neighbors left their homes to gather at the intersection to see the crash and he began filming on his phone. Garcia Decl. ¶¶ 5-8. He describes how federal agents began aggressively arresting a girl at the intersection, which heightened tensions with the crowd. Garcia Decl. ¶¶ 9-10. Then, without any audible warnings, federal agents deployed large amounts of tear gas into the crowd and began shooting rubber bullets,

---

[3] https://bsky.app/profile/thesidewalkschool.bsky.social/post/3m2zcizy5g22l
[4] https://www.youtube.com/shorts/a2uS4NY4WBE

Docusign Envelope ID: 22E56E5A-24D9-4FF3-A3A0-8769B3467DA5

including gassing Mr. Garcia and striking him causing bruising while he was attempting to help his daughter leave the area. Garcia Decl. ¶¶ 10-11. Mr. Garcia then returned to help a woman calling for help to rescue a baby in a car seat who was being subjected to the tear gas. Garcia Decl. ¶¶ 13-14.

32.     The witness statement of Andrea Pedroza recounts similar events at this intersection on October 14. She recounts the federal agents' car crash from the PIT maneuver, where the car the agents rammed then collided into her vehicle that was parked on the residential block. Pedroza Decl. ¶¶ 5-6. She saw about twelve federal agents arrive at the scene, carrying a mix of live round firearms and less-lethal munitions, and included pointing a firearm at a minor and others. Pedroza Decl. ¶ 7, 10-12. After the assembled group of protestors were chanting at the DHS officers, Ms. Pedroza reports that without warning or instruction, the federal agents began tackling protestors. Pedroza Decl. ¶¶ 12-13. They then, also without stated warning, began deploying tear gas and pepper balls at the crowd. Pedroza Decl. ¶¶ 14-15.

33.     Video footage I reviewed shows many of these events from October 14 at the residential intersection described above, including large amounts of tear gas deployed and rounds of KIPs fired without audible warnings.[5] This includes one scene showing a tear gas canister thrown over the head of the crowd, which I explained in my prior report is deadly and only warranted when the use of deadly force is needed to respond to imminent violence. There are no audible warnings before the misuses of force being deployed in this video. The video shows Mr. Garcia fleeing tear gas filling the air of the area while helping a mother rescue her baby in a car seat.

34.     There is no protest policing purpose for dispersing the crowd and deploying tear

---

[5] https://bsky.app/profile/pritzkerposting.bsky.social/post/3m375skills25

gas in this manner and volume. The statements from Mr. Garcia and Ms. Pedroza and the video I reviewed of the events show a chaotic and uncoordinated response by agents who are not trained in policing in these urban environments with spontaneous demonstrations. The tactics evident from the witness statements and the video I reviewed show a tendency to inflame the situation, not to de-escalate it. In my opinion, the tactics federal agents used on the East Side residential neighborhood were a stark departure from standard practices and accepted training in the circumstances.

## II. Opinion 2: DHS agents are engaging in law enforcement functions outside the scope of their training and experience.

35. I am familiar with procedures and training for DHS agents, including that they receive in crowd control and protest policing. In my extensive experience in command of law enforcement officers, at both the local level and federal level, I have learned that officers need appropriate and recurring training and experience to effectively perform law enforcement functions. This is true of any function, but especially in a protest setting where officers are required to be trained specifically to protect the varying First Amendment rights of demonstrators, observers, and journalists at the protest.

36. When law enforcement officers are deployed to perform tasks that exceed their training and experience they could harm a member of their community, create situations in which they are likely to be harmed, and make problems worse rather than solving problems and force other officers to arrive at the scene of an incident to resolve the issue properly.

37. The federal agents under my command at CBP had vastly different training and experience than the officers under my command as in Seattle and Buffalo.

38. DHS agents generally do not receive specific training on policing protests, particularly in urban environments. They receive a small amount of training during basic

instruction, but the majority of agents in my experience do not undertake the more specific training modules and recurring training that is required to be equipped and properly guided for protest policing.

39.     These training shortcomings for DHS agents meeting standard and practices for protest policing were on display in Portland in 2020, where both internal and public government reviews of the use of DHS agents at the demonstrations there show that the agents were not properly assigned and trained to handle crowd control and protest situations.

40.     For example, I have reviewed an internal DHS memo about the use of federal agents in Portland in 2020 that explained at least some of the DHS agents sent to Portland and "assigned to support the civil unrest and riots do not specifically have training in riot control or mass demonstrations."[6] For example, the CBP tactical unit called BORTAC is trained and experienced in interdicting dangerous drug smuggling organizations. That context is far different from the training and experience needed to police protesters in cities.

41.     A DHS inspector general report also specifies that "Law enforcement officers from CBP, ICE," and other agencies seemingly not relevant here, "typically lack this precise scope of authority" for effectively policing protests at federal property. The report concludes that the DHS agents assigned to Portland in 2020 likely did not receive the additional training they would need to engage in protest policing, further supporting that DHS agents in general lack this training from the outset.[7]

42.     Internal communications obtained from public records requests about the use of

---

[6] Sergio Olmos, Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said, NY Times (July 21, 2020), https://www.nytimes.com/2020/07/18/us/portland-protests.html (linking to an internal memo photocopy, available at https://int.nyt.com/data/documenttools/dh-stacticalagent-memo2/bcc35f3303958cac/full.pdf).
[7] Department of Homeland Security Office of the Inspector General, Management Alert - FPS Did Not Properly Designate DHS Employees Deployed to Protect Federal Properties under 40 U.S.C. § 1315(b)(1), OIG-21-05 (Nov. 2, 2020),  https://www.oig.dhs.gov/sites/default/files/assets/Mga/2020/oig-21-05-nov20-mgmtalert.pdf.

Docusign Envelope ID: 22E56E5A-24D9-4FF3-A3A0-8769B3467DA5

DHS agents at protests in 2020 also show that DHS policing units are ill-equipped to engage in protest policing. Among the many internal communications showing the lack of coordination, training, and readiness for DHS agents engaging in protest policing, one CBP field liaison director wrote: "All efforts must be taken to ensure the safety of CBP personnel and they should not be placed in roles that put them in direct contact with the public since they do not possess the appropriate crowd control training and equipment."[8]

43.     Finally, a longer DHS inspector general report published in 2021 reviewed the situation in Portland specifically and detailed the many shortcomings of using DHS agents without the proper safeguards for them to adequately respond to civil disturbance. For example, the inspector general report notes that "only 7 of 63 officers we reviewed received riot and crowd control training" before being on the front line in Portland doing protest policing.[9] The report overall concludes: "Without the necessary policies, training, and equipment, DHS will continue to face challenges securing Federal facilities during periods of civil disturbance that could result in injury, death, and liability."[10]

44.     In 2021, DHS concurred with the inspector general's recommendations to provide policy and training accountability for agents that may be tasked to respond to civil disturbance and protests at federal property.[11] It estimated that the new policies and guidance would be completed June 30, 2022.[12]

---

[8] American Immigration Council, Beyond the Border: U.S. Customs and Border Protection (CBP) Presence at Racial Justice Protests in Summer of 2020 (Sept. 20, 2023) https://tinyurl.com/5y7eyp5m. This webpage summarizes and attaches the underlying records requests.

[9] Department of Homeland Security Office of the Inspector General, DHS Had Authority to Deploy Federal Law Enforcement Officers to Protect Federal Facilities in Portland, Oregon, but Should Ensure Better Planning and Execution in Future Cross-Component Activities, OIG-21-31 at 10 (April 16, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-04/OIG-21-31-Mar21.pdf

[10] Id. at 1.

[11] Id. at 16.

[12] Id.

Docusign Envelope ID: 22E56E5A-24D9-4FF3-A3A9-8769B3467DA5

45.     However, I have not seen any of these policies published, despite a May 30, 2025 report to Congress indicating that the agency completed drafting the new protest policing policies on December 31, 2024. The report to Congress says that "The Department-wide Policy for Public Order Policing is still in the approval process."

46.     From my review, it appears this overhaul of DHS's protest policing policies and trainings that the inspector general found was necessary after Portland in 2020, and DHS agreed was necessary and has purported to undertake, is not actually operative and helping federal agents meet accepted and standard practices for protest policing.

47.     Instead, in my experience, these DHS agents still lack the policies and training needed to police responsibly and to the accepted and standard practices in the protest setting.

48.     When I had thousands of officers under my command at CBP, the agents generally received training related to the unique challenges of policing the ports of entry and between the ports at the northern and southern border. They received training on how to provide security and apprehend individuals as such ports of entry. CBP officers are trained to serve in the rugged areas of the border, where backup is often miles away and radio equipment frequently fails due to the rural terrain. Given the limited resources available for police training, these federal agents would not have received training on policing urban environments such as Chicago and also would not have experience acting in this capacity in an appropriate way.

49.     The federal officers under my command at CBP never received training on how to police an area like Chicago. DHS agents are generally not trained in such tactics of urban policing. I have seen examples where DHS agents detaining an individual will throw a person to the ground or pull people out of cars to handcuff the person. These tactics result in the agents putting the arrested individual on display for a crowd, making a difficult situation much worse. An officer

following the standard practices and accepted training for protest policing would know not to conduct themselves in such a manner.

50.     DHS agents generally do not receive training on how to use less-lethal force in crowded urban environments. They likely have never received specific training regarding how to issue a crowd dispersal order, how to deal with journalists covering a protest, and how to de-escalate potentially volatile protest situations. These officers are rarely tasked with policing an urban environment. When I oversaw training CBP agents in less-lethal force, the specific task on which they were trained was the firing of pepper balls at border walls to deter individuals from scaling those walls. This task is markedly different from crowd control in urban areas.

51.     DHS agents' lack of training of policing an urban environment is apparent in observing the conduct of DHS agents in Broadview. It is my understanding, including as noted in my initial report, that the current "Operation Midway Blitz" is under the command of CBP commander-at-large Gregory Bovino, who appears to be bringing the CBP training and tactics from a significantly different border environment to the Chicago area.

52.     In Broadview, based upon my observations in media and video footage, DHS agents present are policing with masks on, with chemical munitions, without body worn cameras, without a visible identification number, and without clear communications to protestors. I would not expect to see any well-trained officers policing in such a manner. Further, I have observed DHS agents attempting to control crowds through body slams and the firing of less lethal munitions directly at people. It is my opinion that the use of physical force that results in an injury or complaint should have an accompanying arrest report. It is apparent to me that these DHS agents lack the skills and experience to address the law enforcement issues raised by protesting crowds.

53.     In my expert opinion based on my experience in protest policing, DHS agents are

not trained for handling the unique circumstances in a protest setting. In the absence of that training

and guidance, agents are left to use discretion and take uncoordinated action. It is evident from the

materials I have reviewed that, as a result, the DHS agents are not actually controlling protestors

and lessening tensions but they are inflaming the protestors and creating public safety issues.

### III.     Opinion 3: DHS agents are not complying with applicable use of force standards for even more general law enforcement functions.

54.     I am familiar with the law and regulations generally governing the use of force by

DHS agents during immigration enforcement. When I served as the Commissioner of CBP, I made

it a priority to release a revised use of force policy handbook. I also reviewed CBP's use of force

policy and made it accessible to the public. At the time, each DHS component had different use of

force policies. I viewed it as essential that the federal agents under my command only use force

when proportionate and necessary.

55.     I understand that DHS later established a formal department-wide DHS use of

force policy, and the most recent version of DHS's Department Policy on the Use of Force was

updated in February 2023.

56.     I also understand that the CBP Use of Force Policy was published in January 2021.

Both policies are cited above in the materials I considered for this supplemental report.

57.     The policies recognize certain principles applicable to the use of force by federal

agents acting under authority of DHS and/or CBP, respectively. They are for DHS agents policing

in the field pursuant to the agencies' missions of, e.g., counterterrorism, trade and travel security,

and combating transnational organized crime. They are not designed for DHS agents policing in a

protest or civil disturbance setting. As I described in my prior report and further above here, DHS

agents are not trained in protest policing and their experience policing in the field is not directly

transferable to the experience and training needed to adequately police in a protest setting.

17

58.     Nonetheless, the principles contained in these DHS[13] and CBP[14] policies are relevant to show that even if DHS use of force principles for policing in the field applied in these protest settings, the materials I have reviewed show that agents are not abiding those principles, which include:

a.  Reasonableness requirement: The DHS policy specifically provides that Law Enforcement Officers (LEOS) "may use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the LEO at the time force is applied."

b.  De-escalation requirement: The DHS policy provides that "DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage."

c.  Verbal warning requirement: The DHS policy provides that "[w]hen feasible, prior to the application of force, a DHS LEOs must attempt to identify themselves and issue a verbal warning to comply with the LEO's instructions."

d.  Duty to intervene: The DHS policy imposes a duty to intervene when excessive force is used by a DHS officer, specifically, "Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties."

e.  Pepperball restrictions: The CBP policy dictates when less-than-lethal force may be used. The policy permits Compressed Air Launchers (the FN303 that fires pepperballs)

---

[13] https://tinyurl.com/kd2uj6rv
[14] https://tinyurl.com/526e8wxw

Docusign Envelope ID: 22E56E5A-24D9-4FF3-A3A0-8769B3467DA5

to be used for "area saturation against subject(s) who, at a minimum, demonstrate active resistance." CBP Policy at 18. I understand that "area saturation" means the pepperball is fired against an inanimate object to disperse powder into an area, and not to actually strike a person at all. Furthermore, the "FN303 shall not be deployed if the officer/agent is less than 10 feet from the subject unless the use of deadly force is reasonable and necessary." CBP Policy at 18. Additionally, officers may not "intentionally target the head, neck, spine, or groin of an intended subject, unless the use of deadly force is reasonable." CBP Policy at 19.

f. OC Spray Restrictions: Oleoresin Capsicum (OC) Spray (or pepper spray) may be used to enforce a lawful order "on a subject offering, at a minimum, active resistance." CBP Policy at 15.

59. Upon reviewing the material discussed in my prior declaration and further video material discussed here, it is my expert opinion that the federal officers being used for protest policing in the Chicago area are engaging in conduct in violation of these principles, policies, and standard and accepted practices for law enforcement use of force in general policing situations.

60. For example, in my initial report and this supplemental report, I reviewed evidence of federal agents shooting pepper balls directly at people who are not acting aggressively towards the officer. Such a use of force is not consistent with standard and accepted practices, including as reflected in the DHS principles, and there is no legitimate law enforcement justification for the uses of force that I have described. I reviewed federal agents tackling and body slamming individuals at protests and throwing them to the ground. I reviewed video of, and testimony describing, federal agents throwing gas canisters onto the street, from a vehicle and a rooftop, right in the middle of an urban area, often without warning and sometimes even without any active

Docusign Envelope ID: 22E56E5A-24D9-4FF3-A3A0-8769B3467DA5

protest ongoing. These actions do not meet the standards that DHS and CBP established for their agents to follow in general policing and immigration settings, much less the more specific standard practices and accepted training needed in the unique protest setting where agents have to respect the rights of peaceful protesters, journalists, and observers.

## IV. Opinion 4: the federal officers' use of force tactics in the Chicago area is likely to create public safety problems, rather than resolve them.

61. In my many years of managing crowd control situations as a law enforcement officer in Seattle and other local police departments, I learned that the misuse of force not only can violate policy and the law, but it is also highly ineffective and often counterproductive in calming unrest.

62. The use of excessive force on demonstrators and journalists fails to de--escalate potentially tense situations at these events. Instead, public displays of force often inflames crowds. The purpose of law enforcement at these events is to de-escalate crowd tension so that necessary public operations and safety can continue while protest attendees can still exercise their rights.

63. My years of law enforcement experience have taught me that when law enforcement officers engage with individuals by tackling, body slamming, and throwing them to the ground, these actions can turn an isolated incident into a spectacle. The same can be true for shooting into a crowd with KIPs and less-lethals. When police misuse force, in my experience I have often seen an enhanced outbreak of yelling, screaming, gathering of people. What was once an isolated incident can become a crowd control issue when force is misused, requiring the use of additional officers to bring the situation under control.

64. Physical force by federal agents may continue to harm the efforts of local law enforcement to build community trust long after the deployed federal officers leave Chicago.

**V.     Opinion 5: The protests I have reviewed are not of an unusual size or nature and do not require an unusual response, including that they do not require an unusual federal militarized policing response.**

65.     I have reviewed additional video footage taken by the Illinois State Police from fixed security cameras located outside the ICE detainee processing facility in Broadview, Illinois. Specifically, I observed footage taken on Saturday, September 27, 2025, of protestors gathered on Beach Street in front of the facility. I summarized other materials concerning these events in my initial report.

66.     From the footage I reviewed, the Broadview protests appeared dramatically smaller than other protests that I managed over the course of my law enforcement career.

67.     While I was the Chief of Police in Seattle, I led our police department's response to a protest of over 25,000 people relating to immigration, a protest of over 4,000 people relating to the World Trade Organization, and protests relating to other international trade conferences.

68.     What I have observed in footage from Broadview looks nothing like the large and complicated protests I managed in my law enforcement career. I observed footage of small crowds at various times, reaching a peak of, at most, a few hundred people.

69.     In my review of camera footage from September 27, I observed passive protestors standing in a public road on which federal law enforcement wanted to drive vehicles. I observed federal law enforcement officers respond to these scenarios without any evidence of logical pre-planning, without appearing to operate in ways that would reflect proper training and coordination between officers on the ground, and with equipment ill-suited for crowd control, and using unnecessary and improper force protocols.

70.     In my review, I observed on Quad Camera #1 at 7pm on September 27 a small group of people sitting outside the facility, some with signs. A handful of people were standing in

Docusign Envelope ID: 22E56E5A-24D9-4FF3-A3A0-8769B3467DA5

the middle of the street. None of the protestors appeared to be acting aggressively or violently. Only four minutes later, I observed the federal agents advance on the group of peaceful protestors, lunging at them, and possibly dropping what appeared to be a tear gas canister in the process. Their advance was not in formation, but instead they moved forward as a rag-tag group.

71.     In my experience, it is ineffective to respond to protestors on the street in the first instance in such an uncoordinated fashion, and the lack of coordination is likely to prompt unnecessary physical contact with protestors. As I also explain above, such a response increases the risk of a violation of the use of force principles and practices that I am familiar with in both local and federal law enforcement.

72.     I observed on PTZ Camera CP52-E at 8:15pm on September 27 a group of around a hundred people, standing, holding signs, and waving flags on Beach Street along a fence. This group did not appear to me to be a violent group, one where any force was necessary, nor a group that would require military support to control.

73.     On that same camera, I observed the federal agents approach this group that was peacefully protesting with a large vehicle around 8:34pm. At 8:35pm, the vehicle approached the group with its lights flashing. A group of federal agents then stood in front of the vehicle. At 8:36pm, DHS officers aggressively approach the group and push back the protestors. At 8:36pm, I also witnessed the federal agents deploy at least one tear gas canister on this group of protestors, who only minutes earlier were simply standing peacefully with signs and flags. It appeared to me that had the officers approached the group with more coordination and pre-planning, it is unlikely tear gas ever would have been used. As I have detailed above, tear gas is a less-lethal munition that is to be used after other proper methods are attempted, none of which appear to have been used in the video I have reviewed.

74.     The size and nature of the protests outside the Broadview facility are not unusual, but instead similar to the size of small protests I saw as Police Commissioner in Buffalo, New York outside of abortion clinics, or other small-scale protest activity. Protests of this relatively small size do not warrant any extraordinary measures beyond available local law enforcement trained in protest policing.

75.     As my opinions in this report explain, for federal officials to appropriately manage the protests in Chicago and at the Broadview facility in a responsible manner, they need to engage in appropriate tactics consistent with protest policing standard practices and accepted training. They have not done so in the materials I have reviewed.

Date: 10/21/2025

/s/ R GIL KERLIKOWSKE

*Gil Kerlikowske*