**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

CHICAGO HEADLINE CLUB, BLOCK CLUB
CHICAGO, CHICAGO NEWSPAPER GUILD
LOCAL 34071, NABET-CWA LOCAL 54041,
RAVEN GEARY, CHARLES THRUSH,
STEPHEN HELD, WILLIAM PAULSON,
AUTUMN REIDY-HAMER, LEIGH KUNKEL,
DAVID BEALE, RUDY VILLA, JENNIFER
CRESPO, REVEREND DAVID BLACK, FATHER
BRENDAN CURRAN, REVEREND DR. BETH
JOHNSON, REVEREND ABBY HOLCOMBE, on
behalf of themselves and others similarly situated,

     *Plaintiffs,*

     v.

KRISTI NOEM, Secretary, U.S. Department of
Homeland Security (DHS); TODD LYONS, Acting
Director, U.S. Immigration and Customs
Enforcement (ICE); MARCOS CHARLES, Acting
Executive Associate Director, Enforcement and
Removal Operations, ICE; RUSSELL HOTT,
Chicago Field Office Director, ICE; SAM OLSON,
Chicago Field Office Director, ICE; SHAWN
BYERS, Chicago Deputy Field Office Director,
ICE; RODNEY SCOTT, Commissioner, U.S.
Customs and Border Protection (CBP); KYLE
HARVICK, Deputy Incident Commander, CBP;
GREGORY BOVINO, Chief Border Patrol Agent,
CBP; DANIEL DRISCOLL, Director of the Bureau
of Alcohol, Tobacco, Firearms and Explosives
(ATF); WILLIAM MARSHALL, Director of the
Federal Bureau of Prisons (BOP); PAMELA
BONDI, Attorney General of the United States;
KASH PATEL, Director of the Federal Bureau of
Investigation (FBI); FARON PARAMORE,
Director of the Federal Protective Service (FPS);
U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. DEPARTMENT OF JUSTICE;
UNIDENTIFIED FEDERAL OFFICER
DEFENDANTS; UNIDENTIFIED FEDERAL
AGENCY DEFENDANTS; STEPHEN MILLER,
White House Deputy Chief of Staff, and DONALD
J. TRUMP, President of the United States,

     *Defendants.*

No. 25-cv-12173

Hon. Sara L. Ellis,
District Judge

**PLAINTIFFS' FIRST AMENDED
COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

**FIRST AMENDED COMPLAINT**

Plaintiffs CHICAGO HEADLINE CLUB, BLOCK CLUB CHICAGO, CHICAGO
NEWSPAPER GUILD LOCAL 34071, NABET-CWA LOCAL 54041, RAVEN GEARY,
CHARLES THRUSH, STEPHEN HELD, WILLIAM PAULSON, AUTUMN REIDY-HAMER,
LEIGH KUNKEL, DAVID BEALE, RUDY VILLA, JENNIFER CRESPO, REVEREND
DAVID BLACK, FATHER BRENDAN CURRAN, REVEREND DR. BETH JOHNSON, and
REVEREND ABBY HOLCOMBE, on behalf of themselves and others similarly situated, by
their undersigned attorneys, hereby complain against Defendants KRISTI NOEM, Secretary,
U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive
Associate Director, Enforcement and Removal Operations, ICE; RUSSELL HOTT, Chicago
Field Office Director, ICE; SAM OLSON, Chicago Field Office Director, ICE; SHAWN
BYERS, Chicago Deputy Field Office Director, ICE; RODNEY SCOTT, Commissioner, U.S.
Customs and Border Protection (CBP); KYLE HARVICK, Deputy Incident Commander, CBP;
GREGORY BOVINO, Chief Border Patrol Agent, CBP; DANIEL DRISCOLL, Director of the
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); WILLIAM MARSHALL,
Director of the Federal Bureau of Prisons (BOP); PAMELA BONDI, Attorney General of the
United States, KASH PATEL, Director of the Federal Bureau of Investigation; FARON
PARAMORE, Director of the Federal Protective Service; U.S. DEPARTMENT OF
HOMELAND SECURITY; U.S. DEPARTMENT OF JUSTICE; UNIDENTIFIED FEDERAL
OFFICER DEFENDANTS; UNIDENTIFIED FEDERAL AGENCY DEFENDANTS;
STEPHEN MILLER, White House Deputy Chief of Staff and U.S. Homeland Security Advisor;
and DONALD J. TRUMP, President of the United States, in their official capacities, as follows:

2

## INTRODUCTION

1.      The federal government has sent federal forces to cities across the United States in order to prevent the press, elected officials, religious leaders, and civilians engaged in peaceful protest from exercising their First Amendment rights.

2.      All over the country, federal agents have shot, gassed, and detained individuals engaged in cherished and protected activities.

3.      Never in modern times has the federal government undermined bedrock constitutional protections on this scale or usurped states' police power by directing federal agents to carry out an illegal mission against the people for the government's own benefit.

4.      This lawsuit concerns the right of the demonstrator Plaintiffs to exercise their First Amendment rights to peacefully protest and to exercise their religion in the Northern District of Illinois, including the area around the ICE facility in Broadview, Illinois, and in other places where demonstrators are opposing the Administration's federal incursion into the Chicagoland area. And it concerns the rights of the journalist Plaintiffs, as well as ordinary community members, to observe, record, and report on the federal agents' activities and the public's demonstrations against them.

5.      Plaintiffs endeavor to protect their basic constitutional rights to express their views opposing the lawlessness unleashed on the Chicagoland area, and to safely report on that public outcry, without fear of again being shot, gassed, and beaten by federal agents.

6.      Following the announcement of "Operation Midway Blitz" in early September 2025, the Trump Administration has ramped up immigration enforcement operations and deployed federal officers throughout the Northern District of Illinois.

3

7.      Civilians, elected officials, and religious leaders in the community have gathered at protests sites throughout the Northern District of Illinois, including daily protests outside of the Broadview ICE facility, spontaneous protests and demonstrations at locations where ICE and other Federal Officers are brutally enforcing the immigration laws, and elsewhere, to make their voices heard in opposition to the federal government's policies and actions. The demonstrations have taken place since the onset of Operation Midway Blitz and the scaling up of federal forces in this District. Demonstrations and protests are ongoing. The vast majority of protesters are animated but peaceful. The people of faith gather in prayer. Collectively, they express their views with chants, prayer, and uplifted voices.

8.      Local and national press have continuously covered the federal law enforcement deployment to Chicago and elsewhere in this District, sending reporters to the scenes of numerous protests. They have written countless news articles, keeping the public informed and facilitating public debate in furtherance of the bedrock American democratic principle that the government is accountable to its people.

9.      Federal agents have responded with a pattern of extreme brutality in a concerted and ongoing effort to silence the press and civilians. Dressed in full combat gear, often masked, carrying weapons, bearing flash grenades and tear gas canisters, and marching in formation, federal agents have repeatedly advanced upon those present who posed no imminent threat to law enforcement. Snipers with guns loaded with pepper balls, paintballs, and rubber bullets have trained their weapons on the press, on civilians, and even on religious leaders engaged in worship. Federal agents have tackled and slammed people to the ground; they have lobbed flash grenades and tear gas canisters indiscriminately into crowds; they have fired rubber bullets and

pepper balls at selected individuals; and they have cursed and shouted at demonstrators to provoke them.

10.     In addition, federal agents have repeatedly fired less lethal crowd-control munitions directly at clearly identifiable members of the press who were engaged in reporting. They have subjected members of the press to tear gas. And members of the press have been threatened and arrested by federal officers while reporting on protests for no reason other than in retaliation for documenting the federal response to the demonstrations.

11.     Many civilians and press are being injured and sickened, to the point of serious injuries. Some are being randomly singled out for arrest. They are tackled to the ground, handcuffed, and marched into captivity at the Broadview ICE facility and elsewhere, where they are detained *incommunicado* for hours.

12.     No legitimate purpose exists for this brutality or for these arrests. The officers are not physically threatened. No government property is threatened. Defendants are acting to intimidate and silence the press and civilians engaged in protected First Amendment activities.

13.     Plaintiffs seek this Court's protection of their constitutional rights, and they ask the Court to enjoin and prevent Defendants from further use of their unconstitutional tactics.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). A substantial part of the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

### Journalist Plaintiffs

16.     Plaintiff CHICAGO HEADLINE CLUB is a non-profit membership organization of professional journalists working in the Chicagoland area with hundreds of professional journalist members. The Chicago Headline Club is the largest chapter of the Society of Professional Journalists, a national non-profit organization. The Chicago Headline Club's mission is to support member (and non-member) journalists in the Chicagoland area and to promote the values of a free press. The organization pursues this mission by offering trainings, networking opportunities, legislative advocacy, scholarships for young journalists, and by maintaining a legal defense fund to support journalists' First Amendment rights. Several journalist members of the Chicago Headline Club have been shot at with pepper balls by federal officers and subjected to other force while reporting at the Broadview facility.

17.     Plaintiff BLOCK CLUB CHICAGO is a nonprofit news organization registered in the State of Illinois. The organization delivers daily, nonpartisan, and essential coverage of Chicago's diverse neighborhoods through its newsletter, news website, and social media pages. Block Club's website is read by more than a million unique readers each month. Block Club has been covering the protests at the Broadview facility since mid-September. During that time, at least four Block Club reporters or photographers were hit with pepper balls by federal officers at the Broadview ICE facility and were at risk of enduring other forms of force, despite standing on public ways and apart from the crowd, wearing visible press credentials, and displaying other visible indications they were there as members of the press. The danger to Block Club's journalists has made it far harder to carry out its reporting at Broadview.

6

18.     Plaintiff THE CHICAGO NEWSPAPER GUILD LOCAL 34071 (CNG) is a member-led union that is a member chapter of The NewsGuild-CWA. The Guild's membership includes journalists at the Chicago Tribune, Chicago Reader, Chicago Sun Times, and City Bureau, as well as other members including Cook County Court Interpreters and the staff of labor unions and non-profits based in the Chicago area. As a labor union, CNG bargains collective agreements, and represents and organizes workers. CNG has several members who have been targeted by federal officers while reporting at the Broadview ICE facility despite being visibly identifiable as members of the press and not violating any laws or disobeying any lawful orders.

19.     Plaintiff NABET-CWA LOCAL 54041 is the Chicago chapter of the National Association of Broadcast Employees & Technicians nationwide membership union for news media. Local 54041 represents photographers and other journalists at Chicagoland broadcast news channels such as WLS (ABC affiliate), WFLD (Fox affiliate), WMAQ (NBC Universal affiliate), WSNS (Telemundo affiliate), and WGBO (Univision affiliate), and others. NABET's mission includes advocating for its members' working conditions and aiding them in the practice of journalism. As the federal violence toward journalists at the Broadview ICE facility has intensified, Plaintiff NABET-CWA has been forced to divert significant resources to tracking and responding to attacks on journalists by federal agents. At least two NABET-CWA members have been assaulted by federal agents while practicing their profession at Broadview in the past two weeks: one member was subjected to a cloud of tear gas when federal agents ordered him to get out of his clearly marked press vehicle, and the other was shot at close range in the chest with pepper balls by a federal agent.

20.     The organizations listed in paragraphs 16 to 19 above bring this action on their own behalf and, as applicable, on behalf of their members.

21.     Plaintiff RAVEN GEARY is a resident of Chicago, Illinois. Plaintiff Geary is an investigative journalist and co-founder of Unraveled Press, a local media organization. Plaintiff Geary has been reporting on the protests and federal response at the Broadview ICE facility since the beginning of September 2025. In that time, Plaintiff Geary, who always wears her press credentials as well as a helmet with "PRESS" on it, has been fired at by federal agents with pepper balls on several occasions, including on the morning of Friday, September 25, when she was hit directly in the face by an officer who shot her from approximately 30 feet away while she was standing in a public parking area, taking a picture of him. Despite the violence she has experienced, she intends to return to Broadview to continue reporting on the protests and the federal crackdown on them.

22.     Plaintiff CHARLES THRUSH is a journalism student and a contract reporter for Plaintiff Block Club Chicago. Plaintiff Thrush has been sent by Block Club Chicago to the Broadview ICE facility to report on the protests and the federal agents' actions targeting them. Plaintiff Thrush was shot in the hand while clearly identifiable as a member of the press, standing apart from protesters and videotaping as federal agents fired pepper balls at two peaceful protesters attempting to shelter behind a collapsible umbrella. Plaintiff Thrush was also subjected to tear gas and had to run to safety when officers indiscriminately fired chemical agents and kinetic crowd control devices into the crowd. Plaintiff Thrush intends to return to the Broadview ICE facility to continue reporting on the protests, but he has refrained from doing so on at least one occasion due to (and his Block Club editors') fear for his safety.

23.    Plaintiff STEPHEN HELD is a journalist and resident of Chicago. Plaintiff Held has been attending the protests at the Broadview ICE facility since they began in September and is well known to the federal officers at the facility as a member of the press. Plaintiff Held documents the protesters and the federal officer response to them with a video camera and on social media for Unraveled Press, which he co-founded. Plaintiff Held has been shot in the groin by federal officers. And on Saturday September 27, 2025, he was arrested while on a public parkway videoing officers arresting a protester and attempting to obey conflicting instructions from angry federal officers. Plaintiff Held, who was wearing no fewer than four visible indications that he was a member of the press, was tackled, thrown to the ground, handcuffed, and brought inside the Broadview facility. Hours later, he was released with no charges because he had done nothing wrong. Plaintiff Held wants to continue his work reporting at the Broadview ICE facility but is afraid that he will again be targeted if he returns.

### Other Plaintiffs

24.    Plaintiff WILLIAM PAULSON is a 67-year-old retired union painter and student at the City Colleges of Chicago who came to the Broadview ICE facility to express his opinions in opposition to ICE's tactics in enforcing the immigration laws and to bear witness there. While Plaintiff Paulson was on the public way and in the company of other protesters, a group of ICE officers emerged from behind the fence surrounding the ICE facility and, without warning or ordering dispersal, began lobbing canisters of tear gas into the crowd and throwing flash bang grenades. He was overwhelmed and began to vomit. He wishes to return to Broadview to protest, but he is reluctant to do so.

25.    Plaintiff AUTUMN REIDY-HAMER is an Oak Park resident and mother who came to the Broadview ICE facility to protest because she disagrees with rounding up

9

immigrants, separating them from their families, and denying them access to lawyers. She wanted to gather with neighbors and elected officials to speak out against this peacefully and to say that the federal officers' actions do not represent her as a citizen and constituent. A federal officer threw a flash-bang grenade next to her resulting in temporary hearing loss and ringing in her ear. Federal officers also tear gassed her. She is unable to safely exercise her First Amendment rights in the face of federal officers' actions.

26.     Plaintiff LEIGH KUNKEL is a 38-year-old resident of Chicago. She went to the Broadview ICE facility on the morning of Friday September 26th to show solidarity for the members of her community who were being held inside and support those bravely taking a peaceful stand by protesting outside. She was struck in the back of the head and then in the nose by pepper balls shot by a federal officer from close range. When she was shot, she was taking cover behind a van after federal officers had begun shooting pepper balls into the crowd without any warning or apparent justification. She left the protest with welts, a bloody nose, and a newfound fear of exercising her First Amendment rights. She will return to the Broadview ICE facility to continue protesting and bearing witness, but she is afraid that when she does so, she will again be met with physical violence.

27.     Plaintiff DAVID BEALE is a father and Chicago resident. On October 3, 2025, as he biked to the gym, he saw ICE vehicles in his neighborhood on the Northwest Side of Chicago. He stopped to observe their activity, and along with other neighbors told ICE that he didn't want anyone to get hurt, cared about his neighbors, and expressed his belief that what ICE was doing was wrong. In response, an ICE officer called him a "faggot." And, without warning, an ICE agent threw a cannister of tear gas at the crowd, including Mr. Beale. Because of these events, Mr. Beale is reluctant to engage in similar interactions with ICE officers going forward.

28.     Plaintiff RUDY VILLA is a Chicagoan and community leader who, along with others, has worked to observe ICE activities in Chicago while trying to ensure that protests remain peaceful. On October 4, 2025, he went to an area in Brighton Park where he heard that there were people protesting ICE in response to ICE having shot someone. Mr. Villa was wearing a bright safety vest he had recently purchased. While there, he observed ICE/CPB agents trying to rile up the crowd and pointing a pepper ball gun at them. Then, without warning, they started shooting pepper balls at the crowd, including at women and children. They also, without warning, shot tear gas into the crowd.

29.     Plaintiff JENNIFER CRESPO is a Chicagoan and an attorney who has also worked to observe ICE activities in Chicago and ensure that the community can peacefully exercise its constitutional rights. On October 4, as she stood on the sidewalk working with local law enforcement to ensure the protests remained peaceful and calm, she was tear gassed by federal agents. She remains committed to exercising her First Amendment rights and helping others do the same but is fearful of being harmed.

**Religious Freedoms Plaintiffs**

30.     Plaintiff REVEREND DAVID BLACK is an ordained minister in the Presbyterian Church (PCUSA) who serves as Senior Pastor and Head of Staff at the First Presbyterian Church of Chicago in the Woodlawn neighborhood. As Rev. Black stood in the street offering prayers and urging ICE officers stationed on the roof of the Broadview ICE facility to repent from their unnecessarily brutal enforcement of the immigration laws, the ICE officers suddenly and without warning fired upon him, striking him repeatedly in the head with pepper balls. Moments later he was sprayed in the face with tear gas by officers on the street.

11

Rev. Black is called by his faith to return to Broadview to pray for ICE officers there, but his experience requires him to overcome fear in order to do so.

31.     Plaintiff FATHER BRENDAN CURRAN is a Catholic priest and a member of the Dominican Friars with the Province of St. Albert the Great, USA. He is the North American Dominican promoter for justice and peace and a member of the Dominican International Commission for Justice and Peace. He has been regularly attending Friday prayer vigils at Broadway Detention Center for 19 years and was among the original Catholic priests to start those vigils. For approaching two decades, Father Curran has peacefully led other religious adherents in praying the rosary for people detained at Broadway Detention Center, and for employees of ICE. Up until September 12, 2025 he had done so peacefully, but beginning on that date, on the dates he gathered to pray, the intimidating and violent conduct of federal agents, including ICE officers pointed guns from the roof of the building on their vigil, forced them to move their religious activity away from the ICE facility. Father Curran desires to continue to gather to lead others in prayer and expressions of their faith but he is in genuine fear that he will be shot, struck with pepper balls, sprayed with tear gas, or otherwise harmed if he continues to express his religious beliefs.

32.     Plaintiff REVEREND DR. BETH JOHNSON is an ordained minister in the Unitarian Universalist Church and serves a congregation in the suburbs of Chicago. She felt called by her faith to go to the area around the Broadview Detention Center to minister and witness to ICE activities there. On multiple occasions, as she gathered with other religious adherents at Broadview, praying and singing religious songs, she was tear gassed, shot with pepper balls and rubber bullets, and ultimately had to leave the area because of difficulty

12

breathing. Reverend Dr. Johnson wants to continue to express her religious beliefs at the Broadway Detention Center, but is fearful that she will be harmed if she does so.

33.     Plaintiff REVEREND ABBY HOLCOMBE is a pastor at River Forest United Methodist Church and the Urban Village Church – West in River Forest, Illinois. Reverend Holcombe's faith called her show up for people detained at the Broadview ICE facility, to pray, preach, sing, and provide spiritual comfort and healing for people at the facility. On September 19, 2025, she showed up at the facility, wearing her clerical collar, and witnessed people being hit by and suffering the side effects of being tear gassed. As she herself was preaching, she was targeted and shot at by ICE agents on the roof of the facility, forcing her to leave the area. On October 10, 2025, she returned to the facility, tried to bring communion to folks detained inside the facility, but was turned away. Although she would like to return to Broadview to continue her religious practices, she has been traumatized by what she has experienced, and she has had to limit her activities because of the risk of being injured.

**Defendants**

34.     Defendant KRISTI NOEM is Secretary of U.S. Department of Homeland Security (DHS). DHS is a Cabinet-level Department of the U.S. government. Its stated missions include anti-terrorism, border security, immigration, and customs. It was created in 2002, combining 22 different federal departments and agencies into a single Cabinet agency.

35.     Defendant TODD LYONS is Acting Director and the senior official currently performing the duties of the Director of the U.S. Immigration and Customs Enforcement (ICE), an agency housed within DHS. Its stated mission is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety."

13

36.     Defendant MARCOS CHARLES is Acting Executive Associate Director of Enforcement and Removal Operations within ICE.

37.     Defendant RUSSELL HOTT is the Chicago Field Office Director for ICE. ICE employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters. After this Court entered an order directing Director Hott to appear before this Court on October 20, 2025 in order to answer questions about ICE's activities in Chicago, DHS informed the Court that Defendant Hott had returned to Washington, D.C., purportedly to resume responsibilities as field operations director in D.C.

38.     At least as of October 20, 2025, Defendant SAM OLSON is the interim Chicago Field Office Director for ICE.

39.     Defendant SHAWN BYERS is the Deputy Field Office Director for ICE in Chicago.

40.     Defendant RODNEY SCOTT is the Commissioner of the U.S. Customs and Border Protection (CBP). CBP is an agency within DHS. Its stated mission is to "[p]rotect the American people, safeguard our borders, and enhance the nation's economic prosperity." CBP employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters.

41.     Defendant KYLE HARVICK is a Deputy Incident Commander with CBP.  In his role with CBP, he has been involved in directing CBP agents to use excessive force against protesters and journalists.

42.     Defendant GREGORY BOVINO is titularly the Chief Patrol Agent of the U.S. Border Patrol's El Centro Sector. After leading similarly violent and unlawful immigration enforcement efforts in Los Angeles in the summer of 2025, Bovino was reassigned to Chicago in

14

September 2025. He has direct responsibility for all DHS activities in Chicago. On September 27, 2025, he personally directed federal officers to use excessive force against protesters and journalists at Broadview, and he personally used such force himself.

43.     Defendant DANIEL DRISCOLL is the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). The ATF's stated mission is "[t]o conduct investigations utilizing our unique expertise, partnerships, and intelligence to enhance public safety by enforcing the laws and regulations and uphold the Constitution of the United States of America." ATF employees have been stationed at the Broadview ICE facility and are among the federal officers who have used excessive force against protesters and journalists.

44.     Defendant WILLIAM MARSHALL is the Director of the Federal Bureau of Prisons (BOP), an agency within the U.S. Department of Justice. BOP employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters and journalists.

45.     Defendant PAMELA BONDI is Attorney General of the United States, and in that position, oversees the U.S. Department of Justice.

46.     Defendant KASH PATEL is the Director of the Federal Bureau of Investigation (FBI). The FBI is an agency within the Department of Justice responsible for federal law enforcement. FBI agents are among the federal officers who have used excessive force against protesters and journalists.

47.     Defendant FARON PARAMORE is the Director of the Federal Protective Service (FPS). FPS is responsible for protecting federal property, including deputizing DHS officers as needed.

15

48. Defendant U.S. DEPARTMENT OF HOMELAND SECURITY (DHS) is a department of the executive branch of the United States government, responsible for coordinating immigration enforcement actions. ICE, CBP, and the DHS Management Directorate are component agencies within the Department of Homeland Security. Homeland Security Investigations (HSI) is a subordinate agency housed within ICE, while the Federal Protective Service (FPS) is a subordinate agency housed within the DHS Management Directorate. Likewise, CBP contains multiple law enforcement offices, including the U.S. Border Patrol and Office of Field Operations.

49. Defendant U.S. DEPARTMENT OF JUSTICE (DOJ) is a department of the executive branch of the United States government, responsible for enforcing federal law. The ATF, FBI and the Bureau of Prisons are component agencies within the DOJ.

50. UNIDENTIFIED FEDERAL OFFICER DEFENDANTS are unidentified agents and officers of federal agencies, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, who are participating in the unlawful conduct described in this Complaint.

51. Defendants UNIDENTIFIED FEDERAL AGENCIES are unidentified agencies or departments of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

52. Defendant STEPHEN MILLER is the White House Deputy Chief of Staff and U.S. Homeland Security Adviser, who has directed the actions of federal agencies and agents at issue in this case.

16

53.     Defendant DONALD J. TRUMP is the President of the United States and chief executive with responsibility for the federal agencies and agents acting under his authority.

54.     Each of the defendants is sued in their official capacity.

## ALLEGATIONS OF FACT

### The Trump Administration Deploys or Threatens to Deploy
### Federal Law Enforcement Officers and Military to Cities Across the United States

55.     During the summer and fall of 2025, the Trump Administration has deployed federal forces, including federal law enforcement officers and military forces, to cities across the United States.

56.     These deployments have been made under the guise of immigration enforcement and purportedly to protect federal employees. In truth, however, the deployments are calculated to provoke unrest, they are targeted at populations who disagree with the Trump Administration, and they are designed to suppress dissent, speech, and the press.

57.     The Trump Administration has conducted no assessment that any threat to federal employees or civilians requires displacing local law enforcement with federal forces. Instead, the Trump Administration has focused on jurisdictions where political leaders and civilian populations disagree with them and express different viewpoints.

58.     In particular, Defendant Deputy Chief of Staff Stephen Miller has directed the deployment of federal forces, acknowledging in interviews and social media posts that he himself (and not the President) is exercising the authority to "put federal law enforcement and national guard" into American municipalities.  He has recognized that by doing so he is causing the risk of riots and unrest. *Id.* According to Defendant Noem, Defendant Miller has provided direction "night and day" to DHS regarding the use of federal forces in American cities.

59. Defendant Miller has said without providing any basis and ignoring the facts that "[t]he chaos in Chicago, NY, San Fran & Dem cities across the US is solely the result of Dem officials freeing criminals over & over until they kill." He has falsely asserted "the Democrats—like Newsom and Pritzker and Schumer—are relentlessly attacking the same law enforcement heroes the cartels are targeting with violence." Defendant Miller has said, "Ideological screening is foundational to the national interest."

60. President Trump and his administration have referred to American civilians engaged in protected First Amendment activities as "anarchists," "agitators," "violent mobs," "crazy people," and "the enemy from within."

61. Following demonstrations last weekend across the United States, the President showed his disdain for protesters with whom he disagrees by posting on social media an AI-generated video of himself, crowned and flying a fighter jet, dumping diarrhea on marchers in American cities.

62. In every city to which they have been deployed, federal forces have used unjustified violence against the press, elected officials, religious leaders, and private individuals engaged in peaceful and protected activities, using extreme force indiscriminately and arresting people without any legal basis.

63. These federal forces are not trained to conduct local policing, and their presence is superfluous to trained local police agencies, who are well-equipped to address issues of local law enforcement. Local officials have roundly disclaimed the need for federal assistance in policing.

**Injunctive Relief in Los Angeles Prohibits Federal Forces
From Violently Suppressing Lawful Protests**

64. In early June 2025, the Trump Administration, without notice to local officials, began a series of indiscriminate immigration raids across Los Angeles, in which masked federal

18

officers in paramilitary gear brandished rifles and abducted community members from churches, local businesses, and courthouses.

65. Rallying to oppose the actions taken against their friends and neighbors, community members protested at locations in which ICE officers were believed to be holding community members, including the Federal Building at the Roybal Complex.

66. The overwhelming majority of the protesters exercised their First Amendment rights in a peaceful, nonviolent, and legally compliant manner. While there were isolated instances of individuals acting unlawfully, state and local law enforcement officials responded to such actions in a prompt, professional manner.

67. Nevertheless, the Trump Administration deployed thousands of National Guard troops and federal law enforcement officers to Los Angeles, purportedly to quell the violence.

68. Instead, the federal forces escalated the violence against civilians in Los Angeles, launching attacks on the press and peaceful protesters. Among other tactics, the federal forces fired volleys of tear gas, pepper balls, chemical spray, and rubber bullets indiscriminately into crowds of civilians.

69. The Trump Administration's deployment of federal forces and the tactics used in Los Angeles are at issue in *Los Angeles Press Club v. Noem*, No. 2:25-cv-05563 (C.D. Cal. 2025) (Vera, J.). In that litigation, the district judge, among other things, has preliminarily enjoined the federal defendants from "[u]sing crowd control weapons (including kinetic impact projectiles ("KIP"s), chemical irritants, batons, and flash-bang grenades) on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person." *L.A. Press Club*, No. 2:25-cv-05563, Doc. No. 55

at 43 (Sept. 10, 2025), appeal filed, *L.A. Press Club v. Noem*, No. 25-5975 (9th Cir. Sep. 19, 2025).

70.    As the federal deployment of forces in Los Angeles continued, President Trump warned that the deployment in California was "the first, perhaps, of many" federal efforts to suppress protected First Amendment activities, and that civilians demonstrating in future would be met with "equal or greater force."

### Federal Forces Are Deployed in Washington, D.C.

71.    Shortly thereafter, in August 2025, the Trump Administration deployed federal forces in Washington, D.C.

72.    Despite a historic decrease in the rate of violent crime in that city, President Trump declared that local crime was an emergency and assumed control of the city's Metropolitan Police Department.

73.    At the same time, the Trump Administration deployed thousands of National Guardsmen in Washington, D.C., authorizing them to carry firearms. A majority of these guardsmen were from out-of-district.

74.    In response, thousands of residents have gathered to peacefully protest the deployment of federal forces and National Guard on city streets.

75.    These forces have patrolled the capital's main tourist areas and neighborhoods across the city, fully armed, traveling in armored vehicles, and wearing military fatigues.

76.    The District of Columbia filed a lawsuit on September 4, 2025, seeking declaratory and injunctive relief to enjoin the overreach by the executive branch. The issues are currently being litigated.

**The Trump Administration Deploys Federal Forces to
Portland, Memphis, and New Orleans**

77.     In Portland, Oregon, civilians began peaceful protests at an ICE facility in early

June. Federal agents responded to these protests by using tear gas, pepper balls, and smoke

grenades indiscriminately, and by arresting protesters.

78.     On September 27, 2025, President Trump, stating that he was acting at the request

of Defendant Noem, ordered Secretary of Defense Pete Hegseth, "to protect War ravaged

Portland and any of our ICE facilities under siege from attack by Antifa, and other domestic

terrorists. I am also authorizing Full Force if necessary," even though there was no evidence of

any siege or attack in Portland. The Trump Administration has federalized and will imminently

deploy National Guardsmen to Portland, and it has reportedly considered sending troops from the

82nd Airborne Division, an elite combat division of the U.S. Army, to Portland.

79.     In response to the threat and deployment of the National Guard in Portland,

peaceful protests have continued at the ICE facility. Federal agents have tackled protesters and

indiscriminately used chemical agents.

80.     In New Orleans, Louisiana, the Trump Administration has made similar threats to

deploy military forces. On September 3, President Trump said, "We're making a determination

now—do we go to Chicago, or do we go to a place like New Orleans where we have a great

governor, Jeff Landry, who wants us to come in and straighten out a very nice section of this

country that's become quite tough, quite bad. So we're going to maybe Louisiana and you have

New Orleans, which has a crime problem. We'll straighten that out in about two weeks, it will

take us two weeks. Easier than D.C."

81.     Leaked plans from the Pentagon in mid-September showed the federal

government's intention to deploy 1,000 National Guardsmen to cities in Louisiana, including

New Orleans, contingent on Governor Jeff Landry requesting the National Guard. Governor Landry made that request on September 29, asking Secretary Hegseth to deploy 1,000 guardsmen to address "ongoing public safety concerns regarding high crime rates," although New Orleans is currently experiencing some of its lowest crime rates in decades.

82.     In Memphis, Tennessee, the Trump Administration has taken similar action. On September 15, President Trump signed an order establishing a "Memphis Safe Task Force," in response to the "dire" situation in Memphis where "tremendous levels of violent crime [] have overwhelmed its local government's ability to respond effectively," although some crime rates have declined in the last twenty months. This task force includes the deployment of federal agents as well as military forces. A member of President Trump's administration told the task force that they are "unleashed," and that the goal was to "bulldoze the criminal elements in the city, and therefore liberate the law-abiding citizens." On October 10, National Guard members patrolled at a sporting goods store and at a tourist welcome center in Memphis.

83.     On October 17, 2025, public officials with the City of Memphis and Shelby County, Tennessee, sued officials over the deployment, arguing that it violated Tennessee law. *Harris, et al., v. Lee, et al.*, 25-1461-I, Complaint (TN Chancery Ct. Oct. 17, 2025).

**The Trump Administration Has Recently Deployed Federal Forces to Chicago**

84.     In his first term in office, President Trump vowed to send a "surge" of federal law enforcement officers to Chicago "whether they like us there or not," to deal with protesters and crime in a city that President Trump called "stupidly run" "by liberal Democrats."

85.     Beginning in August and September 2025, President Trump again focused on Chicago, saying that he would send federal forces, purportedly to address a crime spike. President Trump called Chicago a "killing field" and the "murder capital of the world." He said

22

"Chicago is the worst and most dangerous city in the World, by far …. I will solve the crime problem fast, just like I did in DC. Chicago will be safe again, and soon." He added that, in his view, the people of Chicago were "screaming" for help, in particular "African American ladies, beautiful ladies are saying, please, President Trump, come to Chicago, please."

86.     The President's statements about crime in Chicago are lies. Chicago has seen record reductions in the frequency of violent crime in recent years, and its violent crime rate per capita is lower than many other cities in the United States, including Kansas City, Cincinnati, Indianapolis, and Little Rock. The past summer was the least violent in Chicago since 1965.

87.     Illinois Governor J.B. Pritzker has said, "There is no emergency that warrants the deployment of troops" to Chicago. Mayor Brandon Johnson has added, "We do not want or need military occupation in our city."

88.     Nonetheless, on August 22, 2025, President Trump signed an executive order directing the newly retitled Secretary of War to establish quick reaction forces within the National Guard to assist local, state, and federal law enforcement.

89.     On September 6, 2025, President Trump escalated his rhetoric, describing his planned operations in Chicago as a "war," this time emphasizing immigration enforcement, instead of crime. President Trump shared the image below on social media, depicting the Chicago skyline ablaze, swarming with military helicopters, with the title "Chipocalypse Now," and the statement "I love the smell of deportations in the morning. Chicago about to find out why it's called the Department of WAR":

23



'I love the smell of deportations in the morning...'

Chicago about to find out why it's called the Department of WAR 🚁🚁🚁



10.9k ReTruths   41.3k Likes                    Sep 06, 2025, 10:38 AM

90.     On September 8, 2025, DHS announced that ICE and CBP officers would join the deployment to Chicago as part of a campaign named "Operation Midway Blitz." The press release announcing Operation Midway Blitz stated that the operation would "target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets."

91.     Since then, DHS leadership and hundreds of federal agents have swarmed City streets. The Pentagon approved plans for DHS to base federal operations at the Great Lakes Naval Station, the largest military base in Illinois. Defendant Bovino, who led operations in Los Angeles, has taken over operations in Chicago. Defendant Noem has been present in Chicago as well, directing federal forces personally.

92.     Defendant Miller has been a "key architect" and leader of the Trump Administration's actions in Chicago. He is the leader of the Trump Administration's overall immigration policy. He also has hundreds of thousands of dollars of stock in Palantir, a tech company whose data systems ICE uses, giving him a strong personal incentive for ICE to increase its operations, whatever the cost. In June of 2025, he set a goal for ICE to arrest 3,000 people every day across the United States.

93.     In keeping with Defendant Miller's and the remaining Defendants' plans, roving patrols of masked, militarized, and often unidentifiable agents have been seen on streets from Chicago's city center to its suburbs. Federal agents have killed civilians, and they have used extreme and unlawful force against individuals. They have illegally stopped, detained incommunicado, and arrested hundreds of people, including many citizens. Federal agents have arrested elected officials without any basis. They have conducted military-style raids on civilian apartment complexes, terrorizing residents, including children, and demolishing personal property. They have blown off the doors of people's houses with explosive devices. They have shot at people. They have thrown tear gas canisters on city streets. They have conducted operations at hospitals, schools, and places of worship.

94.     Defendants made no credible assessment prior to the start of Operation Midway Blitz that the operation was necessary to protect federal employees or civilians in the Chicago area.

95.     The Trump Administration has stated explicitly its intention to illegally suppress speech and assembly, use illegal force, and conduct illegal detentions of individuals who oppose them.

a.      Defendants have focused their federal incursions on cities in "blue" states, where Democrats make up the majority of voting constituents, like Chicago and Los Angeles, or blue cities in red states, like Memphis and New Orleans. President Trump has said that such cities pose "a war from within," and that he instructed the Secretary of Defense that "we should use some of these dangerous cities as training ground for our military."

b.      President Trump recently commented that Democrats follow "the devil's ideology."

c.      Defendants have focused in particular on political opponents. For example, President Trump has specifically said he is deploying federal forces to Chicago "against Pritzker."

d.      Defendants have focused on journalists and media organizations they do not agree with, repeatedly referring to journalists as "disgusting," "crooked," "dangerous," and, most significantly, as "the enemy of the American people." President Trump has suggested that critical media coverage of his administration is "illegal" and "no longer free speech."

e.      Defendant Miller has described people peacefully protesting against ICE's actions in Chicago as engaging in "domestic terrorism and seditious insurrection."

f.      Defendant Miller has also called the Democratic Part "a domestic extremist organization" that is "devoted exclusively to the defense of hardened criminals, gangbangers, and illegal alien killers and terrorists."

g.      Defendants have made clear that they are against protests in general, and that protesters should be met with violence as a consequence of speaking out. For instance, President Trump stated that protesters in the Chicago area were "going to be met with

26

equal or greater force" to that used in Los Angeles. Defendant Noem added, "The more that they protest … the harder ICE is going to come after them." Trump has said that "In the good old days" protesters were treated "very, very rough. And when they protested once, you know, they would not do it again so easily."

h.      Defendants have focused on viewpoints that they do not like. For example, on September 25, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions were "anti-American." This theme has been conveyed to federal officers stationed at the Broadview ICE facility. Secretary Noem has promised the agents stationed at Broadview that they will be given full authority to "hammer" and arrest the protesters for "the way that they're talking, the way that they're speaking, who they're affiliated with."

i.      Meanwhile, Defendants have ignored and, in some cases, even sought to defend viewpoints that support Defendants' policies and actions. For example, on October 3, Defendant Bondi dispatched the DOJ Civil Rights Division to investigate the arrest of conservative-leaning journalist Nick Sorter who has supported the Trump Administration's policies and actions, despite calling for the arrest of other journalists who have criticized those same policies and actions.

j.      Defendants have stated clearly that they intend to illegally arrest civilians. The DHS has stated that it is now federal government policy to conduct arrests based on "reasonable suspicion," rather than the probable cause standard required by the Fourth Amendment. Similarly, Defendant Bovino has indicated an intent to use arrests as a

means of suppressing free speech by referring to the newly-erected "free speech zone" outside the Broadview ICE facility as a "free arrest zone."

96.     Governor Pritzker said that the Trump Administration's rhetoric and operations in Chicago are authoritarianism.

97.     Many people in the Chicagoland area are opposed to the Trump Administration's actions. Following a longstanding tradition of protest, individuals in Chicago have led peaceful marches, demonstrations, and other protests throughout the region. The Broadview ICE facility became the initial focal point for those protests. As the Department of Homeland Security has ramped up violent immigration enforcement actions throughout the Northern District of Illinois, the individual Plaintiffs and others have gathered non-violently to protest, observe, document, or record these operations.

### To Suppress Media Coverage of DHS Violence
### And Peaceful Protest, Defendants Attack the Press

98.     As President Trump and other high-level Administration officials intensified their anti-immigrant and anti-Chicago rhetoric, Operation Midway Blitz was rolled out, and federal officials continued to fill the Broadview ICE facility with immigration detainees and other arrestees, the Broadview location became an active center for protest and dissent. Protest and dissent expanded throughout the Northern District of Illinois, as DHS's violent and unrestrained immigration enforcement caused incidents around the District that angered and disturbed residents and others.

99.     The protests at the Broadview ICE facility and elsewhere, DHS unjustified violence, and the federal government's violent attempts to silence protesters became a story of great interest to the local Chicago media and was also covered in the national press. Much of the

28

coverage described the federal officers' abusive tactics. Defendants sought and are seeking to quash this coverage by attacking and intimidating members of the Press on the ground.

100.    Federal immigration officers have repeatedly and intentionally singled out persons whom they know to be members of the Press for violence, assault, and intimidation. These assaults are not incidental or unintentional. They are undertaken by design to intimidate journalists on scene and to frustrate and suppress coverage of the federal officers' actions toward protesters and immigration detainees.

101.    The attacks on individual journalists are too numerous to list in full. The following incidents are merely illustrative.

a.    Leigh Giancreco is a freelance reporter who was sent by Block Club Chicago to report on the Broadview protests. Even though she was wearing a black helmet labeled PRESS, a neon yellow vest, and press credentials, federal officers shot pepper balls at her, striking her repeatedly.

b.    Plaintiff Raven Geary is a journalist with Unraveled Press who has been covering the actions of ICE at the Broadview facility and throughout Chicago for months and is known as a member of the press to many of the federal agents stationed at Broadview. Nevertheless, and while wearing visible press credentials and press patches, she was shot with a pepper ball in the face without warning while standing in a public parking lot taking a photo of a federal officer.

c.    Plaintiff Charles Thrush is a freelance reporter in his final year of journalism school at DePaul University. He is a contract reporter for Block Club Chicago covering the protests. At the Broadview facility, wearing his press credential around his neck, Mr. Thrush was singled out, fired upon, and struck with a pepper ball. The federal officer shot

29

Mr. Thrush despite the fact he was standing at a distance from the protesters and even though (or because) he was clearly displaying his press credential.

d.      Colin Boyle is a photojournalist who was reporting on the protests in collaboration with Mr. Thrush. Mr. Boyle wore a black backpack clearly marked PRESS and a hat with a Velcro PRESS patch as well as his Chicago Police Department-issued press credentials. He was carrying two cameras. As he photographed peaceful protesters being fired upon by federal officers, Mr. Boyle was also struck with pepper balls.

e.      Shawn Mulcahy is the News Editor of the Chicago Reader and a member of the Chicago News Guild. At the Broadview facility, he wore press credentials, wore a helmet marked PRESS, and carried a notebook. On September 26, 2025, while Mr. Mulcahy was clearly engaged in journalistic activity, a federal officer shot him with a rubber bullet or foam round. Later that same day, ICE agents threw tear gas canisters at Mr. Mulcahy and a group of other journalists.

f.      On the morning of September 29, 2025, in a well-publicized incident, a journalist with CBS Chicago was targeted while in her car driving near the Broadview ICE facility checking on the status of the protests. A federal agent standing behind the fence shot pepper balls at the journalist's car, and chemicals went through her window. There were no protests or activities at Broadview at the time. The journalist had to stop her car and get out as the chemicals engulfed the interior of her vehicle. The Illinois State Police and Broadview Police are investigating the attack.

g.      On October 14, an incident in which an ICE vehicle crashed into another car, CBP officers deployed tear gas throughout the neighborhood on an assembled group of protesters, including clearly-identifiable journalists.

30

h.      Journalist Paul Goyette was targeted with a flash bang grenade thrown just 18 inches from his leg.

i.      Matthew Kaplan and other journalists reporting on an event in Chicago's East Side neighborhood were targeted with tear gas.

j.      Journalist Steve Held was tear gassed while he was reporting on an incident in the Brighton Park neighborhood of Chicago.

102.    The purpose of these and other attacks was to frighten these and other journalists so that the federal officers' violence and suppression of dissent would go unreported.

**Protests at Broadview in September and October 2025 as Operation Midway Blitz Ramped Up; Federal Officers Responded with Brutality in an Effort to Quash Dissent**

103.    At the onset of Operation Midway Blitz, the Broadview ICE facility became a center of focus for protest and dissent. Growing numbers of people from all walks of life came to Broadview to express their disagreement with the presence of Department of Homeland Security officials in the Northern District of Illinois and their violent tactics, as well to dissent from other Trump Administration policies. Protests and prayer vigil at Broadview occurred on a near-daily basis throughout the month of September and into October and are expected to continue.

104.    The protesters have expressed and continue to express their views by chanting and singing, through prayer, and, in some cases, by shouting their condemnation of the actions of ICE and other immigration enforcement authorities. With only a few exceptions, the protests at the Broadview ICE facility have been peaceful and non-threatening to the federal officers and the operations within and around the facility. The protesters staged and are staging their demonstrations of dissent on public property (sidewalks, parkways and the street) in front of and adjacent to the Broadview ICE facility.

31

105.    The Broadview ICE facility is located at 1930 Beach Street in Broadview, Illinois. The multi-story brick structure is set back from Beach Street and surrounded by a fence, and as of Tuesday September 23, 2025, is protected by a second fence that blocks part of Beach Street. Beach Street is a public way. It is within the jurisdiction of the Broadview Police Department, which is responsible for patrol of Beach Street and other public thoroughfares in Broadview.

106.    Acting on direction from agency heads and from high level officials, including the Secretary of Homeland Security, the United States Attorney General, President Trump himself, and the other Defendants named in this complaint, the federal officers at Broadview and elsewhere in the Northern District of Illinois have determined, and remain determined, to deploy physical brutality, tear gas, mace and pepper spray; exploding pepper balls and rubber bullets; flash grenades; and other tactics specifically designed to intimidate, to instill fear, and to silence those who are present to protest, report, observe or document. These tactics are being used to silence and to retaliate against those who are protesting in opposition to the immigration policies of the Trump Administration and perceived political enemies.

107.    The federal authorities have stationed a small group of enforcement officers on the roof of the Broadview ICE facility. Those officers bear weapons that can discharge exploding chemical pellets and rubber bullets, as well as lethal firearms. From their location on the rooftop, they can survey the crowd of protesters below and can target and shoot at individual protesters. Many protesters and those gathering to pray have felt intimidated by the officers' armed presence while they protest and pray. Those gathered have been injured by pepper balls and rubber bullets that these rooftop snipers have aimed in the direction of their faces and torsos.

108.    Other federal enforcement officers are assigned to apparent platoons that muster in the courtyard area in front of the Broadview ICE building. These officers, like the officers on

32

the rooftop, wear cloth masks, dress in army-style fatigues, and carry weapons, tear gas canisters, flashbang grenades, and other implements. In response to the protests, these groups of officers sometimes surge beyond the ICE facility fence without warning and storm the protesters. They attack by slamming individual protesters to the ground, wielding batons and shields, throwing tear gas canisters indiscriminately at groups of protesters, and macing individual protesters in the face at close range, among other things. These are tactics that the federal officers have honed and deployed against dissenters around the country.

109.    There is no legitimate law enforcement purpose for these actions. The protesters do not take actions that threaten the federal officers. The federal officers' brutality is not a response to the violation of any previously given order to disperse or to desist. Rather, the brutality described in the prior paragraphs is deployed solely to silence dissent, to intimidate, and to instill fear.

110.    These tactics (including the use of tear gas and mace along with rubber and pepper balls in particular) create a risk of significant physical harm and injury. Exposure to tear gas can cause long-term respiratory damage among other physical and psychological harms, and flashbangs risk blasting a radius of shrapnel every time they are deployed.

111.    The individual acts of brutality by federal officers are too numerous to catalogue. By way of example only, the following acts of violent intimidation have been employed against innocent, non-threatening individual protesters over the course of September and up to the filing of this complaint:

a.    On September 19, ICE officers approached a group of protesters seated on Beach St. and, without warning or giving a dispersal order, grabbed the protesters, picked them up, and threw one protester onto the ground. The incident is recorded on video.

33

b.      On that same day, ICE officers fired a barrage of rubber bullets and pepper balls from the roof of the Broadview facility into the crowd of protesters below while federal officers on the ground bombarded protesters with flashbang grenades and tear gas. Protester Madeline Sullivan attempted to help the injured, but became overwhelmed, disoriented and ill. Sullivan vomited and continues to suffer back and neck pain.

c.      Daniel Shouse protested on September 22 and 24. On the first day, without warning and with no provocation, an ICE officer repeatedly shot him with a paintball gun. The second day, officers shoved him without provocation and nearly ran him over as he attempted to avoid an intersection. Mr. Shouse sought treatment in a hospital.

d.      Autumn Reidy-Hamer, a resident of Oak Park, came to protest on September 26 and 27. She was part of a group that federal officers sprayed with tear gas and pepper spray without warning or provocation. She saw officers push and shove protesters without warning or provocation.

e.      William Paulson, aged 67, was part of a group of protesters who were protesting peacefully only to be approached by federal officers who tackled a protester and threw him hard to the ground. For no apparent reason and without warning, federal officers from behind the Broadview facility fence lobbed tear gas canisters into the group.

f.      Throughout the evening and night of September 27, federal officers released roaming clouds of tear gas at non-threatening protesters, fired exploding pepper pellets and rubber bullets at protesters from close range, pushed and shoved peaceful protesters and confiscated their signs. All of these violent and unprovoked responses are recorded on video. Some were witnessed by Mr. Paulson.

34

g.      Michelle Narvaez, who came to the Broadview ICE facility on September 22 and again on September 24 to protest the federal officers' violence and suppression of free speech, witnessed federal agents use flashbang grenades, tear gas and pepper balls against non-threatening protesters. She saw federal officers, with no warning, shoot a 16-year-old child who was approaching the Broadview facility to drop off possessions for his detained father after he was instructed to approach the facility by an officer inside.

h.      Rev. David Black, an ordained Presbyterian minister, came to Broadview on September 19, visibly attired in clerical garb, to protest, to pray, and to minister to ICE officers by encouraging them to change their ways, was repeatedly struck in the face when ICE snipers fired exploding at him from the roof of the Broadview facility. Moments later he was doused with chemical spray that ICE agents directed at his face. These events are recorded on video.

i.      Rev. Dr. Beth Johnson, an ordained minister in the Unitarian Church, was fired upon without warning or justification as she and other protesters and clergy members stood on the sidewalk singing "We Shall Not Be Moved" and other traditional songs of protest. Rev. Dr. Johnson was wearing her clerical collar.

j.      Rev. Abby Holcombe was shot at with some kind of projectile as she stood in front of a group of worshipers, wearing her clerical collar that clearly identified her as a pastor, as she prayed for people to "love [their] neighbor."

k.      Rev. Quincy Worthington witnessed ICE agents repeatedly shooting with pepper balls a handicapped woman lying on the ground unable to get up, resulting in her needing an ambulance. As he explained, "Here there's no warning, no provocation.  They just open up on you. Sometimes we can't even determine what they're trying to do."

l.     Juan Munoz, a Trustee of the Township of Oak Park Board, peacefully protested and observed at Broadview on October 3, ultimately standing behind a barrier as directed by an on-scene federal agent. As he stood there filming, he was thrown to the ground and zip-tied by Defendant Bovino himself, leading to his detention at Broadview for 8 hours. During those 8 hours, he was used as a prop by Defendant Noem and Defendants, who displayed him and others who had been arrested by sitting them zip-tied on a barricade as Noem was interviewed by a pro-Trump YouTuber, Benny Johnson. Noem falsely told Johnson that Munoz had been arrested for "violent" conduct. During his detention Munoz was processed, interviewed, ridiculed, but ultimately released without charges by federal authorities who drove him and others in a van to a local gas station and left them there.

These are examples only, and they could be multiplied many times over. Federal officers, acting on instructions and encouragement from high government officials, have systematically worked to intimidate and terrorize non-threatening protesters. They have done so daily since the protests at the Broadview facility began. These attacks on free speech are continuing and will continue unless they are enjoined.

112.    The violence perpetrated by the federal officers–particularly the deployment of massive quantities of toxic chemicals as they attempt to suppress dissent–also affects the community where the Broadview facility is located.

113.    Clouds of tear gas and other chemicals have sickened residents. By way of example only:

a.     Jose Juan Alvarado, a resident of Broadview, reports that he and his wife were sickened and reduced to tears when they went to the grocery store, passing through clouds of tear gas.

36

b.      Reggie Thompson has been unable to access services, including grocery

delivery and electrical support, because of the federal agents' violent presence. The vast

quantities of tear gas have aggravated his asthma.

c.      Local business owner Robert Butler-Bey has experienced emotional distress and

has been unable to breathe because of the tear gas.

d.      Dimeko Harden, who lives a block from the Broadview facility, has been unable

to retrieve mail, to bring repairmen into her home and to engage in normal activities

without experiencing pain and difficulty breathing. She has been forced to keep her

teenage son at home, because he suffers from asthma.

114.    The mayor of Broadview, Katrina Thompson, has made federal agents aware of

the harm their actions are causing to her community. Mayor Thompson stated "[t]he relentless

deployment of tear gas, pepper spray and mace at the ICE facility is endangering nearby village

residents, harming police officers, harming firefighters and American citizens exercising their

First Amendment rights," Broadview's Chief of Police echoed these concerns, explaining that

federal agents have "verbally abused" his officers and stating, "[t]he employment of tear gas,

pepper spray, mace, and rubber bullets by ICE … is creating a dangerous situation for the

community and our first responders."

**The Federal Officers' First Amendment Violations Expand Beyond Broadview**

115.    In furtherance of Operation Midway Blitz, agents under Defendants' supervision

have escalated and expanded their suppression of speech and journalism throughout the Northern

District of Illinois, including in the Chicago neighborhoods of Logan Square, Humboldt Park,

Brighton Park, and East Side. In multiple separate incidents federal officers deployed the same

tactics they have been using at Broadview against spontaneous crowds that had gathered and

were peacefully expressing opposition to Operation Midway Blitz and the tactics being used by ICE and other federal agencies.

### Federal Officers Have Specifically Targeted People Peacefully Observing and Documenting ICE Activities

116.    As DHS officers have fanned out throughout Chicago and the Northern District of Illinois, they have specifically targeted regular citizens who are peacefully observing and documenting the officers' actions in their community. People who are staying at a respectful distance, doing nothing to "interfere" with agents' actions other than by documenting and observing, thereby bearing witness to ICE's actions, have been threatened, arrested, and menaced.  By way of example:

a.    On September 18, in the Humbold Park neighborhood, as Arely Barrera was driving around the area, she parked 50-100 feet away from ICE agents making an arrest to document their actions. As she photographed what they were doing, ICE agents in a vehicle without plates drove up to her, blocking her in her parking spot, and aggressively photographed her and threatened her with arrest.

b.    On October 4, in the Brighton Park neighborhood, Rudy Villa went to an area in Brighton Park where he heard that people were protesting ICE in response to an incident in which someone had been shot by ICE agents. Villa purchased his own reflective safety vest and went to the scene and for a time was effectively liaising between protesters and law enforcement present on the scene to help ensure protests remained peaceful. While he was there, he observed ICE and CPB agents trying to rile up the crowd by yelling and pointing a pepper bell gun at assembled protesters. Without any warning, federal agents shot pepper balls at the crowd, including at women and children who were observing the scene. When they were preparing to leave, and without communicating with Rudy or

38

others who could have helped dissipate the crowd so federal officers could depart, the officers deployed tear gas into the crowd, thereby effectively deploying tear gas through the neighborhood. They then left the area.

c.     On October 10, as Jo-Elle Munchak got out of her car to wordlessly and peacefully record an arrest by a federal immigration agent in the Uptown neighborhood of Chicago. Afterward, when she got back in her car to continue home, federal agents stopped her car, demanded she get out, and aimed at gun at her head, threatening her that if she did this again she would be detained.

d.     On October 12, a crowd gathered as federal agents appeared in Chicago's Albany Park neighborhood. Federal agents ran over the foot of a woman standing in the street. Without any warning, the agents deployed tear gas onto the street, gassing everyone present.

e.     On October 14, after federal agents were involved in a car crash in a neighborhood on Chicago's East Side, residents gathered, some protesting and some simply observing, when CBP agents indiscriminately and without warning deployed tear gas across the area, gassing bystanders, children, and neighborhood residents.

**Federal Officers Have Antagonized Assembled Protestors
And Used Tear Gas Without Warning to Disrupt Protected Speech Activity**

117.     On October 1, in Cicero, Illinois, a CBP agent approached and aimed a gun at Leslie Cortez because she and other residents had been observing and recording immigration agents at a distance.

118.     On October 3, residents of Logan Square spontaneously gathered to express their opposition to the immigration activity occurring in the area. The crowd was peacefully voicing their opposition to the tactics and mission of federal immigration officers. The ICE officers

39

responded by yelling slurs at the assembled crowd, including calling one protester a "faggot." Then, without warning, an ICE officer threw a canister of tear gas at the assembled protesters.

119.    That same day, Chicago Alderperson Jessie Fuentes went to a hospital in Humbolt Park in response to the staff's request that she respond to help them because ICE agents were at the hospital, scaring staff and patients. Alderperson Fuentes responded, spoke to ICE agents in a common area of the hospital, and informed them that she was an elected official. Agents from ICE and CBP responded by shoving her, swearing at her, handcuffing her, removing her from the hospital, and ultimately releasing her with a warning that if she returned to the hospital she would be arrested.

120.    In Brighton Park, protesters gathered in response to a large and visible presence of ICE and CBP officers on the morning of October 4. A crowd of fifty to seventy-five protesters held signs, filmed, and shouted for ICE to leave Chicago. Chicago Police officers took up a position between the protesters and the federal officers, but at some point the federal officers pushed past the local police officers and began pointing weapons at the protesters and using less-lethal munitions including flashbang grenades, tear gas, and rubber bullets. In one incident in the neighborhood a group of five or six CBP officers shot tear gas canisters, without any warning, into a group of people who were peacefully protesting 30-40 feet away from them. Chicago Police officers and civilians alike were subjected to the tear gas and forced to disperse from the streets and sidewalks.

121.    In Humbolt Park, federal immigration agents encountered protesters yelling "you're not welcome here." Some protesters attempted to block the agents' vehicles and were forcibly moved by the officers. Then, as the officer drove away and without any clear justification, they deployed several canisters of tear gas on the assembled crowd.

40

122.    On October 12, in Albany Park, federal immigration agents deployed tear gas across a neighborhood in response to protesters gathering to protest their activities, filling local homes with tear gas.

### Federal Officers Have Falsely Arrested Protestors and Bystanders

123.    Throughout Operation Midway Blitz, federal authorities have routinely falsely arrested and detained people, focusing on those who are expressing disagreement with federal agents' conduct. For example:

a.      On September 30, CBP agents raided an apartment building in Chicago's South Shore neighborhood, arresting and detaining numerous residents of the building who were legal citizens of the United States. Residents of the building were sorted by race and held for hours, zip tied on a bus, until some of them were released. Mayor Brandon Johnson commented about this raid that it "wasn't about public safety. It was certainly not about immigration. This was about a show of authoritarianism, a forceful display of tyranny."

b.      As Scott Blackburn protested outside Broadview Detention Facility on October 3, he saw Defendant Bovino and, recognizing him, told him words to the effect that, "You love to be on television." Bovino told him to move down the street, and as he started to do that, Defendant Bovino stepped across a barrier, tackled Blackburn to the ground, and arrested him. Blackburn was released a few hours later without being charged for any criminal activity.

c.      As described above, Alderperson Jessie Fuentes was arrested at a hospital when, identifying herself as a public official asking a question of ICE agents in a public area of the hospital, she was handcuffed, escorted out of the hospital, and told not to return.

41

d.      Stephen Held was arrested videotaping protestors at Broadview on September 27, 2025, wearing multiple visible indicators that he was a member of the press. He was tackled, handcuffed, and detained inside the Broadview facility for hours before being released without charges.

e.      Daniel Toerpe was peacefully protesting at Broadview on October 3, when he was arrested without warning, and without resisting, by Defendant Bovino.  He was held for hours in Broadview before being released, and was never given any basis for his arrest.

f.      Juan Munoz was peacefully protesting at Broadview on October 3, when he was also arrested without warning and without resisting by Defendant Bovino. He was held for over 8 hours before being released without charges.

124.    Many arrested persons have been released without charging. When citations were issued, they typically lacked merit. Federal grand juries have returned no bills in the cases of at least three people arrested by federal agents. Moreover, United States District Judge Jeffrey Cummings recently ruled that ICE in Operation Midway Blitz has committed at least two dozen violations of a 2018 consent decree in which ICE agreed not to commit warrantless arrests in the Midwest without probable cause. *Nava, et al. v. DHS, et al.*, No. 18-CV-3757, Dkt. 214 (N.D. Ill. Oct. 7, 2025).

## <u>RULE 23(b)(2) CLASS ALLEGATIONS</u>

125.    Plaintiffs Held, Paulson, Villa, Crespo, Father Curran, Rev. Black, Rev. Dr. Johnson, and Rev. Holcombe, (the "Global Class Representatives") seek to bring this action on their own behalf and on behalf of the class of all persons who are or will in the future non-violently protest, observe, document, or record Department of Homeland Security immigration

operations in the Northern District of Illinois. This proposed class is hereinafter referred to as the "Class" or the "Global Class." The Class contains two subclasses as follows:

A. **The Religious Exercise Subclass**, which consists of persons who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration operations in the Northern District of Illinois.

B. **The Press Subclass**, which consists of all persons who are or will in the future engage in news gathering or reporting at Department of Homeland Security immigration operations in the Northern District of Illinois.

**The Global Class May Be Maintained as a Class Action**

126. The Global Class satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds that generally apply to the Class, including by (1) issuing dispersal orders without proper justification directing members of the Class to leave a public space they have a lawful right to occupy; (2) failing to issue any warning or dispersal order to members of the Class before using riot control weapons on those persons; (3) using riot control weapons on identified persons who are members of the Class even though or because it was reasonably foreseeable that doing so would injure that targeted person; (4) indiscriminately firing CS or CN gas canisters, flashbang grenades, and rubber and exploding pepper balls at members of the Class without proper justification; (5) shoving, pushing and slamming to the ground members of the Class who do not pose any immediate physical threat; (6) seizing and/or arresting members of the Class for no reason; (7) failing to identify themselves with visible identification.

127. The Global Class also satisfies all the requirements set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

### Numerosity

128. The Global Class is composed of thousands of persons who are or will in the future non-violently protest, observe, document, or record Department of Homeland Security immigration operations in the Northern District of Illinois, including at the Broadview ICE facility, Albany Park, Brighton Park, East Side, and elsewhere. The Global Class is so numerous that the joinder of all members is impracticable.

### Common Issues of Fact or Law

129.    There are questions of law and fact common to the Class. These common questions of fact and law include, but are not limited to:

a.    Whether Class Members' newsgathering, religious, protest, observation, and documentation activities are protected under the First Amendment;

b.    Whether Defendants violated Class Members' rights guaranteed by the Fourth Amendment;

c.    Whether Defendants have subjected Class members to a common practice of issuing dispersal orders to leave a public space where they have a lawful right to be, and whether that practice violates the rights of Class Members;

d.    Whether Defendants have subjected Class Members to a common practice of failing to issue dispersal orders before using riot control weapons on Class Members, and whether that practice violates the rights of Class Members;

e.     Whether Defendants have subjected Class Members to a common practice of deploying riot control weapons in violation of their rights under RFRA and the First Amendment;

f.     Whether Defendants have subjected Class Members to a common practice of threatening Class Members with detention or arrest and/or detaining and/or arresting Class Members;

g.     Whether Defendants have subjected Class Members to a common practice of threatening Class Members with physical force and/or using force against Class Members;

h.     Whether Defendants have engaged in a common practice of failing to identify themselves as federal agents with visible identification;

i.     Whether Class Members' protected First Amendment activity is a motivating factor for Defendants' above-described common practices;

j.     Whether Defendants' common practices described above are justified by a compelling government interest and if so, whether those practices are the least restrictive means of advancing that interest; and

k.     Whether Defendants' common practices described above would deter a person of ordinary firmness from engaging in protected First Amendment activities at Defendants' immigration operations.

**Typicality**

130.   The claims of the Global Class Representatives are typical of the Class. Each Global Class Representative has or will in the future non-violently protest, observe, document, or record Department of Homeland Security immigration operations in the Northern District of

Illinois; was subjected to one or more of the violations previously enumerated; and seeks protection to bar the repetition of those violations in the future.

131.    The Global Class Representatives have the same interests and have suffered the same type of injuries as the class members. Their claims are based upon the same or similar legal theories as the claims of the members of the Global Class.

## Adequate Representation

132.    The Global Class Representatives will fairly and adequately represent the interests of the Class. Each of these Plaintiffs has a strong interest in achieving the relief requested in this Complaint. None of them has any conflict with any other member of the Class.

133.    The Global Class Representatives are represented by the undersigned counsel, who are all experienced in civil rights, class actions, and complex litigation and are familiar with the issues in this case. Collectively, the undersigned class counsel have successfully litigated dozens of class action cases, including for civil rights violations. Class counsel possess deep knowledge concerning the legal issues in this litigation. They have extensive experience managing complex, document intensive litigation.

134.    Counsel for the Global Class Representatives know of no conflicts between members of the Class, the named Plaintiffs, or the attorneys in this action.

## The Religious Exercise Subclass May be Maintained as a Class Action

135.    Plaintiffs Father Curran, Rev. Black, Rev. Dr. Johnson and Rev. Holcombe (the "Religious Exercise Subclass Representatives") seek to bring this action on their own behalf and on behalf of the subclass of all persons who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration operations in the Northern District of Illinois.

136. The Religious Exercise Subclass satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds that generally apply to the Religious Exercise Subclass, including by (1) issuing dispersal orders without proper justification directing members of the Religious Exercise Subclass to leave a public space they have a lawful right to occupy; (2) failing to issue any warning or dispersal order to members of the Religious Exercise Subclass before using riot control weapons on those persons; (3) using riot control weapons on identified persons who are members of the Religious Exercise Subclass even though or because it was reasonably foreseeable that doing so would injure that targeted person; (4) indiscriminately firing CS or CN gas canisters, flashbang grenades, and rubber and exploding pepper bullets at members of the Religious Exercise Subclass without proper justification; (5) shoving, pushing and slamming to the ground members of the Religious Exercise Subclass who do not pose any immediate physical threat; (6) seizing and/or arresting members of the Religious Exercise Subclass for no reason; (7) failing to identify themselves with visible identification.

137. The Religious Exercise Subclass also satisfies all the requirements set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

### Numerosity

138. The Religious Exercise Subclass is composed of scores of people who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration operations in the Northern District of Illinois, including at the Broadview ICE facility, Brighton Park, Albany Park, and elsewhere. The Religious Exercise Subclass is so numerous that the joinder of all members is impracticable.

47

## Common Issues of Fact or Law

139.     There are questions of law and fact common to the Religious Exercise Subclass. These common questions of fact and law include all of the common questions of fact and law that pertain to the Global Class as set forth above in paragraph 129, plus the following questions, among others, that are specific to the Religious Exercise Subclass:

a.     Whether Defendants' actions violate the rights of the Religious Exercise Subclass under the Religious Freedom Restoration Act, 42 U.S.C. 2000bb-1;

b.     Whether Defendants' actions violate the rights of members of the Religious Expression Subclass to the free exercise of religion as guaranteed by the First Amendment.

## Typicality

140.     The claims of the Religious Expression Subclass Representatives are typical of the Religious Expression Subclass. Each Religious Expression Subclass Representative has engaged in religious expression in the form of prayer, procession, song, preaching, or proselytizing during Department of Homeland Security immigration operations in the Northern District of Illinois in the Northern District of Illinois; was subjected to one or more of the violations previously enumerated; and seeks protection to bar the repetition of those violations in the future.

141.     The Religious Expression Subclass Representatives have the same interests and have suffered the same type of injuries as the class members. Their claims are based upon the same or similar legal theories as the claims of the members of the Religious Expression Subclass.

**Adequate Representation**

142.     The Religious Expression Subclass Representatives will fairly and adequately represent the interests of the Religious Expression Subclass. Each of these Plaintiffs has a strong interest in achieving the relief requested in this Complaint. None of them has any conflict with any other member of the Religious Expression Subclass.

143.     The Religious Expression Subclass Representatives are represented by the undersigned counsel, who are all experienced in civil rights, class actions, and complex litigation and are familiar with the issues in this case. Collectively, the undersigned class counsel have successfully litigated dozens of class action cases, including for civil rights violations. Class counsel possess deep knowledge concerning the legal issues in this litigation. They have extensive experience managing complex, document intensive litigation.

144.     Counsel for the Religious Expression Subclass Representatives know of no conflicts between members of the Religious Expression Subclass, the named Plaintiffs, or the attorneys in this action.

**The Press Subclass May Be Maintained as a Class Action**

145.     Plaintiff Held (the "Press Subclass Representative") seeks to bring this action on his own behalf and on behalf of the subclass of all persons who are or will in the future engage in news gathering or reporting at Department of Homeland Security immigration operations at Department of Homeland Security immigration operations in the Northern District of Illinois.

146.     The Press Subclass satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds that generally apply to the Press Subclass, including by (1) issuing dispersal orders without proper justification directing members of the Press Subclass to leave a

public space they have a lawful right to occupy; (2) failing to issue any warning or dispersal order to members of the Press Subclass before using riot control weapons on those persons; (3) using riot control weapons on identified persons who are members of the Press Subclass even though or because it was reasonably foreseeable that doing so would injure that targeted person; (4) indiscriminately firing CS or CN gas canisters, flashbang grenades, and rubber and exploding pepper bullets at members of the Press Subclass without proper justification; (5) shoving, pushing and slamming to the ground members of the Press Subclass who do not pose any immediate physical threat; (6) seizing and/or arresting members of the Press Subclass for no reason; (7) failing to identify themselves with visible identification.

147.    The Press Subclass also satisfies all the requirements set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

### Numerosity

148.    The Press Subclass is composed of scores of people who are or will in the future engage in news gathering or reporting at Department of Homeland Security immigration operations in the Northern District of Illinois, including at the Broadview ICE facility, Brighton Park, Albany Park, and elsewhere. The Press Subclass is so numerous that the joinder of all members is impracticable.

### Common Issues of Fact or Law

149.    There are questions of law and fact common to the Press Subclass. These common questions of fact and law include all of the common questions of fact and law that pertain to the Global Class as set forth above in paragraph 129, plus the following questions, among others, that are specific to the Press Subclass:

a.    Whether members of the Press Subclass are subject to dispersal orders to the same

degree as the persons who are not professional journalists;

b.    Whether members of the Press Subclass have rights under the First Amendment

that are different in kind and different in scope from the rights of persons who are not

professional journalists.

c.    Whether members of the Press Subclass properly identify themselves as members

of the press at the sites of Department of Homeland Security operations in the Northern

District of Illinois.

**Typicality**

150.    The claims of the Press Subclass Representative is typical of the Press Subclass.

The Press Subclass Representative has engaged in news gathering or reporting during

Department of Homeland Security immigration operations in the Northern District of Illinois;

was subjected to one or more of the violations previously enumerated; and seeks protection to

bar the repetition of those violations in the future.

151.    The Press Subclass Representative has the same interests and has suffered the

same type of injuries as the class members. His claims are based upon the same or similar legal

theories as the claims of the members of the Press Subclass.

**Adequate Representation**

152.    The Press Subclass Representative will fairly and adequately represent the

interests of the Press Subclass. This Plaintiff has a strong interest in achieving the relief

requested in this Complaint. He has no conflict with any other member of the Press Subclass.

153.    The Press Subclass Representative is represented by the undersigned counsel,

who are all experienced in civil rights, class actions, and complex litigation and are familiar with

the issues in this case. Collectively, the undersigned class counsel have successfully litigated dozens of class action cases, including for civil rights violations. Class counsel possess deep knowledge concerning the legal issues in this litigation. They have extensive experience managing complex, document intensive litigation.

154.    Counsel for the Press Subclass Representatives know of no conflicts between members of the Press Subclass, the named Plaintiffs, or the attorneys in this action.

## CLAIMS FOR RELIEF

### COUNT I

### First Amendment of the United States Constitution

155.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

156.    In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

157.    Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence.

158.    Individuals who peacefully gather on the streets, sidewalks and public places of the Northern District of Illinois and in public rights of way to protest have the right to gather, speak, express themselves, gather and report the news, pray, and petition for redress of grievances.

159.    Defendants' actions are designed to chill, suppress, and control speech, reporting, and religious activities that they do not like.

160.    Defendants' actions have severely restricted, and sometimes wholly prevented, Plaintiffs from exercising their First Amendment rights in public streets, sidewalks, and

traditional fora. Defendants' actions have also prevented Plaintiffs from even accessing these traditional public fora. Defendants' actions do not serve any governmental interest, much less a significant or compelling governmental interest, and Defendants' actions are not narrowly tailored.

161.    Plaintiffs' and class members' exercise of their rights to speak, assemble, petition, gather news, and freely practice their religious beliefs is being chilled due to the well-founded fear that they will be brutalized by federal agents for no reason other than engaging in protected activity on the streets and sidewalks of the Northern District of Illinois.

162.    Defendants' actions substantially burden the religious exercise of Rev. Black, Rev. Dr. Johnson, Rev. Holcomb, and Father Curran, as well as similarly situated members of the Religious Exercise subclass.

163.    Defendants' actions would likely deter a person of ordinary firmness from engaging in protected First Amendment activity.

164.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

165.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT II

### First Amendment Retaliation

166.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

167. In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

168. Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence.

169. Individuals who peacefully gather on the streets of the Northern District of Illinois and in public rights of way to protest have the right to gather, speak, express themselves, gather and report the news, pray, and petition for redress of grievances.

170. Plaintiffs' and class members' protected activity was and is at least a motivating factor in Defendants' adverse actions, including use of force, against Plaintiffs and class members.

171. Defendants are retaliating against Plaintiffs and class members precisely because of their protected activity.

172. Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

173. Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT III

### Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1

174. Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

175. The Religious Freedom Restoration Act ("RFRA"), provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

176. Defendants' policy, pattern, and practice of targeting Rev. Black, Rev. Dr. Johnson, Rev. Holcombe, Father Curran, and other similarly situated Religious Exercise subclass members with violence substantially burdens their exercise of religion.

177. No compelling governmental interest exists that would justify Defendants' use of force against clergy peacefully praying in public spaces, nor is the wanton and gratuitous violence employed by Defendants the least restrictive means of furthering any compelling governmental interests that might exist.

178. Defendants' ongoing conduct in violation of Plaintiff's and subclass members' rights and liberties under federal law has caused and is causing them irreparable harm.

179. In the absence of an injunction, Defendants will continue to use force against the Religious Exercise subclass members in an effort to stop them from exercising their religious beliefs.

180. Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT IV

### Fourth Amendment of the United States Constitution

### Excessive Force and Unreasonable Seizures

181. Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

182.     In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizures, specifically, arrests without probable cause and excessive force under the Fourth Amendment.

183.     Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence and/or arresting them without probable cause to believe that they committed a federal crime.

184.     Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs and class members. They also restricted Plaintiffs' and class members' freedom of movement through a show of authority.

185.     The force Defendants used was unreasonable.

186.     Defendants have also arrested Plaintiff Held and other similarly situated individuals without probable cause, and solely to suppress, chill, and retaliate against the exercise of their First Amendment rights.

187.     Defendants are prohibited by the Fourth Amendment from making "preemptive arrests."

188.     Defendants' ongoing conduct in violation of Plaintiffs' and class members' rights has caused and is causing them irreparable harm.

189.     In the absence of an injunction, Defendants will continue to use excessive force against and effect seizures without probable cause on Plaintiffs and class members in violation of the Fourth Amendment, pursuant to official federal policy.

190.     Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT V

### Administrative Procedure Act

191.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

192.    Defendants and the federal agents discussed in this complaint are operating pursuant to a final federal policy, approved by responsible federal agency heads with final policymaking authority, of preventing Plaintiffs and class members from exercising their First Amendment rights and targeting Plaintiffs and class members with unjustified violence.

193.    Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs and class members. They also restricted Plaintiffs' and class members' freedom of movement through a show of authority.

194.    The force Defendants used was unreasonable.

195.    Federal law provides for the publication of regulations that "prescribe the categories of officers and employees … who may use force (including deadly force) and the circumstances under which such force may be used." 8 U.S.C. § 1357(a).

196.    Federal regulation provides that "Non-deadly force may be used only when a designated immigration officer … has reasonable grounds to believe that such force is necessary." 8 C.F.R. § 287.8(a)(ii).

197.    Federal regulation further provides that "A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." 8 C.F.R. § 287.8(a)(iii).

198.     Federal regulation further provides that "Deadly force is any use of force that is likely to cause death or serious physical injury" and that "Deadly force may be used only when a designated immigration officer … has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(i)-(ii).

199.     Defendants' policy and practice of using force against peaceful protesters, journalists, and legal observers fails to take into consideration the risk of harm associated with each weapon used, and permits uses of force that, in violation of 8 C.F.R. § 287.8(a): (1) do not further any legitimate mission assigned to Defendants by law; (2) target the general public; (3) are not based on reasonable grounds to believe such force is necessary; and/or (4) deploy gratuitous violence exceeding the minimum necessary to accomplish any legitimate aims.

200.     Defendants' policy and practice of using excessive force against Plaintiffs and other similarly situated peaceful protesters, journalists, and legal observers is "final agency action" that is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

201.     Defendants' policy and practice of suppressing the speech, religious exercise, reporting and other protected First Amendment activities of Plaintiffs and other similarly situated peaceful protesters, journalists, and legal observers is "final agency action" that is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

202.     Defendants' policy and practice of engaging in policing functions, beyond the scope of "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the

extent necessary to protect the property and persons on the property," 40 U.S.C. § 1315, amounts to final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-.

203.    Defendants' policy and practice of using excessive force against protestors, press, and religious practitioners in the course of engaging in general policing functions also exceeds 40 U.S.C. § 1315's limited grant of protective authority, constituting final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A).

204.    Defendants' policy and practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under § 1357(a). 5 U.S.C. §§ 704, 706(2)(C).

205.    As a proximate result of Defendants' APA violations, Plaintiffs and class members are suffering and will continue to suffer a significant deprivation of their liberty in violation of the statute.

206.    Defendants' unlawful policies and practices against Plaintiffs and class members, described herein, have caused and are causing them irreparable harm.

207.    In the absence of an injunction, Defendants will continue to engage in their unlawful policies and practices against Plaintiffs and class members, described herein.

208.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT VI

## 28 U.S.C. § 2201

## Declaration of Rights

209.    Plaintiffs incorporate each of the paragraphs of the complaint as if restated fully herein.

210.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

211.    There is an actual controversy within the jurisdiction of this court, in as much as one or more federal defendants have engaged in actions endangering Plaintiffs and class members protesting federal immigration policy on the streets of the Northern District of Illinois. No federal authority has agreed to stop this practice.

212.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful, and an injunction precluding Defendants from continuing them.

## COUNT VII

## Conspiracy

213.    Plaintiffs incorporate each of the paragraphs of this complaint as if restated fully herein.

214.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiffs and class members of their constitutional rights, all as described in the various paragraphs of this Complaint.

215.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiffs and class members of these rights.

216.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

217.     The misconduct described herein was undertaken intentionally, in total disregard of Plaintiffs' and class members' constitutional rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment and the following relief:

1.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint restrain Plaintiffs' ability to assemble, peacefully protest, pray, and gather news, in violation of the First Amendment;

2.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of using excessive and retaliatory force, in violation of the First and Fourth Amendments;

3.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will have excessive and retaliatory force used on them, in violation of the First and Fourth Amendments;

4.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of committing arrests without probable cause, in violation of the Fourth Amendment;

5.      A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will be arrested without probable cause, in violation of the Fourth Amendment;

6.      An order vacating and setting aside Defendants' unlawful policies and final agency actions of suppressing disfavored speech, retaliation, interference with free exercise of religion, excessive force, and policing and defending federal property beyond the lawful authority of the federal officials, 5 U.S.C. § 706; and

7.      An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the unlawful actions described in this complaint, and specifically prohibiting Defendants, their officers, agents, assigns, and all persons acting in concert with them from:

a.      Dispersing, arresting, threatening to arrest, threatening or using physical force against any person whom they know or reasonably should know is a Journalist, unless Defendants have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order. Defendants may ask a Journalist to change location to avoid disrupting law enforcement, as long as the instructions are clear and the press have time to comply and sufficient opportunity to report and observe;

b.      Issuing a dispersal order requiring any person to leave a public place that they lawfully have a right to be, unless dispersal is justified by a commanding officer's finding of a serious threat to public safety;

c.      Using riot control weapons—including but not limited to kinetic impact projectiles (KIPs), Pepper ball or paintball guns, pepper or OC spray, tear gas or other chemical irritants, soft nose rounds, 40 or 37mm launchers, less-lethal shotguns, and

flashbang, Stinger, or rubber-ball grenades—on any person who is not themselves posing a threat of imminent physical harm to a law enforcement officer or another person;

d.     Using riot control weapons (including those described above) at identified targets, if doing so could foreseeably result in injury to any person who is not posing a threat of imminent physical harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;

e.     Firing large riot control weapons—including but not limited to tear gas canisters, flashbang, Stinger grenades, or rubber-ball grenades—so as to strike any person, including by deploying these weapons above the head of the crowd, unless the person poses an imminent threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

f.     Firing projectile riot control weapons—including but not limited to KIPs, pepper balls, paintballs, and soft nose rounds—at the head, neck, groin, torso, or other sensitive areas of any person, or striking any person with a vehicle, unless that person poses an immediate threat of serious bodily injury to a law enforcement officer or another person;

g.     Using force, such as pulling or shoving a person to the ground, tackling, body slamming, or kettling on individual(s) who pose no immediate threat of physical harm to others, unless necessary and proportional to effectuate an apprehension and arrest;

h.     Using any riot control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individual(s), unless the threat of physical harm is so serious and imminent that a warning is infeasible. Such warnings shall explain that Defendants may employ riot control weapons, give the targeted individual(s) sufficient time to avoid the use of force, and leave room and

63

opportunity for safe egress. If it appears that the intended audience was unable to hear the warnings, the warning must be repeated prior to the use of riot control weapons;

i.     Seizing or arresting any non-violent person who is not resisting a lawful dispersal order, unless there is specific probable cause to believe that the individual has committed a crime for which a custodial arrest is warranted and for which the federal agent has lawful authority to make an arrest;

8.     An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the unlawful actions described in this complaint, and specifically requiring Defendants, their officers, agents, assigns, and all persons acting in concert with them to have visible identification (name and/or badge number) affixed to their uniforms and prominently displayed, including when wearing riot gear; and

9.     Any other relief this Court deems proper.

RESPECTFULLY SUBMITTED,

**CHICAGO HEADLINE CLUB, et al.**

By:    /s/ Locke E. Bowman

*One of Plaintiffs' Attorneys*

64

Jon Loevy
Locke Bowman
Steve Art
Heather Lewis Donnell
Theresa Kleinhaus
Scott Rauscher
Matt Topic
Julia Rickert
Tara Thompson
Lindsay Hagy
Jordan Poole
Dominique Gilbert
Justin Hill
Aaron Tucek
**LOEVY + LOEVY**
311 N. Aberdeen Street
Chicago, Illinois 60647
(312) 243-5900
steve@loevy.com

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
⅟ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL
RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern
Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2224
wally.hilke@law.northwestern.edu

Craig B. Futterman
**MANDEL LEGAL AID CLINIC**
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

Hayden Johnson*
Katie Schwartzmann*
Conor Gaffney*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave NW, Ste 163
Washington DC 20006
(202) 579-4582
* *Admitted pro hac vice*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
Hirsh Joshi
Priyanka Menon
**ROGER BALDWIN FOUNDATION
OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org

65