## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHICAGO HEADLINE CLUB *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | **No. 25-cv-12173** |
| | ) | |
| v. | ) | **Hon. Sara L. Ellis** |
| | ) | **District Judge** |
| KRISTI NOEM, Secretary of U.S. Department of Homeland Security, in her official capacity, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. III

INTRODUCTION .............................................................................................. 1

RELEVANT FACTUAL BACKGROUND............................................................ 1

I.   Operation Midway Blitz Is Part of The Federal Government's Campaign of Retaliation and Punishment Based on the Viewpoints of People in This District................................. 1

II.  Defendants' Unlawful Actions Extend Throughout This District........................................ 3

III. Defendants' Violence and Violations Have Continued Even Following Entry of the TRO 5

ARGUMENT .................................................................................................... 6

I.   Governing Legal Standards............................................................................. 6

II.  Plaintiffs Are Likely to Succeed on the Merits of their Claims ......................................... 6

     A.   Plaintiffs Are Likely to Prevail on Their First Amendment Speech and Retaliation Claims....................................................................... 7

     B.   Clergy and Other Religious Practitioners Have Free Speech and Assembly Rights to Freely Exercise Their Religion............................................ 13

     C.   The Religious Exercise Plaintiffs Are Likely To Succeed on the Merits of their Free Exercise and RFRA Claims ............................................. 29

     D.   Plaintiffs Are Likely to Prevail on the Merits of Their Fourth Amendment Claims ......................................................................... 33

III. Absent a Preliminary Injunction, Plaintiffs Will Continue to Suffer Irreparable Harm ... 39

     A.   Irreparable Harm under the First Amendment and RFRA Is Presumed .............. 39

     B.   Fourth Amendment Injuries Further Constitute Irreparable Harm ...................... 40

     C.   Plaintiffs Have No Alternative Adequate Legal Remedy ................................... 41

IV.  The Balance of Equities and Public Interest Favor an Injunction .................................... 42

V.   Plaintiffs Have Standing To Obtain the Relief They Seek and This Court Has the Authority to Order it ....................................................................... 43

A.     Plaintiffs Have Standing to Seek to Enjoin the Violence, Targeting, and Retaliation levied at Opposition to and Documentation of Operation Midway Blitz ................................................................................................... 43

B.     This Court is Authorized to Enjoin Defendants' Conduct Throughout This District ....................................................................................................... 45

CONCLUSION ...................................................................................................... 45

# TABLE OF AUTHORITIES
## CASES

Abay v. City of Denver, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020) .......................................... 27

ACLU v. Alvarez, 679 F.3d 583, 589 (7th Cir. 2012) ........................................................... passim

Anthony v. Seltzer, 696 Fed. App'x 79 (3d Cir. 2017) ................................................................ 37

Arizona Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721 (2011) ...................... 10

Ashcroft v. ACLU, 542 U.S. 656 (2004) ...................................................................................... 16

Associated Press v. Budowich, 780 F. Supp. 3d 32 (D.D.C. 2025) .............................................. 17

Barham v. Ramsey, 434 F.3d 565 (D.C. Cir. 2006) ...................................................................... 34

Bell v. Keating, 697 F.3d 445 (7th Cir. 2012) .............................................................................. 44

Bevis v. City of Naperville, 85 F.4th 1175 (7th Cir. 2023) ............................................................ 6

Boos v. Barry, 485 U.S. 312 (1988) ......................................................................................... 7, 23

Bridges v. Gilbert, 557 F.3d 541 (7th Cir. 2009) ......................................................................... 25

Broadrick v. Oklahoma, 413 U.S. 601 (1973) .............................................................................. 44

Brown v. Entertainment Merchants Ass'n, 563 U.S. 786 (2011) .................................................. 22

Brown v. Kemp, 86 F.4th 745 (7th Cir. 2023) .............................................................................. 16

Brown v. Louisiana, 383 U.S. 131 (1966) .................................................................................... 12

Cassell v. Snyders, 458 F. Supp. 3d 981 (N.D. Ill. 2020) ............................................................ 30

Chicago Women in Trades v. Trump, 773 F. Supp. 3d 592 (N.D. Ill. 2025) .................................. 6

Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993) ................. 29, 30, 32

City of Houston, Tex. v. Hill, 482 U.S. 451 (1987) ........................................................................ 9

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ....................................................................... 44

Clash v. Beatty, 77 F.3d 1045 (7th Cir. 1996) ............................................................................. 38

Common Cause Ind. v. Lawson, 937 F.3d 944 (7th Cir. 2019) ..................................................... 43

DM Trans, LLC v. Scott, 38 F.4th 608 (7th Cir. 2022) ................................................................. 41

Edwards v. South Carolina, 372 U.S. 229 (1963) ........................................................... 8

Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008) ..................................................... 37

Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991) .................................................. 17

Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011) ................................................................ 10

Graham v. Connor, 490 U.S. 386 (1989) ....................................................................... 36

Gupta v. Melloh, 19 F.4th 990 (7th Cir. 2021) ............................................................... 38

Hague v. CIO, 307 U.S. 496 (1939) ............................................................................... 14

Hartman v. Moore, 547 U.S. 250 (2006) ....................................................................... 25

Holt v. Hobbs, 574 U.S. 352 (2015) ........................................................................ 30, 33

Hoover v. Wagner, 47 F.3d 845 (7th Cir.1995) .............................................................. 44

Illinois v. Trump, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ...................................... 36

Index Newspapers LLC v. United States Marshals Serv., 977 F.3d 817 (9th Cir. 2020) ............. 24

Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago, 56 F.4th 437 (7th Cir. 2022) .......... 39

Jacobs v. City of Chicago, 215 F.3d 758 (7th Cir. 2000) ............................................... 38

Joelner v. Vill. of Washington Park, 378 F.3d 613 (7th Cir. 2004) ............................... 42

John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers, 994 F.3d 602 (7th Cir. 2021) ............... 17, 24

Korte v. Sebelius, 735 F.3d 654 (7th Cir. 2013) ............................................... 29, 31, 39

League of Women Voters of the U.S. v. Newby, 838 F.3d 1 (D.C. Cir. 2016) ............................ 42

Lewis v. City of New Orleans, 415 U.S. 130 (1974) ........................................................ 9

Los Angeles Press Club v. Noem,
    No. 2:25-CV-05563-HDV-E, 2025 WL 2658327 (C.D. Cal. Sept. 10, 2025) .................. passim

Lozman v. City of Riviera Beach, Fla., 585 U.S. 87 (2018) ............................................ 25

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ...................................................... 43

Mahmoud v. Taylor, 606 U.S. ___, 145 S. Ct. 2332 (2025) ........................................... 39

Maryland v. Pringle, 540 U.S. 366 (2003) ..................................................................... 34

Massey v. Johnson, 457 F.3d at 717 (Aug. 10, 2006) .................................................. 27

Masterpiece Cakeshop v. Colo. Civil Rights Comm., 584 U.S. 617 (2018)................................. 30

Mazurek v. Armstrong, 520 U.S. 968 (1997)........................................................ 6

McGann v. Trathen,
    No. 1-16-CV-01235-JMS-DML, 2017 WL 5571289 (S.D. Ind. Nov. 20, 2017) ................... 23

Mills v. Alabama, 384 U.S. 214 (1966) .......................................................... 11

Minnesota Voters All. v. Mansky, 585 U.S. 1 (2018)................................................ 15

Neita v. City of Chicago, 830 F.3d 494 (7th Cir. 2016)............................................ 34

Nelson v. City of Davis, 685 F.3d 867 (9th Cir. 2012) ........................................ 37, 38

Nicodemus v. City of South Bend, 137 F.4th 654 (7th Cir. 2025)..........................10, 11, 12, 19

Nken v. Holder, 556 U.S. 418 (2009) ............................................................. 6

Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37 (1983) ........................ 14, 15

Quraishi v. St. Charles Cnty., 986 F.3d 831 (8th Cir. 2021) ................................. 37, 38

Reed v. Town of Gilbert, 576 U.S. 155 (2015) ............................................... 15, 16

Reporters Comm. for Freedom of the Press v. Rokita, 147 F.4th 720 (7th Cir. 2025) ................ 45

Schirmer v. Nagode, 621 F.3d 581 (7th Cir. 2010) ................................................ 44

Simic v. City of Chicago, 851 F.3d 734 (7th Cir. 2017) .......................................... 43

Smith v. City of Chicago, 143 F. Supp. 3d 741 (N.D. Ill. 2015)................................... 44

Snyder v. Phelps, 562 U.S. 443 (2011) ........................................................... 7

Sorrell v. IMS Health Inc., 564 U.S. 552 (2011) ................................................. 9

Speech First, Inc. v. Killeen, 968 F.3d 628 (7th Cir. 2020) ................................. 6, 44

St. John's United Church of Christ v. City of Chi., 502 F.3d 616 (7th Cir. 2007)................ 30

Surita v. Hyde, 665 F.3d 860 (7th Cir. 2011) ................................................... 25

TikTok Inc. v. Garland, 604 U.S. 56 (2025) ..................................................... 18

TransUnion LLC v. Ramirez, 594 U.S. 413 (2021).................................................. 43

Trump v. CASA, Inc., 606 U.S. 831 (2025) ............................................................... 45

Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622 (1994) ........................................... 19

Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180 (1997).............................. 19

United States v. Grace, 461 U.S. 171 (1983) ............................................................. 15

United States v. Husband, 226 F.3d 626 (7th Cir. 2000).......................................... 37

United States v. Paul Ivery, 25-cr-609 (N.D. Ill.) ..................................................... 36

United States v. Ray Collins and Jocelyne Robledo, 25-cr-608 (N.D. Ill. Oct. 7, 2025) ............. 36

Village of Broadview v. U.S. Dep't of Homeland Security,

   No. 25 C 12164, 2025 WL 2896819 (N.D. Ill. Oct. 9, 2025) ............................... 3, 14

Vodak v. City of Chicago, 639 F.3d 738 (7th Cir. 2011).......................................... 34

W. Va. St. Bd. of Educ. v. Barnette, 319 U.S. 624 (1943) ........................................ 30

West v. Radtke, 48 F.4th 836 (7th Cir. 2022)........................................................ 31, 32

Williams v. Ind. State Police Dep't, 797 F.3d 468 (7th Cir. 2015) ............................ 36

Williams-Yulee v. Fla. Bar, 575 U.S. 433 (2015) ..................................................... 20

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2009) ................................. 6, 42

**STATUTES**

18 U.S.C. § 247(a)(2)................................................................................................ 33

42 U.S.C. § 2000bb-1(a), (b) ................................................................ 29, 30, 31, 33

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. IV................................................................................................ 36

**INTRODUCTION**

The Court should enjoin Defendants from continuing to violate the core constitutional rights of members of the press, demonstrators, people of faith, and civilians exercising their right to observe, record, and protest government officials. Even this Court's Temporary Restraining Order (TRO) has not prevented Defendants from continuing to violate the rights of people in this District. Plaintiffs are likely to succeed on the merits of their constitutional and statutory claims; Plaintiffs have no alternative adequate remedy at law; and Plaintiffs will continue to suffer irreparable harm if Defendants are not restrained. Overwhelmingly, enjoining Defendants' unlawful conduct serves the public interest. Stopping Defendants' brutal attacks and severe violations of the rights of *non-violent* demonstrators, observers, clergy, and journalists who pose no imminent threat presents no cognizable harm to Defendants.

A preliminary injunction is necessary and appropriate.

**RELEVANT FACTUAL BACKGROUND**

Plaintiffs incorporate the background from their TRO motion, Dkt. 21, and the Amended Complaint. Dkt. 80. In seeking relief, Plaintiffs rely on the evidence previously submitted, *see* Dkt. 22, testimony from October 20, 2025, Dkt. 75, and further evidence submitted before or at the November 5 evidentiary hearing. *E.g.*, Dkt. 73, Dkt. 77, Dkt. 79.

**I.     Operation Midway Blitz Is Part of The Federal Government's Campaign of Retaliation and Punishment Based on the Viewpoints of People in This District**

The Trump Administration has undertaken an aggressive federal incursion into Chicago and its suburbs, which it calls Operation Midway Blitz. *See* Dkt. 21 at 1-6 (collecting sources).[1] Pursuant to Midway Blitz, Defendants have engaged in a widespread and ongoing pattern of violent and unlawful conduct in throughout this District.

---

[1] Permanent links to sources in this filing are in the Declaration of Lindsay Hagy, Dkt. 79.

The Administration has not been shy about its view that people who criticize, or even report on, the government's aggressive actions should be silenced and even punished for their views. *Id.* In early September, President Trump, referencing "Chipocalypse Now," indicated Chicago was about to "find out why it's called the Department of WAR." Dkt. 1 at 19. Soon after, agents from the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Customs and Border Protection (CBP), and other agencies began terrorizing residents throughout this District. *See* Dkt. 21 at 6-7.

Dissent, and press coverage of that dissent, ensued on the public streets outside of an ICE detention facility in Broadview, Illinois. *Id.* In response to those demonstrations, to clergy and other leaders of faith expressing moral outcry, and to extensive press coverage, Defendants began inflicting extreme physical force and chemical and impact munitions such as rubber bullets, pepper balls, flashbang grenades, and teargas against Plaintiffs. *Id.* at 8. These acts were retaliatory, and the leaders of Midway Blitz, Defendant Noem and Defendant Bovino, explicitly indicated they were going to punish and arrest protestors for their speech and turn a "First Amendment Zone" into a "Free Arrest Zone." Dkt. 1 at 21-22.

Defendants' actions were so obviously unlawful that Broadview issued an executive order about the situation. In so doing, Broadview first recognized that the protests at the facility "predictably" followed Defendants' actions. Dkt. 73-30. Consistent with Plaintiffs' evidence, Broadview found it was Defendants—not Plaintiffs—who engaged in "escalation of violence" near the facility. *Id.* That escalation included but was not limited to "needlessly deploying tear gas, pepper spray, mace, and rubber bullets at individuals and reporters, thereby injuring Village residents." *Id.* Broadview even had to obtain its own injunction to prevent Defendants from

blocking the public streets. *Village of Broadview v. U.S. Dep't of Homeland Security*, No. 25 C 12164, 2025 WL 2896819, at *1 (N.D. Ill. Oct. 9, 2025), filed as Exhibit 76, Dkt. 73-71.

## II.     Defendants' Unlawful Actions Extend Throughout This District

As Operation Midway Blitz has progressed, federal officers have expanded their actions against Plaintiffs beyond the Broadview ICE facility and throughout this District to places like Logan Square in Chicago and Brighton Park. Dkt. 21 at 11-12. In Logan Square on October 3, witness accounts and video show that federal agents sitting in traffic deployed tear gas against a small crowd of non-violent and non-threatening demonstrators and onlookers. The agent who dropped the canister, casually dropped the canister without warning or a hint of threat to anyone on a busy street and in a dense residential area nearby a children's daycare. Dkt.73-10 (Beale Decl.) ¶¶2-11. In Brighton Park the next day, again without audible warning, DHS agents deployed plumes of tear gas and flashbang grenades against a crowd of assembled protestors, observers, and press, before speeding away. Dkt. 73-7 (Villa Decl.) ¶¶13-14, 17; Dkt. 22-39 (Goyette Supp. Decl.) ¶¶15-19.

In Albany Park the afternoon of October 12, federal agents wearing no identification made an immigration arrest near the intersection of N. Sawyer and W. Wilson Avenue.[2] Neighbors, seeing the arrest, began to gather to observe, record, and protest DHS agents, and over 50 residents eventually came to observe and protest the officers. Dkt.73-16 (Peachey Decl.) ¶3. The agents drove into a woman standing in the street and ran over her foot. Dkt. 73-1 (Mack Decl.) ¶7. Subsequently, neighbors stood on the sidewalk and in the street, expressing their beliefs that the agents' activities were inappropriate and excessive. Dkt. 79 (Hagy Decl.) ¶76. An agent emerged from a vehicle with a canister in his hand, and threw tear gas into the crowd of

---

[2] *See* https://blockclubchicago.org/2025/10/13/federal-agents-deploy-tear-gas-in-albany-park-as-neighbors-block-immigration-arrest/ (last visited on Oct. 21, 2025); Dkt. 79 (Hagy Decl.) ¶75.

onlookers. *Id.* Publicly posted video footage of the incident shows no sign of any violence or physical threat that would provoke Defendants' use of chemical weapons in a dense residential neighborhood. *Id.* Worse still, the evidence shows that agents gave no warnings. *Id.*; *see also* Dkt. 73-1 (Mack Decl.) ¶1.

On October 14, 2025, federal agents (again, failing to wear unique identifying markings) engaged in high-speed chases throughout Chicago's East Side neighborhood, eventually ramming a vehicle and immobilizing it at the intersection of South 105th Street and Avenue N.[3] While conducting an arrest, agents deployed large amounts of tear gas into and over the head of a crowd and began shooting rubber bullets, without giving any warnings audible to the protesters, observers, or journalists who had gathered. *See, e.g.*, Dkt. 73-8 (Garcia Decl.) ¶¶5-14; Dkt. 73-11 (Kaplan Decl.) ¶¶13-15, 18-22; Dkt. 73-15 (Pedroza Decl.) ¶¶12-15; Dkt. 73-17 (Rodriguez Decl.) ¶¶8-12. Manuel Garcia, a resident of the neighborhood, helped his four-year-old daughter escape from tear gas and rubber bullets, and later helped a woman and her baby escape from the scene after agents again deployed tear gas at the crowd without warning; as Mr. Garcia fled with the baby in hand, federal agents threw a tear gas canister that landed feet away from him. Dkt. 73-8 (Garcia Decl.) ¶¶9-10, 13-14; Dkt. 79 (Hagy Decl.) ¶61.

Agents have also threatened residents for exercising their right to observe and record federal agents. Dkt. 73-12 (Barrera Decl.) ¶¶6-10 (describing federal agents blocking in and aggressively photographing and filming an observer parked 50-100 feet away from an immigration arrest); Dkt. 73-13 (Cortez Decl.) ¶¶3-5 (describing federal agents driving up to a

---

[3] For video and other media, see also Mary Norkol et al., *Feds ram SUV after chase down residential street in Chicago, then tear-gas crowd*, Chi. Sun-Times, Oct. 14, 2025, available at https://chicago.suntimes.com/immigration/2025/10/14/crash-involving-immigration-agents-in-east-side-leads-to-tear-gas-detentions (last accessed Oct. 21, 2025).

resident recording an immigration arrest at a distance and aiming a pepper ball-gun-like weapon directly at her in Cicero, Illinois).

In similar fashion, attorney Jo-Elle Munchak was driving home in Edgewater the morning of October 10, when she saw agents speaking with landscapers near parked cars. Dkt. 77-1 (Munchak Decl.) ¶¶3-4. Ms. Munchak pulled over to videotape the encounter, recorded for a few minutes until the landscaper was handcuffed, and began to drive away. *Id.* Federal agents then blocked her car in with their SUV, pointed "some sort of long gun directed at her head," and began pounding on her windows. *Id.* ¶¶17-21. Though they eventually relented, they threatened she would be detained next time. *Id.* ¶24. As a result, Ms. Munchak is now afraid and hesitant to record law enforcement officers again, though she would like to do so. *Id.* ¶26.

## III. Defendants' Violence and Violations Have Continued Even Following Entry of the TRO

As this Court observed, apparent violations of the TRO have been widely reported. Plaintiffs have offered evidence of ongoing violations, Dkt. 63, which will be taken up at the evidentiary hearing. And, this Court has modified the TRO, Dkt. 66, and heard evidence from CBP and ICE officials about the situation on the ground. Dkt. 75.

There is more evidence that violations of the TRO—including via retaliation, tear gas as a dispersal mechanism, and lack of identification—extend beyond these moments. In addition to the examples noted above—where Defendants fired tear gas and other munitions at nonviolent protesters, observers, and press without audible warning and in violation of this Court's orders— agents have repeatedly failed to prominently display unique visible identification. Overall, substantial evidence shows Defendants' rampant violations of the Court's TRO. *See, e.g.*, Dkt. 73-1 (Mack Decl.) at ¶¶4, 8 (Albany Park, October 12); Dkt. 73-8 (Garcia Decl.) ¶8 (East Side,

October 14); Dkt. 73-15 (Pedroza Decl.) ¶8 (same); Dkt. 73-6 (Crespo Decl.) ¶28 (Hoffman Estates, October 10).[4]

## ARGUMENT

### I.    Governing Legal Standards

To obtain a preliminarily injunction, a movant must establish: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Chicago Women in Trades v. Trump*, 773 F. Supp. 3d 592, 603-04 (N.D. Ill. 2025) (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009). When, as here, the government is a party to the suit, the final two inquiries generally merge. *Chicago Women in Trades*, 773 F.3d Supp. at 604 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The party seeking preliminary relief "carries the burden of persuasion" on each of these points. *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). However, where, as here, plaintiffs are "likely to win on the merits, the balance of harms need not weigh as heavily in [their] favor." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020).

### II.    Plaintiffs Are Likely to Succeed on the Merits of their Claims

Plaintiffs bring claims under the First Amendment, the Fourth Amendment, and the Religious Freedom Restoration Act. Plaintiffs are likely to succeed on the merits of each claim.

---

[4] Photos similarly depict images of federal agents who appear not to be wearing identification as required by the TRO. *See, e.g.*, Dkt. 73-11 (Kaplan Decl.) (several photos of federal agents without identification); Dkt. 73-6 (Crespo Decl.) (same).

**A.    Plaintiffs Are Likely to Prevail on Their First Amendment Speech and Retaliation Claims**

Plaintiffs are likely to prevail on several First Amendment claims, including that (1) Defendants (often violent) restrictions on their activities unconstitutionally burdens protected speech; and (2) Defendants have retaliated against Plaintiffs for their speech.

"In First Amendment cases, the likelihood of success . . . will often be the determinative factor" in granting an injunction. *ACLU v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (cleaned up). Here, Defendants cannot dispute that Plaintiffs—nonviolent protestors, clergy, journalists, and observers—are engaged in core First Amendment-protected activity. The evidence shows, and Plaintiffs expect to further demonstrate, Defendants have suppressed that activity by targeting the content of their speech, retaliating against them, unlawfully ordering Plaintiffs to disperse from public fora where they have a First Amendment right to be, using unlawful force and threats of violence that strikes fear and chills their expression, and arresting them to halt their continued speech. This clear and ongoing pattern of severe First Amendment abridgements is not outweighed by, or tailored to, any countervailing government interest.

**1.    Plaintiffs Are Engaged in Speech and Conduct Protected by the First Amendment**

**a)    Demonstrating, Protesting, Documenting, Objecting to and Observing Government Action is Core Protected Speech and Conduct**

Plaintiffs participating in non-violent protest are engaged in the highest form of First Amendment-protected expression: political dissent. "Organized political protest is a form of classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988). Plaintiffs' "[s]peech on matters of public concern" like Operation Midway Blitz "is at the heart of the First Amendment protection." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (citation omitted). Their decision to chant, sing, shout, march, or pray is "an exercise of these basic constitutional rights in their most

pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). They have a fundamental right to do so free from being beaten, gassed, and shot again by federal agents.

The First Amendment protects these rights, both for the individual and the assembled collective. Chicagoans have come together in numbers large and small to dissent against Operation Midway Blitz. Protesters have gathered at the Broadview Detention facility, expressing their views in a range of nonviolent means and in numbers ranging from a handful to a few hundred. Dkt. 22-19 (Boyle Decl.) ¶5, 8 (describing protest of music, chanting, marching and filming); Dkt. 22-9 (Breslin Decl.) ¶¶8, 11 (describing chanting); Dkt. 22-18 (Held Decl.) ¶21 (describing music and chanting); Dkt. 22-2 (Curran Decl.) ¶¶15, 21 (describing verbal protest, chanting, yelling, and expressing views opposing ICE); Dkt. 22-31 (Thomson Decl.) ¶10 (describing use of megaphone to denounce violence); Dkt. 22-7 (Sullivan Decl.) ¶4 (people holding signs like "immigrants welcome here" and chanting); Dkt. 22-43 (Yarusso Decl.) ¶8; Dkt. 22-10 (Shouse Decl.) ¶¶2-4. They gather to express concerns about the violent escalations of immigration agents in their community. Dkt. 22-5 (Sigcho-Lopez Decl.) ¶¶4-5; Dkt. 22-12 (Reidy-Hamer Decl.) ¶3; Dkt. 22-7 (Sullivan Decl.) ¶2; Dkt. 22-6 (Paulson Decl.) ¶4. They seek to express outrage at the seizure and detention of people absent due process. Dkt. 22-15 (Sakiyama Decl.) ¶¶3-4; Dkt. 22-11 (Roche Decl.) ¶3, and to petition the government to release neighbors and loved ones from DHS custody. Dkt. 22-9 (Breslin Decl.) ¶11 (chanting "Free Isaac."); Dkt. 22-8 (Kunkel Decl.) ¶2.

Chicago residents have also gathered to express dissent on the streets and sidewalks of the community beyond the Broadview Detention Center, to voice dissent against DHS agents conducting militarized operations. Dkt. 22-34 (Orozco Decl.) ¶3; Dkt. 22-41 (Espinoza Decl.) ¶3. They have gathered on street corners outside of their homes, in protest of DHS activity and

violence, chanting and asking questions of DHS agents. Dkt. 73-15 (Pedroza Decl.) ¶¶9, 11. They stand in dissent, because they are concerned about increasingly reckless and dangerous government action in their residential neighborhoods. Dkt. 73-8 (Garcia Decl.) ¶¶3, 9. Protesters chant slogans like "get out of our neighborhood," "you don't belong here," and "how do you sleep at night?" Dkt. 22-34 (Orozco Decl.) ¶5; Dkt. 22-41 (Espinoza Decl.) ¶5. Some hold signs, flags, and placards as a form of protest. Dkt. 22-21 (Goyette Decl.) ¶14; Dkt. 73-8 (Garcia Decl.) ¶6. They take photos of operations, without impeding them, to "create greater accountability for ICE actions in the city." Dkt. 73-12 (Barrera Decl.) ¶¶6-8.

All of these forms of protest are core protected speech, even when words are harsh and emotions rise, as "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). Because Defendants are law enforcement, they "may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Id.* (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (Powell J., concurring)). Plaintiffs are exercising fundamental First Amendment rights to criticize Defendants' policies and tactics in their community. Indeed, "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-63.

Beyond protesting Defendants' actions, Plaintiffs include people who observe and record federal agents in public places. Like protest activity, this "creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). The rights of observers specifically include the "act of *making* an audio or audiovisual recording . . . as a corollary of the right to disseminate the resulting

9

recording." *Alvarez*, 679 F.3d at 595. Restricting these observing and recording rights "suppresses speech just as effectively as restricting the dissemination of the resulting recording." *Id.* at 596.

In particular, "there is a First Amendment right to record the police in the execution of their duties in public spaces." *Nicodemus v. City of South Bend,* 137 F.4th 654, 663 (7th Cir. 2025) (citing *Alvarez*, 679 F.3d at 600-01). "The First Amendment interests" in recording law enforcement activities "are quite strong" due to "our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 597 (quoting *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011)). Thus, although people may not impede ongoing law enforcement activities, *Nicodemus*, 137 F.4th 654, 663 n.8, "police may not order people to disperse just because they are exercising their right to record," *id.* at 664. "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Alvarez*, 679 F.3d at 601 (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)).

Plaintiffs and the Class have engaged in the same protected conduct *Alvarez* and *Nicodemus* recognize by observing, recording, documenting, and disseminating the activities of federal agents in the course of their law enforcement activities. For example, Juan Munoz stood quietly in a designated protest zone filming agents at Broadview before Defendant Bovino climbed over a railing, smacked away his phone, tackled him to the ground, and arrested him for no apparent reason. Dkt. 73-9 (Munoz Decl.) ¶¶14-17. Arely Berrera learned about ICE enforcement activity in a particular location, drove there and took photos of that activity from approximately 50-100 feet away, from her car. Dkt. 73-12 (Berrera Decl.) ¶¶5-8. Agents

10

approached her, and engaged in intimidation that makes her now afraid to record federal agents even though she would like to. *Id.* ¶¶9-13. Likewise, Leslie Cortez recorded an immigration arrest at a distance, only to have an agent aim a weapon that looked like a pepper ball gun directly at her. Dkt. 73-13 (Cortez Decl.) ¶¶4-5. And similarly, Maya Rodriguez was observing federal agents alongside a group of journalists—in an area separate from protesters—when a federal agent threw a tear gas canister directly towards her and the journalists. Dkt. 73-17 (Rodriguez Decl.) ¶¶10-12. None of these observers and recorders impeded federal law enforcement activity; Defendants targeted them and violated their First Amendment rights without any legitimate justification.

> **b)** **Press Plaintiffs' Newsgathering Is Protected by the First Amendment**

Press plaintiffs are also engaged in classic First Amendment-protected activity. "The Constitution specifically selected the press … to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). This constitutional protection reflects "'our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' especially when it pertains to the actions of government officials." *Nicodemus*, 137 F.4th at 664 (quoting *Alvarez*, 679 F.3d at 597). Accordingly, newsgathering—observing, recording, witnessing, interviewing, and otherwise gathering information—are "paradigmatic" First Amendment-protected activities. *Los Angeles Press Club v. Noem*, No. 2:25-CV-05563-HDV-E, 2025 WL 2658327, at *16 (C.D. Cal. Sept. 10, 2025). This constitutional protection does not waver if the news that is being gathered relates to law enforcement operations and seeks to observe the conduct of law enforcement agents. *See Nicodemus*, 137 F.4th at 663. Instead, the

11

ability to report on policing issues is core to the purpose of the Free Press Clause, and journalists' "role is particularly critical, where, as here, the federal government is engaged in sudden and secretive immigration raids, which the public has limited opportunity to observe firsthand and so must rely necessarily upon the press." *L.A. Press Club*, 2025 WL 2658327, at *20 (citations, quotations, and alterations omitted).

Equal to the press's right to gather news on public events and public officials is the press's right to access public fora to gather the news. *Nicodemus*, 137 F.4th at 663. ("One's ability to access these sacrosanct places . . . is a First Amendment concern in and of itself." (quoting *Brown v. Louisiana*, 383 U.S. 131, 142 (1966)). If the government restricts the press's ability to enter public fora to conduct First Amendment-protected activity, that restriction is also subject to constitutional scrutiny. *Id*.

Here, Press Plaintiffs are engaged in newsgathering activities protected by the First Amendment. For instance, Plaintiff Block Club Chicago is a non-profit news organization whose reporters and photojournalists have been regularly covering protests and public response to Operation Midway Blitz and other federal law enforcement in Chicagoland since June. Dkt. 22-20, ¶¶5-19. Their journalists wear clear press identification, stay strictly in public areas, and do not engage in protests—their distinct "role is to document and report on what is happening so that the citizens of Chicagoland can be informed." *Id*. ¶¶22, 24.

Plaintiff Raven Geary is a co-founder and reporter with Unraveled Press. Dkt. 22-17 ¶2. She has been reporting on ICE activity, especially at the Broadview facility, since September. *Id*. ¶3. She published daily updates, live threads, and dozens of stories in September alone about the protests and federal response at Broadview. *Id*. ¶6. When reporting on protests, Ms. Geary wears clear press identification and generally stays away from protestors and law enforcement to the

12

extent she can still accurately report on the events. *Id*. ¶5. She never interferes with police activities while documenting these protests. *Id*.

Plaintiff Stephen Held is also a co-founder and reporter with Unraveled Press. Dkt. 22-18 ¶2. He has reported on federal operations at Broadview dozens of times since August, observing activity and publishing this information to the public. *Id*. ¶3. Like his colleague, Mr. Held wears clear press identification when reporting and only engages with federal officials and law enforcement to ask them questions or conduct other newsgathering. *Id*. ¶4. These are merely examples of the other journalists and news outlets that the press associational plaintiffs and the subclass represent, all of whom are engaged in the core First Amendment activity of covering Operation Midway Blitz and the protests opposing it. *See, e.g.*, Dkt. 22-15 (Grimm Decl.) ¶¶2, 6-15 (discussing repeated attacks on members of Plaintiff Chicago News Guild Local 34071 by federal agents, including multiple examples of aiming force directly at journalists); Dkt. 22-26 (Arnold Decl.) ¶¶3, 7-11 (documenting repeated assaults on Chicago-area journalist members of the Chicago Headline Club by federal agents); Dkt. 73-4 (Farina Decl.) ¶7 (describing federal agents targeting press).

## B. Clergy and Other Religious Practitioners Have Free Speech and Assembly Rights to Freely Exercise Their Religion

Finally, the clergy Plaintiffs among the demonstrators have a First Amendment free speech interest in expressing their religious views. Individuals "engage[d] in religious worship and discussion" are expressing "forms of speech and association protected by the First Amendment." *Widmar v. Vincent*, 454 U.S. 263, 269 (1981). Here, Plaintiffs Black, Curran, Johnson, Holcombe and the subclass they represent have a free speech and assembly right, in

addition to their Free Exercise and RFRA rights, to continue ministering and praying without being subject to unlawful dispersal and use of force.[5]

### 1. Defendants' Restrictions on Plaintiffs' Speech in Traditional Public Fora Fail Every Applicable Constitutional Test

Plaintiffs—protestors, press, observers, and clergy alike—are all engaging in First Amendment protected activities in public streets and sidewalks. These are traditional public fora, "held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). The Broadview facility is surrounded by the public streets that people use to access their homes and businesses, and which have been used for free expression for decades. *See, e.g.*, Dkt. 22-2 (Curran Decl.) ¶2 (describing 19-year history of participation in Friday prayer vigils at Broadview); *cf. Village of Broadview*, 2025 WL 2896819, at *4 (concluding that the fence DHS erected was "on a public street"). Spontaneous protests have arisen in response to—and to express opposition of—DHS operations in neighborhoods and residential areas across this District, on public streets and sidewalks throughout the community. *See, e.g.*, Dkt. 73-10 (Beale Decl.), ¶¶2-11; Dkt. 73-7 (Villa Decl.) ¶¶13-14, 17; Dkt. 22-39 (Goyette Decl.) ¶¶2-14.

Nonetheless, Plaintiffs recount numerous incidents where Defendants have forced nonviolent individuals from these public fora by unlawful dispersal orders, extreme misuses of force, and false arrests, and make them fearful to return to safely exercise their rights. *E.g.*, Dkt. 73-8 (Garcia Decl.) ¶15; Dkt. 73-9 (Munoz Decl.) ¶¶38-45; Dkt. 73-15 (Pedroza Decl.) ¶19; Dkt. 73-17 (Rodriguez Decl.) ¶15; Dkt. 73-28 (Sampson Decl.) ¶16; Dkt. 73-19 (Blackburn Decl.) ¶¶24-26; Dkt. 73-23 (Raad Decl.) ¶20; Dkt. 73-12 (Barrera Decl.) ¶¶7-12. Forcing people out of

---

[5] These issues are more fully discussed below.

a public forum where they have a right to be "is a First Amendment concern in and of itself." *Nicodemus*, 137 F.4th at 663–64 (citations omitted). And the government's power to restrict speech in these fora is "very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983).

Content-based restrictions on speech in traditional public fora "must satisfy strict scrutiny" and "those based on viewpoint are prohibited." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). Intermediate scrutiny applies to content-neutral restrictions that must still be "narrowly tailored to serve a significant government interest" and leave open adequate alternative channels for communication. *Perry*, 460 U.S. at 45.

Here, the record establishes that Defendants have and continue to target Plaintiffs with violent exclusion from public streets and sidewalks based on the content, and often the viewpoint, of their speech. Those actions fail strict scrutiny. Even assuming the Court might find some of Defendants' actions content-neutral, those too would fail under intermediate scrutiny.

> a)  **Defendants' Restrictions Are Content-Discriminatory and Fail Strict Scrutiny**

The record establishes a pattern and practice of Defendants targeting Plaintiffs and Class members exercising their rights in a public forum because of the content and viewpoint of their speech. With violence, baseless seizures, and unjustified orders to disperse, Defendants have and will continue to violate Plaintiffs' fundamental First Amendment rights to report, protest, pray, and record in these public places. As this Court has already observed, no one seriously believes Defendants would operate in this manner if Plaintiffs were celebrating Operation Midway Blitz. This type of government conduct that includes content-based discrimination is "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In light of Plaintiffs' *prima facie* case, Defendants cannot carry their burden to justify their conduct against non-violent

demonstrators, clergy, observers, and press. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (burden shifts to defendants).

Over the past few months, Defendants have repeatedly announced their intent to punish protesters for their "motivating ideology" and "opinion or perspective." *Reed*, 576 U.S. at 168 (internal quotation marks omitted); *Brown v. Kemp*, 86 F.4th 745, 780-81 (7th Cir. 2023) (recognizing that discriminating based on a speaker's motives is viewpoint-based discrimination). For example, on October 3, Defendants Noem and Bovino encouraged federal officers at Broadview to target protesters for their speech and affiliations. Dkt. 21 at 10.

Before that, in June, Defendant Noem threatened that "[t]he *more that they protest* and commit acts of violence against law enforcement officers, the harder ICE is going to come after them." Dkt. 79 (Hagy Decl.) ¶36. Defendant Bondi maligned the protests outside of the Broadview facility as a "riot" and suggested she sought to suppress the activity there. *Id.* ¶40. On September 30, President Trump described protesters as launching a "war from within" the United States and encouraged federal officers to use physical violence against protesters when they get too close. *Id.* ¶46. Defendant Trump also issued a presidential memorandum directing federal officers to "investigate, prosecute, and disrupt" entities and organizations who criticize "support for law enforcement and border patrol."[6] The memorandum is an instruction from the President to engage in viewpoint discrimination against protesters. Other statements resound in these messages. *E.g.* Dkt. 21 at 16-18 (collecting sources).

The record further shows a clear pattern establishing that Defendants are expelling Plaintiffs from traditional public fora because of their protected speech and conduct when they hold signs, chant, speak to officers, and otherwise assemble for the purpose of expressing their

---

[6] Available online at https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/ (last visited Oct. 21, 2025).

dissent to Operation Midway Blitz. *See, e.g.*, Dkt. 73-19 (Walsh Decl.) ¶¶5-7 (describing federal agents shooting pepper balls and throwing canisters and a flash-bang grenade towards nonviolent protesters who were signing by the side of the road at Broadview, and shooting a projectile through the declarant's guitar); Dkt. 22-7 (Sullivan Decl.) ¶8 (describing federal agents grabbing and shoving a nonviolent protester holding a sign); Dkt. 22-6 (Paulson Decl.) ¶13 (describing agents confiscating signs from protesters). Defendants are frequently using extreme force against Plaintiffs not for any public safety reason, but instead to send a message that their views are disfavored in that fora. But such "speech critical of the exercise of the State's power . . . has traditionally been recognized as lying at the core of the First Amendment." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035 (1991) (citation omitted). If Plaintiffs held signs saying and chanted "we love ICE" instead of telling DHS agents to go home, it cannot be doubted that Defendants' conduct toward those demonstrators would be far different. Defendants cannot force people from public streets and sidewalks, and chill them from returning, because of the government's disagreement with the viewpoints they express.

Concerning the Press Plaintiffs, Defendants' conduct is viewpoint discriminatory because they are excluding independent journalists who may portray their conduct in an objective or neutral light, but permitting journalistic activity by media who portray them in a favorable light. Specifically, they allow special access to favored media outlets but shoot impact and chemical munitions at disfavored outlets. In the press context, this is classic viewpoint discrimination. *See John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021); *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 49 (D.D.C. 2025).

Defendants' attack and arrest of reporter and plaintiff Stephen Held is illustrative. On September 27, Mr. Held was reporting from Broadview wearing clear press identification,

including a helmet with "PRESS" emblazoned across the front. Dkt. 22-18 ¶¶6, 30. As he recorded federal agents violently choke a woman, two agents started marching towards him. *Id*. ¶29. Mr. Held was not in a crowd, nor was he doing anything to threaten the safety of the agents or others—he was reporting. The agents tackled Mr. Held, handcuffed him, and detained him for several hours before releasing him without any charges. *Id*. ¶¶30–31.

By stark contrast, Defendant Bovino's chosen media and videographers were allowed to follow him around Broadview, even as Defendant Bovino was tackling and arresting people. *See id*.¶11. This selective exclusion of Press Plaintiffs (and other Plaintiffs exercising their journalistic rights) has occurred repeatedly. *See* Dkt. 73-9 (Munoz Decl.) ¶17 (describing separate incident of Defendant Bovino personally attacking press and demonstrators while being followed by people with cameras); *Id*. ¶¶19, 22 (Defendant Noem permitting YouTuber Benny Johnson to film arrests and interview her while others were attacked); Dkt. 73-18 (Blackburn Decl.) ¶13 (Defendant Noem permitting Johnson and others with cameras to follow her while protestors and journalists were being arrested on public right of way).

Defendants Bovino, Noem, and the Department of Homeland Security have all used the footage and reporting from the podcasters, videographers, and bloggers they prefer—and have allowed to observe and record in the public street—to promote the Government's preferred view of the events at Broadview. *See* Dkt. 79 (Hagy Decl.) ¶¶56-58. These acts threaten the entire information ecosphere—stifling the free exchange of information—which is precisely what the First Amendment endeavors to prevent. To put it mildly, Defendants' actions toward the press Plaintiffs "that discriminate among media, or among different speakers within a single medium . . . present serious First Amendment concerns." *TikTok Inc. v. Garland*, 604 U.S. 56, 72 (2025).

**b)** **Even Assuming Defendants' Restrictions Were Content-Neutral, They Fail Intermediate Scrutiny**

Plaintiffs are likely to prevail on the merits of their First Amendment claims because Defendants' actions are flatly prohibited and fail strict scrutiny. Even assuming for the sake of argument that some of Defendants' conduct were content-neutral, it is still unconstitutional.

Speech abridgment independent of its content or viewpoint is subject to intermediate scrutiny. *See id*. at 67. Under that standard, the government must establish that its action "advances important government interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997). Courts consider whether there is "a reasonably close fit" between the government's "means and its ends." *Nicodemus*, 137 F.4th at 668. Whether evaluated under the strict or intermediate scrutiny standard, Defendants cannot meet their burden, as their actions abridge substantially more speech than necessary to accomplish any lawful, non-conjectural objective.

To start, Defendants seem to claim that their actions support an interest in continuing their immigration enforcement actions and maintaining public safety. There is evidence, however, that these justifications are specious and pretextual when it comes to Plaintiffs. Defendants "must demonstrate that the recited harms are real, not merely conjectural" to have a compelling interest to attack Plaintiffs and the associated Class. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality).

In many circumstances in the record, there is no evident public safety rationale for Defendants' actions. For example, Defendants simply have no compelling public safety interest in aiming at and shooting non-violent protest attendees in the face with chemical munitions. Whether it is Plaintiff Reverend Black, journalist Plaintiffs Geary, or Plaintiff Kunkel, the

government cannot demonstrate a compelling public safety reason for attacking them. The record is full of similar examples. *See, e.g.*, Dkt. 21 at 20-21; Dkt. 73-17 (Rodriguez Decl.) ¶¶5, 8-12 (federal agents deployed tear gas at nonviolent journalists and observers); Dkt. 73-25 (Klonsky Decl.) ¶¶4-5 (federal agents shot pepper balls at peaceful protesters); Dkt. 73-29 (Toobin Decl.) ¶¶7-8 (federal agents shot pepper balls and rubber bullets at nonviolent protesters); Dkt. 73-11 (Kaplan Decl.) at ¶¶21-23 (pointing KIP launcher at man with phone on East Side); Dkt. 73-15 (Pedroza Decl.) ¶¶16-17 (deploying tear gas even though CPD were there); Dkt. 73-17 (Rodriguez Decl.) ¶¶5, 8-12 (same); Dkt. 73-21 (Sampson Decl.) ¶¶8-12 (arrested even though standing on the grass on the side of the street).

This pattern of incidents establishes that, in many cases, Defendants' actions "reflect[] a pretextual motive" apart from any compelling public safety and immigration enforcement rationale. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015). Defendants' pattern of violations amounts to arbitrary and discriminatory abuse of government power. That cannot justify the extensive First Amendment violations here.

But even assuming Defendants have a compelling interest in the abstract, their actions are not sufficiently tailored to address those interests in reality. Defendants' actions here—(1) indiscriminately using and even directly targeting riot control munitions against non-violent attendees at protests; (2) requiring Plaintiffs, especially identifiable press, to disperse without sufficient justification; and (3) threatening and even arresting law-abiding protestors and concerned observers for lawfully recording them—are grossly excessive in relation to their stated goals under any tailoring standard the Court applies.

**First**, Defendants have repeatedly dispersed and inflicted extreme force against Plaintiffs involved in nonviolent protests. For example, on September 26, a group of nonviolent protesters

met at the Broadview Detention Center. *See* Dkt. 22-21 (Goyette Decl.) at ¶¶3-5. Despite their

posing no imminent threat of harm, and even not actually impeding law enforcement, Defendants

attacked these protesters with a host of chemical and impact munitions. *See Id.* ¶¶7-10. Likewise,

during the day on September 27, Broadview protesters "played music, marched, and occasionally

filmed." Dkt. 22-19 (Boyle Decl.) ¶8. In response, DHS agents "fire[d] chemicals and pepper

balls indiscriminately" into the crowd of protesters. *Id.* at ¶14; *see also* Dkt. 22-9 (Breslin Decl.)

¶¶8, 9, 19 (observing 150-200 nonviolent protesters, some of whom were tackled, arrested, and

exposed to chemical agents); Dkt. 22-2 (Curran Decl.) ¶¶20, 27, 32 (Defendants subjected

nonviolent protesters to chemical agents); Dkt. 22-21 (Goyette Decl.) ¶7 (federal agents used OC

spray against and arrested a protester who was not impeding law enforcement). Similar events

occurred at Broadview on October 3 and other dates. *See* Dkt. 21 at 20-21; Dkt. 73-3 (Toerpe

Decl.) ¶¶6-13 (federal agents pulled to the ground and arrested nonviolent protesters); Dkt. 73-10

(Beale Decl.) ¶¶7, 11 (federal agents used tear gas on people who were not impeding law

enforcement); Dkt. 73-26 ¶11.

This is not limited to Broadview but spans the Chicago area. For example, on October

14th, after conducting a car chase in the residential East Side neighborhood, federal officers

pushed, shoved, tackled, and tear gassed protesters who gathered to chant slogans and film

federal agents. *See* Dkt. 73-15 (Pedroza Decl.) ¶¶9-16. The crowd that Defendants gassed

included the elderly and young children; they posed no public safety risk. *See Id.* But Defendants

repeatedly shot, gassed, tackled, body slammed, and seized the demonstrators in this crowd

anyway. Dkt. 73-8 (Garcia Decl.) ¶¶2, 9-11 (teargassed and shot with what felt like rubber bullets

in East Side); Dkt. 73-11 (Kaplan Decl.) ¶¶20-23 (federal agents deployed tear gas); Dkt. 73-17

(Rodriguez Decl.) ¶9) (teargassed). These indiscriminate, arbitrary abuses of government power

are not narrowly tailored. *See* Dkt. 73-22 (Aguayo Decl.) ¶¶4-7 (describing how tear gas lingered and affected many residents); *see also* Dkt. 77-2 (Kerlikowske Supp. Decl.) ¶¶14-34 (generally describing and evaluating Defendants' indiscriminate misuse of tear gas).

Defendants' use of chemical agents, physical violence, and unwarranted dispersal orders against nonviolent protesters and observers is clearly excessive in relation to the government interest in ensuring the execution of its laws. When Defendants are faced with a crowd of nonviolent protesters registering their disagreement with Operation Midway Blitz, federal agents routinely respond with excessive and indiscriminate use of chemical and impact munitions, arrests, and violence. Such a "vastly overinclusive" policy and pattern of Defendants using force against Plaintiffs is "not the narrow tailoring … that restriction of First Amendment rights requires." *Brown v. Entertainment Merchants Ass'n*, 563 U.S. 786, 804 (2011). Defendants' ongoing pattern of crowd-dispersal orders and techniques—including shooting and tear gassing people who pose no threat to law enforcement or public safety—burden substantially more speech than necessary.

Declarations of Plaintiffs' CBP and protest policing expert, Gil Kerlikowske, further support that the federal agents are responding to the demonstrations here in ways that are not sufficiently tailored to a compelling government interest. To start, there are serious doubts that DHS agents used for protest policing in the Chicago area have the experience or adequate training for such settings. Dkt. 22-32 (Kerlikowske Decl.) ¶¶45, 112-19; Dkt 77-2(Kerlikowske Supp. Decl.) ¶¶35-53. Mr. Kerlikowske explains that the officers DHS is using are likely not accustomed to the unique policing protocols for managing protests, and they often lack the training they need to do so appropriately. *E.g.*, Dkt. 77-2 (Kerlikowske Supp. Decl.) ¶¶47, 50-53. Mr. Kerlikowske details numerous instances in Broadview and locations across the Chicago area

where federal agents significantly depart from standard and accepted practices for what officers should do to manage a protest while respecting the specific First Amendment rights of protestors, observers, and journalists. *Id.* ¶¶24-34; *see also* Dkt. 22-32 ¶¶24-33.

Furthermore, even if a small number of individuals in the midst of the 150-200 nonviolent protesters *were* impeding the execution of government functions, such as through civil disobedience, Defendants have the tools at their disposal to effectuate government policy without excessively limiting speech. They could arrest specific individuals who were engaging in violent behavior or remove specific individuals who were obstructing federal officers. *See, e.g. McGann v. Trathen*, No. 1-16-CV-01235-JMS-DML, 2017 WL 5571289, at *2 (S.D. Ind. Nov. 20, 2017) (officer arrested an individual in the midst of a crowd). When such "a less restrictive alternative is readily available," the governments' actions are "not narrowly tailored." *Boos v. Barry*, 485 U.S. 312, 329 (1988).

**Second**, requiring identifiable journalists to disperse along with demonstrators in the facts and circumstances presented here is not sufficiently tailored to any compelling government interest.

Defendants argue that they must have the ability to issue broad dispersal orders for essentially any reason. That is not true; Plaintiffs have a right to exercise their First Amendment expression and conduct in a traditional public forum. But even in scenarios in which dispersal orders may be warranted, such as where there is a riot imposing an imminent threat of violence, applying these dispersal orders to uninvolved journalists who are both at a distance from crowds of demonstrators and law enforcement and clearly identifiable as press, violates the First Amendment's public fora and right-of-access doctrines under the facts and scrutiny standards applicable here. *See, e.g.*, *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817,

831 (9th Cir. 2020); *Los Angeles Press Club v. Noem*, No. 2:25-CV-05563-HDV-E, 2025 WL 2658327, at *19 (C.D. Cal. Sept. 10, 2025).

Because Journalists play an important role in disseminating information and maintaining open and informed public debate, courts "look carefully at any claim that a government entity is disallowing access to the media or a particular subset thereof." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 615 (7th Cir. 2021).

The record shows that, during protests, journalists have "st[ood] apart from the protesters," and have clearly identified themselves as journalists. Dkt. 21 at 18, 27-28; Dkt. 22-22 (Mulcahy Decl.) at ¶10; *see also* Dkt. 22-23 (Decker Decl.) at ¶¶5, 8 (a journalist clearly identified as such stood "at least 40 yards away" from Broadview protesters to document the protest); Dkt. 73-7 (Farina Decl.) ¶7; Dkt. 73-11 (Kaplan Decl.) ¶22.

Standing at such a remove, journalists cannot interfere with the execution of law enforcement operations or impede the effectuation of a dispersal order. Nonetheless, evidence in the record demonstrates that federal agents have "targeted" these clearly identified members of the press with chemical and impact munitions, forcing them to move away from the public locations in which they were reporting. Dkt. 22-21 (Goyette Decl.) at ¶8; *see also* Dkt. 22-22 (Mulcahy Decl.) at ¶10. There is no justification for federal agents to target journalists in this way or subject them to a dispersal order when the role they play, and their conduct at the protest, is far different from a group of demonstrators. Ordering them to disperse with the crowd is not sufficiently tailored to an important government interest, much less narrowly tailored to a compelling government interest.

**Third**, threatening and arresting people for observing, documenting, or recording the police cannot satisfy constitutional inquiry. Evidence now shows part of Defendants' practice

24

includes threatening or even arresting people who record them. *See, e.g.*, Dkt. 73-13 (Cortez Decl.) at ¶¶2-6 (observing and recording federal agents, and having a gun pointed at her as a result); Dkt. 77-1 (Munchak Decl.) at ¶¶4-26 (similar); Dkt. 73-12 (Barrera Decl.) at ¶¶7-12 (photographing federal agents from 50-100 feet away only to be boxed in by agents, who photographed and filmed her). Given that this conduct is protected, *Alvarez*, 697 F.3d at 597, Defendants' actions are unconstitutional.

### 2. Defendant's Actions Constitute Unconstitutionally Retaliation Against Plaintiffs Due To Their Protected Speech

The First Amendment prohibits government from retaliating against people for their speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Indeed, a policy of retaliation for the exercise of constitutional rights "is a particularly troubling and potent form" of First Amendment violation. *Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87, 100 (2018).

To prevail on a First Amendment retaliation claim, Plaintiffs must show: (1) they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quotes and citation omitted).

As this Court has already found, Dkt. 43, Plaintiffs are likely to succeed on the merits of their retaliation claim. First, as discussed, Plaintiffs are demonstrators, observers, clergy, and press engaged in core First Amendment activity. *See supra* II.A.1.

Second, as to whether there are "threats of punishment designed to discourage future protected speech," *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011), the law uses an objective test that asks "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Id.* As this Court has already

recognized, Dkt. 43 at 4, and not subject to reasonable dispute, being shot with impact or chemical munitions, gassed, pepper sprayed, hit with near-lethal grenades, or threatened with arrest for engaging in nonviolent First Amendment activity would deter a person of ordinary firmness from continuing to engage in that protected activity. *See also Index Newspapers LLC*, 977 F.3d at 827 n.4 ("being shot with pepper balls, tear gas, and paint-marking munitions, being pepper sprayed at close range, or being shoved by a law enforcement officer would chill a person of ordinary firmness from continuing to exercise their First Amendment rights."); *L.A. Press Club*, 2025 WL 2658327, at *16 (similar).

Defendants have stated their specific intention to turn the "Free Speech Zone" outside the Broadview ICE facility into a "Free Arrest Zone." Dkt. 21 at 10. The risk of being unlawfully arrested—as Plaintiff Held was—is likely to deter a person of ordinary firmness from engaging in protected First Amendment activity. Dkt. 22-18 (Held Decl.) ¶¶19, 21-32; Dkt. 22-16 (Thrush Decl.) ¶36 (protesters detained for protesting on the greenspace). Defendants have already shown they will conduct these arrests with a level of violence that would obviously deter someone from being willing to engage in expressive conduct (indeed, Defendants have made clear that this is the very point of their actions).

In addition to the evidence previously submitted, *e.g.,* Dkt. 21 at 25-26, 28, the record includes further evidence of the type of harms that would deter individuals, including being threatened by masked federal agents even for the act of recording and observation, being falsely arrested and held in a detention facility as a result of criticizing government. *E.g.*, Dkt. 73-8 (Garcia Decl.) at ¶15; Dkt. 73-9 (Munoz Decl.) at ¶¶38-45; Dkt. 73-15 (Pedroza Decl.) at ¶19; Dkt. 73-17 (Rodriguez Decl.) at ¶15; Dkt. 73-28 at ¶16; Dkt. 73-19 (Blackburn Decl.) at ¶¶24-

26

26; Dkt. 73-23 (Raad Decl.) at ¶20; Dkt. 73-12 (Barrera Decl.) at ¶¶7-12; Dkt. 73-6 (Crespo Decl.) at ¶41; Dkt. 77-1 (Munchak Decl.) at ¶¶17-23.

Third, as the Court recognized, Dkt. 43 at 7, Plaintiffs have submitted evidence that their First Amendment activity was at least a motivating factor in Defendants' use of force and other adverse actions, as the evidence in the TRO motion, Dkt. 21 at 7, 17-18, in the paragraph above, and beyond confirms. *See also* Dkt. 73-19 (Walsh Decl.) at ¶¶5-7; Dkt. 73-15 (Pedroza Decl.) ¶13-14; Dkt. 73-14 (Holcombe Decl.) ¶18-20 (ICE agent shot projectiles at Holcombe after she began praying audibly for his redemption).

There is direct proof that Defendants seek to deter and prevent First Amendment activity directed at documenting and protesting the Trump Administration's mass deportation campaign. *See* Dkt. 21 at 4-10 (collecting sources). There is also circumstantial proof of retaliatory motive. "Circumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive." *Massey v. Johnson*, 457 F.3d at 717 (7th Cir. 2006). As many courts have recognized, the fact that Plaintiffs were not committing unlawful acts but merely engaged in protected activity at the time Defendants used physical force or chemical weapons against them is evidence of retaliatory motive. *See* Dkt. 21 at 27 (collecting cases).

In *Los Angeles Press Club*, for example, the district court reached the same conclusion with respect to DHS defendants' behavior "based, in part, on the extensive record evidence that federal officers repeatedly targeted journalists and peaceful legal observers far from any protesters or bad actors." 2025 WL 26568327, at *17. The evidence here establishes that Defendants have repeatedly targeted journalists who are easily identifiable as press. Dkt. 22 at 20-22 (collecting sources).

27

The evidence also shows that people were gassed and shot even when protests at the Broadview ICE facility were nonviolent, non-threatening, and lawful. *See Id.* The evidence further shows that Defendants used crowd control weapons against people dispersing, attempting to comply with orders, or when no order was given to disperse (let alone an order that they would be shot for failing to disperse). Dkt. 21 at 29; *see also* Dkt. 73-21 (Sampson Decl.) at ¶6; Dkt. 73-23 (Raad Decl.) at ¶16; Dkt. 73-25 (Klonsky Decl.) at ¶4; Dkt. 73-10 (Beale Decl.) at ¶11; Dkt. 73-6 (Crespo Decl.) at ¶21.

One point worth emphasizing is that Defendant's conduct—including what happened to Plaintiff Black that Defendants' ICE witness sought to defend in his testimony—is that Defendants are shooting pepper balls and deploying gas directly *at* people—*see* Dkt. 21 at 28, Dkt. 73-25 (Klonsky Decl.) at ¶4-5; Dkt. 73-29 (Toobin Decl.) at ¶¶7-8; Dkt. 73-14 (Holcombe Decl.) at ¶¶18-19—which is contrary to how those munitions are supposed to be used. Dkt. 22-32 (Kerlikowske Decl.) ¶57. What's more troubling—as with Plaintiff Black—agents have shot protestors in sensitive areas, like the head or neck, which is also inappropriate unless deadly force is justified. *L.A. Press Club*, 2025 WL 2658327, at *18 ("In a disturbing number of cases, Defendants hit declarants in the head. The parties concur that targeting sensitive areas, like the head, neck, spine, or groin, is inappropriate unless the use of deadly force is justified."); *see, e.g.*, Dkt. 73-20 (Vaughan Decl.) ¶12 (describing agents shooting her between the eyes with a pepper ball); Dkt. 22-11 (Roche Decl.) ¶¶8-11 (describing being struck in the head with a projectile).

Defendants have used violent physical force without warning or justification, including punching, grabbing, and brutally tackling and throwing people to the ground. *See* Dkt. 21 at 30. Additional evidence of this disturbing pattern is now before this Court as well. *See, e.g.*, Dkt. 73-8 (Garcia Decl.) at ¶9; Dkt. 73-15 (Pedroza Decl.) at ¶¶12-13 (pushing, shoving, and tackling

28

protesters); Dkt. 73-16 (Peachey Decl.) ¶4 (striking protesters with car); Dkt. 73-21 (Sampson Decl.) ¶¶6-13.[7]

In sum, "[t]he sheer frequency—and brutality—of these events raises the inference of retaliation." *L.A. Press Club*, 2025 WL 2658327, at *18. As in *Los Angeles Press Club*, "the avalanche of evidence before the Court—along with federal officials' statements—suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protesters." *Id.* at *19. There is more than sufficient evidence to find Plaintiffs are likely to prevail on their retaliation claim.

### C.     The Religious Exercise Plaintiffs Are Likely To Succeed on the Merits of their Free Exercise and RFRA Claims

Rev. Black, Rev. Holcombe, Rev. Dr. Johnson, Father Curran, and the Religious Exercise Subclass are likely to succeed in their claims that Defendants have violated their fundamental religious liberties. Defendants' practice of targeting religious observers engaged in preaching, prayer, song, or proselytizing violates both the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act ("RFRA") and cannot survive the strict scrutiny those laws require courts to apply. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (applying strict scrutiny in Free Exercise case); *Korte v. Sebelius*, 735 F.3d 654, 659 (7th Cir. 2013) ("Under RFRA the government must justify the burden under the standard of strict scrutiny.").

The very first words in the Bill of Rights provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST.

---

[7] Even putting aside Defendants' own comments and other direct proof of motivation, given that Plaintiffs and the putative class were engaged in nonviolent protected activity, and separately given Defendants' departures from accepted policing standards, it can be inferred that their protected activity was at least a motivating factor in Defendants' actions. *See, e.g.*, Ex. 32 (Kerlikowske Decl.) ¶¶55, 77 (opining that Defendants violated established policing standards, including by using violence to punish Plaintiffs).

AMEND. I. The Free Exercise Clause "prevents the government from 'plac[ing] a substantial burden on the observation of a central religious belief or practice' unless it demonstrates a 'compelling government interest that justifies the burden.'" *Cassell v. Snyders*, 458 F. Supp. 3d 981, 994 (N.D. Ill. 2020) (quoting *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 631 (7th Cir. 2007)). Fundamentally, the Free Exercise Clause prohibits the federal government and its agents from acting in a way that is "hostile to the religious beliefs of affected citizens" or that "passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colo. Civil Rights Comm.*, 584 U.S. 617, 638 (2018); *see also Lukumi Babalu Aye*, 508 U.S. at 532–33, 547 ("The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures."); *cf. W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Even if Defendants' actions against the Religious Exercise Subclass were permitted under the First Amendment (they are not), RFRA "provide[s] greater protections for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the *least restrictive means* of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b) (emphasis added); *see also Soc. of Divine Word v. USCIS*, 129 F.4th 437, 449 (7th Cir. 2025) (burden shifts to government once RFRA claimant makes a *prima facie* case). A RFRA plaintiff can make the required showing of substantiality by

30

demonstrating that the offending government policy "either (1) compelled them to 'perform acts undeniably at odds with fundamental tenets of [their] religious beliefs,' (2) 'put[] substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs,' or (3) 'bears direct, primary, and fundamental responsibility for rendering [a] religious exercise ... effectively impracticable.'" *Divine Word*, 129 F.4th at 450 (quoting *Korte*, 735 F.3d at 682). In conducting this analysis, courts "focus primarily on the intensity of the coercion applied by the government and not the centrality of the religious practice in question" *Id.* (cleaned up) (quoting *West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022)).

Here, Rev. Black, Rev. Holcombe, Rev. Dr. Johnson, Father Curran, and the other members of the Religious Exercise Subclass are likely to succeed in showing that Defendants' conduct violates their constitutional and statutory free exercise rights. Although the Religious Exercise Plaintiffs and Subclass Members subscribe to differing religious creeds, all share the fundamental belief that their faith calls upon them to pray, sing religious songs, preach, or proselytize at the site of DHS's immigration enforcement actions. They do so for the spiritual benefit of detained migrants and their families, federal agents, and community members who come to protest. *See generally* Dkt. 22-1 (Black Decl.) ¶2; Dkt. 22-2 (Curran Decl.) ¶¶2-8; Dkt. 22-3 (Johnson Decl.) ¶2; Dkt. 73-14 (Holcombe Decl.) ¶¶5-8; Dkt. 22-14 (Gottlieb Decl.) ¶6; Dkt. 22-4 (Worthington Decl.) ¶¶5-7. Some have exercised their religion in this manner for decades. Dkt. 22-2 (Curran Decl.) ¶¶2-8.

In response, Defendants and their agents have deliberately and purposefully targeted the Religious Exercise Plaintiffs and Subclass members with violence. Dkt. 22-1 (Black Decl.) ¶¶4-6 (Reverend Black targeted with multiple pepper ball shots, including in the head; pushed; shoved; subject to canisters of chemicals deployed indiscriminately; had chemicals sprayed directly into

31

face; and "soaked … in liquid chemicals from my head to my toes"); Dkt. 22-3 (Johnson Decl.) ¶¶5-11 (similar); Dkt. 22-14 (Gottlieb Decl.) ¶¶4-5, 8 (similar); Dkt. 22-4 (Worthington Decl.) ¶3; Dkt. 22-17 (Geary Decl.) ¶10 ("Federal agents have fired 'less lethal' munitions at … clergy praying"); Dkt. 22-16 (Thrush Decl.) ¶38 ("I witnessed an identifiable member of the clergy, Michael Woolf of Evanston Illinois, have his nipples grabbed and twisted and his neck grabbed by a Federal Bureau of Prisons officer."). Reverand Holcombe was even singled out to be shot at as she prayed for the DHS agent who began to fire at her. Dkt. 73-14 (Holcombe Decl.) ¶¶13–20.

Such government conduct puts substantial pressure on the Religious Exercise Plaintiffs to violate their beliefs by forcing them to choose between their health and safety on the one hand and authentically practicing their faith on the other. *E.g* Dkt. 22-1 (Black Decl.) ¶8; Dkt. 22-2 (Curran Decl.) ¶¶33-41; Dkt. 22-3 (Johnson Decl.) ¶13; Dkt. 73-14 (Holcombe Decl.) ¶26; Dkt. 22-14 (Gottlieb Decl.) ¶11. This violence has had the intended effect of clamping down on religious exercise and beliefs with which the government disagrees and discouraging others from engaging in similar religious exercise. Father Curran has restricted who he invites to join prayer vigils and stopped using the vigils as an opportunity to provide religious education to Catholic students because of the high risk of violence. Dkt. 22-2 (Curran Decl.) ¶¶33-41. Rev. Holcombe has curtailed and scaled back her ministry because of the violence, which has also similarly deterred members of her congregation. Dkt. 73-14 (Holcombe Decl.) ¶¶16, 20, 25–26.

These are textbook examples of an impermissible burden on religious exercise. *See West*, 48 F.4th at 845 (substantial burden occurs when the government "attaches some meaningful negative consequence to [a person's] religious exercise, forcing him to choose between violating his religion and incurring that negative consequence."). Neither the Constitution nor RFRA permits such blatant hostility to religious practice. *See Lukumi Babalu Aye*, 508 U.S. at 532–33.

32

Finally, Defendants' practice of using force against the Religious Exercise Plaintiffs and Subclass cannot survive strict scrutiny under either the Free Exercise Clause or RFRA. Defendants' violent actions are far from narrowly tailored to achieve a compelling governmental interest. As previously explained, there is no governmental interest, much less a compelling governmental interest, in using force on individuals engaged in nonviolent First Amendment activity, including exercise of religion. And such force is certainly not the "least restrictive means" of achieving even a legitimate governmental interest, as RFRA requires.[8] Again, RFRA "provide[s] greater protections for religious exercise than is available under the First Amendment," *Holt*, 574 U.S. at 357, protecting religious freedom from substantial burdens "even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), (b). In short, the ongoing violence directed at the Religious Exercise Plaintiffs and Subclass is flatly illegal, and Plaintiffs are likely to succeed on the merits of their Free Exercise and RFRA claims.

**D.     Plaintiffs Are Likely to Prevail on the Merits of Their Fourth Amendment Claims**

Plaintiffs advance two Fourth Amendment claims: (1) for those unlawfully seized in the absence of probable cause or reasonable suspicion (often in retaliation for their protected conduct), and (2) for excessive force. Plaintiffs are likely to succeed on both.

**1.     Defendants Are Conducting Arrests in the Absence of Probable Cause in Order to Suppress First Amendment Activity.**

Defendants have conducted numerous false arrests in order to suppress disfavored viewpoints and to retaliate against individuals whose speech they dislike. "To prevail on a false-arrest claim . . . a plaintiff must show that there was no probable cause for his arrest." *Neita v.*

---

[8] Indeed, the lack of any legitimate government interest in such purposefully and needlessly violent conduct is reinforced by the fact that Congress has made it a felony to "intentionally obstruct[ ], by force or threat of force, . . . any person in the enjoyment of that person's free exercise of religious beliefs." 18 U.S.C. § 247(a)(2).

*City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016). Probable cause requires "a reasonable ground for belief of guilt ... particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (cleaned up). Nothing about the context of a group protest can "suspend—or even qualify—the normal operation of the Fourth Amendment's probable cause requirements." *Barham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006); *see also Vodak v. City of Chicago*, 639 F.3d 738, 746 (7th Cir. 2011) (holding "in circumstances that were not threatening to the safety of the police or other people" police could not arrest protestors "who the police had no good reason to believe knew they were violating a police order").

Yet Defendants have repeatedly arrested individuals without particularized probable cause of any criminal infraction, not to enforce the criminal code, but simply to silence and retaliate against disfavored viewpoints. These false arrests play out in a consistent pattern: Defendants arrest individuals who do something that displeases them—like yelling or asking questions—only to release the individuals a few hours later without any criminal charges.

Scott Blackburn is one such victim. While protesting outside the Broadview Detention Facility on October 3, Blackburn saw Defendant Bovino and yelled, "You *love* to be on television."[9] Defendant Bovino told him to "move down the block."[10] Blackburn began to comply, and as he got ready to move, he responded, "Yeah I'll f***ing move, you're such a …."[11] But before Blackburn could finish his sentence, and without time to relocate, Bovino stepped across the barrier, tackled Blackburn to the ground, and arrested him.[12] Blackburn was released a few hours later without any criminal charges. Dkt. 73-18 (Blackburn Decl.) ¶¶21-23.

---

[9] Dkt. 22-45 (Ex. 45 at 0:14); *see also* Dkt. 73-18 (Blackburn Decl.) ¶¶9-12.
[10] *Id.* at 0:16; *see also* Dkt. 73-18 (Blackburn Decl.) ¶¶9-12.
[11] *Id.* at 0:19; *see also* Dkt. 73-18 (Blackburn Decl.) ¶¶9-12.
[12] *Id.* at 0:19-1:10; *see also* Dkt. 73-18 (Blackburn Decl.) ¶¶9-12.

Blackburn's false arrest is far from an isolated incident. Dkt. 73-2 (Held Decl.) at ¶¶12-13; Dkt. 73-9 (Munoz Decl.) ¶¶14-37; Dkt. 22-18 (Stephen Held Decl.) ¶¶29-32; Dkt. 22-16 (Thrush Decl.) ¶36; Dkt. 73-24 (Robert Held Decl.) ¶¶9-12; Dkt. 73-3 (Toerpe Decl.) ¶¶10-18; Dkt. 73-21 (Sampson Decl.) ¶¶10-17; Dkt. 73-8 (Garcia Decl.) ¶¶9-10 (officers arrested nonviolent protester); Dkt. 73-6 (Crespo Decl.) ¶33 (detailing arrest of young woman for engaging in speech activity); Dkt. 73-15 (Pedroza Decl.) ¶13 (arrested minor who was filming). Nor is Defendants' conduct limited to Broadview Detention Facility. For example, Alderperson Jessie Fuentes was arrested at a hospital when she asked ICE officers if they had a warrant to arrest one of her constituents. Dkt. 73-5 (Fuentes Decl.) ¶¶6-9. Like all the other individuals mentioned here, she was released without criminal charges.

Defendants have not hidden their intention to arrest protestors as retaliation for engaging in protected First Amendment activities. On October 3, speaking to a group of federal officers, Defendant Noem said they were going to "prosecute" protesters for the way they were "talking, speaking, [and] who they're affiliated with." Dkt. 79 (Hagy Decl.) ¶18. Defendant Bovino reiterated this attack on freedom of speech and freedom of association, instructing officers that the "Free Speech Zone" outside Broadview would become a "Free *Arrest* Zone." *Id.* Later that day, acting pursuant to this guidance, federal officers arrested several individuals standing in the "Free Speech Zone" without probable cause. *E.g.*, Dkt. 73-9 (Munoz Decl.) ¶¶14-37; Dkt. 73-3 (Toerpe Decl.) ¶¶10-18; Dkt. 73-18 (Blackburn Decl.) ¶¶9-12.

Defendants have additionally threatened criminal consequences for recording law enforcement officers, which is clearly established to be protected activity under the First Amendment. *Alvarez*, 679 F.3d at 595-96. Defendant Noem has stated that "videotaping" federal

officers is a "violent" action,[13] and an official DHS memo has similarly characterized such videotaping as a "threat to law enforcement officers." Dkt. 22-38.

The lack of probable cause for arrests made by Defendants has become apparent in subsequent criminal proceedings. Federal grand juries have refused to return indictments against at least three individuals arrested by Defendants, meaning that the grand juries found no probable cause existed. *Illinois v. Trump*, 2025 WL 2886645, at *5 (N.D. Ill. Oct. 10, 2025) (citing *United States v. Ray Collins and Jocelyne Robledo*, 25-cr-608, Doc. 26 (N.D. Ill. Oct. 7, 2025); *United States v. Paul Ivery*, 25-cr-609 (N.D. Ill.)). As Judge Perry found, the fact that grand juries refused to return indictments against these individuals "calls into question" Defendants' ability to "accurately assess the facts" of what constitutes criminal activity. *Id.*

In the absence of an order from this court, Defendants will continue to target and retaliate against individuals legally engaging in protected First Amendment activities for arrest. This Court should not hesitate to enjoin such plainly unconstitutional conduct.

### 2. Defendants Have Used, And Continue to Use Violent Tactics that Are Excessive and Violate the Constitution

As this Court has recognized, Plaintiffs are likely to prevail on the merits of their Fourth Amendment claims. In making that assessment, courts employ an objective reasonableness standard by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Some factors to consider in the totality of the analysis may be the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers. *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015).

---

[13] *See* https://www.youtube.com/watch?v=uDFX4q6huH8 at 0:26 min, (last visited Oct. 18, 2025).

Deployment of crowd control weapons constitutes a seizure governed by the Fourth Amendment, as these weapons "restrain[] the liberty" of individuals through the use of "physical force." *Torres v. Madrid*, 592 U.S. 306, 311 (2021); *see also Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 840 (8th Cir. 2021) (deploying tear gas is a seizure); *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (tear gas, projectiles, and physical contact was use of force); *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012) (firing pepper balls is a use of force). And no force at all may "legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest." *Anthony v. Seltzer*, 696 Fed. App'x 79, 82 (3d Cir. 2017) (collecting cases).

It is impossible to reconcile Defendants' ongoing violence throughout this District with these constitutional standards. The vast majority of people assembled in Broadview are exercising their First Amendment rights in a nonviolent manner. *See, supra*. There is no need to use *any* force, much less violent projectiles and chemical agents, against individuals who pose no threat to federal officers or who are not obstructing their work. Yet again and again, Defendants have assaulted, deployed tear gas, pepper balls, rubber bullets, flashbang grenades, and other less lethal munitions against people engaged in no crime and causing no threat to safety, but rather expressing their First Amendment rights on public property. The bodily integrity of Plaintiffs whose lungs have been poisoned by gas, or whose eyes have been burned by pepper spray, or whose skin bear bruises and lacerations from being shot with paintballs or rubber bullets has certainly been infringed by Defendants' actions. *Cf. United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000) (holding Fourth Amendment protects bodily integrity and physical security even when intrusion does not cause bodily injury).

The Seventh Circuit has held that pointing a gun at an individual who presents no danger violates the Fourth Amendment. *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000). Yet federal officers have demonstrated a pattern of aiming their weapons directly at Plaintiffs and their class without lawful justification. Dkt. 21 at 28; Dkt. 22-32 (Kerlikowske Decl.) ¶90; Dkt. 22-17 (Geary Decl.) ¶14; Dkt. 73-13 (Cortez Decl.) at ¶¶3-5; Dkt. 73-15 (Pedroza Decl.) ¶10. Law enforcement officers "do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever," much less intentionally assault them with tear gas, pepper balls, and flashbang grenades. *Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021).

More generally, the Fourth Amendment includes a particularity requirement. *See Graham*, 490 U.S. at 396-97. Federal agents' pattern of attacking crowds indiscriminately by firing projectiles and dispersing chemical agents in a sweeping manner, *E.g.*, Dkt. 22-6 (Paulson Decl.) ¶¶11, 16-21; Dkt. 22-11 (Roche Decl.) ¶7; Dkt. 22-3 (Johnson Decl.) ¶11, fails this requirement because the actions are not targeted at specific people who may be the lawful subject of arrest or who pose a threat to another. *See also* Dkt. 73-1 (Mack Decl.) ¶¶9-10 (tear gas deployed at a crowd with no warning); Dkt. 73-7 (Villa Decl.) ¶¶19-20 (federal agents deployed tear gas with no warning against a crowd); Dkt. 73-8 (Garcia Decl.) ¶10 (rubber bullets deployed against protesters); Dkt. 73-27 (Resnick Decl.) ¶¶6, 7, 11 (tear gas deployed indiscriminately against peaceful protesters); Dkt. 73-29 (Toobin Decl.) ¶¶8-11 (federal agents fired pepper balls and rubber bullets into a crowd).

Though Defendants may call their munitions "non-lethal," they can cause serious and life-threatening harm. As Dr. Rohini Haar has attested, projectiles like rubber pellets and foam batons can "penetrate the skin" and be "just as lethal" as conventional live ammunition. Dkt. 22-33 ¶18 (Haar Decl.). Flash-bang grenades can cause "injuries and even death" due to the pressure

38

of the blast or shrapnel exploding outward from the grenade. *Id.* ¶20. And chemical agents like tear gas cause individuals to experience burning sensation on their skin and obstruction in their airways, as well as fear and anxiety. *Id.* ¶45. A scalding canister filled with tear gas launched into a crowd can cause its own deadly injuries. *Id.* ¶43. Many nonviolent protesters, clergy, and journalists have suffered just these sorts of injuries at the Defendants' hands. *See* Dkt. 22 at 37.

There is no need for this violence. And the Constitution does not permit it. Federal officers are engaging in an overwhelming amount of violence against protesters and journalists without justification. Such excessive force violates the Fourth Amendment and inflicts serious injuries upon people in the Northern District. Absent an order from this Court, more people will be seriously harmed by Defendants' actions.

## III. Absent a Preliminary Injunction, Plaintiffs Will Continue to Suffer Irreparable Harm

### A. Irreparable Harm under the First Amendment and RFRA Is Presumed

"Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases." *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450-52 (7th Cir. 2022) (Easterbrook, J.) (citing *Christian Legal Soc'y*, 453 F.3d at 859). Total deprivation of the right is not needed; that the plaintiffs "continued to engage in *some* political activity does not foreclose their contention that they were deterred from engaging in other activities," since "[a] loss is a loss[.]" *Id.* (emphasis in original); *see also Mahmoud v. Taylor*, 606 U.S. ___, 145 S. Ct. 2332, 2364 (2025) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotation omitted); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm"). The same standard applies to RFRA. *See Korte*, 735 F.3d at 666 ("Although the claim is statutory, RFRA protects First Amendment free-exercise

rights, and in First Amendment cases, the likelihood of success on the merits will often be the determinative factor.") (cleaned up).

There is evidence that Defendants' conduct has curtailed the activities of some Plaintiffs. See Dkt. 21 at 38-39 (collecting sources). Additional evidence now illustrates the ongoing chilling effect of Defendants' activities. *See, e.g.*, Dkt. 73-8 (Garcia Decl.) ¶15; Dkt. 73-9 (Munoz Decl.) ¶¶38-45; Dkt. 73-15 (Pedroza Decl.) ¶19; Dkt. 73-17 (Rodriguez Decl.) ¶15; Dkt. 73-23 (Raad Decl.) ¶20; Dkt. 73-12 (Barrera Decl.) ¶13; Dkt. 77-1 (Munchak Decl.) ¶26.

### B. Fourth Amendment Injuries Further Constitute Irreparable Harm

Fourth Amendment injuries—both for false arrest and for excessive force—no less than First Amendment violations, constitute irreparable harm. *See* Dkt. 21 at 39 (collecting cases).

Here, there is a likelihood of future irreparable injury, both of false arrest and excessive force. When Defendants Noem and Bovino addressed federal agents at the Broadview ICE facility on October 3, Noem commended the agents' "professionalism" and said they were "setting an example," in their use of force and arrests. Dkt. 79 (Hagy Decl.), ¶18 at 0:06-0:17. She said, "We're gonna make sure that there's consequences for the way that they're behaving…." *Id.* at 1:14-1:23 min. She continued, "We're gonna give you guys all the authority that you need to go out there and arrest these individuals who are advocating for violence against you." *Id.* at 1:25-1:30 min. She emphasized that they would "send a message," and that Defendants were "here to stay" and "expanding." *Id.* at 1:59-2:04 min.

Moreover, many Plaintiffs intend to return to exercise their First Amendment rights at the Broadview ICE facility. Dkt. 21 at 40-41. Other Plaintiffs and class members remain concerned about Defendants conduct, and want to exercise their right to protest or record throughout the District, but fear reprisals from masked federal agents wielding large weapons that they have proven—in spectacle fashion—they will not only threaten to use, but will actually deploy,

40

against non-violent civilians exercising their rights. Dkt. 21 at 25-26; *see, e.g.*, Dkt. 73-28 (Sampson Decl.) ¶16 (afraid to return to protest at Broadview); Dkt. 73-23 (Raad Decl.) ¶20 (afraid to protest anywhere); Dkt. 73-13 (Cortez Decl.) ¶¶2-6 (afraid to observe agents after agent threatened her with a gun); Dkt. 77-1(Munchak Decl.) ¶¶20, 26 (afraid to film agents after they pointed long gun directly at her head).

### C. Plaintiffs Have No Alternative Adequate Legal Remedy

Finally, beyond the presumption of irreparable harm that accompanies the violation of fundamental constitutional rights, Plaintiffs have no adequate remedy at law for Defendants' illegal conduct. As the Seventh Circuit has explained, "Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). Here, the gravamen of Plaintiffs' claims for relief is that they have reason *now* to engage in expressive activities— whether that be protesting, offering prayer, or observing, documenting and reporting on the activities of federal law enforcement—in response to federal immigration policies and highly publicized enforcement activities happening in the Chicagoland area *now*. In response, Plaintiffs have been met with an organized, ongoing campaign of excessive force, arbitrary violence, and retaliatory acts committed by Defendants. Defendants have given every indication that this campaign of illegal violence and targeting will continue. A legal remedy might, after years of litigation, provide some compensation for the physical injury to a particular plaintiff caused by a particular use of force. But such one-off compensation cannot and does not remedy the harm to the individual Plaintiffs, the organizational Plaintiffs, and the putative Class resulting from Defendants' ongoing policy and practice of using violence to close public space and stifle public discourse at the Broadview ICE facility and throughout the Northern District. Only an injunction can provide such relief.

**IV.      The Balance of Equities and Public Interest Favor an Injunction**

Finally, the balance of equities and public interest weigh in favor of granting emergency relief. The Court must balance the "competing claims of injury and … consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citation omitted). "[U]pholding constitutional rights serves the public interest" and "it is always in the public interest to protect First Amendment liberties." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (citations omitted). In the absence of the relief, Defendants will continue to violently tread on deeply valued foundational liberties, including rights to freedom of speech, expression, association, press, and religion, as well as the right to be free from unreasonable and arbitrary uses of force.

By contrast, Defendants will suffer no injury from a temporary restraining order. As demonstrated throughout this motion, Defendants' misconduct advances no compelling state interest, but instead means to silence, intimidate, and physically harm those with whom Defendants disagree. There is no public interest in allowing Defendants to violate Plaintiffs' rights through unlawful action—and in fact, there is "substantial public interest" in ensuring that that government "abide[s]" by the law. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Nor can Defendants claim the proposed TRO will endanger them or jeopardize their lawful mission. Plaintiffs' expert, the former Commissioner of the CBP and Chief of the Seattle Police, has carefully explained why it is both "safe" and "workable for law enforcement." Dkt. 22-32 (Kerlikowske Decl.) ¶¶2, 120-139; *see also L.A. Press Club*, 2025 WL 2658327, at *23-24 (finding nearly-identical relief workable).

In sum, the balance of the equities tilts sharply in Plaintiffs' favor.

**V.      Plaintiffs Have Standing To Obtain the Relief They Seek and This Court Has the Authority to Order it**

At the TRO stage, the government raised the issues of standing and objected to the request for relief Plaintiffs seek—*i.e.*, a districtwide preliminary injunction. This Court already found that Plaintiffs have sufficient standing, Dkt. 43 at 3-4, and that Plaintiffs may seek districtwide relief, *Id.* at 9-10. For completeness, and though Plaintiffs' additional evidence and motion for class certification should moot both of these issues, they are briefly addressed here.

**A.      Plaintiffs Have Standing to Seek to Enjoin the Violence, Targeting, and Retaliation levied at Opposition to and Documentation of Operation Midway Blitz**

Plaintiffs—as individuals, putative class members, and organizations—have standing to seek the injunctive relief requested in this motion. This Court's prior standing discussion, Dkt. 43 at 3-4, is entirely correct. To have standing, Plaintiffs must present evidence showing: (1) an actual or imminent threat of suffering or other injury in fact; (2) the injuries, or threats of harm, are can be fairly traced the defendant's conduct; and (3) that this Court can prevent or redress those harms. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). A plaintiff "must face a 'real and immediate' threat of future injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citation omitted).

Here, there is no reasonable dispute Plaintiffs have presented evidence of injury in fact, given they have shown evidence of physical injury and the intangible harms of having their rights of free speech and free exercise violated. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (physical harms, "abridgment of free speech" and "infringement of free exercise" constitute concrete harms to satisfy injury in fact requirement for standing) (citations omitted). In addition, given the pattern of Defendants' conduct—and Plaintiffs' desire to exercise their constitutional rights in the future—standing for injunctive relief is secure. *See* Dkt. 43 at 3 (citing

43

*Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010), and *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015)).

The Supreme Court and Seventh Circuit have also recognized that limitations on standing, like those that might apply to physical harms at issue in *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), cannot apply where, as here, the First Amendment has been violated. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638-39 (7th Cir. 2020). "Chilled speech is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012) (citing *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir.1995) ("Arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional right of free speech in order to avert those harms."). The threat of false arrest (and excessive force and other retaliatory action) for protesting or recording Defendants and their agents, of which Plaintiffs have presented evidence and will present at the hearing, thus provides standing to seek injunctive relief on Plaintiff's Fourth Amendment claims in a way that is not impacted by *Lyons* either.

Moreover, as this Court recognized, the news organizations that serve as plaintiffs have organizational standing, on their own right and on behalf of their members. Dkt. 43, at 3-4.

The other elements of standing—that the harms are traceable to the Defendants and that a judicial order will end those harms—are not subject to reasonable dispute. It is federal agents who have used excessive force, threatened or arrested Plaintiffs, issued dispersal orders to preclude reporting, and even threatened bystanders exercising a right to record in public places (like the sidewalks in front of their homes and at protests near the Broadview facility). Preventing Defendants from committing those ongoing injuries will provide relief.

Standing is secure.

**B.     This Court is Authorized to Enjoin Defendants' Conduct Throughout This District**

At this juncture, little needs to be said about this Court's ability to enter the injunction Plaintiffs will ultimately seek, as the precise language of that proposed order will be provided to conform to the evidence at the hearing. Suffice to say: (1) that Plaintiffs will present, and have presented, evidence that the constitutional and statutory violations at issue in this case extend beyond Broadview throughout this District; and (2) that Plaintiffs are seeking class certification, which, consistent with *Trump v. CASA, Inc*., 606 U.S. 831, 837 (2025), supports relief beyond the named plaintiffs in this case, *see* Dkt. 43 at 10 n.4 (citing *CASA*, 606 U.S. at 869 (Kavanaugh, J. concurring)); and (3) enjoining the federal agents from roving throughout this District and threatening, accosting, or using excessive force against people is necessary to provide Plaintiffs here with *complete* relief. *See, e.g.*, *L.A. Press Club v. Noem*, 2025 WL 2658327, at *22 (C.D. Cal. Sept. 10, 2025).[14]

**CONCLUSION**

Plaintiffs respectfully request the Court enter a preliminary injunction following the November 5, 2025, hearing. Once complete, Plaintiffs will submit a proposed preliminary injunction that outlines the relief they seek, consistent with the record developed.

---

[14] On the point about complete relief, the *CASA* Court recognized that while "complete relief" is not synonymous with 'universal relief[,]' . . . the equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties." 606 U.S. at 851 (internal quotes and citations omitted). This is one of the situations where "an injunction requiring the defendant to cease the offending activity entirely may be the only way to provide complete relief to the plaintiff." *Reporters Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 733 (7th Cir. 2025).

DATED: October 21, 2025                    Respectfully submitted,

                                 By:    /s/ *David B. Owens*
                                        *One of Plaintiffs Attorneys*

*Counsel for Plaintiff*

Jon Loevy
Locke Bowman
Steve Art
Heather Lewis Donnell
Theresa Kleinhaus
Scott Rauscher
Matt Topic
Julia Rickert
Tara Thompson
Lindsay Hagy
Jordan Poole
Dominique Gilbert
Justin Hill
Aaron Tucek
**LOEVY + LOEVY**
311 N. Aberdeen Street
Chicago, Illinois 60647
(312) 243-5900
steve@loevy.com

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
⅟ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL
RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern Pritzker
School of Law
375 E. Chicago Ave.
Chicago, IL 60611

Craig B. Futterman
**MANDEL LEGAL AID CLINIC**
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

Hayden Johnson*
Katie Schwartzmann*
Conor Gaffney*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave NW, Ste 163
Washington DC 20006
(202) 579-4582
* *Admitted pro hac vice*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
Hirsh Joshi
Priyanka Menon
**ROGER BALDWIN FOUNDATION OF
ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org

46

(312) 503-2224
wally.hilke@law.northwestern.edu