**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, *et al.*, | ) | No. 25-cv-12173 |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Hon. Sara L. Ellis, |
| v. | ) | District Judge |
| | ) | |
| | ) | |
| KRISTI NOEM, Secretary, U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      Congress Has Conferred Authority on DHS (Including ICE and CBP) to Enforce
        Federal Immigration Laws and Protect Federal Property ................................... 2

II.     Violence Against DHS Officers Across the Nation ............................................ 4

III.    Legal Authority to Protect Federal Property, Personnel, and Functions ............ 6

IV.     Operation Midway Blitz Targets Criminal Illegal Aliens ................................... 9

V.      Threats and Violence Against Federal Personnel and Property at the Broadview
        Facility ............................................................................................................... 10

VI.     Violence and Threats Against Federal Immigration Officers in the Field .......... 14

VII.    Procedural History ............................................................................................. 17

LEGAL STANDARD ........................................................................................................ 18

ARGUMENT ...................................................................................................................... 18

I.      Plaintiffs are unlikely to prevail on the merits of any of their asserted claims ................ 18

        A.      Plaintiffs lack standing to seek prospective relief ................................... 18

        B.      The Court Lacks Jurisdiction to Enjoin the Manner in Which DHS
                Conducts Immigration Enforcement Operations. ................................... 24

        C.      Plaintiffs are unlikely to prevail on their First Amendment free-speech
                claims. ...................................................................................................... 25

                1.      Plaintiffs fail to establish that Defendants have burdened free-
                        speech rights ................................................................................. 26

                2.      Plaintiffs are not engaging in First-Amendment-protected activity
                        when they intermingle themselves with rioters, obstructors, and
                        other lawless actors. ..................................................................... 26

                        a.      Plaintiffs are not engaging in First-Amendment-protected
                                activity when they intermingle themselves with rioters,
                                obstructors, and other lawless actors.. ............................. 26

                        b.      Members of the Press do not have a special right of access
                                to unlawful demonstrations. ............................................. 32

c.  Dispersal of unlawful demonstrations was not content-discriminatory. ............................................................... 35

d.  Defendants did not retaliate against Plaintiffs or the putative class based on their speech.............................................. 37

3.  Even assuming Plaintiffs' protected speech was burdened, Defendants' actions were still constitutionally permissible.................... 41

D.  Plaintiffs are unlikely to prevail on their RFRA or free exercise claims.............. 42

1.  Dispersal orders issued for lawful crowd control purposes do not constitute a substantial burden under RFRA. ............................ 42

2.  Use of crowd control measures to enforce lawful dispersal orders is the least restrictive means to further a compelling government interest.................................................................... 44

E.  Plaintiffs are unlikely to succeed in their Fourth Amendment claims.................. 46

1.  Plaintiffs are unlikely to succeed on their false arrest theory. ................. 46

2.  Plaintiffs are not likely to succeed in their excessive force theory........... 48

II.  Plaintiffs will not suffer irreparable harm in the absence of broad preliminary relief. ....................................................................................... 51

III.  The balance of the equities and public interest weigh against an injunction.................... 52

IV.  Scope of relief. ................................................................................ 55

V.  The Court should require a bond and stay any injunction ................................ 55

**CONCLUSION** ............................................................................... 55

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abbott v. Sangamon County, Ill.*,
  705 F.3d 706 (7th Cir. 2013) ................................................................... 47, 48, 50

*Am. C.L. Union of Illinois v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ................................................................... 31, 32

*AP v. Budowich*,
  No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) .................... 36

*Apache Stronghold v. United States*,
  101 F.4th 1036 (9th Cir. 2024) ................................................................... 43

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................... 2

*Associated Press v. Neal*,
  788 F. Supp. 3d 959 (S.D. Ind. 2025) ................................................... 33

*Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) ................................................................... 36

*Barney v. City of Eugene*,
  20 F. App'x 683 (9th Cir. 2001) ............................................................. 40

*Bell v. Keating*,
  697 F.3d 445 (7th Cir. 2012) ................................................................... 53

*Bivens v. Six Unknown Agents*,
  403 U.S. 388 (1971) ................................................................................... 52

*Blackie's House of Beef, Inc. v. Castillo*,
  659 F.2d 1211 (D.C. Cir. 1981) ............................................................. 45

*Bowen v. Roy*,
  476 U.S. 693 (1986) ................................................................................... 43

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ................................................................... 33, 34, 53

*Bridges v. Gilbert*,
  557 F.3d 541 (7th Cir. 2009) ................................................................... 37

*Brinegar v. United States*,
  338 U.S. 160 (1949) ................................................................................... 46

*Brown v. Battle Creek Police Dep't*,
844 F.3d 556 (6th Cir. 2016) ........................................................ 41, 45

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ..................................................................... 45

*Cameron v. Johnson*,
390 U.S. 611 (1968) ..................................................................... 29

*Campbell v. Miller*,
373 F.3d 834 (7th Cir. 2004) ........................................................ 22, 24

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ..................................................................... 26, 31

*Capp v. Cnty. of San Diego*,
940 F.3d 1046 (9th Cir. 2019) ...................................................... 41

*City of Houston v. Hill*,
482 U.S. 451 (1987) ..................................................................... 31

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .............................................................. 19, 23, 24, 52

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..................................................................... 19

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ..................................................................... 48, 49, 50

*Dahlstrom v. Sun-Times Media, LLC*,
777 F.3d 937 (7th Cir. 2015) ........................................................ 54

*Department of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ......................................................................... 23

*Employment Division, Department of Human Services of Oregon v. Smith*,
494 U.S. 872 (1990) ..................................................................... 43, 46

*Fiorenzo v. Nolan*,
965 F.2d 348 (7th Cir. 1992) ........................................................ 23

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ..................................................................... 24

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461, (2025) .................................................................... 32

*Garland v. Aleman Gonzalez,*
     596 U.S. 543 (2022) ............................................................................. 25

*GEFT Outdoors, LLC v. City of Westfield,*
     922 F.3d 357 (7th Cir. 2019) .............................................................. 18

*Gilligan v. Morgan,*
     413 U.S. 1 (1973) ................................................................................. 21

*Graff v. City of Chicago,*
     9 F.3d 1309 (7th Cir. 1993) ................................................................ 41

*Graham v. Connor,*
     490 U.S. 386 (1989) ................................................................ 27, 48, 50

*Grayned v. City of Rockford,*
     408 U.S. 104 (1972) ..................................................................... 26, 53

*Great Lakes Higher Edu. Corp. v. Cavazos,*
     698 F. Supp. 1464 (W.D. Wisc. 1988) .............................................. 51

*Hartman v. Moore,*
     547 U.S. 250, (2006) .......................................................................... 38

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,*
     452 U.S. 640 (1981) ............................................................................ 26

*Holmes v. Village of Hoffman Estates,*
     511 F.3d 673 (7th Cir. 2007) .............................................................. 46

*Ill. Republican Party v. Pritzker,*
     973 F.3d 760 (7th Cir. 2020) .............................................................. 18

*Illinois v. Gates,*
     462 U.S. 213 (1983) ............................................................................ 48

*In re Neagle,*
     135 U.S. 1 (1890) ................................................................................... 6

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago,*
     56 F.4th 437 (7th Cir. 2022) .............................................................. 51

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
     505 U.S. 672 (1992) ............................................................................ 53

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
     994 F.3d 602 (7th Cir. 2021) ................................................. 33, 37, 54

*Korte v. Sebelius*,
　　735 F.3d 654 (7th Cir. 2013) ......................................................... 42, 45

*Leigh v. Salazar*,
　　677 F.3d 892 (9th Cir. 2012) .............................................................. 33

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
　　591 U.S. 657 (2020) .......................................................................... 43

*Los Angeles Press Club v. Noem*,
　　2025 WL 2658327 (C.D. Cal. Sept. 10, 2025) ...................................... 23

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
　　485 U.S. 439 (1988) .................................................................... 43, 44

*Manery v. Lee*,
　　124 F.4th 1073 (7th Cir. 2025) ........................................................... 27

*McCullen v. Coakley*,
　　573 U.S. 464 (2014) .......................................................................... 52

*Menora v. Illinois High Sch. Ass'n*,
　　683 F.2d 1030 (7th Cir. 1982) ............................................................ 26

*Menotti v. City of Seattle*,
　　409 F.3d 1113 (9th Cir. 2005) ..................................................... *passim*

*Michigan Dep't of State Police v. Sitz*,
　　496 U.S. 444 (1990) .......................................................................... 55

*Mims v. City of Eugene*,
　　145 F. App'x 194 (9th Cir. 2005) ........................................................ 41

*Missouri v. McNeely*,
　　569 U.S. 141 (2013) .......................................................................... 54

*National Treasury Emps. Union v. Von Raab*,
　　489 U.S. 656 (1989) .......................................................................... 45

*Neita v. City of Chicago*,
　　148 F.4th 916 (7th Cir. 2025) ............................................................. 46

*Newsom v. Trump*,
　　141 F.4th 1032 (9th Cir. 2025) ........................................................... 52

*Nicodemus v. City of S. Bend, Indiana*,
　　137 F.4th 654 (7th Cir. 2025) ............................................................. 31

*Nken v. Holden,*
    556 U.S. 418 (2009)................................................................. 55

*Noem v. Vasquez Perdomo,*
    --- S. Ct. ---, 2025 WL 2585637 (Sept. 8, 2025)................................ 4, 19

*Perry v. Sheahan,*
    222 F.3d 309 (7th Cir. 2000) .................................................. 22

*Press-Enterprise Co. v. Superior Ct.,*
    478 U.S. 1 (1986)........................................................... 33, 34, 38

*Puente v. City of Phoenix,*
    123 F.4th 1035 (9th Cir. 2024) ......................................... *passim*

*Reporters Comm. for Freedom of Press v. AT&T,*
    593 F.2d 1030 (D.C. Cir. 1978) ............................................... 21

*Rizzo v. Goode,*
    423 U.S. 362 (1976)................................................. 19, 20, 21, 55

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984)........................................................... 29

*Sierakowski v. Ryan,*
    223 F.3d 440 (7th Cir. 2000) .................................................. 22

*Thayer v. Chiczewski,*
    705 F.3d 237 (7th Cir. 2012) .............................................. 37, 38

*Torres v. Madrid,*
    592 U.S. 306 (2021)........................................................... 49

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)........................................................... 21

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540 (2025)........................................................ 55

*Trump v. Hawaii,*
    585 U.S. 667 (2018)........................................................... 46

*United States v. Betts,*
    99 F.4th 1048 (7th Cir. 2024) ................................................ 26

*United States v. Bonin,*
    932 F.3d 523 (7th Cir. 2019) .............................................. 41, 45

*United States v. Grady*,
  18 F.4th 1275 (11th Cir. 2021) .............................................. 44

*United States v. Griefen*,
  200 F.3d 1256 (9th Cir. 2000) .......................................... 52, 53

*United States v. Hays*,
  No. 20-CR-30021, 2021 WL 4130501 (C.D. Ill. Sept. 10, 2021),
  *aff'd*, 90 F.4th 904 (7th Cir. 2024)...................................... 47

*United States v. Husband*,
  226 F.3d 626 (7th Cir. 2000) ........................................... 50, 51

*United States v. Lewis*,
  62 F.4th 733 (2d Cir. 2023) ................................................. 54

*United States v. Patane*,
  542 U.S. 630 (2004)........................................................... 55

*United States v. Pugh*,
  90 F.4th 1318, *cert. denied*, 145 S. Ct. 236 (2024)................. 30

*United States v. Taylor*,
  148 F.4th 896 (7th Cir. 2025) ............................................ 30

*United States v. Wilson*,
  154 F.3d 658 (7th Cir. 1998) ............................................. 29

*Updike v. Multnomah Cnty,*
  870 F.3d 939 (9th Cir. 2017) ............................................. 24

*Virginia v. Black*,
  538 U.S. 343 (2003)........................................................... 30

*Virginia v. Hicks*,
  539 U.S. 113 (2003)........................................................... 30

*Walker v. Wexford*,
  No. 3:20-CV-1020-JD-MGG, 2021 WL 810034 (N.D. Ind. Mar. 3, 2021) ............ 41

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)....................................................... 35, 36

*Washington Mobilization Comm. v. Cullinane*,
  566 F.2d 107 (D.C. Cir. 1977).................................... *passim*

*Whren v. United States*,
  517 U.S. 806 (1996)........................................................... 46

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................. 18, 51, 52

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) ..................................................................... 29

*Woods v. Vill. of Bellwood*,
   502 F. Supp. 3d 1297 (N.D. Ill. 2020) ................................................ 27

*Young v. Lane*,
   922 F.2d 370 (7th Cir. 1991) ........................................................... 19

*Zellner v. Herrick*,
   639 F.3d 371 (7th Cir.2011) ............................................................ 38

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl.1 .............................................................. 6

**Statutes**

6 U.S.C. § 202 ............................................................................ 3

6 U.S.C. § 211 ............................................................................ 3

6 U.S.C. § 252 ............................................................................ 3

8 U.S.C. § 1103 .......................................................................... 3

8 U.S.C. § 1226 .......................................................................... 3

8 U.S.C. § 1231 .......................................................................... 3

8 U.S.C. § 1252 ......................................................................... 25

8 U.S.C. § 1357 ...................................................................... 3, 25

8 U.S.C. §§ 1221-1231 ................................................................ 25

18 U.S.C. § 111 ......................................................... 11, 17, 48, 53

18 U.S.C. § 115 ........................................................................ 30

18 U.S.C. § 1361 ....................................................................... 53

19 U.S.C. § 1589a ....................................................................... 3

28 U.S.C. § 2680 ....................................................................... 52

40 U.S.C. § 1315 ............................................................................................... 4, 6

42 U.S.C. § 2000bb-1 ....................................................................................... 42, 44

**Executive Materials**

E.O. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025)............................................... 4

E.O. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025)............................................... 4

Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 25, 2025)................................. 4

**Other Authorities**

Benny Johnson (@bennyjohnson), X.com (Oct. 3, 2025) at 2:27-50,
    https://x.com/bennyjohnson/status/1974174065985470970 (last visited Oct. 30, 2025) ......... 39

Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (October
    14, 2025),
    https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-
    cbp-officers-chicago. ................................................................................. 6

Despite 1,000% Increase in Assaults on ICE Officers, Governor Newsom Signs Unconstitutional
    Law to Ban Law Enforcement Officer Protections (September 22, 2025),
    https://www.dhs.gov/news/2025/09/22/despite-1000-increase-assaults-ice-officers-governor-
    newsom-signs-unconstitutional................................................................. 5

DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement
    Officers (October 9, 2025),
    https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-escalating-
    threats-against-federal-law........................................................................ 6

DHS Issues Statement on Targeted Attack on Dallas ICE Facility (September 24, 2025),
    https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-
    dallas-ice-facility....................................................................................... 5

DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and
    Calls on Democrat Politicians to Tone Down Dangerous Rhetoric About ICE (June 7, 2025),
    https://www.dhs.gov/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-
    officers-los-angeles-ca-and ....................................................................... 5

DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb Threat at
    26 Federal Plaza in New York City (September 18, 2025),
    https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-obstruction-law-
    enforcement-and-bomb-threat-26 ............................................................ 5

ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal
    Aliens Terrorizing Americans in Sanctuary Illinois (September 8, 2025),

https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal. ................................................................................... 9

ICE Reports Second Death from Dallas Sniper Attack After Detainee Succumbs to Injuries (Oct. 2, 2025),
https://www.ice.gov/news/releases/ice-reports-second-death-dallas-sniper-attack-after-detainee-succumbs-injuries ........................................................................... 5

Justice Department Publishes List of Sanctuary Jurisdictions (August 5, 2025),
https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions ........ 9

Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE Dallas Facility (August 26, 2025),
https://www.dhs.gov/news/2025/08/26/law-enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility ........................................................................... 5

Orin S. Kerr, The Limits of Fourth Amendment Injunctions,
7 J. Telecomm. & High Tech. L. 127 (2009) .......................................................... 54

Secretary Noem Travels to Chicago as Operation Midway Blitz Reaches More Than 1,000 Illegal Aliens Arrested (October 3, 2025),
https://www.dhs.gov/news/2025/10/03/secretary-noem-travels-chicago-operation-midway-blitz-reaches-more-1000-illegal ...................................................................... 9

**INTRODUCTION**

Beginning in September 2025, widespread protests have targeted Department of Homeland Security (DHS) officers and agents conducting immigration-enforcement operations in Chicago, Illinois, and the surrounding area. Although some protests remained peaceful, others turned violent. Rioters have attacked law enforcement personnel with fireworks, rocks, and other objects. Rioters also breached the perimeter of federal buildings, blocked all traffic into the only immigration facility in the region, damaged federal vehicles, and injured officers. At some violent protests, officers responded by issuing dispersal orders and using nonlethal crowd-control devices.

Plaintiffs are journalists, protesters, press organizations, and religious practitioners. They allege that, at certain demonstrations in September and October 2025, DHS officers have chilled their free speech and religious exercise rights, have targeted them with crowd-control devices in retaliation for exercising their First Amendment rights, and have violated their Fourth Amendment rights. On October 9, the district court granted Plaintiffs' request for a temporary restraining order that binds DHS and all DHS officers operating in the judicial district. Among other things, the injunction exempts any journalist from obeying lawful orders to disperse from a violent protest, constrains officers' ability to use crowd-control devices to control violent protests, and requires badges to be displayed with ever-narrowing specificity. The TRO is legally unsound and micromanages federal immigration enforcement actions. The Court should not extend its burdensome and unworkable requirements to a preliminary injunction.

Plaintiffs fail to meet any of the requirements for a preliminary injunction. At the threshold, Plaintiffs lack standing because their allegations of past harm do not support their speculation that such harm will recur in the future in an area of over nine million people. On the merits, Plaintiffs' various free-speech theories fail—Plaintiffs and the putative class members are not engaging in

1

constitutionally protected activity when they intermingle themselves with unlawful actors, members of the press do not have a special right of access to unlawful demonstrations, and Defendants have not retaliated or discriminated against Plaintiffs based on the content of their speech. Plaintiffs' religious rights claims also fail, since lawful and general dispersal orders in response to crowds intermixed with unlawful, obstructive, or violent conduct does not substantially burden the practice of religion. Plaintiffs' Fourth Amendment claim similarly fails because Plaintiffs have not established a pattern of false arrests or excessive force that would warrant a broad, district-wide injunction. The balance of the hardships and public interest favor the government, because issuing a preliminary injunction would continue the judicial micromanaging of immigration enforcement actions and would cause officers to improperly hesitate before protecting themselves, the public, and federal property out of fear of contempt. This Court should deny the motion for preliminary injunction.

## **BACKGROUND**

### I.    **Congress Has Conferred Authority on DHS (Including ICE and CBP) to Enforce Federal Immigration Laws and Protect Federal Property**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In a series of immigration laws mainly codified in Title 8 of the United States Code, Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Id.* at 395. "A principal feature" of this congressionally established "removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

Congress has charged the Secretary of Homeland Security with "administration and enforcement" of immigration laws, including vesting immigration officers and agents with broad authority to arrest, detain, and remove aliens who are unlawfully present or otherwise removable.

2

8 U.S.C. §§ 1103(a)(1), 1226(a) (permitting arrest and detention upon a warrant issued by the Secretary); *id.* § 1226(c)(1) (the Secretary "shall take into custody any alien" who has committed certain crimes); *id.* 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders); *see also id.* § 1357(a) (listing powers that immigration officers may exercise, including interrogation without a warrant of "any alien or person believed to be an alien as to his right to be or to remain in the United States").

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). CBP is an agency within DHS charged with, among other things, "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement (ICE), another agency within DHS, is likewise charged with enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See*, *e.g.*, 6 U.S.C. §§ 202, 252(a)(3). CBP and ICE law enforcement personnel have criminal and civil arrest authority. *See*, *e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a. ICE's mission includes arresting aliens unlawfully present in the country, and when appropriate, detaining them during immigration proceedings and ultimately removing them from the country. Ex. 1,[1] Decl. of Russel Hott ("Hott Decl.") ¶¶ 7-8. When ICE or CBP arrests individuals as part of immigration enforcement in the Chicago area, they are taken to the Broadview Processing Center ("BSSA" or "Broadview facility") for intake and processing. *Id.* ¶¶ 12-13.

Congress has also charged the Secretary of Homeland Security with "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property," which includes "areas outside the property to the extent

---

[1] Citations to "Ex. __" are to the exhibits attached to this brief.

necessary to protect" federal property. 40 U.S.C. § 1315(a), (b)(1). Thus, DHS's statutory mission includes protecting the Broadview facility and individuals at the facility.

## II. Violence Against DHS Officers Across the Nation

Millions of aliens are currently unlawfully present in the country. *See Noem v. Vasquez Perdomo*, --- S. Ct. ---, 2025 WL 2585637, at *1 (Sept. 8, 2025) (Kavanaugh, J. concurring) ("The Government estimates that at least 15 million people are in the United States illegally."). As the President has recognized, "[m]illions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws." E.O. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025). This massive increase in illegal immigration has imposed significant harms on the American people. The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels." E.O. 14159, 90 Fed. Reg. at 8443. "Deadly narcotics and other illicit materials have flowed across the border[.]" E.O. 14165, 90 Fed. Reg. at 8467. "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities. Proclamation 10886, 90 Fed. Reg. at 832. "Many of these aliens unlawfully within the United States present significant threats to national security and public safety," and thus the Government must take appropriate action to "protect[] the American people by faithfully executing the immigration laws of the United States." E.O. 14159, 90 Fed. Reg. at 8443; *see* E.O. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025); Proclamation No. 10866, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025).

Opposition to this vigorous enforcement of federal immigration law has unfortunately taken the form of violence against federal law enforcement. Violence against ICE officers and

4

agents has increased approximately 1,000 percent across the United States.[2] The attacks against immigration enforcement personnel are widespread, take on many forms, and are occurring across the United States. An "Anti-ICE" sniper attempted to assassinate ICE officers in the Dallas, Texas area by shooting indiscriminately into an ICE facility.[3] No ICE personnel were struck, but three detainees were shot and two were killed.[4] This incident tragically illustrates that violence targeted at immigration enforcement officers and agents also threatens the safety of detainees and members of the public. ICE facilities have faced multiple bomb threats.[5] Federal officers and agents face violent attacks at federal buildings,[6] at immigration processing facilities, and while on patrol conducting immigration enforcement operations, ECF No. 35-12 ¶ 16. Foreign criminal organizations are offering thousands of dollars as bounties for the murder of federal immigration enforcement officers and agents.[7] Because federal immigration officers and agents have faced doxing, including revelation of their home addresses, these threats extend to their families.[8]

### III.    Legal Authority to Protect Federal Property, Personnel, and Functions

---

[2] Despite 1,000% Increase in Assaults on ICE Officers, Governor Newsom Signs Unconstitutional Law to Ban Law Enforcement Officer Protections (September 22, 2025), https://www.dhs.gov/news/2025/09/22/despite-1000-increase-assaults-ice-officers-governor-newsom-signs-unconstitutional.

[3] DHS Issues Statement on Targeted Attack on Dallas ICE Facility (September 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.

[4] Id.; ICE Reports Second Death from Dallas Sniper Attack After Detainee Succumbs to Injuries (Oct. 2, 2025), https://www.ice.gov/news/releases/ice-reports-second-death-dallas-sniper-attack-after-detainee-succumbs-injuries.

[5] See, e.g., Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE Dallas Facility (August 26, 2025), https://www.dhs.gov/news/2025/08/26/law-enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility; DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb Threat at 26 Federal Plaza in New York City (September 18, 2025), https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-obstruction-law-enforcement-and-bomb-threat-26.

[6] DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous Rhetoric About ICE (June 7, 2025), https://www.dhs.gov/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and.

[7] Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (October 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago.

[8] DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement Officers (October 9, 2025), https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-escalating-threats-against-federal-law.

The federal government has broad authority to protect federal property, personnel, and government functions. Congress has authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a). In addition, the Constitution grants the President the "executive Power," U.S. Const. art. II, § 1, cl. 1, and affords him both the authority and the responsibility to "take care that the Laws be faithfully executed." *Id.* These provisions authorize the President to enforce federal statutes as well as to protect federal officials, federal property, and the performance of federal functions. *See In re Neagle*, 135 U.S. 1, 64–68 (1890) (holding that the President has inherent authority to provide bodyguards, immune from state law, to protect judicial officers under the Take Care Clause).

In exercising this authority, DHS has issued policy guidance on the use of force by its personnel. *See* Ex. 46, ICE_00000001 ("DHS policy"); Hott Decl. ¶ 40. "The general principle undergirding the [DHS] Use of Force Policy is the respect for human life and the communities served. To that end, the Use of Force Policy requires that law enforcement personnel only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied." Hott Decl. ¶ 40.

DHS policy authorizes officers and agents to "use only the level of force that is objectively reasonable in light of the facts and circumstances confronting [the officer] at the time force is applied," recognizing that officers and agents are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy § II.B. The policy states that law enforcement personnel should "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* § III.C.

6

But this does not mean that LEOs must "meet force with equal or lesser force," nor that LEOs "have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat." *Id.* § III.D. Rather, as CBP's use of force policy details, the "use of force is 'necessary' when it is reasonably required to carry out the [officer's or agent's] law enforcement duties in a given situation, considering the totality of facts and circumstances of such particular situation." Ex. 47, CBP Use of Force Policy, CBP_000482 ("CBP Policy"), § 1.A.7. Further, law enforcement personnel must demonstrate proficiency with less-lethal force devices before using such devices. DHS Policy § IV.

CBP's policy authorizes different uses of force depending on the type of resistance a subject demonstrates. The lowest level of resistance offered by a subject authorizes the lowest level of force by law enforcement personnel. Each more serious level of resistance by a subject authorizes a proportional increase in the law enforcement personnel's use of force. In response to "passive resistance," CBP officers and agents are authorized to use "contact controls" which include escort holds, joint manipulation or immobilization, or touch pressure point stimulation. CBP Policy § 3.B.2; *see also* App. VI (defining "passive resistance"). In response to "active resistance," CBP law enforcement personnel are authorized to use empty-hand strikes, oleoresin capsicum ("OC") spray, electronic control weapons, compressed air launchers for saturation, and less lethal chemical munitions ("LLCM"). *Id.* § 3; *see also id.* App. VI (defining "active resistance"). When confronted with "assaultive resistance," CBP officers and agents may use punches, kicks, batons, compressed air launchers for kinetic impact, less-lethal specialty impact ("LLSI") munitions, and controlled noise and light distraction devices ("CNLDD") in response. *Id.* § 3; *see also id.* App. VI (defining "assaultive resistance"). The use of deadly force by a CBP

law enforcement is only authorized when the use of deadly force would be objectively reasonable. *Id.* § 3.B.1.c.

But use of force standards are guidelines not to be mechanically applied, as DHS Policy makes clear. DHS Policy § II.C.1. When exigent circumstances arise, "for self-defense or the defense of another, DHS [officers or agents] are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances." *Id.* § III.F; *see also id.* § XII.E. (defining "exigent circumstances").

In all events, DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* § III. Leaders of ICE and CBP have affirmed the importance they place on their personnel adhering to legal limits on the use of force with respect to Operation Midway Blitz. ICE Field Office Director ("FOD") Hott, who until October 17 served as the Chicago Field Office Director of ICE Enforcement and Removal Operations, has averred that "ICE officers and special agents are bound by the DHS use of force policy," Hott Decl. ¶ 40, and that officers and agents are trained on use of force, with training focusing on "de-escalation where possible[,]" *id.* ¶ 41. He underscored that "the Use of Force Policy strictly prohibits the use of excessive force and warns its officers and agents that DHS does not tolerate excessive force and constitutes it as misconduct" and those who engage in excessive force are "subject . . . to administrative and criminal penalties." *Id.* ¶ 42. CBP Incident Commander Parra for Operation Midway Blitz similarly has averred that CBP officers and Border Patrol agents "must comply with CBP's Use of Force Policy[,]" under which they may use "objectively reasonable force only when it is necessary to carry out their law enforcement duties." Parra Decl. ¶ 5. As he explains, CBP officers and Border Patrol agents receive extensive training to ensure they use force appropriately, including "initial academy

training," "eight hours of Use of Force training" every quarter, and "certifications for the use of each CBP authorized less-lethal device they carry," with "annual recertification" required. *Id.* ¶ 8.

## IV.    Operation Midway Blitz Targets Criminal Illegal Aliens

DHS launched Operation Midway Blitz to address the dangers arising from the presence of illegal aliens in the Chicago area, including members of gangs who have engaged in violent crimes and drug trafficking.[9] Illinois and Chicago have sanctuary laws and policies that limit the cooperation of state and local officials with federal immigration officials, which has hindered the federal government's ability to enforce immigration laws in Illinois and Chicago, and has exacerbated the dangers posed by certain illegal aliens. *See* Hott Decl. ¶¶ 9-11.[10]

As of October 3, 2025, the Operation had led to the successful arrest of more than 1,000 illegal aliens including murderers, child abusers, kidnappers, gang members, and armed robbers.[11] Unfortunately, the success of the Operation has come with enormous risk to federal law enforcement and repeated violent attacks against them. Initially these attacks occurred at or around the Broadview facility, but more violence has occurred as federal law enforcement officers (often CBP personnel) have engaged in immigration enforcement in Chicago and the surrounding area. Law enforcement personnel face threats every day they engage in enforcement of immigration laws. Cartels and at least one gang in Chicago have placed bounties for the murder of immigration officers and many officers have been doxed with their addresses posted on social media or their

---

[9] ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois (September 8, 2025), https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal.

[10] *See also* Justice Department Publishes List of Sanctuary Jurisdictions (August 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

[11] Secretary Noem Travels to Chicago as Operation Midway Blitz Reaches More Than 1,000 Illegal Aliens Arrested (October 3, 2025), https://www.dhs.gov/news/2025/10/03/secretary-noem-travels-chicago-operation-midway-blitz-reaches-more-1000-illegal; ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois (September 8, 2025), https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal.

photos taken as they operate in the field. *See* Hott Decl. ¶ 34; Ex. 2, ICE_00000338; Ex. 3, Declaration of Daniel C. Parra ("Parra Decl.") ¶ 30 (Latin Kings gang placed $10,000 bounty for the killing of Chief Gregory Bovino). Below, Defendants summarize just some of the evidence showing the violent and threatening behavior toward federal law enforcement, and the context in which federal officers and agents have occasionally used less-lethal force as a reasonable and lawful response to these threats.[12]

## V. Threats and Violence Against Federal Personnel and Property at the Broadview Facility

At the start of Operation Midway Blitz, crowds of protestors gathered regularly outside the Broadview facility. Although some protestors have been peaceful, on many occasions, "BSSA has been beset by increasingly aggressive, obstructive, and violent protesters." Hott Decl. ¶ 13; *see also* Parra Decl. ¶ 13. As detailed below, protestors have regularly threatened violence or committed actual violence by physically striking or throwing objects at federal officers and agents, damaging federal property (such as breaking windows and slashing the tires of government vehicles), and engaging in other illegal behavior.

On several occasions in September and early October, federal officers used less-lethal force to respond to these threats and disperse crowds engaged in illegal, violent, and threatening behavior. Crowds have regularly blocked ingress and egress from the Broadview facility, which impedes immigration enforcement operations in the entire region, because the facility is ICE's only intake and processing facility in the region. Hott Decl. ¶¶ 13-14. Individuals have regularly vandalized and damaged government vehicles and ICE officers' personal vehicles at and around

---

[12] Defendants have been working diligently to meet the expedited production deadlines set by this Court. *See, e.g.*, Notification of Docket Entry, ECF No. 146 (Oct. 28, 2025). Defendants' counsel have endeavored to incorporate some of the relevant evidence from those productions into the discussion below. However, given that Defendants' counsel have been working on drafting this brief in parallel with meeting the production deadlines, Defendants reserve the right to rely on any of the discovery materials disclosed in this case at the preliminary injunction hearing.

the Broadview facility, including by slashing tires and breaking windows and windshields. *See* Hott Decl. ¶ 16; *id.* ¶ 36 (photographs of damaged vehicles). Protestors have also damaged the facility itself, including by breaking pipes for external plumbing. Hott Decl. ¶ 18.

On September 19, a large crowd of protestors gathered at the Broadview facility and again obstructed ingress and egress. Hott Decl. ¶ 20. Federal officers gave multiple verbal warnings to back away and warned of possible deployment of chemical agents, but protestors ignored dispersal orders. *Id.* Some protestors physically attacked officers, including by pepper spraying, kicking, and throwing rocks and other objects at officers. *Id.* Several protestors were arrested for assault, obstruction, and trespassing, some of whom fought officers during their arrests. *Id.*; *see also* Parra Decl. ¶ 21. The events of that day and others are memorialized in contemporaneous arrest reports by ICE and Incident Reports from CBP's Enforcement Acton Statistical Analysis and Reporting System (E-Star).[13] In addition, the CBP agents drafted memoranda regarding those events, leading a CBP supervisory official to conclude that "[a]ll uses of force were within policy and were effective in controlling the crowd." Ex. 11, CBP_000546.

Another large protest occurred on September 20. "The protests began peacefully and without incident in the morning," and federal officers used no force while the protestors were peaceful. Hott Decl. ¶ 21. Later that day, the crowd engaged in violent activity, including throwing rocks at officers, shaking the gates of the facility, threatening to kill officers, physically assaulting officers, and slashing the tires of government vehicles. *Id.* When ICE officers approached to arrest an individual attempting to slash a vehicle's tires, an individual sprayed a chemical irritant at the

---

[13] *See also* Ex. 4, ICE_00000027 (ICE report of arrest of individual under 18 U.S.C. § 111 for assaulting officers on September 19); Ex. 5, ICE_00000044 (same, concerning another individual); Ex. 6, ICE_00000094 (same, concerning another individual); Ex. 7, ICE_00000112 (same, concerning another individual); Ex. 8, ICE_00000130 (same, concerning another individual); Ex. 9, ICE_00000148 (same, concerning another individual); Ex. 10, CBP_000017 (E-Star report regarding events of September 19 at Broadview facility).

officers. *Id.*; Ex. 12, ICE00000_171. At a September 21 protest, protestors also trespassed, shook the gates, slashed the tires of ten vehicles, and ignored orders to disperse. Hott Decl. ¶ 22.

On September 26, hundreds of protestors (some carrying fireworks, face masks, gas masks, and goggles) gathered and blocked the entrance to the Broadview facility. Hott Decl. ¶ 27. Officers repeatedly warned the crowd to disperse with a Long Range Acoustic Device, but crowd members ignored the orders and continued to block traffic. *Id.* Officers then deployed less-lethal munitions to allow vehicles to exit. *Id.* During the push, two protestors were arrested for assault, one of whom was carrying a concealed handgun. *Id.*; *see also* Parra Decl. ¶¶ 22-23.[14] In addition, a grand jury in this district recently returned an indictment against six of the protestors for impeding and conspiring to impede a federal officer, alleging that on September 26, they surrounded an ICE agent's vehicle attempting to enter the Broadview facility, broke a side mirror and rear windshield wiper, and scratched the word "PIG" on the body of the vehicle. Indictment, *United States v. Rabbitt*, No. 1:25-cr-693 (N.D. Ill. Oct. 23, 2025), ECF No. 1.

Another large crowd gathered on September 27 and blocked traffic. Hott Decl. ¶ 28. Federal officers gave multiple commands to disperse, but the crowd failed to comply. *Id.* Multiple protestors then committed various violent and threatening acts against federal officers and agents, including deploying fireworks toward federal officers, threatening to kill federal officers, grabbing an officer's helmet, pushing an officer, and striking an officer's wrist. *Id.* Approximately 12 individuals were arrested for assault or resisting or impeding federal personnel. *Id.*; *see also* Parra Decl. ¶¶ 24-27.[15] During these events, ICE officers discovered a round, green ball with a wick,

---

[14] These events are memorialized in a CBP E-Star Report, Ex. 13, CBP_000041, and a memorandum from CBP supervisory official compiling memoranda from the agents involved and concluding, that the "use of force was within policy and was effective in controlling the crowd," Ex. 14, CBP_000576.

[15] *See also* Ex. 15, CBP_000448 (E-Star report regarding events of September 27 at Broadview); Ex. 16, ICE_00000178 (ICE report of arrest and investigation for assaulting federal agents on September 27); Ex. 17,

which the Bureau of Alcohol, Tobacco, Firearms, and Explosives labeled as an improvised explosive device. Hott Decl. ¶ 29.

On October 3, Secretary Noem visited the Broadview facility, and a large protest again turned violent. Hott Decl. ¶ 31. After a crowd gathered and blocked the roadway, federal personnel gave multiple orders to disperse, which the crowd disregarded. *Id.* When officers attempted to clear the area, some protestors assaulted officers and were arrested. *Id.*[16] Ultimately, federal officers had to deploy chemical munitions to disperse the crowd. Hott Decl. ¶ 31.

Since October 3, federal law enforcement have not deployed chemical munitions at the Broadview facility, though protests have continued. *Id.* In early October, the Illinois State Police (ISP), Broadview Police, and other state and local law enforcement agencies announced a Unified Command to coordinate public safety around the Broadview facility. Hott Decl. ¶ 56. The Unified Command established designated protest areas near the facility, but not on federal property. *Id.* The Broadview mayor established a curfew at the facility, and state and local officers also established a constant security presence around the facility. *Id.* Since then, crowds have continued to gather and protest, but state and local officials have handled crowd control and have made arrests, when necessary. *Id.* ¶ 57.[17] Since October 3, federal law enforcement have not needed to use chemical munitions or any less-lethal force at the Broadview facility. Hott Decl. ¶ 57.

---

ICE_00000200 (same, concerning another individual); Ex. 18, ICE_00000221 (same, concerning another individual); Ex. 19, ICE_00000191 (ICE report of arrests of 12 individuals for assaulting, resisting, or impeding federal officers on September 27); Ex. 20 ICE_00000291 (chain of emails describing several episodes of unrest at Broadview facility from September 19 through September 27).
[16] *See also* Ex. 21, ICE_00000229 (ICE arrest report for October 3 assault on federal officer); Ex. 22, ICE_00000234 (same, concerning another individual); Ex. 23, ICE_00000239 (same, concerning two other individuals); Ex. 24, ICE_00000261 (same, concerning another individual); Ex. 25, ICE_00000267 (same, concerning another individual).
[17] *See also*, *e.g.*, Ex. 26, ICE_00000364 (October 10 ICE situation report showing that approximately 50 state and local officers were "staged . . . for civil disturbance if needed," "ISP will continue to provide 24 hr protection," "[t]he facility sustained no damage," and "[t]here were no injuries" to federal officers); Ex. 27, ICE_00000367 (similar report for October 11); Ex. 28, ICE_00000369 (similar report for October 12); Ex. 29, ICE_00000371 (similar report for October 13); Ex. 30, ICE_00000355 (similar report for October 21).

VI.     **Violence and Threats Against Federal Immigration Officers in the Field**

As part of Operation Midway Blitz, CBP has been conducting immigration enforcement throughout northern Illinois. *See* Parra Decl. ¶ 11. This enforcement involves detaining individuals violating immigration laws and bringing them to the Broadview facility for processing and temporary housing. *Id.* ¶ 12. As CBP personnel have engaged in immigration enforcement in the field, they have "encountered large groups of individuals gathering to actively impede CBP's immigration enforcement efforts. Individuals and large groups have been increasingly willing to threaten CBP personnel, damage government property, and assault officers performing their lawful duties." Parra Decl. ¶ 29.

As described below and memorialized in contemporaneous CBP reporting, such violence and threats have included striking CBP personnel, throwing rocks and other projectiles at them, threatening violence against federal officers and their families, intentionally ramming government vehicles and driving at CBP personnel, and blocking egress on public roads, which impedes law enforcement and creates danger that the crowd on the scene will grow larger and more violent. As Incident Commander Parra summarizes,

> In my twenty-three years of service with the Border Patrol, I have never witnessed the level of combativeness and sustained level of violence directed at law enforcement personnel in the performance of their lawful government duties that I have seen in Chicago. There is a distinction between peaceful and protected protest activity, and the assaultive behavior, damage to government property, and aggressive actions that CBP personnel are experiencing when performing lawful law enforcement actions.

Parra Decl. ¶ 73.

CBP personnel encountered several acts of threats and violence on October 3 alone. In at least five separate incidents, individuals or crowds acted violently toward CBP agents, including throwing rocks at them, ramming them with vehicles and attempting to run CBP vehicles off the road, attempting to punch agents, and blocking agents from leaving volatile scenes. Parra Decl.

14

¶¶ 31-36, 40. In some of these incidents, agents used less-lethal force such as pepperballs and CS gas to neutralize threats and allow agents to exit safely. *Id.*[18]

On October 4, several vehicles boxed in a CBP vehicle, and two vehicles rammed the CBP vehicle. Parra Decl. ¶ 41. After agents exited the vehicle, a vehicle drove directly at an agent, who discharged his firearm at the driver; the driver fled the scene but was later apprehended. *Id.* A large crowd then converged near the scene and threw objects at the agents and pushed agents; CBP personnel had to deploy pepperballs to clear the scene. *Id.* ¶ 42.[19]

On October 12, in the Albany Park neighborhood, a crowd surrounded agents arresting an illegal alien and positioned themselves to obstruct agents from leaving the scene. Parra Decl. ¶ 43. The crowd impeded the agents' movement, linked arms to block their vehicles from leaving, and ignored orders warning them to disperse before chemical munitions were deployed. *Id.* ¶ 45. An agent then deployed a CS canister to disperse the crowd. *Id.* Crowd members kicked the canister back at them and threw a bicycle toward an agent. *Id.* ¶ 46; *see also* Ex. 39, CBP_000360 (E-Star report).

On October 14, after CBP personnel attempted to initiate a consensual encounter with occupants of a Ford Escape, the vehicle intentionally rammed a government vehicle and drove away. Parra Decl. ¶ 48, 50. CBP personnel gave chase as the Escape drove erratically; eventually the Escape suddenly hit the brakes, causing a CBP vehicle to hit the Escape from behind and both vehicles to come to rest. *Id.* ¶ 51. The occupants fled on foot but were apprehended, and a large crowd gathered to surround the agents. *Id.* ¶ 52. Some crowd members yelled violent threats, some shoved CBP agents, and others threw rocks, eggs, and other objects. *Id.* ¶¶ 53, 56. The crowd

---

[18] *See also* Ex. 31, CBP_000067, Ex. 32, CBP_000615, Ex. 33, CBP_000061, Ex. 34, CBP_000108, Ex. 35, CBP_000093, Ex. 36, CBP_000078 (E-Star Reports regarding these incidents).
[19] *See also* Ex. 37, CBP_000116 (E-Star report regarding shooting); Ex. 38, CBP_000134 (E-Star report regarding dispersal of crowd following shooting).

repeatedly ignored orders to disperse. *Id.* ¶ 54. CBP personnel deployed CS canisters to disperse the crowd and safely exit the scene. *Id.* ¶ 55; *see also* Ex. 40, CBP_000204 (E-Star report).

On October 22, a crowd confronted a group of CBP personnel, including Chief Bovino, who were conducting immigration enforcement. Parra Decl. ¶ 57. The crowd closed in on the agents and ignored orders to back up. *Id.* A female member of the crowd threatened to kill Chief Bovino and was arrested. *Id.* ¶ 59. In another incident on October 22, a truck drove recklessly and attempted to ram a CBP vehicle, but ended up colliding with another car. *Id.* ¶ 60. As agents rendered aid to the injured driver, a crowd formed around a CBP vehicle. *Id.* ¶ 61. One person began kicking the CBP vehicle, and an agent lowered his window and deployed a short burst of OC spray at the individual kicking the vehicle. *Id.* ¶ 62.[20]

On October 23, a truck attempted to ram into CBP personnel, and a crowd surrounded agents at the next intersection, with some throwing fireworks at agents, and one person throwing a rock at an agent's head. Parra Decl. ¶¶ 64-65. CBP personnel deployed gas multiple times to disperse the crowd to allow the agents and officers to leave safely. *Id.* ¶ 64.

On October 24, a crowd gathered around CBP personnel conducting immigration enforcement. One person tried to deflate the tire of a CBP vehicle as agents attempted to place an arrestee in the vehicle, and one vehicle blocked the CBP vehicle from exiting. Parra Decl. ¶¶ 67-68. After the crowd ignored commands to disperse and warnings that gas would be deployed, an agent deployed a CS canister. *Id.* ¶ 69. Crowd members then threw objects at the vehicle, including a pumpkin; an agent then deployed another CS canister to disperse the crowd and allow the agents to leave the area safely. *Id.*; *see also* Ex. 43, CBP_000321 (preliminary report); Ex. 44, CBP_000633 (E-Star report).

---

[20] *See also* Ex. 41, CBP_000276 (E-Star report regarding collision); Ex. 42, CBP_000278 (E-Star report regarding deployment of OC spray).

Based on preliminary reports, on October 25, a crowd blocked CBP agents from leaving the area where they were performing immigration enforcement operations, with a car and a bicycle blocking in the CBP vehicle, leading to arrests for violations of 18 U.S.C. § 111. Parra Decl. ¶¶ 70–71. After the crowd ignored multiple dispersal orders and blocked the agents' movement, an agent deployed a CS munition to disperse the crowd and allow agents to exit. *Id.* ¶ 72; *see also* Ex. 45, CBP_000643 (preliminary report).

## VII. Procedural History

This case arises from protests at the Broadview Facility. Compl., ECF 1. Plaintiffs are five news organizations, three reporters, six individuals, and four religious practitioners. Am. Compl. ¶¶ 16–33, ECF 80. Plaintiffs allege that, during protests at the Broadview facility and at a handful of other incidents, DHS officers targeted them with nonlethal crowd-control devices in a manner that violated the First and Fourth Amendments as well as the Religious Freedom Restoration Act (RFRA). *See generally* Am. Compl. The Court granted Plaintiffs' TRO motion. ECF 42–43. Plaintiffs have since filed the instant motion for preliminary injunction. Pls.' Mot. for Prelim. Inj., ECF 82, 86 ("Mot.").

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such a remedy, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Id.* at 20; *see also*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (applying *Winter*). Only after Plaintiffs have established likelihood of success, irreparable harm, and inadequate legal remedies should a court go on to

weigh the balance of equities and public interest. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

## ARGUMENT

### I.    Plaintiffs are unlikely to prevail on the merits of any of their asserted claims.

Plaintiffs "bear[] a significant burden" and must establish a "strong showing" that they are likely to succeed on the merits. *Ill. Rep. Party*, 973 F.3d at 762–63. "[A] mere possibility of success is not enough" to entitle Plaintiffs to a preliminary injunction. *Id.*  Plaintiffs here fail to meet their burden, as the Court lacks jurisdiction over this dispute and Plaintiffs' legal theories all fail.

From the outset, Defendants note that Plaintiffs' Motion for Preliminary Injunction rests largely on alleged incidents and evidence involving non-Plaintiffs and incidents that go beyond the scope of the claims in the Amendment Complaint. Although Defendants disagree that consideration of such events is proper, Defendants below respond in full to Plaintiffs' arguments.

### A.    Plaintiffs lack standing to seek prospective relief.

Plaintiffs lack standing to seek prospective injunctive relief based on past allegations that certain individual officers violated their Fourth Amendment rights, their First Amendment free-speech rights, and their statutory and constitutional rights to religious freedom. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *2 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring in grant of stay application) (citing *Lyons*, 461 U.S. 95). Plaintiffs must instead demonstrate a "real and immediate threat of repeated

injury," *Young v. Lane*, 922 F.2d 370, 373 (7th Cir. 1991), and may not rely on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The Supreme Court has consistently held that individual plaintiffs lack standing to seek forward-looking and programmatic relief based on isolated incidents of alleged unlawful behavior by law enforcement. In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part," even though the police department allegedly had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.*

Similarly, in *Rizzo v. Goode*, 423 U.S. 362 (1976), the Supreme Court held that Article III standing concerns precluded the entry of a broad injunctive order in a class action lawsuit against the city of Philadelphia to reform the conduct of the city police. The plaintiffs alleged widescale illegal and unconstitutional behavior by the police "against all Philadelphia residents in general." *Id.* at 367. The district court issued a sweeping injunction imposing "a comprehensive program for dealing adequately with civilian complaints" about police misconduct. *Id.* at 369. The Supreme Court reversed, holding that the district court's order was "an unwarranted intrusion by the federal judiciary into the discretionary authority committed to them by state and local law to perform their official functions." *Id.* at 366. The Supreme Court criticized the district court for transforming isolated disputes between "individual citizens and certain policemen" into an "attempt by the federal judiciary to resolve a 'controversy' between the entire citizenry of Philadelphia and the petitioning elected and appointed officials" about the way to address police misconduct. *Id.* at 371. The Supreme Court found the lawsuit presented Article III standing concerns because plaintiffs'

asserted basis for injunctive relief was speculation about what a "small, unnamed minority of policemen might do to them in the future." *Id.* at 605.

The Supreme Court also emphasized that the district court's certification of a class of all Philadelphia residents could not cure the standing problem. *Id.* at 373–77. The district court had no Article III power to enter injunctive relief because Plaintiffs' support for an Article III case or controversy was based on about 20 past incidents in a city with 3 million inhabitants. *Id.* at 373.

The Court's TRO and Plaintiffs' request for a similar preliminary injunction suffers from the same flaws as the injunctive relief that the Supreme Court vacated in *Rizzo*. Plaintiffs have brought overly broad class-wide claims on behalf of every would be "protester" (a vague and undefined term) in this district based on speculative allegations that someone might one day be subjected to an unlawful use of force while protesting an immigration arrest somewhere in the Chicago area. As in *Rizzo*, the handful of incidents Plaintiffs highlight—out of a metropolitan area with nearly 9.5 million people—are insufficient to establish that an "injury in fact" is "actual or imminent." The mere possibility of future misconduct cannot support such sweeping "judicial supervision of [law enforcement] activity." *Reporters Comm. for Freedom of Press v. AT&T*, 593 F.2 d 1030, 1068, 1069-70 (D.C. Cir. 1978) (citing *Rizzo*, 423 U.S. at 373-75). Where, as here, Plaintiffs seek relief from allegedly "unconstitutional behavior," the "the putative injury typically proves too remote or attenuated to sustain [a court's] jurisdiction under Article III." *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) (citing *Lyons*, 461 U.S. at 105-06).

Similarly, in *Gilligan v. Morgan,* 413 U.S. 1 (1973), plaintiffs claimed that the Ohio National Guard had violated their rights during a period of civil unrest and sought prospective injunctive relief. Plaintiffs requested a "judicial evaluation of the appropriateness of the 'training, weaponry, and orders' of the . . . Guard," the establishment of "standards for the training, kind of

weapons, and scope and kind of orders to control the . . . Guard," and "continuing judicial surveillance over the Guard to assure compliance." *Id.* at 3, 6. The Supreme Court rejected Plaintiffs' claims, because this was not "an action seeking a restraining order against some specified and imminently threatened unlawful action," but was, rather, "a broad call on the judicial power to assume continuing regulatory jurisdiction over the activities of the National Guard," *id.* at 5, "embrac[ing] critical areas of responsibility vested . . . in the Legislative and Executive Branches of the Government," *id.* at 7, which would be "inappropriate for a district judge to undertake." *Id.* at 8. Plaintiffs seek intrusive relief that similarly exceeds the bounds of Article III. Federal courts "do not possess a roving commission" to "exercise general legal oversight of the . . . Executive Branch[]," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021).

These precedents foreclose Plaintiffs' standing on all claims. The vast majority of Plaintiffs' claims arise from a handful of incidents involving the use of force at the Broadview facility. But all those allegations concern incidents that occurred in late September and early October. Since then, as the record demonstrates, DHS has not used force at the Broadview facility. Indeed, since October 4, 2025, the Illinois State Police are "present at Broadview" and engaged in law enforcement protecting the facility. ECF 34, 128:21-129:1; *see* Hott Decl. ¶¶ 56-57. To the extent Plaintiffs are concerned about use of force at the Broadview facility, there is no imminent threat that such force will come from Defendants. *See Schirmer v. Nagode*, 621 F.3d 581, 587 (7th Cir. 2010) (holding plaintiffs lacked standing to seek prospective relief based on arrest arising from the police's unlawful application of a failure-to-disperse provision); *Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000) (finding no standing under *Lyons* because plaintiff "cannot demonstrate a realistic threat that he would be the subject of another" adverse action); *Sierakowski v. Ryan*, 223 F.3d 440, 443-44 (7th Cir. 2000) (citing cases denying standing based on *Lyons*)

The chances of Plaintiffs' other alleged injuries recurring are even more tenuous. A handful of plaintiffs allege that they witnessed or were subject to crowd-control devices during a handful of immigration-enforcement actions that those individuals happened to witness in and around Chicago. But there is no indication that "the same" events will occur or that any Plaintiff would be present if they did. *See Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) ("Unless the same events are likely to happen again *to him* there is no controversy between [plaintiff] and the City about the City's future handling of other arrests.").

That leaves Plaintiffs' wholly speculative claim that they might one day encounter an immigration enforcement operation somewhere on the streets of the Chicago area that would violate their constitutional rights. Any standing theory based on immigration enforcement operations generally in the Chicago area would require the Court to venture into the realm of speculation: that one of the named Plaintiffs, out of over nine million residents in the area, is likely and imminently to encounter an immigration official and face an unlawful use of force from DHS.

Plaintiffs' standing theory is even weaker than the plaintiffs in *Rizzo* and *Lyons*, as Plaintiffs have not shown that DHS has a general policy of retaliation. To the contrary, DHS expressly prohibits law enforcement personnel from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." ECF No. 35-3 at 2. And DHS's policies "correctly set out the bounds for the use of less lethal munitions and crowd-control weapons." *Los Angeles Press Club v. Noem*, 2025 WL 2658327, at *19 (C.D. Cal. Sept. 10, 2025).

Nor have plaintiffs plausibly alleged an unwritten policy of "officially sanctioned" retaliation. *See Fiorenzo v. Nolan,* 965 F.2d 348, 350 (7th Cir. 1992). Plaintiffs rely on declarations asserting that DHS officers and agents targeted Plaintiffs with crowd-control devices at certain protests between September 5 and October 14. Mot. at 10. But DHS officers have been faced with

many protests while conducting operations in the area. The record demonstrates that DHS officers have used force only on certain occasions and when necessary. Even Plaintiffs could not colorably claim that retaliatory force was used at *all* such protests, as presumably would have occurred if an unwritten DHS policy condoning retaliation existed. And Plaintiffs twist Secretary Noem's remarks in suggesting that she "ratified Defendants' practice of meeting First Amendment protected activities with force." TRO Mot. at 40, ECF No. 21; *see also Department of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020) (plurality op.) (cautioning against looking to such unofficial statements when evaluating governmental action).

Similarly, Plaintiffs' evidence does not establish that they would again be subjected to retaliatory force even if such a policy existed. *See Lyons*, 461 U.S. at 105. As explained, there were numerous protests in Chicagoland in September and October, yet plaintiffs have identified only a comparatively small number of allegedly retaliatory incidents involving them; most alleged incidents did not involve plaintiffs at all. *See* ECF 73 (showing that only 5 named Plaintiffs were among the 29 declarants). And tellingly, none of the incidents of alleged noncompliance with the TRO involves the Broadview facility or any named plaintiff. *See, e.g.*, ECF 90, 94, 118, 140. Thus, even if Plaintiffs intend to continue their activities as reporters, protesters, and religious practitioners, they have failed to establish that they will themselves be retaliated against in the future. *See Lyons*, 461 U.S. at 105-06, 108; *Updike v. Multnomah Cnty,* 870 F.3d 939, 948 (9th Cir. 2017) (rejecting plaintiff's argument that, because officers had denied him interpretive services during five prior arrests, he was at risk of being denied interpretive services in the future).

Plaintiffs' class claims do not save them. As an initial matter, "the district court has not certified" their proposed classes and "may never do so." *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004). More fundamentally, though, the fact that Plaintiffs are attempting to bring a class

action suit "adds nothing to the question of standing" here, "for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (cleaned up and citations omitted). That some unnamed class members might hypothetically be able to demonstrate that *they* have standing is thus irrelevant to whether *Plaintiffs themselves* do. *Id.* And class action or not, Plaintiffs' lack of standing necessarily precludes the Court from adjudicating their claims. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) ("*Before* a class is certified, it is true, the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit."); *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 939 (7th Cir. 2016) ("The party invoking federal jurisdiction bears the burden of establishing standing . . . .").

None of the press organizations' individual members established standing for prospective relief, so the organizational Plaintiffs cannot establish associational standing on that ground. Nor have the press organizations established standing based on their own injuries. The organizations make no specific allegations about how Defendants' conduct harmed them, other than suggesting that they must "divert significant resources to tracking and responding to attacks on journalists by federal agents." Am. Compl. ¶ 19. But this theory of standing is foreclosed by *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), where the court held that there is no organizational standing "when an organization diverts its resources in response to a defendant's actions." *Id.* at 395. The Plaintiff organizations' allegations of generic setbacks to their respective missions, and the costs they have incurred as a result, are no different from the allegations rejected in *Alliance for Hippocratic Medicine*.

**B.    The Court lacks jurisdiction to enjoin the manner in which DHS conducts immigration enforcement operations.**

Section 1252(f)(1) of the Immigration and Nationality Act ("INA") provides that, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim of the identity of the party or parties bringing th[is] action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." 8 U.S.C. § 1252(f)(1). Part IV of the subchapter includes sections 1221-1231, which "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

In *Aleman Gonzalez*, the Supreme Court explained that section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. Accordingly, if an order enjoins or restrains action that "in the Government's view" serves to "enforce, implement, or otherwise carry out" sections 1221-1231 of the INA, it is impermissible—regardless of whether the court considers the Government to be carrying out those sections as "properly interpreted." *Id.* at 550-52. Accordingly, even if plaintiffs had standing, they cannot obtain an injunction that would restrain the government's responses to interference with the carrying out of immigration provisions covered under section 1252(f)(1), such as an apprehension or detention under section 1226. In short, section 1252(f)(1) bars this Court from enjoining or restraining the government from engaging in measures it deems appropriate to effectuate the apprehension of aliens as authorized by 8 U.S.C. § 1221-1231.[21]

---

[21] Section 1252(f)(1) does not extend to immigration enforcement actions conducted under 8 U.S.C. § 1357, which vests Defendants with the authority to, among other things, interrogate and arrest without a warrant individuals believed to be aliens.

**C.      Plaintiffs are unlikely to prevail on their First Amendment free-speech claims.**

Plaintiffs advance multiple free-speech theories. Mot. at 13–35. All of them fail because when federal law enforcement have used force, they have done so reasonably where demonstrations have turned violent, obstructive, and unlawful. Plaintiffs' contrary arguments simply ignore that context.

**1.      Plaintiffs fail to establish that Defendants have burdened free-speech rights.**

In the Seventh Circuit, the plaintiff bears "the burden of proving that their First Amendment rights were infringed" before the burden shifts to the government to justify the infringement. *Menora v. Illinois High Sch. Ass'n*, 683 F.2d 1030, 1035 (7th Cir. 1982). Plaintiffs fail because they have not made a strong showing that Defendants have broadly burdened any protected speech.

**a.      Plaintiffs are not engaging in First-Amendment-protected activity when they intermingle themselves with rioters, obstructors, and other lawless actors.**

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citation omitted). "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). Thus, demonstrations can be curtailed and dispersed consistent with the First Amendment when they either become violent, become obstructive, pose a clear and present danger of imminent violence, or are violating some other law in the process. *See Puente v. City of Phoenix*, 123 F.4th 1035, 1062–63 (9th Cir. 2024); *United States v. Betts*, 99 F.4th 1048, 1054 (7th Cir. 2024) *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 119 (D.C. Cir. 1977).

26

"[I]n assessing whether a sufficient clear and present danger justifies dispersal of a crowd, '[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it *as a unit*.'" *Puente*, 123 F.4th at 1062–63 (emphases added) (citing *Cullinane*, 566 F.2d at 120). Thus, when "[c]onfronted with a mob the police cannot be expected to single out individuals; they may deal with the crowd as a unit." *Cullinane*, 566 F.2d at 120. In analyzing such situations, courts "must remember that field encounters often require law enforcement officers to make split-second decisions in quickly unfolding, highly stressful situations." *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025); *see also Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Woods v. Vill. of Bellwood*, 502 F. Supp. 3d 1297, 1313 (N.D. Ill. 2020).

Here, Plaintiffs devote substantial attention to undisputed propositions of law that voicing dissent, news reporting, expressing religious views, and protesting peacefully in traditional public fora is constitutionally protected. Mot. at 14–32. The issue before this Court, however, is different: whether federal agents were justified in dispersing demonstrations where crowd members engaged in unlawful, obstructive, and violent acts. The answer is yes.

On the days of the incidents that form the basis of Plaintiffs' claims, ICE and CBP personnel at the Broadview facility and a few other incidents Plaintiffs reference were subject to increasing levels of violence, obstruction, and other lawless behavior that justified the use of dispersal orders. Although the specifics of the daily protests differ on the margins, the underlying conduct followed a consistent pattern: Throughout September and the beginning of October, demonstrators at the Broadview Facility became increasingly violent and obstructive such as to justify the use of crowd-control measures. Among other things, individuals came to the Broadview Facility and slashed tires of government vehicles, shattered government vehicle windows, painted

graffiti on the Broadview Facility, and destroyed Broadview's plumbing system. Hott Decl. ¶¶ 15–36. Crowds of protestors also (1) blocked all traffic in and out of Broadview; (2) trespassed on government property; (3) physically battered law enforcement personnel; (4) threw bottles, rocks, and potatoes at law enforcement; (5) resisted arrest; (6) shot fireworks at federal officers and the Broadview facility; (7) threatened to kill law enforcement; (8) brought explosive devices, firearms, knives, and tear gas to the demonstrations; and (9) used Aztec Death Whistles to potentially impair law enforcement's hearing. Hott Decl. ¶¶ 14–37; Parra Decl. ¶¶ 16–27. Those specific acts of violence must also be considered in the broader context of ongoing threatened violence in Chicago, in which Cartels and the Latin Kings gang have reportedly placed bounties for the murder of immigration officers and agents. Hott Decl. ¶ 34; Parra Decl. ¶ 30. In response to those circumstances, repeated verbal or automated warnings to disperse were given on each day, which the crowd ignored on each day. *See* Hott Decl. ¶¶ 20-22, 27-28, 31 (describing warnings given on September 19, 20, 21, 26, 27, and on October 3, 2025).

Beyond the Broadview Facility, there have also been incidents of crowds and vehicles forming to obstruct, batter, and impair federal immigration officers and agents within the Chicago metropolitan area. Parra Decl. ¶¶ 31–72 (describing incidents on October 3, 4, 12, 14, 22, 23, 24, and 25). Even Plaintiffs' own favorable and curated portrayal of these so-called "peaceful" demonstrations reveals that they were neither peaceful nor lawful.[22]

---

[22] *See* Rush Decl., ECF 22-16 (describing the protests on September 19 and 26, 2025 at the Broadview Facility as "mostly peaceful" and then admitting that on both dates, protestors were "linking arms" to "block[] a road" into the Broadview Facility); TRO Mot. at 26 n.47, https://www.youtube.com/watch?v=QoobmuQoKWM (36:00 – 45:00) (last visited Oct. 30, 2025) (depicting a crowd blocking traffic into Broadview on September 27, 2025); Toobin Decl., ECF 73-29 (indicating that on September 26, 2025, demonstrators at Broadview permitted only vehicles to pass through that they believed were not associated with immigration enforcement); Villa Decl., ECF 73-7; Rodriguez Decl., ECF 73-17 (stating that on October 14, 2025, a crowd formed around federal agents and that at least one individual in the crowd threw an egg at federal agents); Mot. to Enforce TRO at 3 n.4, ECF 57, https://vimeo.com/1126897694?share=copy (video from October 12, 2025, in Albany Park, showing a woman pull back her arm and strike the vehicle and showing a crowd linking arms in the middle of a road to prevent federal agents' cars from leaving) (last visited Oct. 31, 2025).

In sum, the evidence demonstrates that federal agents lawfully dispersed demonstrations and crowds that had become unlawful. On at least September 6, 12, 19, 20, 21, 26, 27, and October 3, demonstrators obstructed vehicle access to and from the Broadview facility. *See, e.g.*, Hott Decl. ¶¶ 15–31; Parra Decl. ¶¶ 16–27. Similar obstructive behavior on public roads occurred on at least October 3, 4, 12, 14, 22, 23, 24, and 25 in other parts of Chicago. *See, e.g.*, Parra Decl. ¶¶ 31–72; Hearing Tr. (Oct. 20, 2025) 20:1-22:22, 23:25-25:9, 32:14-37:14. That conduct is not protected by the First Amendment, and law enforcement were permitted to disperse a crowd intermixed with obstructionists blocking traffic. *See Cameron v. Johnson*, 390 U.S. 611, 617 (1968) ("'[P]icketing and parading (are) subject to regulation even though intertwined with expression and association" where such conduct "obstructs or unreasonably interferes with ingress or egress to or from the courthouse."); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965); *United States v. Wilson*, 154 F.3d 658, 663 (7th Cir. 1998).

On at least September 12, 13, 19, 26, 27 and October 3, 4, 12, 14, 22, and 23, demonstrators and members of the public battered law enforcement and/or vandalized property. *See, e.g.*, Hott Decl. ¶¶ 15–37; Parra Decl. ¶¶ 16–27, 31-72. That is not constitutionally protected activity, and law enforcement were lawfully permitted to disperse a crowd intermixed with batterers and vandals. *See Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."); *Roberts v. United States Jaycees*, 468 U.S. 609, 628 (1984) ("[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection" (citation omitted)).

On at least October 3, 4, 12, 14, 22, 23, 24, and 25, demonstrators and members of the public physically impeded federal agents from enforcing federal immigration laws. Parra Decl.

¶¶ 31-72; Trans. (October 20, 2025) 20:1-22:22, 23:25-25:9, 32:14-37:14. That is also not constitutionally protected activity, and law enforcement were lawfully permitted to disperse a crowd intermixed with saboteurs. *See United States v. Pugh*, 90 F.4th 1318, 1330 (11th Cir.) (finding that the federal government could, consistent with the First Amendment, criminalize physical interferences with law enforcement officer's duties incident to and during the commission of a civil disorder), *cert. denied*, 145 S. Ct. 236 (2024).

On at least September 6, 19, 20, and 21, demonstrators trespassed on government property. Hott Decl. ¶¶ 15–37. Again, that is not constitutionally protected activity, and law enforcement were lawfully permitted to disperse a crowd intermixed with trespassers. *See Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (assuming that the asserted court street was a public forum and holding that the government could, consistent with the First Amendment, punish trespass and prevent the trespasser from future entry onto that street). On multiple occasions, demonstrators and members of the public have made death threats toward federal officers and agents. Hott Decl. ¶¶ 21, 28; Parra Decl. ¶ 20, 59. That is not constitutionally protected speech, and federal law enforcement can arrest for and curtail such speech. *See* 18 U.S.C. § 115; *United States v. Taylor*, 148 F.4th 896, 899 (7th Cir. 2025); *Virginia v. Black*, 538 U.S. 343, 344 (2003).

The record shows that this unlawful conduct was not limited to one or two individuals. Lawless individuals were intermixed with the crowds at the Broadview facility and elsewhere. Law enforcement are not required to wait until a situation becomes unmanageable or overtly dangerous before dispersing a crowd. They may lawfully disperse before that point, because when a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell,* 310 U.S. at 308. Here, there was not only a "clear and present

danger" of such conduct at these demonstrations but actual violence, obstruction, and assault. The decision to disperse was legally justified.

Plaintiffs first attempt to justify the unlawful demonstrations by relying on *City of Houston v. Hill*, 482 U.S. 451, 461–63 (1987), which found a city ordinance unconstitutional that "prohibit[ed] speech that 'in any manner . . . interrupt[s]' an officer." Mot. at 16. That reliance does not advance Plaintiffs' theory in the slightest. That case involved words. This case involves demonstrators blocking roads, throwing objects, slashing tires, battering law enforcement personnel, and destroying property.

Plaintiffs next contend that federal law enforcement have interfered with individuals' right to record. Mot. at 16–18. To support this claim, they first rely on *Am. C.L. Union of Illinois v. Alvarez*, where the Seventh Circuit held unconstitutional, as applied to the plaintiff, a statute criminalizing the use of an eavesdropping device to hear or record any oral conversation without consent. 679 F.3d 583, 587–607 (7th Cir. 2012). But the court there also emphasized that "the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs" as well as "take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations." *Id.* at 607. Plaintiffs also rely on *Nicodemus v. City of S. Bend, Indiana*, 137 F.4th 654, 669 (7th Cir. 2025), where the court recognized that the "right to record is not unlimited" and that officers may constitutionally establish a buffer zone separating the public from a crime scene. 137 F.4th at 664 n.8, 670.

Those cases do not help Plaintiffs. To begin, Plaintiffs primarily rely on four declarants—none of whom are even named plaintiffs. And two of the four declarants they rely on for this argument were intermixed with unlawful demonstrations. *Compare* Munoz Decl., ECF 37-9

(recording at Broadview Facility on October 3, 2025) *with* Hott Decl. ¶ 31 (describing unlawful demonstration ton October 3, 2025); *compare* Rodriguez Decl, ECF 73-17 (recording during October 14, 2025 incident at 105th and Avenue N) *with* Parra Decl. ¶¶ 48–56 (describing unlawful demonstration on October 14, 2025 at 105th and Avenue N.). Law enforcement may, consistent with the First Amendment, disperse those intermixed with unlawful demonstrations, including individuals recording. *See Alvarez*, 679 F.3d at 607. The remaining two declarants claim that they were recording federal agents while the agents enforced federal law and made arrests. *See* Berrera Decl., ECF 73-12; Cortez Decl., ECF 73-13. In both instances, federal agents allegedly approached the declarants but never ordered them to stop recording. *See* Berrera Decl., ECF 73-12; Cortez Decl., ECF 73-13. Indeed, both declarants admit that they continued recording. Berrera Decl., ECF 73-12; Cortez Decl., ECF 73-13. Federal agents are allowed to secure crime scene perimeters, including while armed, and Plaintiffs cite no authority to the contrary.

In sum, once the demonstrations became obstructive and violent, they lost First Amendment protection, and no heightened scrutiny applies to law enforcement personnel reasonably dispersing unlawful demonstrations. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471, (2025) (finding that rational basis applies to unprotected speech).

### b. Members of the Press do not have a special right of access to unlawful demonstrations.

Plaintiffs seek a special rule for members of the press at unlawful demonstrations, asserting that members of the press should not be dispersed "along with demonstrators." Mot. at 30–31. That argument fails. When a protest turns violent and threatens federal personnel and property, officers may respond by issuing general dispersal orders and by using appropriate force. *See Puente*, 123 F.4th at 1062–63; *Cullinane*, 566 F.2d at 119; *Menotti v. City of Seattle*, 409 F.3d 1113, 1151 (9th Cir. 2005). In that context, protesters and journalists are not entitled to special treatment.

The nature of the right-of-access doctrine confirms this conclusion. The doctrine evaluates claims of access to certain "government proceeding[s] or activit[ies]." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012); *see Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8-9 (1986) (applying doctrine to "governmental processes"). A violent protest—which the government did not organize—is not a government proceeding to which a right of access could attach. *See Associated Press v. Neal*, 788 F. Supp. 3d 959, 964 (S.D. Ind. 2025) (finding that "the Seventh Circuit has never extended the *Press-Enterprise II* framework to an event beyond a judicial proceeding").

Applying the right-of-access framework to violent protests is especially inapt because it essentially grants the press a special First Amendment immunity to dispersal orders and the use of crowd-control devices that the public does not possess. It is black-letter law, however, that the press lacks a "constitutional right of special access to information not available to the public generally." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2021) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)). Members of the public have no First Amendment right to disregard dispersal orders or to be exempted from the use of crowd-control devices, and the press is no exception.

Even if violent protests are governmental proceedings subject to the right-of-access doctrine, such a right would still not attach here. The doctrine applies only when the "place and process [in question] have historically been open to the press and general public" and when "public access plays a significant positive role in the functioning of the particular process" at issue. *See Press-Enterprise*, 478 U.S. at 8. On the first prong, there is no tradition of public access to violent protests. *See Branzburg*, 408 U.S. at 684-85 ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded . . ."). The existence of such a tradition is a prerequisite for a right-of-access claim to proceed. *Press-Enterprise*, 478 U.S. at 9.

33

Because no right of access attaches to violent protests, the Court need not consider whether the issuance of dispersal orders and the use of crowd-control devices are narrowly tailored. *Press-Enterprise*, 478 U.S. at 8-9 (explaining that a court considers whether restrictions on public access are narrowly tailored only if that particular "place and process" have traditionally been open to the public). But if the Court reaches the question, it should conclude that such measures are the narrowest means of addressing unpredictable and violent protests. As the government's declarants explained, "[t]he most effective method" that law enforcement has in situations involving imminent destruction of federal property or harm to law enforcement is "less lethal munitions to push the entire crowd back," which also do not cause permanent harm to those exposed. Harvey Decl., ECF 35-4. Similarly, when law enforcement personnel are confronted by a "protest that is obstructing transportation," the use of crowd-control devices may be both "appropriate" and "necessary." *Id.*; *see* Parra Decl. ¶ 75. By design, many such devices "have an impact upon a specific area" or "may collaterally affect persons in a crowd." Harvey Decl. ¶ 11.

As already discussed, law enforcement need not refrain from issuing dispersal orders or deploying crowd-control devices against rioters simply because peaceful protesters or innocent bystanders may also be in the crowd. "[O]nce a pattern of chaotic violence ha[s] been established, it [i]s unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. When "law-breaking and law-abiding protestors [a]re often indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly with enforcement," *id.* at 1135, officers may lawfully respond to the group even if their response affects peaceful protesters or innocent bystanders too, *id.* at 1134; *see id.* at 1126-28. The First Amendment does not grant journalists an exception to this rule.

### c. Dispersal of unlawful demonstrations was not content-discriminatory.

Plaintiffs then pivot to another First Amendment theory, asserting that Defendants have dispersed demonstrations and used force against demonstrators based on the content and viewpoint of their speech. Mot. at 22. To credit that claim, however, this Court would have to find that Defendants acted *not* in response to the violence, lawlessness, and obstruction at these events, but rather because of the speakers' opinions and views. There is no factual basis to support that claim.

When determining whether the government is restricting speech based on content, "[t]he government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S. 781, 791–92 (1989). A government action that "serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* In other words, whether government action is based on viewpoint does not depend on whether it happens to affect a speaker with a particular viewpoint. *Id.* For example, in *Ward*, the Supreme Court held that a city's noise regulation reflected a legitimate goal of preventing excess noise in residential areas—not restricting music with a particular viewpoint. *Id.* at 792-93.

So too here. Plaintiffs insist that demonstrations were dispersed because they expressed anti-ICE, anti-deportation views. Mot. at 22–24. To support that theory, Plaintiffs claim that the outcome would have been different if the demonstrators were carrying "We love ICE" signs. Mot. at 24. But Plaintiffs ignore that federal officers have dispersed anti-ICE demonstrations *because* they have involved violent and obstructive conduct directed at federal immigration officials, such as blocking the entrance into the Broadview facility, blocking federal personnel from transporting immigration detainees, slashing the tires of government cars, and throwing objects. *See, e.g.*, Hott Decl. ¶¶ 15–37; Parra Decl. ¶¶ 16–72. Plaintiffs offer no evidence that any pro-ICE demonstrators engaged in comparably unlawful conduct yet were treated differently.

35

Plaintiffs next rely on isolated quotes from certain Defendants that do not support their claim. They strangely take issue with Secretary Noem's comment about stopping acts of violence against law enforcement. Mot. at 23. They also take issue with Attorney General Bondi accurately describing a recent protest at the Broadview Facility as a "riot." *Id.* Such comments do not establish any content-based discrimination.

Plaintiffs next advance an even weaker claim of content discrimination concerning the Press Plaintiffs. Mot. at 24–25. They argue that Defendants have engaged in viewpoint discrimination by excluding certain independent journalists from the access that these journalists want. *Id.* Plaintiffs' supposed evidence of viewpoint bias is that Secretary Noem and other federal officials have appeared with videographers and photographers. *See* Mot. at 25 (complaining that Secretary Noem was being followed by "others" with cameras). But it is hardly novel—or unconstitutional—that public officials want to have staff document their official activities.

Setting aside those irrelevant allegations, Plaintiffs are left with the claim that political commentator Benny Johnson apparently was granted access to the Broadview Facility for an exclusive interview. Mot. at 25. But that argument, too, fails. The First Amendment does not require the government to grant equal press access to exclusive interviews. *See*, *e.g.*, *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418–19 (4th Cir. 2006); *AP v. Budowich*, No. 25-5109, 2025 WL 1649265, at *7 n.6 (D.C. Cir. June 6, 2025).  In any event, the comparison to Johnson is a false one because the press plaintiffs are not seeking access to the Broadview facility for interviews; they are seeking to insulate themselves from lawful crowd-control measures directed at the violent demonstrations with which they are intermingling.  Plaintiffs' reliance on cases like *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021), which concern certain limited access press events, are thus misplaced.

### d. Defendants have not retaliated against Plaintiffs based on their speech.

To establish a claim of First Amendment relation, "the plaintiffs must show that: (1) they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the [law enforcement] officer's decision." *Thayer v. Chiczewski*, 705 F.3d 237, 251–52 (7th Cir. 2012). Plaintiffs fail at least prongs one and three.

As outlined above, Plaintiffs fail the first prong because they are not engaging in First-Amendment-protected activity when they intermix themselves with violent, obstructive, and lawless actors. But even if the Court disagrees, Plaintiffs also fail prong three.

To be sure, members of the public have the First Amendment right to criticize government action, even harshly. For example, members of the public have the right to call police officers "pigs." But they do not have the right to carve the word "pig" into an officer's vehicle nor do they have the right to threaten or attack officers while doing so. *Cf.* Indictment, *Rabbitt*, 1:25-cr-693 (N.D. Ill.). The record establishes that when Defendants have used force, it has been in this latter context, and thus Plaintiffs' retaliation claim fails.

 To succeed on their retaliation claim, Plaintiffs must show that "the First Amendment activity was 'at least a motivating factor' in the Defendants' decision" to take the challenged action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Where the claim is that the alleged retaliatory action is a law enforcement action, this bar is high; ultimately, "[i]f retaliation is not the but-for cause of the arrest," or similar challenged conduct, "the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Thayer*, 705 F.3d at 252 *(*quoting *Hartman v. Moore,* 547 U.S. 250, 260, (2006))

37

Plaintiffs cannot make a *prima facie* case of retaliatory motive, let alone establish that "the real reason" for the challenged actions "was retaliatory animus" for Plaintiffs' speech. *Id.* (citing *Zellner v. Herrick,* 639 F.3d 371, 379 (7th Cir.2011)). The record establishes the opposite. *See* Hott Decl. ¶¶ 67; Parra Decl. ¶¶ 14-15. The record shows that federal law enforcement officers acted in the context of persistent threats to their own safety, as well as the safety of other employees of Defendants and those in Defendants' custody. *See, e.g.*, Hott Decl. ¶¶ 67; Parra Decl. ¶¶ 13. Defendants' personnel have been subjected to persistent, violent, dangerous conduct, both at their Broadview facility and in the field. *See supra* at 5-10 (Background, Parts IV & V); *see generally* Hott Decl. ¶¶ 14-39 (violence at Broadview); Parra Decl. ¶¶ 13-28 (same); *id.* ¶¶ 31-72 (violence in the field in Chicagoland area).

To support their retaliation claim, Plaintiffs first allege that Chief Bovino stated that he had the "specific intention to turn the 'Free Speech Zone' outside the Broadview ICE facility into a 'Free Arrest Zone.'" Mot. at 33. But Plaintiffs misquote Chief Bovino. He actually said that they were dealing with an "unsafe crowd" and that "when they resist, what happens? They get arrested. So it's now going to be a free arrest zone. And I'll give them one warning and that'll be for safety of us and the Secretary to leave." Benny Johnson (@bennyjohnson), X.com (Oct. 3, 2025) at 2:27-50, available online at https://x.com/bennyjohnson/status/1974174065985470970 (last visited Oct. 30, 2025)). That statement is consistent with the law. *See Menotti*, 409 F.3d at 1151.

Despite the consistent and significant risk posed to Defendants' personnel from the unlawful actions of individuals hostile to their mission, Plaintiffs do not and cannot claim that *every* interaction with protestors resulted in force being used against them, let alone unlawful force. *See* Parra Decl. ¶ 75 (stating that "many of CBP's operations in Chicago occur without the need to deploy less than lethal force or munitions"). This is telling. If the use of crowd control devices

had been taken for the purpose of retaliation against protected speech—rather than for the safety of the officers themselves, those in their custody, and the public at large—such munitions would be deployed in every instance where Defendants encountered protesters, whether those protests were violent or nonviolent, lawful or unlawful. This is not the case. For example, on September 20, 2025, protestors gathered at the Broadview Facility and protested peacefully "without incident in the morning." Hott Decl. ¶ 21. Only later in the day, when protestors began throwing objects, threatening to kill officers, slashing tires, and blocking traffic into the Broadview Facility, did federal officers use any force. *Id.* Similarly, on October 3, 2025, federal officers were at a hospital when a crowd surrounded them and threw metal spikes around their vehicles. Parra Decl. ¶ 36. Despite this unlawful conduct, officers successfully removed the metal spikes and "safely move[d] through the crowd without using force." *Id.* And since October 3, crowds have protested outside the Broadview facility but have not threatened federal officers or agents, and Defendants have had no need to use force. Hott Decl. ¶¶ 56-57. Thus, the record reflects that federal law enforcement only used force in situations where they or others were threatened or assaulted, notwithstanding ongoing protests.

As a legal matter, it does not matter that some individuals present at violent and dangerous demonstrations—even if not personally engaging in unlawful conduct—were incidentally affected by crowd-control measures. That some individuals affected by crowd control activities may have some indicia of religious or press affiliation—or were individuals who were not themselves participating in violent or unlawful acts—does not support the contention that any such individuals were "targeted" or intentionally affected at all. By their very nature, crowd control devices are designed to disperse widely, and may incidentally affect others in the area. And the means by which they are deployed—whether thrown by hand or the use of pepper ball guns—are not

39

precision devices that can be reliably aimed to hit or avoid moving individuals from a distance.[23] *See* Hott Decl. ¶ 62; Parra Decl. ¶ 16 ("From a distance, the PLS is not a precision tool, and it cannot be meaningfully used to target an individual's person."). Officers may lawfully deal with an obstructive and violent crowd as a whole rather than isolate and target each individual bad actor. *See Puente*, 123 F.4th at 1062–63; *Cullinane*, 566 F.2d at 120.

Plaintiffs have not carried their burden in establishing that any use of force affecting them was "anything other than the unintended consequence of an otherwise constitutional use of force under the circumstances." *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) (rejecting First Amendment retaliation claim where "protesters were warned repeatedly to clear the street or tear gas would be deployed, and there is no dispute that a small group of the crowd became violent"); *see also Mims v. City of Eugene*, 145 F. App'x 194, 196 (9th Cir. 2005) (holding that use of a crowd control team "in full riot gear was not a disproportionate response and does not indicate preexisting hostility toward the protestors' views"); *Walker v. Wexford*, No. 3:20-CV-1020-JD-MGG, 2021 WL 810034, at *3 (N.D. Ind. Mar. 3, 2021) (finding that "speculation about the defendants' motives" is not enough to establish a First Amendment retaliation claim). Given the chaotic circumstances presented by the violent protests, Plaintiffs have not established that Defendants would not have used force "but for" a retaliatory motive. *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1059 (9th Cir. 2019).

### 2. Even assuming Plaintiffs' protected speech was burdened, Defendants' actions were still constitutionally permissible.

---

[23] Further, even if Plaintiffs could somehow establish the likelihood that individuals with indicia of press affiliations were the intentional targets of particular crowd control actions (which they cannot), that would not be sufficient to indicate that this was due to any protected activity and not the unlawfulness of their actions or reasonably perceived threat. These indicia are not necessarily apparent, particularly in the context of crowds, and may be shared by those acting both lawfully and unlawfully. *See, e.g.*, Parra Decl. ¶¶ 14-15; Hott Decl. ¶ 61.

Even if the Court determined that Defendants regulated Plaintiffs' protected speech, Defendants' actions were content-neutral time, place, and manner regulations. As explained above, Defendants neither retaliated nor discriminated based on the content or viewpoint of speech. At most, law enforcement neutrally dispersed an obstructive and violent crowd.

The government can impose "reasonable time, place and manner restrictions" consistent with the First Amendment, so long as the restrictions are narrowly tailored to serve a significant government interest and leave alternative avenues to communicate the same information. *Graff v. City of Chicago*, 9 F.3d 1309, 1319 (7th Cir. 1993). Here, federal law enforcement used force to disperse crowds that had become obstructive and violent. Doing so protects public safety and officer safety—both of which are compelling government interests. *See United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019) (finding public safety a compelling public interest); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016). In situations throughout September and October, federal personnel directed crowds to stop obstructing traffic, to move back, to move out of the road, and to stop unlawful behavior. *See, e.g.*, Hott Decl. ¶¶ 15–37; Parra Decl. ¶¶ 16–72. Defendants did not direct crowds to leave the area completely. Thus, Defendants' actions were narrowly tailored and left open ample alternative channels for speech.[24]

**D.    Plaintiffs are unlikely to prevail on their RFRA or free exercise claims.**

Under RFRA, "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1), (2). Plaintiffs neither establish a substantial

---

[24] Plaintiffs, again, rely on their expert declarant who claims that officers are inadequately trained and departing from standard practice. Mot. at 29; ECF 23-32, 77-2. But this expert declarant has not reviewed anything other than what Plaintiffs have carefully curated for him, diminishing the reliability of any of his opinions. By contrast, the record shows that ICE and CBP officers receive extensive training. *See* Parra Decl. ¶ 8; Hott Decl. ¶¶ 41-42.

burden nor that the government's actions would fail to satisfy RFRAs requirements if they had. And because RFRA imposes a more difficult standard than the Free Exercise Clause, Plaintiffs *a fortiori* have not made out a Free Exercise Clause claim.

> **1. Dispersal orders issued for lawful crowd control purposes do not constitute a substantial burden ender RFRA.**

To establish a substantial burden under RFRA, a plaintiff must show that the offending government policy either (1) compels them to "perform acts undeniably at odds with fundamental tenets of [their] religious beliefs," (2) "put[s] substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs," or (3) "'bears direct, primary, and fundamental responsibility for rendering [a] religious exercise . . . effectively impracticable.'" *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013). Plaintiffs fail to establish such a burden.

Plaintiffs argue that Defendants' decision to employ force against them, including at times using less-lethal instruments, substantially burdens their religious exercise. Mot. at 37–40. Plaintiffs once again overlook the full context: federal personnel used force to disperse crowds only after they had become obstructive or violent. *See generally* Hott Decl. ¶¶ 14-39 (violence at Broadview); Parra Decl. ¶¶ 13-28 (same); *id.* ¶¶ 31-72 (violence in the field in Chicagoland area). Tellingly, Plaintiffs cite no court case finding a religious free-exercise right to disregard law enforcement orders to disperse when the public safety or order demands it. There is no such right.

While the free exercise of religion "affords an individual protection from certain forms of governmental compulsion," it "does not afford an individual a right to dictate the conduct of the [g]overnment's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 700 (1986). The Supreme Court reaffirmed those principles in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), holding that whether the government has imposed a substantial burden on the exercise of religion "cannot depend on measuring the effects of a governmental action on a religious objector's

spiritual development." *Id*. at 451. The "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not impose a substantial burden. *Id*. at 450-51.

Here, lawful and general dispersal orders in response to crowds intermixed with unlawful, obstructive or violent conduct neither burden Plaintiffs from practicing their religion nor impose any financial or other penalty on Plaintiffs for engaging in such activity. Plaintiffs are free to undertake whatever religious activities they choose; they are not, however, free to insist that they be granted special access to unlawful demonstrations under the guise of religious freedom. Just as the Supreme Court found no substantial burden when the government disrupted a site of traditional religious significance to Native practitioners, *Lyng*, 485 U.S. at 452-53, Plaintiffs' religious rights here are not burdened by having to follow general orders to disperse from unlawful demonstrations.

The Plaintiffs' version of what constitutes a RFRA substantial burden would be unworkable because "[a] broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs." *See id*. 452. Under Plaintiffs' theory, the decision to disperse an unlawful demonstration would be subject to strict scrutiny just because a few in the crowd claimed to be holding a prayer vigil. No court has ever suggested RFRA reaches that far. *See United States v. Grady*, 18 F.4th 1275, 1287 (11th Cir. 2021) ("RFRA is not a 'get out of jail free card,' shielding [individuals] from criminal liability."); *Lyng*, 485 U.S. at 452 (noting that "government simply could not operate" if strict scrutiny were to be required to satisfy every religious need and desire).

Moreover, where government action merely limits "one of a multitude of means" by which practitioners may exercise their religious beliefs, no substantial burden exists. *Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001). Here, the religious Plaintiffs fail to make the requisite substantiality showing because alternative means of religious practice remain available to them. Plaintiffs have various ways in which they may satisfy their broad religious beliefs without engaging in activity that interferes with DHS's efforts to control chaotic and often violent protests. At most, DHS's attempts to manage protests at the Broadview facility restricted "one of a multitude of means" by which Plaintiffs could practice their religious beliefs, which does not constitute a substantial burden. *Henderson*, 253 F.3d at 15. None of the religious Plaintiffs claimed that their sincerely held religious beliefs compelled them to engage in violent protests or to interfere with legitimate law-enforcement activities. Plaintiffs have "ample avenues open" by which they can express their deeply held beliefs. *Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995).

Plaintiffs have thus failed to establish a substantial burden on their exercise of religion.

### 2. Use of crowd control measures to enforce lawful dispersal orders is the least restrictive means to further a compelling government interest.

If Court were to conclude that the Defendants had imposed a substantial burden, there is still no RFRA violation if the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

Here, Defendants have a compelling interest in the protection of federal property, public order and security, and the physical safety of their officers confronting large, dynamic gatherings involving obstructive and violent behavior. *See Bonin*, 932 F.3d at 535; *Brown*, 844 F.3d at 568; *Korte*, 735 F.3d at 686. The federal laws whose enforcement these gatherings challenge—and often violently obstruct—themselves further compelling interests. *See Blackie's House of Beef,*

44

*Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981); *National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989).

The use of lawful, less-lethal crowd control devices is the least restrictive effective means to disperse demonstrators throwing objects, battering officers, vandalizing property, and blocking traffic. *See* Harvey Decl., ECF 35-4 (describing crowd control devices as "the most effective method" that law enforcement has to push an "entire crowd back" from destroying property and blocking traffic); Parra Decl. ¶ 75 (these devices are important force de-escalation tools that avoid more violent confrontations). Whether the religious Plaintiffs themselves ever engaged in such activities makes no difference when they intermix with demonstrations that turn unlawful.

In sum, there is no less-restrictive means to further the compelling interest of protecting public and officer safety in the context of chaotic and dangerous crowds. *See Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 731 (2014) (indicating that a less-restrictive alternative should further the government's compelling interests "equally well" as the government's approach).

Plaintiffs also invoke the free exercise clause. *See* Mot. 36. But RFRA provides more—not less—protection for religious exercise. And as explained above, Plaintiffs have failed to establish that officers' use of force was anything but neutral and generally applicable. Thus, such actions under the Free Exercise Clause would be subject to nothing more than rational basis review. *See Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872, 879 (1990). That low standard is easily satisfied here because the use of reasonable crowd control measures in response to violent crowds is rationally related to the legitimate interest of protecting the public and officer safety. *See Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (noting that the Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny").

## E.     Plaintiffs are unlikely to succeed in their Fourth Amendment claims.

45

### 1. Plaintiffs are unlikely to succeed on their false arrest theory.

Plaintiffs argue that "Defendants have conducted numerous false arrests in order to suppress disfavored viewpoints and to retaliate against individuals whose speech they dislike." Mot. at 40. But law enforcement's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). The Fourth Amendment's probable cause analysis looks solely to the objective basis for the officer's decision. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Further, the facts and circumstances known to the officer must be "viewed from the standpoint of an objectively reasonable police officer." *Neita v. City of Chicago*, 148 F.4th 916, 933 (7th Cir. 2025). Probable cause is "a practical, commonsense, and nontechnical standard which requires only determining 'factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" *Id*. (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Probable cause to justify an arrest exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). "Probable cause is a low standard." *United States v. Hays*, No. 20-CR-30021, 2021 WL 4130501, at *4 (C.D. Ill. Sept. 10, 2021), *aff'd*, 90 F.4th 904 (7th Cir. 2024). The Seventh Circuit has recognized that Illinois law makes obstruction or resistance of a peace officer, including refusal of orders to disperse, a legal basis for probable cause for arrest. *See Abbott*, 705 F.3d at 722-23 (citing cases). Therefore, a finding of probable cause for arrest exists where someone fails to comply with a dispersal order, persists in verbal defiance of such orders, or remains in such close proximity to law enforcement operations that it hinders or obstructs those operations. *Id*. (collecting cases). Similarly, the Ninth

Circuit recognizes that failing to obey a lawful order to disperse justifies an arrest. *See Menotti*, 409 F.3d at 1151–56.

As discussed above, federal law enforcement have repeatedly confronted large crowds in highly volatile, rapidly evolving situations, often leading to arrests and sometimes the use of less-lethal crowd control instruments. Most of Plaintiffs' cited declarants claiming false arrest were present for unlawful demonstrations (and most also are not Plaintiffs). *Compare* Held Decl., ECF 73-20 (describing arrest at Broadview on September 27, 2025), Sampson Decl., ECF 73-21 (same) *with* Hott Decl. ¶ 28 (describing assaults, death threats, property damage, blocking traffic, and disregarding lawful dispersal orders by crowd on September 27, 2025 at Broadview).

Plaintiffs claim that Jessica Fuentes was unlawfully arrested at a hospital, Mot. at 42, but again, Plaintiffs omit critical context. While officers were with an injured immigration detainee, Fuentes attempted to enter the detainee's hospital room, and officers stopped her. Parra Decl. ¶ 37. After being told to leave, she refused to comply with their lawful commands. *Id.* She was briefly detained and released without charges. *Id.* Given that full context, officers had probable cause to believe that Fuentes was impeding and interfering with the performance of immigration officers' duties. *See* 18 U.S.C. § 111.

Plaintiffs' argument is misplaced that any subsequent decision by a grand jury not to indict arrestees is proof that Defendants must have violated the Fourth Amendment. Mot. at 42. Probable cause *for arrest* does not turn on whether a grand jury, after the fact, determines that there is probable cause *for indictment*. The former looks only at what the officer knew at the time, while the latter allows for further development of facts and extended deliberation. Probable cause at the moment of arrest "deals not with hard certainties, but with probabilities." *Abbott*, 705 F.3d at 714 (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

In sum, Plaintiffs have failed to show that Defendants have arrested individuals without probable cause, much less on such a systematic level that would warrant broad injunctive relief.

**2. Plaintiffs are not likely to succeed in their excessive force theory.**

Plaintiffs next argue that the use of less-lethal crowd control instruments to disperse crowds constitutes a "seizure" under the Fourth Amendment. Mot. at 43–46. But Plaintiffs apply the wrong standard; instead, the Fourteenth Amendment's "shocks the conscience" standard applies.

By its own terms, the Fourth Amendment protects the right to be secure in one's person, house, papers and effects against "unreasonable searches and seizures." Thus, when the use of force entails a "seizure" of a "person," courts evaluate whether the force was excessive under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). However, for claims of excessive force outside the context of a seizure, courts instead apply the substantive due process standard that asks whether the officer's conduct "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844, 846-47 (1998).

Here, there is no seizure, so the Fourteenth Amendment standard applies. *See Putente v. City of Phoenix*, 123 F.4th 1035, 1051-55 (9th Cir. 2024) (affirming denial of Fourth Amendment claim in the context of crowd control measures employed during protest of the President). The record establishes that Defendants sought to disperse dangerous crowds, not restrain them. The "seizure" of a "person" follows from either some physical force or show of authority that "in some way restrains the liberty of the person." *Torres v. Madrid*, 592 U.S.306, 311 (2021) (cleaned up). By contrast, the entire purpose of dispersing a dangerous crowd is to encourage them to leave the area, not to restrain or confine them under government control.

*Puente v. City of Phoenix* is instructive. There, the Ninth Circuit held that the Phoenix police's dispersal of an uncompliant crowd by airborne chemical irritants (e.g., tear gas and pepper spray) and auditory or visual irritants (e.g., the noise and light effects of flash-bang grenades) was

48

not a "seizure" within the meaning of the Fourth Amendment. 123 F.4th at 1051-54. The court explained that "an application of force with an objective intent merely to *disperse* or *exclude* persons from an area—and *without* any measures objectively aimed at detaining or confining them in the process—does not involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'" *Id*. at 1052 (emphasis in original). So too here. Plaintiffs provide no evidence that federal law enforcement used crowd control devices with any objective intent other than to disperse or excuse persons from an area. Plaintiffs thus fail to demonstrate a seizure within the meaning of the Fourth Amendment. Accordingly, Plaintiffs' Fourth Amendment claims fail.

To the extent Plaintiffs' attempt to reframe their claims under the Fourteenth Amendment, they would be evaluated under the "shocks the conscience" standard and also fail. *County of Sacramento*, 523 U.S. at 844, 855 ("Regardless [of] whether [Defendant officer]'s behavior offended the reasonableness [standard] … it does not shock the conscience…."). Under this standard, courts ask whether the force was used for the purpose of causing the subject harm. *Id*. at 854. The record here supports no such conclusion. Far from an intent to cause harm, the use of less-lethal crowd control measures in situations where officers face crowds committing unlawful, threatening, or violent conduct is a de-escalation technique intended to *reduce* the risk of harm to officers, those in their care, and members of the crowd. *See* Parra Decl. ¶ 75; Harvey Decl., ECF 35-4. In such instances, officers have a legitimate concern for their own safety, as well as an obligation to protect public safety and safeguard federal property. For this reason, Plaintiffs cannot meet their burden to show that Defendants' use of crowd control measures to enforce lawful dispersal orders shocks the conscience.

Even if the Fourth Amendment objective reasonableness standard applied, Plaintiffs fail to meet that standard as well. The objective reasonableness standard requires that the use of force be

"'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "[R]easonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97; *see also Abbott* , 705 F.3d at 724–25 (giving "leeway to law enforcement officers' assessments about the appropriate use of force").

Here, Plaintiffs single out the use of less-lethal crowd control instruments as excessive force, contending that chemical irritants can pose health risks and that they violate Plaintiffs' bodily integrity. Mot. at 43–45. Yet Plaintiffs cite no case where a court found excessive force from the use of crowd control devices to disperse demonstrations. Instead, Plaintiffs rely on *United States v. Husband*, 226 F.3d 626, 633 (7th Cir. 2000), which hurts rather than helps their theory. There, the court listed examples where courts have found a sufficient insult to bodily integrity as to pose a violation of the Fourth Amendment, including compelled surgery to extract a bullet, compelled stomach pumping, and compelled endoscopy. *Husband*, 226 F.3d at 633. No remotely similar intrusions occurred here. Diffuse exposure to crowd control measures, while unpleasant, is a far cry from the sorts of violations of bodily integrity that could violate the Fourth Amendment.

The record here shows that federal personnel responded to unlawful demonstrations and acted to disperse such demonstrations. In contending that "[t]he *vast majority* of people assembled at Broadview are exercising their First Amendment rights in a nonviolent manner," Mot. at 44 (emphasis added), Plaintiffs implicitly concede that some members of those large crowds acted violently. A crowd where significant numbers are freely engaging in assaultive behavior creates an objectively reasonable ground to issue dispersal orders and, if needed, enforce them with the

use of less lethal crowd control measures. Because doing so is objectively reasonable under the circumstances, Plaintiffs are unlikely to prevail on their excessive force claims.

## II. Plaintiffs will not suffer irreparable harm in the absence of broad preliminary relief.

Plaintiffs have failed to establish they will suffer irreparable harm in the absence of preliminary relief. To establish irreparable harm, Plaintiffs rely largely on evidence submitted by non-parties to support their request for injunctive relief. Plaintiffs cannot establish irreparable injury by citing harms allegedly inflicted on non-parties. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm[.]" (emphasis added)); *Great Lakes Higher Edu. Corp. v. Cavazos*, 698 F. Supp. 1464, 1475 (W.D. Wisc. 1988).

Although the law of this circuit is that "irreparable harm is presumed in First Amendment cases," *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450-52 (7th Cir. 2022), that assumes the plaintiffs have established a likelihood of success on the merits of their First Amendment claim, which they have not, as discussed above. Moreover, Plaintiffs have not established irreparable harm for the broad relief that they seek. Since Plaintiffs filed their TRO, the Illinois State Police have begun handling crowd control at the Broadview facility. Hott Decl. ¶¶ 56-57. Plaintiffs' request for relief, therefore, is based on a changed state of affairs. Plaintiffs' theory that the continued enforcement of federal law shows a likelihood of irreparable harm is implausible. Mere speculation that individual officers may somehow, someday commit sporadic violations of people's rights at future protests—specifically targeting one of the Plaintiffs—cannot establish irreparable harm to grant injunctive relief in the whole judicial district. Indeed, an individual citizen does not face a likelihood of irreparable harm just because there is a generalized risk that an officer may one day act unconstitutionally. *See Lyons*, 461 U.S. at 111. Plaintiffs have failed to demonstrate that they will suffer irreparable harm absent the broad relief they seek.

On the Fourth Amendment, Plaintiffs have also failed to show irreparable harm, especially since legal remedies under the Federal Tort Claims Act, 28 U.S.C. § 2680(h), and *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), are available for certain Fourth Amendment violations.

**III.    The balance of the equities and public interest weigh against an injunction.**

The balance of the equities and public interest favors Defendants, who are enforcing existing law and defending life and property in response to repeated violent attacks. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. (citation omitted). "The federal government's interest in preventing" attacks on federal personnel and damage to federal buildings "is significant." *See Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025) (collecting cases).

Moreover, there is a pointed public interest when disorder threatens the integrity of public property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000); *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (recognizing "the legitimacy of the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights." (cleaned up)). Additionally, Congress has recognized such interests, including by making the destruction of federal property and assault of federal officers felonies. 18 U.S.C. §§ 111, 1361. The federal government has an interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated[;]" for government buildings, those uses are public uses that are in the public interest. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992). The public interest is advanced when law enforcement personnel disperse violent opportunists near federal buildings and personnel. *See, e.g.*, *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise protected speech may be curtailed when an assembly stokes—or is

threatened by—imminent physical or property damage."); *Griefen*, 200 F.3d at 1260. *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). Plaintiffs cannot dispute that the federal government and public have a compelling interest in protecting federal property and personnel.

Plaintiffs' theory that the federal government is engaged in a "campaign of retaliation and punishment based on the viewpoints of people in [the Northern District of Illinois]," Mot. at 8, is unavailing when the facts are replete with violent attacks on law enforcement. Even if the protests had not become violent riots, the courts have already thoroughly weighed the interest the press has in access and found it no greater than that of the public generally. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972) ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded"); *MacIver*, 994 F.3d at 612; *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946 (7th Cir. 2015).

Imposing policing rules fashioned by Plaintiffs' attorneys—not law enforcement—will and has already created confusion and hesitation for law enforcement. *See* Parra Decl. ¶ 74 (because of the TRO, "I believe that agents are improperly hesitating before they can appropriately deploy less lethal munitions."). It is also unwarranted since Plaintiffs' alleged constitutional violations cannot outweigh the concrete harm to the government and the public were this Court to grant broad injunctive relief.

The balance of hardships and public interest favor the government especially in the Fourth Amendment context. Granting the injunction demanded here would require the Court to reach a conclusion about future uses of force without the guidance ordinarily gleaned from case-specific facts and circumstances. *See United States v. Lewis*, 62 F.4th 733, 743 (2d Cir. 2023) ("[T]he Supreme Court has long expressed a preference for case-by-case analysis in the Fourth Amendment context."). That would call for the Court to hazard a guess about situations implicating

Fourth Amendment issues that simply cannot be foreseen: "[I]t is difficult for a court to pronounce how the Fourth Amendment might apply to a general set of facts," because that would require "predict[ing] all of the factual scenarios that might arise and answer[ing] exactly how the Fourth Amendment would apply to all of them." Orin S. Kerr, The Limits of Fourth Amendment Injunctions, 7 J. Telecomm. & High Tech. L. 127, 133 (2009). "Fourth Amendment decisions are too fact-sensitive for courts to use injunctive relief to craft broad-ranging injunctions." *Id.* at 138; *see also Missouri v. McNeely*, 569 U.S. 141, 158 (2013).

## IV.    Scope of Relief.

Plaintiffs have not proposed a preliminary injunction, stating that they will submit one after the hearing. Mot. at 52. Defendants thus reserve the right to file supplemental briefing in opposition to Plaintiffs' proposed preliminary injunction. Defendants incorporate by reference their previous arguments on the motion for temporary restraining order. *See generally* Defs.' Opp'n to Mot. for TRO at 6–24, ECF 35; ECF 63; Hearing Tr. (Oct. 6, 2025); Hearing Tr. (Oct. 8, 2025); Hearing Tr. (Oct. 9, 2025). To summarize, the TRO and any similar preliminary injunction is inconsistent with the Supreme Court's holding in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). Courts should not micromanage law-enforcement that are responding to unpredictable and violent protests. *See*, *e.g.*, *United States v. Patane*, 542 U.S. 630, 642 (2004); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990). The TRO and any similar preliminary injunction is overbroad, unworkable, disrupts the status quo, and inconsistent with the asserted claims. Finally, the Supreme Court has reiterated that the equitable power of the federal courts does not permit courts to micromanage the internal operations of law enforcement agencies: *See Rizzo*, 423 U.S. at 378–79; *Cullinane*, 566 F.2d 107, 123 (D.C. Cir. 1977); *In re Noem*, Case No. 25-2936, Dkt. 11 (7th Cir.

Oct. 31, 2025) (finding that it infringes on the separation of powers to "intrud[e] into personnel management decisions of the Executive Branch").

## V. The Court should require a bond and stay any injunction

Finally, if the Court grants an injunction, it should require a bond commensurate with the scope of any injunction pursuant to Rule 65(c).

To the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for seven days to allow the United States to seek emergency relief if appeal is authorized. Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken v. Holden*, 556 U.S. 418, 434 (2009).

## <u>CONCLUSION</u>

For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: October 31, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW WARDEN
Assistant Director
Federal Programs Branch

SEAN SKEDZIELEWSKI
Counsel to the Assistant
Attorney General

*/s/ Samuel S. Holt*
SAMUEL S. HOLT
PETER GOLDSTONE
CHRISTOPHER LYNCH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 674-9761
Fax: (202) 616-8470
Samuel.Holt2@usdoj.gov

*Counsel for Defendants*