**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

| | |
|---|---|
| CHICAGO HEADLINE CLUB, et al., | Case No. 1:25-cv-12173 |
| *Plaintiffs*, | |
| v. | **DECLARATION OF DANIEL I. PARRA** |
| Kristi NOEM, et al. | |
| *Defendants*. | |

<u>**DECLARATION OF DANIEL I. PARRA**</u>

I, Daniel I. Parra, declare and affirm as follows:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol Agents are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with the Constitution and other applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2. I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol

operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line. I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3. I entered on duty with the U.S. Border Patrol on July 28, 2002. My first assignment as a Border Patrol Agent was at the El Centro Border Patrol Station, El Centro Sector. Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity. These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation.

4. At present, I serve as the Incident Commander for "Operation Midway Blitz". In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Chicago area, and I operate out of the Border Patrol Incident Command Post (BP ICP) at the Naval Station Great Lakes Installation in Great Lakes, Illinois. Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of materiel, but the requisite training needed to operate in such a complex and fluid environment, including instruction in constitutional law, de-

escalation techniques, and safe arrest practices. I oversee logistics, use of force events, personnel, and intelligence.

5. The actions undertaken by CBP law enforcement personnel are informed by their experience and the comprehensive training they receive at various stages of their careers. CBP officers and agents, including law enforcement employees of the U.S. Border Patrol (USBP) and the Office of Field Operations (OFO), must comply with CBP's Use of Force Policy. Pursuant to the CBP Use of Force Policy, officers and agents may use objectively reasonable force only when it is necessary to carry out their law enforcement duties. Before using force, law enforcement personnel are required to consider the totality of circumstances known by the officer or agent at the time of the use of force and weighs their actions against the rights of the subject.

6. The CBP Use of Force policy addresses the deployment of less lethal devices and outlines the circumstances in which they may be utilized. Crowd control devices and less-lethal munitions are utilized during civil disturbances. Due to the dynamic situations encountered during these events, giving warnings and/or commands and time for a subject or subjects to comply may not always be feasible. Under CBP policy, chemical irritants may be utilized when an individual is engaging in active resistance. Active resistance is a type of resistance where a subject physically opposes an officer's or agent's control efforts. Assaultive resistance under CBP policy is defined as resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self. This includes a subject's attempts, or apparent intent, to make physical contact in an attempt to control or assault the officer/agent.

7. The CBP Use of Force Policy defines less-lethal force as force that is not likely or intended to cause serious bodily injury or death. The use of less-lethal devices or weapons is meant for situations where empty-hand physical techniques are not sufficient, practical, or appropriate. Less-lethal equipment used by CBP officers and agents includes Oleoresin Capsicum (OC) spray (also referred to as pepper spray), collapsible straight batons, Electronic Control Weapons (ECWs and also referred to as TASERs), compressed air launchers that include the Pepperball Launching System (PLS) and FN303, munition launchers that include the 40MM, and Controlled Noise and Light Distraction Devices (CNLDD and commonly referred to as a flash-bang). Smoke canisters may also be used for crowd control purposes.

8. Following their initial academy training, CBP law enforcement personnel receive additional on-the-job training and periodic refreshers on a full range of topics, including eight hours of Use of Force training, which is conducted quarterly by all Border Patrol Agents. Additionally, officers and agents are required to obtain certifications for the use of each CBP authorized less-lethal device they carry and must complete an annual recertification on them each fiscal year. CBP also offers Mobile Field Force (MFF) training which includes additional specialized training on crowd control operations. MFF I training includes crowd control familiarization, basic formations, and gas mask proficiency. MFF II training expands into shield and baton proficiency, multiple formations and movement, CS gas exposure, and mass arrest procedures.

9. The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

10. On or about September 5, 2025, CBP Border Patrol agents and CBP Officers were deployed to Chicago, Illinois, as part of Operation Midway Blitz, which is a national, multi-agency operation. The operation's purpose is to enforce immigration law through law enforcement efforts. Due to the scope and complexity of the operation, over 200 agents redeployed away from their patrol functions at the border to support this mission.

11. As part of Operation Midway Blitz, CBP personnel, along with personnel from partner federal agencies, participate in a variety of different law enforcement actions in northern Illinois. These enforcement actions primarily revolve around immigration enforcement authorities granted under Title 8 of the U.S. Code but may also involve enforcement of certain portions of the U.S. criminal code under Title 18.

12. CBP officers and Border Patrol agents routinely bring individuals detained under the immigration laws during the ongoing operations to the ICE Broadview Service Station Area (BSSA) located at 1930 Beach Street, Broadview, Illinois for processing and temporary housing.

13. CBP special operations teams are routinely needed to maintain crowd control in Chicago. Demonstrations outside the BSSA and other facilities have devolved into violent riots, where rioters seek to impede and obstruct law enforcement activities. On other occasions, during enforcement actions in the field, Border Patrol Agents have been surrounded and blocked from leaving a scene, requiring the use of less than lethal force to safely exit the situation. CBP's frequent need to react and respond to the violent and obstructive actions of individuals and groups drains law enforcement resources and impacts the Agency's ability to perform its mission responsibilities.

14. In my personal observations of the crowds at the BSSA, it is not easy to distinguish between religious observers and the rest of the crowd. I have not witnessed any observable religious practices in the events I have been involved with. I have not seen any reporting which would cause me to believe that CBP personnel have directly targeted religious observers for enforcement actions.

15. Similarly, in the highly evolving and chaotic situations that CBP personnel are confronting it can be difficult to identify members of the press. Again, however, I have not seen any reporting that would cause me to believe that CBP personnel have directly targeted journalists or members of the press for enforcement actions.

16. CBP personnel have encountered aggressive activity from large groups of individuals gathering to actively impede CBP's efforts at the BSSA facility. On September 12, 2025, CBP Office of Field Operations (OFO) personnel were stationed inside the BSSA facility. They were advised that law enforcement personnel were attempting to exit the facility in a marked vehicle, but a crowd of individuals was blocking the driveway. Special Response Team (SRT) operators estimated the size of the crowd to include approximately 200 or more individuals. Many members of the crowd were wearing masks, gloves, helmets, and carrying improvised shields made of wood and other materials. SRT operators verbally instructed the crowd to clear the vehicle path for officer safety, but several individuals refused to comply. An SRT operator then deployed less lethal munitions via a PepperBall launching system (PLS) in the direction of the driveway, to disperse the crowd away from law enforcement vehicles. From a distance, the PLS is not a precision tool, and it cannot be meaningfully used to target an individual's person. He did not observe any kinetic impact on any members of the crowd from the deployment.

Following the deployment of the less lethal munition, the crowd dispersed, and the vehicles were able to safely exit the BSSA facility.

17. On September 19, 2025, at approximately 8:30am, an ICE ERO vehicle was in the process of exiting the BSSA facility when it was approached by a crowd of approximately 50 individuals. Several individuals obstructed the vehicle's movement by linking arms and sitting on the ground in front of the vehicle or by hitting and pushing the vehicle. Multiple commands were given instructing the crowd to step away from the vehicle. After the individuals failed to comply, Border Patrol Agents discharged less lethal munitions. Agents observed members of the crowd picking up some of these munitions and throwing them back at law enforcement personnel. Agents represented that each volley of less lethal munitions was executed in a controlled and targeted manner, and use of force was assessed in relation to the imminent danger.

18. At approximately 12:00pm that same day, an ERO vehicle attempted to exit the BSSA facility. Twenty-five or more individuals blocked the gate. An advance team of agents decided to exit the gate first and gave instructions for protestors to clear the area and make room for the vehicle. Approximately two to three individuals ignored the commands. Border Patrol Agents deployed less lethal munitions which successfully moved the obstructive individuals away from the gate and allowed the ERO vehicle to exit.

19. Later that evening, a crowd of approximately 120 individuals gathered outside of the BSSA and intentionally blocked the path of a Border Patrol vehicle transporting detainees to the facility. ICE agents responded to the scene to deter the crowd from obstructing the path of the vehicle and protect the detainees, but the crowd refused to move. A CBP team

of OFO SRT officers were instructed to act as a Quick Reaction Team to support law enforcement efforts to clear a path for vehicles entering/exiting the BSSA. Several members of the crowd were wearing masks and goggles and were aggressively yelling profanities towards law enforcement.

20. As SRT officers were advancing, clear commands of "get back" or "move back" were given to the protestors blocking the roadway. The crowd responded with "kill yourself." "fuck ICE," and other threatening statements, and they refused to comply with the SRT officers' commands. Without provocation, individuals within the crowd began throwing dangerous objects including rocks, commercial-grade fireworks, liquid filled bottles, and other unknown hard projectiles directly at officers. An SRT officer reported that he was struck on the right leg above the knee with a rock.

21. In response to escalating danger and to prevent further assaults, SRT officers deployed less lethal munitions to disperse the obstructing rioters and ensure the safety of agents and detainees. Approximately eight subjects were taken into custody for assaulting CBP employees on September 19, 2025.

22. On September 26, 2025, rioters restricted vehicle access to the BSSA by blocking the nearby intersection of 25th Street and Harvard Street, just outside the BSSA, requiring the deployment of a specialized Border Patrol Tactical Unit (BORTAC) which was forced to use less lethal munitions to disperse the obstructing rioters and allow access to the BSSA. CBP deployed additional SRT and Mobile Field Force (MFF) officers to maintain control of the area thereafter as rioters refused to disperse. Border Patrol Agents observed: multiple individuals in the crowd wearing welding gloves; crowd members picking up a deployed CS canister, and rioters throwing the deployed CS canister through the glass

window of an adjacent building located at 2000 S 25th Ave, Broadview, Illinois, which was occupied by non-government workers associated with a business located inside the building.

23. Two individuals aggressively approached law enforcement officers and ignored multiple verbal commands to move away from the street. As Agents attempted to place the individuals under arrest, they became physically combative. Border Patrol Agents deployed less lethal munitions to keep the agitated crowd back in order for law enforcement personnel to safely make the arrests. Following the use of less lethal munitions, the crowd was moved back several times to allow the arrival and departure of vehicles to and from the facility.

24. The following day, on September 27, 2025, rioters again impeded CBP vehicles and personnel from entering and exiting the BSSA. Approximately 100-150 individuals were becoming aggressive and shouting obscenities towards CBP personnel. Several individuals carried homemade shields with profanity written on them, as well as pipes, metal chains, and rocks/bricks. Some individuals began pushing and shoving Border Patrol Agents as well as throwing garbage, liquid-filled bottles and rocks at the Agents. At approximately 7:30 p.m., Border Patrol and OFO SRT teams deployed outside the facility gate to remove the concealed shields and rocks to prevent their continued use against law enforcement. While Border Patrol and SRT were removing the shields and rocks, several members of the crowd became aggressive, physically assaulting government personnel, and several arrests were made as a result.

25. In the next hour, at approximately 8:30 p.m., the crowd's behavior intensified significantly. Multiple individuals began forcefully striking and shaking the BSSA

facility's gate, which is a critical security barrier protecting not only the officers and agents assigned to the operation but also the detainees housed within the facility, for whom the Government maintains responsibility. During this outburst by the crowd, agents and officers observed members of the crowd re-establishing previously cleared stash points and placing additional rocks and bricks in strategic locations near the perimeter of the BSSA facility.

26. Based on the crowd's escalating aggression, the re-deployment of potential weapons, and the ongoing tampering with the facility's main gate, the decision was made to temporarily reposition the perimeter for non-government personnel access to one block away from the BSSA facility to create a safer defensive posture and prevent an imminent breach. CBP personnel gave commands to the crowd to move back multiple times and directed them to the nearest intersection. A dispersal announcement was also made over the loudspeaker of an HSI Bearcat vehicle; however, numerous individuals refused to comply and became assaultive during the movement, including attempts to tackle CBP personnel. In response to the active aggression and to safely disperse the crowd, CBP personnel deployed less lethal munitions in accordance with established policy and training.

27. Following the deployment of less-lethal munitions, CBP personnel effectively pushed the crowd back to the intersection of Beach Street and Lexington Avenue and away from the BSSA facility's egress point. Throughout the night, CBP personnel continued to secure the facility. Approximately 50–75 federal officers formed a line to relocate the crowd to a safe distance away from the perimeter fence. The main entrance/exit was then opened, sirens were activated, and announcements were made over the loudspeaker to direct the crowd to move back from the facility. During that time the crowd continued to shout

obscenities and made threatening comments such as "Kill yourselves," "Fuck ICE," "Fuck you all," "You will get what's coming to you," and "We'll find your hotels." Based on the events described above, federal agents arrested 11 individuals on September 27, 2025. Two arrestees were armed with loaded handguns. A CBP SRT Officer reported knee pain, bruising on his chin and upper right chest following an altercation with two individuals who tackled him and slammed him into the BSSA fence.

28. Based on my understanding and belief, CBP personnel have not had to deploy chemical munitions at the BSSA facility since the introduction of the United Command on or around October 3, 2025.

29. Away from the BSSA, on multiple occasions as described in more detail below, CBP personnel have also encountered large groups of individuals gathering to actively impede CBP's immigration enforcement efforts. Individuals and large groups have been increasingly willing to threaten CBP personnel, damage government property, and assault officers performing their lawful duties.

30. On October 3, 2025, an alleged member of the Latin Kings street gang posted a $10,000.00 bounty for the killing of the Chief Gregory Bovino.[1]

31. On October 3, 2025, while conducting immigration enforcement operations near North Pulaski Road and West Wilson Avenue, an individual threw gravel at a rental vehicle containing several BORTAC agents. The individual then threw a larger rock that hit the

---

[1] *See* https://www.dhs.gov/news/2025/10/06/latin-kings-gang-member-arrested-illinois-after-placing-hit-commander-large-border (Last Visited Oct. 24, 2025).

side of the vehicle and dented the panel. BORTAC agents were able to arrest the
individual based on a violation of 18 U.S.C. § 111.

32. At approximately 10:00am, that same day, in the vicinity of 55th Street and South Pulaski
Road, Chicago, CBP SRT officers, in rough duty SRT uniforms, with law enforcement
identifiers clearly visible, were riding in an unmarked minivan when they were followed
by four or five vehicles driven by civilians. The drivers were honking their horns,
recording the minivan with their cell phones, and shouting out the SRT officers' presence
to the public. A pickup truck then accelerated to approach the minivan before striking its
rear panel. After the collision, the truck continued to drive erratically and attempted to
get in front of the minivan before falling back and striking the rear bumper. To prevent
injury and further damage to the minivan, one SRT officer used a PLS against the
windshield of the truck. The SRT officers drove to a Chicago Police Station to file a
report. All three officers reported pain from the vehicle collision. To date, I am not aware
of the Chicago Police Department taking any action on this case.

33. At around 11:30am on October 3, Border Patrol Agents were conducting immigration
enforcement operations near West 25th Street and South Drake Avenue. While
conducting a consensual encounter with a suspected alien, an individual ignored agents'
instructions to step away from the encounter and threw a closed-fist punch toward an
agent's face. Agents were able to execute a controlled takedown and arrested the subject
for assault on a federal officer.

34. Separately, at around 11:50am on October 3, while conducting targeted law enforcement
operations in Cicero, Illinois, agents noticed a blue Ford SUV and a red sedan begin to
follow them. The vehicle operators were using hand gestures to other vehicles to block in

the government vehicle. These two vehicles continuously attempted to cut the agents off and swerved into our vehicle in an attempt to make the agents drive off the road and effectively cut off their lane. This continued for approximately ten blocks.

35. While waiting at a red light at the intersection of North Drake and West Armitage Avenues, a crowd began to form around the vehicle, yelling at the agents to leave, screaming "fuck you," and sticking out their middle fingers. As the light turned green, an individual on a motorcycle parked diagonally on the road to block the government vehicle from the front, while two other vehicles attempted to further box-in the vehicle. Agents gave commands for the motorcycle to move out of the way. After verbal commands were not effective, an agent deployed a CS canister to disperse the crowd surrounding the vehicle. Despite the deployment of less lethal munitions, the motorcyclist refused to move. One agent exited the vehicle and deployed two baton strikes on the motorcycle, away from the individual. The baton strikes were effective at getting the motorcyclist to move out of the way of the government vehicle.

36. Also on October 3, 2025, Border Patrol apprehended an injured detainee who was subsequently transported to the Humboldt Park Medical Center. While agents were at the hospital, approximately 20-30 people gathered, filming agents, and screaming profanities. Agents observed a male driver in a 2013 Toyota Camry dropping caltrops (a type of hand-thrown spike) onto the street on West Thompson Street directly into the path of agents' vehicles. As an agent exited their vehicle to retrieve the caltrops off the street, the same driver made a U-turn and threw several more caltrops out the window, landing directly beneath a government vehicle. Agents at the scene were able to again

successfully remove the caltrops from the roadway and safely move through the crowd without using force or dispersing less lethal munitions.



37. While two Border Patrol Agents were conducting a hospital watch of the injured detainee inside the hospital, an individual later identified as Jessica Fuentes attempted to gain entry into the room. Ms. Fuentes did not identify herself, and when agents stopped her from entering the room, she demanded to know if agents had a "signed judicial warrant." When agents again asked Ms. Fuentes to identify herself, she only stated she was an Alderwoman in the area and again demanded to know if the agents had a signed judicial warrant. An agent told Ms. Fuentes to leave the room. Ms. Fuentes refused to obey the command, and the agent told her again that she needed to leave the room. Ms. Fuentes again refused the command, and the agent placed her in handcuffs and informed her she was under arrest for impeding official law enforcement duties and responsibilities. The agents were then able to remove her from the room. Ultimately, she was released without being processed or charged with a crime.

38. Later, officers arrived to relieve Border Patrol Agents who were maintaining custody of an injured detainee at a hospital in the Humboldt Park neighborhood of Chicago. Upon

arrival, individuals confronted the officers, announced that "ICE" was present, blew whistles and yelled verbal threats. Given the volatile situation, the agents left the scene, staged remotely, and coordinated an alternate way to enter the hospital to resume their duties, causing extra work for both the hospital and CBP. It took over four hours for a law enforcement relief team to be able to enter the hospital. At one point, agents reported that 20 bicycles and four vehicles chased them throughout Humboldt Park. To evade the vehicles and seek to maintain both officer and public safety, CBP personnel were forced to utilize emergency lights and conduct evasive driving.

39. Once at the hospital, the only way agents could pick up the CBP personnel inside the hospital was to drive to the emergency room entrance, where a crowd had formed. The crowd immediately engulfed the vehicle on all sides, and approximately thirty subjects surrounded and stood in front of the vehicle. The individuals disobeyed agents' commands to move away from the vehicle, began screaming and yelling, and struck the vehicle with their fists. A rock or a piece of concrete was thrown at the vehicle, striking the pillar between the front and rear passenger windows. Both vehicle windows were open and if this projectile had hit just a few inches forward or backward, it would have struck agents directly in the face or head.



40. As agents began attempting to move the crowd back, members of the crowd started pushing and kicking agents. An agent informed the crowd that if they didn't move back, he would deploy chemical munitions. The crowd continued to block the agents' path and attempted to assault agents by pushing and kicking them. The agents then deployed less lethal munitions, which enabled them to safely clear a path through the crowd and exit the hospital.

41. On October 4, 2025, several individuals used their vehicles to box-in a government vehicle used by Border Patrol Agents assigned to a mobile response team on a public road. A black GMC Envoy driven by a male driver and a silver Nissan Rogue driven by a female driver rammed the government vehicle from both sides. Agents exited their vehicle to disperse civilians for safety and to prevent further assault. The female driver then drove her vehicle directly at a Border Patrol Agent. Faced with an imminent threat of death or great bodily harm given the high potential of being run over, an agent discharged his service-issued firearm at the Nissan Rogue, striking the female, who fled the scene but was eventually apprehended. A handgun was later found inside the female driver's purse. Both drivers were criminally charged under 18 U.S.C. § 111(a) and (b).

42. Approximately 200 rioters converged at three separate locations near the scene of the shooting. Over the next four hours, rioters threw objects at agents, including glass bottles and traffic cones, and forcefully pushed the agents. The Chicago Police Department initially refused to assist, but over one hour later, they provided perimeter security. Based upon the situation, CBP personnel were forced to deploy less lethal munitions to disperse the rioters.

43. On October 12, 2025, Border Patrol Agents were conducting immigration enforcement duties in the Albany Park neighborhood on the north side of Chicago. At approximately 12:45 p.m., while agents were arresting an illegal alien, a group began to gather in the area and obstruct the agents' law enforcement efforts and freedom of movement. A Quick Reaction Force (QRF) arrived on scene to assist with crowd control and instructed the crowd to disperse. The crowd ignored verbal commands, and the crowd size increased to approximately 40 individuals, including some who arrived on bicycles and positioned themselves in a fashion to block a government vehicle and Border Patrol Agents from leaving the area.

44. The majority of Border Patrol Agents were wearing rough duty uniforms with body armor, each wearing a visible badge; there were also plainclothes agents operating in the area as well. According to Border Patrol uniform policy, agents authorized to wear plainclothes need not display their badges on their outermost garment, and they were wearing unique alphanumeric identifiers in compliance with the TRO. In some cases, where uniformed agents may not have had immediate access to embroidered patches bearing unique alphanumeric identifiers, bright orange or yellow tape with the unique identifiers handwritten on the tape were worn near the shoulder of their uniforms.

45. As the situation escalated, some of the agents were able to leave the area in their vehicles; however, a number of individuals linked arms to block additional vehicles from leaving. QRF personnel issued multiple warnings, advising the crowd to clear the area before chemical agents were deployed. The crowd continued to grow and ignored verbal commands and hand signals directing them to stand aside. They continued to actively impede the agents' movement. Based on previous experience, the agents became

concerned that the longer they remained on the scene, the more dangerous the environment would become, anticipating that social media would broadcast their location and allowing for the threatening crowd to continue to grow. The agents provided warnings to the crowd that they needed to disperse immediately. Due to the totality of the circumstances, handheld CS gas was used.

46. An unidentified person wearing a red shirt attempted to pick up the CS grenade but quickly dropped it after presumably realizing it was too hot to handle. The same individual then kicked the CS grenade toward agents, picked it up again, and threw it, striking an agent's vehicle. Another subject subsequently threw a bicycle toward the agent who originally deployed the first CS grenade. Throughout the incident, the mob continued throwing various objects at agents. As the chemical irritant spread, the crowd began to disperse, allowing the remaining agents to safely clear the area.

47. One agent suffered a sprained elbow during this confrontation as a direct result of his efforts to gain control of the individual that attempted to throw the CS grenade back at the agents.

48. On October 14, 2025, Border Patrol Agents were conducting immigration enforcement in support of Operation Midway Blitz near the 3000 block of east 100th Street, on the southeast side of Chicago.

49. The Border Patrol agents were wearing rough duty uniforms with body armor, each having a visible badge. In some cases, where uniformed agents may not have had immediate access to embroidered patches bearing unique alphanumeric identifiers, bright

orange or yellow tape with the unique identifiers handwritten on the tape were worn near the shoulder of their uniform.

50. At approximately 10:30 a.m., Border Patrol Agents attempted to initiate a consensual encounter with the occupants of a red Ford Escape occupied by at least two individuals. The occupants of the vehicle saw the agents and fled in the Escape, intentionally striking the unmarked Ford Expedition driven by the Border Patrol Agents in the process. As the Escape struck the Agents' vehicle, the two Agents on the side where contact was made were momentarily pinned between the door and the frame of the vehicle, while a third Agent was narrowly able to avoid being struck. The Agents notified nearby units, including an observation unit in the air, and promptly began following the individuals fleeing the scene in the Escape.

51. The Escape drove up and down several streets and alleys, winding his way through the southeast side of the city as the Agents followed closely behind for approximately 25 minutes. As they drove, the driver of the Escape displayed no regard for traffic laws and posted signs. The passenger was attempting to signal passersby that immigration enforcement personnel were in the area while the driver operated the vehicle in an aggressive manner, often slamming the brakes at random intervals in an apparent effort to harass the Agents in the vehicle behind them. As the Agents continued to follow closely behind the Escape in the Expedition, the driver of the Escape suddenly hit the brakes again, causing the Agents' vehicle to hit the Escape from behind. Consequently, both vehicles were damaged—the Expedition's airbags deployed, and the Escape spun around and struck a Toyota RAV4 parked nearby—and both the Expedition and the Escape came

to rest at the intersection of East 105th Street and South Avenue N at approximately 10:34 a.m.

52. The occupants of the Escape fled the scene on foot but were apprehended by CBP within a few minutes. A crowd began to gather, and approximately two dozen CBP law enforcement personnel formed a perimeter to secure the scene of the disabled vehicles, which was now a crime scene that needed to be protected from outside interference. CBP personnel notified the Chicago Police of the collision and Chicago Police responded to conduct a traffic investigation. Initially, the crowd around the intersection was comprised of a few dozen people, but soon CBP personnel were encircled and outnumbered two-to-one, and members of the crowd could be heard shouting things like, "ICE go home," and calling CBP personnel "racists" or "nazis." Soon, the hostile crowd doubled or tripled in size.

53. As CBP personnel worked to maintain their perimeter, protesters attempted to encroach on the scene of the active investigation related to the collision which was precipitated by the original assault on the agents committed by the driver of the red Escape, the evidence of which—including both damaged vehicles—needed to be preserved. The crowd became increasingly agitated as uniformed agents attempted to maintain a perimeter. The crowd continued to shout at the CBP personnel, but the language escalated to profanity-laced threats of violence against the law enforcement personnel such as, "I'll fuck you up," and "I'll rip your fucking head off." At approximately 11:51 a.m., after repeated verbal instructions to disburse were ignored and in response to individuals beginning to physically shove CBP personnel, a CBP officer deployed a handheld smoke cannister. A member of the crowd that had gathered around the scene picked up the smoke cannister

and threw it back at Agents, resulting in his immediate arrest for assault of a federal officer.

54. At approximately 12:12 p.m., tow trucks arrived on scene to transport the damaged Ford Escape and Expedition to a secure lot. The gathered crowd, which now greatly outnumbered the agents, continued to become increasingly aggressive, and eventually several individuals began to throw objects in the direction of the agents while ignoring commands to move back. Two individuals were taken into custody after throwing eggs and other additional objects at CBP personnel. Several government vehicles were damaged, including some with slashed tires and broken windows.

55. At approximately 12:38 p.m., additional officers from the Chicago Police Department arrived, but they did not quickly get control of the crowd. As CBP personnel prepared to depart the scene, multiple individuals blocked the road and ignored orders to allow the remaining CBP personnel to depart. CBP personnel were finally able to disperse the hostile crowd by deploying approximately seven CS grenades, and despite having to fend off individuals' attempts to kick or throw the CS grenades back at the CBP personnel, this deployment of chemical munitions finally allowed the remaining CBP personnel to safely clear the area.

56. This incident turned volatile very quickly. As CBP law enforcement personnel were preparing to turn the scene over to Chicago Police Department, the crowd became increasingly assaultive very rapidly, throwing rocks and various other objects at the Agents. Several CBP personnel reported being hit by various thrown objects, including at least one Agent who was struck in the face with an egg and another who was struck with a ping-pong ball-sized rock. The two agents that were involved in the initial

vehicular assault informed supervisors that they sustained injuries. One BPA was struck in the left shoulder by an 8–10-inch piece of concrete that was thrown from the crowd. One agent reported neck pain and the other reported right knee pain. Due to the assaultive force exerted against them, CBP personnel deployed CS gas to protect themselves and their law enforcement partners and to allow them to depart the scene without further injuries. The crowd was instructed to stand aside by multiple CBP law enforcement officers, and when the crowd did not comply and instead continued to escalate its assaultive behavior, chemical munitions were deployed in a precise and defensive manner.

57. On October 22, 2025, while conducting enforcement operations near a laundromat in the vicinity of 3100 South Pulaski Road in Chicago, CBP personnel, including Chief Gregory Bovino, were confronted by a number of people shouting at them and filming their activities with their smartphone cameras. They insulted individual Agents and then physically began encroaching on the Agents despite being told to back up.

58. The Border Patrol Agents were wearing rough duty uniforms with body armor, each having a visible badge or when the uniformed agents did not have immediate access to embroidered patches bearing unique alphanumeric identifiers, bright orange or yellow tape with the unique identifiers handwritten on the tape were worn near the shoulder. Chief Bovino's personal protective detail, comprised of Agents from CBP's Office of Professional Responsibility (OPR), who were not part of the immigration enforcement operations or assigned to Operation Midway Blitz, and were on the scene in plainclothes, prominently displayed their organizational patches and badges on their body armor.

59. Based on preliminary reports, a female member of the crowd threatened to kill Chief Bovino, and Agents on the scene immediately took her into custody. She was subsequently released, but the case was referred to the FBI for further investigation and prosecution, including efforts to subpoena the phone camera footage she shot of the incident.

60. Also on October 22, 2025, Border Patrol Agents were engaged in operations near the Home Depot store in the vicinity of Ogden Avenue and 26th Street. Agents noticed a pair of vehicles had been following them for some distance when one of them, a blue pickup truck, began driving in an aggressive manner, as if to ram the Border Patrol vehicles head-on. While driving recklessly on a crowded street, the driver of the pickup disregarded a red light and collided with a gray Toyota Corolla.

61. Border Patrol Agents notified Chicago Police, rendered aid to the injured driver of the Corolla, and arrested the driver of the pickup. Agents also secured the accident scene until Chicago police personnel arrived. While they were at the scene of the accident, a crowd began to form. Many were shouting insults at the Agents and carrying signs or waving flags with slogans like "Fuck ICE" emblazoned on them.

62. Once Chicago Police arrived to take over the scene of the collision, CBP personnel sought to depart the scene. As they got into their vehicles, a member of the crowd suddenly approached from the side and began kicking one of the vehicles, in an apparent effort to damage it. One of the occupants, an SRT officer, lowered his window and deployed OC spray in a short burst (approximately one second in duration) at the individual kicking the vehicle. Although the spray was deployed directly at the

individual kicking the vehicle, windy conditions caused the spray to appear to affect two or three other individuals that had also approached the vehicle with unknown intentions.

63. In this instance, CBP personnel inside the vehicle did not give explicit warnings to anyone in the crowd before deploying the OC spray in a targeted fashion against a particular individual because CBP personnel had to act quickly to stop the individual from damaging government property.

64. On October 23, 2025, at approximately 9:50 am, based on preliminary reports, agents reported a big box truck attempted to ram into agents at West 27th Street and South Sacramento Avenue. At the same time, agents reported that they were blocked in at the next intersection located at West 27th Street and South Whipple Street, Chicago, Illinois. A crowd began to gather in the area shouting and gesturing aggressively, incessantly blowing whistles, honking car horns, and throwing fireworks at CBP personnel. As the situation continued to escalate, Agents deployed gas in the area to disperse the crowd that was initially ineffective, but additional back-up arrived, and more gas was deployed, which finally allowed the vehicle transporting the arrestees to depart.

65. At approximately 10:15 am, an unknown male threw a rock directly at an agent and struck him in the head. The agent was wearing his ballistic helmet and did not sustain any injuries.

66. Chicago Police Department (CPD) responded to the area, but when additional Agents attempted to depart, they were surrounded by the crowd. CPD assisted in holding back the crowd while agents attempted to get in their vehicles and leave the area. Simultaneously, several subjects began to throw rocks and other objects. Agents reported

that their back window had been broken near the intersection of West 26th Street and South Sacramento Avenue.  At the same time, agents advised that they were blocked in at the intersection of West 26th Street and South Avers Avenue, Chicago.  Agents advised that additional cars were called in to assist, and CBP personnel deployed less lethal munitions.  Agents reported that a tire on a government vehicle was punctured during the incident.

67. On October 24, 2025, based on preliminary reports, Border Patrol agents conducted immigration enforcement activities near West Henderson Street and N Lakewood Ave.  Several individuals began following the agents on bicycles and vehicles, blowing whistles and honking their horns.  At approximately 12:00 PM, agents were attempting to arrest an individual, when a group began to gather in the area.  The crowd size increased to approximately 50 individuals.

68. While agents were attempting to place an arrestee inside their vehicle, a member of the crowd tried to deflate the tire of the vehicle using car keys to push the valve stem on the driver side of the vehicle. Numerous commands were given to the crowd to stop advancing so that agents could exit the area.  While the crowd continued to advance, a civilian vehicle made its way toward the agents to impede their vehicle from exiting the area.  Agents ordered the driver to stop, but the driver continued attempting to impede them from leaving the area.

69. As agents continued to attempt to leave the area, they gave repeated orders for the crowd to stay back.  Members of the crowd ignored these warnings, and continued to try to prevent the egress of the vehicle.  One of the agents ordered the crowd to stay back or else gas would be deployed.  At approximately 12:03pm, the agents gave one last

warning for the crowd to back away, but several individuals continued to ignore the warning. An agent then deployed a pocket CS gas canister approximately 15 feet in front of the vehicle. After this deployment, members of the crowd began to throw objects at the vehicle, including a pumpkin that struck the front driver side of the vehicle and the expended CS gas canister. An agent then deployed a triple chaser CS gas cannister approximately 20 feet in front of the vehicle to again attempt to disperse the crowd and allow the agents to leave the area. This deployment effectively dispersed the crowd and enabled agents to safely leave the area.

70. On October 25, 2025, based on preliminary reports, Border Patrol agents working in support of Operation Midway Blitz in Chicago, Illinois conducted targeted enforcement at W Grace St and N Kildare Ave. At approximately 10:00 AM, agents were attempting to perform immigration enforcement operations.

71. A crowd began to gather in the area and increased to approximately 20-30 individuals, preventing the agents from leaving the area. Multiple orders were given to the group to move out of the way, when a car blocked agent's vehicle in on one side and a bicycle blocked on the other side. The agents subsequently made arrests for violations of 18 USC § 111.

72. The crowd became more agitated and multiple warnings were given to disperse. When the crowd continued to block the agent's movement, they deployed a less lethal munition. The use of the less lethal munition successfully dispersed the crowd allowing agents to safely clear the area.

73. In my twenty-three years of service with the Border Patrol, I have never witnessed the level of combativeness and sustained level of violence directed at law enforcement

personnel in the performance of their lawful government duties that I have seen in Chicago. There is a distinction between peaceful and protected protest activity, and the assaultive behavior, damage to government property, and aggressive actions that CBP personnel are experiencing when performing lawful law enforcement actions.

74. CBP takes its obligations to comply with the Court's TRO seriously and would not want to be held in contempt by the court, but I believe that the TRO entered in this case is adversely affecting CBP law enforcement operations. Because the TRO requires additional considerations outside of the CBP and DHS Use of Force Policy that agents are thoroughly trained on, I believe that agents are improperly hesitating before they can appropriately deploy less lethal munitions. Although the parameters of the TRO have been communicated to CBP personnel, the TRO adds a level of complexity to a dynamic situation for law enforcement, which could potentially harm members of the public, detainees in custody, and CBP personnel.

75. Less lethal munitions are an important force de-escalation tool for law enforcement. While many of CBP's operations in Chicago occur without the need to deploy less than lethal force or munitions, it is important to have the ability to use these measures should circumstances warrant. They permit agents to successfully disperse crowds that are engaging in active resistance and assaultive behavior. On occasions when agents are faced with escalating force—up to and including lethal force—from crowds, less lethal munitions can enable agents to safely exit these volatile scenes without resorting to the use of further physical force or deadly force themselves. An order that would prohibit officers from using less lethal munitions would likely lead to more violent engagements, not less. Consequently, I believe that the issuance of a preliminary injunction in this

case would adversely impact CBP operations, potentially endanger CBP personnel, and would have a negative impact on public safety.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 30th day of October, 2025, at Great Lakes, Illinois.

Daniel I. Parra
Incident Commander-Operation "Midway Blitz"
U.S. Border Patrol
U.S Customs and Border Protection
U.S. Department of Homeland Security