

U.S. Department of Homeland Security
Washington, DC 20528

Issue Date: February 6, 2023

Policy Statement 044-05 (Revision 01)

MEMORANDUM FOR: Agency Leaders

FROM: Alejandro N. Mayorkas
Secretary

SUBJECT: **Update to the Department Policy on the Use of Force**

## I. Purpose

Pursuant to the Secretary's authority under Title 6, United States Code (U.S.C.) § 112, this policy articulates Department-wide standards and guidelines related to the use of force by Department of Homeland Security (DHS) law enforcement officers and agents (LEOs) and affirms the duty of all DHS employees to report improper uses of force. All DHS Components and Offices employing LEOs (hereafter "Components") are directed to implement this guidance, including investigation and documentation practices, through Component-specific policy, procedure, and training.

This Memorandum supersedes the Memorandum from Acting Deputy Secretary Claire Grady *Department Policy on the Use of Force* (September 7, 2018) and has been updated to comply with Executive Order 14074, *Advancing Effective, Accountable Policing and Criminal Justice Practices to Enhance Public Trust and Public Safety*, May 25, 2022. The September 1, 2021, *Addendum on the Use of Force Pursuant to 6 U.S.C. § 124n Operations* (counter unmanned aircraft systems) remains in effect.

## II. Use of Force Standard

### A. Introduction

In determining the appropriateness of a particular use of force, the Department is guided by constitutional law, as interpreted by the U.S. Supreme Court.[1] The Fourth Amendment supplies a constitutional baseline for permissible use of force by LEOs in the course of their official duties; law enforcement agencies may adopt policies that further constrain the use of force. This policy describes the governing legal framework and articulates additional principles to which the Department will adhere.

---

[1] See, e.g., *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

Update to the Department Policy on the Use of Force
Page 2

    B.    General Statement

LEOs may use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is **objectively reasonable** in light of the facts and circumstances confronting the LEO at the time force is applied.

    C.    Discussion: The Fourth Amendment "Reasonableness" Standard

1. The Supreme Court has ruled that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[2] This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness."

2. Because this standard is "not capable of precise definition or mechanical application," its "proper application requires careful attention to the facts and circumstances of each particular case."[3] The reasonableness of a LEO's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[4] In determining whether the force a LEO used to effect a seizure was reasonable, courts allow for the fact that LEOs are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving.

3. Consequently, there may be a range of responses that are reasonable and appropriate under a particular set of circumstances.

4. Once used, physical force[5] must be discontinued when resistance ceases or when the incident is under control.

---

[2] *Graham*, 490 U.S. at 396. The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations omitted).
[3] *Graham,* (citing *Garner*, 471 U.S. at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure'"). The "totality of the circumstances" refers to all factors surrounding a particular use of force. In *Graham*, the Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and whether the subject is actively resisting arrest or attempting to evade arrest by flight. Other factors include, but are not limited to: the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.
[4] *Id.*
[5] Other than the force reasonably required to properly restrain a subject and safely move the subject from point to point. That is, once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or other control techniques" to safely and securely conclude the incident.

Update to the Department Policy on the Use of Force
Page 3

### III. General Principles

    A.    Respect for Human Life

All DHS personnel have been entrusted with a critical mission: "With honor and integrity, we will safeguard the American people, our homeland, and our values." In keeping with this mission, respect for human life and the communities we serve shall continue to guide DHS LEOs in the performance of their duties.

    B.    De-escalation

To ensure that DHS LEOs are proficient in a variety of techniques that could aid them in appropriately resolving an encounter, Components shall provide use of force training that includes de-escalation tactics and techniques.

    C.    Use of Safe Tactics

1. DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage. DHS LEOs should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

2. Chokeholds and carotid restraints are prohibited unless deadly force is authorized (see Section VI). Chokeholds and carotid restraints must not be used as a means to control non-compliant subjects or persons resisting arrest.

    D.    Additional Considerations

1. DHS LEOs are permitted to use force that is objectively reasonable in light of the totality of the circumstances. This standard does not require LEOs to meet force with equal or lesser force.

2. DHS LEOs do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

3. DHS LEOs are permitted to utilize force against an animal if the animal poses an immediate danger to the officer or others in close proximity to the animal. These incidents shall be reported per Component guidelines. A firearm may also be used to humanely euthanize an animal that appears to be seriously injured or diseased.

Update to the Department Policy on the Use of Force
Page 4

E. Warnings

1. When feasible, prior to the application of force, a DHS LEO must attempt to identify themselves and issue a verbal warning to comply with the LEO's instructions. In determining whether a warning is feasible under the circumstances, a LEO may be guided by a variety of considerations including, but not limited to, whether the resulting delay is likely to:

    a. Increase the danger to the LEO or others, including any victims and/or bystanders;

    b. Result in the destruction of evidence;

    c. Allow for a subject's escape; or

    d. Result in the commission of a crime.

2. In the event that a LEO issues such a warning, where feasible, the LEO should afford the subject a reasonable opportunity to voluntarily comply before applying force.

F. Exigent Circumstances

In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances.

G. Medical Care

As soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries, complains of being injured, or requests medical attention. This may include rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility.

H. Duty to Intervene in and Report Improper Use of Force

1. The Department is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, Components will ensure that their policies and procedures unambiguously underscore the following:

    **The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.**

Update to the Department Policy on the Use of Force
Page 5

    2. DHS LEOs have a duty to intervene to prevent or stop a perceived use of excessive force by another LEO—except when doing so would place the observing/responding LEO in articulable, reasonable fear of death or serious bodily injury.

    3. **Any DHS employee** with knowledge of a DHS LEO's improper use of force shall, without unreasonable delay, report it to their chain of command, the internal affairs division, the DHS Office of Inspector General, and/or other reporting mechanism identified by Component policy or procedure.

    4. Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution. Components shall ensure that all personnel are aware of these obligations, as well as the appropriate mechanism(s) by which such reports should be made.

I. Training

Components shall ensure that their LEOs are trained in their Component's use of force policies, at least annually, including related legal updates, discretion in using deadly force and less than lethal force, and de-escalation techniques. Training shall include scenario-based learning that simulates operating conditions, such as shooting scenarios and the application of force, including deadly force. Such training shall be recorded in component training records. Components must also provide annual training to their LEOs on:

    1. The prohibition on chokeholds and carotid restraints unless the legal standard for deadly force is met;

    2. The affirmative duty to request and/or render medical aid following the use of force;

    3. The affirmative duty to intervene if a LEO is misusing force or using excessive force; and

    4. Implicit bias and profiling.

J. Officer Wellness Resources

As soon as practicable after a use of force incident, Components shall ensure that employees are immediately advised of available wellness resources if the employee was involved in or witnessed an incident where force was used.

Update to the Department Policy on the Use of Force
Page 6

IV. **Less-Lethal Force and Less-Lethal Devices**

   A.  All Components shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques, authorized less-lethal devices, and necessary training and certifications—both initial and recurring.

   B.  Components shall conduct less-lethal use of force training no less than every two years and incorporate decision-making and scenario-based situations in these training programs.

   C.  DHS LEOs are prohibited from carrying any unauthorized less-lethal device for duty use.

   D.  LEOs shall demonstrate proficiency, in accordance with established Component standards, for each less-lethal device that they are authorized and certified to carry. If a certification or valid waiver expires, a LEO is prohibited from carrying that device for duty use until the LEO meets the requirements for recertification on that device.

V. **Warning Shots and Disabling Fire**

   A.  General Prohibition

   Except in the limited circumstances described in Section V.B., "Exceptions," DHS LEOs are prohibited from discharging firearms solely:

   1. As a warning or signal ("warning shots"); or

   2. To disable moving vehicles, vessels, aircraft, or other conveyances ("disabling fire").

   B.  Exceptions

   1. Warning Shots

      a. <u>Maritime Law Enforcement Operations</u>: Authorized U.S. Coast Guard (USCG), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

      b. <u>Aviation Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave the airspace, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

Update to the Department Policy on the Use of Force
Page 7

      2. Disabling Fire

          a. <u>Maritime Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel, when conducting maritime law enforcement operations, may discharge firearms to disable moving vessels or other maritime conveyances. Such disabling fire is classified as less-lethal force.

          b. <u>Physical Protection</u>: Authorized United States Secret Service (USSS) personnel exercising USSS's protective responsibilities, and other authorized and appropriately trained DHS LEOs assigned to assist USSS in exercising these responsibilities, may discharge firearms to disable moving vehicles, vessels, and other conveyances, and such disabling fire is classified as less-lethal force—EXCEPT: <u>Aircraft in Flight</u>: Disabling fire against an aircraft in flight is permitted only if the use of deadly force against the occupants of the aircraft, or in response to the threat posed by the aircraft, itself, is otherwise authorized under this policy. This is classified as a use of deadly force.[6]

   C. Safety Considerations

      1. Warning shots and disabling fire are inherently dangerous and, when authorized under this policy, should be used with all due care. DHS LEOs must exercise good judgment at all times and ensure that safety is always the primary consideration.

      2. When authorized LEOs deem warning shots or disabling fire warranted, each shot must have a defined target.

**VI. Deadly Force**

   A. General Guidelines

      1. As with any use of force, a LEO's use of deadly force must be objectively reasonable in light of the facts and circumstances confronting the LEO at the time force is applied.

          a. DHS LEOs may use deadly force only when necessary, that is when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person.[7]

---

[6] As a use of deadly force, this is not mere "disabling fire," which by definition is not intended to cause bodily injury.
[7] For more detailed discussion of the use of force standard and the "reasonableness" determination, see Section II., Use of Force Standard.

Update to the Department Policy on the Use of Force
Page 8

      b. <u>Fleeing Subjects</u>: Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the LEO has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape.[8]

      c. Deadly force shall not be used against a person whose actions are only a threat to themselves or property. This prohibition expressly does not apply if the person poses an imminent threat of death or serious physical injury to the officer or to another person.

B. Discharge of Firearms

  1. General Guidelines

      a. Discharging a firearm against a person constitutes the use of deadly force and shall be done only with the intent of preventing or stopping the threatening behavior that justifies the use of deadly force.

      b. The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force.

      c. Discharging a firearm from a moving vehicle is prohibited except when deadly force is authorized, or except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

  2. Moving Vehicles, Vessels, Aircraft, or other Conveyances

      a. DHS LEOs are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy.[9] Before using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of-control conveyance.

      b. Firearms shall not be discharged solely as a warning or signal at moving vehicles, vessels, aircraft, or other conveyances, except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

---

[8] See *Garner*, 471 U.S. at 11-12. To further illustrate a "threat of serious physical harm," the *Garner* Court explained: "…if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Id. The Supreme Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

[9] Here, a distinction is drawn between firing at the operator, i.e., targeting the operator with the intent to cause serious physical injury or death, and firing at a moving vehicle or other conveyance solely as a warning or signal or to disable the vehicle, and with no intent to injure (see section V., Warning Shots and Disabling Fire).

    c. Firearms shall not be discharged solely to disable moving vehicles, vessels, aircraft, or other conveyances, except when deadly force is authorized or under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

**VII.** **Reporting Requirements and Incident Tracking**

 A. Uses of force shall be documented and investigated pursuant to Component policies.

 B. It is a Department priority to ensure more consistent Department-wide reporting and tracking of use of force incidents. More consistent data will enable both the Department and Components to more effectively assess uses of force, conduct meaningful trend analysis, revise policies, and take appropriate corrective actions if needed.

 C. Components shall establish internal processes to collect and report accurate data on Component use of force activities. The Office of Strategy, Policy, and Plans, in consultation with the Components and DHS headquarters offices, will establish reporting timelines, reportable data elements, and other reporting requirements. Components shall provide to the DHS Office of Strategy, Policy, and Plans the following reportable use of force incidents and data:

  1. Any injury or death to an officer, subject, or bystander;

  2. Any use of deadly force against a person, to include when a firearm is discharged at a person;

  3. Any intentional deployment of a less-lethal device against a subject, including canines against a subject;

  4. Any use of a vehicle, weapon, or physical tactic or technique that delivers a kinetic impact to a subject; and

  5. For only CBP, USCG, and ICE, use of disabling fire against a maritime vessel or aircraft.

 D. All Components shall participate in the Federal Bureau of Investigation's (FBI) National Use of Force Data Collection program and report such data to the FBI in the manner prescribed.

 E. Additional law enforcement-related reporting:

  1. No-Knock Entries: Components shall report data on the use of no-knock entries to the Office of Strategy, Policy, and Plans annually, in the manner and format prescribed by the Office of Strategy, Policy, and Plans. Components

Update to the Department Policy on the Use of Force
Page 10

>shall provide timely notification of all no-knock warrants and entries to the Office for Civil Rights and Civil Liberties (CRCL) within 30 days of execution. Notification shall include the supporting affidavit and a copy of the warrant, unless prohibited by law or court order. CRCL may request additional information to review for compliance with policy and to inform recommendations for protecting civil rights and civil liberties, as appropriate. CRCL seeks to review the data provided, as well as other related data, over the next year, and provide the Law Enforcement Coordination Council with findings and suggested actions based upon CRCL's work.

>2. Other statistical reports as required by the Under Secretary for Strategy, Policy, and Plans.

**VIII. Departmental Review and Oversight**

>A. Each DHS Component will establish and maintain a use of force review council or committee to perform internal analysis of use of force incidents from the perspective of training, tactics, policy, and equipment; to identify trends and lessons learned; and to propose any necessary improvements to policies and procedures.

>B. The Secretary, supported by the Office of Strategy, Policy, and Plans, shall manage a Law Enforcement Coordination Council (LECC) to provide a forum by which Components can share lessons learned regarding use of force policies, training, law enforcement administrative matters, and oversight. The LECC will be comprised of all Components and offices with operational law enforcement elements and will include participation from relevant DHS headquarters offices with oversight or support responsibilities. LECC members will be responsible for reporting on use of force-related trends, developments, and lessons learned within their respective Components. The LECC will be structured with subcommittees addressing areas of law enforcement policy, training, administration. Additional subcommittees may be established as needed.

**IX. Military Activities**

This policy shall not apply to the United States Coast Guard when operating under the Standing Rules of Engagement, or to other DHS personnel when they fall under Department of Defense control as civilians accompanying the force.

**X. Limiting the Use of No-Knock Entries**

DHS LEOs shall limit the use of no-knock entries to situations where knocking would create an imminent threat of physical violence to the LEO or another person or only for evidence preservation in national security matters.

>A. Warrant: A DHS LEO may seek judicial authorization to conduct a no-knock entry only if that LEO has reasonable grounds to believe at the time the warrant is sought that knocking and announcing the LEO's presence would create an imminent threat of

Update to the Department Policy on the Use of Force
Page 11

physical violence to the LEO or another person or for evidence preservation in a national security matter.

1. A LEO may only seek a warrant for a no-knock entry in situations where announcing the LEO's presence would create an imminent threat of physical violence after obtaining approval from the Criminal Chief of the relevant U.S. Attorney's Office and an Assistant Special Agent in Charge (or equivalent rank) in the LEO's field office.

2. Evidence Preservation in National Security Matters: Should an exceptional circumstance arise in a national security matter where no imminent threat of physical violence is present but the LEO believes the evidence is material to the protection of life or public safety and not merely to advance a criminal prosecution, and the risk of evidence destruction so pronounced, that a no-knock entry is warranted, judicial authorization for a no-knock warrant can be sought if approval is first obtained from the principal leader of the Component and from the United States Attorney or relevant Assistant Attorney General, with notice provided to the Office of the Deputy Attorney General.

3. Once judicial authorization is obtained, LEOs may proceed without knocking and announcing their presence unless they learn of facts that negate the circumstances that justified this exception to the knock and announce rule.

B. Exigent Circumstances: If the LEO did not anticipate the need for a no-knock entry when applying for the warrant, the LEO may conduct a no-knock entry only if exigent circumstances arise at the scene such that knocking and announcing the LEO's presence would create an imminent threat of physical violence to the LEO or another person. The LEO shall immediately notify the Special Agent in Charge/Head of Field Office and provide written notice to the U.S. Attorney in the district in which the entry was made.

**XI.  No Right of Action**

This policy is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**XII.  Definitions**

A. ***Deadly Force***: Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury. In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

 B. ***Chokeholds and Carotid Restraints***: Chokeholds apply pressure to the throat or windpipe and restrict an individual's ability to breathe. The carotid restraint technique restricts blood flow to the brain causing temporary unconsciousness.

 C. ***De-Escalation***: The use of communication or other techniques during an encounter to stabilize, slow, or reduce the intensity of a potentially violent situation without using physical force, or with a reduction in force.

 D. ***Disabling Fire***: Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

 E. ***Exigent Circumstances:*** A situation that demands unusual or immediate action that may allow LEOs to circumvent usual procedures in order to preserve life or prevent catastrophic outcomes.

 F. ***Law Enforcement Officer***: A position occupied by a DHS employee authorized by statute to enforce the laws of the United States, carry firearms, and make criminal arrests in the performance of their assigned duties.

 G. ***Less-Lethal Device***: An instrument or weapon that is designed or intended to be used in a manner that is not likely to cause death or serious bodily injury (see "Serious Bodily Injury"). Examples include, but are not limited to, conducted electrical weapons/electronic control weapons, impact weapons, and certain chemical agents. These are also commonly referred to as "intermediate force" or "less-than-lethal" weapons or devices.

 H. ***Less-Lethal Force***: Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

 I. ***Lessons Learned***: Information gleaned through internal review and analysis of use of force incidents that is sufficiently significant or critical to consider a change to policies, procedures, or training standards. Lessons learned may include, for example, information that can enhance law enforcement personnel skills; identify gaps in current training; identify current unique criminal trends being experienced in the field; provide information on new equipment recommendations or gaps; identify concerns with standard less-lethal equipment/tactics; or any information that can prevent harm to the community, law enforcement, or arrestees.

 J. ***National Security Matter***: Subject matter that relates to the security and defense of the United States, including: classified information; terrorism; espionage; great power competition; critical infrastructure protection; cybersecurity; and weapons of mass destruction.

Update to the Department Policy on the Use of Force
Page 13

      K. **_Serious Bodily Injury_**: Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

      L. **_Use of Force_**: The intentional application by law enforcement of any weapon, instrument, device, or physical power in order to control, restrain, or overcome the resistance, or gain compliance or custody, of another.

      M. **_Warning Shot_**: Discharge of a firearm as a warning or signal, for the purpose of compelling compliance from an individual, but not intended to cause bodily injury.