IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CHICAGO HEADLINE CLUB,** *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-12173 |
| | ) | |
| **KRISTI NOEM**, Secretary, U.S. Department of Homeland Security, in her official capacity, *et al.,* | ) ) ) | Hon. Judge Sara L. Ellis |
| | ) | |
| Defendants. | ) | |

**CHICAGO PUBLIC MEDIA, INC.'S, CHICAGO SUN-TIMES MEDIA, INC.'S, AND CHICAGO TRIBUNE COMPANY, LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR LEAVE TO INTERVENE AND FOR <u>IMMEDIATE ACCESS TO SEALED FILINGS</u>**

**FACTUAL BACKGROUND**

This is a case of extraordinary national importance and interest, with ramifications reaching far beyond the interests of the immediate parties. This Court found that the plaintiffs—who are civilians and members of the press—have shown a likelihood of success on the merits on their claims that the Trump Administration's use of force and selective suppression of speech in the implementation and execution of the on-going Operation Midway Blitz violated their First and Fourth Amendment rights. Accordingly, the Court granted the plaintiffs' motion for temporary restraining order (Dkt. No. 21) and entered a modified TRO on October 17, 2025, temporarily enjoining the defendants and their respective officers, agents, assigns, and all persons acting in concert with them from engaging in various unconstitutional activities. (Dkt. No. 66).

Despite the entry of the TRO, federal agents have allegedly continued their lawless conduct. After plaintiffs filed notices of violations, this Court held a hearing on October 28, 2025 at which U.S. Border Patrol commander Gregory Bovino appeared "to go through [the TRO order] so that we're on the same page." (Dkt. No. 144, 6:5-9). Based on that hearing, this Court entered its order requiring the government to file use of force reports and body-worn camera footage that "links up with any of [those] reports" dating back to September 2, 2025 (Dkt. No. 144, 33:20-25). The Court also ordered the government to produce a chart listing "everyone who has been arrested that has not been arrested for anything immigration-related" including the arrestee's name, the date of the arrest, the charge, and the resolution (the reports, body-cam footage and charts are collectively referred to as the "Submitted Materials"). (Dkt. No, 144, 35:25-36:14). However, the Court further ordered that the government file the Submitted Materials under seal. (Dkt. No. 144, 49:8-20; Dkt. No. 146). The Court did not make findings of

1

fact as to why the Submitted Materials were to be filed under seal, and the sole rationale that the government provided for filing under seal was the burden arising from "the time it would take sometimes [sic] to redact" the Submitted Materials. (Dkt. No. 144, 49:8-11).

The preliminary injunction hearing is set for November 5, 2025. The Court's decision in that hearing will unquestionably affect fundamental constitutional rights of the citizens and residents of the Chicagoland area. There can hardly be a greater legitimate public interest in access to the evidence that the Court considers in this hearing, including the Submitted Materials filed by the government. The public and the press have a right of access to see for themselves the evidence that the Court has required the government to file regarding the use of force, the body-cam footage of that force including agents' confrontations with protestors exercising First Amendment freedoms, and information about arrests unrelated to immigration. This is especially so because the Trump Administration has unequivocally denied that it has engaged in the use of excessive force, unlawful tactics, or has arrested citizens,[1] and President Trump has declared that ICE raids "haven't gone far enough because we've been held back by the judges."[2]

Chicago Public Media, Inc., Chicago Sun-Times Media, Inc., and Chicago Tribune Company, LLC (collectively the "Media Parties") seek leave to intervene and to have full and immediate access to the evidence filed by the government in this case and any exhibits filed under seal by plaintiffs due to the government's designation of materials as attorneys' eyes only. The Court's order sealing the Submitted Materials without making supporting findings of fact only served to deepen public suspicion and fear that the government is misrepresenting its action in Operation Midway Blitz, that the government is violently trampling bedrock constitutional

---

[1] *See* https://www.c-span.org/clip/news-conference/noem-denies-us-citizens-have-being-arrested-or-detained-in-ice-crackdown/5177694 (last visited November 4, 2025).
[2] https://www.cbsnews.com/news/trump-says-ice-raids-havent-gone-far-enough-60-minutes/ (last visited November 4, 2025).

freedoms of the public and the press, and that evidence of that unlawful conduct is being secreted in inaccessible court files and considered only behind closed courthouse doors. Full and contemporaneous access to the Submitted Filings by the press as the eyes and ears of the public is an antidote to those fears and concerns.

Chicago Public Media, Inc. is a 501(c)(3) nonprofit organization that operates WBEZ, a noncommercial radio station broadcasts local and national news and iconic programming on 91.5 FM and streaming on the internet at wbez.org. WBEZ was established in 1943 and is a charter member of National Public Radio. Its award-winning content has driven civic engagement and conversation for decades for a large and diverse audience. Both the Chicago Sun-Times and Chicago Tribune have been stalwarts of Chicago media for several decades. They operate both in print and on the internet at chicago.suntimes.com. and chicagotribune.com, respectively. Both have won several Pulitzer Prizes for their investigative journalism and news coverage. In 2022, the Sun-Times joined Chicago Public Media and began operations as a 501(c)(3) nonprofit organization.

## ARGUMENT

I. **THE COURT SHOULD GRANT THE MEDIA PARTIES LEAVE TO INTERVENE IN THIS CASE**

Federal courts have long recognized the right of the media to intervene in matters to assert a right of public access to judicial records. *Globe Newspaper Co. v. Super. Ct. for Norfolk*, 457 U.S. 596, 609, n. 25 (1982) ("representatives of the press and general public must be given an opportunity to be heard" on matter of access) (quotations and citations omitted); *In re AP*, 162 F.3d 503, 508 (7th Cir. 1998) ("representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion from the proceedings or access to documents") (quotations and citations omitted); *Bond v. Utreas*, 585 F.3d 1061, 1073 (7th Cir.

3

2009) ("[i]t is beyond dispute" that the press may assert access to court records). This right to intervene is "rooted in the public's well-established right of access to public proceedings." *Jessup v. Luther*, 227 F.3d 993, 997 (7th Cir. 2000). Moreover, intervention is not only permitted, but also "the most appropriate procedural mechanism by which to accomplish this task [of ensuring a right of access]" and "affords the court an opportunity for due deliberation." *In re AP*, 162 F.3d at 507; *see also*, *Jessup*, 227 F.3d at 997 (the Seventh Circuit has "recognized intervention as the logical and appropriate vehicle by which the public and the press may challenge" orders limiting access to court records).

Courts in this district routinely grant the press leave to intervene to assert a claim for access. As the court recognized in *U.S. v. Torres*, 602 F. Supp. 1458, 1461 (N.D. Ill. 1985):

> a cursory review of cases involving news media interest in criminal prosecutions (usually involving evidence to be captured or copied) shows that courts, *without discussion*, have permitted applications to be made for certain relief, or have granted news media organizations leave to intervene. In such cases, news media entities or organizations have been named and treated as applicants or as intervenors.

(emphasis added) (collecting cases). The Seventh Circuit further recognizes the importance of a *timely* right to intervene, holding that: "[i]n order to ensure the right of access—of 'immediate and contemporary' access—our case law has recognized that those who seek access to [court documents] have a right to be heard in a manner that gives full protection of the asserted right." *In re AP*, 162 F.3d at 507.

The Media Parties seek leave to intervene in this matter for the purpose of asserting the right of the public and the press to access and obtain copies of the Submitted Materials that the Court receives in compliance with its October 28, 2025 Order. Through intervention, the Media Parties may fully explain to the Court their positions why, under applicable law, they should be allowed access to the Submitted Materials and why access should be granted contemporaneously

4

with the filing of the Submitted Materials with the Court. Permitting the Media Parties to intervene and be heard on this matter will also afford the Court the opportunity for due deliberation on the important matter of public access to the evidence supporting (or not supporting) the claims of the federal government to justify the use of force, and to arrest and detain members of the public ostensibly exercising free speech.

## II. THE PUBLIC AND THE PRESS HAVE A RIGHT OF ACCESS TO COURT RECORDS, INCLUDING SUBMISSIONS FILED BY THE GOVERNMENT IN COMPLIANCE WITH THIS COURT'S ORDERS

The public and the press have a well-established right of access to court proceedings and documents. *Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994). In *Nixon v. Warner Communications*, 435 U.S. 589, 597-98 (1978), the Supreme Court recognized "a general [common law] right to inspect and copy public records and documents" that pre-dates the Constitution and arises under centuries of common law. The Supreme Court subsequently held that the right to attend criminal trials and access court records was also constitutionally rooted in the First Amendment. *E.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982). In *Grove Fresh*, the Seventh Circuit recognized that:

> [t]hough its original inception was in the realm of criminal proceedings, the right of access has since been extended to civil proceedings because the contribution of publicity is just as important there. In fact, mistakes in civil proceedings may be more likely to inflict costs upon third parties, therefore meriting even more scrutiny.

24 F.3d at 897. This observation is particularly apt in this case, where the constitutional rights of the public are squarely at issue.

In the Seventh Circuit, courts have specifically recognized that the right of access extends to the right to copy audio and video evidentiary material. *See U.S. v. Guzzino*, 766 F.2d 302, 303 (7th Cir. 1985) (recognizing "the right of the media to copy audio or video tapes which have

5

been admitted into evidence in a criminal trial"); *U.S. v. Andreas*, No. 96 CR 762, 1998 U.S. Dist. LEXIS 11347 at *3 (N.D. Ill. July 16, 1998) (granting access to copy audio recordings admitted into evidence). These courts have generally analyzed the right of access under the common law. *See, Guzzino*, 766 F.2d at 303; *U.S. v. Edwards*, 672 F.2d 1289, 1292 (7th Cir. 1982); *Andreas*, 1998 U.S. Dist. LEXIS 1347 at *3. But the Seventh Circuit has often observed that the right also has a constitutional footing. *E.g.*, *Grove Fresh*, 24 F.3d at 897 ("Justified originally by common-law traditions predating the enactment of our Constitution, the right of access belonging to the press and the general public also has a First Amendment basis"); *U.S. v. Peters*, 754 F.2d 753, 763 (7th Cir. 1984) (in deciding a right of access to trial exhibits, recognizing "a longstanding common law right of access to judicial records" that "is of constitutional magnitude through the first amendment"); *but see Edwards*, 672 F.2d at 1294 (the right to access and copy audio recording "is of a non-constitutional origin").[3]

Regardless of whether the right arises from the common law or the First Amendment, formidable democratic underpinnings favor access. As the *Grove Fresh* court explained, public scrutiny promotes community respect for the rule of law, provides a check on the activities of judges and litigants, and fosters more accurate fact finding. 24 F.3d at 897. In *In re Continental Illinois Sec. Litigation*, 732 F.2d 1302, 1308 (7th Cir. 1984), the court recognized that the public right of access to judicial records was "fundamental to a democratic state." The "common law right supports and furthers many of the same interests which underlie those freedoms protected by the Constitution." *U.S. v. Edwards*, 672 F.2d 1289, 1292 (7th Cir. 1982). The common law

---

[3] In *Nixon*, the Court held that the First Amendment did not grant a greater right of access to audio recordings to the press than it did the public. 435 U.S. at 609. However, at the time it decided *Nixon*, the Court had not yet recognized *any* constitutional right of public access to a criminal trial. That changed two years later in *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) when seven justices of the Court found that the First Amendment guaranteed public right of access to criminal trials. *See Globe Newspaper Co.*, 457 U.S. at 603.

right of access is also "critical to our type of government in which the citizenry is the final judge of the proper conduct of public business." *Peters*, 754 F.2d at 763 (internal quotation omitted).

### A.     The Constitutional Standard

Courts viewing the right of access through a constitutional prism apply strict scrutiny to assess limitations on access, requiring a "compelling government interest" that is "narrowly tailored" to meet that interest. *Globe Newspaper*, 457 U.S. at 607; *Peters*, 754 F.2d at 758. The court in *Grove Fresh* explained:

> The First Amendment presumes that there is a right of access to proceedings and documents which have "historically been open to the public" and where the disclosure would serve a significant role in the functioning of the process in question. This presumption is rebuttable upon demonstration that suppression is essential to preserve higher values and is narrowly tailored to serve that interest.

24 F.3d at 897 (quotations and citations omitted). The court must be "firmly convinced that disclosure is inappropriate" and "[a]ny doubts must be resolved in favor of disclosure." *Id*. In applying these requirements a court must (1) identify the overriding interest; (2) narrowly tailor the closure after specifically considering alternatives; and (3) **make specific findings of fact to adequately support its decision.** *Press Enterprise Co. v. Super. Ct. of California*, 464 U.S. 501, 510 (1984) (emphasis added). Overcoming the constitutional presumption of access is a "formidable task." *In re AP*, 162 F.3d at 506.

### B.     The Common Law Standard

The common law right of access also imposes a high hurdle to denying access. Like its constitutional counterpart, the common law right of access includes a "strong presumption in support of the common law right to inspect and copy judicial records." *Edwards*, 672 F.2d at 1294; *see also Guzzino*, 766 F.2d at 303; *In re Application of CBS*, 540 F. Supp. at 771; *Andreas*, 1998 U.S. Dist. LEXIS 1347 at *3. The common law right is "more general in its contours" and

7

"establishes that court files and documents should be open to the public unless the court finds that its records are being used for an improper purpose." *Grove Fresh Distribs.*, 24 F.3d at 897. In *Edwards*, the Seventh Circuit adopted the *Nixon* Court's list of factors relevant in determining whether a purpose is improper, including:

> whether the information would be used to gratify private spite or promote public scandal through the publication of the painful and sometimes disgusting details of a case; whether the petitioner sought to use court files as reservoirs of libelous statements for press consumption . . . or as sources of business information that might harm a litigant's competitive standing; whether the court had already permitted considerable public access to the contents of the records in question, (e.g., by way of printed transcript, as opposed to tape recording); whether further access would appreciably enhance public understanding of an important historical occurrence; and whether granting the request would prejudice the due process rights of a criminal defendant.

672 F.2d at 1293 (citations and quotations omitted); *see also*, *Andreas*, 1998 U.S. Dist. LEXIS 11347 at *8-10 (applying *Nixon* factors). A party opposing disclosure bears the burden "to demonstrate that justice *requires* the denial of access." *Torres*, 602 F. Supp. at 1465 (emphasis added); *In re Application of CBS*, 540 F. Supp at 771.

      C.    **The Court Should Allow Access to the Government's Submitted Materials Under Either Standard**

Whether the Court applies a constitutional standard or a common law standard in this case to the Submitted Materials filed with the Court, the starting point of the analysis is a presumption of access. There is no basis to overcome that presumption under either approach.

The sealing of the Submitted Materials does not satisfy any element of the constitutional test of strict scrutiny. First, neither the government nor the Court has identified any overriding interest in this case. The sealed records are reports of use of force against members of the public ostensibly exercising their free speech rights in public settings. They also include footage of that use of force taken from federal agents' body-worn cameras, and the lists of arrestees unrelated

8

to immigration enforcement. None of those records have any connection to matters of security or relate to private matters; they are all-related to government action against the public and occurring in public. Second, because there has been no attempt to even identify an overriding interest, it is impossible to determine whether a blanket sealing of the Submitted Materials is narrowly tailored to meet any articulable goals or if any viable alternative to blanket sealing exists. Third, the Court appears to have presumed that redactions of the Submitted Materials would be required, but did not articulate either the specific material that would be subject to redaction or make findings of fact supporting the blanket sealing of the Submitted Materials in lieu of redactions. Nor did the Court find that the denial of access is "essential" to preserve a higher interest, or that the denial of access is narrowly tailored to serve that interest.

Likewise, there is no basis to overcome the common law presumption of access. First, there is no evidence that the Media Parties are seeking the requested access for any improper purpose. *Grove Fresh Distribs*., 24 F.3d at 897. Not a single factor articulated in *Nixon* and adopted by the Seventh Circuit in *Edwards* weighs in favor of finding an improper purpose. There is no evidence that the Media Parties intend to use the Submitted Materials to "gratify private spite or promote public scandal through the publication of the painful and sometimes disgusting details of a case" or seek to "use court files as reservoirs of libelous statements for press consumption . . . or as sources of business information that might harm a litigant's competitive standing." This is an historically important case involving fundamental constitutional rights, the separation of powers, and the challenged candor of the executive branch in carrying out its policies. The Submitted Materials are evidence to be considered by this Court in resolving this matter and the Court's evaluation and weighing of that evidence directly affects public welfare and trust. Cloaking the Submitted Materials in secrecy fosters only distrust and

9

suspicion, while making the evidence considered by the Court available to the public and the press will appreciably enhance public understanding of this moment in history.

The final *Nixon* factor is whether granting the request would prejudice the due process rights of a criminal defendant. In this case, there is no criminal defendant, but there are arrestees. In assessing this factor, the Court should remain mindful that it may deny access only "on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." *Edwards*, 672 F.2d at 1294; *Torres*, 602 F. Supp. at 1464. But there has not even been an attempt at speculation, let alone an articulation of facts, that making the Submitted Materials available to public scrutiny will prejudice any third party. If there is any concern about the identity of arrestees, the Court can and should then weigh that concern against the public interest and determine if justice requires wholesale sealing. But as it stands, the record is devoid of any of the findings of fact or consideration of the factors necessary to warrant the sealing of the Submitted Materials.

### D. The Court Should Not Delay Its Consideration of the Request for Access

This Court should not delay either considering this motion or permitting the Media Parties access to the Submitted Materials filed with the Court. This is truly a matter of access delayed equating to access denied. Because "newsworthiness of particular story is often fleeting," courts recognize that delay in access to court records is an injury that compounds daily. *Grove Fresh*, 24 F.3d at 897-98 ("[t]o delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression"); *In re AP*, 162 F.3d at 506-07 ("[o]ur cases, and, indeed, the controlling jurisprudence of the Supreme Court of the United States, also have emphasized that the values that animate the presumption in favor of access require as a 'necessary corollary' that, once access is found to be appropriate, access

ought to be 'immediate and contemporaneous'"), *quoting Press Enter. Co.*, 464 U.S. at 510. Permitting access to the Submitted Materials at some future point would only remove context and diminish the value of news about an important public issue, all while events threatening constitutional rights continue to unfold.

## CONCLUSION

For the reasons set forth herein, Chicago Public Media, Inc., Chicago Sun-Times Media, Inc., and Chicago Tribune Company, LLC respectfully request that the Court grant them leave to intervene in this matter and grant them access to the materials filed by the government with the Court pursuant to the Court's October 28, 2025 Order.

Dated: November 4, 2025

Respectfully submitted,

**CHICAGO PUBLIC MEDIA, INC., CHICAGO SUN-TIMES MEDIA, INC. AND CHICAGO TRIBUNE COMPANY, LLC**

By: /s/ Steven P. Mandell
    One of their attorneys

Steven P. Mandell (ARDC No. 6183729)
smandell@mandellpc.com
Brian D. Saucier (ARDC No. 6226006)
bsaucier@mandellpc.com
MANDELL P.C.
1 N. Franklin Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 801-6337

## CERTIFICATE OF SERVICE

    The undersigned, an attorney, certifies that a copy of the foregoing document has been served November 4, 2025 via the Court's CM/ECF system on all counsel of record who have consented to electronic service.

/s/ Steven P. Mandell