Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

- - - - - - - - - - - - - - - -x

CHICAGO HEADLINE CLUB, et al., :

    Plaintiffs,           :

   v.                   : No. 25-cv-12173

KRISTI NOEM, Secretary of    :

U.S. Department of Homeland   :

Security, in her official    :

capacity, et al.,          :

    Defendants.         :

- - - - - - - - - - - - - - - -x

Wednesday, October 29, 2025

Washington, D.C.

Videotaped Deposition of

RUSSELL HOTT

a witness, called for examination by counsel for

Plaintiffs pursuant to notice and agreement of

counsel, beginning at 10:40 a.m. at the Department

of Justice, 1100 L Street, N.W., Washington, D.C.,

before Jennifer M. O'Connor, notary public in and

for the District of Columbia.



Page 2

```
 1    APPEARANCES:
 2       On behalf of the Plaintiffs:
 3          DAVID B. OWENS, ESQ.
            Loevy & Loevy
 4          University of Washington Law School
            William H. Gates Hall, Suite 265
 5          Seattle, Washington 98145-1110
            (312) 243-5900
 6          David@loevy.com
 7          SHALINI AGARWAL, ESQ.
            Protect Democracy Project
 8          2020 Pennsylvania Avenue, N.W., Suite 163
            Washington, D.C. 20006
 9          (202) 579-4582
            Shalini.agarwal@protectdemocracy.org
10
         On behalf of the Defendants:
11
            PETER R. ("P.R.") GOLDSTONE, ESQ.
12          CHRISTOPHER M. LYNCH, ESQ.
            U.S. Department of Justice
13          Civil Division
            1100 L Street, N.W.
14          Washington, D.C. 20005
            (202) 598-0912
15          Peter.R.Goldstone@usdoj.gov
16          LES/PII        , ESQ.
            LES/PII              , ESQ.
17          U.S. Immigration and Customs Enforcement
            500 12th Street, S.W.
18          Washington, D.C. 20024
            (202) 598-0912
19          LES/PII    @ICE.DHS.gov
            LES/PII        @ICE.DHS.gov
20
21
22
```

Page 3

```
 1    APPEARANCES: (Cont'd)
 2          PII             , ESQ. (Via Zoom)
            Legal Counsel Division
 3          Office of the General Counsel
            U.S. Department of Homeland Security
 4          1790 Ash Street, S.E.
            Washington, D.C. 20032
 5          (202) PII
            PII          @hq.dhs.gov
 6
            SEAN SKEDZIELEWSKI, ESQ. (Via Zoom)
 7          U.S. Department of Justice
            Civil Division
 8          950 Pennsylvania Avenue, N.W.
            Washington, D.C. 20530
 9          (202) 307-1697
            Sean.Skedzielewski@usdoj.gov
10
         ALSO PRESENT:
11
            Valerie Barajas, Loevy & Loevy Paralegal
12
13
14
15
16
17
18
19
20
21
22
```

Page 4

```
 1              C O N T E N T S
 2    EXAMINATION BY:                        PAGE
 3        Counsel for Plaintiffs        6
 4    HOTT DEPOSITION EXHIBITS:
 5    No. 1 - Declaration                   34
 6    No. 2 - Photographs                   92
 7    No. 3 - ICE List                     137
 8    No. 4 - E-mail                       142
 9    No. 5 - Illinois v. Trump Exhibit    157
10    No. 6 - Video of Secretary Noem      181
11    No. 7 - Video of CBP Officers        181
12    No. 8 - Video of Pastor              181
13    No. 9 - Video with Gas Masks         181
14    No. 10 - Video of Man Being Tackled  181
15
16
17
18
19
20
21
22
```

Page 5

```
 1              P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  We are now on the
 3    record.  This begins videotaped number 1 in the
 4    deposition of Russell Hott in the matter of Chicago
 5    Headline Club and others versus Kristi Noem and
 6    others in the United States District Court, Northern
 7    District of Illinois, Eastern Division, Case No.
 8    25-cv-12173.
 9        Today's date is October 29, 2025.  The
10    time on the video monitor is 10:40 a.m. Eastern
11    Standard Time.  This deposition is being taken at
12    the Department of Justice located at 1100 L Street,
13    N.W., Washington, D.C. at the request of Loevy &
14    Loevy.
15        The videographer is Jason Aqui of Magna
16    Legal Services, and the court reporter is Jennifer
17    O'Connor, also of Magna Legal Services.  Will
18    counsel and all parties present state their
19    appearances and whom they represent.
20        MS. AGARWAL:  Shalini Agarwal, on behalf
21    of Plaintiffs.
22        MR. OWENS:  David B. Owens.  I represent
```



Page 6

1 the plaintiffs. We have a number -- number of
2 people online, I believe, appearing remotely too.
3 MR. GOLDSTONE: That's fine. Peter R.
4 Goldstone, Department of Justice, representing
5 Defendants. With me I also have Yerin Cho and Bryan
6 Hudson. They're with DHS, as well as Chris Lynch,
7 who is also DOJ.
8 THE VIDEOGRAPHER: Will the court reporter
9 please swear in the witness.
10 Whereupon,
11 RUSSELL HOTT
12 was called for examination by counsel for Plaintiffs
13 and, after having been first duly sworn, was
14 examined and testified as follows:
15 THE VIDEOGRAPHER: Proceed.
16 EXAMINATION BY COUNSEL FOR PLAINTIFF
17 BY MR. OWENS:
18 Q Please state your name.
19 A Russell Hott.
20 Q What's your job title?
21 A I'm a field office director.
22 Q For what agency?

Page 7

1 A Immigration and Customs Enforcement.
2 Q You refer to that as ICE?
3 A Yes.
4 Q How long have you worked for ICE?
5 A I've worked for ICE since March 1, 2003.
6 Q And where is your current job located?
7 A Chantilly, Virginia.
8 Q Chantilly, Virginia?
9 A Yes.
10 Q And how long have you been in that post?
11 A Since, I want to say, February of 2025.
12 Q Okay. Did you spend some time in Chicago
13 during 2025?
14 A I did.
15 Q And in what capacity?
16 A I served as the field office director on
17 an interim basis.
18 Q And for which field office?
19 A The Chicago Field Office.
20 Q How long were you there?
21 A I want to say just shy of three months.
22 Q I know you recently were -- was your last

Page 8

1 day around October 17th? Sound right?
2 A Yes.
3 Q Why were you -- why did you leave Chicago
4 and come back to Virginia, or this area?
5 A So as I mentioned, I was serving as the
6 interim field office director while ongoing efforts
7 to locate a permanent field office director were
8 underway.
9 Q Has a permanent field office director been
10 located for the Chicago region?
11 A That's -- that's not my decision to make.
12 I'm not aware of whether a decision has been made.
13 Q Okay. Was anybody hired to fill the
14 permanent position before you departed?
15 A I don't know that answer, sir.
16 Q Did you ask to come back or to leave
17 Chicago on or before October 17th?
18 A I was directed to come back to Chantilly,
19 but again, my nature in that role was interim and
20 temporary from the onset.
21 Q How long have you been posted in
22 Chantilly?

Page 9

1 A Since -- I'm sorry, could you clarify?
2 What do you mean?
3 Q Sure. I understand in your career you've
4 been with ICE for, I think, since 2003, right?
5 A Yes.
6 Q And so in the past 22 years as a ICE
7 officer, you've worked in a variety of locations,
8 correct?
9 A Yes.
10 Q Do you have a home base, or do you move
11 around a lot?
12 A Well, Chantilly is my -- my permanent
13 field office.
14 Q Okay. And so you were in Chicago on an
15 interim basis this year, correct?
16 A That's correct.
17 Q And do you know why it was that you were
18 moved on or around October 17th?
19 A I would say that ultimately, as I
20 mentioned, I was there on an interim basis. I was
21 there with the expectation that it would be a very
22 short tenure, several months. So when I received



Page 10

1  notice to return to Chantilly, it was not
2  unexpected.
3      Q   Got it.  Were you expected to be in the
4  Chicago area for the entire duration of Operation
5  Midway Blitz?
6      A   I was in Chicago for the entirety of
7  Midway Blitz based on the original plans for Midway
8  Blitz.
9      Q   What do you mean by that?
10     A   I was originally supposed to run through
11 October 15th.
12     Q   So the original plan was to -- Midway
13 Blitz would begin at some point in September and
14 then conclude by October 15th; is that correct?
15     A   That is correct.
16     Q   And is Midway Blitz ongoing?
17     A   It is.
18     Q   Do you know why it's going -- gone longer
19 than the original plan?
20     A   I don't know, sir.
21     Q   So you've given sworn testimony in 2025,
22 and I want to just make sure that I have the full

Page 11

1  universe of what that consists of, okay?
2      A   Okay.
3      Q   Have you given another deposition about
4  your work as a ICE officer in 2025?
5      A   Yes.
6      Q   In what capacity?
7      A   As a field office director.
8      Q   Was that -- was that in the capacity of
9  some litigation?
10     A   It was based on an EEO kind of
11 non-selection, or I'm sorry, for a firing.
12     Q   Okay.  What's EEO?  Sorry.
13     A   Equal Employment Opportunity.
14     Q   Got it.  So the deposition you gave
15 related to an employment matter; fair to say?
16     A   Yes.
17     Q   Have you given any depositions as it
18 relates to your role as a field officer in ICE in
19 terms of your duties or what you've done in the
20 field outside of the deposition we're having right
21 now?
22     A   In 2025?

Page 12

1      Q   Yes, sir.
2      A   I don't believe so.
3      Q   You have given, I believe, three
4  declarations over the past few months; is that fair
5  to say?
6      A   I think that's probably in line.
7      Q   Well, so there's one in the "Broadview"
8  case.  That was the lawsuit about the fence,
9  correct?
10     A   Yes.
11     Q   You also provided a declaration in the
12 "Illinois v. Trump" case concerning the National
13 Guard, correct?
14     A   Yes.
15     Q   And then last night you provided a
16 declaration in this lawsuit, correct?
17     A   Yes.
18     Q   Have you provided any other sworn
19 declarations concerning your role as a ICE officer
20 in 2025 as it relates to enforcement activities
21 undertaken in August and September and October of
22 2025?

Page 13

1      A   I believe so.
2      Q   What's that?
3      A   I don't recall the specific nature of
4  those cases at this moment.
5      Q   How many other cases are there?
6      A   I don't know that.
7      Q   How many declarations have you signed in
8  the last four months?
9      A   I don't know the answer to that as well.
10     Q   So we've just gone over three.
11         Is there one more missing?  Are there two
12 more missing?  Are there 25 other declarations out
13 there?  Can you give me a ballpark?
14     A   I don't know, sir.
15     Q   You have no idea how many times you've
16 sworn under penalty of perjury to facts in a
17 declaration in the last four months?
18     A   That is correct.
19     Q   So we recently received last night a
20 number of documents that -- that are about specific
21 incidents that happened primarily at Broadview.  And
22 I want to ask you some questions more generally

MAGNA ▶
LEGAL SERVICES

Page 14

1  about your role at Broadview or while you were in
2  Chicago, okay?
3      What was your assignment beginning in
4  August of 2025 and continuing through October 17,
5  2025?
6      A   I served as the interim field office
7  director for the Chicago Field Office.
8      Q   What were your responsibilities?
9      A   I had oversight of all of ICE's interior
10 enforcement and removal efforts in that field office
11 during that time.
12     Q   I apologize if I misheard you.  Did you
13 say "interior enforcement"?
14     A   That's correct.
15     Q   Okay, thank you.  And were you -- did you
16 have a specific office or place that you worked out
17 of while you were in Chicago?
18     A   I worked out of the federal building in
19 downtown Chicago.
20     Q   And did you -- and I want to understand a
21 little bit about how ICE coordinated with other
22 agencies that were involved in Midway Blitz, okay?

Page 15

1      A   Okay.
2      Q   Can you describe for me generally what
3  your role was in coordinating with other agencies.
4      A   So at the onset of Midway Blitz, my
5  program was leading the -- the effort to locate --
6  we had a list of several thousand targeted
7  individuals.  These were generally individuals that
8  had prior criminal histories that were released from
9  other jails at the local and state level.
10     And our efforts through ERO, Enforcement
11 and Removal Operations, was to coordinate with the
12 other federal agencies like the Bureau for Alcohol,
13 Tobacco and Firearms, the Federal Bureau of
14 Investigations, the Drug Enforcement Administration
15 and other similar agencies.
16     Q   Okay.  Would Customs and Border Patrol
17 have been another agency?
18     A   So Customs and Border Protection was kind
19 of managing their -- their own particular part of an
20 operation.
21     Q   What do you mean by that?
22     A   I believe that CBP had announced that when

Page 16

1  they were arriving they were going to execute
2  something they called Operation At Large.
3      Q   And what was your understanding of
4  Operation at Large?
5      A   I -- I really don't have a lot of
6  information on At Large.
7      Q   Okay.
8      A   You know, that's a CBP function.
9      Q   And let's just take a step back then.
10     As a general matter, what are the
11 historical enforcement rules of ICE in conducting, I
12 think you call it, ERO?
13     A   Yes.  So the program I serve under, ERO,
14 Enforcement and Removal Operations, is focused on
15 the identification, apprehension, detention, removal
16 of individuals who are unlawfully present in the
17 United States.  We look at that from an interior
18 perspective.
19     I think the distinguishing factor for our
20 colleagues in Customs and Border Protection, they
21 have kind of three main components as well.  They
22 have Air and Marine Operations, they have the Office

Page 17

1  of Border Patrol and the Office of Field Operations.
2  So OFO, or Field Operations, operates at the ports
3  of entry.  Those would be airports, land borders,
4  things of that nature, seaports.  Border Patrol
5  operates in between the ports of entry along the
6  northern and southern borders.  And Air and Marine
7  kind of operate in the air and certainly on
8  waterways.
9      Q   Thank you.  I think you mentioned
10 something to this effect earlier, which is that ICE,
11 historically at least, has conducted targeted
12 investigations or operations about people who tend
13 to have criminal backgrounds or something like that;
14 is that correct?
15     A   I think what I said was that Midway Blitz
16 was focused in on individuals with a prior criminal
17 history that were released from other jails.
18     Q   Okay.  But I mean, historically that's
19 been the role of ICE as -- generally in conducting,
20 you know, its removal operations, is targeted
21 missions as opposed to something like a roving
22 patrol, right?



Page 18

1    A   I would say that any -- anyone who is
2  unlawfully present in the United States is subject,
3  you know, to oversight from -- from ERO.  So that --
4  you know, our mission focus has been on the worst
5  first, but it does not preclude individuals who are
6  otherwise unlawfully present.
7    Q   Right.  So I guess what I'm trying to
8  understand a little bit is that CBP also is focused
9  on the removal of certain individuals from this
10  country, right?
11    A   Yes.
12    Q   And, you know, is the relationship between
13  CBP and ICE, as a general matter, do you operate in
14  silos as you're sort of working on the same kind of
15  end goal?
16    A   I -- I think there is a -- I mean, by
17  design, right, all of the DHS entities -- the
18  Department of Homeland Security coordinate and kind
19  of support each other in different functions and
20  different roles.  My portion of the agency handles
21  everything on the interior from the onset of an
22  encounter all the way through with the removal

Page 19

1  portion of that.
2        Where that intersects with our Customs and
3  Border Protection colleagues, for example, an
4  individual who is encountered at an airport with a
5  fraudulent passport, you know, it would be Field
6  Operations that would refer that case to my part of
7  DHS for the detention and removal piece of that
8  individual.
9    Q   What I'm wondering about more specifically
10  is how -- what was the interactions as it pertains
11  to CBP and ICE during the pendency of Midway Blitz,
12  at least while you were there?
13    A   So I would say that, you know, we -- we
14  had conversations on de-confliction, but there were
15  parallel and kind of separate ongoing efforts
16  between CBP and ICE and the other federal partners
17  at that time.
18    Q   What is de-confliction?
19    A   So in law enforcement, that would be, for
20  example, if there was an investigation from ATF on
21  this building, right, so we would de-conflict any
22  interests with the ATF with, you know, any interests

Page 20

1  or investigation that we were looking at from that
2  standpoint.  So it was making sure that there were
3  no operational conflicts.
4    Q   I see.  It's true, though, that ICE hasn't
5  historically engaged in sort of roving patrols
6  throughout cities untargeted from specific
7  individuals, right?
8    A   ICE does focus in -- as I mentioned
9  before, we do prioritize individuals with criminal
10  histories, but we certainly are amenable to anyone
11  who is unlawfully present in the country.  And
12  generally, you know, how we identify that
13  information comes from a lot of different avenues.
14    Q   Sure.  And I'm not talking about the --
15  how you identify the information.  I'm more talking
16  about we've seen -- well, I believe are CBP agents
17  doing more like roving patrols, moving between
18  different locations, sort of as you described?  It's
19  my understanding that's not historically the
20  approach that ICE has taken; is that correct?
21    A   I would say that CBP and ICE have separate
22  missions.  I can't speak to CBP's approach to

Page 21

1  anything, but certainly from the ICE side, as I
2  mentioned, anyone unlawfully present in the United
3  States is amenable to removal from -- from our
4  auspices.
5    Q   Sure.  I guess in your experience and in
6  the agency over the past 22 years, it's not been
7  your experience that ICE -- or excuse me -- CBP is
8  typically involved in urban enforcement operations,
9  right?
10    A   They, again -- you know, there are
11  different elements of CBP, so when you mention CBP,
12  they -- they do have an interior nexus as well.
13    Q   Okay.  So -- sorry, I lost my pen.  Okay.
14  In your view, would CBP agents be adequately trained
15  to perform roving patrols in large cities or
16  residential areas?
17    A   I'm not qualified to speak on CBP.
18    Q   So let's talk a little bit more about
19  Midway Blitz.
20        Was the Criminal Alien Program at ICE
21  involved in the operation?
22    A   The Criminal Alien Program was involved



Page 22

1   from -- from the onset, yes.
2     Q   And the Criminal Alien Program, that's
3   sort of what we've been alluding to earlier, where
4   that is focusing on the worst first, I guess as you
5   put it?
6     A   Yes.
7     Q   And as it relates to Midway Blitz, does
8   CBP have primary operational control for -- of the
9   enforcement actions going on in Chicago?
10     A   CBP has primary control for CBP.
11     Q   Okay.  Does CBP have primary control over
12   ICE or any other federal agencies?
13     A   Not that I'm aware of.
14     Q   Now, how are you given directives -- or
15   excuse me.
16     Were you given any directives about the
17   Midway Blitz operation and what the goals were
18   before you began?
19     A   Yes.
20     Q   And what were those goals?
21     A   As I mentioned earlier, we were targeting
22   several thousand individuals that had been released

Page 23

1   from states and local custody with egregious violent
2   criminal histories.
3     Q   Who provided you with the directive?
4     A   That came through my chain of command.
5     Q   Who is in your chain of command?
6     A   It would be our Field Operations Division
7   in Headquarters and through the Enforcement and
8   Removal Operations leadership.
9     Q   All right, let's -- we'll tease that out a
10   little bit more -- in more detail.
11     Who's your direct supervisor?
12     A   Liana Castano.
13     Q   And what was that title?
14     A   She is the assistant director for Field
15   Operations.
16     Q   Do you know who she reports to?
17     A   She reports to the deputy executive
18   associate director, Tom Brophy.
19     Q   And do you know who Mr. Brophy or what
20   level he reports up the chain of command to?
21     A   He reports to the executive associate
22   director, who is Marcos Charles.

Page 24

1     Q   And that's the executive associate
2   director for Immigration and Customs Enforcement,
3   correct?
4     A   No, that would be for Enforcement and
5   Removal Operations.
6     Q   Okay.
7     A   So within ICE there are three operational
8   programs and ERO is one of those three.
9     Q   I appreciate it.  Thank you.
10     So then what's up the chain of command
11   after the executive associate director of ERO?
12     A   The deputy director for ICE.
13     Q   Who's that?
14     A   Oh, my goodness.  Ms. Sheehan.
15     We'll get a full name when it comes.  Do
16   you know how to spell the last name?
17     A   I believe it's S-h-e-e-h-a-n.
18     Q   Thank you.
19     A   Hmm-hmm.
20     Q   And who does Deputy Director Sheehan
21   report to?
22     A   She reports to the acting director of ICE?

Page 25

1     Q   Who is that?
2     A   Todd Lyons.
3     Q   Who does Mr. Lyons report to?
4     A   I believe the Deputy Secretary for
5   Homeland Security.
6     Q   Who's that?
7     A   I don't know that offhand.
8     Q   Got it.  And am I right that the Deputy
9   Secretary for Homeland Security reports to the
10   Secretary for Homeland Security?
11     A   That's correct.
12     Q   All right.  In your interactions at Midway
13   Blitz, did you have any -- excuse me.
14     In your participation in Midway Blitz, did
15   you have any personal interactions with the
16   Secretary of Homeland Security?
17     A   I did.
18     Q   And when did you have interactions with
19   Ms. Noem?
20     A   I believe she came to visit the Broadview
21   facility in early October.
22     Q   Were you present when she was there?

Page 26

1      A   Yes.
2      Q   We'll talk a little bit more about that
3  October 3rd date in a little bit.
4          Outside of that date, did you have any
5  interactions with Ms. Noem?
6      A   No.
7      Q   Have you spoken to her since?
8      A   No.
9      Q   Have any other direction about your role
10  in Midway Blitz in Chicago from anybody in the
11  Administration?
12      A   That's a really --
13      Q   Fair enough.
14      A   Could you --
15      Q   Let me -- let me --
16          MR. GOLDSTONE:  Objection, vague.
17          MR. OWENS:  No -- no problem.  I'll
18  rephrase.
19          BY MR. OWENS:
20      Q   Did you have any interactions with the
21  President of the United States as it concerns
22  implementing Operation Midway Blitz?

Page 27

1      A   No.
2      Q   Did you have any interactions with Stephen
3  Miller as it relates to implementing Operation
4  Midway Blitz?
5      A   No.
6      Q   Who did you receive your directions from
7  when it came to operationalizing Midway Blitz during
8  your short time in Chicago?
9      A   Both from Marcos Charles and Liana
10  Castano.
11          THE VIDEOGRAPHER:  Counsel, put your mic
12  on, please.
13          BY MR. OWENS:
14      Q   Who is Liana Castano?
15      A   She is the assistant director for field
16  operations within ERO headquarters.
17      Q   Did you participate in any enforcement
18  removal actions in Los Angeles this summer?
19      A   No.
20      Q   Did you participate in any enforcement
21  removal actions in Portland, Oregon this summer?
22      A   No.

Page 28

1      Q   Memphis?
2      A   No.
3      Q   New Orleans?
4      A   No.
5      Q   Fair to say that your -- your role in the,
6  I guess, increased enforcement activities this
7  summer were -- pertained to Chicago?
8      A   For the summer it was Chicago and
9  Chantilly, Virginia.
10      Q   Right.  The only time that you operated
11  out of your home base was in Chicago?
12      A   That's correct.
13      Q   Now, I -- you mentioned that the -- the
14  goal, at least as far as ICE's involvement in the
15  Midway Blitz, was the several thousand individuals
16  who were believed to be present in the Chicagoland
17  area that you were trying to apprehend.
18          Were there other specific operational
19  goals that were -- come to mind?
20      A   No.
21      Q   Were you given any directives from your
22  chain of command about how Operation Midway Blitz

Page 29

1  would be implemented as it relates to use of force
2  against civilians?
3      A   We do have a use of force policy that
4  governs all those actions.
5      Q   I appreciate that.  And I saw that in your
6  declaration, the use of force policy from 2023.  I'm
7  aware of that.
8          My question's a little bit different,
9  which is about whether or not you were given any
10  specific direction about use of force during Midway
11  Blitz itself specifically.
12      A   No.
13      Q   So I understand that -- strike that.
14          What was your role in overseeing
15  operations at the Broadview facility while you were
16  the interim director in Chicago between August and
17  October?
18      A   So the Broadview facility is utilized as
19  an intake and processing center, so as individuals
20  are arrested, they were being taken there and issued
21  charging documents and afforded an opportunity to
22  have a view of their -- their rights and kind of



Page 30

1 expectations on what they would face going through
2 removal proceedings.
3       From there, individuals were generally
4 moved to other detention facilities.  So Broadview
5 was focused in on the processing side.
6    Q   Understood.  And I guess what I'm
7 wondering is, what was your role of oversight with
8 respect to those processing procedures or how things
9 were happening at Broadview while you were in
10 Chicago between August and October?
11    A   So I mean, much like any other sub office
12 that -- within the field office, my role was to
13 ensure that individuals were being timely processed
14 and that they were receiving notices accordance --
15 according to law, procedure and regulation.
16    Q   All right.  At some point protests began
17 at Broadway while you were there, right?
18    A   Yes, protests had preceded my arrival.
19    Q   Fair enough.  Thanks for the correction.
20 There were -- so --
21       MR. LYNCH:  Just for the record, I think
22 it's Broadview.  I think you said "Broadway."

Page 31

1       MR. OWENS:  Oh, my apologies.  Thank you.
2 I appreciate that double correction.
3       BY MR. OWENS:
4    Q   So you were -- as it relates to
5 interactions with people demonstrating or protesting
6 at Broadview, what were your -- what was your role
7 as a supervisor?
8    A   So I mean certainly ICE, just like any
9 other federal entity, respects the rights of anyone
10 to exercise their First Amendment rights.  And
11 ultimately, you know, when I arrived, there were
12 ongoing protests on a weekly basis multiple times
13 per week.  It wasn't until September that we saw
14 things kind of turn the page.
15       But up until that point, our role was de
16 minimus.  I mean, we certainly -- you know, folks
17 that were in a public setting were permitted to
18 protest.
19    Q   Okay.  Once Midway Blitz ramped up and the
20 protest ramps up, were any orders or guidelines
21 provided to ICE agents about how to interact with
22 civilians?

Page 32

1    A   No.  I mean, our folks are highly skilled
2 and highly trained.  There are no separate
3 instructions on that because that is part of the
4 regular training they go through on a daily basis,
5 and ongoing training.
6    Q   Is -- is it your understanding, or
7 testimony rather, that part of regular ICE training
8 involves crowd control?
9    A   Regular ICE training has an introduction
10 to it.  Our -- but generally our officers do not
11 receive regular training on that.
12    Q   And I didn't see anything in your
13 declarations, at least the three that I have of how
14 many of them there are, about experience with crowd
15 control or those types of situations.
16       Do you have experience in that area?
17    A   I have been trained on that.
18    Q   Do you have experience personally in that
19 area?
20    A   I mean, certainly during my time as the
21 interim field office director I was participating in
22 some of the crowd control efforts.

Page 33

1    Q   Before you got to Broadview, did you have
2 any extensive experience in your 22 or 23 years in
3 ICE doing any crowd control?
4    A   No.
5    Q   Does DHS provide any guidance about how
6 and when to issue audible dispersal orders if a
7 crowd is gathered?
8    A   So there are definitely ongoing trainings,
9 so with that, we have a specialized group of
10 individuals and there are special response teams
11 that go through extensive training on that.
12    Q   Where's that -- how is that training
13 administered?
14    A   I -- I have not gone through the training,
15 so I can't speak to it, sir.
16       MR. GOLDSTONE:  I also want to object to,
17 I think your earlier question was about DHS
18 policies.  That was vague.  DHS has numerous
19 subcomponents.
20       MR. OWENS:  That's fine.
21       BY MR. OWENS:
22    Q   All right, why don't we go ahead and mark



Page 34

1  this as Exhibit 1 for your deposition.
2       (Hott Deposition Exhibit No. 1 was marked
3  for identification.)
4       BY MR. OWENS:
5       Q   Should be no surprise that this is the
6  copy of the declaration that you signed yesterday.
7       You remember this one?
8       A   Yes.
9       MR. GOLDSTONE:  Thank you.
10      MR. OWENS:  And we were at Kinkos at 9:01,
11 so somebody at least has to take these.
12      BY MR. OWENS:
13      Q   And I apologize, sir, if you ever -- ever
14 need a break at any time, you know, I'm just going
15 to plow through and -- because I know you have a
16 hard start and we need to get out of here.  But if
17 you ever need a break, let me know, okay?
18      A   I appreciate that.
19      Q   All right.  So this 40-page declaration is
20 one that you signed yesterday, correct?
21      A   Yes.
22      Q   It's under penalty of perjury, correct?

Page 35

1       A   I believe so.
2       Q   Do you want to look at the 40th page.
3       A   Yes.
4       Q   And I know this isn't a color copy, but is
5  that your signature?
6       A   That appears to be a facsimile of my
7  signature.
8       Q   Fair enough.  All right, so let's go all
9  the way back to the -- to the beginning here, and
10 I'm just going to ask you a few questions about your
11 background and we'll go through this together, okay?
12      A   Okay.
13      Q   So just on page 2 of paragraph number 3,
14 indicates that there were about 180 officers in six
15 states across two time zones in the Chicago Field
16 Office.
17      Do you see that?
18      A   Yes.
19      Q   Did that increase or fluctuate -- sorry.
20 Strike that.
21      The numbers indicated in paragraph 3 here
22 about 180 officers across those states and then 65

Page 36

1  more officers in Chicago with 31 at Broadview, were
2  those numbers increases from what is typically seen,
3  or is that sort of the hand that you were dealt when
4  you go there?
5       A   So to clarify, the 65 is a subset to the
6  180, just as the 31 is a subset of the 65.  But that
7  number is relatively static based on the field
8  office.  What I would say is in September we did
9  start to onboard additional individuals, so the
10 number is increasing.
11      Q   Okay.  Do you know where that number was
12 at when you left?
13      A   I don't know offhand.
14      Q   Okay.  Paragraph 4, two sentences and
15 indicates that you've -- this declaration is
16 submitted -- it's submitted in support of
17 defendant's opposition to Plaintiff's motion for
18 preliminary injunction, right?  And you reviewed
19 Plaintiff's motion and supporting exhibits, correct?
20      A   Yes.
21      Q   So having reviewed all of the exhibits for
22 the preliminary injunction motion and having

Page 37

1  yourself been on the scene, it's your testimony and
2  belief that no injunctive relief is appropriate or
3  warranted in this case, correct?
4       MR. GOLDSTONE:  Objection, legal
5  conclusion.
6       BY MR. OWENS:
7       Q   You can answer.
8       A   I don't believe an injunction is
9  necessary.
10      Q   And you submitted this declaration today
11 in opposition to the plaintiff's request for an
12 injunction, right?
13      A   I submitted this yesterday.
14      Q   Thank you.
15      A   Yes.
16      Q   You submitted this declaration,
17 nonetheless, for the specific purpose of creating
18 evidence for the government to use to oppose the
19 plaintiff's request for a preliminary injunction in
20 this case, right?
21      MR. GOLDSTONE:  Objection, argumentative.
22      THE WITNESS:  (No answer).



Page 38

1          MS. AGARWAL:  You can answer.
2          THE WITNESS:  Yes.
3     BY MR. OWENS:
4     Q    All right.  So if you want to go to page
5     number 4, are you with me?
6     A    Yes.
7     Q    This -- and there's a little title here
8     that says, "Chicago's restrictions on straight" --
9     "state and local cooperation with federal
10    officials."
11         Do you see that?
12    A    Yes.
13    Q    Do you agree with me that whether or not
14    Chicago has some restrictions on state or local
15    cooperation with federal officials is irrelevant to
16    the question of whether or not there should be an
17    injunction for excessive force or First Amendment
18    activities at Broadview or in the Northern District
19    of Illinois?
20         MR. GOLDSTONE:  Objection.  Calls for
21    legal conclusion.
22    BY MR. OWENS:

Page 39

1     Q    You can answer.
2          MR. GOLDSTONE:  As well as speculative.
3          THE WITNESS:  No, sir.
4     BY MR. OWENS:
5     Q    Okay.  Why is it relevant?
6     A    So I believe that these policies have lead
7     to additional challenges in enforcing Title 8 and
8     Title 18 laws.
9     Q    Is it your testimony that you included
10    this here because you believe that these laws
11    somehow -- excuse me -- the Chicago restrictions
12    about local cooperation provide a justification for
13    use of force against clergy or press?
14         MR. GOLDSTONE:  Objection, legal
15    conclusion.  Also argumentative.
16         THE WITNESS:  That is not my testimony,
17    sir.
18    BY MR. OWENS:
19    Q    Okay.  So is it -- is it your position
20    that this information is relevant to whether or not
21    protestors have had their First Amendment rights
22    violated?

Page 40

1          MR. GOLDSTONE:  Again, objection,
2     argumentative and legal conclusion.
3          THE WITNESS:  No, sir.
4     BY MR. OWENS:
5     Q    Why did you include this in your
6     declaration as it relates to the motion for
7     preliminary injunction filed in this case?
8     A    From the standpoint that the policies
9     inhibit individuals that the agency has an interest
10    in from being surrendered directly from a secure
11    environment to a field environment, it forces the
12    agency to pursue these individuals in communities,
13    in neighborhoods as opposed to directly from a jail,
14    a safe and secure environment.
15    Q    Okay.  Do you agree with me that whether
16    or not Chicago coop -- has an ordinance cooperating
17    with ICE in every way possible or not cooperating
18    with them wouldn't justify using excessive force
19    against a protestor?
20         MR. GOLDSTONE:  Objection.  Again,
21    argumentative and legal conclusions.
22    BY MR. OWENS:

Page 41

1     Q    You can answer.
2     A    No.
3     Q    Why do you disagree?
4     A    I disagree because the use of force is
5     separate and apart from the policies on enforcement.
6     Q    Okay.  Sir, I think maybe I asked a poor
7     question.
8          It sounds like you agree that these
9     ordinances are sort of irrelevant to whether or not
10    a particular use of force is justified, right?
11    A    No, I'm saying that our use of force is
12    based on a threat, not on enforcement operations.
13    Q    Got it.  And so the city's ordinance
14    doesn't, you know, change whether or not there's a
15    particular threat an officer faces and the
16    circumstances, correct?
17         MR. GOLDSTONE:  Objection, speculative.
18    Asked and answered.
19    BY MR. OWENS:
20    Q    You can answer.
21    A    I'm sorry, could you repeat that?
22    Q    Sure.  When it comes to use of force,



Page 42

1  officers are trained and officers understand that
2  they have to use force that's reasonable in the
3  circumstances confronting them, correct?
4       A   Yes.
5       Q   And that's -- whether or not the City of
6  Chicago has an ordinance about cooperating with ICE
7  is irrelevant to whether or not an officer faces a
8  threat and the particular circumstances that they
9  are confronting, right?
10       MR. GOLDSTONE:  Objection, argumentative,
11  legal conclusion, and I think again, asked and
12  answered.
13       THE WITNESS:  I don't see it from that
14  lens, sir.
15       BY MR. OWENS:
16       Q   Okay.  What lens do you see it from?
17       A   So I believe -- so threats exist
18  regardless of whether or not there is an enforcement
19  action being taken place -- or taking place.  What
20  I'm saying is that this is relevant from the
21  standpoint that we would not be in a community, we
22  would not be exposed to those threats if these

Page 43

1  policies weren't in place.
2       BY MR. OWENS:
3       Q   Okay.  So you're saying that officers on
4  top of a building at the Broadview facility wouldn't
5  have had to shoot pepper balls or tear gas groups of
6  people if the City of Chicago got rid of these
7  ordinances; is that what you're surmising?
8       MR. GOLDSTONE:  Objection,
9  mischaracterization, argumentative.
10       MR. OWENS:  Form is fine.  I don't need
11  all these things.  We can move on.
12       THE WITNESS:  I don't think those are
13  similar things, sir.
14       BY MR. OWENS:
15       Q   Okay.  It seems to me that -- well, on one
16  hand, the City of Chicago, at least according to
17  you, has ordinances that frustrate cooperation
18  between local policing and ICE, correct?  That's
19  what this paragraph is about, or page is about,
20  right?
21       A   Yes.
22       Q   You agree that regardless of whether or

Page 44

1  not the city has this ordinance, that wouldn't
2  justify violating the Constitution by ICE agents,
3  right?
4       MR. GOLDSTONE:  Argumentative, legal
5  conclusion.
6       BY MR. OWENS:
7       Q   Can we agree on that?
8       A   No, sir.  It implies that the Constitution
9  was violated, sir.
10       Q   Okay.  So it's your position that no ICE
11  agent during Operation Midway Blitz under your
12  supervision violated the Constitutional rights of
13  any protestor, clergy or member of the press,
14  correct?
15       MR. GOLDSTONE:  Objection, misconstrues.
16       THE WITNESS:  No, that's not what I'm
17  saying.  From my -- from my times at the facility, I
18  never witnessed any violations.
19       BY MR. OWENS:
20       Q   Fair.  And let's just -- that's what I was
21  trying to say.
22       So when you were in Chicago at the field

Page 45

1  office, and whether you were downtown in the field
2  or at Broadview, you didn't see what you believe
3  were any violations of the Constitution, correct?
4       A   I did not.
5       Q   All right.  And you didn't see any
6  violations with the First Amendment as it relates to
7  people's right to protest the government, correct?
8       A   I did not.
9       Q   And you didn't see any violations of the
10  4th Amendment as it relates to the prohibition on
11  excessive force being used, correct?
12       A   From any of the times I visited the
13  facility or other locations, I did not see that.
14       Q   Okay.  And you did not see that even in
15  your review of video and evidence and other things
16  that happened while you weren't there, right?
17       A   So I -- ICE -- let me say this.  When ICE
18  -- if there's an ongoing investigation into those
19  things, it would not be ICE reviewing videotape and
20  policing them.
21       Q   Who would be?
22       A   It could be a litany of other agencies.



Page 46

1   The FBI was reviewing some of those.
2       Q   Okay.  So let me -- let me understand a
3   little bit more, and this is actually what the next
4   page is about.  And so I was going to ask you a
5   little bit about the distribution of
6   responsibilities at the Broadview facility itself,
7   okay?
8       A   Okay.
9       Q   What was ICE responsible for, at least
10  while you were there, as it relates to the facility
11  itself?
12      A   So it is an ICE-owned facility.  You know,
13  the care and security of the facility, the
14  processing of individuals, that is essentially what
15  ICE had oversight on.
16      Q   Okay.  Now, when it came to managing or
17  interacting with demonstrators or protestors
18  outside, were those ICE agents primarily responsible
19  for those interactions?
20      A   There were times that ICE was involved.
21  There were times where other agencies were involved.
22      Q   Was there a standard practice about which

Page 47

1   agency would be involved in certain circumstances?
2       A   The situation dictated that.
3       Q   How so?
4       A   There was a large volume of individuals
5   outside the building.  There would be a request for
6   additional support.
7       Q   And when you say a request for additional
8   support, you mean that ICE would make a request for
9   additional support from other federal agencies?
10      A   Federal, state and local.
11      Q   Whose call was it to make if there was a
12  belief that additional support was necessary?
13      A   We had an on-site SRT commander that would
14  review the security posture.
15      Q   What's SRT?
16      A   Special Response Team.
17      Q   And was the -- SRT would have been ICE?
18      A   Yes.
19      Q   Were those officers individuals that you
20  supervised?
21      A   Yes.
22      Q   And can you describe to me more sort of

Page 48

1   generally what -- what distinguishes the SRT
2   officers from other ICE officers who were present in
3   Chicago.
4       A   SRT individuals are ICE officers.  They
5   are a group of individuals that go through
6   specialized training similar to any kind of major
7   city special weapons and tactics teams.  So when
8   they are not performing SRT responsibilities, they
9   are performing regular deportation officer
10  responsibilities.
11      Q   And so kind of like the more heavily
12  trained, heavily armed, advanced, it's kind of like
13  SWAT; is that what you're referring to?
14      A   Well, they are highly trained, highly
15  skilled individuals.
16      Q   Got it.  And so you understand that the
17  SRT members are -- you know, they're -- they have
18  exceptional training when it comes to firing
19  munitions, right?
20      A   They do have high standards.
21      Q   And -- and at least as I understand it,
22  and you can tell me if I'm wrong, that when it comes

Page 49

1   to using things like pepper ball guns, that's
2   something that SRT officers you would expect to have
3   been trained in, right?
4       A   Yes.
5       Q   That's not something that the standard
6   field officers are trained in, right?
7       A   That is correct.
8       Q   And that the SRT officers are also trained
9   in the deployment of tear gas and other riot control
10  measures, correct?
11      A   I believe so.
12      Q   And the SRT members at one point while you
13  were working and supervising in Chicago were
14  positioned on roof -- on a roof of a building,
15  correct?
16      A   Yes.
17      Q   Who made that call?
18      A   That would be the SRT commander.
19      Q   Did you supervise that person?
20      A   Yes.
21      Q   And so you approved of the decision to
22  have officers on the roof of the building shooting



Page 50

1　down at protestors?
2　　　　MR. GOLDSTONE: Objection. You can
3　answer.
4　　　　BY MR. OWENS:
5　　Q　You can answer.
6　　A　So I -- I would say that what I approved
7　of was the appropriate use of force given a
8　situation that would dictate it. We trained our
9　individuals to use force only when there are no
10　reasonable alternatives.
11　　Q　Got it. And in your estimation, there
12　were no reasonable alternatives at some points to
13　having officers or SRT agents on the roof of the
14　Broadview facility, correct?
15　　　　MR. GOLDSTONE: Objection, misconstrues.
16　　　　THE WITNESS: So during every visit I
17　made, I had no objection to the decisions that were
18　being made there.
19　　　　BY MR. OWENS:
20　　Q　Okay. But let's back up then.
21　　　　You were aware that at some point that SRT
22　officers were on the roof of the Broadway facility

Page 51

1　and they shot pepper balls into the crowd there,
2　right?
3　　A　Yes.
4　　Q　And you have no qualms about them -- their
5　decision to -- to do that, correct?
6　　　　MR. GOLDSTONE: Objection, argumentative.
7　　　　THE WITNESS: I think based on the
8　circumstances that I saw in person, yes.
9　　　　BY MR. OWENS:
10　　Q　Sorry, I think I may have had a double
11　negative there.
12　　　　It sounds like you thought that that
13　decision was justified, right?
14　　A　Yes.
15　　Q　Okay. I might have put a double negative
16　in the last question, so my apologies for the lack
17　of clarity there.
18　　　　And that when you were -- now, were you
19　specifically there at Broadview at any times that
20　tear boss -- tear gas was deployed?
21　　A　I don't believe so.
22　　Q　Were you ever actually at the facility

Page 52

1　when pepper balls were shot from the roof?
2　　A　Yes.
3　　Q　When was that?
4　　A　I don't recall the specific dates.
5　　Q　Okay. Is it one of the dates that's
6　mentioned in your declaration?
7　　A　It is possible. I couldn't say with
8　clarity.
9　　Q　Fair enough. I guess we'll get there. So
10　I'm on page number 5 of Exhibit No. 1 of your
11　declaration in this case. And you've got something
12　where you say, "There's increased violence against
13　federal officers."
14　　　　Do you see that in paragraph 14?
15　　A　Yes.
16　　Q　And then it says, "You got law enforcement
17　and non-law enforcement alike who are attempting to
18　go and leave work."
19　　　　And so it sounds like there were
20　protestors that were obstructing the ingress and
21　egress of the officers coming in and out of the
22　facility; is that right?

Page 53

1　　A　That is correct.
2　　Q　And if we go to the next page, is that --
3　that's what's depicted in these pictures; is that
4　right?
5　　A　No, this is a vehicle coming out of a
6　sallyport that was being stopped, not the employees
7　coming and going from the building to the parking
8　lot.
9　　Q　Okay. Were you present when the incident
10　-- when this incident happened that's captured in
11　the two pictures on page number 6 of your
12　declaration?
13　　A　I don't believe so.
14　　Q　Who took these pictures?
15　　A　I don't know the answer.
16　　Q　Who are the agents -- who is the agent
17　with the large gun depicted in that picture?
18　　A　I don't know who that is.
19　　Q　Who is the person driving the car out of
20　the sallyport?
21　　A　I don't know.
22　　Q　Were there any warnings given for people



Page 54

1  to disperse before this picture was taken?
2      A   I don't know.  I wasn't there.
3      Q   The woman in the second picture on the
4  bottom with the glasses and the mask, do you see
5  her?
6      A   Yes.
7      Q   Do you know who that is?
8      A   No.
9      Q   Do you see the tear gas in that picture?
10     A   Well, I see a cloud, yes.
11     Q   Sure.  You see a cloud.  Fair enough.
12         Do you know why that cloud was there at
13  that moment?
14     A   I assume -- I mean, I believe it was a CS
15  cannister.
16     Q   And what's a CS cannister?
17     A   It's a gas cannister.  I don't know the
18  actual -- it's a very long --
19     Q   Yes.
20     A   -- name, but essentially it is used like
21  when crowds become violent and aggressive.
22     Q   For sure.  Can we call it tear gas that --

Page 55

1  so we don't have to try to look up the long CS name?
2  Is that --
3      A   Yes.
4      Q   -- a good way to refer to it, tear gas; is
5  that fair?
6      A   Yes.
7      Q   Okay, great.  So you mention in the next
8  paragraph on your -- in your declaration -- and I
9  should have mentioned this earlier.  I'm going to
10  ask you -- and we have limited time.  I don't have
11  any fancy tricks, so we're just going to go sort of
12  front to back through --
13     A   Sure.
14     Q   -- lots of this.  If you need time to look
15  at anything that I ask you about, take the time that
16  you need.  But since this is something that you
17  signed yesterday and we have limited time, I'm just
18  going to plow through.  But at any point, if you
19  want to look at this or another document, let me
20  know, okay?
21     A   Okay.
22     Q   All right.  So in paragraph number 15, you

Page 56

1  describe incidents that happened allegedly on
2  September 6, 2025.
3      Q   Do you see that?
4      A   Yes.
5      Q   Were you present at the Broadview facility
6  September 6, 2025?
7      A   I don't believe so.
8      Q   What is the basis for the facts that
9  you've included in the paragraph 15 in this
10  declaration?
11     A   I believe this was activity that was
12  documented on our end.
13     Q   From whom?
14     A   The individuals that would have been
15  involved.
16     Q   Okay.  So when you say that this activity
17  was documented, what mechanisms were there for
18  documenting activity that existed at Broadview
19  between August and October?
20     A   There -- there's a reporting requirement
21  that goes into play for uses of force and things of
22  that nature.  They go to our ICE headquarters for

Page 57

1  review.
2      Q   And what was that -- is there like a
3  document system, or how did that work?
4      A   There is.
5      Q   Can you describe that, please.
6      A   The acronym is UFAD.  I think it's the use
7  of force -- I'll be honest, I don't know the other
8  two letters.
9      Q   Fair enough.  It's government.  Is it
10  U-F-A-T?
11     A   A-D.
12     Q   A-D.  Okay.  And so what types of
13  information have to be recorded in the use of force
14  system that -- U-F-A-D?
15     A   So a UFAD reporting would essentially be
16  anything where a hard technique is utilized.
17     Q   What's a hard technique?
18     A   For example, if -- if officers had to use
19  physical control activity, if officers had to use a
20  baton to control an individual.  So things --
21  anything that would go above -- a soft technique
22  would be starting at the most basic officer presence

**MAGNA**
LEGAL SERVICES

Page 58

1    endpoint.
2        Q    A command could be a soft technique?
3        A    Correct.
4        Q    So hard techniques may -- start with like
5    going hands on, right?
6        A    Well, I mean, there's no start.  I mean,
7    the force is based off of the requisite activity,
8    right?  If somebody pulls a firearm or starts
9    driving towards you, there's no, you know, kind of
10   start soft and go --
11       Q    Fair.  Fair enough.  I understand.  Hard
12   techniques include tear gas, right?
13       A    I don't know for --
14       Q    Hard techniques include pepper spray?
15       A    I don't know that.
16       Q    Hard techniques include pepper balls?
17       A    That would be in the same category, but I
18   don't know that.
19       Q    Well, pepper spray is different than the
20   guns that shoot, like the paint ball gun things,
21   right?
22       A    Yes.

Page 59

1        Q    Okay.  And you agree that the pepper ball
2    guns -- or how do you refer to them?
3        A    Yes, pepper ball gun.
4        Q    Okay, we'll call them a pepper ball gun.
5    That's an impact munition, right?
6        A    Not -- it's not designed from that
7    standpoint.
8        Q    Well, you could shoot somebody with it
9    directly, right?
10       A    Yes.
11       Q    And it's designed to have pepper balls be
12   shot on the ground and sort of release the pepper to
13   disperse people, right?
14       A    Yes.
15       Q    But if misaimed, it could be used to shoot
16   somebody in the -- right, in their body?
17       A    Yes.
18       Q    And it could hit somebody in the head,
19   right?
20       A    I mean, yes.
21       Q    You know that happened at Broadview,
22   right?

Page 60

1        MR. GOLDSTONE:  Objection, misconstrues.
2        BY MR. OWENS:
3        Q    You -- you're -- are you aware that people
4    have been shot in the face or their torso by pepper
5    ball guns at Broadview?
6        A    Yes.
7        Q    And you agree that that's not the designed
8    purpose for those guns, right?
9        MR. GOLDSTONE:  Objection, misconstrues.
10       THE WITNESS:  No, it's not.
11       BY MR. OWENS:
12       Q    All right.  So we're ask -- we were just
13   discussing a little bit about the -- do you call it
14   UFAD or U-F-A-D?
15       A    UFAD.
16       Q    Okay, UFAD system.  And anything that
17   would be a hard control use of force should be
18   reported in that system; is that correct?
19       A    Yes.
20       Q    Okay.  And deadly force, like using a
21   firearm, would count, right?
22       A    Yes.

Page 61

1        Q    And so I guess I'm wondering, going back
2    to paragraph 15, you said that there was some
3    information that you reviewed.
4        Are you able to tell me at all what
5    information it was that you reviewed that supports
6    the claim that, you know, somebody puffed his chest
7    out and acted aggressively towards the officer?
8    It's on the 7 -- the top of page 7.
9        A    You said -- it would have been in any of
10   the reporting that went forward.
11       Q    Fair to say that you don't have personal
12   knowledge of this incident, correct?
13       A    Yes.
14       Q    Now you -- and just sticking with page 6
15   and 7 here, if individuals, protestors or
16   demonstrators were in front of the cars blocking,
17   you know, and impeding a federal agent, that's
18   something that they could be arrested for, correct?
19       A    If they are forcibly obstructing, yes.
20       Q    Now, in paragraph number 16, you talked --
21   you discussed -- and again, take as much time as you
22   need to -- to address it -- you indicate that there



Page 62

1  were tires slashed, there were moving cars that were
2  vandalized, et cetera.
3      Do you see all that information?
4      A   Yes.
5      Q   Are you aware of any instance in which
6  tear gas is deployed due to -- during the process
7  because somebody was slashing the tires of a car?
8      A   I am not aware.
9      Q   Are you aware of pepper ball guns being
10  shot at somebody or a group of people perhaps who
11  were involved in slashing the car tires?
12      A   I am not aware.
13      Q   In -- on page number 7 in paragraph --
14  between 16 and 17, there's a picture here.
15      Do you see that?
16      A   Yes.
17      Q   Who took that picture?
18      A   According to this, it says Paul Goyette.
19      Q   Well, you've sort of beat me to it.
20      How do you know that Paul Goyette took
21  that picture?
22      A   I -- I don't.

Page 63

1      Q   Why does it say, "Credit Paul Goyette" in
2  that picture?
3      A   I don't know, sir.
4      Q   Who is the agent in that picture?
5      A   I don't know that either.
6      Q   Were you present when this picture was
7  taken?
8      A   No, sir.
9      Q   Do you know what this picture depicts?
10      A   No.
11      Q   And we'll talk a little bit more about
12  this, but where is this car coming out of?
13      A   This appears to be coming out of the
14  sallyport at the Broadview location.
15      Q   Got it.  So same place as the other
16  pictures that we just reviewed?
17      A   Yes.
18      Q   Paragraph number 17, you say -- or excuse
19  me -- you declare that individuals accosted nearby
20  businesses.
21      Do you see that?
22      A   Yes.

Page 64

1      Q   And one of the employees had their own
2  vehicle vandalized, right?
3      A   Yes.
4      Q   What business had its employees accosted?
5      A   I don't know the specific business, but
6  there's a building on Harvard Street that is
7  adjacent.
8      Q   Do you know the type of business it was?
9      A   I believe it was a pest control.
10      Q   And so tell me about the conversation you
11  had with the owner of the pest control business.
12      A   I did not have a conversation with the --
13  the owner.
14      Q   What's the basis for the claim here that
15  individuals accosted employees of a nearby business?
16      A   The local business owners had requested
17  ICE assistance when we had vehicles damaged.  The
18  local PD that responded also was alerted.  So we --
19  we learned from the PD as well.
20      Q   Got it.  And just to be -- so your -- just
21  to be clear about this, as it relates to the events
22  that are described allegedly in paragraph number 17,

Page 65

1  that's not something that you were personally a part
2  of, right?
3      A   Actually, I personally had my tires
4  slashed as I was driving out of the building.
5      Q   That was paragraph 16.  We -- already
6  -- your tires were slashed, right?
7      A   I believe this is a different incidence,
8  but yes.
9      Q   Okay.  I'm asking about paragraph 17,
10  about whether or not you had any interactions with
11  individuals who -- or excuse me -- with business
12  owners who said that they were accosted by
13  protestors.
14      A   I did not.
15      Q   Did you review a report from the Broadview
16  Police Department about that?
17      A   I did not.
18      Q   What's the basis for including this in
19  your declaration?
20      A   Because this was part of the investigation
21  that's ongoing in the damage to our vehicles.
22      Q   Okay.  Can you be a little bit more



Page 66

1 specific. Is there a document or a report? How do
2 you know about this?
3    A   The FBI is investigating it.
4    Q   Did you have a conversation with somebody
5 at the FBI? Did you read a report authored --
6    A   Yes.
7    Q   Okay. Who did you talk to?
8    A   To the acting SAC at that particular time,
9 the special agent in charge.
10    Q   Who was that?
11    A   Luke Rothaar, I think.
12    Q   Do you know the spelling on the last name?
13    A   I think it's R-o-t-h-a-a-r.
14    Q   So let's -- in September of 2025, as there
15 were increased demonstrations, protests and things
16 like that, you understood that many of the protests
17 were related to and expressing dissent about the
18 increased enforcement operations in Midway Blitz,
19 correct?
20    A   The protestors were protesting a multitude
21 of things and that was put out on their social
22 media. Some were protesting "Free Palestine." So I

Page 67

1 cannot attest to what the protestors were
2 specifically there for.
3    Q   Well, you certainly knew some of them did
4 not approve of ICE or Midway Blitz or rounding up of
5 people in Chicago and roving patrols by CBP,
6 correct?
7         MR. GOLDSTONE: Objection, argumentative.
8         THE WITNESS: The social media contexts,
9 it showcased disdain for the mission.
10         BY MR. OWENS:
11    Q   Yeah. And you saw that on the ground when
12 you were there as well, right?
13    A   Yes.
14    Q   You saw signs that said, "Fuck ICE,"
15 right?
16    A   Yes.
17    Q   You saw vandalism that said, "Fuck ICE,"
18 right?
19    A   Yes.
20    Q   You saw lots of protest that was
21 indicating disapproval with the mission, right?
22    A   Yes.

Page 68

1    Q   And you understood that people were there
2 -- that press members were there reporting on those
3 events, correct?
4    A   Yes.
5    Q   And you did see press while you were
6 there, right?
7    A   Yes.
8    Q   Did you see religious observers while you
9 were there?
10    A   I did not.
11    Q   Did you ever see -- now, earlier in your
12 testimony today you mentioned that there had been
13 protests. You correctly mentioned that there had
14 been protests and demonstrations at the Broadview
15 facility before you were assigned there on an
16 interim basis.
17         Were you aware that some of those involved
18 prayer vigils that had been going on for over a
19 decade?
20    A   Well, I was aware that some of those
21 included prayer vigils. I could not attest to the
22 duration.

Page 69

1    Q   Fair enough. You just know that there
2 were prayer vigils and other religious exercises
3 that occurred at that facility predating your
4 presence there?
5    A   Yes.
6    Q   So in paragraph number 18 you indicate
7 that there was damage to these downspouts.
8         Do you see that?
9    A   Yes.
10    Q   Who conducted that damage?
11    A   We do not know that yet.
12    Q   Do you have video surveillance of this
13 happening?
14    A   There is video surveillance.
15    Q   Of a person committing an act of violence
16 on this downspout?
17    A   I can't -- I don't know that.
18    Q   Okay. Well, let's take a step back then.
19 There is video surveillance at the Broadview
20 facility, correct?
21    A   Correct.
22    Q   Did you specifically review video



Page 70

1 surveillance as it relates to trying to identify who
2 might have damaged this downspout?
3   A  No.
4   Q  Are you aware of whether the person was a
5 protestor?
6   A  I am not.
7   Q  Are you aware of whether the person was --
8 oh, actually, strike that.
9      Are you aware of whether it was a person
10 at all who broke this?
11  A  No.
12  Q  You said in this paragraph here at the top
13 of page 8 that "The vandalism that's included in
14 multiple locations, 'Fuck ICE,'" and then "BSSA's
15 external plumbing systems were destroyed by
16 individuals when they broke off plumbing and
17 downspouts."
18     Do you see that?
19  A  Yes.
20  Q  So I see in this picture the -- or in
21 these pictures rather, the two -- two images of what
22 appear to be the same thing.

Page 71

1      Are those the same thing?
2   A  I don't know.
3   Q  Okay.  Well, you used the word "plumbing
4 and downspouts," so I'm wondering if they're
5 separate things that you're talking about, or is
6 this just two pictures of the same item.
7   A  I believe there were additional downspouts
8 that were damaged.
9   Q  Okay.  Who took these pictures?
10  A  I don't know that.
11  Q  Do you know if they were taken by an
12 officer?
13  A  I don't know.
14  Q  Do you know when they were taken?
15  A  I don't know.
16  Q  And again, you don't know how this damage
17 occurred to this -- to the plastic pipes that are
18 included in these pictures, right?
19  A  I specifically do not, but it's being
20 investigated.
21  Q  Okay.  Have you read any reports about --
22 on the -- the -- the nature of that investigation?

Page 72

1   A  No, sir.
2   Q  Since you've been dispatched back to
3 Virginia, have you had any involvement in ongoing
4 enforcement activities in Chicago?
5   A  No.
6   Q  And --
7      MR. GOLDSTONE:  One moment.  I don't mean
8 to break your --
9      MR. OWENS:  We're good.
10     MR. GOLDSTONE:  -- stream.  It has been
11 about an hour.
12     MR. OWENS:  Yeah.
13     MR. GOLDSTONE:  And I would like to offer
14 our deponent an opportunity just to take a break.
15     MR. OWENS:  Absolutely.  Let's take a --
16 let's take a break.
17     MR. GOLDSTONE:  Sure.
18     THE VIDEOGRAPHER:  Off the record.  The
19 time is 11:48.
20     (A brief recess was taken.)
21     THE VIDEOGRAPHER:  We're going back on the
22 record.  The time is 12:02.

Page 73

1      BY MR. OWENS:
2   Q  Mr. Hott, right, did I pronounce that
3 correctly?
4   A  Yes.
5   Q  Okay.  So we're on page number 9 of your
6 declaration, paragraph number 20, where you describe
7 an incidence that allegedly occurred on September
8 19, 2025.
9      Do you see that?
10  A  Yes.
11  Q  All right.  First question is, were you
12 present at Broadview on September 19, 2025?
13  A  I don't recall.
14  Q  Were you present for any of the incidents
15 described in paragraph 20 of your declaration?
16  A  I don't -- I don't believe so.
17  Q  What's a long-range acoustic device?
18  A  It's essentially a device that can -- has
19 the capability of playing large sounds, you know,
20 direction, things of that nature.
21  Q  Is it something that could be used to get
22 a crowd of people warnings to disperse or warnings



19  (Pages 70 to 73)

Page 74

1 that force is about to be used?
2     A   Yes.
3     Q   Is that what it's designed for?
4     A   It has multiple purposes, but I don't know
5 exactly.  But the design requirement was that that's
6 generally how it's used by the agency.
7     Q   Got it.  And ICE had at least one
8 long-range acoustic device as of September 19, 2025
9 at the Broadview facility?
10    A   Yes.
11    Q   Did that device ever break?
12    A   I'm not aware of that.
13    Q   Was that device ever removed from the
14 Broadview facility?
15    A   I'm not aware of that.
16    Q   Did you ever give a command or an order
17 that people stop using the long-range acoustic
18 device to provide caution or other warnings to
19 protestors or demonstrators?
20    A   No.
21    Q   Are you aware of any other agent or
22 officer who gave a command that the long-range

Page 75

1 acoustic device not be used at Broadview to provide
2 warnings to protestors of the possible arrest and
3 use of chemical agents?
4     A   I'm not aware of that.
5     Q   Can you tell me why the long-range
6 acoustic device wasn't used on September 26, 2025?
7     A   I don't know that it wasn't used.
8     Q   Can you tell me that it was?
9     A   No.
10    Q   Can you tell me any other date beyond
11 September 19, 2025, according to paragraph 20 of
12 your declaration, where a long-range acoustic device
13 was used to caution protestors of possible arrests
14 and use of chemical agents?
15    A   I don't know.
16    Q   And now, how do you know that a long-range
17 acoustic device was used on September 19th?
18    A   That was based on reporting.
19    Q   What reporting?
20    A   Reporting from our employees on the ground
21 there.
22    Q   So like a use of force report, or what

Page 76

1 type of a document are we looking at here?
2     A   No, it's not a formal report.  It was
3 notification that it was being deployed.
4     Q   Somebody told you that personally?
5     A   Yes.
6     Q   Who is that?
7     A   The deputy field office director.
8     Q   Who's that?
9     A   Shawn Byers.
10    Q   Okay.  You indicate here in the middle of
11 your -- of the paragraph, and I want to just direct
12 your attention to it, where you -- where your
13 declaration says, quote, "Several protestors were
14 arrested for assault, obstruction and trespassing
15 that day, including for pepper spraying a federal
16 officer, kicking an officer, deliberately tripping
17 an officer," et cetera, et cetera.
18        Do you see that sentence?
19    A   Yes.
20    Q   Okay.  And there are a lot of incidents
21 that are alleged to have occurred here.
22        Were you present for any of them?

Page 77

1     A   I did see an officer get punched.  I did
2 see an officer get kicked.
3     Q   On September 19, 2025?
4     A   I don't know the date.
5     Q   Okay.  So you're saying you saw an officer
6 get punched and an officer get kicked at some point,
7 right?
8     A   Yes.
9     Q   When you saw those things, was tear gas
10 deployed?
11    A   No.
12    Q   When you saw those things, was a pepper
13 ball gun used to shoot people?
14    A   I have seen the pepper ball deployment.
15    Q   When you saw those things, a pepper ball
16 was deployed when an officer was kicked or punched
17 --
18    A   No.
19    Q   -- or you just saw a pepper ball gun be
20 deployed generally?
21    A   I have seen the pepper ball gun deployed
22 generally.  I have not seen it in direct response to



Page 78

1    an assault.
2        Q    Thank you.  You say that -- in your
3    declaration that "There was an incidence where
4    somebody was pulling the face mask and personally"
5    -- "and forcefully ripping off an officer's beard."
6        Do you see that?
7        A    Yes.
8        Q    What does that mean?
9        A    Well, there was an officer that was
10   wearing a gas mask and a protestor had ripped the
11   gas mask off.  This officer had a large beard.  They
12   grabbed it and forcefully ripped the beard out of
13   his chin.
14       Q    His beard was ripped off of his face?
15       A    Yes, a good portion of it.
16       Q    Okay.  Did you take any pictures of it?
17       A    I did not.
18       Q    Did somebody else?
19       A    I'm not aware.
20       Q    How do you know that this happened?
21       A    From the officer reporting it.
22       Q    Okay.  Who is he?

Page 79

1        A    I don't recall the officer's name.
2        Q    Was it somebody that you were familiar
3    with before you began work on Midway Blitz?
4        A    No.
5        Q    Do you know whether a report was written
6    about this incident?
7        A    I don't know that.
8        Q    Do you know whether or not the person who
9    allegedly ripped off an officer's beard was charged
10   with a crime?
11       A    I don't know that specifically.
12       Q    Okay.  Same paragraph.  You indicate that
13   -- that protestors also shot fireworks toward
14   officers stationed outside and you cite a "Block
15   Club" article, right?
16       A    Yes.
17       Q    Sorry.  Next -- next -- great.  And then
18   you see footnote 4 and then the citation at the
19   bottom, it says, "Photos available at Block Club
20   Chicago."
21       Do you see that?
22       A    Yes.

Page 80

1        Q    And do you have any reason to doubt that
2    the pictures that the "Block Club" journalists or
3    that were posted on "Block Club's" website
4    accurately depict what took place at the scene?
5        A    Without looking at the "Block Club"
6    article, I couldn't say that.
7        Q    Well, you wouldn't have cited the article
8    in a sworn declaration under penalty of perjury if
9    you didn't think that it accurately depicted what
10   was happening at the scene, right?
11       MR. GOLDSTONE:  Objection, argumentative.
12       THE WITNESS:  I'm saying I don't have the
13   article in front of me, sir, to reference at this
14   point.
15       BY MR. OWENS:
16       Q    I understand.  I'm asking a different
17   question.
18       My question is, because this is a
19   declaration that you've signed under penalty of
20   perjury, under oath, just like the oath that you
21   gave today, you wouldn't have included this in your
22   declaration under penalty of perjury if you had

Page 81

1    reason to doubt the veracity of the images that were
2    shown here, correct?
3        MR. GOLDSTONE:  Objection, argumentative.
4        THE WITNESS:  I believe these photos were
5    pulled from that website, yes.
6        BY MR. OWENS:
7        Q    And again, you wouldn't post photos or
8    have sworn to the photographs if you thought they
9    were doctored or fake or inaccurate, right?
10       A    I would not --
11       MR. GOLDSTONE:  Objection, argumentative.
12       THE WITNESS:  I would not swear to
13   something I did not believe was accurate.
14       BY MR. OWENS:
15       Q    You take your oath seriously?
16       A    I do.
17       Q    And you understand that oath is the same
18   as whether or not you're testifying in court at a
19   deposition or in a declaration, right?
20       A    I do.
21       Q    Page number 10, what does this depict?
22       A    I believe this is a protestor that was



Page 82

1  throwing objects towards the officers.
2    Q   Okay.  Why is this included in this
3  declaration?
4    A   It was placed there because it supports in
5  paragraph 20 where I talk about rocks, potatoes and
6  other objects being thrown at law enforcement.
7    Q   I see.  Okay.  And do you know if the
8  incident depicted on this, what looks like still
9  images from a Tik Tok video, was that September
10 19th?
11   A   I don't know the date from the images.
12   Q   Was this particular person arrested?
13   A   I don't know that.
14   Q   Have you watched the full Tik Tok video
15 from which these images arise?
16   A   I don't believe so.
17   Q   Sir, are you aware of whether or not there
18 were people sitting around peacefully and protesting
19 when this person threw that item?
20   A   I do not know.
21   Q   Are you aware of whether or not pepper
22 ball guns were used to shoot at the crowd of people

Page 83

1  peacefully protesting because one person threw a
2  rock?
3    A   I don't believe that pepper balls would be
4  used on peaceful protestors.
5    Q   And you agree that pepper ball guns
6  shouldn't be used to shoot at peaceful protestors,
7  right?
8    A   It is my experience that that has not
9  occurred.
10   Q   I understand that.  You deny that it
11 occurred, but you agree that it also should not --
12       MR. GOLDSTONE:  Objection.
13       BY MR. OWENS:
14   Q   -- occur, correct?
15       MR. GOLDSTONE:  Asked and answered.
16       MR. OWENS:  Excuse me.  Don't interrupt
17 me.
18       BY MR. OWENS:
19   Q   You agree that that should not occur,
20 correct?
21       MR. GOLDSTONE:  Objection.  Asked and
22 answered.

Page 84

1        THE WITNESS:  No.  Based on policy, you
2  know, those items are used only when there's no
3  other alternative.
4        BY MR. OWENS:
5    Q   Thank you.  Page 11, you see the images
6  here?
7    A   Yes.
8    Q   Were you present when these images were
9  taken?
10   A   No.
11   Q   And I just -- this may just be something
12 I'm failing to understand, as I understand -- I just
13 want to make sure I understand your declaration,
14 because in paragraph 20, you talk about the morning
15 of Friday, September 19th.
16       Do you see that?
17   A   You said, I'm sorry, paragraph 21?
18   Q   No, 20, going backwards.
19   A   Okay.
20   Q   Yeah.  And then you've got the images that
21 we just discussed, and then these images follow.
22       Do you see that?

Page 85

1    A   Yes.
2    Q   So can you tell me whether these images at
3  night relate to paragraph 20 about the 19th, the
4  paragraph 21 about the 20th, or something else?
5    A   I don't know when those photographs were
6  taken, on which date.
7    Q   Okay, thank you.  The next in your
8  declaration you describe -- and I'm here on page 11
9  and paragraph 21.
10       Do you see that?
11   A   Yes.
12   Q   Were you present for any of the events
13 that you described having occurred in paragraph
14 number 21?  And just for clarity, it goes on from
15 page 11 to page 12.
16   A   I was present for the officer who was
17 elbowed in the jaw.  I believe I was inside the
18 building when that occurred and saw it from the
19 closed circuit television.
20   Q   Okay.  Where did that occur sort of at --
21 on the, I guess for lack of a better word, campus
22 there?



Page 86

1     A   So that occurred directly coming out of
2  the sallyport.  There was a vehicle attempting to
3  come out and the officer was asking a protestor to
4  move out of the way.
5     Q   I know that you -- you mentioned earlier
6  that you were -- primarily your office was in the
7  federal building downtown.
8         How much time did you spend at Broadview
9  generally when you were participating as a
10 supervisor in Midway Blitz?
11    A   I was probably at least once a week,
12 sometimes two or more times per week.
13    Q   And when you would go, would you be there
14 5, 10 minutes or stay for a few hours?
15    A   It would be several hours.
16    Q   And you said there was closed circuit
17 television there?
18    A   Yes.
19    Q   And does that closed circuit television
20 depict what's happening on the surveillance cameras?
21    A   I'm not sure -- sorry.
22    Q   No, no, I appreciate it.  I'm just trying

Page 87

1  to understand whether or not there are two reporting
2  systems or one.
3         And so earlier you mentioned that there's
4  surveillance video outside of Broadview, right?
5     A   Yes.
6     Q   And I'm wondering, when you said you're
7  observing some of these incidents from the closed
8  circuit television, whether that's the same
9  surveillance camera or if that's a different,
10 separate additional system?
11    A   So there were two separate pieces of that
12 puzzle, right?  I think the State Police have put up
13 cameras on -- at temporary poles out in parking
14 lots, and our closed circuit television feeds into
15 its own server.
16    Q   Okay.  And the ICE closed circuit
17 television would also be the surveillance footage of
18 outside of the building?
19    A   Correct.
20    Q   And ICE maintains its own server for that?
21    A   That's correct.
22    Q   Okay, thank you.  So what happened to the

Page 88

1  person who physically elbowed an officer in the jaw
2  after the officer directed the protestor to move
3  aside?
4     A   I don't believe there was any action taken
5  on that.
6     Q   Was that person arrested?
7     A   I don't recall that.
8     Q   And I take it, given the testimony you've
9  already given today, that no tear gas was deployed
10 during that incident, correct?
11    A   No.
12    Q   Or sorry, that was a poor question.  Was
13 any tear gas deployed during that incident?
14    A   No.
15    Q   So and this is -- I'm going to -- I'm on
16 page 12, but it's still paragraph 21, because you
17 describe a different sort of set of events there at
18 the top of the page.
19        Are you with me?
20    A   Yes.
21    Q   Great.  So you indicated that a protestor
22 approached a government vehicle and attempted to

Page 89

1  slash the tires with what appeared to be a knife.
2         Do you see that?
3     A   Yes.
4     Q   And were you present for this?
5     A   I don't believe so.
6     Q   Was the person who attempted to slash the
7  tires, were they tear gassed?
8     A   I don't know that.
9     Q   Were they pepper sprayed?
10    A   I don't know that.
11    Q   Were they shot with a pepper ball gun?
12    A   I don't know.
13    Q   Did you review the reports from this
14 incident?
15    A   No.
16    Q   So if there's a separate report, ICE
17 report that says that it was not the person who was
18 arrested that allegedly sprayed an unknown chemical
19 irritant at the ICE officers, would you have any
20 reason to dispute the ICE report that says that?
21    A   I'm sorry, could you repeat that.
22        MR. GOLDSTONE:  Hypothetical.



Page 90

1          MR. OWENS:  It's not hypothetical.  It's
2   real.
3          BY MR. OWENS:
4      Q    But I'll clarify it for you.  So the
5   sentence that you have here in the last paragraph of
6   page 21 says, quote, "As ICE officers approached to
7   effectuate his arrest, the protestor sprayed an
8   unknown chemical irritant at the ICE officers,"
9   correct?
10     A    Yes.
11     Q    And the person that you're referring to to
12  effectuate his arrest is the person who attempted to
13  slash the vehicle's tires, correct?
14     A    Yes.
15     Q    One of your -- the reports that we've read
16  indicates that it wasn't the person who was being
17  arrested, but somebody else who attempted to spray a
18  chemical irritant at the ICE officers.
19         Would you be able to tell me whether or
20  not your declaration is correct or what's in that
21  ICE report is correct?
22     A    I do not know.

Page 91

1      Q    No problem.  Paragraph 22.  Well actually,
2   let's -- we'll -- we'll -- for -- for time's sake,
3   we'll just -- we'll skip that.  I don't get to do
4   all the things that I want to ask you about today.
5          Paragraph 23, you say here that "The
6   weekends of September 12th, the 14th and 19th, the
7   21st, were particularly violent."
8          Do you see that?
9      A    Yes.
10     Q    And protestors would throw bottles, rocks
11  and other objects at officers and even cannisters of
12  chloroben -- I can't even pronounce that.  We
13  already decided we weren't going to try to say that
14  word today, but CS gas, right?
15     A    Yes.
16     Q    Which they brought and would throw at
17  federal officers at BSSA, which is the Broadview
18  facility, correct?
19     A    Correct.
20     Q    And then you say, "CS is a form of tear
21  gas generally used for crowd control," right?
22     A    Yes.

Page 92

1      Q    And then you indicate that there's photos
2   available at "USA Today" and et cetera, et cetera.
3   The address goes on in footnote 5 here, correct?
4      A    Yes.
5          MR. OWENS:  Can we mark this as Exhibit 2,
6   please.
7          (Hott Deposition Exhibit No. 2 was marked
8   for identification.)
9          MR. OWENS:  So I apologize, we only have
10  two copies of this, so obviously the witness can
11  have one.  I'll give you one.  I will pull this up
12  on my computer.
13         MS. BARAJAS:  We do.
14         MR. OWENS:  You have it?
15         MS. BARAJAS:  Yeah.
16         MR. OWENS:  Great.
17         BY MR. OWENS:
18     Q    So sir, do you see Exhibit No. 2 here?
19     A    Yes.
20     Q    Right.  And so just -- just to understand,
21  paragraph 23, you're talking about protestors
22  throwing bottles, rocks and other things and even

Page 93

1   CO2 cannisters at officers, correct?
2      A    CS cannisters.
3      Q    Oh, excuse me, CS cannisters, right?
4      A    Yes.
5      Q    That's what that paragraph is about, it's
6   about threats to officers that include people
7   throwing things, right?
8      A    Yes, sir.
9      Q    All right.  Do you see the first picture
10  in the article?
11     A    Yes.
12     Q    And do you agree with me that that's not
13  showing anybody throwing tear gas at officers?
14     A    It does not depict it.
15     Q    All right.
16         MR. OWENS:  Go to the next picture.
17         BY MR. OWENS:
18     Q    And you agree with me that the next
19  picture shows somebody wearing an Elmo costume and a
20  penguin costume?
21         MS. BARAJAS:  Cookie Monster.
22         MR. OWENS:  Oh, is that Cookie Monster?



Page 94

```
 1        BY MR. OWENS:
 2     Q   Not Elmo.  I apologize.  A Cookie Monster
 3  costume and a penguin costume on their way to
 4  demonstrate at Broadview, correct?
 5     A   I believe so.
 6     Q   And you agree with me that that does not
 7  show somebody throwing CS gas at any officers,
 8  correct?
 9     A   Correct.  But those are also different
10  dates than what you mentioned.
11     Q   Okay.  Well, it's actually what you
12  mentioned in your declaration, right?
13     A   Right, but you were referencing September
14  12th and the 19th, so I'm saying you were asking me
15  about September 13th and this says October 11th and
16  October 12th.
17     Q   For sure.  We'll get there, I promise.
18  But it's your declaration that cites this article,
19  correct?
20     A   Correct.
21     Q   All right.  So after, sorry, Cookie
22  Monster, the next picture shows some counter
```

Page 95

```
 1  protestors, right?
 2     A   I don't know.
 3     Q   Well, you see the guy in the MAGA hat?
 4     A   Yes.
 5     Q   All right.  You see the caption too,
 6  right?
 7     A   Yes.
 8     Q   You had -- but at any rate, you agree with
 9  me that this picture doesn't show somebody throwing
10  CS gas at any federal agent, right?
11     A   I don't see a CS cannister.
12     Q   All right, next, scrolling down, do you
13  see the next picture?
14     A   Yes.
15     Q   It says -- and it's got a person -- of a
16  woman who has a sign -- picture or a banner that
17  says, "Father, forgive them for they know not what
18  they do."  Do you see that?
19     A   Yes.
20     Q   And you understand that's a reference to
21  what Jesus said on the cross before he was
22  crucified, right?
```

Page 96

```
 1     A   I don't know that reference.
 2     Q   Okay.  Maybe not in your tradition, but at
 3  any rate, you agree with me that that sign -- that
 4  woman with that sign does not indicate any -- that's
 5  not a picture of somebody throwing CS gas at a
 6  federal officer, correct?
 7     A   It does not appear so.
 8     Q   All right, next picture in this article
 9  shows demonstrators, you know, to be -- to be frank,
10  in Little Village, right, at least according to the
11  byline, right?
12     A   Yes.
13     Q   And, you know, even though it's Little
14  Village and it's on a different day, that picture
15  also doesn't show anybody tossing something that
16  looks like tear gas at any federal officer, correct?
17     A   Well, I would also say that it does not
18  appear to be ICE, even though it's categorized as
19  ICE.
20     Q   Right.  And those are Border -- CBP
21  agents, right?
22     A   Well, I mean, I can't make it out from
```

Page 97

```
 1  here, but I don't believe they're ICE.
 2     Q   And -- and the likely agents to have been
 3  doing enforcement activities in Little Village in
 4  early October as part of Operation Midway Blitz
 5  would be BCP, correct, most probably?
 6     A   Yes.
 7     Q   All right.  Going down to the next
 8  picture, you see this picture includes some ISP
 9  officers with batons pushing on some protestors,
10  correct?
11     A   Yes.
12     Q   And that, of course, as well, doesn't
13  include any image of a protestor or demonstrator
14  throwing OC -- or excuse me -- CS gas at a federal
15  agent, correct?
16     A   Well, those are state employees.
17     Q   Right.  Doesn't even include federal
18  employees at all, right?
19     A   Correct.
20     Q   Okay.  Scrolling down to the next picture,
21  you agree with me that a picture of a man holding an
22  American flag cleaning water out of his -- using
```



Page 98

1  water to clean his eyes does not depict somebody
2  throwing CS gas at a federal agent, correct?
3      A   No, it does not.
4          MR. OWENS:  Keep going down.
5          BY MR. OWENS:
6      Q   For time, I'm going to skip through the
7  next couple of pictures, because there is a picture
8  of a man --
9          MR. OWENS:  That's it, stop there.
10         BY MR. OWENS:
11     Q   -- the last one, which is -- is also the
12  picture that's included in your declaration, right?
13     A   Sorry.  Oh, this one.  Yes.
14     Q   You see the guy in the blue plaid shirt
15  with the gloves?
16     A   Yes.
17     Q   All right.  Is it your testimony or
18  contention that this person appears to be throwing
19  CS gas at a federal officer?
20     A   Well, I don't know the context that led up
21  to this moment.
22     Q   Okay.  Is it your contention that this

Page 99

1  person appears to be throwing CS gas at a federal
2  officer?
3      A   I do not see that.
4      Q   So paragraph number 24 -- we're done with
5  Exhibit 2 and we'll go back to Exhibit 1.  Thank
6  you.
7          Paragraph 24 of your report, sir, you
8  indicate that -- you're talking about firing CS
9  cannisters into the crowd.  I apologize.
10         Do you agree that care should be taken or
11  that -- and I believe that you said this earlier, is
12  that using CS gas -- gas in a crowded situation
13  should be, you know, last -- last resort if there
14  aren't other reasonable alternatives, right?
15     A   I think what I said was our use of force
16  policy indicates that force should be a last resort.
17     Q   Got it.  Do you believe it's dangerous to
18  -- do you agree with me that it would be dangerous
19  to throw tear gas cannisters over crowds of -- over
20  the heads of people?
21         MR. GOLDSTONE:  Objection, speculation.
22         THE WITNESS:  It depends on where it was

Page 100

1  thrown, but I don't necessarily agree with it.
2          BY MR. OWENS:
3      Q   Well, there'd be a risk of hitting
4  somebody in the head with a tear gas can.
5          That'd be pretty dangerous, right?
6      A   Well, any thrown object could be
7  dangerous.
8      Q   Sure.  And a thrown object and a gas --
9  because those gas cannisters, they heat up, right,
10  as -- after they're deployed, right?
11         MR. GOLDSTONE:  Objection, speculation.
12         THE WITNESS:  There is a chemical
13  reaction.
14         BY MR. OWENS:
15     Q   Right, but the cannisters themselves get
16  physically hot so they can't be held for some time
17  while the gas is emitting, right?
18     A   Well, they do get hot.  I've seen people
19  hold them while they're -- I've seen protestors pick
20  them up after they've been deployed and throw them
21  back.
22     Q   Right.  Or kick them back, right?

Page 101

1      A   Correct.
2      Q   And I guess what I want to understand is,
3  so if tear gas is thrown into a group of people who
4  don't have the ability to go anywhere, should they
5  just stand there in the gas or not -- or should kick
6  it on the ground away from them?  What would you
7  expect them to do?
8          MR. GOLDSTONE:  Objection, speculation.
9          THE WITNESS:  I think the expectation from
10  a law enforcement standpoint is if a direction is
11  given to move back, to move out of the way, that the
12  individuals that are obstructing are compliant with
13  those orders.
14         BY MR. OWENS:
15     Q   Okay.  So I just want to understand from a
16  law enforcement perspective, and I appreciate you
17  adding that phrase, is what the expectation is once
18  you use tear gas as a dispersal mechanism.
19         Is it supposed to -- people are supposed
20  to flee more quickly; is that the idea?
21     A   The intent is to move individuals out of
22  that -- that area.



Page 102

1    Q   Okay.  And now, if they're in a
2  residential area or an area in which they cannot,
3  you know, leave quickly, what do you expect them to
4  do?
5         MR. GOLDSTONE:  Objection, speculation.
6         BY MR. OWENS:
7    Q   Form a law enforcement perspective.
8    A   Well, ICE has not deployed in the Chicago
9  area any CS cannisters in a residential
10  neighborhood.
11    Q   Sure.  I guess that -- and I'm not going
12  to have a big fight with you about whether or not
13  Broadview's a residential or quasi-residential or
14  any of that, but you're saying that ICE hasn't
15  deployed any tear gas outside of the Broadview
16  facility; is that what you're saying?
17    A   Yes.
18    Q   Okay.  But ICE has deployed tear gas where
19  there have been large crowds of people, correct?
20    A   ICE has deployed CS cannisters at the
21  Broadview location when the crowd was violent and
22  obstructive.

Page 103

1    Q   Okay.  And so from a law enforcement
2  perspective, you would anticipate when there's a
3  crowd, gas is deployed, they should run away, right?
4    A   The expectation is to disperse, yes.
5    Q   Okay, thank you.  So another one of your
6  declarations, I'm not sure if we'll have time to get
7  through today, focuses on the fence that was put up
8  at Broadview, right?  You're aware of that?
9    A   Yes.
10    Q   And you're aware -- you -- was it your
11  call to put up the fence?
12    A   Yes.
13    Q   Why did you put up the fence?
14    A   After the violent weekends that we saw the
15  second and third weekends of September, the need to
16  escort employees who were not law enforcement to and
17  from the building, the vandalism, the fence was
18  intended to keep the violent protestors away from
19  the direct egress and ingress points of the
20  building.
21    Q   And is it fair to say the boiling point
22  for you and your determination about whether to

Page 104

1  install the fence was the planned protests involving
2  what was potentially up to 800 people who wanted to
3  form, you know, a ring of people around the
4  building?
5         MR. GOLDSTONE:  Objection, argumentative.
6         THE WITNESS:  No, it was the aggressive
7  nature, the increasingly aggressive nature and
8  violent activity from the protestors that were
9  on-site.
10         BY MR. OWENS:
11    Q   Okay, so at least the way I read your
12  declaration, you can tell me where I went wrong, is
13  that in paragraph 26, the way I read this is that
14  you indicate that you're aware of social media
15  efforts to gather a crowd of 800 to create a human
16  wall, correct?
17    A   Yes.
18    Q   You understood that those organizers
19  intended their demonstrations to be nonviolent,
20  correct?
21    A   No.
22    Q   What's that?

Page 105

1    A   No, I don't know the intent of the
2  organizers.
3    Q   Oh, I thought you did understand -- we'll
4  come to that in a minute.
5         You understood that the intent of the
6  organizers, at least the published intent of the
7  organizers, was to create a human wall, right?
8    A   I believe the -- well, let me read this
9  really quickly.
10    Q   Yeah, absolutely.
11         (The witness examined the document.)
12         THE WITNESS:  Okay, sir.
13         BY MR. OWENS:
14    Q   Okay.  At least the way I read your
15  declaration was that you understood that the
16  organizers of this event about the 800-person
17  potential human wall intended it to be a nonviolent
18  demonstration, correct?
19    A   So again, I can't speak to the organizers'
20  intent.  What I can say is that this was a
21  contributing factor in some of the decision-making
22  on the fence, along with, as I mentioned, the

MAGNA
LEGAL SERVICES

1   increasingly aggressive and violent tactics we were
2   seeing at the facility.
3       Q   You understood that the organizers had at
4   least publicly instructed participants to remain
5   nonviolent, yes?
6       A   They do say nonviolent in this.
7       Q   And that's what you've sworn to in a
8   declaration that you signed yesterday.  Quote,
9   "Although the organizers instructed participant" --
10  "potential participants to remain nonviolent and not
11  impede ICE operations."
12          You understood that, correct?
13      A   I'm sorry, where --
14      Q   Paragraph 26, second sentence, first
15  clause.
16      A   Yes.
17      Q   That was your understanding yesterday,
18  right, when you signed this?
19      A   Yes.
20      Q   That was your understanding in September
21  when you -- when this contributed to your decision
22  to erect the fence, correct?

1       A   Yes.
2       Q   All right, paragraph -- pages -- excuse
3   me, page 14 and 15 of your declaration includes
4   pictures of social media images, right?
5       A   Yes.
6       Q   And those social media images are about
7   organizing this 800-person human wall, right?
8       A   Yes.
9       Q   Those images, you understood that the
10  point of this demonstration was to protest the
11  Midway Blitz and the aggressive enforcement action
12  that was occurring, right?
13      A   Again, I can't speak to the intent of the
14  organizers or --
15      Q   Well, you understood what the words are on
16  these social media posts that you've included in
17  your sworn declaration, right?
18      A   Yes.
19          MR. GOLDSTONE:  Objection, argumentative.
20          BY MR. OWENS:
21      Q   Okay.  You also understand that those
22  words say that "Our community's under siege in the

1   past two weeks.  Nearly 550 people across the
2   Chicago area were arrested in Operation Midway
3   Blitz, a federal crackdown that has torn families
4   apart and instilled fear in our neighborhoods."
5           You knew about that stuff, right?
6       A   Yes.
7       Q   You knew that that was the viewpoint and
8   perspective of the demonstrators, that they were
9   opposed to those arrests, right?
10      A   This is by one individual, sir.  You're
11  saying -- so Michael Ford, according to this, wrote
12  this posting.  I'm saying Michael -- I don't know if
13  Michael Ford is the organizer.  I don't know if
14  there are additional organizers.
15      Q   You don't know Michael Ford personally,
16  right?
17      A   No.
18      Q   But you were aware of this social media
19  information, right?
20      A   Yes.
21      Q   You took it seriously, right?
22      A   I did.

1       Q   And you have reason to believe, based upon
2   your involvement in Operation Midway Blitz and
3   seeing what you describe, increasing protests at the
4   area, you had every reason to believe that this is
5   the thing that could have occurred, right?
6       A   I'm sorry.
7       Q   Sorry, that --
8           MR. GOLDSTONE:  Objection.
9           BY MR. OWENS:
10      Q   -- the 800-person human wall and a
11  demonstration that could have very well likely
12  occurred, right?
13      A   Yes.
14      Q   And that is part of why -- and part of why
15  you made the decision to erect the fence, correct?
16      A   Yes.
17      Q   All right.  You're not saying today that
18  you didn't take these social media posts seriously,
19  are you?
20      A   I'm saying today that this was a
21  contributing factor to the decision-making.
22      Q   Okay, thanks.  I think I might have

Page 110

```
 1    misunderstood.
 2         So we're going to talk about September
 3    26th and 27th in some more detail later once we get
 4    our social media -- or our media set up.
 5         But my first question is, were you present
 6    at Broadview on September 26th for the events that
 7    you describe in paragraph 27 of your declaration?
 8      A   I don't believe I was.
 9      Q   Were you present on September 27th for the
10    events that you describe in paragraph 28 of your
11    declaration?
12      A   I don't believe so.
13      Q   So we'll go forward.  Paragraph -- and
14    I'll just -- I'll just narrate it as we're going
15    through.  So in all fairness, paragraph 29 is also
16    about the 27th and the 28th.
17         Do you see that?
18      A   Yes.
19      Q   And now I want to ask about paragraph 30.
20    Do you see that?
21      A   Yes.
22      Q   What's an Aztec death whistle?
```

Page 111

```
 1      A   It's a high-pitched device.  I think it
 2    puts out some significant decibel levels, creates
 3    kind of a very piercing sound to kind of mimic
 4    screaming individuals, and it's used in these
 5    particular protests to hurt the hearing of anyone
 6    who is within that distance.
 7      Q   Okay.  Why did you mention Aztec death
 8    whistles in -- sorry, strike that.
 9         When you were at Broadview, did you ever
10    hear or see somebody use an Aztec death wishal --
11    whistle, I apologize.
12      A   Yes, sir.
13      Q   You did?
14      A   I did.
15      Q   How many times?
16      A   I would say at least once.
17      Q   And what happened?
18      A   I'm not sure.  I mean, there was no action
19    taken on the individual.
20      Q   Okay.  Is -- are you -- so I just want to
21    understand, was this a rampant thing that was
22    occurring at Broadview, Aztec death whistles?
```

Page 112

```
 1      A   Yes.
 2      Q   Okay.  And so how do you know that it was
 3    a rampant thing that was occurring again and again?
 4      A   Again, from reporting from our
 5    on-the-ground folks that --
 6      Q   And where did you get that reporting?
 7      A   I believe that was verbal reporting, sir.
 8      Q   Do you have an estimate about how many
 9    reports you received of Aztec whistle -- whistles,
10    death whistles being used on protestors there?
11      A   I don't know offhand.  I know the FBI put
12    out a law enforcement bulletin on this as well.
13      Q   Right.  I'm just talking about things that
14    you experienced or were told about at Broadview.
15      A   Right.
16      Q   And I think that you said it was used
17    pretty regular there, right?
18      A   Yes.
19      Q   And are you suggesting that it would be a
20    crime to use an Aztec death whistle?
21      A   It potentially could be, sir.
22      Q   Like a crime against one protestor against
```

Page 113

```
 1    the others that were standing next to them?
 2      A   It could be assault on any individual.
 3      Q   By blowing a whistle?
 4      A   Yes.
 5      Q   Okay.  And these particular whistles were
 6    so rampant.
 7         Were any arrests made for using these
 8    Aztec vessels -- whistles that you're aware of?
 9      A   I don't know that.
10      Q   Have you ever seen an arrest report for
11    somebody arrested for, I guess, employing an Aztec
12    death whistle on a federal agent?
13      A   I can't say I have.
14      Q   Did you receive any reports of officers
15    having hearing loss or other ear injury due to the
16    rampant use of Aztec death whistles at the Broadview
17    facility during Operation Midway Blitz?
18      A   I don't believe so.
19      Q   I'd like to ask you a few questions about
20    the Secretary's visit at Broadview on October 3rd,
21    okay?
22      A   Okay.
```

Page 114

1    Q   So -- and I'm just going to ask you a few
2  questions apart from your declaration for a minute
3  and then we'll get into it, okay?
4    A   Sure.
5    Q   So when did you first learn that the
6  Secretary of Homeland Security was coming to
7  Broadview?
8    A   I think it probably was either a few days
9  or a week before.  It was a very short amount of
10 time.
11   Q   Did you speak with her?
12   A   I did.
13   Q   Before she arrived?
14   A   No.
15   Q   When did you speak with Secretary Noem?
16   A   When she arrived at the Broadview location
17 on the 3rd.
18   Q   Who did she arrive with?
19   A   She traveled with a party of individuals,
20 Secret Service, and I think Corey Lewandowski.
21   Q   Did she have any media with her?
22   A   I believe she did.

Page 115

1    Q   Do you know Benny Johnson?
2    A   Yes.
3    Q   And was he with her?
4    A   He was with the party.  I don't remember
5  if he was traveling with her directly.
6    Q   Now, before Secretary Noem arrived on
7  October 3rd, had you allowed other media to be
8  present at Broadview sort of from the inside?
9    A   We did.
10   Q   Who did you allow to be present on the
11 inside?
12   A   I don't recall offhand.  We did
13 ride-alongs with ABC, NBC, CBS, Fox, a lot of
14 different outlets, so I don't recall specifically.
15   Q   Okay.  And that was during Midway Blitz?
16   A   Yes, sir.
17   Q   So did -- and I apologize.  I forgot to
18 ask you about this earlier.
19        What was your level of coordination with
20 Chief Bovino during your time as a supervisor during
21 Midway Blitz?
22   A   So generally we would meet on a weekly

Page 116

1  basis for about an hour.
2    Q   At some point did CBP start participating
3  in more enforcement activities or arrests or detail
4  at Broadview?
5    A   I would -- I'm not -- let me just say, CBP
6  was running a parallel track.  So as I mentioned on
7  the front end, because we are the agency that kind
8  of accepts all -- that manages the detention and
9  removal piece, any arrests that CBP would make on
10 the Title 8 side would be in process at Broadview.
11   Q   Okay.  And I guess what you had described
12 in your declaration is that there were -- additional
13 support was needed given some of the protests that
14 were happening at Broadview, right?
15   A   That's correct.
16   Q   Did CBP participate in that -- some of
17 those efforts before or outside of October 3rd?
18   A   Yes.
19   Q   And when was that?
20   A   I don't recall those specific dates.
21   Q   Is there any document or e-mail or
22 communication that you're aware of that would

Page 117

1  reflect when CBP was on scene facilitating with
2  interacting with civilians or protestors?
3    A   I have not seen that.
4    Q   You said you would meet with Chief Bovino
5  about weekly?
6    A   Yes.
7    Q   Would you -- did you e-mail with him at
8  all?
9    A   I think infrequently I have e-mailed him.
10   Q   Text message with him at all?
11   A   No text messaging.
12   Q   Phone calls?
13   A   Probably several phone calls.
14   Q   And CBP was present on October 3rd,
15 correct?
16   A   Yes.
17   Q   Were you aware that they were going to be
18 there?
19   A   Yes.
20   Q   And why were they there?
21   A   Well, I mean, with the Secretary coming to
22 town, we had all the federal partners on-site there.

MAGNA
LEGAL SERVICES

Page 118

1  Q  And how long was Secretary Noem at
2  Broadview?
3  A  I want to say several hours.
4  Q  Did you meet with her personally then?
5  A  Yes.
6  Q  And what did you discuss?
7  A  We discussed the Broadview situation, the
8  Midway Blitz, things of that nature.
9  Q  Were you present when she spoke to a group
10 of people with Chief Bovino -- looked like mostly
11 Border Patrol agents -- before they were deployed on
12 her exit?
13 A  I was near that location, yes.
14 Q  And were you -- was there any discussion
15 about once Secretary Noem was there and needed to
16 leave, that there are multiple ways that she could
17 have left?  Was there any discussion about what the
18 best way was to get her out of there?
19 A  Well, I mean, there was really only one
20 egress point from there.
21 Q  What was that?
22 A  Harvard Street.

Page 119

1  Q  Why was Beach Street unavailable?
2  A  There was a fence.
3  Q  The fence you erected?
4  A  Yes, sir.
5  Q  Okay.  So at that point, it's your
6  testimony, the only way to -- to get Secretary Noem
7  out of there was, rather than opening the fence, was
8  to go down Harvard Street?
9  A  I mean, we could have opened the fence,
10 yes.  There was a gate in the fence.  But the path
11 of least resistence was Harvard Street.
12 Q  Were there protestors on Beach Street?
13 A  Yes.
14 Q  Were there protestors on Harvard Street?
15 A  Yes.
16 Q  So there were -- so in your testimony, it
17 didn't matter which way you went in terms of Harvard
18 or Beach as an -- as it relates to the presence of
19 civilian protestors?
20 MR. GOLDSTONE:  I'm going to object.  I
21 think we're beginning to impinge on --
22 MR. OWENS:  What's that?

Page 120

1  MR. GOLDSTONE:  I think we're beginning to
2  impinge on questions of executive discretion or
3  deliberation.
4  MR. OWENS:  Okay.  Are you instructing him
5  not to answer?
6  MR. GOLDSTONE:  Repeat the question and
7  then I'll instruct him.
8  BY MR. OWENS:
9  Q  The question was whether or not there were
10 protestors on Beach Street and whether or not there
11 were protestors on Harvard Street?
12 MR. GOLDSTONE:  That's fine.  I'm just
13 warning you ahead of time if we start to stray into
14 those areas --
15 MR. OWENS:  Sure.
16 THE WITNESS:  So yes, there were.
17 BY MR. OWENS:
18 Q  Okay.  And I think that -- why was it, in
19 your view, that Harvard Street was, as you said
20 already, the path of least resistence?
21 A  So that is not an ICE decision.  That's a
22 Secret Service call for the Secretary's travel.

Page 121

1  Q  Did you have any input on that decision?
2  A  No, sir.
3  Q  All right.  We're going to try to show you
4  this video.  I hope it is -- I hope it works.  And if
5  we have some problems, we'll make do.  So this is
6  the --
7  MS. BARAJAS:  We -- I'm plugging it in.
8  Just one second, because I want to get set up before
9  doing all that.
10 THE VIDEOGRAPHER:  Counsel, do you want to
11 go off the record briefly and I can help?
12 MR. OWENS:  Do you need --
13 MS. BARAJAS:  I don't -- I can try.  Just
14 join the --
15 (Pause)
16 BY MR. OWENS:
17 Q  All right, are you able to see that?
18 A  No, sir.
19 Q  Are you able to see that?
20 A  Not yet.  There -- I see something, yes.
21 Q  Wonderful.  All right, let's -- now,
22 before we start, you see there's an image here of

**MAGNA**
LEGAL SERVICES

Page 122

1 Secretary Noem and with some camouflaged agents, a
2 giant truck tank thing and Mr. Bovino off to the
3 right.
4      Do you see that?
5    A   Yes.
6    Q   Okay.  You mentioned a moment ago you were
7 nearby where this occurred.
8      Where were you?
9    A   I think fixing this particular video, I
10 would have been off to the Secretary's left.  You
11 know, there was a large contingent of security and
12 employees around her.
13   Q   Okay.  You were present and you could hear
14 her speak though, right?
15   A   No, sir.
16   Q   Oh, you couldn't?
17   A   No.
18   Q   Could you hear Mr. Bovino speak when he
19 spoke?
20   A   No.
21   Q   Okay.  So what were you doing?
22   A   I was on the back side of that, sir,

Page 123

1 interacting with our employees as well.
2    Q   So were you just not paying attention to
3 this conversation; is that what you're saying?
4    A   That's correct.
5    Q   Okay.  When did you first become aware of
6 this video?
7    A   I don't recall exactly.
8    Q   You've seen it?
9    A   I believe -- well, I mean, I assume it's
10 one video, but without seeing it --
11   Q   Well, let's watch it together.
12   A   Yes, sir.
13     (Video played.)
14     (Video stopped.)
15     BY MR. OWENS:
16   Q   So you've seen that video before?
17   A   Yes, I have.
18   Q   And it's your testimony today under oath
19 that you didn't hear the words that Secretary Noem
20 said during that conversation, correct?
21   A   That's correct.
22   Q   Did you hear what Chief Bovino said about

Page 124

1 rolling up and having a free arrest zone?
2    A   No, sir.
3    Q   Were your officers, your ICE officers
4 under your command, did they participate in the exit
5 from that fenced-in area out into the community
6 where the crowd was?
7    A   They did.  But let me --
8      (Interference.)
9      THE WITNESS:  Sorry.  Our employees were
10 involved only after we received a call from ISP for
11 additional assistance.  So we were not part of the
12 primary exit plan.
13     BY MR. OWENS:
14   Q   So as I understand your testimony, there
15 was an exit that happened, so probably almost
16 immediately after this video, right?
17   A   I don't know when she left, but --
18   Q   Okay.
19   A   -- presumably shortly after.
20   Q   Well, there's a big crowd of people and
21 you saw them leave, right?
22   A   No, I did not.

Page 125

1    Q   Okay.  Where did you go?
2    A   I was inside dealing with other matters at
3 that time.
4    Q   Okay.  And some amount of time passed,
5 right?
6    A   Presumably.
7    Q   Yeah.  And well, that's when you were
8 called by ISP.  You weren't called by CBP to deal --
9 to deal with the protestors or people outside.  You
10 were called by ISP afterwards, right?
11   A   That's correct.
12   Q   Okay.  Now, going back to Exhibit No. 1,
13 your declaration from this case, paragraph 31, you
14 indicate a few things in this paragraph.  And I want
15 to just give you the opportunity to read it.  I'm
16 going to ask you, you say sort of, as we already
17 discussed, there were a bunch of people there
18 conducting crowd control.  And then you say, "At one
19 point, a line of federal agents moved forward to
20 push the crowd out of the roadway."
21     Do you see that?
22   A   Yes.

MAGNA
LEGAL SERVICES

Page 126

1      Q   "Multiple verbal commands were issued by
2  federal agents to move back in order to facilitate a
3  safe distance away from the vehicles and federal
4  agents securing the area to allow operations to
5  proceed."
6        Do you see that?
7      A   Yes.
8      Q   Well, I thought you just told me that you
9  weren't out there when this occurred, right?
10     A   I was not, sir.
11     Q   I thought you just told me that ICE agents
12 weren't out there when this occurred?
13     A   That's not accurate.  I said ICE was
14 called, but they were not part of the initial egress
15 plan.
16     Q   Okay.  So the sentence that you're
17 describing here about a line of federal agents
18 moving forward seems to describe conduct by federal
19 agents, not ISP.
20       What am I missing?
21     A   ISP was at the corner of 25th and Harvard
22 Street, where Harvard Street meets Beach Street.

Page 127

1  That was where CBP and the other federal entities
2  were opening the gate and controlling that egress
3  point.
4      Q   Okay.  So just so I'm totally clear, it's
5  your testimony that this is -- strike that.
6        How long after Secretary Noem began to
7  depart that this occurred?
8      A   Well, I believe this -- you know, the
9  agents moving forward was when the Secretary was
10 departing.
11     Q   Okay.  So let me just -- ask you this way.
12 The two sentences that I just read --
13     A   Yes.
14     Q   -- from your declaration, what's the basis
15 for you swearing to these things under oath?
16     A   It's an account of what transpired during
17 that time.
18     Q   Who is that account provided to you by?
19     A   The other agencies that were involved in
20 this through the unified command post that was
21 established.
22     Q   Okay.  Did you personally observe any of

Page 128

1  these incidents yourself?
2      A   I personally observed the significant
3  level of protestors on both streets.
4      Q   Right.  But I'm -- what I'm asking is did
5  you see -- or strike that.
6        Did you hear multiple verbal commands be
7  issued by federal agents?
8      A   No, sir.
9      Q   And do you -- who was it who told you that
10 this occurred?
11     A   This would have come through, as I
12 mentioned, our unified command.
13     Q   Right, but unified command is not a human
14 being.  So who told you this?
15     A   I don't specifically recall the
16 individual, sir.
17     Q   All right.  What's the basis for the --
18 your sworn testimony here that quote, "For the
19 protestors who refused to comply, federal agents
20 followed up with physical nudges or pushes"?
21     A   This goes to the belief that we did have
22 some violent protestors and protestors that were

Page 129

1  assaultive or forcibly obstructing.
2      Q   I'm a little confused.  The sentence that
3  you wrote indicates that federal agents pushed
4  protestors who refused to move.
5      A   Yes, a refusal to comply does fall into
6  obstruction, sir.
7      Q   Right, so a refusal to comply is violence;
8  is that your testimony?
9      A   No, that's not what my testimony is.  I'm
10 saying that the protestors who refused to comply
11 were pushed or nudged.
12     Q   Fair enough.  Okay.  So you got here a
13 sentence about "upon being pushed."
14       So this -- as I read this, you're saying
15 the protestor was pushed by a federal agent,
16 correct?
17     A   I'm sorry?
18     Q   It was the very next sentence.
19     A   "Upon being pushed"?
20     Q   Do you see that?
21     A   Yes.
22     Q   And you're referring to the protestor

MAGNA
LEGAL SERVICES

Page 130

1  being pushed, right?
2      A   Correct.
3      Q   "One disruptive male protestor pushed and
4  assaulted Border Chief Patrol Gregory Bovino, who
5  then fell forward."
6          Do you see that?
7      A   Yes.
8      Q   Who is the disruptive male protestor that
9  pushed and assaulted Border Patrol Chief Gregory
10 Bovino?
11     A   I don't know his name, sir.
12     Q   Did you see this occur?
13     A   I saw the video of it, sir.
14     Q   Oh, you saw a video of it?
15     A   Yes.
16     Q   Okay, perfect.  Let's just make sure that
17 we're talking about the same video.
18         (Mr. Owens conferred with Ms. Barajas.)
19         BY MR. OWENS:
20     Q   So we'll play about the first 30 seconds
21 of this, and the question is, is this the video that
22 you were just referring to.

Page 131

1          (Ms. Barajas conferred with Mr. Owens.)
2          BY MR. OWENS:
3      Q   Are you able to see the image there?
4      A   Yes.
5      Q   Okay.  And we'll just play about the first
6  30 seconds of this, and the question is whether or
7  not this is the video you were referring to.
8      A   Okay.
9          (Video played.)
10         THE VIDEOGRAPHER:  You're sharing your
11 folder, not the video.
12         THE WITNESS:  I see the video.
13         MS. BARAJAS:  You see the video?
14         THE VIDEOGRAPHER:  Oh, I don't see that.
15         MR. OWENS:  If you've got it and you've
16 got it, I say we just move forward, or is that going
17 to --
18         THE VIDEOGRAPHER:  Yeah, on Zoom you can't
19 see the video.  You can only see the folder.  So if
20 you just share the video -- because what happened
21 is, I know he sees it, but we can't see all we want
22 to.

Page 132

1          MR. OWENS:  Go back down.
2          THE VIDEOGRAPHER:  So just reshare.
3          MR. OWENS:  Stop your sharing.  You need
4  to stop -- stop sharing or just share that video.
5  Perfect.
6          MS. BARAJAS:  Oh.
7          MR. OWENS:  There we go.  All right.
8          BY MR. OWENS:
9      Q   Again, the question is, is this the video
10 you're referring to?
11     A   Yes, sir.
12         (Video played.)
13         (Video stopped.)
14         BY MR. OWENS:
15     Q   Is that the video that you're referring
16 to?
17     A   I don't recall specifically, but it's in
18 that vein.
19     Q   Okay.  Same incident, fair to say?
20     A   Yes.
21     Q   Okay.  And it's your testimony under oath
22 that that -- that that incident involved a

Page 133

1  disruptive male protestor pushing and assaulting
2  Border Patrol Chief Gregory Bovino and that Mr.
3  Bovino then fell forward, correct?
4      A   Yes.
5      Q   So just really briefly, paragraph 32.
6      A   Hmm-hmm.
7      Q   I'm wondering generally, did you at ICE
8  during your time in Midway Blitz, did you have folks
9  or staff or yourself monitor social media or other
10 -- engage in other investigation of the protestors
11 themselves?
12     A   No.
13     Q   So the information here, is this paragraph
14 32 about people arriving and leaving together in
15 advance and stuff like that, is that information
16 that was reported to you as opposed to things that
17 you saw personally?
18     A   That is correct.
19     Q   Paragraph 34, you indicate that there's
20 something here that like "Cartels and the Latin
21 Kings have placed $10,000-$50,000 bounties on the
22 murder of immigration officers," right?

MAGNA
LEGAL SERVICES

Page 134

1     A   Yes, sir.
2     Q   And in your declaration, you do refer to a
3   DHS press release.
4         Do you see that in footnote 8?
5     A   Yes.
6     Q   Other than this press release, do you have
7   any basis of knowledge for claiming that cartels and
8   the Latin King's gang have placed bounties on the
9   heads of -- for the murder of immigration officers?
10    A   Yes.
11    Q   What's that?
12    A   There's some classified intel on that,
13  sir.
14    Q   What's that?
15    A   It's classified.
16    Q   This is an attorney's only confidential
17  proceeding.
18        MR. LYNCH:  No.  No, objection.
19        MR. GOLDSTONE:  No.  No, objection.
20        MR. LYNCH:  We're going to instruct him
21  not to answer anything that's classified.
22        MR. OWENS:  You don't have to scream.

Page 135

1   It's --
2         MR. LYNCH:  Well, I'm not on the mic, so
3   --
4         MR. OWENS:  Got it.  Yeah, yeah, so let's
5   only have one person talk at a time.
6         MR. GOLDSTONE:  It's classified
7   information.  We're not satisfied attorney's eyes
8   only will suffice.
9         MR. OWENS:  Okay, very good.
10        MR. GOLDSTONE:  It will also be covered by
11  executive privilege if need be.
12        MR. OWENS:  Are you going to instruct him
13  not to answer the question?
14        MR. GOLDSTONE:  At this point, if you're
15  asking him to characterize that class of
16  information, yes, I'm instructing --
17        MR. OWENS:  Absolutely.
18        MR. GOLDSTONE:  -- him not to answer.
19        MS. AGARWAL:  I'm just -- I'm making a
20  record.
21        MR. GOLDSTONE:  That's fine.
22        MR. OWENS:  Thank you.

Page 136

1         BY MR. OWENS:
2     Q   All right, let's move on to paragraph
3   number 35.
4     A   Yes, sir.
5         (Ms. Barajas conferred with Mr. Owens.)
6         THE VIDEOGRAPHER:  Two hours, 16 minutes.
7         MR. OWENS:  Oh, thank you.  I appreciate
8   it.
9         BY MR. OWENS:
10    Q   Paragraph 35.
11    A   Okay.
12    Q   All right.  So you indicate that
13  protestors have followed vehicles often up to 50
14  miles to photograph license plates and occupants of
15  vehicles?
16        What's the basis for that claim?
17    A   Actually, we were running vehicles from
18  the Broadview location to a location in Indiana, a
19  number of vehicles that followed the entire way.
20  When our vehicle stopped, protestors got out and
21  tried to actually get into some secure areas along
22  the way and a local police department was called.

Page 137

1     Q   Were you there for that?
2     A   No.
3     Q   Okay.  So you're saying that this is
4   another thing that was reported to you, right?
5     A   Yes, sir.
6     Q   Okay.  I want to draw your attention to
7   the next paragraph, or excuse me, end of this
8   paragraph, which is about doxing of officers.
9         Do you see that?
10    A   I'm sorry, you said paragraph 36?
11    Q   Still on 35.
12    A   Oh.
13    Q   The end of the paragraph.
14    A   Yes.
15    Q   Okay.
16        MR. OWENS:  Can we mark this as Exhibit
17  No. 3.  Thanks.
18        (Hott Deposition Exhibit No. 3 was marked
19  for identification.)
20        MR. OWENS:  Thanks.
21        BY MR. OWENS:
22    Q   And now in footnote number 9 to your

**MAGNA**
LEGAL SERVICES

Page 138

1 declaration, you have a website that you refer to
2 here called the ICE list and it's a website that you
3 looked at in the last week, correct?
4 A Yes.
5 Q All right. I guess October 24th would be
6 the last week, right?
7 A Yes.
8 Q Okay. In Exhibit 3, here we've got the
9 ICE List website.
10 Are you familiar with this website?
11 A I have seen it, yes.
12 Q Okay. And it indicates "Real police don't
13 need masks."
14 Do you see that on page 1?
15 A Yes.
16 Q And "Identifying Agents," do you see that?
17 A Yes.
18 Q And then on page 2 it's got like a wall of
19 faces. Do you see that?
20 A Yes.
21 Q And if you go through, some of the faces
22 that are included on this website are here, like

Page 139

1 Lyndon Roan, Sean Hannity, and Ann Coultier.
2 Do you see that?
3 A Yes.
4 Q And this is the site that you put in your
5 declaration for the website that's out there,
6 "Doxing Officers," correct?
7 A Yes.
8 Q You can put that up. Paragraph 36 of your
9 declaration, Exhibit 1, you indicate there's been
10 property damage and then there's a number of
11 pictures of slashed tires, broken windows, et
12 cetera, et cetera, okay? Do you see that?
13 A Yes.
14 Q Are any of these pictures a picture of
15 your car tire that was slashed?
16 A Yes, sir, page 21, the top photograph.
17 Q Okay. And where was the -- your car
18 parked when this happened?
19 A It wasn't parked. I was driving out of
20 Broadview --
21 Q I see.
22 A -- in a caravan and there was an

Page 140

1 individual that jumped on the hood and one that ran
2 around and punctured the tire.
3 Q I see. So these acts of vandalism to
4 federal cars are crimes, right?
5 A Yes.
6 Q Very much so. And the people who commit
7 those crimes could be subject to arrest, right?
8 A Yes.
9 Q None of the people who committed these
10 crimes, to your knowledge, were subjected to tear
11 gas, correct?
12 A I don't know that.
13 Q None of the people who committed these
14 crimes were subject to being shot by pepper ball
15 guns, correct?
16 A I don't know that.
17 Q Do you have any reason to believe that the
18 people who committed any of those acts of vandalism
19 or felonies against federal cars or vehicles were
20 subject to tear gas or pepper ball guns?
21 A I don't know that.
22 Q All right, why don't we take another

Page 141

1 break. It's been about -- it's probably been more
2 than an hour.
3 A Sure.
4 THE VIDEOGRAPHER: Off the record. The
5 time is 1:15.
6 (A brief recess was taken.)
7 THE VIDEOGRAPHER: We are now on the
8 record. The time is 1:27.
9 MR. GOLDSTONE: Before you start, I just
10 want to say for the record that we want to read and
11 sign.
12 MR. OWENS: Oh, sure. Absolutely. No
13 problem. Thank you.
14 BY MR. OWENS:
15 Q So before our last break I asked you a few
16 questions about the portion of your report that
17 indicates that there have been bounties placed out
18 for -- excuse me, your declaration. I apologize --
19 bounties placed out on -- for some federal officers.
20 And I referred you to a paragraph number 34 that
21 says, "Cartels and the Latin Kings gang have placed
22 $10,000-$50,000 bounties on the murder of

MAGNA
LEGAL SERVICES

Page 142

1  immigration officers."  And in this declaration, you
2  cited DHS press release.
3       Are we on the same page?
4       A   Yes.
5       Q   Okay.  What information -- I want to
6  separate this out a little bit.  You have that it's
7  the cartels that have placed bounties between 10,000
8  and 50,000 dollars on the murder of immigration
9  officers.
10      A   That is coming from a classified intel
11 report.
12      Q   Okay.  Well, some of it comes from this
13 press release, right?
14      A   Yes.
15      Q   And then some of it comes from information
16 that you've received over e-mail, correct?
17      A   Yes, I have received e-mail on this.
18      Q   So, for example, we can mark this as
19 Exhibit No. 4.
20      (Hott Deposition Exhibit No. 4 was marked
21 for identification.)
22      BY MR. OWENS:

Page 143

1       Q   And just for the record, this is one of
2  the documents that was produced to us last night.
3  ICE338 is the Bates stamp.
4       A   Yes.
5       MR. LYNCH:  And just for the record, of
6  course, to the extent there is anything that you
7  need to answer involving classified information, we
8  instruct you not to answer that.  You can answer to
9  the extent it's not classified.
10      MR. OWENS:  We're getting there.
11      BY MR. OWENS:
12      Q   Sir, are you familiar with this e-mail?
13 And it does go on to the second page.
14      A   I don't necessarily know this specific
15 e-mail, I don't believe.
16      Q   No -- no problem.  And I just wanted to
17 make sure you, know, because this e-mail has
18 information that some cartels may have placed
19 bounties on federal agents, has -- involved with
20 immigration enforcement.
21      I don't see your name on this e-mail, so
22 this isn't one of the things that you're referring

Page 144

1  to as an additional basis for your declaration,
2  correct?
3       A   Correct.
4       Q   All right.  So now let's go back to your
5  declaration.  And as it relates to cartels, you're
6  relying on this press release, and then you said
7  there's some classified information in addition to
8  that, correct?
9       A   Yes.
10      Q   What is the classified information that
11 you have about cartels having placed bounties on the
12 heads of -- for the murder of immigration officers?
13      MR. GOLDSTONE:  Okay, we're instructing
14 you not to answer.  Objection on the basis it's
15 classified, executive privilege, state secret, law
16 enforcement privilege.
17      BY MR. OWENS:
18      Q   Are you going to take your --
19      MR. GOLDSTONE:  Everything.
20      MR. OWENS:  I get it.
21      BY MR. OWENS:
22      Q   Are you going to take your counsel's

Page 145

1  advice and decline to answer the question?
2       A   Yes.
3       Q   And if I ask you any further questions
4  about any information you have about cartels
5  allegedly putting bounties on -- between 10 and
6  50,000 dollars for the murder of immigration
7  officers, are you going to continue to assert the
8  privilege?
9       A   Yes.
10      Q   All right.
11      A   To the extent it's classified.
12      Q   Right.  And so to the extent -- is there
13 any information that you have that is classified
14 that isn't information that's in this DHS press
15 release that is the basis for your contention that
16 the cartels have placed bounties on the murder of
17 the immigration officers.
18      MR. GOLDSTONE:  I'm sorry, vague and
19 confusing.  Could you please --
20      MR. OWENS:  Sure.
21      MR. GOLDSTONE:  -- restate?
22      BY MR. OWENS:

MAGNA ▶
LEGAL SERVICES

Page 146

1    Q   Other than this press release, is there
2  any nonclassified information on which you are
3  relying for the contention that there are cartels
4  that have put out bounties for immigration officers?
5    A   I believe there are social media postings
6  on this as well.
7    Q   Social media post from who?
8    A   Well, different gang members.
9    Q   Okay.  So it's your testimony that there
10 are gang members who have posted on -- this online?
11   A   Yes.
12   Q   Anything else you're relying on for this
13 contention?
14   A   As I mentioned, there are classified
15 intelligence reports on it.
16   Q   Sure.  As it relates -- now same -- same
17 questions as it relates to the Latin Kings.
18       You're claiming -- now the Latin Kings is
19 a street gang, right?
20   A   Yes.
21   Q   You have never been a gang enforcement
22 officer during your 23-period -- 22-, 23-year period

Page 147

1  with ICE, correct?
2    A   Well, I think from the standpoint that,
3  you know, ICE deals with foreign nationals who have
4  gang affiliation, we do have a role in that aspect.
5    Q   Okay.  Other than this press release,
6  what's the basis for your claim that the Latin Kings
7  have placed bounties on the murder of immigration
8  officers?
9    A   There are also social media postings on
10 this, and as I mentioned, classified intel reports.
11   Q   Okay.  What's the classified intel
12 reports?
13       MR. GOLDSTONE:  And again, I have to
14 object and instruct the client not to answer.
15       BY MR. OWENS:
16   Q   Are you going to follow your attorney's
17 advice and decline to answer the question?
18   A   Yes.
19   Q   If I ask you any further questions about
20 any classified information that you may have for the
21 purported contention that the Latin Kings have put
22 out bounties on the -- for the murder of immigration

Page 148

1  officers, are you going to continue to follow your
2  attorney's advice and not answer?
3    A   Yes.
4    Q   Okay.  And just while we're on the same
5  page here, page 19 of your declaration, paragraph
6  number 36, you say, "The photographs are damage
7  caused by violent protestors."
8        Do you see that?
9    A   Yes.
10   Q   Okay.  And now, I know that you were
11 obviously present for when the -- your car's tire
12 was punctured.
13       Were you present for any of these other
14 instances?
15   A   Let me see the other photos.  No, sir, not
16 from -- not from those photos.
17   Q   So other than the photos that depict your
18 car, what's the basis for your contention that it
19 was, quote, "Violent protestors who committed those
20 acts"?
21   A   The reporting and observations from the
22 officers who were involved.

Page 149

1    Q   Other folks, not yourself, right?
2    A   Yes.
3    Q   So I want to just go forward here.
4  There's a bunch of stuff in your declaration about
5  Portland and Los Angeles and other cities in the
6  country.
7        You don't have any -- it's not your
8  testimony that it was permissible to use tear gas or
9  pepper ball guns against any protestors in Chicago
10 based upon what happened in Portland or Los Angeles,
11 is it?
12   A   No.
13   Q   Moving forward, so you -- and I want to go
14 with you to paragraph 48.
15       Do you see that?
16   A   Yes.
17   Q   Okay.  You talked about an increase in
18 targeting ICE operations spreading across the
19 nation, right?
20   A   Yes.
21   Q   Would you agree that Operation Midway
22 Blitz are the type of targeting that we've seen by

MAGNA
LEGAL SERVICES

Page 150

1   the DHS agents or various agencies going through
2   neighborhoods and picking up landscapers off the
3   street or people at Home Depot is more aggressive
4   than it has been traditionally?
5       MR. GOLDSTONE: Argumentative.
6       THE WITNESS: Well, I mean from an ICE
7   standpoint, our mission has relatively remained the
8   same. We enforce the laws established by Congress.
9       BY MR. OWENS:
10      Q   Right. But at any other point in your
11  experience as -- a federal agent has the -- the
12  administration said, we want to arrest and deport
13  3,000 people in a single year; has that ever been an
14  agency goal before this year?
15      A   There have been other administrations that
16  set expectations from that standpoint.
17      Q   Of the same goal?
18      A   Not the same goal.
19      Q   Okay. The goal now and the enforcement
20  mechanism is higher, right?
21      A   Yes.
22      Q   The resources being given to ICE and other

Page 151

1   agencies for these types of enforcement or, you
2   know, mechanisms is significantly higher than it's
3   ever been, correct?
4       A   Well, what makes it -- there is a -- our
5   separate funding bill from a baseline budget, so
6   there's an increased enhancement bill.
7       Q   Let's just cut to the chase. You agree
8   with me that there's increased protests as the
9   actions of ICE have also continued and CBP have also
10  continued to increase themselves, right?
11      MR. GOLDSTONE: Objection, argumentative.
12      THE WITNESS: There are definitely
13  increased protests.
14      BY MR. OWENS:
15      Q   And those correlate to a similar increase
16  in increased enforcement action in ways that haven't
17  previously occurred generally in our country, right?
18      MR. OWENS: Objection, argumentative.
19      THE WITNESS: Not necessarily, sir.
20      BY MR. OWENS:
21      Q   Okay. Can you give me -- can you identify
22  a time in your career where roving patrols of

Page 152

1   federal agents in masks tear gassed residential
2   neighborhoods in a large city?
3       A   I could not.
4       Q   And I just want to make sure that this is
5   true. I'm moving forward a little bit here to
6   paragraph number 57 of your declaration.
7           You indicate that between October 3rd and
8   October 17th federal officers did not deploy any
9   chemical munitions or less lethal munitions at
10  Broadview, correct?
11      A   Yes.
12      Q   Any reason to doubt that?
13      A   No.
14      Q   All right. So the next paragraph here in
15  your declaration is about the temporary restraining
16  order.
17          Do you see that?
18      A   Yes.
19      Q   You were still at Broadview -- or excuse
20  me, strike that.
21          You were still in Chicago when the
22  temporary restraining order was issued on October 9,

Page 153

1   2025, correct?
2       A   Yes.
3       Q   What did you do to implement the TRO?
4       A   I believe we consulted with counsel and
5   put out a broadcast message to the workforce.
6       Q   What's a broadcast message?
7       A   It's an e-mail that essentially goes to
8   every employee in the Chicago AOR.
9       Q   And AOR, can you help me with that one.
10      A   Sorry. Area of Responsibility.
11      Q   Thank you. And other than sending a
12  broadcast message, how else did you communicate the,
13  if at all, the existence of the TRO to ICE agents?
14      A   The broadcast message was our official
15  notice.
16      Q   Does the broadcast message have like read
17  receipts?
18      A   I don't believe so.
19      Q   Do you have any mechanism for ensuring
20  that any ICE agent read through the entirety of the
21  TRO after receiving the broadcast message, if
22  assuming they received it?

MAGNA ▶
LEGAL SERVICES

Page 154

1    A   No.
2    Q   Was there any kind of roll call where
3  officers were required to acknowledge receipt and
4  having read the TRO when they came into work on a
5  particular day?
6    A   I'm not aware of that.
7    Q   Stuff like that does happen, for example,
8  with training, right, so if you need to get this
9  training, you'll have some acknowledgment that has
10  to be made for training, right?
11    A   If it's required, yes.
12    Q   Okay.  But there was no acknowledgment
13  required for the TRO, right?
14    A   No.
15    Q   Sorry.  Let me -- I added a double
16  negative.  I apologize.  I want to clear up the
17  record.
18      Was there any acknowledgment system that
19  existed for the TRO?
20    A   No.
21    Q   Please describe for me any problems that
22  you had implementing the TRO between October 9th,

Page 155

1  when it was issued, and October 17th, when you were
2  transferred back to Virginia.
3    A   I think based on the fact that we had not
4  had to deploy any munitions is an indication, right,
5  that there really were no challenges in
6  implementing.
7    Q   At -- during your period of time at
8  Broadview -- sorry.
9      Do you agree that it's unconstitutional to
10  arrest people for being opposed to Midway Blitz?
11      MR. GOLDSTONE:  Objection.  Calls for a
12  legal conclusion.
13      THE WITNESS:  No.
14      BY MR. OWENS:
15    Q   Now, I want to ask a little bit about, you
16  know, the period of time once the protests kicked up
17  and SRT started using pepper ball guns and CS gas
18  and things like that.
19      Were there any practices that you are
20  aware of about when SRT believed we're going to
21  deploy tear gas that they had in effect?
22    A   I'm not sure I understand that question,

Page 156

1  sir.
2    A   No problem.  So I know there's a use of
3  force policy, and we're not going to have time to
4  talk about it much today.
5      But I'm wondering if there were other
6  practices that you implemented that you said, okay,
7  I don't want to see tear gas being used in this
8  situation, you know, just as a general practice on
9  the ground.
10    A   I did not issue separate policies, no.
11    Q   Okay.  Did you have any guidance that you
12  provided to the SRT members about any particular
13  munition or use of crowd control device?
14    A   No.
15      MR. LYNCH:  Sir, that was before the TRO,
16  you're saying; that was the question?
17      MR. OWENS:  Yeah.
18      MR. LYNCH:  Okay.
19      MR. OWENS:  Yeah, for sure.
20      BY MR. OWENS:
21    Q   So I'm going to just spend the rest of the
22  17 minutes or so that we have asking about some

Page 157

1  specific incidents that happened at Broadview,
2  because you describe a number in your declaration
3  and I want to make sure that we're on the same page
4  about -- because I believe you said that it was your
5  testimony that you hadn't seen anybody's
6  constitutional rights being violated, right?
7    A   Yes.  I did not see anyone outside of
8  policy.
9    Q   And, of course, it would be outside of
10  policy to violate somebody's constitutional rights,
11  correct?
12    A   Yes.
13    Q   Oh, actually, I forgot.  I forgot one
14  other thing that I need to ask you about before we
15  get to why you believe it was appropriate to pepper
16  spray David Black in the face.
17      MR. OWENS:  But we can mark this as
18  Exhibit No. 5, please.
19      (Hott Deposition Exhibit No. 5 was marked
20  for identification.)
21      MR. OWENS:  And this doesn't have a Bates
22  stamp.  It was a document that was filed in the

Page 158

1    "Illinois v. Trump litigation." There you go.
2    Thank you so much.
3         BY MR. OWENS:
4         So Mr. Hott, after --
5         MR. OWENS:  Copies.
6         BY MR. OWENS:
7         Q    After -- we just finished discussing that
8    after October 3rd there were no more incidents of
9    CO2 being -- or --
10        A    CS.
11        Q    -- CS gas being used, or things like that.
12   And so do you remember -- are you familiar with
13   e-mails that you had with individuals at ISP about
14   their work?
15        A    Yes.
16        Q    Okay.  So I'm going to direct you to the
17   last two pages of this exhibit.  And you'll see here
18   there's, I think, two e-mails, one from Sunday,
19   October 5th from Peter Sukmanowski, and that -- that
20   is to you and some other folks.  And then there's an
21   e-mail that you sent to David Keltner a couple days
22   later.

Page 159

1         Are you familiar that -- with that?
2         A    Yes.
3         Q    Okay.  And so the first thing is I wanted
4    to just see and confirm is that as it relates to Mr.
5    -- is it Sku -- Skumanowski?
6         A    Sukmanowski.
7         Q    Sukmanowski.  Wow.  Samsonite.  I was way
8    off.
9         Sukmanowski, he -- his e-mail describes
10   some events that indicate that no intervention was
11   required with protestors, and it looks to me like
12   he's describing events from Saturday, October 4th;
13   is that correct?
14        A    It appears so.
15        Q    And let's just take a step back.  There
16   was a unified command -- I think that's how you all
17   referred to it -- when ISP came in and started sort
18   of doing the security around the perimeter of the
19   facility.
20        And that was the coordination that
21   happened between federal and state agents, correct?
22        A    Yes.

Page 160

1         Q    And once that unified command occurred,
2    there were no more tear gassings or pepper ball
3    shootings that happened at Broadview while you were
4    there, correct?
5         A    From an ICE standpoint, yes.
6         Q    Yes, from an ICE standpoint, correct.  And
7    it's the assessment of Mr. Suk -- Sukmanowski -- I
8    got it wrong again.  Is that right?
9         A    Yes.
10        Q    That the unified command was effective and
11   it was working and had worked on October 4, 2025,
12   correct?
13        A    Yes.
14        Q    And then by October 7th, and maybe before,
15   you concurred with that recommendation, correct?
16        A    I'm not sure there was a recommendation.
17        Q    I'm sorry.  You concurred with that
18   assessment, that the unified command was effective
19   and was working, right?
20        A    It did -- it was effective.
21        Q    And so you state in your e-mail from
22   Tuesday, October 7th, "From our discussion yesterday

Page 161

1    afternoon, I'm passing along the kudos of one of my
2    on-site managers.  While I echo the sentiment below,
3    I want to add that I enjoyed getting to know and
4    work with you."
5         Do you see that?
6         A    Yes.
7         Q    And when you said you were passing along
8    the kudos of one of your on-site managers, what did
9    you mean by that?
10        A    From the standpoint that the on-site
11   presence of the state and local police resulted in
12   the facility operations continuing unimpeded, I
13   think that's what it was alluding to.
14        Q    Great.  So are you aware of a person named
15   David Black?
16        A    I don't know that name specifically.
17        Q    Are you aware of an individual who was
18   sort of seen in like religious garb getting pepper
19   sprayed in the face?
20        A    Yes.
21        Q    You're familiar with that picture?
22        A    Yes.



Page 162

1    Q   Okay.  Have you seen the video from that
2 incident?
3    A   I have seen that video.
4    Q   Okay.  And have you seen the video of him
5 being shot with pepper balls from agents on the
6 roof?
7    A   I have.
8    Q   And it's your testimony that in seeing
9 that video that the use of force complied with
10 policy and then, of course, the Constitution?
11   A   I would say that, you know, based on the
12 snippets of the video, I don't necessarily have all
13 the context behind it.
14   Q   I understand that.  My question was a
15 little bit different, which is, I believe -- and if
16 your testimony is different now you can, of course,
17 tell me -- that it was your testimony that you
18 hadn't seen anything that you believed was out of
19 policy or violated the Constitution, correct?
20   A   That is correct.
21   Q   And so it's -- it's your testimony then
22 that the video of David Black being shot by a pepper

Page 163

1 ball gun from the roof of the Broadway facility is
2 within policy, correct?
3    A   There's a totality of the circumstances
4 that have to be taken into account, right?  Again,
5 the context is so relevant here.
6    Q   Okay.  Why don't we go ahead and look at
7 this together.
8    A   Sure.
9        (Ms. Barajas conferred with Mr. Owens.)
10       BY MR. OWENS:
11   Q   All right, do you have it on your screen?
12   A   Yes, sir.
13   Q   Wonderful.
14       MR. OWENS:  We good on audio?  Wonderful.
15 Go ahead.
16       (Video played.)
17       (Video stopped.)
18       BY MR. OWENS:
19   Q   Okay.  So the context I see in that video
20 is a pastor with his arms up getting shot in the
21 head with a pepper ball gun.
22       Do you see that too?

Page 164

1        MR. LYNCH:  Objection, argumentative.
2        BY MR. OWENS:
3    Q   Let me ask again.
4        What I saw on that video was a pastor with
5 his arms up getting shot in the head with a pepper
6 ball gun.
7        Did you see that?
8    A   I saw an individual that was -- had his
9 arms up.
10   Q   You don't know him personally.
11   A   No.
12   Q   Right?  You know now that he's a pastor,
13 right?
14   A   I don't know that, sir.
15   Q   Regardless of whether he's clergy or not,
16 in your mind, that was an acceptable use of force by
17 federal agents, correct?
18       MR. LYNCH:  Objection.
19       MR. GOLDSTONE:  Objection, argumentative.
20       THE WITNESS:  So I would say from -- from
21 that snippet of the video -- right again, I don't
22 have the context.  Everything has to be looked at

Page 165

1 from a whole.  Was he -- you know, for example, was
2 he directed to move back?  He appears to be on the
3 Broadview facility property there and not in the
4 public area.
5        BY MR. OWENS:
6    Q   You agree that shooting somebody in the
7 head with an impact munition is a form of deadly
8 force, correct?
9        MR. GOLDSTONE:  Objection.
10       THE WITNESS:  Again, without the context,
11 I don't know what that -- what that is.
12       BY MR. OWENS:
13   Q   Sorry, please just answer my question.
14       My question was do you agree that shooting
15 somebody in the head with an impact munition is a
16 form of deadly force?
17       MR. GOLDSTONE:  Objection.
18       THE WITNESS:  I don't necessarily agree
19 with that, sir.
20       BY MR. OWENS:
21   Q   So you disagree with the ICE policy on use
22 of force that says that using impact munitions

MAGNA
LEGAL SERVICES

Page 166

1  against somebody's head, even if it were technically
2  in the non-lethal thing, could be used at -- could
3  be deadly force?
4      A   That's not what I said, sir.
5          MR. GOLDSTONE:  Objection.
6          BY MR. OWENS:
7      Q   Okay.  So yes or no, using an impact
8  munition to shoot somebody in the head from above is
9  deadly force?
10     A   I don't know that.  That's not a yes or no
11 answer.
12     Q   Okay.  And either way, whether what
13 happened to Mr. Black is depicted in that video as
14 deadly force, non-deadly force, in your mind, it's
15 constitutionally justified, correct?
16     A   Again, I don't know the context behind
17 that.  I can't answer that question.
18     Q   Did you see in that video at least -- I
19 understand you're saying you want more context.  Do
20 you see anything in that video that would show that
21 Mr. Black was posing a threat of -- of imminent
22 bodily harm to one of the agents or others?

Page 167

1      A   Well, again, this all goes to context,
2  sir.  I don't see anything.  Without the additional
3  context a snippet of a video does not play into a
4  use of force.
5      Q   Okay.  Did you -- have you reviewed the
6  surveillance video footage from Mr. Black being shot
7  in the head with a pepper ball gun by a masked agent
8  on top of the Broadview facility on September 19,
9  2025?
10     A   I don't believe so.
11     Q   Why not?
12     A   I wasn't aware of this case.
13     Q   Okay.
14         MR. OWENS:  Why don't we go ahead to the
15 26A video.
16         BY MR. OWENS:
17     Q   And I have -- we're going to look at four
18 different clips from this video from September 26th.
19 And we can go back through your declaration if you'd
20 like, but that's one of the days that you described.
21 Had a big paragraph about the danger to officers.
22 But -- and I know you weren't there for it, so do

Page 168

1  you need to look back at your declaration for
2  context about --
3      A   Sure.
4      Q   -- the day?  Okay.
5      A   You said that was paragraph -- or the
6  26th?
7      Q   There was a paragraph about the 26th,
8  which is on page number 15, paragraph 27.
9      A   Okay.
10     Q   All right.  And so do you remember just
11 generally -- as I said before, you can, of course,
12 feel free to read your declaration.  But that was
13 one of the days in which you indicated there was,
14 you know, violence that happened accord -- from
15 protestors, them throwing things like that, okay?
16     A   Okay.
17     Q   All right.  And so I'm going to ask you
18 about some different incidences that occurred also
19 on September 26th, okay?
20     A   Okay.
21         MR. OWENS:  Can you pull that up.  And
22 I'll make a record at the end about which videos are

Page 169

1  the exhibits we'll append.
2          BY MR. OWENS:
3      Q   All right, before we get started, are we
4  there?
5      A   I see the video.
6          THE VIDEOGRAPHER:  Are you sharing your
7  video now?
8          MR. OWENS:  Okay.
9          MS. BARAJAS:  Hmm?
10         THE VIDEOGRAPHER:  You're sharing your
11 desktop, not the video.
12         THE WITNESS:  I see the video on this end.
13         MR. OWENS:  Yeah.  It will show there, but
14 it's like --
15         MR. GOLDSTONE:  The videographer doesn't
16 have it.
17         THE WITNESS:  I see.
18         MR. OWENS:  Okay.
19         THE VIDEOGRAPHER:  Perfect.
20         MR. OWENS:  Excellent.  All right, let's
21 start it all the way over.
22         BY MR. OWENS:

MAGNA
LEGAL SERVICES

Page 170

1      Q   All right, so you hear -- you see here an
2  individual who's been shot a number of times in the
3  upper body and torso with pepper ball gun -- by a
4  pepper ball gun.
5         Are you able to see that?
6      A   Yes.
7      Q   Okay.
8         MR. OWENS:  Go right ahead.
9         (Video played.)
10         (Video stopped.)
11  BY MR. OWENS:
12      Q   Okay, so just at the very end of that
13  video, and we'll try to see if we can pause it on a
14  freeze frame there.  My apologies.
15         MR. OWENS:  Just to the very last, with
16  the guy on the roof.
17         (Video played.)
18         MR. OWENS:  Okay.  All right.
19         (Video stopped.)
20  BY MR. OWENS:
21      Q   So do you see that, sir, the still shot
22  there of an officer on the roof far away from any

Page 171

1  protestors?
2      A   Yes, sir.
3      Q   In what circumstances -- and he appears to
4  be very far from the individuals who are walking
5  down there.  And I understand this video doesn't
6  capture everything that took place on this, okay.
7         Why would it be acceptable for an officer
8  to shoot a -- some kind of munition from a roof that
9  far away in those -- over the heads of a number of
10  people in that circumstance?
11         MR. LYNCH:  Objection.
12         MR. GOLDSTONE:  Objection, speculation.
13         THE WITNESS:  Well, I mean, certainly
14  without the context, you know, the overwatch
15  position is something that is widely used in
16  military and law enforcement practices.
17  BY MR. OWENS:
18      Q   Okay.  And so you think it's appropriate
19  to use military practices against protestors in our
20  city streets; is that -- that's like acceptable
21  policy?
22         MR. GOLDSTONE:  Objection, misconstrues.

Page 172

1         THE WITNESS:  I did not say that -- that
2  was not my testimony about the military, sir.
3  BY MR. OWENS:
4      Q   Okay, so this is a practice that is
5  derived from the military, using, you know, some
6  type of a watch on a roof, right, or from elevation,
7  from heights, for advantage, something like that,
8  right?
9      A   Yes.
10      Q   Okay.  And in this situation, you have
11  what appears to be an agent shooting some kind of
12  thing at somebody who's very far away from them.  I
13  don't see any guns being displayed at the agent.
14  Somebody appears to be walking away.
15         Why would that be an acceptable use of
16  force?
17         MR. LYNCH:  Objection.
18         MR. GOLDSTONE:  Objection.
19         THE WITNESS:  Again, without context, it's
20  hard to answer those kinds of questions, sir.  I
21  can't speculate on that.
22  BY MR. OWENS:

Page 173

1      Q   Okay, lets see the next video.
2         (Video played.)
3         THE VIDEOGRAPHER:  Stop the video and
4  share the video.
5         MR. OWENS:  All right, start over.
6         (Video played.)
7         MR. OWENS:  Okay, stop there.
8         (Video stopped.)
9  BY MR. OWENS:
10      Q   So please tell me why it's an acceptable
11  use of force to have a federal agent shooting
12  through a fence at protestors who are yelling at
13  police officers?
14         MR. GOLDSTONE:  Objection, argumentative.
15         THE WITNESS:  Again, context is -- is
16  everything.  I don't know what led up to that
17  moment.
18  BY MR. OWENS:
19      Q   Anything else you could say about why it
20  would be appropriate for an officer to shoot through
21  a fence at people who are screaming, "What you're
22  doing is wrong"?

MAGNA
LEGAL SERVICES

Page 174

1      MR. GOLDSTONE: Objection, speculative.
2      THE WITNESS: It could have been -- well,
3   again, what you don't see on camera is something
4   that I don't see or you see in this deposition
5   either. If there are forceable obstruction, if
6   there were directions to move away, if there was an
7   imminent threat to the individuals in the vehicle,
8   again, it's our policy that use of force is looked
9   at as a means only when there are other -- no other
10  viable alternatives.
11     BY MR. OWENS:
12     Q   Okay. And so there must have been a
13  reason that there was no other viable alternative
14  for shooting through that fence at protestors who
15  were screaming, "You're doing" -- "What you're doing
16  is wrong," right?
17     A   I don't know the context, so I can't
18  answer that.
19     Q   But that's your true belief. Even without
20  the context, you're saying you believe that this
21  wasn't wrong, right?
22     MR. GOLDSTONE: Objection, argumentative.

Page 175

1      THE WITNESS: That's not what I said, sir.
2      BY MR. OWENS:
3      Q   Okay. So would you be open to the idea
4   that was -- that this was potentially outside of
5   policy if there wasn't more context than is shown in
6   the video, just an agent shooting at people who are
7   screaming at them, "You're" -- "What you're doing is
8   wrong"?
9      MR. GOLDSTONE: Objection, speculative.
10     THE WITNESS: That is -- but that's the
11  whole point of context. If I don't have context, I
12  can't, you know, answer that question wholesomely.
13     BY SIR.
14     Q   I understand. The use of force policy
15  requires officers to intervene if they see another
16  officer using excessive force, correct?
17     A   I'm sorry?
18     Q   ICE's use of force policy requires
19  officers to intervene and stop somebody else if they
20  see them using excessive force, correct?
21     A   I don't know if that's directly in the
22  policy.

Page 176

1      Q   Well, you refer to the policy in the
2   declaration that you signed and gave us yesterday,
3   right?
4      A   Yes, sir.
5      Q   Have you interacted with or interviewed
6   any protestors directly, how --
7      A   Yes.
8      Q   Okay. In what context?
9      A   Well, certainly as I was getting out of
10  vehicles I would engage them. The night that we
11  installed the fence, I was chatting with the
12  protestors.
13     Q   Okay. So one last clip, and we should be
14  done.
15     MR. OWENS: The -- it's the 22,
16  "noturtlesoup17" one.
17     BY MR. OWENS:
18     Q   Now, sir, what I'm going to show you is a
19  clip here that is of additional use of force. And
20  what you're going to see in the video is somebody be
21  tackled. And I'm not going to ask you questions
22  about the force being deployed on the person being

Page 177

1   tackled. Instead, I'm going to ask you questions
2   about the people shooting the pepper ball guns,
3   okay?
4      A   Okay.
5      Q   Which is kind of in the background. And
6   then you'll see a van come through. So that's what
7   -- what this image is.
8      MR. OWENS: Yeah, that's it.
9      (Video played.)
10     (Video stopped.)
11     BY MR. OWENS:
12     Q   All right, were you able to see that?
13     A   Yes, sir.
14     Q   Now, because I mentioned that I was --
15  wanted to ask you about the use of force on the, not
16  the guy on the ground, and he's in the foreground
17  and that van goes through, I'm going to watch --
18  we're going to go back and I'm going to play it
19  again so that we can talk about it, okay?
20     MR. OWENS: Will you do those 20 seconds
21  again. Thanks.
22     (Video played.)

MAGNA
LEGAL SERVICES

Page 178

1        (Video stopped.)
2        MR. OWENS: That's great.
3    BY MR. OWENS:
4    Q  So do you see on the image there the woman
5  in the white shirt with the blue jeans standing on
6  the sidewalk?
7    A  Yes, sir.
8    Q  Who had just had pepper ball shot at her?
9    A  Yes.
10    Q  It's your testimony and it's your belief
11  that that was an appropriate use of force by the
12  agents there, correct?
13        MR. LYNCH: Objection.
14        MR. GOLDSTONE: Objection.
15        THE WITNESS: That's not my testimony,
16  sir.
17    BY MR. OWENS:
18    Q  Oh, I'm sorry. So it's -- you agree with
19  me then that that's patently unconstitutional?
20        MR. GOLDSTONE: Objection, argumentative.
21        THE WITNESS: That's also not my
22  testimony.

Page 179

1    BY MR. OWENS:
2    Q  Okay. So is that within policy, or is it
3  unlawful? Which one?
4    A  This is not ICE employees, so I can't
5  speak to CBP policies.
6    Q  Okay, fair enough. Would it be -- would
7  that use of force of shooting those pepper ball --
8  pepper balls at a person standing on the sidewalk
9  there recording the police, would that have been
10  consistent with ICE policy?
11    A  Again, context. It's the totality of the
12  circumstances that dictate the use of force.
13    Q  Okay. What additional circumstance do you
14  need here to determine whether or not it was
15  appropriate to shoot pepper balls at people --
16        MR. LYNCH: By my recollection, we're at
17  three hours.
18        MR. OWENS: I'm in the middle of a
19  question.
20        MR. LYNCH: Fair enough. I think we hit
21  the three hours.
22        MR. OWENS: That's fine. Just don't be

Page 180

1  rude about it. I mean, like don't interrupt people,
2  okay. It's just like -- there's no need for that.
3        MR. LYNCH: Dude, you don't need to
4  lecture me.
5        MR. OWENS: I just don't like to be
6  interrupted.
7        MR. LYNCH: All right.
8        MR. OWENS: That's it.
9        MR. LYNCH: I'm telling you. Okay.
10        MR. OWENS: Okay? So --
11        MR. LYNCH: You can finish your question.
12  He doesn't have to answer it, and we can be done.
13        MR. OWENS: That's -- that's totally fine.
14  There's really no reason to do that, okay? That's
15  fine. We're done. I don't have a problem with
16  that. I understand. I appreciate your time.
17    For the record, we reserve our right to
18  seek additional time for this deposition, given the
19  600 pages of documents that we received last night.
20  There are five exhibits to this deposition that are
21  videos, which we will mark as 6, 7, 8, 9 and 10. I
22  will provide those to all parties so everybody has

Page 181

1  them afterwards so that we can do it that way.
2        (Hott Deposition Exhibit Nos. 6 through 10
3  were marked for identification.)
4        MR. OWENS: Is there anything else that we
5  need to put on the record? You've already put on
6  the record that you're going to read and sign the
7  deposition.
8        MR. GOLDSTONE: Correct.
9        MR. OWENS: I understand that.
10        MR. LYNCH: And we would obviously oppose
11  any reopening. This was expedited discovery. You
12  have 30 plus attorneys on the case.
13        MR. GOLDSTONE: We will oppose.
14        THE VIDEOGRAPHER: All right, and would
15  you like to put your video, transcript orders on
16  record?
17        MR. OWENS: Sure. We'll take it. But we
18  don't need any -- we don't need any indexes and we
19  don't need any physical copies, digital everything.
20        MR. GOLDSTONE: Same.
21        MR. LYNCH: Include that the transcript as
22  quickly, rough. I don't know what your policies



Page 182

1   are.
2           THE VIDEOGRAPHER:  No questions?
3           MR. OWENS:  Yeah.
4           THE VIDEOGRAPHER:  We are off the record.
5   The time is 2:08.
6           (Whereupon, at 2:08 p.m., the deposition
7   was adjourned.)
8           (Signature not waived.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 183

1           CERTIFICATE OF NOTARY PUBLIC
2           I, JENNIFER M. O'CONNOR, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the foregoing witness whose testimony
5   appears in the foregoing deposition was duly sworn
6   by me; that the testimony of said witness was
7   recorded by me and thereafter reduced to typewriting
8   by me; that said transcript is a true record of the
9   testimony given by said witness; that I am neither
10  counsel for, related to, nor employed by any of the
11  parties to the action in which this proceeding was
12  called; and, furthermore, that I am not a relative
13  or employee of any counsel employed by the parties
14  hereto, nor financially or otherwise interested in
15  the outcome of this action.
16
17  _____
    Jennifer Marie O'Connor
18  Notary Public in and for the
    District of Columbia
19  My Commission Expires on February 14, 2030
20
21
22

**MAGNA**
LEGAL SERVICES