# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | No. 25-cv-12173 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KRISTI NOEM, Secretary of U.S. Department of Homeland Security, in her official capacity, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**CORRECTED REPLY BRIEF IN SUPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES................................................................................................II

INTRODUCTION ........................................................................................................... 1

FACTS ............................................................................................................................ 1

I.    The Government's Factual Assertions Are False, Irrelevant, or Unsupported .................. 1

    A.    Defendants' Assertions Are Blatantly Contradicted by the Record ...................... 1

    B.    Many of Defendants' Assertions Are Misleading or Exaggerated......................... 4

    C.    The Fundamental Flaws with Hott and Parra's Declarations Confirm Defendants' Assertions Are Unreliable and Lack Evidentiary Support................. 7

II.    The Pattern of Violence and Retaliation Is Intentional and Ongoing ................................ 8

ARGUMENT .................................................................................................................. 10

I.    Plaintiffs Have Standing To Seek Injunctive Relief ........................................................ 10

II.    Plaintiffs Are Likely to Succeed on the Merits of Each of Their Claims. ........................ 14

    A.    Plaintiff's First Amendment Claims Are Compelling............................................ 14

    B.    The Right To Exercise Religion Has Been Substantially Burdened..................... 29

III.    Plaintiffs Have Submitted Overwhelming Evidence of Ongoing Violations of the Fourth Amendment.................................................................................................................. 30

    A.    Plaintiffs Claims that Defendants Uses of Weapons of War and other Violence is Unconstitutional Are Likely To Succeed ........................................................... 30

    B.    Because Arresting People for Exercising Their Constitutional Rights Is Obviously Unconstitutional, Plaintiffs Are Likely To Prevail on their False Arrest Claims .................................................................................................... 33

IV.    Defendants Have Caused, and Continue to Inflict, Irreparable Harm .............................. 34

V.    The Balance of Equities Overwhelmingly Demands Injunctive Relief............................ 35

VI.    The Scope of Injunctive Relief Plaintiffs Seek is Necessary and Proper ........................ 37

VII.    The Court Should Not Grant a Stay or Require a Bond .................................................... 40

CONCLUSION................................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Abay v. City of Denver,* 445 F. Supp. 3d 1286 (D. Colo. 2020) ..................................... 39

*ACLU v. Alvarez,* 679 F.3d 583 (7th Cir. 2012) ........................................................... 18

*Allee v. Medrano,* 416 U.S. 802 (1974) ...................................................................... 12

*Alsaada v. City of Columbus,* 536 F. Supp. 3d 216 (S.D. Ohio 2021) ......................... 39

*Am. Civil Liberties Union of Illinois v. Alvarez,* 679 F.3d 583 (7th Cir. 2012) ............. 25

*Am. Life League, Inc. v. Reno,* 47 F.3d 642 (4th Cir. 1995) ........................................ 30

*Anti Police-Terror Project v. City of Oakland,* 477 F. Supp. 3d 1066 (N.D. Cal. 2020) ............. 39

*Backes v. Vill. of Peoria Heights,* 2010 WL 4568773 (C.D. Ill. Oct. 28, 2010) ........... 31

*Barham v. Ramsey,* 434 F.3d 565 (D.C. Cir. 2006) ..................................................... 24

*Bell v. Keating,* 697 F.3d 445 (7th Cir. 2012) ............................................................. 11

*Bernal v. Johnson,* 2014 WL 4976212 (N.D. Ill. Sept. 25, 2014) ............................... 31

*Black Lives Matter Seattle-King Cnty. v. Seattle Police Dep't,*

    466 F. Supp. 3d 1206 (W.D. Wash. 2020) .......................................................... 39

*Breathe v. City of Detroit,* 484 F. Supp. 3d 511 (E.D. Mich. 2020) ............................. 39

*Brown v. Ent. Merchants Ass'n,* 564 U.S. 786 (2011) ................................................. 19

*Brown v. Kemp,* 86 F.4th 745 (7th Cir. 2023) ........................................................ 11, 13

*Brown v. State of Louisiana,* 383 U.S. 131 (1966) ...................................................... 22

*Byrne v. Rutledge,* 623 F.3d 46 (2d Cir. 2010) ........................................................... 17

*California v. Hodari D.,* 499 U.S. 621 (1991) .............................................................. 31

*Cantwell v. Connecticut,* 310 U.S. 296 (1940) ...................................................... 14, 16

*Carlson v. Bukovic,* 621 F.3d 610 (7th Cir. 2010) ...................................................... 33

*Cheairs v. City of Seattle,* 145 F.4th 1233 (9th Cir. 2025) .......................................... 32

*Cheffer v. Reno,* 55 F.3d 1517 (11th Cir. 1995) .......................................................... 30

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*,
    797 F.3d 426 (7th Cir. 2015) ................................................................. 13

*Chicago Women in Trades v. Trump*, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025)..................... 38

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)......................................................... 12

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996)......................................................... 16

*Council of Organization on Philadelphia Police Accountability and Responsibility v. Rizzo*,
    357 F.Supp. 1289 (D.C.Pa., 1973) ................................................... 10, 12, 39

*Counterman v. Colorado*, 600 U.S. 66 (2023) .............................................................. 15

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .................................................... 32

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) .......................................................... 25

*De Jonge v. Oregon*, 299 U.S. 353 (1937)................................................................. 22

*Don't Shoot Portland v. City of Portland,* 465 F. Supp. 3d 1150 (D. Or. 2020) ........................ 39

*Est. of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010) .............................................. 31

*Fiorenzo v. Nolan*, 965 F.2d 348 (7th Cir. 1992) ........................................................ 12

*Gilligan v. Morgan*, 413 U.S. 5 (1973) ................................................................... 40

*Gonzalez v. Menard, Inc.*, 534 F. Supp. 2d 815 (N.D. Ill. 2008) ....................................... 13

*Graham v. Connor,* 490 U.S. 386 (1989) .............................................................. 30, 31

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)....................................................... 23

*Honig v. Doe*, 484 U.S. 305 (1988)...................................................................... 12

*Illinois v. Trump*, No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025)......................... 22, 23

*In re A & F Enters., Inc. II*, 742 F.3d 763 (7th Cir. 2014) ............................................ 40

*In Re: New York City Policing During Summer 2020 Demonstrations*,
    No. 20-cv-8924 (S.D.N.Y. 2023) ...................................................................... 39

*Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466 (7th Cir. 2024)............................. 36

*Index Newspapers v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020)....... 16, 23, 27

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437 (7th Cir. 2022) .......... 34

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,* 994 F.3d 602 (7th Cir. 2021) .......... 17, 25, 26

*Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017) ................................................................................. 16

*Jones by Jones v. Webb*, 45 F.3d 178 (7th Cir. 1995) ...................................................................... 33

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) .................................................................. 30

*Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025) ........................................................................ 11

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ............................................................................... 32

*Korte v. Sibelius*, 735 F.3d 654 (7th Cir. 2013) .............................................................................. 34

*Lakeview Tech., Inc. v. Robinso*n, 446 F.3d 655 (7th Cir. 2006) ................................................... 10

*Lamb v. City of Decatur*, 947 F. Supp. 1261 (C.D. Ill. 1996) ......................................................... 31

*Lawson Prods., Inc. v. Avnet, Inc*., 782 F.2d 1429 (7th Cir. 1986) ................................................. 10

*Los Angeles Press Club v. Noem,* 2025 WL 2658327 (C.D. Cal Sept. 10, 2025) ....... 12, 23, 25, 27

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................................... 20, 21

*McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997) ........................................................... 37

*Medrano v. Garland*, 2024 WL 1348252 (S.D. Ind. Mar. 29, 2024) .............................................. 31

*Murrey v. United States*, 73 F.3d 1448 (7th Cir. 1996) ................................................................... 39

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ............................................................. 22

*Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024) ................................... 11

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) .................................................................... 16

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ....................................... 27

*Phillips v. Cmty. Ins. Corp*., 678 F.3d 513 (7th Cir. 2012) ............................................................ 31

*Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024) ............................................... 16, 17, 32

*Salazar v. Buono*, 559 U.S. 700 (2010) .......................................................................................... 39

*Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) ........................................................................ 12

*Scott v. Harris*, 550 U.S. 372 (2007) ................................................................................................ 1

*Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489 (9th Cir. 2015) .................... 27

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ......................... 38

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................. 11

*Tennesee v. Garner*, 471 U.S. 1 (1985) ............................................. 33

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ...................................... 30, 31

*Trump v. CASA, Inc.*, 606 U.S. 831 (U.S., 2025) ................................ 37, 38

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) ........................ 36

*United States v. Betts*, 99 F.4th 1048 (7th Cir. 2024) ..................... 17

*United States v. Grace*, 461 U.S. 171 (1983) ........................... 17

*United States v. Husband*, 226 F.3d 626 (7th Cir. 2000) ................... 30

*Virginia v. Hicks*, 539 U.S. 113 (2003) ..................................... 38

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) ..................... 16, 24

*Ward v. Utah*, 321 F.3d 1263 (10th Cir. 2003) ........................... 11

*Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977) ........................... 17

*Watts v. United States*, 394 U.S. 705 (1969) ................................. 16, 34

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................... 24

**Rules**

18 U.S.C. § 247(a)(2) ........................................................ 30

Fᴇᴅ. R. Cɪᴠ. P. 52(a)(2) ..................................................... 10

v

**INTRODUCTION**

Plaintiffs seek a preliminary injunction to prevent the widespread, intentional, and ongoing violations of the constitutional rights of civilians in this district who are being harmed by the unconscionable "war" federal agents are conducting against them. The record shows that, without an injunction, Defendants will continue to act as if they can use weapons of war to commit shocking acts of violence against civilians—protesters, press, clergy, bystanders, pregnant women, children—with impunity. As a result, Defendants must be enjoined.

**FACTS**

**I.     The Government's Factual Assertions Are False, Irrelevant, or Unsupported**

The government makes little effort to rebut Plaintiffs' evidence, including experts Gil Kerlikowske and Dr. Rohini Haar, Dkt. 22-32; Dkt. 22-33; Dkt. 77-1, and the nearly 80 declarations submitted so far. Instead, the government presents evidence that is contradicted by the record, irrelevant, or unreliable. The government also distractingly focuses on the conduct of non-Plaintiffs who have vandalized federal property or assaulted officers. Plaintiffs, and the putative class members, are non-violent protesters, members of the press, clergy, and observers whose constitutional and statutory rights are being trampled by the Defendants.

**A.     Defendants' Assertions Are Blatantly Contradicted by the Record**

Courts should not accept factual accounts that are blatantly contradicted by objective evidence, *Scott v. Harris*, 550 U.S. 372 (2007), yet that is what the government asks this Court to do. Some examples are discussed below.[1]

---

[1] The government claims bounties have been taken out by cartels and gangs. Plaintiffs dispute these claims. There are compelling reasons to believe, as this Court has seen, that these claims are overblown and incredible, as set forth elsewhere. Dkt. 184 (sealed motion).

1

### 1. Deadly Force Against Reverend David Black

Video shows that Reverend Black, while posing no threat to anyone, was shot directly in the torso and then the head with a pepper ball gun fired by a masked agent standing on the roof of the Broadview facility. Dkt. 22-44. This constitutes deadly force, but the only report agents completed regarding their use of pepper ball launchers on 9/19/25 says falsely that they used pepper balls as "area saturation," not directly on a person. Ex. 98 (E-Star Report) at CBP 12-13; Ex. 99 (E-Star Report) at CBP 37. Defendant Bovino doubled down on this lie when shown the video of Rev. Black at deposition, refusing to acknowledge what it clearly shows and claiming he "didn't see a projectile hit anyone" in the video. Ex. 100 (Bovino Dep.) at 165.

### 2. Bovino Tackles Scott Blackburn, Claims The Opposite Occurred

Bovino testified that he did not use force against Scott Blackburn at Broadview on October 3, 2025, Ex. 100 at 172-81, and Russell Hott, referring to the same incident, swears "one disruptive male protester pushed and assaulted Border Patrol Chief Gregory Bovino, who then fell forward." Dkt. 173-1 ¶ 3; Ex. 101 (Hott Dep.) at 129-33. But video shows Blackburn saying things like "you are going to be on television" and other protected speech while Bovino gives a command to move down the block. Dkt. 22-45 at 0:15-0:21. Blackburn assents to moving down the block but criticizes Bovino along the way. *Id*. In retaliation for this protected speech, Bovino says "what'd you say," climbs over the railing that separates them, grabs Blackburn, and tackles him to the ground. *Id*. at 0:21-0:28. The video shows Bovino bracing himself for the takedown maneuver and forcing Blackburn to the ground. *Id*. Bovino's denial that he applied force against Blackburn and Hott's echo of this lie undermines the credibility of both witnesses, as well as the government's broader contentions about rampant violence by protesters.

### 3. Bovino Encourages Tear Gas and Pepper Balls in Little Village

Defendants contend agents operated with "extreme professionalism" and did "everything right," Ex. 102 (Fox News interview), when they were "blocked in" at the intersection of 27th and Whipple during "pandemonium." Ex. 103 (Situation Report, CBP 283-286) at 283. According to Defendants, tear gas was deployed, but was ineffective, and was then deployed again after people prevented them from leaving. *Id.* Defendants also contend Bovino was hit in the head with a rock during this incident tear gas, something he says the Court should "see what [it's] like" before issuing orders like the TRO. Ex. 104 (Telemundo Interview at 1).[2]

The truth, however, is that agents were not boxed in and there was no "pandemonium." The body worn camera from a vantage point at the intersection of 27th and Whipple, to the East of where tear gas was deployed shows clear means of egress that direction. *See* Ex. 105 (REL 147). Yet agents, including Bovino, repeatedly used tear gas on observers and protesters to the West of the intersection, in the absence of any threat and without warning. Ex. 106 (REL 146) at 9:37-10:05; Ex. 100 at 246 (admitting that he tossed the first canister of gas before being hit by a rock); Dkt. 94-1 ¶¶7-8; Dkt. 94-2 ¶¶7-11. Agents used other munitions as well, including shooting a silent observer in the neck with a pepper ball from point blank range. Dkt. 94-3 (Bahena Decl.) ¶¶ 5-9. Body-worn camera video also shows Bovino throwing tear gas above the heads of the crowd without warning and despite an absence of threats or violence. Ex. 107 (REL 148) at 11:25-11:35. Bovino tells his officers, "if you need deploy gas, you deploy fucking gas," to which an officer responded, "no, we're good. We're good. We're ready to move out whenever you are." *Id.* at 14:15-14:25. Agents were not prevented from leaving; Bovino provoked

---

[2] At deposition today, Bovino claimed there is video of him being hit with a rock, and that he has viewed the footage. Plaintiffs are aware of no such video, and have requested its immediate production.

violence. Soon after, an agent shot someone close range with a munition and threw more gas at protesters, all without warning. *Id.* at 15:28-15:35.

### 4. Agents, Not Protestors, Threw A Bike In Albany Park

Describing an event on October 12, 2025, DHS claimed that a protester "threw their bicycle at an agent."[3] *See also* Ex. 108 (Situation Report) at CBP 357 ("subject subsequently threw a bicycle toward the agent who deployed the munition."). Defendants also claimed they warned the crowd of chemical munitions and waited until after the crowd threw objects and became violent. Defs.' Ex. 39 at CBP 369; Dkt. 173-2 ¶¶43-46. The truth is that an agent picked up a bicycle from a protester and threw it—not the other way around. Ex. 109 (REL 116) at 1:00-1:45. Agents twice drove into protesters standing nonviolently in the street. Ex. 110, at 5:25-5:47; 7:50-8:09; Dkt. 73-16 ¶4; Dkt. 73-1 (Mack Decl.) at ¶7. Although agents did tell protesters "you're gonna get gassed," they did not do so loudly enough for most to hear, and waited only a few seconds before deployment. Ex. 111 at 8:48-57; Ex. 112 at 9:25-33; Dkt. 73-1 ¶10.

### B. Many of Defendants' Assertions Are Misleading or Exaggerated

The government routinely engages in exaggerations that undermine its credibility

**1. Lakeview**. Defendants claim that on October 24 in the Lakeview neighborhood, "one vehicle blocked [a] CBP vehicle from exiting" and that a crowd "ignored commands to disperse"; subsequently, agents deployed gas, crowd members allegedly threw a pumpkin at the vehicle, and agents deployed more gas. Dkt. 173 at 16.

In fact, Defendants used gas in a residential neighborhood multiple times without audible warnings, after residents protested their arrest of a person in the front yard of a residence. *See* Dkt. 140; Dkt. 140 at 1 n.1; Exs. 90-93, 95-96 (available at Dkt. 140 at 1 n.2). Defendants' own

---

[3] *See* https://blockclubchicago.org/2025/10/13/federal-agents-deploy-tear-gas-in-albany-park-as-neighbors-block-immigration-arrest/ (last accessed November 3, 2025).

videos show that one agent mocked a vocal but nonviolent crowd of protesters as gas was thrown, saying twice, "have fun!" and laughing at the protesters after the canister went off. Ex. 113 (Axon_Body_4_Video_2025-10-24_1258_D01A2282F) at 6:35-57. The agent then yelled "throw another one" and prepared a second canister. *Id*. Similarly, one agent told another, "Hey, throw it [tear gas] for fun," an admission that this use of force was not justified by any exigency. Ex. 114 (REL 156 at 4:00-4:15). The gas did not help agents leave; instead, they weren't able to leave in their cars after using the gas because it overwhelmed them so much that they had to flee the block on foot. Ex. 113 at 6:47-9:30. There was no threat when gas was deployed. Dkt. 140-1 at 1 n.1 at 0:42-1:08; Dkt. 140-1 ¶¶5-13; *see also* Dkt. 140-2 ¶¶11-16.

**2. Old Irving Park**. Regarding the October 25, 2025 incident in Old Irving Park, Parra claims DHS deployed munitions only after giving multiple orders to disperse people who blocked agents' movements. Dkt. 173-2 ¶¶70-72. In truth, agents threw gas at nonviolent protesters in a residential neighborhood that morning as people prepared their children for a Halloween parade. Defendants tackled at least three people, including a 70-year-old woman, without justification. Dkt. 118-1 ¶¶ 2-14; Dkt. 118-2 ¶ 7; Dkt. 118-3 (Ex. 88, 10/25/25 video); Ex. 115 (Witchek Decl.); Ex. 116 (REL 86) at 11:30-11:43. Defendants threw gas behind the path of the vehicles' egress and in the direction of nonviolent protesters with only three seconds of warning. Ex. 116 (REL 086) at 11:43-11:55.

**3. East Side**. According to Defendants, as agents waited for Chicago Police Department tow trucks to arrive after a car accident, as many as one hundred and fifty protesters arrived and "surrounded" CBP officers. Defs.' Ex. 40 (E-Star Report) at CBP 253; Dkt. 173-2 ¶¶50-51. Defendants say agents threw a smoke canister when protesters attempted to encroach on the vehicles. Dkt. 173-1 ¶53. Defendants point to rocks and eggs thrown at officers as a "serious and

immediate threat" justifying the continued use of chemical weapons, including eight cans of tear gas and multiple kinds of other ammunition, Ex. 117 (E-Star Report) at CBP 418.

In fact, agents created the chaos by conducting a Precision Immobilization Technique ("PIT") against a car, a dangerous maneuver in which a vehicle is intentionally struck to make it spin out and stop. Dkt. 57 at 4-5 & n.11-12; Ex. 118 (Axon_Body_3_Video_2025-10-14_1119_X60A79913) at 2:30-3:00; 3:20-3:30 (driver of vehicle that conducted PIT saying, "I'm gonna PIT him, bro, fuck it."). Officers further escalated the situation by pushing and shoving protesters and pointing guns at them, all without issuing clear, audible instructions. Dkt. 73-15 ¶12. Agents then repeatedly used tear gas and other munitions without warning. Dkt 73-8 ¶¶ 5-14; Dkt. 73-11 ¶¶ 13-15, 18-22; Dkt. 73-15 ¶¶ 12-15; Ex. 119 (Axon_Body_4_Video_2025-10-14_1206_D01A2277Q) at 47:15-47:30. Agents deployed chemical weapons even when the situation was fairly calm, Dkt. 73-17 ¶¶ 8-12, and agents acknowledge that they used chemical weapons without offering warnings. Ex. 117at CBP 418. These acts were premeditated. Ex. 120 (Axon_Body_4_Video_2025-10-14_1130_D01A4281B) at 2:10:05-2:12:01 (showing an agent tell other agents that he planned to use gas before throwing three canisters without warning).

**4. Brighton Park**. Defendants contend that, over the course of several hours in the Brighton Park neighborhood at W. 39th Place and S. Kedzie Ave., "multiple incidents of assaults on agents and impeding their lawful authority took place." Ex. 121 (Discharge Report) at CBP 156. This allegedly included "the throwing of objects (glass bottles, road cones, deployed chemical munitions), and physically pushing agents," as well as blocking the road. *Id.*; Dkt. 173-2 ¶42. Agents deployed chemical munitions and were instructed to "use all means necessary" to exit the scene, including the use of deadly force. *Id.* Parra even claimed that objects were

"continuously thrown over four hours" and that *200 people* were either throwing things, pushing agents, or obstructing. Ex. 122 (Parra Dep.) at 124, 130.

Video from the scene, however, shows a large number of nonviolent protesters and observers who cleared a path for agents in the street when directed. As the protesters were dispersing, an agent threw a canister of tear gas into the crowd without warning. Ex. 123 (Axon_Body_4_Video_2025-10-04_1332_D01A32322) at 1:05:50-1:09:05. Although protesters allowed vehicles to pass, Dkt. 73-6 ¶¶ 13, 18, 20; Dkt. 73-2 ¶ 26, agents repeatedly used tear gas, pepper balls, and flashbang grenades against protesters and journalists without warning or justification. The use of these munitions injured protesters and journalists, as well as CPD officers and community members, including children. Dkt. 73-6 ¶¶ 11, 16-17, 21-25; Dkt. 73-4 ¶ 13; Dkt. 73-2 ¶¶ 25-32; Dkt. 22-41 ¶¶ 7-8, 10-11; Dkt. 22-34 ¶¶ 7-10; Dkt. 73-7 ¶¶12-22; Dkt. 22-39 ¶¶ 15-19; Ex. 124 (Ramirez Decl.).

### C. The Fundamental Flaws with Hott and Parra's Declarations Confirm Defendants' Assertions Are Unreliable and Lack Evidentiary Support

The government's response relies heavily on the declarations of Hott and Parra, but the depositions of these witnesses, though time limited, reveal that their declarations are not credible or persuasive The depositions reveal, among other things, that the government's reliance on crimes being committed against federal agents (like the slashing of car tires) to justify their treatment of protesters is baseless. No evidence exists that the crowd control munitions agents have been deploying in this District have any connection to such incidents. Ex. 101 at 62-63, 77, 88, 140-41. In other words, the violence meted out against Plaintiffs was neither because of, nor

7

in response to, tire slashing or other alleged vandalism,[4] meaning such incidents are irrelevant to this case. The people involved could simply be arrested. *Id.* at 61, 140-41.

More generally, both the declarations of Hott and Parra purport to describe facts as if they had personal knowledge of events when they do not. *E.g.* Ex. 101 at 53-54, 56, 61-66, 69-73, 76-77, 81-82, 84-85, 88-90, 92-99, 126-28, 136-37, 139-40, 148-49. In fact, Parra has spent most of Midway Blitz at the Great Lakes naval base and only personally observed one event in his declaration (on September 27), Parra is "not too familiar with the City of Chicago," Ex. 122 at 30, and his assertion that the TRO is adversely impacting immigration enforcement activities is based only on a "quick recap" from CBP supervisors about Little Village and other unspecified third-hand conversations. *Id.* at 98-102. Parra repeatedly admitted being unsure which munitions have been used (and he himself is not even certified to use CS gas), how they were used, on whom, and whether or how warnings were given. *See, e.g., id.* at 45, 78, 82--85, 91, 93, 95, 126, 148, 152-53, 159. These incredible, unreliable declarations cannot rebut Plaintiffs' evidence.

## II.    The Pattern of Violence and Retaliation Is Intentional and Ongoing

Defendant Bovino has directly stated his belief the residents should not be protesting. "If someone strays into a pepper ball, then that's on them. Don't protest, and don't trespass." Ex. 126 (Tr. of CBS Interview) at 4; Ex. 127 (Video of CBS Interview) at 2:52-3:03. He further stated: "If they're going to create another sanctuary behind signs, then we'll go behind those signs and ensure that it's not a sanctuary." Ex. 128 (CNN Interview) at 6; Ex. 129 (CNN Video) at 3:45-3:55.

---

[4] Likewise, Hott claims that protesters have tried to "permanently maim" officers through "rampant" use of "Aztec Death Whistles," Dkt. 173-1 ¶ 30. Ex. 101 at 111-12. But he admitted that he only heard or saw it once at Broadview, *id.* at 111, and ICE reports do not even support that far more limited assertion. Ex. 125 (10/1/25 Email, ICE 335-36) at 335 (10/1/25 email: "These 'whistles' have been observed in Portland, though they have not yet been encountered in Chicago or Broadview.").

Additionally, Bovino has shown his disregard and disdain for this Court's orders. In response to a post on X stating "Border Patrol Commander caught on camera violating federal restraining order—throwing canisters of tear gas into crowd," Bovino responded with a string of supportive emojis. Ex. 130 (Bovino Tweets) at 1. In response to a tweet stating, "Good man, I heard about the robe-stain judge . . . ordering you to appear for using tear gas against assault by rocks – I just wanted to say EFF them, we ALL stand with you," Bovino responded, "Thank you!!! Following!" *Id.* at 3. As he left the courthouse after being called in to testify following his decision to throw gas canisters at a crowd of protesters, Bovino put a gas canister on the dashboard of his vehicle, an apparent display of defiance. Ex. 131 (yourstorymatters_bsky_social_2025.10.28 at 1.13pm) at 0:00-0:14. Shortly after, DHS posted a mash-up video of Bovino, fist pumping to a song called with a chorus about "When I ruled the World."[5]

Bovino also asserts he has "interacted with many violent rioters and individuals at the Broadview facility," and, indeed, will not admit he has ever seen protesters who were not violent rioters. Ex. 100 at 215. Yet Bovino admitted He did not know "what they are," he explained, and could not remember whether any protesters were non-violent. *Id*. By Bovino's logic, anyone who shows up to protest is presumptively violent or assaultive and he can then "go hard" against them.

Unsurprisingly but unfortunately, Defendants have failed to rein in their agents since despite the TRO was entered. *See* Dkts. 57, 90, 94, 118, 140, 188. They have persisted in using tear gas and other dangerous munitions against nonviolent protesters, and they have done so without giving adequate warning, particularly in Lakeview, Old Irving Park, Albany Park, and

---

[5] https://x.com/DHSgov/status/1983273176907043070

Little Village. Dkts. 57, 94, 118, 140. Defendants have also ignored the prohibitions against tackling or body slamming individuals who pose no immediate threat of physical harm. Ex. 115 ¶¶6-8; Ex. 116 (REL 86) at 11:30-11:43 (agents tackling a woman walking her bike in Old Irving Park). Despite these abuses, the President claims agents' tactics "haven't gone far enough" because "we've been held back by judges." Ex. 132 (60 Minutes Interview. 11/2/25).

## ARGUMENT

Defendants' response is filled with distractions about immigration law, about vandalism, and other topics all to portray a scene on the ground where weapons of war are Defendants only apparent option. They are not describing Plaintiffs or putative class members, who are nonviolent protestors, members of the press, and religious observers who used public places—most often street corners—to express their political views. In response and retaliation, Plaintiffs have been met with brutality that cannot be squared with the Constitution, federal law, or a free society.

An injunction is necessary. In issuing such relief, this Court must make factual determinations based upon credibility and weighing of the evidence. *See Lakeview Tech., Inc. v. Robinso*n, 446 F.3d 655, 657-58 (7th Cir. 2006); FED. R. CIV. P. 52(a)(2). This Court's factual findings are reviewed for clear error, whether based on live or documentary evidence. *Lawson Prods., Inc. v. Avnet, Inc*., 782 F.2d 1429, 1439 (7th Cir. 1986) Plaintiffs present an extensive record of direct and circumstantial evidence that is credible and far outweighs the government's unreliable information. Respectfully, Plaintiffs ask this Court to explicitly find the government's evidence lacks credibility or is unreliable and issue the proposed injunction.

## I.    Plaintiffs Have Standing To Seek Injunctive Relief

Defendants fail to respond to Plaintiffs' argument that First Amendment claims provide ample standing and that cases like *Lyons* (or *Rizzo*) cannot apply in the chilled speech or pattern of retaliation contexts. *Compare* Dkt. 173 at 18-24, *with* Dkt. 86 at 43. Both are independently

sufficient to support standing for Plaintiffs' First Amendment and RFRA claims. The pattern of retaliatory and excessive force, which Defendants do not disclaim continuing, is also sufficient for Plaintiffs' Fourth Amendment standing.

First, in the First Amendment context, an injury exists where government action causes "an objectively reasonable chilling effect on the plaintiff's speech and he self-censors as a result." *Kilborn v. Amiridis*, 131 F.4th 550, 565 (7th Cir. 2025). Plaintiffs harmed by the chilling effect on their speech need only identify past harms establishing the chill is objectively reasonable, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014), as chilled speech "is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012).[6]

Here, Plaintiffs submit ample evidence of Defendants chilling their speech, including by subjecting Plaintiffs to violence for expressing their constitutional rights. Predictably, the specter of masked men with military munitions threatening, arresting, or even shooting them again leads Plaintiffs to hesitate or forgo exercising their expressive rights. The ongoing pattern of violations across the District, as in Lakeview, Logan Square,[7] Albany Park, and elsewhere, is especially a constitutional injury because people are afraid to exercise their rights at any point throughout the district. The spectacle—and specter—of Defendants violence for criticism, concern, or mere video coverage looms large. The evidence from Bovino and the President is that these actions will continue, and even increase if not enjoined. This is beyond sufficient for chilled-speech standing. *See Brown v. Kemp*, 86 F.4th 745, 767-69 (7th Cir. 2023).

---

[6] The government's citation to *Bell* is puzzling. The Court affirmed entry of a *permanent* injunction for the Plaintiff and recognized that First Amendment rights were sufficient to show standing. Many courts have held that the *Lyons* rule does not map onto First Amendment claims involving chilled speech. *See Index*, 977 F.3d at 826; *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024); *Ward v. Utah*, 321 F.3d 1263, 1269 (10th Cir. 2003).

[7] The Logan Square incident is particularly telling. There, while sitting in traffic and allegedly blocked by one person on a scooter, agents causally deployed tear gas in a public street in front of a grocery store and near a day care, endangering the public, children, and passersby. Dkt. 73-10 ¶¶ 2-11; Ex. 133 (10/3/25 video).

In addition, as the government acknowledges, standing for injunctive relief can be shown based upon an "officially sanctioned" course of retaliation. Dkt. 173 at 22 (citing *Fiorenzo v. Nolan*, 965 F.2d 348, 350 (7th Cir. 1992)). Standing can also be established via Defendants' "persistent pattern of targeting disfavored speech." *Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010) (citing *Allee v. Medrano*, 416 U.S. 802, 815 (1974)). Here, the record establishes an officially sanctioned course of retaliation with respect to how Defendants have treated Plaintiffs. The fact that Defendants have defied the Court's orders and continue to attack them at the highest levels of government shows that what is occurring here is officially sanctioned and programmatic. The course of retaliatory and excessive force establishes standing for both the First Amendment and Fourth Amendment claims. *See Honig v. Doe*, 484 U.S. 305, 320 (1988).

Neither *Lyons* nor *Rizzo* preclude Plaintiffs' claims. While *Lyons* noted "past exposure to illegal conduct does not in *itself* show a present case or controversy," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 111 (1983), the Court did not foreclose standing where evidence of a pattern of conduct exists.[8] And *Rizzo* confirms that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." 423 U.S. 362, 372 (1976) (internal quotes and citation omitted).

Plaintiffs' injury-in-fact follows *Allee v. Medrano*, where there was a "pervasive pattern of intimidation in which the law enforcement authorities sought to suppress appellees' constitutional rights." 416 U.S. 802, 809 (1974). Defendants' own conduct and statements confirm a strong likelihood of recurring injury. The president has now approved of the unconstitutional acts here and called for an *increase* in these tactics. Ex. 132. Defendant Noem

---

[8] Separately, in *Lyons* people could avoid being choked by the LAPD if they "conduct their activities within the law and so avoid" exposure to that violence. 461 U.S. at 497. Plaintiffs here are not able to do this. They are being threatened, and actually harmed, for conduct that is within the law. *Cf. See Los Angeles Press Club v. Noem,* 2025 WL 2658327, at *14 (C.D. Cal Sept. 10, 2025).

has been on the ground saying that people are going to be arrested for the content of their speech and their affiliations.[9] Likewise, Bovino has himself committed unconstitutional acts—including securing the false and retaliatory arrest of Blackburn and deploying tear gas in violation of the TRO. At deposition, Bovino maintained that the use of force here has been "more than exemplary," doubling down on what he said in the media. Ex. 100 at 156. Bovino's attitude is thus: "If someone strays into a pepper ball, then that's on them. Don't protest, and don't trespass," Ex. 126 at 4. Defendants' affirmative conduct, and their commitment to it, is evidence of the risk of recurring harm. *See Brown*, 86 F.4th at 769.[10]

Finally, Defendants' attempts to downplay the impact of Plaintiffs' (1) putative class certification and (2) the press plaintiffs' associational standing must fail. As to class certification, while it is true that the named plaintiffs must establish standing, the very function and existence of a class of people demonstrates broader issues that warrant injunctive relief. *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441-43 (7th Cir. 2015) (injunctive class appropriate "to require the defendant to do or not do something that would benefit the whole class"); *Gonzalez v. Menard, Inc.*, 534 F. Supp. 2d 815, 816 (N.D. Ill. 2008) (plaintiffs pursue a class action "because of the widespread nature of the asserted harms").

As to the press associational plaintiffs, the government is simply wrong when it says the only harm is "diverting resources." Dkt. 173 at 24. Press plaintiffs have been restricted from doing their very jobs, and providing coverage critical of Defendants at the toll of extreme violence, on repeated occasions and at numerous locations. Standing is secure.

---

[9] https://x.com/bennyjohnson/status/1974174065985470970
[10] In *Rizzo*, the trial court found the "responsible authorities had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights." 423 U.S. at 377. Not so here.

## II.      Plaintiffs Are Likely to Succeed on the Merits of Each of Their Claims.[11]

### A.      Plaintiff's First Amendment Claims Are Compelling

#### 1.      Defendants' Claims that Plaintiffs Were Involved in Violent Riots Constituting a "Clear and Present Danger" Are False

Defendants do not directly accuse Plaintiffs of committing any acts of violence, obstruction, or property destruction. Indeed, Plaintiffs have submitted nearly 80 declarations (to date) from themselves and others similarly situated swearing that they were not committing any violence or obstruction when they were exercising their First Amendment rights at Broadview and elsewhere. Defendants do not rebut this evidence. Instead, Defendants mischaracterize the protests as violent "riots" and assert that Plaintiffs lose the protection of the First Amendment when they "intermingle themselves" with "rioters, obstructors, and other lawless actors." Dkt. 173 at 26. They are wrong as a matter of fact and as a matter of law.

First, as discussed above, the protests—at Broadview and elsewhere in this District—do not involve a "clear and present danger of riot, disorder … or other immediate threat to public safety, peace, or order." Dkt. 173 at 26 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). While there have been tense moments, the chaos has come primarily from Defendants, not protestors, and certainly not Plaintiffs and their putative class. Neither the video evidence nor objective third-party witnesses, such as Broadview Police Chief Mills support, such assertions, and Plaintiffs' over 80 declarations from direct observers of the events flatly contradict the government. Dkts. 22-1–22-31, 22-34, 22-39, 22-41–22-42, 73-1–73-29, 77-1–77-2, 90-1, 94-1–94-4, 118-1–118-2, 140-1–140-2; Ex. 134 (Whitney Decl.); Ex. 135 (Squires Decl.); Ex. 136 (Little Decl.); Ex. 137 (K. Mack Decl.); Ex. 138 (Brooks Decl.); *see also* Ex. 139 (9/19/25

---

[11] Plaintiffs do not challenge the government's authority to enforce federal immigration law or its authority to prioritize certain types of enforcement over others. Thus, the government's references to federal immigration statutes (Dkt. 173 at 24-25) are irrelevant.

Broadview security footage) Dkt. 145 (Turner Decl.). These witnesses describe Defendants shooting, gassing, and otherwise assaulting or arresting nonviolent protesters without warning or justification. Defendants' claims about "crowd members" engaging in "increasing levels of violence, obstruction, and other lawless behavior that justified the use of dispersal orders" are also untrue. Dkt. 173 at 27. The only day audible dispersal orders were given at Broadview was the morning of September 19, 2025. Ex. 101 at 73-75; Dkt. 22-16 ¶¶ 4, 10-11. No orders (or audible orders) to disperse were given in the afternoon or evening of September 19, or September 20, 21, 26, 27, or October 3, 2025. Dkt. 22-1 ¶¶ 4-5; Dkt. 22-3 ¶¶ 5-6, 8-9; Dkt. 22-5 ¶ 6; Dkt. 22-6 ¶¶ 5, 9-12, 16; Dkt. 73-18 ¶ 10. Hott had no knowledge of events at Broadview on September 26-27, Ex. 101 at 110. Outside of Broadview, Defendants disperse protesters by tossing canisters of gas—frequently from car windows and as they are already leaving an area. E.g., Dkt. 141-1 ¶ 11; Ex. 114 at 4:00. Defendants rely exclusively on Parra's declaration for events beyond Broadview, but his statements are exaggerated or not credible (*e.g.*, Dkt. 173-2 ¶ 46; Ex. 109 at 1:00-1:45) and contradicted by Plaintiffs' declarations. *Compare* Facts Section, *supra*, (discussing events at Brighton Park, the East Side, Albany Park, Lakeview, and Little Village) and Dkt. 73-5 (Fuentes Decl.), *with* Dkt. 173-1 ¶¶ 37, 41-56, 64-69. Second, individuals who may have committed isolated acts of vandalism, assault on or true threats against officers, or forcible obstruction, may be arrested and prosecuted. *See* Ex. 101 at 61, 140. But one person throwing a water bottle in a crowd of 50 or 100 non-violent protesters does not a "riot" make. Nor does a group of people linking arms in front of a DHS vehicle or a person standing in the Broadview driveway. *See, e.g.*, Ex. 109 at 1:00-1:40; Dkt. 22-44.Yelling "FUCK ICE" or telling an officer to go "kill himself" is not a true threat that lacks constitutional protection. Ex. 122 at 113; *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) ("true threats," are "serious expressions

15

conveying that a speaker means to commit an act of unlawful violence"); *Watts v. United States*, 394 U.S. 705 (1969) ( distinguishing "true threats" from protected "political hyperbole"). Nor do such isolated acts present a "clear and present danger of riot" or "immediate threat to public safety, peace, or order" that would justify dispersing non-violent peaceful protesters with chemical weapons, especially without warning. *See Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir. 2011) (cannot arrest peaceful demonstrators for defying orders without communicating orders to the demonstrators); *Nelson v. City of Davis*, 685 F.3d 867, 872-73 (9th Cir. 2012) (cannot use force (including less-lethal weapons) without giving audible dispersal orders and opportunity to comply). Agents' subjective fears are insufficient to establish clear and present danger of riot or immediate threat to public safety. *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017); ("Fear of serious injury cannot alone justify suppression of free speech and assembly.... there must be reasonable ground to fear that serious evil will result if free speech is practiced.") (citation omitted); *Puente v. City of Phoenix*, 123 F.4th 1035, 1062 (9th Cir. 2024) (court must examine whether "objectively reasonable grounds to conclude that there was a 'clear and present danger of riot.'") (quoting *Cantell*, 310 U.S. at 308); *NTEU*, 513 U.S. at 475 (government limiting speech "must demonstrate that the recited harms are real, not merely conjectural").

The unrefuted evidence establishes that Plaintiffs were peacefully engaged in First Amendment activity each time federal agents attacked them. And the putative class is composed only of those who "*non-violently* protest, observe, document, or record" DHS operations. Dkt. 80 at 42-43 (emphasis added); Dkt. 81 at 2. "[P]eaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others." *Index Newspapers v. United States Marshals Service*, 977 F.3d 817, 834 (9th Cir. 2020); *see also Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("preventing First Amendment activities before demonstrators have

acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation").[12]

When there is no clear and present danger, "speech restrictions imposed on [persons on] government-owned property are analyzed under a 'forum-based' approach…." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010), as Plaintiffs have explained. Dkt. 86 at 14-15; *cf. John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,* 994 F.3d 602, 609 (7th Cir. 2021) (using a forum analysis). Plaintiffs are indisputably engaged in First Amendment activity in traditional public fora, where government's power to restrict speech is "very limited." *United States v. Grace*, 461 U.S. 171, 188 (1983).

### 2.   Plaintiffs' Evidence of Content-Based Discrimination Is Unrebutted

Defendants do not dispute that content-based restrictions on speech in traditional public fora must satisfy strict scrutiny. Instead, they dispute whether their restrictions on Plaintiffs' speech are, in fact, content-based discrimination. Dkt. 173 at 35-36. But Defendants do not rebut Plaintiffs' evidence of content (and viewpoint) discrimination, such as officers shooting or confiscating protest signs, and an officer pointing a firearm at a civilian while saying, "bang, bang … liberal." *See* Dkt. 86 at 1-3, 15-18; Dkt. 22 at 2-7; Dkt. 94-4 ¶¶ 9-10. Noem characterizes all peaceful protesters as rioters, even though they are not, and she claims simply recording officers is "violence." Dkt. 21 at 5 n.19. Just *yesterday*, in response to an X post about Reverend Black's protest at Broadview, "Where are the children? Where are they? Find them, bring them home!," Bovino posted, "Yes, and he doesn't seem concerned about the hundreds of

---

[12] Defendants' cases (Dkt. 173 at 26-27) are inapposite. *Puente v. City of Phoenix*, 123 F.4th 1035, 1062-63 (9th Cir. 2024), involved a thrown "pyrotechnic device" and gas canister, an escalating number of thrown objects, and attempt to breach a security fence. *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977), stands for the uncontroversial proposition that "the police may validly order violent or obstructive demonstrators to disperse or clear the streets." *United States v. Betts*, 99 F.4th 1048, 1051-52 (7th Cir. 2024), involved a defendant who was convicted under the Anti-Riot Act after posting a flyer on Facebook literally inviting people to "RIOT" and then filming himself and others damaging property and looting.

thousands of children who became completely missing after the last administration ushered them in." Ex. 140 (Bovino X Post, 11/2/25). And Defendants' repeated characterization of peaceful protests in opposition to federal immigration enforcement actions as "violent" "riots" is itself evidence of content discrimination.

Defendants miss the point when they claim that Press Plaintiffs seek special access. Instead, they seek to report on the protests and whom Defendants' immigration enforcement actions have shot and gassed. The fact that federal agents shot, gassed, and falsely arrested journalists simply trying to cover the events at Broadview (and elsewhere) while granting right-wing "influencer" Benny Johnson special access to film and photograph evinces content and viewpoint discrimination.

### 3. Defendants have Suppressed and Chilled Plaintiffs' Right to Record

Plaintiffs do not dispute the uncontroversial proposition that individuals recording law enforcement activity in public cannot interfere with crime scenes or public safety. *See* Dkt. 173 at 31-32. But as discussed above, Defendants' characterization of the protests at Broadview as "unlawful" or violent is false. Their "intermixing" theory is likewise unsupported by both the record and the law. There is nothing in *ACLU v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012), that allows Defendants to disperse non-violent, non-obstructive individuals who are recording DHS immigration enforcement activity in public.

Defendants are also wrong in arguing that Plaintiffs primarily rely on declarants who are not plaintiffs. Many of the Plaintiffs were both recording or photographing the protests and engaged in other protected activity at the same time, and intend to continue doing so. *E.g.*, Dkt. 73-6 ¶¶ 5-6, 9, 15, 22-23, 27-28, 32, 38-39, 41; Dkt. 22-2, exhibits; Dkt. 77-1 ¶¶ 5-26; Ex. 136. Defendants have threatened individuals who record them, including Jo-Elle Munchak, Dkt. 77-1 ¶¶ 23-26, Arely Barrera, Dkt. 73-12 ¶¶ 6-11, and Leslie Cortez, Dkt. 73-13 ¶¶ 4-5. This has

chilled them from exercising their First Amendment right to record. Dkts. 77-1 ¶ 26; 73-12 ¶¶ 12-13; 73-13 ¶ 6.

### 4. Defendants' Conduct Is Not Tailored, Let Alone Narrowly Tailored, to An Actual Compelling State Interest

Defendants fail to establish that their challenged pattern of abridging core First Amendment rights is narrowly tailored to serve a compelling government interest. Agents' wholesale dispersals and indiscriminate uses of force, when focused and authorized apprehensions and arrests as needed would suffice, is not narrowly tailored. Agents' repeated *specific targeting* of peaceful Plaintiffs and putative Class members with severe force is not narrowly tailored. And agents' well-documented failure to issue lawful warnings, give time for compliance, and perform standard de-escalation techniques for protest policing, demonstrate that Defendants are not truly furthering a public safety interest or acting in a tailored manner. Rather, the evidence is overwhelming that federal agents are escalating the situation. These tactics are antithetical to the First Amendment.

First, Defendants lack a compelling state interest for their actions against non-violent protesters, observers, clergy, and journalists, *i.e.*, the putative Class members who predominate the people affected here. Defendants must "specifically identify an actual problem in need of solving." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011). But as described *supra*, Defendants' story lacks credibility. They attempt, in the courtroom and to the public, to portray the Chicago area as a warzone in need of a war-like policing response. But the evidence shows that Chicagoans have by and large peacefully participated in both planned and spontaneous protests, with journalists and observers there to record and report; some attendees have performed civil disobedience; very few have acted violently; and even then, the agitators of escalated public safety threats are most often *Defendants*, not the protest attendees. Indeed, that

19

is the apparent goal in Defendants' operations: engage in aggressive and highly visible roving patrols, spur public backlash, escalate tensions by inflicting less-lethal force on the assembled crowd, and produce and post online videos to propagandize federal agents brutalizing individuals in the fallout. Despite these provoking conditions, Chicagoans have predominantly acted with remarkable restraint when expressing their dissent—leaving Defendants to invent and exaggerate circumstances to justify their pretext for only more violence. But the "ambiguous proof" that Defendants offer "will not suffice" under First Amendment scrutiny. *See id.* at 800. They fail to establish a true compelling public safety interest—e.g., conditions of widespread and rampant rioting across the District—to support the agents' ongoing pattern of severe and retaliatory force that Plaintiffs seek to enjoin.

Second, even if Defendants' claimed widespread public safety threat from protests were grounded in the facts here, their pattern of unlawful actions is not narrowly tailored. *See McCullen v. Coakley*, 573 U.S. 464, 476 (2014). Not once do Defendants address any of the dozens of Plaintiffs' specific examples of agents' extreme use of force *against the putative Class members* who seek this Court's protection. Defendants cannot defend the facts of their actions consistent with the First Amendment.

Instead, to justify agents' indiscriminate misuse of force, Defendants argue that "[a]s a legal matter, it does not matter that some individuals" at protests "were incidentally affected by crowd-control measures." Dkt. 173 at 39. Defendants' arguments (*id.* at 27-31) boil down to the astonishing claim that so long as any person in a crowd of assembled people throws an item or kicks a vehicle, defaces property, or even trespasses or performs peaceful civil disobedience, the government is then authorized to use the pattern of severe force documented here: point-blank shooting innocent people with pepper balls in the face, slamming people to the ground, tear

gassing residential areas, striking individuals with vehicles, and more. *See, e.g.*, Dkt. 86 at 19-22. The pattern of indiscriminate force includes agents inflicting severe chemical or projectile attacks on clergy praying, expecting mothers, retirees, young people, journalists, and even the Chicago police officers attempting to buffer the federal agents from the crowds. As Defendant Bovino put it: "If someone strays into a pepper ball, then that's on them. Don't protest, and don't trespass." Ex. 126 at 4. That overinclusive approach to protected expressive activity is what a robust application of the First Amendment seeks to prevent.

Defendants also claim that their pattern of indiscriminate misuse of force is tailored because it is "the most effective method" of clearing out a protest. *See* Dkt. 173 at 34, 45. But the First Amendment does not permit the government to broadly abridge speech "for mere convenience." *McCullen*, 573 U.S. at 486. The very purpose of "demanding a close fit between ends and means" is to "prevent[] the government from too readily sacrificing speech for efficiency." *Id.* (cleaned up).

Defendants' startlingly broad claimed power to use indiscriminate force also ignores Plaintiffs' extensive record of federal agents *specifically targeting* individuals with severe force, often equivalent to deadly force. Dkt. 22-32 ¶¶ 34-35, 57-60, 70; Dkt. 77-2 ¶¶ 58-60 (summarizing DHS policy about less-lethal force equaling deadly force). Agents specifically targeted and shot with pepper balls at least Plaintiffs Rev. Black (Dkt. 22-1 ¶¶ 4-5), Geary (Dkt. 22-17 ¶¶ 2-10), Kunkel (Dkt. 22-8 ¶ 15), and Thrush (Dkt. 22-16 ¶¶ 15-16), in addition to other putative Class members.[13] Defendants decline to defend any of these targeted attacks on Plaintiffs and the Class, which fail to satisfy any level of First Amendment scrutiny.

---

[13] *See, e.g.*, Dkt. 94-3 ¶¶ 6-7 (shooting individual in the neck at point-blank range); Dkt. 73-14 ¶¶ 18-20 (agent targeted and shot projectiles after she began praying audibly for his redemption); Dkt. 22-16 ¶¶ 17-27 (recounting numerous examples of agents specifically targeting protesters and journalists).

Moreover, there is a deep-set tradition in this country of peaceful civil disobedience, where non-violent individuals "sit or stand … as monuments of protest against" an injustice. *Brown v. State of Louisiana*, 383 U.S. 131, 139 (1966) (plurality op.); *see also Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *6 (7th Cir. Oct. 16, 2025) (recognizing "civil disobedience as a form of protest"). Sporadic incidents of civilians truly blocking traffic or trespassing, forming many of Defendants' claimed justifications for agents' escalated use of force (Dkt. 173 at 28-30 & n.22), are minor offenses. The required narrowly tailored response is for the government to establish particularized probable cause to arrest the person for committing a crime punishable unrelated to protected speech, and then to use the level of force necessary to "apprehend[] the perpetrators accordingly." *See Illinois*, 2025 WL 2937065, at *6. Defendants' claimed free reign to shoot, body slam, or gas that individual—much less the people standing nearby—is not narrowly tailored. *See* Dkt. 22-32 ¶¶ 34-37, 77-78, 89 (Kerlikowske explaining that it is standard and accepted protest policing practice to arrest lawbreakers, not to use broad force). To respect the First Amendment, the government can respond to lawbreaking by specifically "dealing with the abuse," not by targeting an entire group. *De Jonge v. Oregon*, 299 U.S. 353, 364-65 (1937); *accord NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982).

The ample record of federal agents failing to give sufficient and audible warnings before inflicting severe force is alone sufficient to show that their actions fail First Amendment scrutiny.[14] As explained *supra*, Defendants' summary contrary claims by unknowledgeable declarants are not credible. Defendants' notice failures arise in the contexts of both individual warnings that force would be used against a specific person, and broad warnings for the

---

[14] *See, e.g.*, Dkt. 22-1 ¶ 6; Dkt. 22-3 ¶¶ 6, 9; Dkt. 22-6 ¶¶ 7-10, 16-21; Dkt. 22-16 ¶¶ 11-13, 35; Dkt. 22-17 ¶ 9; Dkt. 22-12 ¶ 6; Dkt. 22-9 ¶¶ 12-13; Dkt. 22-5 ¶ 6; Dkt. 22-21 ¶ 10; Dkt. 22-7 ¶ 9; Dkt. 22-43; Dkt. 73-1 ¶¶ 9-10; Dkt. 73-2 ¶ 27; Dkt. 73-7 ¶¶ 13, 16, 19-20; Dkt. 73-8 ¶¶ 10, 12, 13; Dkt. 73-15 ¶¶ 12, 15; Dkt. 73-17 ¶¶ 8-9; Dkt. 73-21 ¶ 6; Dkt. 73-23 ¶ 16; Dkt. 73-25 ¶ 4; Dkt. 73-27 ¶ 10; Dkt. 73-29 ¶ 8; Dkt. 73-10 ¶ 11; Dkt. 73-6 ¶ 21.

assembled crowd to leave a designated area (where a broader dispersal order was authorized). *See* Dkt. 22-32 ¶¶ 22-33, 38-43, 55, 63-65, 100; Dkt. 77-2 ¶¶ 58-60.

Such individual warnings and broad dispersals must be appropriate and authorized in the first place because "[a]ccess to the streets, sidewalks, parks, and other similar public places for the purpose of exercising First Amendment rights cannot constitutionally be denied broadly." *Grayned v. City of Rockford*, 408 U.S. 104, 117 (1972) (citations, quotations, and alterations omitted). Agents' "undifferentiated fear or apprehension of disturbance" on display here "is not enough to overcome the right to freedom of expression." *See id.* (citation omitted).

Defendants lack the broad authority they claim to disperse people. Defendants argue that they can order and force crowds to disperse as part of Operation Midway Blitz because of 40 U.S.C. § 1315 (a narrow statute about protecting federal *facilities*), and an inherent *implied* protective power under *In re Neagle*, 135 U.S. 1, 64-68 (1890). *See* Dkt. 173 at 6. But § 1315 is best read to permit lawful dispersals only very close to federal property, not as a source of roving police power. *See Index*, 977 F.3d at 831-32; *L.A. Press Club*, 2025 WL 2658327, at *20. In fact, the DHS commanding officer overseeing the Portland mission in *Index* explained that § 1315 dispersal power extends no more than a block from a federal facility. *See* Ex. 141 (*Index*, Gabriel Dep.) at 59.

Defendants' reliance on *In re Neagle* is also misplaced. A central rule in our federalist system is that the general "police power" is one in "which the Founders denied the National Government and reposed in the States." *Illinois*, 2025 WL 2937065, at *7. The *In re Neagle* Court implied a narrow exception for the "power of the president to take measures for the protection of" a Supreme Court justice "while in the discharge of [his] duties," such that a U.S. marshal could protect the justice "threatened with a personal attack which may probably result in

his death." 135 U.S. at 67. But such implied executive power must be construed narrowly. *See Medellin v. Texas*, 552 U.S. 491, 524 (2008) (applying *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), framework). The implied power does not, as Defendants claim, permit federal officers to do what local police do: disperse crowds, enforce traffic rules, and the like. Defendants can enforce Title 8, and they can make arrests (with probable cause) for violations of 18 U.S.C. § 111. But federal agents lack the type of authority to disperse crowds and use severe force to do so, further establishing Defendants lack of compelling interest and narrow tailoring.

Where individual warnings or broader dispersals are appropriate and authorized, they must be audible, clear, and provide opportunity to comply. *See Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011); *Barham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006). But Defendants repeatedly failed to warn or de-escalate and they provide meager support for even attempting to do so.[15] Although some agents told people in front of them to "move back" or "back away," e.g., Dkt. 73-9 ¶13; Dkt. 22-12 ¶ 22, that is not an actual warning of force or a legitimate order to disperse from the protest.

Instead, their actions appear designed not to improve public safety but to impermissibly chill speech, harming Plaintiffs and the Class not just when they are attacked but also by engendering fear that Defendants will attack them again. This pattern of not employing standard warning, wait time, and de-escalation techniques used in a protest policing context exposes Defendants' failures at each step of the First Amendment analysis. They lack a compelling public safety rationale, because Defendants ignore that warnings and de-escalation will improve public

---

[15] *See, e.g.*, Dkt. 22-2 ¶¶ 34-41; Dkt. 22-1 ¶ 8; Dkt. 22-8 ¶ 20; Dkt. 22-18 ¶¶ 19-32; Dkt. 22-3 ¶¶ 7, 12-13; Dkt. 22-11 ¶ 9; Dkt. 22-6 ¶ 23; Dkt. 22-16 ¶ 42; Dkt. 22-19 ¶ 22; Dkt. 22-20 ¶¶ 27-30; Dkt. 22-22 ¶ 13; Dkt. 22-12 ¶ 27; Dkt. 22-24 ¶¶ 8, 11; Dkt. 22-9 ¶¶ 13-14, 17-19; Dkt. 22-5 ¶ 8; Dkt. 22-7 ¶¶ 7, 10; Dkt. 22-23 ¶ 15; Dkt. 73-8 ¶ 15; Dkt. 73-9 ¶¶ 38-45; Dkt. 73-15 ¶ 19; Dkt. 73-17 ¶ 15; Dkt. 73-28 ¶ 16; Dkt. 73-19 ¶¶ 24-26; Dkt. 73-23 ¶ 20; Dkt. 73-12 ¶¶ 7-12; Dkt. 73-6 ¶ 41; Dkt. 77-1 ¶ 26.

safety not detract from it; their use of force absent warning and de-escalation is not narrowly tailored; and attacking demonstrators instead of giving them a reasonable opportunity to express their views does not "leave open ample alternative channels for communication." *See McCullen*, 573 U.S. at 477.

### 5. Defendants' Dispersals of Journalists Are Unconstitutional

Uncensored reporting is essential to government accountability and transparency. Journalists allow "citizens 'to see, examine, and be informed of their government,' not just for its own sake but so as to enable citizens to form their own judgments on matters of public concern…." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 614 (7th Cir. 2021) (quoting *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 599–600 (7th Cir. 2012)). Protecting objective reporting on Operation Midway Blitz is of urgent concern both because of the serious abuses of government power and because of the extent to which the government has consistently misrepresented what is actually happening in Chicago. The press "role is particularly critical, where, as here, the federal government is engaged in sudden and secretive immigration raids, which the public has limited opportunity to observe firsthand and so must "'rel[y] necessarily upon the press to bring to [it] in convenient form the facts of those operations.'" *Los Angeles Press Club v. Noem*, 2025 WL 2658327, at *20 (C.D. Cal. Sept. 10, 2025) (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975)). Independent newsgathering is indispensable to clear public understanding of ICE and CBP activities in this District.

Defendants make the extraordinary argument that because protests are not "government proceedings" there is no press right to access them at all, R. Doc. 173 at 32, and then that because there is no right to access "violent protests" the government's decision to disperse Journalists from protest sites need not be narrowly tailored to accomplish a government interest. *Id*. at 34. This is wrong as a matter of law. Journalists herein seek to report on public events

occurring in the most traditional of public fora—streets and sidewalks in the Northern District of Illinois. The burden on Journalists' protected First Amendment activity in that public fora is subject to strict scrutiny if content based, and intermediate scrutiny if a content neutral time, place and manner restriction, according to the very case upon which Defendants rely, *John K. MacIver Institute for Public Policy, Inc. v. Evers*, 994 F.3d at 609. Defendants' novel argument that banning media and targeting press with projectiles and chemicals is not subject to constitutional scrutiny must be rejected by this Court. Defendants' attacks on Journalists are viewpoint-based, Dkt. 86 at 17-18, and strict scrutiny must be applied.

Defendants offer a red herring that Journalists in this case are seeking a "special rule" preventing them from dispersing, in contravention of the legal principle that Journalists have no greater rights of access than the public. Dkt. 173 at 32-33. First, Plaintiff Journalists' proposed remedy does not seek a blanket rule, but rather seeks to have their constitutional rights protected to the fullest extent possible. *See* Proposed Injunction. But second, Defendants' attempt to overlay a broad proposition conflating Journalist and protester "access" confuses the law and turns the constitutional presumption on its head.

The cases articulating that the media has no greater right of access than the general public pertain *to access of a non-public forum*. If the public does not have a right to be in a *non-public* place *because the information there is rightfully designated as non-public* (e.g., grand jury proceeding, judicial conferrals, non-public parts of government buildings, executive sessions of government bodies) the press has no right to be there either. The cases upon which Defendants rely simply stand for the proposition that if information and place is rightly deemed *private* by the government, the press has no special right to access it. *MacIver Institute*, 994 F.3d at 609 ("There is no question that a traditional public forum is not at issue in this case….").

26

Journalists in this case are reporting from traditional public fora of streets and sidewalks, where information is public and they lawfully have a right to be engaged in the protected activity of newsgathering. *Boos,* 485 U.S. at 318. Journalists herein are not arguing for "special access" to a non-public forum; they are arguing that their removal from a traditional public forum must be subjected to exacting constitutional scrutiny. The government cannot close a traditional public forum to all expressive activity, *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983); *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 496 (9th Cir. 2015), and restrictions on speech in a traditional public fora are subject to rigorous scrutiny.

The burden of showing that the press can be constrained lies with the government. The Journalists as a subclass are advancing rights separate and apart from the main Protester class claims. If Defendants seek to ban media from a public forum, and to target media with weapons, they must explain why those policies meet constitutional scrutiny. This is not providing "special privileges," it is requiring Defendants to justify silencing this subclass's speech in particular, separate from whatever justifications may exist for other classes of plaintiffs, because the nature of the conduct in which they are engaged and the government interest and tailoring for each subclass is distinct. Defendants seek not only to silence any dissent, but go a step further and would prevent press record of the government's abuses. The First Amendment does not allow our public squares to be secreted away. As have other courts, this Court should affirm the crucial role of the press in these matters and reject the government's assertion that dispersing the press is essential to its interests. *Index*, 977 F.3d at 831; *LA Press Club*, 2025 WL 2658327, at *20.

### 6. Plaintiffs' Retaliation Claims Are Compelling

Defendants argue that (1) Plaintiffs were not engaged in protected activity and (2) have presented insufficient evidence of retaliation. Both arguments fail. First, Plaintiffs' evidence is

unrebutted that they were engaged in lawful, protected activity (protesting, praying, recording, or newsgathering) when they were gassed, shot, falsely arrested, or otherwise subjected to violence.

Second, on the sufficiency of Plaintiffs' evidence of retaliation, Defendants simply ignore the wealth of evidence of retaliation, including dozens of declarations supporting Plaintiffs' case. *See* Dkt. 86 at 27-29; Dkt. 22 at 24-31. What, for example, was the public safety need for shooting Reverend Black in the head with pepper balls he "extended [his] arms … in a traditional Christian posture of prayer and blessing" and "urged the ICE officers to repent and to believe the Good News that the Kingdom of God is near"? *See* Dkt. 22-44; 22-1 ¶¶ 4-5. What was the public safety need for shooting Plaintiff Held in the groin as he was doing his job as a journalist? Dkt. 22-18 ¶¶ 17-18. In addition, what was Bovino's comment "what did you say" followed by tackling Scott Blackburn to the ground who, while assenting to his command also swore at Bovino, other than retaliation for protected speech?

In ignoring this damning evidence, Defendants suggest that Plaintiffs must prove that "*every* interaction" with federal agents resulted in force used against them. Dkt. 173 at 38. This cannot be true, and Defendants cite no authority in support. Plaintiffs need only show that their First Amendment activity was a motivating factor in an adverse action, not that every single action was the same type of retaliation. *See Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) (a plaintiff need only show "adverse action was taken against him" and "his protected conduct was at least a motivating factor of the adverse action"). Plaintiffs have met this burden.

Defendants also argue that crowd control devices (such as tear gas) are designed to disperse widely and thus "incidentally" affect nonviolent protesters or journalists. That does not help its argument, and in fact confirms an injunction is needed to protect Plaintiffs from further abuse. Violent individuals in an otherwise peaceful crowd can be arrested, and using military

28

munitions against the group for the acts of an identifiable person is the precise problem complained of here. Defendants' decision to use tear gas without regard for bodily integrity or safety of the many people nonviolently exercising their rights is circumstantial evidence Plaintiffs' speech is a motivating factor for Defendants' actions. *See* Dkt. 22-32 ¶ 42.[16]

## B.      The Right To Exercise Religion Has Been Substantially Burdened

The Religious Exercise Plaintiffs ("REPs") are likely to prevail on their Free Exercise and Religious Freedom Restoration Act claims. Defendants do not dispute that the faith of the REPs calls on them to pray, sing, and preach at DHS enforcement actions, nor do they dispute these plaintiffs do so for the spiritual benefit of detained migrants and their families, federal agents, and community members.[17] Plaintiffs engage in these practices nonviolently, but Defendants have targeted them with pepper balls, physical force, and chemical munitions. Dkt. 86 at 31-32. This unjustified use of force and hostility to religious practice puts substantial pressure on the REPs to modify their religious behavior in violation of the law. *Id.* at 32-33.

Although the government denies interfering with the REPs' ability to practice their faith, Defendants fail to refute Plaintiffs' actual evidence.[18] Defendants do assert that their actions are narrowly tailored to achieving a compelling interest, but this assertion is demonstrably false, as explained above. Far from being narrowly tailored, Defendants' actions violate Congress's criminal prohibition on "intentionally obstruct[ing], by force or threat of force, . . . any person in

---

[16] The cases cited by Defendants (Dkt. 173 at 40) are so factually inapposite they require no discussion.

[17] Instead, Defendants litigate against a straw man by contending that the REPs are trying to use their religious beliefs to dictate "the government's internal procedures"; are "intermixed" with "unlawful, obstructive or violent conduct"; seek "special access to unlawful demonstrations"; and have ample alternative means of practicing their faith. Dkt. 173 at 42-44. Defendants cite *no evidence* in support of these propositions. *Id.* Nor can they, as such claims are not supported by the record in this case. *See generally* Dkts. 22-1, 22-2, 22-3, 73-14, 22-14, 22-4.

[18] The government cites to the Hott and Parra declarations for "full context." Dkt. 173 at 42. As explained at length above, these declarations are unreliable and unsupported. But in any event, they do not contradict Plaintiffs' evidence showing Defendants' targeting of religious practitioners with unjustified and excessive force. *See* Dkt. 173-1 ¶¶ 14-39; Dkt. 173-2 ¶¶ 13-28.

the enjoyment of that person's free exercise of religious beliefs." 18 U.S.C. § 247(a)(2); Dkt. 86 at 33 n.8. Defendants can have no legitimate interest in the gratuitous, unjustified violence deployed against the REPs when the law makes such violence a felony. The REPs simply want the government to stop targeting them with pepper balls, tear gas, and other violence while they exercise their rights to peacefully pray, preach, and proselytize in a public space.[19] For the government to suggest, literally at gun point, "you can pray wherever you want, as long as it's not here" violates the law. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 512 (2022).

## III. Plaintiffs Have Submitted Overwhelming Evidence of Ongoing Violations of the Fourth Amendment

### A. Plaintiffs Claims that Defendants Uses of Weapons of War and other Violence is Unconstitutional Are Likely To Succeed

The government points out that the text of the Fourth Amendment includes a right of people to be *secure* in their persons. Dkt. 173 at 48. By its own text, the Fourth Amendment embraces a right to bodily integrity. *United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000). Infringement of that right must be adjudged on the Fourth Amendment's "reasonableness" standard and not substantive due process standards. *Graham v. Connor* itself so held in reversing the lower court's application of a substantive due process rule to "make explicit … that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. 386, 395 (1989).[20]

---

[19] Cases involving abortion protesters illustrate this point. Though RFRA does not give believers the right to engage in violence or to obstruct others, it does protect the right to nonviolently object on religious grounds. *See Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995); *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995). Here, by contrast, the government seeks to restrict nonviolent, non-obstructive religious activity, in violation of RFRA.

[20] The government overreads *Torres v. Madrid*, 141 S. Ct. 989, 991 (2021), a case about shooting guns at someone who is shot but still escapes. The *Torres* Court specifically limited its decision to instances where (1) deadly force is

Applying *Graham,* and cases previously cited but not discussed by the government, *e.g.*, Dkt 212 at 345-35, myriad courts have recognized that the Fourth Amendment standard governs so-called less lethal devices, like pepper spray, tear gas, flash bang grenades and other items in Defendants' coffers of military-grade munitions. *See, e.g.*, *Phillips v. Cmty. Ins. Corp*., 678 F.3d 513, 521 (7th Cir. 2012) (discussing "less-lethal" munitions, including "impact weapons," and noting that "pepper spray, tasers, or pain compliance techniques" are also considered under the Fourth Amendment); *Est. of Escobedo v. Bender*, 600 F.3d 770, 786 (7th Cir. 2010) (clearly established that unreasonable use of tear gas and flash bang grenades absent a threat was unconstitutional under the Fourth Amendment); *Medrano v. Garland*, 2024 WL 1348252, at *4 (S.D. Ind. Mar. 29, 2024) (assessing use of tear gas under Fourth Amendment); *Backes v. Vill. of Peoria Heights*, 2010 WL 4568773, at *8 (C.D. Ill. Oct. 28, 2010) (same and collecting authorities); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996) (analyzing officer's use of pepper spray into a crowd of protesters exercising their First Amendment rights under the Fourth Amendment, and denying qualified immunity for so doing); *Bernal v. Johnson*, 2014 WL 4976212, at *4 (N.D. Ill. Sept. 25, 2014) (pepper spray constitutes physical force).

Here, Plaintiff's excessive force claims include being shot with pepper balls (including from above and in the head and upper body); being pepper sprayed (again, sometimes directly in

---

involved and (2) that force is "used to apprehend." *Id.* *Torres* was explicit its analysis did not concern other types of force, including crowd-control munitions like "pepper spray, flash-bang grenades, lasers, and more." *Id.* In addition, even assuming *Torres* had any applicability here, the Court made clear that weapons that in fact impact someone's body are analyzed under the Fourth Amendment. *See id.* at 995 ("As Justice Scalia explained for himself and six other Members of the Court, the common law treated 'the mere grasping or application of physical force with lawful authority' as an arrest, 'whether or not it succeeded in subduing the arrestee.'" (quoting *California v. Hodari D*., 499 U.S. 621, 625 (1991)). Indeed, under the common law "merely touching" was sufficient to constitute an arrest. *Hodari D*., 499 U.S. at 625. For that reason, *Torres* reaffirmed, "the Court explained in *Hodari D.,* "[a]n arrest requires *either* physical force … or, where that is absent, *submission* to the assertion of authority." 141 S. Ct. at 995 (quoting *Hodari D*., 499 U. S., at 626 (emphasis in original)). Here, there is no question that Plaintiffs were all either subject to physical force (e.g., being gassed, pepper balled, etc.), or submitted to that authority, including by leaving and dispersing as Defendants intended. Plaintiffs inhaled chemicals into their lungs, felt it in their eyes, nose, and throats, or were physically impacted by pepper balls. The chemical irritants cause physical effects on Plaintiffs' bodies. *See* Dkt. 22-33 ¶¶ 23-25, 29-31, 33, 37-41, 45.

the head); being tackled, shoved, beaten, choked, and otherwise subject to excessive hands-on tactics; and being subject to tear gas, including gas canisters fired as projectiles.[21]

Defendants' only argument is that Plaintiffs were in a crowd of people where someone allegedly did something violent and so it was perfectly permissible for the government to rain down on them with a torrent of violence and military-grade munitions. Fortunately, as even Defendants' cited authority shows, that is not the law. *See Puente*, 123 F.4th at 1057-61 (assessing protesters' claims of excessive force individually).

This argument reflects the government's refusal to acknowledge its sins. As explained above, indisputable video shows unconscionable force against Scott Blackburn, David Black, and people being subject to tear gas throughout this District.[22] Plaintiffs are likely to prevail on their Fourth Amendment claims, which challenge myriad violence, including deadly force."[23]

---

[21] Given controlling Seventh Circuit authorities cited here, the portion of Ninth Circuit's decision cited by the government, *Puente v. City of Phoenix*, 123 F.4th 1035, 1054 (9th Cir. 2024), is unpersuasive on the question of whether firing tear gas constitutes a seizure. For one, Puente's discussion is only about tear gas in the context of class claims, not individual claims. See id. at 1057. Plaintiffs' claims include individual instances of inhaling tear gas, and being subjected to tear gas and pepper balls fired as projectiles, which are not contemplated by Puente's class analysis, as other Ninth Circuit decisions have recognized. *See, e.g., Cheairs v. City of Seattle*, 145 F.4th 1233, 1243 (9th Cir. 2025). Even assuming Puente's class analysis were somehow relevant, the decision never discusses that Torres specifically declined "to opine on matters not presented" in that case; i.e., "pepper spray, flash-bang grenades, lasers, and more." 141 S. Ct. 998. Nor did Puente address the right of security—and bodily integrity—that is included in the Fourth Amendment. Finally, if the Court were to find Puente's class-claim application of Torres relevant, doing so would contradict the bedrock principle that subjective intent plays no role in the Fourth Amendment analysis. An officer's "intent to restrain" is analytically relevant only insofar to ensure that the force is not accidental, since the Supreme Court has separately held that negligence is below the threshold for constitutional violations. *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). Apart from that consideration—not at issue in here—subjective intent is a different, irrelevant type of intent. *Puente* notwithstanding, it remains the fact that "the defendant's state of mind is not a matter that a plaintiff is required to prove," *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015), and so what an agent was trying to achieve or had in mind when they fired their weapons at Plaintiffs remains irrelevant.

[22] Even if a "shocks the conscience" standard were to apply to part of this claim (the tear gassing), Plaintiffs are still likely to prevail. Plaintiffs and others—like children, babies, obvious press, praying clergy, etc.—are being subject to tear gas while agents laugh away. Defendants' actions—which are thankfully unprecedented for DHS—are truly unconscionable.

[23] Shooting impact munitions—like the pepper ball guns—at someone's head or face is deadly force under ICE policy. Ex. 142 (ICE use of force policy) at ICE 24 (defining deadly force to include "[a]ny use of impact weapons to strike the neck or head"). That is precisely what happened to David Black and others when he stood, arms open, protesting in front of Broadview. Dkt. 22-45. Likewise, the record shows Defendants have used chokeholds against protestors who posed no threat of death or imminent bodily harm to anyone. *E.g.*, Dkt. 118-1 ¶ 7; The Independent,

**B.  Because Arresting People for Exercising Their Constitutional Rights Is Obviously Unconstitutional, Plaintiffs Are Likely To Prevail on their False Arrest Claims**

In their Opposition, Defendants do not even attempt to justify the arrests cited in Plaintiff's motion for preliminary injunction. Instead, they argue generically that the arrests were prompted by confrontations with "large crowds in highly volatile" and "rapidly evolving situations." Dkt. 173 at 47. But this one-size-fits-all explanation fails to satisfy the "fact-intensive" probable cause inquiry. *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995). The lacking justifications confirm that Defendants are using 18 U.S.C. § 111 as a catch-all provision to criminalize protected First Amendment activity with which they disagree.

As ordered by this Court, Dkt. 146, Defendants produced a chart purporting to list all arrests made since September 2, 2025. *See* Ex. 143 (Chart of Arrests). There are several known arrests missing from that chart, and Plaintiffs understand that a number of people have been zip-tied or handcuffed, held by federal agents, and then let go, apparently without any paperwork from that event. *See* Dkt. 73-9 ¶¶ 14-37 (Munoz detailing his false arrest but his name is missing from Defendants' chart); Dkt. 73-18 ¶¶ 21-23 (Blackburn); Dkt. 73-3 ¶¶ 10-18 (Toerpe). In short, there are reasons to doubt the numbers presented in this chart.

Setting aside the unknown number of omissions, Defendants' chart shows ninety-two arrests under 18 U.S.C. § 111. According to this record, twenty-six out of ninety-two, or nearly 30% of arrests since September 2, did not result in indictments. This unusually high number of arrests that do not lead to an indictment supports an inference—particularly with direct evidence of Bovino conducting a retaliatory arrest and the threats of arrest (or worse) made by agents—

---

*ICE Agent Appears to Put Woman in Chokehold During Protester Clashes*, YouTube (Sept. 25, 2025), available at https://www.youtube.com/watch?v=Dzm_b4FZ47c. That, too, is contrary to policy, Ex. 142 at ICE 22-24; Dkt. 35-10 (CBP policy) at 14, and it constitutes deadly (and excessive) force. *Tennesee v. Garner*, 471 U.S. 1, 7 (1985); *Carlson v. Bukovic*, 621 F.3d 610, 621 (7th Cir. 2010).

that Defendants are arresting people and releasing them a few hours later to suppress and deter the protected activities in which those people were engaged. Indeed, the government's claims that a protestor, Cole Sheridan, attacked Bovino have not panned out, and the case against him was dismissed. Exhibit 144.

Plaintiffs submitted video and testimonial evidence supporting their claims, which stands unrebutted. *See* Dkt. 82 at 34-36. There is now more evidence showing Plaintiffs are likely to prevail on the merits, including from the depositions of Hott and Bovino. Hott—shockingly—answered "No" when asked if he agreed "agree that it's unconstitutional to arrest people for being opposed to Midway Blitz?" Ex. 101 at 155. Similarly, Bovino testified that he has instructed his officers to arrest protesters who make hyperbolic comments in the heat of political demonstrations, Ex. 100 at 193-97, even though such statements—which do not constitute true threats—are protected speech. *See Watts v. United States*, 394 U.S. 705, 708 (1969).

## IV. Defendants Have Caused, and Continue to Inflict, Irreparable Harm

The government cannot seriously contend that the risks of irreparable harm are not present here—people in this District now live under the threat of the infliction of tear gas and pepper ball bullets for exercising their First Amendment rights or of being, by happenstance, in the proximity of others exercising such expression. These harms are ongoing.

Not only is irreparable harm presumed for First Amendment and RFRA claims, *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450-52 (7th Cir. 2022), *Korte v. Sibelius*, 735 F.3d 654, 666 (7th Cir. 2013), the evidence overwhelmingly shows that irreparable injury is occurring on a nearly daily basis; protesters hesitate in speaking out, bystanders afraid to record, and children now terrified to participate in outdoor parades.

Defendants mistakenly argue that irreparable harm cannot be presumed because Plaintiffs have not shown a likelihood of success on the merits of their claims. That contention is belied by

34

the law and record in this case, including this Court's prior findings, Dkts. 43, and the evidence submitted since then. Even though the TRO was ordered more than three weeks ago, federal agents, wearing masks and no identifiers, have continued to deploy excessive force indiscriminately against individuals exercising their First Amendment rights. This has occurred at the Broadview facility, Little Village, Old Irving Park, and Lakeview neighborhoods, Aurora, Evanston, and beyond. Federal agents have repeatedly deployed tear gas and other riot control weapons against crowds of non-violent protesters, without warning, and have physically assaulted demonstrators and journalists that were observing or recording police conduct.

The evidence further shows that Defendants' conduct has curtailed or burdened protected speech, *see* Dkt. 21 at 38-39 (collecting sources), and continues to chill protected expression throughout the district. *See*, *e.g.*, Dkt. 73-8 ¶ 15; Dkt. 73-9 ¶¶ 38-45; Dkt. 73-15 ¶ 19; Dkt. 73-17 ¶ 15; Dkt. 73-23 ¶ 20; Dkt 73-12 ¶ 13; Dkt. 77-1 ¶ 26. Individuals have been forced to alter their protected First Amendment activity by, *e.g.*, refraining from returning to protests or recording agents, out of fear of retaliation by the Defendants. This is precisely the type of impinged and interrupted expression that constitutes irreparable harm. *See* Dkt. 86 at 39-40.

Finally, as explained above, the likelihood of irreparable harm here is not merely speculative, and *Lyons* does not impact the analysis, given the nature of Plaintiffs' First Amendment claims. In addition, the Fourth Amendment injuries suffered here—from indiscriminate uses of tear gas, pepper balls being shot at people's body's and heads, and other violence by roving patrols of agents intent on continuing this conduct for an untold period of time—constitute irreparable harms. *See* Dkt. 86, at 40-41.

## V.    The Balance of Equities Overwhelmingly Demands Injunctive Relief

Defendants have failed to demonstrate that a preliminary injunction would cause them injury that outweighs the irreparable harms they continue to inflict on Plaintiffs. "Where, as here,

free speech is at stake, the law places a heavy thumb on the scale favoring injunctive relief. Indeed, an injunction that protects First Amendment freedoms is always in the public interest." *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 472 (7th Cir. 2024) (cleaned up) (citation omitted). Moreover, courts in this Circuit "weigh[s] the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). Defendants have not come close to showing hardships of sufficient magnitude to outweigh Plaintiffs' overwhelming evidence of ongoing First Amendment harms.

Defendants assert their interest in protecting federal property and personnel, Resp. Br. at 52-53, but fail to explain how the proposed relief impairs those interests. At most, Defendants claim, without evidence, that an injunction "will and has already created confusion and hesitation for law enforcement," citing Daniel Parra's "belie[f]" that under the TRO, "agents are improperly hesitating before they can appropriately deploy less lethal munitions." *Id.* at 53. But they do not provide a single instance where a federal agent failed to use force when it was necessary and appropriate while the TRO has been in effect.

Further, the proposed preliminary injunction does not prevent Defendants from responding to actual violence or threats of violence. Like the TRO, it applies only to class members, who encompass those who "*non-violently* demonstrate, protest, observe, document, or record." Dkt. 81 at 2. As discussed in Part VI, *infra*, its requirements extend only as far as necessary to protect Plaintiffs' constitutional rights while allowing Defendants to do their work. Bovino even contended that, despite the TRO, his operations "continue unabated," and that the "temporary restraining order and the meetings with the judge and all the other accouterments that

36

comes with what her orders are, will have no effect on Operation Midway Blitz, the Border Patrol, ICE, and those allied law enforcement teams."[24] *See* Ex. 100 at 94-95.

The equities are overwhelmingly lopsided in favor of an injunction.

## VI.    The Scope of Injunctive Relief Plaintiffs Seek is Necessary and Proper

The government attempts two points, without substantial discussion, regarding scope.

**First**, the government again makes passing reference to *Trump v. CASA*, 606 U.S. 831 (2025). Dkt. 138 at 54. This is insufficient. If the government really contends that *CASA* is at issue, then it, at minimum, must attempt to explain why this Court's prior analysis at the TRO stage, Dkt. 43 at 9-10, does not apply here. In addition, Plaintiffs noted that both the motion for class certification and necessity of an injunction providing complete relief warrants a district-wide injunction. Dkt. 86 at 45 & n.45. These include the impact of class certification motion, and Plaintiffs' arguments about complete relief to themselves requiring an injunction that will benefit non-parties. *Id.* Again, the government has no response.

While class certification would alter the landscape with respect to *CASA*, *see* Dkt. 43, at 10 n.4, Plaintiffs would still be entitled to the same relief—and that relief would be consistent with *CASA*—even if the Court were not able to resolve that motion before issuing an injunction or even if certification were denied. The injunction sought here is necessary to provide complete relief to Plaintiffs themselves. *Id.* The Seventh Circuit has long acknowledged both the limits of *CASA* and the propriety of injunctive relief where, as here, "it is not possible to award effective relief to the plaintiffs without altering the rights of third parties." *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) (Easterbrook, J.).

---

[24] The Faulkner Focus, FOX NEWS (10/29/25), available at https://www.foxnews.com/video/6384251017112, 6:55.

Applying these rules, Judge Kennelly recently issued an injunction, explaining, "Courts, including the Supreme Court, have long recognized that a plaintiff may bring a facial First Amendment challenge, 'not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the [challenged law]'s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Chicago Women in Trades v. Trump*, 2025 WL 3034056, at *6 (N.D. Ill. Oct. 30, 2025) (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984). Such a challenge, if successful "justifies an 'expansive remedy…suspending all enforcement of the challenged law, to protect "an uninhibited marketplace of ideas' and 'reduce the [] social costs caused by the withholding of protected speech.'" *Id.* at *6 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)). A "court may enjoin enforcement against nonparties to 'administer complete relief *between* the parties.'" *Id.* at *4 (quoting *CASA,* 606 U.S. at 851).

These rules are dispositive here. For one, the types of munitions involved are not discriminating between people; tear gas cannot be deployed in a crowd and somehow miss the named plaintiffs. In addition, part of the harm at issue is the impact on speech: people are afraid to protest or even record from a distance if there is a risk that masked paramilitary agents will arrest, pepper ball, gas, threaten, or beat them. Part of the terror, indeed, is seeing the spectacle violence meted out against similarly situated individuals who have committed no violence. The only way to solve that problem—chilled speech and a burden on the right to assembly—is to preclude Defendants from doing these acts to anyone. Thus, as in *Women in Trades*, enjoining Defendants' actions throughout this District is necessary to protecting the plaintiffs, and the "benefit to the covered nonparties is incidental to that need." *Id.* at *5.

**Second**, the government argues that any injunction would be unworkable, too burdensome, and micromanaging. It is mistaken. Plaintiffs' proposed order (hereto Ex. A) is tailored to address the pattern of constitutional violations, is workable, and is not, as the government argues, "micromanaging." Dkt. 173 at 54. The order restrains agents' pattern of unlawful force against Plaintiffs, while recognizing in repeated "unless" clauses that agents still can act decisively when necessary to stop violent individuals threatening public safety. It includes discrete compliance and factual record-building provisions to ensure accountability given Defendants' repeat TRO violations. This "prospective relief . . . fits the remedy to the wrong … established." *Salazar v. Buono*, 559 U.S. 700, 718 (2010).

The order is also workable. Dkt. 22-32 ¶¶ 120-139. Despite many opportunities to identify potential workability issues, Defendants have failed to do so. Dkt. 75 (10/20/25 Hrg. Tr.) at 32-33; Ex. 100 at 92-95; Ex. 122 at 97-108; Ex. 101 at 154-55). Given Bovino's judicial admission the TRO is not hard to implement, *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996), the claim that the injunction is unworkable is baseless.[25]

Nor is the proposed order "micromanaging" like the injunction questioned in *Rizzo*, which "significantly revis[ed] the internal procedures" of a police department by imposing several "prophylactic" administrative and complaint-handling measures. 423 U.S. at 378. The *Rizzo* Court did not disturb the district court's other injunction that "restrain[ed] the police from violating the constitutional rights of citizens in certain enumerated respects," which is in line

---

[25] The order is also analogous to many of the injunctions issued after the summer 2020 protests, without apparent workability concerns. *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216 (S.D. Ohio 2021), *modified* 2021 WL 3375834 (S.D. Ohio June 25, 2021); *Breathe v. City of Detroit*, 484 F. Supp. 3d 511 (E.D. Mich. 2020), *order clarified*, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020); *Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020); *Black Lives Matter Seattle-King Cnty. v. Seattle Police Dep't*, 466 F. Supp. 3d 1206 (W.D. Wash. 2020); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150 (D. Or. 2020); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066 (N.D. Cal. 2020); Dkt. 1099, *In Re: New York City Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (S.D.N.Y. 2023) (settlement agreement, perma.cc/6QFX-QP58).

with the proposed order here. 357 F. Supp. 1289, 1319 (E.D. Pa. 1973); *see also Gilligan v. Morgan*, 413 U.S. 5, 10-12 (1973) (questioning order superintending "the composition, training, equipping, and control" of the force while emphasizing that the Court was not addressing "a restraining order against some specified and imminently threatened unlawful action").

## VII. The Court Should Not Grant a Stay or Require a Bond

Because the standards necessary for obtaining an injunction mirror those for a stay pending appeal, *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014), a stay is unwarranted. In addition, because the real harm here is rampant violations of Plaintiffs' rights, waiver of the bond or a nominal bond is appropriate. *See* Dkt. 43 at 9-10.

### CONCLUSION

A preliminary injunction is warranted, and Plaintiffs' motion should be granted.

DATED: November 3, 2025                    Respectfully submitted,

                                    By:    /s/ David B. Owens
                                            *Counsel for Plaintiffs*

Jon Loevy                                Craig B. Futterman
Locke Bowman                         **MANDEL LEGAL AID CLINIC**
Steve Art                                University of Chicago Law School
Heather Lewis Donnell              6020 S. University
Theresa Kleinhaus                     Chicago, IL 60637
Scott Rauscher                          (773) 702-9611
Matt Topic                               futterman@uchicago.edu
Julia Rickert
Tara Thompson                         Hayden Johnson*
Lindsay Hagy                           Katie Schwartzmann*
Jordan Poole                             Conor Gaffney*
Dominique Gilbert                     **PROTECT DEMOCRACY PROJECT**
Justin Hill                                 2020 Pennsylvania Ave NW, Ste 163
Aaron Tucek                             Washington DC 20006
**LOEVY + LOEVY**                 (202) 579-4582
311 N. Aberdeen Street               *\* Admitted pro hac vice*
Chicago, Illinois 60647
(312) 243-5900                           Daniel Massoglia
steve@loevy.com                       Hannah C. Marion
                                            **FIRST DEFENSE LEGAL AID**

40

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
℅ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL
RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern Pritzker
School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2224
wally.hilke@law.northwestern.edu

601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
Hirsh Joshi
Priyanka Menon
**ROGER BALDWIN FOUNDATION OF
ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org